UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KHURSTED A. CHOWDHURY           )
                                )
        Plaintiff,              )
                                )
v.                              )           Civil Action No: 07-0997 (RCL)
                                )
                                )
MIKE JOHANNS, Secretary,        )
United States Department of Agriculture  )
                                )
        Defendant.              )
                                )


**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Federal Rules of Civil Procedure, defendant respectfully submits this

Motion for Summary Judgment.

Plaintiff is a South Asian male over the age of forty whose country of national origin is

Bangladesh.  At the times pertinent to his complaint plaintiff was employed by the United States

Department of Agriculture.   Plaintiff alleges discrimination based on race, age, national origin

and reprisal, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e

et seq., and  the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.,

Specifically, plaintiff alleges that

Count 1. Defendant discriminated against him based on race and national
origin in rating plaintiff's performance unacceptable and in removing him from
federal employment.  Complaint at ¶48-52

Count 2.  Defendant treated plaintiff in a manner that was different from
younger employees, in violation of ADEA in rating plaintiff's performance
unacceptable, otherwise criticizing his performance and in removing him from
federal employment.  *Id*. at ¶ 53-56

Count 3. Because he exercised his rights under Title VII , defendant retaliated
against him  in rating plaintiff's performance unacceptable, otherwise
criticizing his performance and in removing him from federal employment.  *Id.*

at ¶ 57-61.

    Count 4.  Because he exercised his rights under the ADEA, defendant retaliated against him in rating plaintiff's performance unacceptable, otherwise criticizing his performance and in removing him from federal employment.  *Id.* at ¶ 62-65.

As set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff has failed to establish an essential element of his claims, there are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law.  Alternatively, the defendant has legitimate non-discriminatory/retaliatory reasons for its actions.  Wherefore, defendant respectfully requests that plaintiff's complaint be dismissed with prejudice as to all of his claims.

Respectfully submitted,

/s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

/s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/ Rhonda C. Fields
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KHURSTED A. CHOWDHURY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 07-0997 (RCL) |
| | ) | |
| | ) | |
| MIKE JOHANNS, Secretary, | ) | |
| United States Department of Agriculture | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF SUMMARY JUDGMENT MOTION**

Defendant respectfully submits this memorandum of points and authorities in support of his summary judgment motion.

**STATEMENT OF FACTS**

At the times pertinent to his complaint, plaintiff was employed by the United States Department of Agriculture. Complaint at ¶ 14. He was a Veterinary Medical Officer assigned, to what became the Zoonoses Disease and Residue Surveillance Division in the Office of Public Health/Food Safety and Inspection Service. *Id.* at ¶ 15.

The position description for a Veterinary Medical Officer in the Zoonoses Branch (VMO) reflected that

> The primary purpose of this position is to investigate and study potential meat and poultry borne enteric disease; determine and document their cause and extent; and, develop sound scientific, factually supported recommendations to correct and prevent such conditions. The incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health.

> The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food

borne pathogens. . . . Problems solved are extremely difficult in nature and the
results have a significant impact on program direction.

Mat Fact 3.  A VMO  was required to independently plan, coordinate and conduct studies as

assigned.  "[T]he incumbent must be flexible, enterprising, and expedient in utilizing the full range

of professional abilities. There are high requirements for good judgement and ability to

conceptualize. To accomplish this, one must utilize personal contacts, regulations, policies,

manuals, professional texts, technical publications, professional journals, and guidance from the

Branch Chief to ensure timely completion of selected projects. " *Id*.   The Position Description

also reflects that the duties involved  highly complex investigation and analysis.  *Id*.

Beginning in about March 2001, plaintiff's first line supervisor was Dr. Delila Parham.

Parham affidavit, Blue[1] at p. 50 ¶12**.**    Dr. Parham described plaintiff's performance as follows:

He did not meet deadlines and when he did provide work it nearly always had to
be rewritten.   I would have to send it back to him several times before his work
was satisfactory and then eventually I had to do it myself.

Parham affidavit, Blue at p. 51, ¶14.

His performance was never good.  Probably, there were supervisors who would
just tolerate it.   He was never rated beyond fully successful by me.

Parham affidavit, Blue at p. 51, ¶15.

Plaintiff's previous supervisor for approximately a five year period had been Dr. William

James.   James affidavit, Blue at p. 43 ¶7.  Dr. James 's description of plaintiff's performance

reflected  that it was less than stellar:

In terms of [plaintiff's] work product, he could do simple things well, but
assignments that were more complicated and required an analysis and original
thinking, he was less competent.   A great deal of time that I was his immediate
supervisor, I was on detail to other offices, so I was  not around to give him
hands on supervision.  I didn't have that many years of close supervision with
him. . . .

---

[1] Exhibits from the Report of Investigation for case number FSIS-2006-02551.

* * *

> I can't remember precisely but I probably gave him superior rating but I don't
> remember how many times I rated him myself.  He was respectful and
> professional and the projects I gave him he did in a satisfactory manner.   The
> more complicated projects were difficult for him.

James affidavit, Blue at p. 43 ¶ 8-98.  When asked why he would have given plaintiff a superior

rating, Dr. James replied

> It's been to[o] many years for me to recall, but it may have been because a
> superior rating is the most common rating at FSIS.  Not having been able to
> provide him any closer supervision than I did, I rated him according to the
> knowledge I had of his performance and it was probably influenced by what
> others who were working with him were getting.

*Id.*  at p.  44 ¶12.   Dr. Alice Thaler  also had supervised plaintiff before Dr. Parham.  Dr.

Thaler remembered that

> When he was in policy with me, I was on the verge of putting him on a
> performance improvement plan then, and that's when the reorganization
> happened.  I thought in the interim he would have developed better skills.  When
> I became Senior Director for Program Services, I discussed his performance with
> his supervisor and she did raise concern, but she wasn't to the point of putting
> him on a performance improvement plan yet.

Thaler affidavit,  Blue p. 57.

## EEO COMPLAINTS

In 2004, Dr. Thaler became Dr. Parham's first line supervisor and  plaintiff's second line

supervisor.  Complaint at ¶17.  Dr. Parham relates that

> When Dr. Chowdhury and I started working together, I had a different
> supervisor.  When Dr. Thaler became my supervisor, I told her his performance
> was not very good and she said he should go on a performance improvement plan
> (PIP).

Parham affidavit, Blue at p. 51, ¶15.   Dr. Parham verbally told plaintiff about his inadequate

performance, and, during his mid-year appraisal in December 2004, she also gave him a detailed

written account of his  work performance.   Parham affidavit, Blue at p. 51, ¶16.

**Mid-year Appraisal December 2004**

On December 8, 2004, Dr. Parham, in the presence of Dr. Robert Brewer,  met informally with Dr. Chowdhury to discuss her concerns with his unacceptable work performance.  MatFact 8.   Since Dr. Chowdhury was going to be on leave for approximately the entire month of January, 2005, it was decided that he should be given a mid-year performance appraisal prior to his leave.  *Id.*

On December 20, 2004, Drs Parham and Thaler met with Dr. Chowdhury to discuss his mid year performance appraisal.  Mat Fact 9.   At that time they gave him a memorandum outlining the reasons why his performance had been found to be unacceptable.  Mat Fact 9.

**August 2005  – Performance Improvement Plan (PIP)**

The Department of Agriculture, Food Safety and Inspection Service (FSIS) Directives set forth the requirements for placing an employee on a performance improvement plan (PIP) when his performance on a critical level falls below fully successful.  Mat Fact 10-12.  "Management may reduce in grade, remove, or reassign  employees whose performance continues to be unacceptable."  Mat Fact 12.

Plaintiff was not given a rating of record following the end of the appraisal period June 30, 2005.  Rather, pursuant to the FSIS Directive, on August 9, 2005,  plaintiff was advised that his performance continued to be at the unsatisfactory level and that he would be placed on a Performance Improvement Plan. Mat Fact 13.  This  was confirmed by a memorandum instituting the PIP dated August 16, 2005.  PIP.  The PIP noted that although he had been afforded training opportunities following his mid-year performance appraisal, plaintiff's performance had not improved.  PIP at p. 2.   The PIP set forth two examples of plaintiff's continued unacceptable performance,  under the critical elements Mission Support and Research and Analysis and the non-critical element of Communications, citing his work on a "Thinking Paper" and on the "toxoplasmosis paper."  Mat Fact 18-20.

**Thinking Paper**

On about February 25, 2005, Dr. Parham had  assigned Plaintiff to prepare a "Thinking Paper" setting forth suggestions for future work the Zoonoses Branch should undertake.   Blue 226.  On March 16, 2005, plaintiff sent Dr.  Parham a two page document listing what he described as the four most common foodborne pathogens and suggesting that the branch investigate their risk profiles.   Thinking Paper (TP) 3/16/05 attachment.   The document contained approximately seven sentences discussing one of the pathogens and no discussion of the others and lacked any references.   *Id.*   Four months later, on July 19, 2005, plaintiff sent Dr. Parham his final draft of the paper.  TP 7/19/05 attachment.   It was 11 pages long; incorporated the prior draft and discussed three other pathogens, one of which was Toxoplasmosis.   Although, as is discussed below, plaintiff was supposed to have been engaged in a project including a literature search concerning toxoplasmosis, only two references were cited in the four paragraphs devoted to toxoplasmosis.  *Id.* at p. 4.

The PIP explained, among other matters, that the "Thinking paper" was not well researched, lacked depth and did not provide adequate support for the work suggested; the drafts submitted were not comprehensive, did not provide an adequate analysis of the issues, and did not suggest an ability to design an effective study approach or utilize analytical methods and objectives.  PIP at p. 5-6.   The paper also was not timely and was poorly written.  Dr. Parham pointed out that "Some of the material lacked references, especially the section on avian influenza.  Much of the material has been lifted exactly as written from other documents. Lifting text from another manuscript without proper reference is not acceptable.  In early July you were given an opportunity to revise or modify the document but informed me that you were satisfied with the paper as written."  PIP at p. 6.

**Toxoplasmosis Paper**

Over a year after he was supposed to have begun the project[2],  plaintiff, for the first time, advised Dr. Parham in December 2004 that he had not been working on toxoplasmosis.  Blue 270-271.  He told Dr. Parham that he had been discouraged from doing a literature review and writing a review paper because of statements from Dr. Dubey.   *Id*.; plaintiff discovery response (PDR) 52-53, Chowdhury 12/17/04 memo to Parham at p. 1.  He also stated that he "almost forgot about Toxoplasmosis."   *Id.*  But plaintiff assured Dr. Parham, "Now that you are still interested in this issue . . .  I believe I can work on the project of toxoplasmosis.  I can still continue working on this issue and if you want I can formulate some idea which will be appropriate for the public health protection on the area of FSIS.   "  He further stated that at the least he would "prepare issue paper after sufficient literature survey.   After coming from my vacation in January, I can start working on this issue again."  *Id.*

Based on this,  Dr. Parham gave plaintiff a second chance: "We will consider that you are starting anew with your toxoplasmosis proposal.  Please provide an outline of what you would like to do. . . ." PDR 40 [handwritten notes and arrows, etc, on these PDR exhibits are plaintiff's notations].

By memorandum dated February 7, 2005,  plaintiff submitted a work plan concerning (A) investigating the status of developing a rapid test for T.  Gondii ("Rapid Tests"),  and ( B) investigating, inter alia, the prevalence of toxoplasma gondii infections in US meat and poultry products in the slaughter plants and assessing economic and public health impact. ("Prevalence at Slaughter")  PDR.  42.  Plaintiff estimated that he could finish his investigation of Rapid

---

[2]  In his memorandum to Dr.  Parham dated December 17, 2004, plaintiff admitted that he first volunteered to work on toxoplasmois in early 2003.  "It was I myself volunteered to work on this issue, because early 2003, I did not have much to do other than attending to some periodical working group meetings on BSE/TSE. . . .It was at that time I did express my desire to work on toxoplasmosis but I did not know what I could do . . . ." PDR 52.

Tests by the end of April and produce a concise report of his findings by the end of June 2005. *Id*. at 43. Plaintiff estimated he could finish a literature search of Prevalence at Slaughter by the end of December, 2005 and produce a final report by the end of March 2006. *Id.*

In an e-mail dated February 10, 2005, Dr. Parham followed up on her conversation that afternoon with plaintiff concerning his toxoplasmosis work plan. Concerning the Rapid Tests, she suggested that plaintiff find out how much information was available on rapid tests. She also suggested that he should be able to find answers to his questions on the topic and prepare a summary report in less than a month. Concerning Prevalence at Slaughter, she recommended, among other things, that he conduct an initial literature review to assist him in developing a "thesis" or "approach" to his paper; she felt that if that approach were approved, he should be able to complete a literature review and draft his paper much sooner than March 2006. PDR 44. She also suggested that plaintiff talk to the Risk Assessment Division about a cooperative effort on Risk assessment and contact certain identified individuals for economic information.

On February 25, plaintiff gave Dr. Parham a revised work plan, and she responded that she would try to sit down with him to discuss it. PDR 46-48. The revised work plan suggested (A) an investigation of the status of developing a rapid test for T. Gondii at slaughter plants and (B) a literature review to assess the toxoplasma situation in the United States. *Id.*

Dr. Parham orally discussed the February 25, 2005 proposal with plaintiff. Parham Dec. at ¶ 3. She told him that the paper should be a review paper, since he would not be able to do a study unless he had a collaborator that performed that kind of work. For that reason, of the topics suggested, it was discussed that it would be more feasible to pursue the second topic (B) or some aspect of it. *Id.*

By e-mail dated July 15, 2005, Dr. Parham asked for an update on the Toxoplasmosis project before plaintiff went on vacation. PDR 49. By e-mail dated July 19, 2005, plaintiff told

Dr. Parham that he thought her request for a thinking paper had replaced the toxoplasmosis project; that he had incorporated toxoplasmosis into the thinking paper but "otherwise the original toxoplasma paper remained the same."   PDR 50.  In an e-mail dated August 4, 2005, plaintiff sent Dr. Parham his updated Toxoplasma Research Project, indicating that he had been working on it since he returned from his vacation.  PDR 51.   He admitted "You are right that in words you did not tell me to replace toxo project with the Thinking paper project."    PDR 51. He again stated that he had misunderstood, and thought the toxoplasmosis project was included in the thinking paper which had been submitted on May 20, 2005.  *Id*.

Thus, it appears that two references in four paragraphs of the Thinking Paper is the only reflection of literature research concerning toxoplasmosis done and used by plaintiff during this period. TP 7/16/05 attachment at p. 4.

The PIP issued to plaintiff on August 16, 2005 explained why Dr. Parham believed the toxoplasmosis paper was unacceptable in the three elements of plaintiff's performance requirements .  Mat Fact 20.

**Tasks Required to Be Completed During PIP**

The PIP gave plaintiff three tasks to complete successfully in a 90-day period in order to show improvement to the fully successful level –  preparation of 1) a Toxoplasmosis Paper, 2) a Salmonella Serotype Paper, and 3) Bi-monthly Zoonotic Disease Surveillance reports.  Mat Fact 21.   The PIP also explained how successful completion of the tasks would demonstrate fully successful work under the applicable performance standards. *Id.*

The period of the 90-day  PIP began officially on August 29, 2005, when Dr.  Thaler met with plaintiff  to discuss the PIP.  8/30/05 memo DDR 283-284.  Therefore, the PIP was scheduled to end on about November 29, 2005.  Dr. Parham met with plaintiff on August 30, 2005, to ascertain if plaintiff had any questions concerning the PIP.  *Id.*

On August 11, 2005 (after he had been advised on August 9, 2005 that his performance was unacceptable and he was going to be put on a PIP), plaintiff had made an informal EEO complaint concerning his unsuccessful performance rating. EEO counselor report at p. 2; Settlement agreement. On October 11, 2005, plaintiff signed a settlement agreement with the agency which, among matters, allowed a) submission of the Salmonella Serotype Paper and Zoonotic Disease Surveillance Report by the end of November 2005; b) an extension to submit the Toxoplasmosis Paper no later than December 31, 2005; c) submission of a substantive progress report that includes updates on the three PIP projects on a weekly basis, in lieu of a daily journal, and d) a 90-day detail, contingent upon his successful completion of the PIP. Settlement agreement at p. 1. Plaintiff agreed to "release, waive and withdraw all concerns, complaints. . .civil actions against the Agency . . . for any concerns arising out of these (or related) employment situations prior to the signing of the agreement." Settlement Agreement at p. 2.

**Unsatisfactory Rating after PIP**

On February 8, 2006, plaintiff received his final evaluation for July 1, 2004 to June 30 2005; the rating was unsuccessful. Mat Fact 43. By memorandum dated February 8, 2006, Dr. Parham advised plaintiff that his performance rating remained at the unsuccessful level, because he had failed to complete the PIP successfully. *Id.*

Plaintiff had submitted an acceptable final product for the assignment to compile a bimonthly report on zoonotic and emerging diseases. But the Toxoplasmosis and Samonella Serotypes papers did not meet the fully successful level for the three applicable performance standards. Mat Fact 44-47.

Plaintiff made initial contact with an EEO counselor on February 9, 2006. Brown EEO counselor report. He challenged the rating received following completion of the PIP. *Id.* at p. 2;

3/7/06 Complaint.  Gould letter at p. 2-3; Bradshaw memo.

**Termination of Employment**

On May 22, 2006, plaintiff received a notice of proposed removal based on unacceptable performance.  Mat Fact 50.   By letters dated May 31, 2006, plaintiff's counsel requested an oral conference and submitted a written objection to the proposed removal.  Mat Fact 51.   The oral conference was held on June 15, 2006, with Oral Conference Officer Larry G. Janney, plaintiff and his counsel present.  Mat Fact 52.   The oral conference officer reviewed all of plaintiff's objections to the proposed termination.  In a decision dated August 13, 2006, he found "substantial evidence exists in support of the performance standards under which CHOWDHURY worked were valid, CHOWDHURY's performance in at least one critical element was deficient as charged, and CHOWDHURY was provided with a reasonable opportunity to demonstrate acceptable performance prior to proposing his removal . . .Therefore, it appears that Agency officials met its (sic) burden of proof and the removal action should go forward."  Blue 135.

Tia Gayle, Supervisory Employee Relations Specialist, was the final agency reviewing official concerning the proposed termination.  By letter dated September 1, 2006, Ms. Gayle sustained the proposal to terminate plaintiff's employment.  Mat Fact 54.

**June 9, 2006 e-mail re Peru questions**

On June 8, 2006, Dr.  Thaler saw a report which had been prepared by plaintiff during her absence, and which had been sent outside of the branch to her boss,  David Goldman and to Dr. Holt.  Red Thaler Aff at p. 3;  Mat Fact 55.  Dr. Thaler  reviewed the report, found what she believed to be inaccuracies and misleading information in the report, revised it and resubmitted it to Dr. Holt.  *Id.*

Dr. Thaler sent an e-mail to David Goldman  and to the members of her staff who had

been involved in the handling of the report.  In the e-mail she expressed her problems with the report and manner in which it had been handled.  Mat Fact 56.  The e-mail 1) stated that OIA rather than OPHS should have responded to the questions from Peru; 2) stated that the document as submitted was not acceptable; 3) apologized to her boss for a document being sent to him which had not received adequate review, and 4) stated "We will instruct employees who are acting as the branch chief  to not clear documents on sensitive issues until they have been reviewed by at least the branch chief and division director."  Mat Fact 57.

## ARGUMENT

### A.  Summary Judgment

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir. 1995).  A genuine issue is one that could change the outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn there from must be considered in the light most favorable to the nonmoving party, *see, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), a complaint should be dismissed if it "appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  *Matsushita,* 475 U.S. at 587.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

**Discrimination Claims**

Defendant has not submitted any direct evidence of discrimination based on race, national origin or age.  Therefore, the Court may evaluate the case under the *McDonnell- Douglas* procedure as modified by the District of Columbia Circuit.  Under the procedure first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of prohibited discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  *McDonnell- Douglas* articulated the requirement that a plaintiff establish a prima facie case as the initial step in the burden of production, because the prima facie case includes the minimal essential elements required to raise an inference of discrimination. Therefore,  "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

Under *McDonnell Douglas,* if the employee succeeds in establishing a prima facie case, the employer then must articulate legitimate, nondiscriminatory reasons for its actions.  *See McDonnell Douglas*, 411 U.S. at 802.  The defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions.  *Texas Dept. of Community Affairs v. Burdine*,  450 U.S. 248, 259-260 (1981).  The  plaintiff then has an opportunity to discredit the employer's explanation or otherwise demonstrate that discrimination was a motivating factor.  *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998).  The plaintiff at all times retains the burden of persuasion.  *McDonnell Douglas*, 411 U.S. at 802;  *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2002).

The Supreme Court has explained that the elements of a prima facie case of discrimination may differ from case to case.  *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981).  The fundamental requirement, however, is that the prima facie

case give rise to an inference that the defendant's conduct was discriminatory. *See Simens v. Reno*, 960 F.Supp 6, 8-9 (D.D.C. 1997). As a general matter, therefore, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) he was a member of a protected group, (2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)(Title VII), *Aka*, 156 F.3d at 1288.

In this case, defendant has legitimate non-discriminatory reasons for its actions. In such cases, the District of Columbia Circuit has directed that the District Courts not decide whether plaintiff has met the third prong of *the McDonald Douglas* prima facie case test. The courts have been directed to proceed as described below:

> the D.C. Circuit has recently clarified the *McDonnell Douglas analysis* where an employer has moved for summary judgment in cases where plaintiff is a member of a protected class and has alleged an adverse action, but the employer has proffered a legitimate, non-discriminatory explanation for its action. In such cases, a court need not decide if plaintiff has produced evidence sufficient to support an inference of discrimination or retaliation, but instead it should proceed directly to the third step of *McDonnell Douglas* and decide whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady v. Office of the Sergeant at Arms*, No. 06-5362, 2008 WL 819989, at *3 (D.C.Cir. Mar. 28, 2008).

*Brantley v. Kempthorne*, 2008 WL 2073913, 4 (D.D.C.) (D.D.C.2008).

> [I]f an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action, the district court must conduct one central inquiry in considering an employer's motion for summary judgment or judgment as a matter of law: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis. *See Brady*, 520 F.3d 490, ---- - ----, 2008 WL 819989, at *2-3.

*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

A plaintiff must present substantial and credible evidence of discrimination in order to survive a motion for summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson,* 121 F.Supp.2d 72, 77 (D.D.C. 2000) *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); *Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001).  Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Weigert v. Georgetown University*, 120 F.Supp. 2d 1, 22 (D.D.C. 2000), *quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

### D.  Retaliation Claim

A prima facie case alleging retaliation or reprisal is established when the plaintiff demonstrates: (1) that he engaged in protected behavior, (2) defendant subjected him to a materially adverse action, and (3) that a causal connection existed between the protected activity and the materially adverse action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006); *Rochon v. Gonzalez*, 438 F. 3d 1211, 1219 (D.C.Cir. 2006).   In defining a materially adverse action, the Supreme Court has ruled that

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

*Burlington,* 126 S.Ct. at 2415 (citations omitted).  If plaintiff is able to establish  that he engaged in protected activity and a materially adverse action, the analysis then follows that for a discrimination claim, i.e. if the  the employer articulates legitimate, nondiscriminatory reasons for its actions,

"to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason." *Lathram*, 336 F.3d at 1088.

*Pardo-Kronemann v. Jackson*,  541 F.Supp.2d 210, 220 -221 (D.D.C.2008).

In order to establish a prima facie case of retaliation, a complainant also must show a causal connection existed between the materially adverse action and his statutorily protected activity.  *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). The causal connection required to establish a prima facie case of retaliation may be shown by evidence that the agency had knowledge of the protected activity and that there was a temporal link between the activity and the adverse personnel action.  *Jones v. Washington Metropolitan Area Transit Authority*, 946 F. Supp. 1011, 1021 (D.D.C. 1996). "The cases that accept mere temporal proximity between an agency's knowledge of the protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case, uniformly hold that temporal proximity must be "very close."  *Clark County School District  v. Breeden*, 532 U.S. 268, 273-274 (2001), *citing Richmond v. Oneok, Inc*., 120 F.3d 205, 209 (10th Cir. 1997)(three month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(four month period insufficient);  *Mayers v. Laborers' Health & Safety Fund of North America,*  478 F.3d 364, 369(D.C. Cir. 2007).

### E.  Nature of Agency Action: adverse personnel action or a materially adverse action

**Discrimination Claims–Adverse Personnel Action**

In discrimination claims against federal employers a required element is some form of legally cognizable adverse personnel action by the employer.  *Brown v. Brody*, 199 F.3d 446, 453 (D.C.Cir. 1999); *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 17-18 (D.D.C. 2000).

To establish an "adverse personnel action" there must be a significant change in the complainant's employment status--such as failing to hire, firing, failing to promote, or a decision

causing a significant change in benefits. *Id.*

Courts have further defined the concept of an "adverse personnel action" as one involving a **material** change in the aggrieved employee's employment status. A materially adverse change can be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F. 2d 132, 136 (7th Cir. 1993)*; compare with Flaherty v. Gas Research Institute* (7th Cir. 1994)(a "bruised ego" is not enough), *Koscis v. Multi-Care Mgt., Inc.,* 97 F. 3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties, or prestige insufficient), *Harlston v. McDonnell Douglas Corp.,* 37 F. 3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

**Age discrimination claims**

In order to establish a prima facie case of discrimination under the ADEA plaintiff must establish that he was disadvantaged in favor of a similarly situated substantially younger person. *See, e.g. Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323-324 (7th Cir. 2001)**.**

> To make out a prima facie case for wrongful discharge in the ADEA context, the plaintiff must "show that he belongs in the statutorily protected age group, he was qualified for the position, he was terminated, and he was disadvantaged in favor of a younger person." *Hall*, 175 F.3d at 1077.

*Carswell v. Air Line Pilots Ass'n Intern.*, 540 F.Supp.2d 107, 115 (D.D.C.2008). Courts routinely apply the *McDonnell Douglas* framework to ADEA claims. *Dobbs v. Roche*, 329 F.Supp.2d 33, 39 (D.D.C.2004) *citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 140-42,(2000); *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C.Cir.1997).

### ANALYSIS OF PLAINTIFF'S CLAIMS

**August 2005 Unsatisfactory Rating and PIP**.

Pursuant to his settlement agreement with the agency, plaintiff has relinquished any claim

concerning acts occurring before October 11, 2005.  October 11, 2005 Settlement agreement.

Plaintiff did not claim a breach of the settlement agreement at the administrative  level, and thus

has failed to exhaust his administrative remedies concerning any alleged breach of the agreement.

The Equal Employment Opportunity Commission Regulations provide that:

> (a) Any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process, shall be binding on both parties. Final action that has not been the subject of an appeal or civil action shall be binding on the agency. If the complainant believes that the agency has failed to comply with the terms of a settlement agreement or decision, the complainant shall notify the EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The complainant may request that the terms of settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point processing ceased.

29 C.F.R. § 1614.504 (a).   The terms of plaintiff's settlement agreement appropriately advise

plaintiff of his remedies should there be a breach and of his obligation to file a request for

enforcement or reinstatement of his claim within 30 days of the alleged breach.   Settlement

Agreement at p. 3 ¶5.

The first complaint plaintiff brought to the EEO after the signing of the settlement

agreement was made on February 9, 2006.  Brown EEO counselor report.  He challenged the

rating received following completion of the PIP.  Plaintiff claimed discrimination on the basis of

race, old age, sex, religion and reprisal.  *Id.* at p. 2; 3/7/06 Complaint.

Although the agency originally construed plaintiff's complaint as an allegation of non-

compliance with the settlement agreement signed on October 11, 2005, plaintiff's counsel

explained that the complaint was not about non-compliance, but was a new claim of

discrimination. Gould letter at p. 2-3.  Therefore the February 2006 complaint was treated as a

new claim of discrimination concerning solely the outcome of the PIP.  Bradshaw memo.

Plaintiff did not claim a breach of the settlement agreement and did not   – as  was required by

the federal regulation and his settlement  agreement  –  tell the agency he was seeking to reopen

17

any claim arising before his signing of the settlement agreement on October 11, 2005.  Gould letter.

Since plaintiff was advised of his unacceptable rating and placed on the PIP in August 2005, plaintiff's placement on the PIP and any actions preceding it are not proper claims before the Court.   Therefore, the acts at issue in this matter pertain to plaintiff's February 6, 2006 unsatisfactory performance rating due to failure to complete the PIP successfully, his termination on September 1, 2006, and the June 9, 2006 e-mail from Dr. Thaler about the Peru questions.

### February 6, 2006 Unsatisfactory Performance Rating and September 1, 2006 Employment  Termination

Plaintiff has established that he is a member of the alleged protected groups.    Defendant concedes, in this matter, that both the unsatisfactory performance evaluation following the PIP and the termination were materially adverse actions for purposes of discrimination and retaliation claims.

### Defendant had legitimate non-discriminatory reasons for its actions

As is reflected above, plaintiff received an unsatisfactory performance evaluation on February 6, 2006, due to his failure to meet the requirements of his PIP.  See PIP Assessment Summary Report.  His employment was terminated on September 1, 2006, because of his unacceptable performance on at least one critical element of his performance improvement plan. *See* Oral Hearing Report; Gayle Letter.

### Salmonella Paper

#### Background

On  June 29, 2005, Loren Lange, the Deputy Assistant Administrator, Office of Public Health and Science, of USDA' s Food Safety and Inspection Service, assigned the Zoonoses Branch to take the lead on preparing a paper concerning the top 20 salmonella serotypes in young chickens. Mat Fact 23.

18

Dr. Chowdhury was assigned to work on descriptive data on the 20 salmonella serotypes for chickens.  Mat Fact 25.  Specifically, Dr. Parham asked Dr. Chowdhury to prepare a brief summary statement about each of the top 20 salmonella serotypes[3] for young chickens. Mat Fact 26.   The assignment was given to plaintiff on about June 30, 2005.  He was given a list of the top 20 young chicken serotypes.  His assignment was as follows

> you are providing a brief statement (paragraph) on each of the young chicken serotypes listed . . .You will indicate the reservoirs[4], commonality, public health

---

[3]  se·ro·type (sîr-tp, sr-)  n.  A group of closely related microorganisms distinguished by a characteristic set of antigens. tr.v. se·ro·typed, se·ro·typ·ing, se·ro·types
To classify according to serotype; assign to a particular serotype.

The American Heritage® Dictionary of the English Language, Fourth Edition copyright ©2000 by Houghton Mifflin Company. Updated in 2003. Published by Houghton Mifflin Company. All rights reserved.

Also called:

se·ro·var (sîr-vâr) n.A group of closely related microorganisms distinguished by a characteristic set of antigens. Also called serotype.

The American Heritage® Medical Dictionary Copyright © 2007, 2004 by Houghton Mifflin Company. Published by Houghton Mifflin Company. All rights reserved.

Serovar:  A serovar or serotype is a grouping of microorganisms or viruses based on their cell surface antigens. Serovars allow organisms to be classified at the sub-species level; an issue of particular importance in epidemiology.[1] A group of serovars with common antigens is called a serogroup.

Serovars may be established based on virulence factors, lipopolysaccharides in Gram-negative bacteria, presence of an exotoxin (pertussis toxin in Bordetella pertussis, for example), plasmids, phages, or other characteristics which differentiate two members of the same species. [1][2]

Salmonella, for example, has over 4400 serovars: Salmonella enterica serovar Typhimurium, S. enterica serovar Typhi, and S. enterica serovar Dublin, to name a few.[2]

From Wikipedia, the free encyclopedia


[4]  reservoir . . . 2 : an organism in which a parasite that is pathogenic for some other species lives and multiplies without damaging its host; also : a noneconomic organism within which a pathogen of economic or medical importance flourishes without regard to its pathogenicity for the reservoir <rats are reservoirs of plague> -- compare CARRIER 1a

significance, and other pertinent facts, etc.  The paper must include references.

*Id*.  Plaintiff responded that  he did not understand the assignment.  He stated he had spent a day

searching the internet, reading books and articles on salmonella but  "did not find anything called

description of serotypes separately." PDR 241.    He seemed to think he should be able to find

one textbook or other reference that would have the requested information already collected for

him.  Dr. Parham told plaintiff that he would have to conduct research of the literature  and try to

get the information requested.   Parham Dec. at ¶ 6.

On July 7, 2005, plaintiff sent to Dr. Parham, with a cc to Dr. Thaler, a partial report on

serotypes  numbered 11-20.  He advised that after doing some research and in discussions with

four microbiologists  "I have learned that there is  no such thing called 'serovar description'

available any where.   Perhaps no body has done it! So there is no quick shot!  If we want to do it

then one needs to read hundreds of articles in order to categorize their descriptions basically from

the raw materials (articles). . . . But I believe it's worth doing."   PDR 256.   Dr. Chowdhury

persisted in complaining that there was  no "description" of the serovars in any single reference

and that the task was impossible based on discussions he had with microbiologists. Dr.  Parham

explained to Dr. Chowdhury that she did not want a paper from a technical  microbiology point

of view, but from a public health perspective and in keeping with the agency's mission. [If Mr.

Lange had wanted a microbiology focused paper, he would have asked the microbiology branch

to do the report.] She  told Dr. Chowdhury that  he may have gotten the response from

microbiologists, which he reported, because he had not explained to them what she  actually had

requested.   It appeared that he wanted to be able to just cut and paste the information from a

textbook.  She agreed with Dr. Chowdhury that there probably was no single reference which had

compiled  the information requested and that he would actually have to research the literature

---

http://medical.merriam-webster.com/medical/reservoir

regarding the 20 salmonella serotypes. She told him to "google" the serotypes using the search engines available and then do a literature review on them from outside sources as well as using agency materials. Parham Dec. at ¶6. The work product which he submitted was not acceptable. She told him that the information supplied concerning each serotype was not sufficient and that the submission was not substantive.[5] On July 12, 2005, plaintiff submitted a second draft of his paper. PDR 244. In his forwarding e-mail, plaintiff continued to complain basically that he could not do a cut and paste job on this assignment. He complained that there was no single reference describing the serovars, and that he would have to actually read numerous articles "and think if they are of any use for our purpose." PDR 244. Mr. Lange

---

[5] At deposition one of plaintiff's co-workers immediately knew what was being asked and identified that plaintiff's product was not sufficient.

    Q  Can you tell me either from looking at this what Mr. Lange wanted with regard to -- I mean other than just reading -- well, let's look at number three.
    A  Okay.
    Q  Can you tell me what he was looking for there as far as you understood?
    A  Yeah. He wants to know what the top 20 serotypes are and how those serotypes are characterized in chickens in the scientific literature.

                     * * *

    Q  If you look at the report that Dr. Chowdhury prepared that's attached there --
    A  Okay.
    Q  -- is that a brief summary of -- a brief description of Salmonella serotypes that appear in young chickens?
    A  Probably briefer than what Dr. Lange would have wanted. . . .
    Q  How would you know that?
    A  Because he asks here about information such as reservoirs, commonality, et cetera, and it just doesn't look very -- doesn't look like it's as extensive as what he usually asks for.
    Q  Well, has he asked you for these things before?
    A  Not particularly like a statement like this, no.
    Q  So then how would you know -- you wouldn't really know what he's asked for prior to this, would you?
    A  Well, just generally, any time I'm asked for anything it usually needs more than this.

Anandarama Depo at p. 18- 31.

reviewed this submission and stated:

> The July 2005 report.  Looks like copied from a standard reference.  No
> relationship from references to presentation.  No value added.  What do the
> findings mean for FSIS.

DDR 442.

On July 18, 2005, plaintiff submitted a paper with 20 serovar descriptions.  PDR 254.

= Blue 315.   The format was the same as the other submissions.  The following is an example of

the information as provided by plaintiff for each serotype:

> (1) Typhimurium.

> Resevoirs: Domestic and wild animals, including poultry, swine, and cattle,
> rodents and pet animals, and also man.
> Commonality: Man, Cattle, Swine, Turkey

> Public health significance: Very high

> Antigenic character: 1,4,[5], 12,1

*See* DDR 445-450, plaintiff's July 7, 2005 submission.

His July 2005 submissions on the serotypes, and his initial submission of the zoonoses

report under the PIP,  are examples of the type of work plaintiff submitted which Dr. Parham

described as not good and requiring revisions.  Parham Dec at ¶6.

**PIP Requirement re salmonella paper**

The PIP required plaintiff to redo the project, but limited to only five (5) serotypes:

> 2) **Salmonella Serotype Paper**: Prepare a scientific paper of the top five poultry
> Salmonella serotypes, describing each serotype in detail, such as reservoirs, its
> public health significance, related antimicrobial resistance issues, etc. The paper
> must be well researched with references and it must be free of major errors
> requiring few edits and revisions. The paper, if well written and properly
> researched, would address a request made by the Assistant Deputy Administrator
> to provide descriptive information on key poultry Salmonella serotypes.

Mat Fact 21.

On November 14, 2005, plaintiff gave a draft of the salmonella paper to Dr. Parham.  Mat

Fact 31.   On November 21, 2005, Dr. Parham discussed with plaintiff needed revisions to the document. *Id.* The discussion incorporated suggestions/criticisms from Dr. Thaler. *Id.*.   Plaintiff submitted his final paper to Drs. Parham and Thaler on November 30, 2005.   Mat Fact 32.

A copy of the document was sent to Mr. Lange with a request for his comments.  Mat Fact 33.   He started making hand written notes on the face of the document for about three pages.   Then he wrote

> I've read enough to see that data is carelessly or inaccurately presented.  The text as written is inaccurate . . . .
>    The material doesn't present the information in a format that addresses OPHS issues.  I would expect a GS-13 analyst to organize material to address a serotype in the following manner:
>
> Heidelberg:
>    1.  Presence in FSIS regulated products.
>    Yes chicken is high, but how could one not mention Heidelberg in market hogs?
>    2.  Then discuss some documentation of outbreaks attributed to FSIS regulated products.
>    3.  Finally summarize some "expert opinion" about links to specific products. What do experts think are the likely sources of human illness?  While this may go beyond the letter of the original request, it is what we would expect of a GS-13 analyst in OPHS.

Mat Fact 33.

Dr. Parham prepared a summary assessment which included her and Dr. Thaler's assessment of the paper as well as Mr. Lange's.   PIP summary assessment.

**Toxoplasmosis paper**

As was discussed above, plaintiff had been assigned to do a paper concerning toxoplasmosis since 2003.   In December 2004, he was told that his performance in failing to do the toxoplasmosis paper was considered unacceptable.   Although he was given a second chance to do the paper, plaintiff again failed to do substantive work to research and complete the paper from early 2005 through July 2005, claiming that he thought the assignment had been superceded by the Thinking Paper.

**PIP requirement**

The PIP, which started on August 29, 2005,  gave plaintiff a third chance to prepare a

paper on Toxoplasmosis:

> 1) **Toxoplasmosis Paper**: Prepare a scientific paper on toxoplasmosis as it relates
> to meat and poultry, written in a format prescribed by a peer-reviewed journal.
> The paper must be well researched with references and it must be free of major
> errors requiring few edits and revisions. Within two weeks of receiving this letter
> you are expected to provide me with your specific focus on the paper, provide the
> format for the paper, and establish milestones and delivery dates for completing
> all work on the paper within this 90-day opportunity period. The paper, if well
> written, properly researched and prepared for publication in a peer-reviewed
> journal, would indicate Fully Successful performance . . . .

Mat Fact 21.

During the PIP period plaintiff submitted some daily journal and then progress reports

concerning his work.  Blue 192-206.  Plaintiff also had approximately weekly meetings with Dr.

Parham and/or Dr. Thaler during which he was supposed to discuss his progress with the three

PIP assignments.  Blue at p. 207-224.  Pursuant to the Settlement Agreement, the deadline for

submission of the toxoplasmosis paper was extended from November 29, 2005 to December 30,

2005.  Mat Fact 22.

Although required to submit a work plan within two weeks of his receipt of the PIP in

August 2005,  plaintiff did not submit a work plan for the toxoplasmosis until December 1, 2005.

Blue 300.  Plaintiff submitted the Toxoplasmosis paper to Dr. Parham by e-mail dated December

30,  2005. Blue 283.

Dr.  Eric Hemphill,  Chief of the Animal and Egg Production Food Safety Branch, was

asked to review the document.  Blue 283.  He stated:

> In general the document is a helpful regurgitation (review) of information on
> Toxoplasmosis.  There are, however, numerous grammatical errors and needs
> additional/critical wordsmithing.   I suggest that the author review and make
> appropriate corrections, entries and changes prior to further distribution.
> A paragraph or so on conclusion of the paper and future considerations for
> research (i.e., developing a vaccine) may be useful but not necessary.

Other than that please note comments re the paper. FEH
P.S.  Author also leans heavily on Dubey et al., in same 1990 AVMA journal.

Mat Fact 39.  Dr.  Hemphell also submitted written edits and comments on the face of the

document.  *See* Blue 284- 295.  There are numerous edits, questions and criticisms on a

document which was required to "be completed during the opportunity period" and which "must

be well researched with references and it must be free of major errors requiring few edits and

revisions."  Mat Fact 21.

Katie Pritchard, Writer/Editor (OPHS employee) also was asked to review the document.

Her overall assessment was as follows:

> To put it bluntly, this document should not proceed further in the review or
> clearance process without first undergoing substantial changes and rewriting.  I
> would not clear this document if it was sent to me for that purpose, nor would I
> attempt to edit it because there are simply too many problems.  This document is
> not ready for review.   Overall, the main idea of the paper it lost on the reader.  It
> is poorly organized and difficult to follow.  The document seems as though it is
> pieced together.   As a result, there is no flow of information and the document
> seems to jump from idea to idea, never fully explaining the main point.

Mat Fact 40.   Ms.  Pritchard then discussed various categories of problems relating to the paper

including "References to Studies" (e.g. lack of information concerning what the studies were or

what the actual results were; use of ambiguous time frames and geographical references);

"Inconsistencies" (in uses of various words); "Awkward phrasing" (which "makes sentences

difficult  to understand and often times,  not make sense at all") "Other errors" (prevelance of

spelling, punctuation, and grammatical errors).  *Id.*

Dr. Thaler also reviewed the document. She  prepared a memorandum discussing some of

the deficiencies in plaintiff's work product

> I completed my initial review of Dr. Chowdhury's Toxoplasmosis paper. At a
> GS-13 level, I expect an initial work product to be ready to review for substance,
> without significant basic editing mistakes. As stated in the PIP letter the paper
> must be well researched with references and it must be free of major errors
> requiring few edits and revisions. A GS-13 level staff officer would be expected
> to independently determine when to use his professional contacts to assist in

> review of a paper prior to submitting it to his supervisor. A GS-13 level staff officer also is expected to prioritize the work to meet quality and timeliness goals. Dr. Chowdhury informed me that he decided to devote only the 30-day extension of the PIP to writing the Toxoplasmosis paper.
>
> From the perspective of being ready for supervisory review, the paper is disappointing.

Mat Fact 41.  Dr. Thaler noted style inconsistencies, grammatical errors, and misspelled words. She found the substance of the paper to be poor, with, among other matters, no analysis, conclusions which contradicted the data.  She found that "scientific information in the references used demonstrates an inability to extract and use the data properly;" "[t]he data was not organized or analyzed," and  there were  no graphs or tables to aide  comprehension.   Dr.  Thaler supplied examples  of her concerns.   *Id.*  She also noted at least three  instances of plaintiff lifting sentences verbatim from references without indicating they were quotes and one where he listed references not pertinent to the matter under discussion. *Id.*

Dr. Parham also assessed the paper as poorly written, requiring numerous edits of grammar, punctuation and spelling.   Blue 278e.   She noted data "strung together with little attempt to analyze or interpret it or arrange it in a coherent and rational manner that provides for order throughout the paper."  Blue 278. "Material is often improperly referenced or missing a reference and much of it has been plagiarised.  In some cases the literature seems to be misunderstood or misinterpreted. " Mat Fact 42.

Based on these assessments, plaintiff's performance under the PIP on the toxoplasmosis paper was found to be unacceptable.  February 8, 2006 memo re unacceptable performance rating.  Mat Fact 43-47.

**The Termination of  Employment**

The recommendation to terminate plaintiff's employment was based on his failure to raise his performance to the fully successful level on the two critical elements "Mission Support" and

"Research and Analysis." Blue 93. The recommendation due to plaintiff's failure to successfully complete the paper on toxoplasmossis was based on the assessments of Dr. Thaler, Dr. Hemphill, Dr. Parham and Kathrine Pritchard. Blue 95. The recommendation due to plaintiff's failure to successfully complete the Salmonelle Serotype paper was based on the assessment of Deputy Assistant Administrator Lange, Dr. Thaler and Dr. Parham. Blue 96.

Following an independent recommendation by the oral hearing examiner, see Oral Hearing Report, the decision on the proposed removal was made independently by Tia Gayle, Supervisory Employee Relations Specialist for the reasons stated in her decision letter. Blue 100-110. In sum, the evidence showed that plaintiff's performance was unacceptable in at least one critical element.

Thus, defendant had legitimate non-discriminatory reasons for finding plaintiff's performance to be unacceptable following the PIP and for terminating his employment.

**Plaintiff has not submitted sufficient evidence for a reasonable fact finder to find that the asserted non-discriminatory reason was not the actual reason and that defendant intentionally discriminated/retaliated against plaintiff**

**Plaintiff Has Failed to Establish a Causal Connection Between Protected Activity and the February 2006 Rating and His Termination**

Plaintiff has failed to establish a causal connection between his unsatisfactory performance rating on February 6, 2006 and protected activity. The protected activity upon which plaintiff bases this retaliation claim is his contact with an EEO counselor on August 11, 2005 which resulted in a settlement on October 11, 2005. Plaintiff's Interrogatory Response (PRog) #13. The initial contact in August is almost six months before the February 2006 rating, and the October settlement is almost four months before the rating. Therefore, plaintiff has not established a causal connection based on temporal proximity.

Plaintiff also has not established a causal connection between his termination and protected activity. The decision to discharge plaintiff was not made by Drs. Parham and Thaler. The decision

was an independent determination by Tia Gayle following her review of the assessments of plaintiff's

work,  plaintiff's written and oral rebuttals, and the decision  by Larry G. Janney, an independent

Oral Conference Officer.  *See* Gayle letter and  Analysis and Findings in Oral Conference Report at

p. 8-11.  Neither of these individuals had been the subject of plaintiff's EEO complaint, and thus had

no motive or incentive to retaliate against him.

> That Sampson knew of the plaintiff's complaint regarding Talley's promotion does not
> address, much less rebut, the defendant's nondiscriminatory justification. It shows
> awareness but not involvement or motive. *See, e.g., Bieber v. Runyon*, 1996 WL
> 525372, at *11 (D.D.C. Sept.9, 1996) (granting judgment for defendant when plaintiff
> admitted that earlier complaint was not based on actions taken by or in any way
> involving perpetrator of alleged retaliation); *Wada v. Tomlinson*, 517 F.Supp.2d 148,
> 208 (D.D.C.2007) (same); *Broderick v. Donaldson*, 338 F.Supp.2d 30, 43
> (D.D.C.2004) (same).

*Short v. Chertoff* , 2008 WL 2174856, 5 (D.D.C.) (D.D.C.2008).  Additionally, the hearing examiner

made his decision following the June 15, 2006 oral conference.  Oral Conference Report.  Plaintiff's

EEO complaint had been filed February 9, 2006, at least four months before.  Ms. Gayle's final

decision was issued on August 13, 2006,  six months after the complaint.  Thus plaintiff has not

established temporal proximity with protected activity sufficiently close  to raise an inference of

retaliation.

Additionally, as is discussed below, plaintiff has not submitted any other evidence which

would allow a reasonable fact finder to conclude that the actions were done for retaliatory or

discriminatory reasons.

### Other Alleged Evidence of Pretext and Discrimination/Retaliation

In his written objection to the proposed notice of removal, plaintiff contended that the

assessment of his performance as unacceptable was pretense for discrimination and retaliation.  Blue

117.  He set forth the following reasons.

**Similarly situated individuals**

Plaintiff argued that he was treated differently from the other Veterinary Medical Officers (VMOS) in his branch (Jane Harmon, Maqbool Querishi and Bernard Salamone) because "none of them had to publish any peer review article to receive a satisfactory performance rating." Blue 117-118.    But Dr. Parham had asked the other VMOs in the branch to prepare a paper for peer review. Parham Dec. at ¶7.  This later was qualified as a requirement to write a paper of peer review quality. *Id.*  Neena Anandaraman was asked to do a research paper for peer review.  *See* Anandaraman Depo at pp. 12- 17.  Her Salmonella Article was published in February, 2004. Anandaraman Article. Dr. Jane Harmon published an article on mad cow disease.  *See* Harmon BSE Article (sent for clearance for publication in August 2005).  Dr. Bernard Salamone testified that at a staff meeting the VMOs were told they were going to have to write a peer-reviewed paper.  He said his performance rating went down one level because he had not written a peer-reviewed paper.  Salomone Depo at p. 14-16.  Dr. Qureshi only joined the staff in 2004.  Parham Dec. at ¶ 7.   He had been working in the field as an inspector.  *Id.*  He was not asked to do a peer reviewed paper because of his newness to the branch and the change in the type of work he was doing.   He needed time to transition into this position with different duties.  *Id*.  Unlike Dr. Qureshi, Plaintiff had been in the Zoonoses branch since 2001 when it was established and had been with the Division since the mid-1990s.  *Id*.  He had agreed to do a paper on toxoplasmosis beginning in 2003. *Id.*

Moreover, the evaluation of plaintiff's performance under the PIP was not based on whether he had published a paper, but on the quality of the paper he presented.  *See* PIP Summary Assessment at p. 1-2:

> For the PIP, he was expected to prepare a scientific paper on the subject as it relates to meat and poultry that was well researched with references.  The paper was expected to be free of major errors that required edits and revisions. . . . Preparation of the paper in a format suitable for publication in a peer-reviewed journal would demonstrate his knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging diseases.  It would also demonstrate his ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations for specific

Agency issues. In addition, it would show that he is capable of providing written documents that are clear, concise, and presented in an organized manner that are well researched and reflect sound scientific principles.

Thus, plaintiff was not treated differently than other similarly situated VMOs in his branch.

**Told he should retire**

Plaintiff also argued that there was evidence of age discrimination due to remarks made by Drs. Parham and Thaler concerning plaintiff's age. Blue118.   In defendant's Interrogatories, plaintiff was asked to "Fully describe any statements by DOA  employees or managers which you believe evidence discriminatory animus towards you based on age, race, color, national origin or reprisal." PRog # 15.   The only response given was

On December 13, 2004, the plaintiff sent Dr. Parham the Columbia poultry evaluation report  she requested.  Later that day, he went to her office and asked her not to punish him for not completing the paper. . .  The plaintiff told her that in a few years, he would be retired.  At this point, Dr.  Parham said, "if you think you are so old then maybe you should retire soon."

Prog # 12 and 15.

He also claims that a remarkably  similar conversation occurred between himself and Dr. Thaler in August 2005, after he had been told he was being put on a PIP:

Then next day I went to Dr. Thaler with the work that I did a list of the report that BSE that I made.  I showed her, Dr. Thaler, please intervene.  I'm senior; I'm getting older.  I'm planning to retire  within a few years, and please do not punish me.  . . . please convince   Dr. Parham she's probably mad at because of that serovar  paper I made lots of argument with her.  I explain to her.  She said, Dr. Chowdhury -- Dr. Thaler said, if you think you are old, you should be retiring by now.  Same  thing was told in December by Dr. Parham.

Q    How did this come up about you retiring?

A    Because I said I'm older, I'm going to be retired in a few more years, please do not put me on this hassle.

Q    Don't put you on the PIP?

A    Don't put me on PIP.

Chowdhury Depo at p.  64-65.

30

The two statements which plaintiff claims were made are not evidence of discriminatory age related animus.  First, based on the content of the alleged statements and the circumstances in which they allegedly were  made, no reasonable juror could find that the statements were derogatory or showed age bias.  "The purpose of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (1976) is "to promote employment of older persons **based on their ability rather than age**; to prohibit **arbitrary** age discrimination in employment; (and) to help employers and workers find ways of meeting problems arising from the impact of age on employment."  *Macellaro v. Goldman*, 643 F.2d 813, 815 (D.C. Cir.1980)(emphasis added).   Neither Dr.  Parham nor Dr.  Thaler arbitrarily told plaintiff that they thought he was old nor did they arbitrarily say they thought he should retire.  Rather, following conversations with plaintiff which dealt solely with their assessment of his performance, plaintiff says he sought them out and he brought up the topic of him being old and planning to retire soon.  According to plaintiff,  he asked both individuals to not take or to intervene in a performance based action because he was old and was going to be retired soon.   Clearly, a performance based action should not be stopped or influenced  solely due to an individual's age.  As is reflected above, the ADEA directs that actions should be based on ability.  Plaintiff's statements indicate or suggest the he is saying he does not have the ability to perform acceptably because he is old.   The responses that **if he** thought that he was old maybe he should retire, reflect that if plaintiff felt he was not able to do his job because of his age, he should consider leaving.  The responses were not statements of bias against plaintiff nor do they reflect a  mis-perception of plaintiff's abilities due to his age.  Second,

> While comments suggesting that employers might have considered discriminatory factors are clearly relevant, stray remarks are not sufficient to prove discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 271. . . (1989) (O'Connor, J. concurring). Stray remarks are generally comments made in isolated situations or made out of context of the employment decision. *Dunaway v. Int'l Brotherhood of Teamsters*, 310 F.3d 758 (D.C.Cir.2002).

*Threadgill v. Spellings*,  377 F.Supp.2d 158, 164 (D.D.C.2005).  *Accord Brady v. Livingood*,  456

F.Supp.2d 1, 6 (D.D.C.2006); *Isse v. American University*, 540 F.Supp.2d 9, 30 (D.D.C.2008). The statement allegedly made by Dr. Parham was in December, 2004. That was approximately eight months before she placed plaintiff on a PIP in August 2005, and approximately 14 months before she gave him an unsuccessful performance appraisal in February 2006. The statement allegedly made by Dr. Thaler in August 2005 was after plaintiff was placed on the PIP, and thus was unrelated to the decisional process of placing him on the PIP. It would have been six months before his unsuccessful performance appraisal. Therefore the statements were unrelated to the decisional process, and not sufficient to prove discrimination.

Many of the deficiencies cited by Drs. Parham and Thaler are easily recognizable from the face of the documents at issue, and their findings are explained by concrete objective examples. Additionally, plaintiff has submitted no evidence of age discrimination -- nor of any other discriminatory or retaliatory intent -- attributable to Mr. Lange, Dr. Hemphill and Ms. Pritchard. These individuals, likewise found deficiencies in plaintiff's performance on the toxoplasmosis and salmonella papers.

It is also noted that plaintiff has not offered any evidence of statements allegedly made by any employees or managers demonstrating discriminatory intent on the basis of nation origin, race, or retaliation. Plaintiff's response to Interrogatory 12 & 15.

**Retaliation**

Plaintiff alleged retaliation claiming that " after Dr. Chowdhury filed his EEO complaint, he was assured that he would receive a fair review of his work during the PIP. That did not happen. In fact, his treatment worsened and he was accused of having poor performance when that was not the case." Blue 118.

Defendant's interrogatory #13 sought explication of this statement. PRog #13. Concerning the outcome of the PIP, plaintiff contended a) he did not begin his PIP until October 15, 2005 and

had only two months to complete the toxoplasma and salmonella papers; b) Drs. Parham and Thaler found fault with only petty matters such as grammar, punctuation, quotes; c) he had to complete a daily journal, and d) they had the papers reviewed by unqualified individuals. PRog #13.

   **a) he did not begin his PIP until October 15, 2005 and had only two months to complete the toxoplasma and salmonella papers:**  That plaintiff did not start working on the matters assigned under the PIP until October 15, 2005,  is not evidence of retaliation/discrimination but of his failure to utilize his time appropriately.  The PIP memorandum clearly stated that it became effective on August 16, 2005 and was for a  90 day period.  PIP at p. 1.  On the toxoplasmosis paper, plaintiff was required to submit within 2 weeks of receipt of the PIP memorandum "your specific focus on the paper, provide the format for the paper, and establish milestones and delivery dates for completing all work on the paper within this 90-day opportunity period.  PIP at p.  7.  On the salmonella paper, the PIP clearly set forth that plaintiff was to "Prepare a scientific paper of the top five poultry Salmonella serotypes, describing each serotype in detail, such as its reservoirs, its public health significance, related antimicrobial resistance issues, etc.  PIP at p.  7.

   At their meeting on August 30, 2005,  Dr. Parham advised plaintiff that the PIP began on August 29, 2005 when plaintiff met with Dr. Thaler about the PIP.   She also emphasized to him that although  they would have weekly meetings, he could talk with her at any time he wanted her assistance. Blue 207.

   If plaintiff did not start  working on toxoplasmosis and salmonella until October 15, 2005, then plaintiff mis-lead his supervisors concerning his activities.   *See* plaintiff's daily journal and progress reports.  Blue 193- 206 .  During his subsequent meetings with Dr. Parham, plaintiff did not indicate  that he had failed to begin his PIP assignments.   Dr. Parham made notes concerning her approximately weekly meetings with plaintiff.  Blue 207-224.  She sent the notes to plaintiff. The notes reflect that prior to October 15, 2005, plaintiff told Dr Parham that he had begun working on

the salmonella and toxoplasmosis assignments.  There is no evidence in the record that plaintiff advised Dr. Parham that her notes did not accurately reflect the content of their meetings.  The meeting notes for September 6, 2005 reflect that plaintiff said that he would present a plan for the toxoplasmosis paper on September 12.  Blue  212.  The September 12, 2005 meeting notes reflect that plaintiff gave Dr. Parham a project title and a brief work  plan for the toxoplasmosis paper. They discussed his focus for the paper.   Blue 213.  The salmonella paper was discussed and plaintiff was told to send Dr. Parham a list of the serotypes he  would be reviewing.  Blue 213.  The September 19, 2005 notes reflect that plaintiff told Dr.  Parham that he had started work on  the toxoplasmosis paper, that he had begun a literature review, and  had selected articles in his focus area.  He at first said he would start writing the paper that week, but later said he would not start writing the paper until the end of October.  Blue 214.   He also gave Dr. Parham a list of  the five salmonella serotypes he had selected and indicated he had begun the literature reviews for the project.  Blue 214.  The October 17, 2005 meeting notes reflect that it was stated that based on the settlement mediation, plaintiff had an extension to December 31, 2005 to complete the toxoplasmosis paper.  His consultations and research concerning both papers was discussed.   Blue 211.  Thus, the record evidence does not show that plaintiff was only given two months to complete the two papers.  It shows that plaintiff led his supervisors to believe he had started working on the projects in September.

**b) Drs. Parham and Thaler found fault with only petty matters such as grammar, punctuation, quotes:**  The record shows that Drs. Parham and Thaler's  criticism of the two papers involved far more than minor quibbles over grammatical and typographical mistakes by Drs Parham and Thaler.   First, the documents were reviewed by other individuals  who shared his supervisors' opinions that the papers were deficient.  These individuals, Mr. Lang, Dr. Hemphill, and Ms. Pritchard, had not been the subject of plaintiff's prior EEO complaint and had no reason to retaliate

against plaintiff.  Mr. Lange's assessment of the salmonella paper was that  "Data is carelessly or inaccurately presented.  The text as written is inaccurate . . . .The material doesn't present the information in a format that addresses OPHS issues."   Mat Fact 33.  Dr.  Hemphill found the toxoplasmosis paper to have "numerous grammatical errors and needs additional/critical wordssmithing."  Mat Fact 39.   He hand wrote on the document numerous  edits, questions and criticisms. These  included: "very unclear, contradictory!!!"  Blue 284; "unclear?? Grammatical changes needed [in] entire paragraph."  Blue 287.  Writer/ editor Pritchard  found that the toxoplasmosis paper needed substantial changes and rewriting.   Mat Fact 40.

Second, in addition to grammatical and typographical errors, Dr. Thaler's memorandum concerning the toxoplasmosis paper reflected her opinion that there were significant substantive problems with the document.   For example, she found that "scientific information in the references used demonstrates an inability to extract and use the data properly" "the data was not organized or analyzed."  She found sentences lifted verbatim from references without proper attribution.  Mat Fact 41;  Thaler Toxo Comments, Blue 272-277.  Dr. Parham also believed that there were similar substantive problems with the document.  Mat Fact 42.   Examples of their concerns were included in the PIP Assessment Summary Report given to plaintiff on February 6, 2006. See Mat Fact 45, 46.

Thus, the record does not show that the only fault found with the papers was about petty matters.  The assessments addressed substantive deficiencies the reviewers found  in plaintiff's papers which his supervisors believed showed his ability to do literature research and analysis based on that research at an unacceptable level.

**c) he had to complete a daily journal:** The requirement that plaintiff do a daily journal was instituted by Dr. Parham at the mid-year performance discussion in December 2004, when she told him his performance was at the unacceptable level.   Mid-year performance memo, IPRO 1807-1809.  Major projects had been late and had been received "only after setting a 'final' due date." *Id* at

1807.  Plaintiff had stopped working on the toxoplasmosis without telling his supervisor after talking with individuals outside of the branch.  *Id.* at 1807-1808.   Plaintiff was directed to "provide a daily journal of all work done including the amount of time spent on each assignment and/or task."   And "to provide the supervisor with a journal of his daily activities; the activities, including phone calls he is engaged in and the amount of time spent on each." *Id*. at 1809.  In July, Dr.  Parham found out that plaintiff again had  discontinued the toxoplasmosis project – allegedly because he "assumed" the Thinking paper had replaced it. The PIP required an expanded journal because the list given was very general and Dr. Parham wanted to know what plaintiff was doing.  Mat Fact 16.

Since the requirement to complete a daily journal was instituted in December 2004, before plaintiff's initial complaint on August 11, 2005, the requirement could not have been made in retaliation for protected activity. It was non-discriminatory/retaliatory that Dr. Parham in the PIP would require additional information, since plaintiff appeared to still have a problem communicating to her what he  was, or was not, doing.   Pursuant to the settlement agreement in October, 2005, the daily journal was changed to a weekly journal.   Mat Fact 22.   Further, it is clear from a review of plaintiff's daily journal entries that they were far from a minute by minute recounting of plaintiff's daily activity.  *See* Blue 192-206.  And it was imminently reasonable and non-discriminatory that plaintiff's supervisor 1) would want to examine plaintiff's time management since he was not submitting work timely and 2) would want documentation of what he was doing since there appeared to be a communication problem concerning his assignments.

 and **d) they had the papers reviewed by unqualified individuals:**  Plaintiff has submitted no evidence that Drs. Parham and Thaler did not reasonably believe that the individuals they asked to review the papers were not qualified to do so.  The toxoplasmosis paper was reviewed by Dr. Eric Hemphill and Katherine Pritchard.   Dr. Hemphill was the branch Chief of the Animal and Egg Production Food Safety Branch  and served on the National Pork Board Toxoplasma/Trichina

Committee.  PIP Summary Assessment at p. 2; Parham Dec. at ¶ 11.  Ms. Pritchard was the editor/writer for OPHS and was responsible for reviewing papers for publication for OPHS.  Parham Dec. at ¶10.   Thus, the agency had assigned her to and she had reviewed papers for publication before being asked to review plaintiff's paper. *Id.*   Loren Lange, who reviewed the salmonella paper, was the Deputy Assistant Administrator, OPHS and had given the salmonella assignment to Dr. Thaler.  He was their superior in the organization and one of the intended consumers  of the report. Parham Dec. at ¶ 9.  Thus, notwithstanding  plaintiff's unexplained opinion of their qualifications, Drs Parham and Thaler were reasonable in viewing those individuals as qualified to give them independent assessments of the papers, based on their positions in the organization.

**Prior performance ratings; group award**

Plaintiff also alleged that since he had received fully successful and superior performance ratings in prior years "the sudden change in Dr. Chowdhury's performance ratings was more likely related to the decisions of his managers to remove him for discriminatory and retaliatory reasons." Written Objection, Blue 118.

Giving plaintiff an unsuccessful rating was not due to retaliation because plaintiff was told prior to his EEO activity that his performance was unacceptable.  In December 2004, he was told at mid-year that his performance was unacceptable;  he was told on August 9, 2005  that his end year performance was unacceptable and he was being put on a PIP.  Initial contact with the EEO was on August 11, 2005.  Therefore, finding his performance to be unacceptable could not have been due to retaliation.   Additionally, "employers need not suspend previously planned [ employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County School Dist. v. Breeden*,  532 U.S. 268, 272  (2001).

Plaintiff has not shown a sudden change in his performance rating.    His prior supervisor Mr. James has stated that plaintiff  "could do simple things well, but assignments that were more complicated and required an analysis and original thinking, he was less competent."  James Aff, Blue 43.

Dr. Parham became plaintiff's supervisor in March 2001.  Parham aff, Blue 50.  His performance rating did not suddenly change to unacceptable upon her becoming his supervisor.  Rather she rated him fully successful even though his performance was not that good. *Id*. Blue 51.  Thus, there can be no inference that she was biased against him due to a protected status and arbitrarily gave him an unacceptable performance rating.

However, by December 2004, plaintiff's performance had deteriorated from not very good to unacceptable.  Parham Dec. at ¶ 1.  By plaintiff's own rendition of what occurred in December 2004, Dr. Parham "threatened" him that his rating would be unsatisfactory if he did not do the toxoplasmosis paper, and he saw that she was "really serious."  Chowdhury Depo at p. 96-97.  Yet, notwithstanding his assurances to Dr.  Parham, and after being given a second chance he again failed to do the paper claiming he assumed it had been replaced by the Thinking paper.  Parham Dec. at ¶2-4.  In the August 16, 2005 PIP, plaintiff was given a third chance to do the toxoplasmosis paper.  Although plaintiff had 120 days to work on the paper, according to plaintiff, 1) he did not give Dr. Parham a work plan until December 1, 2005 and she approved it that day; 2) he did not get the literature he needed until December 15 , and 3) he did not start writing the paper until a week before it was due.  Chowdhury Depo at. p68-69,  71- 72.  The Salmonella paper also was a second chance to produce an acceptable work product. *See* Parham Dec. at ¶ 6; Mat Fact 23-29.

At the time plaintiff was placed on the PIP, plaintiff was on notice that his performance was considered unacceptable and why.  The PIP also instructed him how to demonstrate that he could do work at an acceptable level.  The PIP explained that if he did not do the assignments successfully he

would be subject to reduction in grade or removal.  PIP.  Thus, plaintiff has not submitted evidence that his receipt of an unacceptable rating when he failed to successfully complete his PIP assignments was "sudden" and unexplainable as nothing but evidence of discriminatory intent.

Additionally, Dr.  Parham had not recommended plaintiff for any award.  The agency had given a group award for work previously done on BSE.  Parham Dec.  at ¶ 13.  Since Dr. Chowdhury was a part of the group, he was included in the award.  Dr. Parham was not asked to assess his individual performance regarding the group award.  *Id.*

**Microbiologist should have done salmonella paper**

Plaintiff also claimed that the PIP required him to write a microbiology paper on salmonella that he was not fully qualified for, and that the paper should have been assigned to a microbiologist. Written objection, Blue 117.  First of all, Mr. Lange had directed that the assignment be given to the Zoonoses branch. Mat Fact 23  ("ZDRSD should take lead and get help from HHSD on human data.").  Therefore, the assignment to other than a microbiologist is not evidence of discriminatory intent on the part of Dr. Parham or Dr. Thaler.  Second, by the time of the PIP, Dr. Parham had clearly told plaintiff that they wanted a public health related document and not a microbiology paper. Parham Dec. at ¶ 6.  Third, plaintiff contends variously that he was not qualified to do the salmonella report, did not understand the assignment, could not find the information in a single reference and had to read and analyze numerous references to find the information.  This does not raise an inference of discrimination; rather it reflects negatively on whether plaintiff retained the ability to carry out the required functions of his job.  Plaintiff's job was not supposed to be easy.  He was supposed to be able to do more than cut and paste information out of one reference.  His supervisors were not supposed to have to tell him how to do research or to do research for him. Plaintiff's Position Description reflects that he was supposed to be able to do research, to independently plan, coordinate and conduct assigned studies.  He is supposed to be able to do highly complex

investigation and analysis.  *See* Mat Fact 3.  Indeed, when plaintiff 's counsel asked one of plaintiff's former co-workers about the salmonella serotype assignment, she had no difficulty in understanding what was being requested or how to go about doing the assignment.  Additionally, she immediately recognized that the submissions plaintiff had done before the PIP was not sufficient.  Further, years before, she had been assigned to do a similar report on a salmonella serotype.  See Anandaraman Depo Excerpt at p.18 -31.

### Other alleged rebuttal

Plaintiff also submitted other rebuttals to the comments and criticisms concerning his PIP reports in his Written and oral Objections.   Blue 120-123.  One of plaintiff's more interesting arguments was that he was not responsible for statements in the paper which were criticized because the statements were quotes from other people's articles and not his own conclusions.  See e.g. *Id*. at p. 120-122 ¶ 2,5,6; p. 123 ¶ 3.  This rebuttal merely confirms the criticisms that the papers were lacking in analysis and did not properly reflect direct quotations.

Concerning the quotes, one of the performance deficiencies noted in the PIP in August 2005 had been "Some of the material lacked references, especially the section on avian influenza.  Much of the material has been lifted exactly as written from other documents.  Lifting text from another manuscript without proper reference is not acceptable." PIP at p. 6.  But in the toxoplasmosis paper submitted in December 2005,   plaintiff persisted in lifting text verbatim without showing it to be a quote.[6]  Plaintiff contended that his lack of quotation marks around or indentation of text directly

---

[6] One of the instances noted in Dr. Thaler's review of the paper was :

> 7.      Under the Etiology and Transmission Section [plaintiff wrote]
> Oocysts shed in cat feces can persist for months or years in the environment in an infectious form (12, 25, 33, 36).
>
> This is lifted verbatim from reference (11) but in not properly referenced in Dr. Chowdhury's paper.

lifted from references "merely followed the style" of the Journal of Food Production.    See Blue

122; Chowdhury Depo at p.77-83.  Plaintiff's contention lacks evidentiary support.  As plaintiff

admitted, the Journal of Food Production's Instructions for Authors, Chowdhury Depo at Ex 5, does

not address the issue of direct quotations. Chowdhury Depo at p. 83.   However, it does refer authors

to the American Society for Microbiology (ASM) Style Manual for "useful guidance" concerning

references, among other matters. Chowdhury Depo at Ex 5 ( in section called "Preparation of

Manuscripts").   The ASM Style Manual says "Double quotation marks (" ") are used to set off

matter quoted verbatim in the text.  Alterations of or additions to the quoted matter should be set off

by square brackets ([  ])."  ASM Style Manual at p.43.

       Dr. Chowdhury also appears to argue that due to his work on Bovine Spongiform

Encephalopathy (BSE), he should be excused for his deficient performance.   While Dr.  Chowdhury

did do work on BSE during the rating period, it   should not have taken all of his time.  Dr.  Parham

estimates that it should have taken no more than 35% of the time of a competent GS 13 VMO.

Parham Dec. at ¶ 15.  During the remainder of his time, he was required to do the other assignments

given to him.    *Id.* at ¶ 15-17.

       **Termination**

       Both the Oral hearing Examiner's Report and the Final Decision contain the reasons for

sustaining the recommendation to terminate plaintiff's employment.  Plaintiff's employment  was

terminated because his performance was found to be  unacceptable in at least one critical element.

Plaintiff has failed to submit any evidence showing discriminatory or retaliatory bias or intent on the

part of the Oral Hearing Examiner or Ms. Gayle, the author of the final decision.

---

       Oocysts shed in cat feces can persist for months or years in the environment in an
       infectious form (Frenkel et al., 1975)

Thaler review comments Blue 276.  See also *Id*. at ¶ 8.

**June 9, 2006 e-mail re Peru questions**

At the end of May/beginning of June 2006, both Dr. Thaler and Dr.Parham were absent from the office.  On May 31, 2006, Dr. Harry Walker was acting on behalf of Dr. Thaler.  On May 31, 2006, he received an e-mail from Kristin Holt at the Center for Disease Control, requesting answers to questions concerning Bovine Spongiform Encephalopathy (BSE) a/k/a "Mad Cow Disease."  Walker Aff.  Red tab 12.  Dr. Walker gave the request to Dr. Qureshi who was acting for Dr. Parham.  *Id.*  Dr. Qureshi gave the assignment to plaintiff on Friday, June 5, 2006.  Qureshi affidavit, Red tab 13.  Dr. Walker did not substantially review the report because he was "not familiar with this line of work."  Walker affidavit.  Dr. Parham returned to work on Monday and learned of  Dr. Chowdhury's assignment which was due that day.  Parham aff. at p. 3 Red Tab 11.  Plaintiff sent his completed report to Dr. Parham who forwarded it to Dr. Holt without reviewing it.  *Id.*; 6/5/06 e-mails at 1:12 PM and 1:23 PM Red Tab 18.

Plaintiff sent a copy of the report to David Goldman, Dr. Thaler's boss, in a June 8, 2006 e-mail with a cc to Dr. Thaler.  Red Tab 21.  After seeing  plaintiff's response in the June 8, 2006 e-mail, Dr. Thaler reviewed the report.  She found inaccuracies and misleading information in the report, revised it and resubmitted it to Dr. Holt.  Thaler Aff at p. 3.  Red Tab 9.

Dr. Thaler sent an e-mail to David Goldman (to whom plaintiff had sent the report), the acting branch chief, Dr. Parham, Drs Walker and Qureshi and Dr. Chowdhury expressing her problems with the report and manner in which it had been handled.  Thaler aff at p. 4.  The e-mail 1) stated that OIA rather than OPHS should have responded to the questions from Peru; 2) stated that the document as submitted was not acceptable; 3) apologized to her boss for a document being sent to him which had not received adequate review, and 4) stated "We will instruct employees who are acting as the branch chief  to not clear documents on sensitive issues until they have been reviewed by at least the branch chief and division director."  June 9, 2006 Thaler e-mail Red Tab 21.

This e-mail should be rejected as supporting any independent claim of discrimination or retaliation. Plaintiff has failed to show that the e-mail was an adverse employment action for purposes of a discrimination claim or an materially adverse action for purposes of a retaliation claim since the criticism of the document occasioned no objective harm to plaintiff. The claim should be dismissed on that basis alone. *See Walker v. Johnson*, 501 F.Supp.2d 156, 177 (D.D.C.2007) (admonishment in an e-mail "had no tangible effect on the terms or conditions of Dr. Walker's employment, and no reasonable employee would have been dissuaded from filing an EEO charge based on the email, which-even in the light most favorable to Dr. Walker-amounts to nothing more than a mild rebuke . . . .. It exemplifies the type of "mere scolding, without any disciplinary action which follows" that is simply not actionable under Title VII. Childers, 44 F.Supp.2d at 20.)

Alternatively, the legitimate non-discriminatory reason for its issuance was that the e-mail was used as a manner for Dr. Thaler to tell everyone involved with the Peru report her concerns about the report and how it was handled.

There are no material facts in dispute. The question before the Court is not whether a particular individual's assessment of plaintiff's performance on the Toxoplasmosis and Salmonella papers was right, wrong or fair, but whether plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against plaintiff. *See Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C.Cir. 2002):

> At best, her responses constituted an argument that, notwithstanding those failings, the District should not have terminated her because there were extenuating circumstances and there were some positive attributes to her performance. But courts are without authority to " 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C.Cir.1996) (*quoting Milton v. Weinberger*, 696 F.2d 94, 100 (D.C.Cir.1982)). And Waterhouse's responses offered no grounds for a rational juror to conclude that the reason she was fired was racial discrimination rather than poor performance. *See Forman v. Small*, 271 F.3d 285, 291 (D.C.Cir.2001) ("Consistent with the courts' reluctance to become involved in

micromanagement of everyday employment decisions, the question before the court is limited to whether [plaintiff] produced sufficient evidence of ... discrimination, not whether he was treated fairly...." (citations omitted)); *Fischbach*, 86 F.3d at 1183 (noting that to rebut the employer's nondiscriminatory explanation " '[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible' " (*quoting Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994))).

*Id*. 298 F.3d at 995;  *Smith v. Jackson*,  539 F.Supp.2d 116, (D.D.C.2008)

Significantly, the Court is without authority to " 'second guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Fischbach*, 86 F.3d at 1183 (*quoting Milton v. Weinberger*, 696 F.2d 94, 100 (D.C.Cir.1982)). As a result, "[o]nce the employer has articulated a non-discriminatory explanation for its action ... the issue is not 'the correctness or desirability of the reasons offered ... but whether the employer honestly believes in the reasons it offers.' " *Id.* (*quoting McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)).

*Id*. 539 F.Supp.2d at 136.

## CONCLUSION

Plaintiff Chowdury has failed to present sufficient evidence of discrimination or retaliation.

Therefore, defendant's motion for summary judgment should be granted.

Respectfully submitted,

_____/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/ Rudolph Contreras_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/ Rhonda C. Fields_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KHURSTED A. CHOWDHURY    )
    )
       Plaintiff,             )
    )
v.                         )     Civil Action No: 07-0997 (RCL)
    )
    )
MIKE JOHANNS, Secretary,    )
United States Department of Agriculture    )
    )
       Defendant.      )
    )

**STATEMENT OF MATERIAL FACTS**

       Defendant respectfully submits this statement of material facts as to which there is no genuine dispute.

1.     Plaintiff is an South Asian male over the age of forty whose country of national origin is Bangladesh.  Complaint at ¶ 7.

2.     At the times pertinent to his complaint, plaintiff was employed by the United States Department of Agriculture.  Complaint at ¶ 14.  He was a Veterinary Medical Officer assigned to what became the Zoonoses Disease and Residue Surveillance Division in the Office of Public Health/Food Safety and Inspection Service.  *Id.* at ¶ 15.

3.     The position description (PD) for a Veterinary Medical Officer in the Zoonoses Branch (VMO) reflected the following duties:

> Analyzes and evaluates reported cases of meat and poultry borne illnesses and hazards. Analyzes reports and data for Director's office, for consumers, and for trends that would help identify emerging hazards.
>
> Provides concise, factual, timely written oral reports of all situations required and/or requested.
>
> Performs special epidemiological projects concerned with food hygiene, public health, and preventative medicine.
>
> Expands personal knowledge for food production, food animal production, and agricultural and industrial practices that might impact on public health and

medicine.

Represents the Agency in a professional manner at meetings, conferences, seminars, and training sessions as either a participant to obtain information, or as a speaker to impart information.

Researches literature and keeps abreast of advances in the field of epidemiology and assesses potential impacts on program activities.

Position Description, Blue[1] 67.  The "Supervisory Controls" and "Guidelines" sections of the position description reflect that a VMO   was required to independently plan, coordinate and conduct studies as assigned.  "[T]he incumbent must be flexible, enterprising, and expedient in utilizing the full range of professional abilities. There are high requirements for good judgement and ability to conceptualize. To accomplish this, one must utilize personal contacts, regulations, policies, manuals, professional texts, technical publications, professional journals, and guidance from the Branch Chief to ensure timely completion of selected projects. " *Id*. at p.  69.  The position description also reflects that the duties involve highly complex investigation and analysis.

The nature of investigations is complex and may involve in-depth probing into practices and procedures of food animal production, processing, transportation, distribution, consumer purchasing, and preparation. This all has to be conducted within a framework of compliance with the needs and concerns of the individuals concerned or involved and within the needs of regulatory programs. Much of this may be highly sensitive and good judgement with prudence must prevail.

*Id*.  at p.  69, "Complexity";

The primary purpose of this position is to investigate and study potential meat and poultry borne enteric disease; determine and document their cause and extent; and, develop sound scientific, factually supported recommendations to correct and prevent such conditions.

The incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health.

The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens. The need for an interdisciplinary approach to problem definition and resolution requires the ability to coordinate efforts with both officials within and outside the Agency, as well as with the meat, poultry, and egg products industries and related organizations. Problems solved are extremely difficult in nature and the results have a significant impact on program direction.

---

[1] Exhibits from the Report of Investigation for case number FSIS-2006-02551.

*Id*. at p. 69-70 "Scope and Effect."

4.      Beginning in about March 2001, plaintiff's first line supervisor was Dr. Delila Parham. Parham affidavit, Blue at p. 50 ¶12.

## BACKGROUND

5.      In 2004, Dr. Thaler became Dr. Parham's first line supervisor and  plaintiff's second line supervisor.  Complaint at ¶17.

6.      When Dr. Thaler became  Dr. Parham's supervisor, Dr. Parham told Dr. Thaler plaintiff's performance was not very good and she said he should go on a performance improvement plan (PIP).  Parham affidavit, Blue at p. 51, ¶15.

7.   Dr. Parham verbally told plaintiff about his inadequate performance, and, during his mid-year appraisal in December 2004, she also gave him a detailed written account of his  work performance.   Parham affidavit, Blue at p. 51, ¶16.

**Mid-year Appraisal December 2004**

8.      On December 8, 2004, Dr. Parham, in the presence of Dr. Robert Brewer,  met informally with Dr. Chowdhury to discuss her concerns with his unacceptable work performance.  DDR 548; IPRO 548.  Since Dr. Chowdhury was going to be on leave for approximately the entire month of January, 2005, it was decided that he should be given a mid-year performance appraisal prior to his leave.  *Id.*

*9.*      On December 20, 2004, Drs Parham and Thaler met with Dr. Chowdhury to discuss his mid year performance appraisal.  *Id.*  At that time they gave him a memorandum outlining the reasons why his performance had been found to be unacceptable.  IPRO 1807-1809  (Red Ex 15 at p. 10-12).    The memorandum addressed three  areas in which  plaintiff's performance was found by them  to be unsuccessful:   Mission Support, Research and Analysis, and Personal Contacts.  It reflected that "Major projects  were received late and only after setting a 'final' due date. On one project, no work was being done, and there was no discussion with the supervisor to apprise her of the situation." *Id*.   The document discussed problems with the Colombia and

Thailand Review, and the Toxoplasmosis project which plaintiff had abandoned without telling

Dr. Parham.  It stated that "Dr. Chowdhury struggles with providing well-researched,

well-written assignments. He does not ensure that all relevant and technical scientific issues are

fully analyzed, and, therefore, much of his work is returned to him for more in-depth analysis.

Moreover, the majority of his work requires major edits and revisions." *Id.*  Also "Dr.

Chowdhury does not accept supervision well. When attempting to discuss additional 'work

needed on projects that he is assigned, he has become loud and disruptive with his supervisor. . . .

Dr. Chowdhury does not provide the supervisor with information that would inform the decision.

. . . In some situations he discussed assignments with personnel outside the branch and made a

decision that he would not continue to work on the assignment based on his discussion with these

individuals. Although he discontinued work on the assignment, he did not inform his

supervisor." IPRO 1807-1809 (Red Ex 15 at p. 10-12)  The document also discussed various

actions to be taken to help improve performance including frequent meetings with Dr. Parham

and preparation of a daily journal specifying the work plaintiff was doing and the time spent on

said activities. *Id.*

**August 2005  – Performance Improvement Plan (PIP)**

10.    The Department of Agriculture, Food Safety and Inspection Service (FSIS) Directives

provide that a supervisor

> should inform an employee in writing if performance on a critical element falls
> below the fully successful level as soon as that fact becomes apparent.  The
> supervisor should place the employee under a PIP.  The PIP provides the
> employee a reasonable opportunity to improve performance to the fully successful
> level before the employee receives a rating of record of "Unacceptable."

FSIS Directive 4430.1, Blue at p. 353.  The supervisor must identify the performance elements

and standards not accomplished at the fully successful level and provide "reasonable means to

assist . . . in improving performance. . . [such as] training, closer supervision, revision of

assignments, or coaching. *Id.*  The supervisor also was to "Describe specific incidents that

illustrate the failure to meet the standards. *Id.*   The employee is to be given a reasonable time to

4

demonstrate performance at the fully successful level "usually no less that 30 days." *Id.*

11.     The directive sets forth what must be in a PIP: identification of critical element being failed, what must be done to bring performance to the fully successful level, time frame provided for improvement, assistance offered, and consequences of failure to bring performance to fully successful level. *Id.* at p. 352.

12.      "Management may reduce in grade, remove, or reassign  employees whose performance continues to be unacceptable." *Id.*  at p. 351.

13.     Plaintiff was not given a rating of record following the end of the appraisal period June 30, 2005.  Rather, on August 9, 2005,  plaintiff was advised that his performance continued to be at the unsatisfactory level and that he would be placed on a Performance Improvement Plan. Parham Dec at ¶ 5.

14.     Plaintiff was issued a memorandum instituting the PIP dated August 16, 2005:

> This notice is written confirmation that I am providing you with an opportunity to improve your performance to the Fully Successful level. At your midyear appraisal on December 20, 2004, you were advised that you were not working at the Fully Successful level and given a document detailing the concerns about your work and actions needed to correct the concerns listed. (See Exhibits 1-5 that includes the midyear performance appraisal document and supporting email messages.) You have had two major projects since your midyear appraisal and from your work on these projects I have determined  that your performance continues to be unacceptable in three elements of your position. The following Performance Improvement Plan (PIP) outlines activities that you must complete to attain a Fully Successful rating in the two critical and one non-critical element in which your performance has fallen to an unacceptable level. If you have any concerns about the PIP or require additional guidance in following it, please let me know as soon as the questions arise.
>      The PIP becomes effective today and will continue for 90 calendar days from today. It is important to perform well under the performance standards that were provided to you on July 18, 2005. A copy of the elements and standards for your job is attached. By the end of the opportunity period, you must have brought your performance up to at least the Fully Successful level in each of the critical elements that you are currently unacceptable in to avoid a reduction in grade or removal. This PIP is to assist you in reaching that objective.

PIP at p. 1.

15.     The PIP provided for plaintiff to meet weekly with Dr. Parham, or in her absence with Dr. Thaler.  PIP at p. 1.

16.    The PIP required plaintiff to keep an expanded daily journal:

> In December 2004, following a discussion that you had not accomplished any work on 'a particular project, I requested that you begin keeping a journal so you could track your time and make adjustments, as necessary, to use it more efficiently. Beginning this week, you will be required to complete a more expanded version of your journal. Currently, you provide a very general list of tasks that you are working on. I am now requesting that you expand this list to include the number of tasks that you have completed and more specific details about the work performed on each task. For example, one of your tasks in your May 26, 2005, journal was working on the thinking paper." (See Exhibit b.) You will need to explain specifically what work was being done and at what stage you are in the paper; that is, you might indicate that you have contacted personnel at the National Agriculture library to begin the literature search, how much time was involved, how many references were ordered, and when you expect to receive the reference material. You will continue to submit the journal to me by close of business on the Thursday of the second week of the pay period. The new, expanded journal should prove helpful in our discussions on your progress in reaching the Fully Successful level during the next 90 days.

PIP at p. 1-2.

17.    The PIP stated that

> The deficiencies in your performance have been in the critical elements of Mission Support and Research and Analysis and the non-critical element of Communications. These elements reflect the complexity and nature of work that is performed and expected in the Zoonoses Branch at the GS- 13 level.

PIP at p. 2.

> Currently, your performance in these elements is at an unacceptable level as evidenced in the number of errors I hare found in your work and the missed deadlines. As was discussed at the midyear appraisal, major projects were received late and only after I set a "final" due date. In addition, work products received did not demonstrate the complexity and nature of work that should be performed by personnel in the Zoonooses Branch at the 05-13 grade level. You have had two major projects since the midyear evaluation, a "thinking paper" and a toxoplasmosis paper. While unacceptable work performance was not limited to task associated solely to these projects, they will be discussed as representative examples of your work following the midyear appraisal in December.

PIP at p. 4-5.

18.    The PIP set forth two examples of what Dr. Parham considered unacceptable performance, under the critical elements Mission Support and Research and Analysis and the non-critical element of Communications, citing his work on a "Thinking Paper" and on the "toxoplasmosis paper." PIP at p. 4-5.

19.     The PIP issued to plaintiff dated August 16, 2005 had the following assessment

concerning the thinking paper:

> Thinking Paper: The thinking paper, which you were asked to model after the Agency's bovine spongiform encephalopathy thinking paper, had to be returned to you to conduct more extensive scientific research and studies. You were asked to think broadly then began narrowing the paper down to a workable one. Your first draft was submitted on March 9, 2005; it was not well researched, lacked depth, and did not provide adequate support for the work suggested. The paper was returned to you with recommendations for conducting more thorough study and analysis, and you immediately requested an extension of one month without even attempting to meet the due date, delaying submittal of the paper until May 20. The second draft of the paper was longer and showed that you had done more 'work, but still could not be considered a comprehensive scientific review of the issues. You failed to fully develop the role of the Zoonoses Branch to the level of specific recommendations with the pros and cons of each and priority for meeting strategic goals. When the first draft was returned to you, I recommended that you consult others for input into the paper, providing you an opportunity to collaborate with other federal and state government personnel, academia, and others to clarify and exchange information on the branch's role, support information in the paper, and discuss potential research needs of the Agency related to zoonotic or emerging diseases. The second draft did not show that you had collaborated with others to assist you in your determinations. In addition, much of the material in the paper had been lifted directly from other sources, some without acknowledging the sources, which violates applicable Agency rules and regulations against this type of practice. . . .
> * * *
>
> As discussed in the Mission Support element, the thinking paper had to be returned to you to conduct more extensive scientific research and studies. The drafts you submitted were not comprehensive, did not provide an adequate analysis of the issues, and did not suggest an ability to design an effective study approach or utilize analytical methods and objectives. Although you were expected to write this as a scientific paper, no references were included with the first draft to support the ideas and conclusions drawn in the paper. There was little attempt to analyze the effect of Agency policy proposals on current projects and initiatives. As written, the paper would not allow you to make meaningful recommendations for future projects and initiatives, and of the recommendations made, most are currently being done or under discussion. . . .
> * * *
> The assignment was not timely. The original assignment was discussed with you verbally at least one week prior to your formally receiving the task on February 25, 2005. You submitted the first draft on March 9, 2005. The paper was returned to you for corrections with a due date of April 22. You immediately requested an extension of one month without even attempting to meet the due date, submitting the paper on May 20. This branch is expected to produce well-written scientific papers; both drafts of the thinking paper were poorly written and could not be accepted for Agency use without much needed work. Some of the material lack references, especially the section on avian influenza. Much of the material has been lifted exactly as written from other documents. Lifting text from another manuscript without proper reference is not acceptable. In early July following training courses in May and June, you were given an opportunity to revise or modify the document but informed me that you were satisfied with the paper as written. Work on this

paper presented an opportunity for you to liaison with federal and state government personnel, academia, and others to clarify and exchange information on the branch's role and support information in the paper, which was recommended when the first draft was returned to you, but there was no evidence in the second draft that you did this. . . .

PIP at p. 5-9.

20.    The PIP issued to plaintiff dated August 16, 2005 had the following assessment

concerning the toxoplasmosis paper:

For the toxoplasmosis project, an independent research project in which you were expected to develop the project plan and establish milestones, you have again performed no work on the project beyond submittal of the project plan in February. This project was carried over from the 2003-2004 rating cycle. Although no work had been done on the project prior to the midyear appraisal in December, during the appraisal you indicated to Dr. Thaler and me that you wished to retain the project and would begin the necessary research. You were given ideas for developing a feasible plan in February, and some work could have been completed within one month. Only after a task request was sent via Outlook in July 2005 did you admit that no additional work had been done on the project, explaining that you thought that the thinking paper replaced the toxoplasmosis assignment. However, in August you submitted a new project plan indicating that you may have misunderstood. . . .

* * *

As of July 19, by your own admission, no work had been done beyond the project plan. Incomplete work products during this rating period are evidence of unacceptable execution of your analytical skills. It would also indicate an inability to plan, organize, and prioritize assigned work.

* * *

For the toxoplasmosis project, you failed to do work beyond drafting the project plan. When asked recently to give an update of the toxoplasmosis project, you indicated that you were not working on the project because you thought the thinking paper replaced the toxoplasmosis paper. This was not the case, and you made no attempt to clarify this. In August you sent an update of the toxoplasmosis project, admitting that I had not told you that the thinking paper replaced the toxoplasmosis paper, but I had never approved your project plan for the toxoplasmosis paper. You are correct that there is no written communication on this, but we have had verbal discussions in your office and at branch meetings. This is a failure to communicate, orally or in writing, to the supervisor to assist in clarifying or resolving a problem. In not continuing work on the project or providing a work product, you have not conducted business in a professional manner or shown a commitment to service.

PIP at p. 5-6.

**Tasks Required to Be Completed During PIP**

21.    The PIP gave plaintiff three tasks to complete successfully in a 90-day period in order

show improvement to the fully successful level –  preparation of 1) a Toxoplasmosis Paper, 2) a

Salmonella Serotype Paper, and 3) Bi-monthly Zoonotic Disease Surveillance reports. The PIP

also explained how successful completion of the tasks would demonstrate fully successful work

under the applicable performance standards:

**Tasks to Improve Performance to the Fully Successful Level**

During this opportunity period, you must improve your performance to at least the Fully
Successful level in order to continue in your position. The following is a list of specific
tasks that have been assigned to you **that must be completed during this opportunity
period**. **You must meet all deadlines for the tasks described below**. During this
opportunity period there may be other related tasks such as review of notices and/or
directives that are assigned to you that will also need to be completed timely and
accurately. [Emphasis added.]

**Toxoplasmosis Paper**: Prepare a scientific paper on toxoplasmosis as it relates to meat
and poultry, written in a format prescribed by a peer-reviewed journal. The paper must be
well researched with references and it must be free of major errors requiring few edits and
revisions. Within two weeks of receiving this letter you are expected to provide me with
your specific focus on the paper, provide the format for the paper, and establish milestones
and delivery dates for completing all work on the paper within this 90-day opportunity
period. The paper, if well written, properly researched and prepared for publication in a
peer-reviewed journal, would indicate Fully Successful performance in the following:

Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4[:]
Preparation of a paper for publication in a peer -reviewed journal would
demonstrate your knowledge and expertise of zoonotic diseases and pathogens and
the impact on food safety to address emerging and re-emerging diseases. It would
also demonstrate your ability to use available reference material and conduct a
comprehensive scientific study that would provide recommendations and support
analysis and management for specific Agency issues.

Research and Analysis element A, B, and C, and goals/activities #s 1 - 4[:]
Preparation of a paper for publication in a peer -reviewed journal would
demonstrate your ability to research and analyze issues thoroughly and accurately.
As discussed under Mission Support, it would also demonstrate your ability to use
available reference material and conduct a comprehensive scientific study that
would provide recommendations and support analysis and management for specific
Agency issues.

Communications element A, B, and C, and goals/activities #s lb, c, e, and g. [:]
Preparation of a paper for publication in a peer-reviewed journal would
demonstrate your ability to provide written documents that are clear, correct, and
presented in an understandable manner. It would show too that you can prepare
documents that are well written, researched, and organized, and reflect sound
scientific principles and concepts to consistently withstand scientific critique.

**Salmonella Serotype Paper**: Prepare a scientific paper of the top five poultry Salmonella serotypes, describing each serotype in detail, such as reservoirs, its public health significance, related antimicrobial resistance issues, etc. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. The paper, if well written and properly researched, would address a request made by the Assistant Deputy Administrator to provide descriptive information on key poultry Salmonella serotypes. It would indicate Fully Successful performance in:

> Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4[:] preparation of the report would demonstrate your ability to provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements. It would show that you are capable of conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues.

> Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4 [:] Preparation of the paper would show that you are capable of researching and analyzing issues thoroughly and accurately, and in a timely manner, making use of available reference sources that would allow you to identify and compile information to carry out the required analysis.

> Communications element A, B, and C, and goals/activities #s lb, c, e, and g[:] Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show that you can present written findings and observations to managers in a manner that enhances confidence and credibility in the Branch and Division.

**Zoonotic Disease Surveillance:** Prepare bi-monthly compilation of worldwide emerging zoonoses as indicated in scientific journals, newspapers, internet, and other available reference materials that may have potentially serious human health concerns and can possibly be foodborne (especially related to meat, poultry, and eggs). Submissions are due on Thursday by close of business and must be free of major errors and require few edits and revisions. The report, if conscientiously prepared and timely submitted, would provide the Zoonoses Branch with up-to-date information on zoonotic disease incidence worldwide and serve as a valuable reference source for Agency inquiries on the subject. It would indicate Fully Successful performance in:

> Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4 [:] Preparation of the report would indicate your ability to provide a work product that is responsive to the supervisor's and the organization's stated priorities and requirements. In preparing the report, you would acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.

> Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4 [:]

Preparation of the report would demonstrate your ability to make use of available reference sources, research and analyze issues thoroughly and accurately, identify and compile information, establish and maintain working files, and identify relevant scientific issues that may have policy implications.

Communications element A, B, and C, and goals/activities #s lb, c, e, and g [:] Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, timely, and presented in an understandable manner. It would indicate an ability to present written findings to colleagues and managers in a manner that enhances confidence and credibility in the Branch and Division.

PIP at p. 6-8.

22.    On about August 11, 2005, plaintiff had made an informal EEO complaint concerning his unsuccessful performance rating he had been advised about on August 9, 2005. EEO counselor report at p. 2; 10/11/05 Settlement agreement. On October 11, 2005, plaintiff signed a settlement agreement with the agency which, among matters, allowed

a) submission of the Salmonella Serotype Paper and Zoonotic Disease Surveillance Report by the end of November 2005,

b) an extension to submit the Toxoplasmosis Paper no later than December 31, 2005,

c) submission of a substantive progress report that includes updates on the three PIP projects on a weekly basis, in lieu of a daily journal, and

d) a 90-day detail, contingent upon his successful completion of the PIP.

Settlement agreement at p. 1.

Plaintiff agreed to "release, waive and withdraw all concerns, complaints. . .civil actions against the Agency . . . for any concerns arising out of these (or related) employment situations prior to the signing of the agreement."  10/11/05 Settlement Agreement at p. 2.

### SEPTEMBER 2005-DECEMBER 2005: PIP PERFORMANCE PERIOD

**Salmonella Serotype Assignment**

#### Background

23.    On  June 29, 2005, Loren Lang, the Deputy Assistant Administrator, Office of Public

Health and Science, of USDA's Food Safety and Inspection Service, in a voice mail, followed up with an E-mail to Dr, Thaler, assigned the Zoonoses Branch to take the lead on an assignment pertaining to salmonella serotypes:

> Re: my voice mail I just left.
>
> OFO wants us to look at:
>
> Top 20 Serotypes in young chickens 1998-2005.    Number and % of total samples with Serotypes (All sets)
>
> Top 20 human illnesses by year (maybe just last couple years).
>
> Trends or changes
>
> What is known about sources
>
> ZDRSD should take lead and get help from HHSD on human data.

June 29, 2005 Lange e-mail.

24.    The next day, Dr. Parham sent an e-mail interpreting Mr. Lange's request.  Blue 327-328. He responded indicating that the item numbered 3 reflected his original request.  *Id.*

25.    Dr. Parham assigned Drs. Anandaraman and Maqbool to put together information on the top 20 Salmonella serotypes for poultry and humans.   July 6, 05 Parham e-mail.  Dr. Chowdhury was assigned to work on descriptive data on the 20 salmonella serotypes for chickens.  *Id.*

26.    Dr. Chowdhury was given a list of chicken serotypes.  His specific assignment was as follows

> you are providing a brief statement (paragraph) on each of the young chicken serotypes listed . . .You will indicate the reservoirs, commonality, public health significance, and other pertinent facts, etc.  The paper must include references."

PDR 242, Parham assignment to Chowdhury start date June 30, 2005.

27.    On July 7, 2005, plaintiff sent to Dr. Parham, with a cc to Dr. Thaler, a partial report on serotypes numbered 11-20.  PDR 256.  The following is an example of the information as provided by plaintiff for each serotype:

<u>(1) Typhimurium.</u>

> Resevoirs: Domestic and wild animals, including poultry, swine, and cattle,
> rodents and pet animals, and also man.
> Commonality: Man, Cattle, Swine, Turkey
>
> Public health significance: Very high
>
> Antigenic character: 1,4,[5], 12,1

*See* DDR 445-450, plaintiff's July 7, 2005 submission.

28.    On July 12, 2005, plaintiff submitted a second draft of his paper.  PDR  244.

29.     Mr. Lange reviewed plaintiff's  submission and stated:

> The July 2005 report.  Looks like copied from a standard reference.  No
> relationship from references to presentation.  No value added.  What do the
> findings mean for FSIS.

DDR 442.

### **PIP Performance**

30.    The PIP required plaintiff to redo the project, but limited to only five (5) serotypes.    *See*

¶21  above.

31.    On November 14, 2005, plaintiff gave a draft of the salmonella paper to Dr. Parham.  Blue

217.  On November 21, 2005, Dr. Parham discussed with plaintiff needed revisions to the

document.  Blue 218-219.  The discussion incorporated suggestions/criticisms from Dr. Thaler.

Blue 329.

32.    Plaintiff submitted his final paper to Drs. Parham and Thaler on November 30, 2005.  Blue

333.

33.    A copy of the document was sent to Mr. Lange with a request for his comments.  Blue

344- 345.   He made hand written notes on the face of the document for about three pages.  IPRO

481- 490.  Then he wrote

> I've read enough to see that data is carelessly or inaccurately presented.  The text
> as written is inaccurate . . . .
>         The material doesn't present the information in a format that addresses
> OPHS issues.  I would expect a GS-13 analyst to organize material to address a
> serotype in the following manner:
>
> Heidelberg:
>         1.  Presence in FSIS regulated products.

Yes chicken is high, but how could one not mention Heidelberg in market hogs?

2.  Then discuss some documentation of outbreaks attributed to FSIS regulated products.

3.  Finally summarize some "expert opinion" about links to specific products. What do experts think are the likely sources of human illness?  While this may go beyond the letter of the original request, it is what we would expect of a GS-13 analyst in OPHS

IPRO 477-478.

34.    Dr. Parham prepared a summary assessment which included  her and Dr. Thaler's assessment of the paper as well as Mr. Lange's.   PIP Summary Assessment.

**Toxoplasmosis Assignment**

   **PIP Performance**

35.    As was discussed above, plaintiff previously had been assigned to do a paper concerning toxoplasmosis.  See ¶ 20 above.

36.    During the PIP period Plaintiff submitted some daily journal and then progress reports concerning his work .  Blue 192-206.  Plaintiff also had meetings with Dr. Parham and/or Dr. Thaler during which he was supposed to discuss his progress with the three PIP assignments.  Blue at p. 207-224.

37.    On December 1, 2005, plaintiff submitted a work plan for the toxoplasmosis paper to Dr. Parham.  Blue 300.

38.     Plaintiff submitted the Toxoplasmosis paper to Dr. Parham by e-mail dated December 30,  2005. Blue 283.

39.    Dr.  Eric Hemphill, was asked to review the document.  Blue 283.  He stated:

In general the document is a helpful regurgitation (review) of information on Toxoplasmosis.  There are, however, numerous grammatical errors and needs additional/critical wordsmithing.   I suggest that the author review and make appropriate corrections, entries and changes prior to further distribution.
A paragraph or so on conclusion of the paper and future considerations for research (i.e., developing a vaccine) may be useful but not necessary.
Other than that please note comments re the paper. FEH
P.S.  Author also leans heavily on Dubey et al., in same 1990 AVMA journal.

Blue 283.  Dr.  Hemphell also submitted written edits and comments on the face of the document.

*See* Blue 284- 295.

40.     Katie Pritchard, Writer/Editor (OPHS employee) also was asked to review the document.

Her overall assessment was as follows:

> To put it bluntly, this document should not proceed further in the review or
> clearance process without first undergoing substantial changes and rewriting.  I
> would not clear this document if it was sent to me for that purpose, nor would I
> attempt to edit it because there are simply too many problems.  This document is
> not ready for review.  Overall, the main idea of the paper it lost on the reader.  It is
> poorly organized and difficult to follow.  The document seems as though it is
> pieced together.   As a result, there is no flow of information and the document
> seems to jump from idea to idea, never fully explaining the main point.

Blue 279.  Ms.  Pritchard then discussed various categories of problems relating to the paper

including "References to Studies" (e.g. lack of information concerning what the studies were or

what the actual results were; use of ambiguous time frames and geographical references);

"Inconsistencies" (in uses of various words); "Awkward phrasing" (which "makes sentences

difficult  to understand and often times,  not make sense at all") "Other errors" (prevelance of

spelling, punctuation, and grammatical errors).  Blue 279-282.

41.     Dr. Thaler also reviewed the document.   Dr. Thaler prepared a memorandum discussing

some of the deficiencies she perceived  in plaintiff's work product

> I completed my initial review of Dr. Chowdhury's Toxoplasmosis paper. At a
> GS-13 level, I expect an initial work product to be ready to review for substance,
> without significant basic editing mistakes. As stated in the PIP letter.   The paper
> must be well researched with references and it must be free of major errors
> requiring few edits and revisions. A GS-13 level staff officer would be expected to
> independently determine when to use his professional contacts to assist in review
> of a paper prior to submitting it to his supervisor. A GS-13 level staff officer also is
> expected to prioritize the work to meet quality and timeliness goals. Dr.
> Chowdhury informed me that he decided to devote only the 30-day extension of
> the PIP to writing the Toxoplasmosis paper.
>
> From the perspective of being ready for supervisory review, the paper is
> disappointing.

 Thaler Toxo comments, Blue 272-277.   Dr. Thaler noted style inconsistencies, grammatical

errors, and misspelled words.  She found the substance of the paper to be poor, with, among other

matters, no analysis, conclusions which contradicted the data.  She found that "scientific

information in the references used demonstrates an inability to extract and use the data properly;"

15

"[t]he data was not organized or analyzed," and  there were  no graphs or tables to aide comprehension.   Dr.  Thaler supplied examples  of her concerns.   *Id*.

42.        Dr. Parham also assessed the paper as poorly written, requiring numerous edits of grammar, punctuation and spelling.   Parham Toxo comments,  Blue 278.   She noted data "strung together with little attempt to analyze or interpret it or arrange it in a coherent and rational manner that provides for order throughout the paper."  Blue 278. "Material is often improperly referenced or missing a reference and much of it has been plagiarised.  In some cases the literature seems to be misunderstood or misinterpreted. " *Id.*

### UNACCEPTABLE RATING AFTER PIP

43.        On February 8, 2006, plaintiff received his final evaluation for July 1, 2004 to June 30 2005; the rating was unsuccessful.  Blue 74.  By memorandum dated February 8, 2006, Dr. Parham advised plaintiff that his performance rating remained at the unsuccessful level, because he had failed to complete the PIP successfully.  Blue 80-82 and Summary Assessment.

44.        Plaintiff was advised that he had submitted an acceptable final product for the assignment to compile a bimonthly report on zoonotic and emerging diseases, but that the papers on toxoplasmosis and salmonella serotypes did not meet the acceptable level.  Blue 80.

45.   The Summary Assessment stated the following concerning plaintiff's toxoplasmosis paper:

> Accomplishment: Dr. Chowdhury acknowledged his concern about completing the work in the required time frame at almost every weekly meeting. Yet, he afforded no opportunity for Drs. Thaler or Parham to assist him because he did not provide project plans with milestones and delivery dates, outlines, or drafts for review.  At the September 12 meeting, he provided a very sketchy work plan that did not include milestones and delivery dates.  At the September 19 meeting, he indicated that he had started the literature review and had begun to write the paper, but later said he would not begin writing the paper until the end of October. At the November 21 meeting, Dr. Chowdhury admitted that he was not far along with the toxoplasmosis paper and would not be able to turn his attention to it until he completed the other two projects.  In the December 19 meeting, he indicated that he had begun "patching" the paper together, and would spend the following week reviewing and making corrections to the paper. When asked in the December 19 meeting if Dr. Parham could assist him by reviewing his outline or draft, he said assistance was not needed because he did not have an outline or draft ready to show.  He explained that it would be difficult to have someone review the paper because they would need at least one week to do so. At the December 19 meeting, although concerned about the time, Dr. Chowdhury expressed confidence in having the paper ready on the due date.

Assessment: This project was not completed successfully. Dr. Chowdhury submitted his review paper, "Seroprevalence of *Toxoplasma gondii* infection in various food animal species in the United States of America and its public health significance," on December 30, 2005. The submission was timely, but the work product was not completed to the required level of quality for work of this type. Drs. Alice Thaler, Erich Hemphill, and Delila Parham, ZDRSD, OPHS, and Katrine Pritchard, Management Support Staff, OPHS, reviewed the final paper. Dr. Hemphill is the branch chief of the Animal and Egg Production Food Safety Branch, and serves on the National Pork Board *Toxoplasma/Trichina* Committee. Ms. Pritchard is the editor/writer for OPHS. All reviewers agreed that the paper is poorly written and has major errors that would require significant edits or revisions before it would be cleared by the Agency for submittal to a peer-reviewed journal. The work product did not meet the Fully Successful level for the three elements described below. The examples are not comprehensive, but are meant to illustrate a general pattern that indicates less than acceptable performance for each element.

### A. Mission Support (Critical):

Although some level of error is anticipated in a first draft, the number of errors found in the paper indicating misinterpretation or misunderstanding of the literature is unacceptable. For example, narrow, geographical-based studies are used to represent the national picture. In the etiology and transmissions section of the paper, Dr. Chowdhury states that the "investigation also confirmed that all mammalian wild animals (cats, raccoons, opossums, skunks, house mice, white footed mice, rats) serve as the main reservoirs of *T. gondii* infection in swine. However, what is actually stated in the abstract of the reference is, "All mammalian species examined were reservoirs of *T. gondii* infection." In the discussion section, the reference states, "The current investigation has identified all mammalian species captured in large numbers on swine farms in Illinois (cats, raccoons, opossums, skunks, house mice, white-footed mice, rats) as reservoirs of *T. gondii* infection." The findings are representative of Illinois only.

The paper contains material that has been copied verbatim from references, without proper acknowledgment of the source. In some cases, material is copied and given seemingly minor word changes that result in erroneous statements being made. In the etiology and transmission section, Dr. Chowdhury states, "Cats are the only primary host since all the developing stages occur in the cat and not in other animals." The reference states, "Cats are the definitive hosts for *Toxoplasma gondii*, since all the developmental stages occur in the cat and not in other species. Cats and other felines are the only definitive host – meaning the only host where the parasite completes its life cycle and produces oocysts (eggs). By using "primary host" and only discussing household cats, it could be inferred that there are several hosts where the parasite can complete its life cycle. While some word changes made by Dr. Chowdhury resulted in true statements, the statements may not reflect the intent of the reference. For example, Dr. Chowdhury states, "Domestic animals can become infected by eating oocysts from a contaminated environment (feed contaminated by cat's feces) or by eating raw or poorly cooked meats that are contaminated by the cat's feces or rodents. The reference states, "Hogs can become infected by eating oocysts from a contaminated environment (for example, in feed contaminated by cats) or by eating poorly cooked meats that are contaminated (for example, rodents dying in hog pens.)" While it is true that domestic animals can become infected by eating oocysts from a contaminated environment, as used in the paper, it is a broader claim than can be supported with the reference.

No real analysis, discussion, summary, or conclusion is provided to pull the "pieces"

together to make the review relevant and useful to the Agency. While there are a few recommendations under the control section, the paper shows a lack of knowledge about the Agency's plans for addressing *T. gondii* in the slaughterhouse. The paper states, "It has been recommended that until examination of meat for *T. gondii* infection is implemented in the slaughterhouse; all meat should be cooked according to industry guidelines before human consumption in order to reduce the potential for transmission of *T. gondii* in humans." The Agency has not indicated that testing will occur ever at the slaughterhouse, no quick test is currently available, and industry is required to provide safe food handling labels, not cooking labels.

### B. Research and Analysis (Critical)

A review paper is meant to be a comparison and synthesis of results from various investigations. Many studies are cited throughout the paper, but no real information on what the results show is presented.  Many of the references used in the paper are "fact sheets, and are not from peer reviewed literature. Generally, background references such as textbooks or fact sheets are used to acquaint the author with the subject matter and are not cited because they contain information that is common knowledge in the subject area. Timeframes for the studies are either omitted or referred to in vague terms such as "more recent" or "much earlier."  Data are strung together with little attempt to analyze or interpret it. Percentages are used as evidence of various points, but since true numbers from the studies are not shown, there is no way of knowing what they mean. For example, the abstract states, "In the swine populations, *Toxoplasma gondii* antibodies were more prevalent in breeding swine (An average: 13.2%) than among finishing swine (An average: 4.3%), and prevalence of *T. gondii* was markedly lower among the swine raised in confinement (An average: 9.3%) than the pig herds in non-confinement facilities (An average: 14.1%)."  Several inconsistencies are noted in the paper. For example, Dr. Chowdhury states that confinement operations are expected to reduce exposure to toxoplasmosis; however, pigs are raised in confinement yet pose a high risk of infecting people. Conversely, he states animals raised outdoors risk greater exposure to toxoplasmosis, but does not explain why cattle, which are raised outdoors, pose a low risk of infecting people.

### C. Communications (Non-critical)

Numerous grammatical, spelling, and punctuation errors indicate that the document was not even "spell-checked" before submission. In the very first line of the document, the word "states" is spelled "sates." The paper lacks order and a consistent style of presentation throughout. For example, the paper switches at random between the words pigs, swine, and hogs.  Similarly, references to pork are varied: pig meat, meat (pork), and pork meat, as are references to the United States: US, USA, America, states of America, and United States of America. Phrasing is often awkward or unclear. For example, the paper states, "Pregnant women may not get *T. gondii* infection by the direct contact with cats, as the oocysts are not found on cat fur and are often buried in soil along with cat feces, and pregnant women probably get the diseases from the contaminated soil by cat feces."  Material has been plagiarized, which violates applicable Agency rules and regulations against this type of practice.

Summary Assessment at p. 1-4.

46.  The summary Assessment stated the following concerning the Salmonella Serotype Paper

Accomplishment:  At the September 19 meeting, Dr. Chowdhury shared the list of five serotypes he would address in his report, and indicated that he had begun the literature review. However, Dr. Chowdhury wrote in his October 21 progress report, "This week I made some headway in my serovars assignments. That is I have decided to stop running door to door to ask for help from experts/Microbiologists and making phone calls and sending emails (which has absorbed my enormous amount of time) which has turned out to be unproductive. I get same old answer from everybody. Name of the game is—I shall have to make it up myself.  Best is to spend my time on literature search and pick something related to my purpose.  I will need to search thousands of articles to do a moderate job." In meetings held October 24, 2005, and November 7, 2005, Dr. Chowdhury acknowledged that he had hoped to find the material in a single source and had contacted several persons in and out of the agency including Moshe Dreyfuss, Branch Chief, Dr. Bonnie Rose, Kristina Barlow, Microbiology Division, OPHS, and Dr. Richard Gast, Agriculture Research Service, USDA, all of whom informed him that he would not find this information in a single source and provided possible sources that he might use to gather the information.  He expressed concern about the number of articles needed to write the paper and the paucity of information available for some of the serovars. At the November 7 meeting, he agreed to provide a draft of the paper at the next meeting.  The draft submitted on November 16, 2005, was poorly written, and Drs. Thaler and Parham provided extensive comments to the draft, which were discussed with him and included in the November 21 meeting notes.  No additional drafts were presented for review before the final paper was submitted.

Assessment: This project was not completed successfully. The paper was submitted on November 30, 2005, at the time required; however, it was not completed to the required level of quality for work of this type. Dr. Parham forwarded the paper to Loren Lange, Deputy Assistant Administrator, OPHS, to determine its adequacy in meeting his request. Mr. Lange commented that the data were carelessly or inaccurately presented and there were inaccuracies in the text. He did not think the material was presented in a format that addressed OPHS issues such as presence in FSIS regulated products and/or documentation of outbreaks attributed to FSIS regulated products. He did not find that this report reflected management expectations of a GS-13 analyst in OPHS. The work product did not meet the fully successful level for the three elements discussed below.  A few examples from the paper are provided as evidence of failure.

A. Mission Support (Critical):

Much of the information provided is too general for a paper of this nature and, often, does not address the specific topic being discussed.  Of the information provided, Mr. Lange found inaccuracies in the text as seen in the sentence, "This serovar is multiple drugs resistant."  Mr. Lange noted that resistance varies by serotype and/or strains.  Mr. Lange questioned the isolation rates provided in the paper.  Dr. Chowdhury obtained the percentages from a draft table prepared by Dr. Neena Anandaraman, Zoonoses Branch, ZDRSD, OPHS.  The table has not been published, which should have been noted in Dr. Chowdhury's paper. For S. Heidelberg, the isolation rates are not the same as those provided in the draft table from lowest to highest for 1998 – 2004.

B. Research and Analysis (Critical):

The paper did not demonstrate ability to research and analyze issues thoroughly and accurately. In many cases, relevant information has been omitted. For example, S. Heidelberg is a known pathogen in swine and found commonly in market hogs, a product

the Agency regulates.  Yet, the paper does not include swine as a reservoir for S. Heidelberg. The sections on public health significance do not elaborate, in most cases, on the true public health significance of the serotype.  For example, Dr. Chowdhury states that the public health significance for S. Heidelberg is moderate to high with about 5.39 - 8.0% isolated from human sources.  No further analysis is provided.  No attempt is made to correlate the information provided for isolation rates for young chickens and the public health significance. The text includes a lot of extraneous information, not relevant to the discussion. Several unnecessary paragraphs are included that provide no substantive information. For example, in the antimicrobial resistance section under S. Typhimurium, the paper states, "S. Typhimurium with excess mortality and the demonstration of a hazard to human health underscores the need for restrictions in the use of antimicrobial drugs in the production of food from animals.  A particular risk was associated with quinolone resistance, indicating that the use of fluoroquinolones for food production animals should be discontinued."  Discussion on the merits of using antimicrobial drugs in food animals is outside the scope of the paper.  Mr. Lange would not anticipate a discussion on this subject given that drug usage in food animals is regulated by the Food and Drug Administration.

C. Communications (Non-critical):

The paper is poorly written. There are many incomplete sentences, and many are unclear. Carelessly written sentences resulted in ambiguous statements.  For example, in the discussion on S. Heidelberg, it is written: Rate of isolation: 16.84 – 22.9% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998—2004) samples of broiler HACCP plants. Based on the manner in which the text was written, Mr. Lange assumed that the intent is to talk about the percent of young chicken isolates that are S. Heidelberg, but with the poor phrasing, it is unclear exactly what is intended. There are many grammatical errors as seen in these sentences: (1) Consuming shellfish taken from sewage-contaminated beds and raw fruits.  (2) Very high percentages (22-26%) was isolated from the human source by Public Health Laboratory Systems (PHLIS) reported to CDC (Center for Disease Control) from 1998-2003. The paper switches between "multiple drugs (s should be omitted) resistant" and "multiple antimicrobial resistant."  Both terms are incorrectly used in the paper.

Summary Assessment at p.  5-6.

47.     The assessment stated the following concerning the zoonoses assignment

Accomplishment: Dr. Chowdhury submitted six reports during the opportunity period. The term "bimonthly" was confusing to Dr. Chowdhury who interpreted it as every two months, while Dr. Parham interpreted it as every two weeks. Given the confusion over the term bimonthly, it was agreed in the September 12, 2005, meeting that the first report would be due on September 15, 2005, and six reports would be prepared during the opportunity period. The first report was several pages long, and had been simply cut-and-pasted primarily from ProMed Internet reports. No attempt had been made to organize the material using titles or subtitles or limit the paper by choosing only relevant material to include in the report. At the September 19 weekly meeting, Dr. Parham discussed the first report with Dr. Chowdhury and the need to improve it and especially the need to use more than one source for the report. The second report, dated September 29, 2005, was in the same format and style as the first report.  Dr. Thaler forwarded the report to ZDRSD staff requesting feedback on how useful the staff found the report and suggestions on the format and additional resources to obtain information that could be included in the report with the goal of producing as comprehensive a report as possible to

support surveillance efforts and policy based on science.  All comments were compiled by Dr. Thaler and provided to Drs. Chowdhury and Parham for discussion at the October 17 meeting.

While many found the "idea" of this type of report useful, they did not find the report useful as written.  One reviewer commented, "Very disappointing. Not acceptable. This is not a report. It appears to be mainly a "cut and paste" compilation of a few websites or abstracts of around four conditions. A report would require some sort of stated purpose, summary, or conclusion with these compilations as references, not the body of the report." Another reviewer commented, "Lot of information but not arranged," and provided a suggested style for arranging the material. The reviewer also suggested that Dr. Chowdhury "adopt a style or a format for compiling the report including adopting a [consistent] font." Dr. Chowdhury agreed to review the comments and work to provide a useful report.  Assisted by Dr. Thaler, he prepared a new format for the paper, and submitted it to Dr. Parham on October 18, 2005. The October 27 report, prepared in the new format, was submitted to the division director, branch chiefs, and Zoonoses Branch staff for review.  One reviewer commented that the avian influenza section was very good and informative, but questioned the accuracy of a statement that the EU did not feel it presented a threat to humans. The reviewer commented too that the quality of the work for the other diseases did not match that of avian influenza, the report should be checked carefully for spelling, typing, spacing, syntax and grammatical errors since these errors were very distracting to the reader, and that hyperlinks should be checked to see if they worked. The final report was submitted November 28, 2005.

Assessment:  The work product met the Fully Successful level for the three elements - Mission Support (Critical), Research and Analysis (Critical), and Communication (Non-critical) on Communication (Non-Critical).  Each submission was timely.  Dr. Harry Walker, Branch Chief, ZDRSD, OPHS, was asked to review the final report.  Dr. Walker had a few comments on the report, but indicated it was a good report. While Dr. Chowdhury required a lot of guidance from the first to the final report, the final report was considered acceptable.

*Id.*at p. 7-8.

48.     Plaintiff made initial contact with an EEO counselor on February 9, 2006.  Brown EEO counselor report.  He challenged the rating received following completion of the PIP.  *Id.* at p. 2.

49. Although the agency originally construed plaintiff's complaint as an allegation of non-compliance with the settlement agreement signed on October 11, 2005, plaintiff's counsel explained that the complaint was not about non-compliance, but was a new claim of discrimination

[I]t is clear that the terms of Dr. Chowdhury's new EEO complaint attack the substantive decisions made during the PIP, as opposed to any failure to abide by the agency's procedural obligations during that time.
       For these reasons it was error for the Employment Complaints Division to treat

Dr. Chowdhury's complaint as one for non-compliance.

Gould letter at p. 2-3. Therefore the complaint was treated as a new claim of discrimination concerning solely the outcome of the PIP. Bradshaw memo.

## TERMINATION OF EMPLOYMENT

50.    On May 22, 2006, plaintiff received a notice of proposed removal based on unacceptable performance. Blue 93-99.

51.    By letters dated May 31, 2006, plaintiff's counsel requested an oral conference and submitted a written objection to the proposed removal. Blue 114-124.

52.    The oral conference was held on June 15, 2006, with Oral Conference Officer Larry G. Janney, plaintiff and his counsel present. Blue 125-135.

53.    The oral conference officer reviewed plaintiff's objections to the proposed termination. In a decision dated August 13, 2006, he found "substantial evidence exists in support of the performance standards under which CHOWDHURY worked were valid, CHOWDHURY's performance in at least one critical element was deficient as charged, and CHOWDHURY was provided with a reasonable opportunity to demonstrate acceptable performance prior to proposing his removal . . .Therefore, it appears that Agency officials met its (sic) burden of proof and the removal action should go forward." Blue 135.

54.    Tia Gayle, Supervisory Employee Relations Specialist, was the final agency reviewing official concerning the proposed termination. By letter dated September 1, 2006, Ms. Gayle sustained the proposal to terminate plaintiff's employment. Blue 100-110.

## JUNE 9, 2006 E-MAIL RE PERU QUESTIONS

55.    On June 8, Dr. Thaler saw a report which had been prepared by plaintiff during her absence. Thaler Aff at p. 3. Red Tab 9. She reviewed the report, found what she believed to be  inaccuracies and misleading information in the report, revised it and resubmitted it to Dr. Holt. Thaler Aff at p. 3. Red Tab 9.

56.    Dr. Thaler sent an e-mail to David Goldman and to the members of her staff who had

been involved in the handling of the report. In the e-mail she expressed her problems with the report and manner in which it had been handled.  Thaler aff at p. 4.

57.     The e-mail, in sum 1) stated that OIA rather than OPHS should have responded to the questions from Peru; 2) stated that the document as submitted was not acceptable; 3) apologized to her boss for a document being sent to him which had not received adequate review, and 4) stated "We will instruct employees who are acting as the branch chief  to not clear documents on sensitive issues until they have been reviewed by at least the branch chief and division director."  June 9, 2006 Thaler e-mail Red Tab 21.

Respectfully submitted,

_____
/s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
/s/ Rudolph Contreras
RUDOLPH  CONTRERAS, D.C. Bar #434122
    Assistant United States Attorney

_____
/s/ Rhonda C. Fields
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

.

**Date: March 9, 2005**

**Subject:  Thoughts on Future Work for the Zoonoses Branch.**

Introduction:

Bacterial contamination of food represents one of the major public health problems worldwide. The United States Department of Agriculture, Food Safety and Inspection Service (FSIS), adopts inspection of meat and poultry to ensure they are safe, wholesome, and adequately labeled.

Modern advances in the field of microbiology and epidemiology of fooborne disease indicate that microorganisms which may go undetected during the traditional inspection techniques may sometimes cause foodborne illness. According to the Foodborne Diseases Active Surveillance Network (FoodNet) in the United States, each year foodborne illness affect 6 to 80 million persons, cause 9,000 deaths, and cost an estimated 5 billion U.S. dollars.  Approximately fifty percent of the reported foodborne disease outbreaks implicate meat, poultry and/or products containing meat and poultry as vehicles for the pathogens.  With respect to human health, zoonotic agents are the most important causal factor prevails in food animal at slaughter plants.   Many human pathogens can reside harmlessly on the feathers or skin of the healthy birds or in their digestive tracts.   Even when produced under ideal conditions, carcasses from normal, healthy broiler chickens can contain a variety of bacteria, including some human pathogens. According to the UK's Food Standards Agency (FSA), Campylobacter is the most common cause of food poisoning in the UK and chicken is a major source of this type of bacteria in the kitchen.

After the Campylobacter as the most frequently found foodborne agent, some other disease causing agents such as Listeria, Toxoplasma and recently incriminated virus Avian Influenza A (H5B1) should also come under consideration.

Therefore under the above circumstance I do consider that, Zoonoses Branch can investigate the risk profiles of the following foodborne pathogens listed below, (most priority item at the top of the list):

1.  Campylobacteriosis
2.  Listeriosis
3.  Toxoplasmosis
4.  Avian Influenza A (H5B1)

Many chicken flocks are silently infected with Campylobacter; that is, the chickens are infected with the organism but show no signs of illness. Campylobacter can be easily spread from bird to bird through a common water source or through contact with infected feces. When an infected bird is slaughtered, Campylobacter can be transferred from the intestines to the meat. More than half of the raw chicken in the United States market has Campylobacter on it. Campylobacter is also present in the giblets, especially the liver.

Poultry get infected with Campylobacter most likely during the pre-harvesting stage. We can discuss how we can assess the risks and what will be the mode of our investigations. Finally we can recommend our suggestions to intervene the risk factors.


Khurshed A. Chowdhury, DVM., Ph.D.
VMO, ZDRSD.

| | |
|---|---|
| **From:** | Chowdhury, Khurshed [IMCEAEX-_O=USDA_OU=FSISHQTR_CN=RECIPIENTS_CN=KCHOWDHURY@fsis.usda.gov] |
| **Sent:** | Wednesday, March 16, 2005 9:02 AM |
| **To:** | Parham, Delila |
| **Subject:** | RE: Thoughts on Zoonoses Branch Work |
| **Attachments:** | Thoughts on future work of Zoonoses branch.doc |

Hi Delila,

Here is the attached copy of thinking paper you have requested.  Thanks.


Khurshed


    -----Original Message-----
**From:** Parham, Delila
**Sent:** Wednesday, March 16, 2005 7:44 AM
**To:** Chowdhury, Khurshed
**Subject:** Thoughts on Zoonoses Branch Work

Please forward an electronic copy of your thinking paper to me.  Also, I hope you have continued to work on it and provide more thoughts in greater detail.

Thanks.

Delila

Date; July 19, 2005

To: Delila Parham
    Chief, Zoonoses Branch.
    ZDRSD.

From: Khurshed Chowdhury
      VMO, Zoonoses Branch

Subject:  Thinking Paper on Future Works for the Zoonoses Branch.


**Please Note**:  I have gone through my paper in which I have suggested some research works that Zoonoses branch can participate and I have found this paper O.K. to me for our discussion. Since FSIS is not a research agency, it must reach out to other research agencies within the Federal government (e.g. ARS), and to the private sector, to meet its research needs. I don't know what and how much Zoonoses branch can perform to conduct any research on these subjects that I have described. Also do not know what should be the role of Zoonoses branch on these above tasks. I also do not know how much research fund we have in order to conduct any research.  Please let me know how much we can spend on research.

I believe Zoonoses branch could determine the mode of work through brainstorming discussions amongst the staffs of Zoonoses branch. Therefore, I suggest that we could have series of discussion meetings and could reach the project target through our brainstorming discussions. And if we can fix our budget then we can formulate our research. Please let me know your decision.  Thanks.


Introduction:

Bacterial contamination of food represents one of the major public health problems worldwide. The United States Department of Agriculture, Food Safety and Inspection Service (FSIS), adopts inspection of meat and poultry to ensure they are safe, wholesome, and adequately labeled.

According to the scientific status summary [1] of the institute of food technologists, and food safety research priorities challenges[2] an estimated 76 million cases of foodborne illness occur each year in the US, cause 9000 deaths, costing between $6.5 and $34.9 billion in medical care and lost productivity.  In the US, incidence of foodborne illness is documented through FoodNet, a reporting system used by public health agencies that captures foodborne illness in over 13% of the population.

Modern advances in the field of microbiology and epidemiology of fooborne disease indicate that microorganisms which may go undetected during the traditional inspection

techniques may sometimes cause foodborne illness. Approximately fifty percent of the reported foodborne disease outbreaks implicate meat, poultry and/or products containing meat and poultry as vehicles for the pathogens. With respect to human health, zoonotic agents are the most important causal factor prevails in food animal at slaughter plants. Many human pathogens can reside harmlessly on the feathers or skin of the healthy birds or in their digestive tracts. Even when produced under ideal conditions, carcasses from normal, healthy broiler chickens can contain a variety of bacteria, including some human pathogens.

According to the surveillance data of 2004,[12] a total of 15,806 laboratory-diagnosed cases of infections in FoodNet surveillance areas were identified, as follows: *Salmonella*, 6,464; *Campylobacter*, 5,665; *Shigella*, 2,231; *Cryptosporidium*, 613; STEC O157, 401; *Yersinia*, 173; *Vibrio*, 124; *Listeria*, 120; and *Cyclospora,* 15. Overall incidence per 100,000 persons was 14.7 for *Salmonella,* 12.9 for *Campylobacter,* 5.1 for *Shigella,* and 0.9 for STEC O157. The overall incidence per 1 million persons was 13.2 for *Cryptosporidium,* 3.9 for *Yersinia,* 2.8 for *Vibrio,* 2.7 for *Listeria,* and 0.3 for *Cyclospora.* However, substantial variation occurred across surveillance sites.

According to the UK's Food Standards Agency (FSA), Campylobacter is the most common cause of food poisoning in the UK and chicken is a major source of this type of bacteria in the kitchen. After Salmonella, Campylobacter is the most frequently found foodborne agent, some other disease causing agents such as Listeria, Toxoplasma and recently incriminated virus Avian Influenza A (HPAI) should also come under consideration.

Avian influenza, though not a direct foodborne disese, has been recognized as the threat to the global food system. By remerging the AI globally this deadly disease has created global havoc by spreading SARS among the humans, and causing millions of birds loss, creating food shortages, also great economic losses to the many nations.

Therefore under the above circumstance I do consider that, Zoonoses Branch can investigate the present baseline data and risk profiles of the following foodborne pathogens listed below, (most priority item at the top of the list):

1. Campylobacteriosis
2. Listeriosis
3. Toxoplasmosis
4. Avian Influenza  (HPAI)


Brief descriptions of the selected important foodborne pathogens

A. Campylobacteriosis:

According to the Centers for Disease Control and Prevention (CDC) [3] and the US meat export federation [4] Campylobacter Jejuni is estimated to be the most common cause of

bacterial diarrhea disease in the US and overwhelming number of cases detected by the FoodNet system in 1997. Campylobacter affect over 1% of the US total population every year causing 5% mortality. The illness caused by Campylobacter jejuni is called campylobacteriosis.  Source of campylobacter jejuni organism include: poultry, shelfish, livestock and household pets.  Methods of transmitting the disease include: undercooked poultry and meats, raw (unpasteurized) milk and untreated water.

According to the FSIS research agenda [16] *Campylobacter* is the most frequently identified cause of acute infectious diarrhea internationally and is the most commonly isolated bacterial intestinal pathogen in the United States. It has been estimated that between 170,000-2,100,000 cases of campylobacteriosis occur annually with an associated 120-360 deaths. *Campylobacter jejuni* and *Campylobacter coli* (two closely related species) are commonly foodborne, and are the infectious agents most frequently described in association with Guillain-Barré Syndrome, perhaps as frequently as 1 in a 1000 cases.

Many chicken flocks are silently infected with Campylobacter; that is, the chickens are infected with the organism but show no signs of illness. Campylobacter can be easily spread from bird to bird through a common water source or through contact with infected feces. When an infected bird is slaughtered, Campylobacter can be transferred from the intestines to the meat. More than half of the raw chicken in the United States market has Campylobacter on it. Campylobacter is also present in the giblets, especially the liver. Poultry get infected with Campylobacter most likely during the pre-harvesting stage.

## B. Listeriosis

*L. monocytogenes* is a pathogenic bacterium found in the environment (e.g., in soil, water, vegetation and on the surfaces of equipment, floors and walls) and is often carried by healthy animals (including humans).  *L. monocytogenes* is spread very easily by direct food contact with a contaminated surface, and it can survive and grow in a refrigerated, packaged ready-to-eat (RTE) product.  Although frequently present in raw foods of both plant and animal origin, it also can be present in cooked foods because of post-processing contamination.

As per FSIS assessing team [5] food animals can carry *Listeria monocytogenes* in their intestines without becoming sick. As a result, the bacteria may be spread to meat and dairy products. *Listeria monocytogenes* is killed by cooking or by other heating methods, such as pasteurization, used to produce ready-to-eat foods. However, ready-to-eat food can become contaminated after processing within the processing plant or along the route from the plant to your plate. Outbreaks of listeriosis are associated with ready-to-eat foods such as hot dogs, luncheon meats, cold cuts, fermented or dry sausage, and other deli-style meat and poultry. In the home, *Listeria monocytogenes* is destroyed if ready-to-eat foods are reheated to steaming hot.

According to the CERHR report [6] consumption of food contaminated with *L. monocytogenes* can cause listeriosis. Listeriosis is a potentially fatal disease in newborns, the elderly and persons with weakened immune systems, such as those with chronic

disease or human immunodeficiency virus (HIV) infection or those taking chemotherapy for cancer. Listeriosis is also a major concern in pregnant women. Even though symptoms may be relatively mild in the mother, the illness can be transmitted to the fetus, causing illness or fetal death. Over all mortality rates by listeria is 28%.

According to the Centers for Disease Control and Prevention (CDC)[9], an estimated 1,100 people in the United States report serious illness from listeriosis each year. Of those reporting, approximately 25% die as a result of the illness.

C. Toxoplasmosis:

Toxoplasma gondii is a protozoan parasite which exists enzootically in wide variety of hosts including man. The parasite is worldwide in distribution. Serologic surveys by the Agriculture Research Service (ARS) study[7] indicate that infection is widespread in most domestic animals; however, except for abortions in sheep and goats, overt disease is sporadic and rare. Although variable in different parts of the US, the proportion of cattle, sheep, and swine with toxoplasma antibodies ranges from 40 to 50%. Antibody titers are common in sheep, goats, and pigs; less common in horses and cattle. Congenital infections are an important cause of abortions and stillbirths in humans and animals. The organism may be demonstrated in tissue sections, but diagnosis should be supported by serology since it can be confused with other protozoans. Most infections by *Toxoplasma* in humans and animals are asymptomatic. Approximately 30%-40% of human adults in the USA are estimated to have antibodies to *Toxoplasma*.

Both lamb and pork carry a higher risk of toxoplasma infection than beef and poultry, because of the fact that, animal that is reared outdoors may have greater risk of environmental exposure to the disease than the animal reared indoors.

According to study by ARS [7] pigs are important sources of infection for humans in the U.S. There is no doubt that the cat is the primary source of contamination of *T. gondii* in the environment and that the ingestion of oocysts from cats is the main mode of transmission to humans in countries where meat is cooked thoroughly before ingestion and the environment is heavily contaminated with *T. gondii* oocysts. In these situations, most people begin to acquire *T. gondii* infection during childhood.

However, in the U.S. and similar urbanized societies, most people become infected during their teens or adulthood. Studies by CDC [15] suggest that the ingestion of *T. gondii* tissue cysts in undercooked or uncooked meat is an important source of human infection. Eating contaminated raw or partly cooked meat, especially pork, lamb, or venison; by touching your hands to your mouth after handling undercooked meat. Contaminating food with knives, utensils, cutting boards and other foods that have had contact with raw meat. Drinking water contaminated with *Toxoplasma*. Receiving an infected organ transplant or blood transfusion, though this is rare, are the other sources of toxoplasma infection to humans.

D. Avian Influenza (HPAI)

Avian influenza is a viral disease caused by a contagious type Orthomyxovirus influenza virus type A. The disease affects a wide variety of avian species; including chickens, turkeys, pheasants, quail, ducks, geese, and guinea fowl. A highly pathogenic and a mildly pathogenic influenza type A viruses occur world-wide.

Migratory Waterfowl act as a natural reservoir of avian influenza virus by carrying the virus in their intestinal tract and shedding it in their feces. Avian influenza viruses are spread to susceptible birds through inhalation of influenza particles in nasal and respiratory secretions and from contact with the feces of infected birds. The risk to domestic poultry arises if they become infected with low pathogenic avian influenza viruses (LPAI) from wild birds, which then mutate and become high pathogenic viruses (HPAI). A second risk arises if wild birds become infected with HPAIs by contact with affected domestic poultry or their feces. The international movement of poultry, smuggling of pet and zoo birds, poultry equipment, and humans also poses a risk for transmission. Humans may potentially transmit Avian Influenza to animal and bird species, although the risk is moderate to low. Strains of virus believed to be derived from human sources have caused disease in chickens and calves. Mechanical transmission of the virus from humans to birds is more likely than biological transmission, although the risk of mechanical transmission is moderate.

Inter-species transmission: Birds- to pig- to humans or swine- to birds- to humans or duck- to chicken and then to humans; and virus remain in the wild birds. Recent outbreaks of AI caused considerable spread the disease to human infections (Cambodia-2, Thailand-17, and Vietnam 60, Hong Kong 18, Netherlands 5) have caused great global concerns.


Worldwide, there are many strains of avian influenza (AI) virus that can cause varying amounts of clinical illness in poultry. AI viruses can be classified into low pathogenic (LPAI) and highly pathogenic (HPAI) forms based on the severity of the illness they cause. Most AI virus strains are LPAI and typically cause little or no clinical signs in infected birds. However, some LPAI virus strains are capable of mutating under field conditions into HPAI viruses. HPAI is an extremely infectious and the fatal form of the disease HPAI can strike poultry quickly without any infection warning signs. Once established, the disease can spread rapidly from flock to flock. Mortality of the birds could reach as high as 100%.

Of all the strains of HPAI virus ever isolated, only one has been shown under natural conditions to be infectious to people. The H5N1 strain isolated in Hong Kong [19] in 1997 was highly pathogenic for chickens and caused a limited outbreak in 18 people. Six of these individuals died. Other reported cases of avian influenza have occurred in the Netherlands. In March 2003, two outbreaks of highly pathogenic avian influenza (HPAI) have been detected in several Dutch poultry farms in the Netherlands [20]. Since then the number of bird flu cases in the Netherlands continued to grow. At least 5 workers have been infected now with highly pathogenic avian influenza (HPAI) during outbreak of avian influenza in poultry farms in the Netherlands. About 70 people working on a Dutch cull of poultry infected with avian influenza have caught conjunctivitis, according to the Dutch health ministry. Specialists handing the outbreak in the Netherlands had believed

the strain of the virus detected in poultry flocks only caused conjunctivitis, an eye infection, in humans.  Dutch health ministry announced a Dutch veterinary surgeon might have died from avian influenza. The official cause of death was chronic pneumonia, but the bird flu virus was also found in the surgeon's lungs. The veterinary surgeon had visited a contaminated poultry farm, but did not take preventative medication. Dutch workers involved in the mass cull of infected or possibly infected birds were vaccinated against avian influenza and received other medications to prevent infection.

According to the Federation of Animal science Society [8]  avian influenza is very important emerging disease because of its impact on the commercial poultry industry, both in the U.S. and abroad, its potential for crossing into other species, including humans, and its potential being used as a bioterrorism weapon. The world Health Organization has identified avian influenza as a critical issue because of its potential for causing worldwide pandemics in this time of international travel and globalization.

Avian influenza is reportable in Canada and the United States. It must be confirmed by virus isolation. The U.S. Department of Agriculture's (USDA) Animal and Plant Health Inspection Service (APHIS) works to keep HPAI from becoming established in the U.S. poultry population.

**Current status of FSIS performance on the above issues:**

FSIS plays an active role in investigations with CDC and FDA if a food production problem or an illness outbreak is identified that involves meat, poultry, or egg products. If necessary, the Agency prevents these food products from going to grocery stores, restaurants, and other food service operations; can stop a plant from operating; and works with producers to recall food that has already gone to store shelves or homes, said Dr. Catherine Woteki [2], Under Secretary for Food Safety, USDA.

Since 1997 the top regulatory priority which include: (1) the implementation of HACCP systems,  (2) Sanitation Standard Operating Procedures (Sanitation  SOP),  (3) development by FSIS of a public-health driven food safety research agenda, and  (4) involvement with CDC in the FoodNet foodborne disease surveillance system, or other control measures in meat and poultry slaughter and processing plants were in progress.

Preliminary assessments results:

 CDC has performed active surveillance [18] for a number of foodborne pathogens since 1996. Preliminary surveillance data for 1999 compared with data from 1996 through 1998 suggested the following:
 · The incidence of E. coli O157 declined 22%
 · The incidence of Campylobacter declined 26%
 · The incidence of Shigella declined on average by 44%
 · The incidence of Salmonella enteritidis declined 48%
 · The incidence of parasitic diseases caused by Cyclospora infections decreased 70%

CDC has stated [18] that the declines (from 1996 through 1998) in Salmonellosis and Campylobacteriosis may reflect changes in meat and poultry processing plants in the U.S. mandated by the PR/HACCP rule of the USDA.

FSIS had reached a major milestone [18] in its food safety strategy on January 25, 2000, with the third and final phase of HACCP implementation. On this date, 3,159 Federal and approximately 2,300 State-inspected very small plants--those with fewer than 10 employees or less than $2.5 million in sales--were required to implement HACCP and meet performance standards for Salmonella. FSIS achieved its goal of having all domestic meat and poultry establishments operating under HACCP.

According to the Centers for Disease Control and Prevention (CDC),[10] the rate of listeriosis has fallen by 35 percent from 1996-2002. Still, each year, *L. monocytogenes* causes an estimated 2,493 cases of listeriosis and 499 deaths. The case-fatality rate is high across the whole population—20 deaths per 100 cases of illness. Epidemiologic surveillance data show that the case-fatality rate varies by age, with a higher case-fatality rate among newborns and the elderly.

The USDA began strengthening its Listeria rules [11] for ready-to-eat (RTE) meats in November 2002, after an outbreak in the Northeast involving at least 52 illness cases, seven deaths, and three miscarriages. That prompted the agency to require plants to start testing their surfaces and equipment for Listeria or else submit to increase testing by the FSIS. Previously the FSIS had tested RTE products but not plant equipment.

The USDA does not regulate retail delis, which are under the jurisdiction of the FDA and state and local health departments, according to FSIS officials. In other items, the report says most of the small and very small plants producing RTE products didn't receive or didn't know about the FSIS compliance guidelines for the Listeria regulations.

Latest assessments results:

In October 2003 the FSIS added a requirement that firms take specific steps to prevent Listeria contamination of RTE foods. The rule has instructed the producers to choose one of three approaches: (1) using both a "post-lethality" (post-cooking) treatment, such as heating, and a chemical growth inhibitor; (2) using either a post-lethality treatment or a growth inhibitor; or (3) using sanitation only. Firms using sanitation only are supposed to get the most FSIS inspections and those using the first approach the fewest.

The team has reported that more than 87% of the nearly 3,000 plants that produce RTE meats have adopted at least one Listeria-related measure since the regulations took effect in October 2003, according to the FSIS report. About 17% of the plants began using a post-lethality treatment to control Listeria, and 27% began using an antimicrobial agent or "other control process" in one or more of their RTE products. Also, about 59% of the firms started testing for Listeria or similar organisms on food-contact surfaces after the rules took effect, the report said.

According to the acting Under Secretary for Food Safety Dr. Merle Pierson [17] the 2003 interim final rule on control of *Lm* in ready-to-eat (RTE) meat and poultry products, based on a thorough risk assessment, was encouraging. The latest data from 2003 showed a 25 percent drop in the percentage of positive *Lm* regulatory samples from the year before, and a 70 percent decline compared with years prior to the implementation of HACCP.

The annual report published by the Centers for Disease Control and Prevention (CDC) [17] there were significant declines from 1996 to 2003 in illnesses caused by *E. coli* O157:H7, *Salmonella*, *Campylobacter*, and *Yersinia*. Specifically to the products we regulate, the CDC reported that illnesses caused by *Salmonella Typhimurium*, typically associated with meat and poultry, decreased by 38 % from 1996 to 2003. Human illnesses caused by *E. coli* O157:H7, often associated with ground beef, declined 42 % from 1996 to 2003. The decrease in *E. coli* O157:H7 infections occurred primarily from 2002 to 2003. Furthermore, cases of campylobacteriosis decreased by 28% in this seven year period as well.

According to CIDRAP [11] News, 2004, USDA has declared that new Listeria rule has made difference. Most firms that produce ready-to-eat (RTE) meat and poultry products have taken specific steps to prevent Listeria contamination since new federal safety rules took effect last year, the US Department of Agriculture (USDA) announced. The report said that FSIS has found Listeria contamination on about 1% or fewer of recent RTE product samples. However, it cited evidence from other sources that 3% to 5% of RTE meats from retail delicatessens which are not regulated by the USDA may harbor Listeria.

Comparing 1996--1998 with 2004, the estimated incidence[12, 13, 14] of several infections declined significantly, as illustrated by the relative rates. The estimated incidence of infection with *Campylobacter* decreased 31% , *Listeria* decreased 40% , and overall *Salmonella* infections decreased 8%

During 1996--2004, substantial declines[12, 13, 14] occurred in the estimated incidence of infections with *Campylobacter*, *Cryptosporidium*, STEC O157, *Listeria*, *S. Typhimurium*, and *Yersinia*. The 2004 incidence of STEC O157 infections declined below the 2010 national target of 1.0 case per 100,000 persons in FoodNet overall and in seven of the 10 surveillance sites. In addition, the decline in *Campylobacter* incidence represents progress toward the national health objective of 12.3 cases per 100,000 persons (*3*); the renewed decline in *Listeria* incidence, to 2.7 cases per 1 million population in 2004, suggested that the revised national objective to reduce foodborne listeriosis to 2.5 cases per 1 million population by 2005 might be achievable with continued efforts (*4*). The overall decline in *Campylobacter* incidence from the baseline period to 2004, the majority of which occurred before 2001, might reflect efforts to reduce contamination of poultry and educate consumers about safe food-handling practices. Dramatic declines in foodborne illnesses and incidence of pathogens in products show that FSIS risk-based approach is working.

## What should be the actual role of Zoonoses branch on this issues?

In order to achieve the goal of reducing foodborne diseases through farm-to-table strategy, FSIS has already established a wide spectrum measures that include:(1) the implementation of HACCP systems, (2) Sanitation Standard Operating Procedures (Sanitation SOP), (3) development by FSIS of a public-health driven food safety research agenda, and (4) involvement with CDC in the FoodNet foodborne disease surveillance system, or other control measures in meat and poultry slaughter and processing plants were in progress. Because FSIS is not a research agency, it must reach out to other research agencies within the Federal government (e.g. ARS), and to the private sector, to meet its research needs.

But what should be the role of Zoonoses branch on these above tasks is hard to answer at this time, and could be formulated through brainstorming discussions amongst the staffs of Zoonoses branch. However, Zoonoses branch staffs can work on the following:

A. Gather annual updated information, as to, what is the actual incidence of foodborne illness in the United States? What is the incidence by specific pathogen and by specific food product? What is the incidence of Campylobacteriosis, Listerios, Toxoplasmosis, and other foodborne pathogens that can be attributed to cross-contamination, particularly during meat processing in the plants, and also food preparation in the kitchen? What is the relationship between the numbers of bacteria on raw products and foodborne illness? What are the risks along the food chain? How are pathogens introduced into the food chain? What is the relationship between the numbers of bacteria on raw product and foodborne illness? ZDRSD staffs may need to have schedule visits to meat processing plants to identify the paths or stages of contamination and cross-contamination of foodborne pathogens.

B. Can form a team with Risk Assessment Division (RAD) to do risk assessment for each important foodborne pathogens in the slaughter plants and to evaluate cost-effective risk mitigation strategies through various surveillance and monitoring activities in the food processing plants. And can recommend necessary research proposals to the ARS and CSREES.

C. Each member of ZDRSD's staffs can be assigned one or two important foodborne disease/diseases to write an issue paper gathering up to date information and development of the current status of FSIS on the particular disease. This updated issue paper can be circulated among the FSIS field and other staffs to keep them abreast on current achievement on the food safety.

D. Money allocation may be needed to conduct plant surveillances but at this period it will be difficult to make any budget for this task of surveillance. However, after discussing and making the final program of surveillances appropriate amount of money could be budgeted later.

References:

1) Scientific Status summary: Bacteria associated with foodboren diseases. Institute of Food Technologists. Agust 2004.   http://www.ift.org/pdfs/sss/bacteria.pdf)

2) Food Safety Research Priorities and Challenges: Speech made by Dr. Catherine Woteki, Under Secretary for Food Safety, (U.S. Department of Agriculture) before the first National Conference on Food Safety Research, November 12, 1998, Alexandria, VA

(3) Tracking down trouble bacteria that cause foodborne illness, US Food and drug Administration, FDA editorial content, August 10, 1999
http://www.fda.gov/fdac/features/1999/campchrt.html

(4) USMEF backgrounder Foodborne Illness, September 2003
http://www.usmef.org/TradeLibrary/assets/11170/fbibackgrounderfile/FoodborneIllness_backgrounder.pdf

(5) FSIS assessing the effectiveness of the "Listeria monocytogenes" interim final rule, Summary report;  Washington. DC. September 2004
http://www.aamp.com/news/documents/LmAssessmentReport2004.pdf

(6) Listeria and food popisoning; CERHR reports, October 2003.
http://cerhr.niehs.nih.gov/genpub/topics/listeria-ccae.html

(7) Toxoplasmosis: Author: J.P. Dubey, USDA, ARS, Beltsville, Maryland
http://www.ncagr.com/vet/Toxoplasmosis.htm

(8) Dr. Robert Norton, Federation of Animal science Society (FASS)

(9) Listeriosis and Food safety Tips: Consumer information. Food Safety and Inspection Service,United States Department of Agriculture, Washington, D.C. 20250-3700
http://www.fsis.usda.gov/OA/pubs/lmtips.htm

(10) FSIS rule designated to reduce Listeria monocytogenes in ready-to-eat meat and poultry products.
http://www.fsis.usda.gov/Frame/FrameRedirect.asp?main=http://www.fsis.usda.gov/OA/background/lmfinal.htm

(11) USDA says new Listeria rule has made a difference: Robert Roos News Editor, Dec 3, 2004 (CIDRAP News)http://www.foodhaccp.com/memberonly/newsletter143.html

(12) Preliminary FoodNet Data on the Incidence of Infection with Pathogens Transmitted Commonly Through Food --- 10 Sites, United States, 2004
http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5414a2.htm

(13) Allos BM, Moore MR, Griffin PM, Tauxe RV. Surveillance for sporadic foodborne disease in the 21st century: the FoodNet perspective. Clin Infect Dis 2004;38(Suppl 3):S115--20.

(14) Hardnett FP, Hoekstra RM, Kennedy M, Charles L, Angulo FJ; Emerging Infections Program FoodNet Working Group. Epidemiologic issues in study design and data analysis related to FoodNet activities. Clin Infect Dis 2004;38(Suppl 3):S121--6.

(15) Toxoplasmosis: CDC Parasitic Disease Information.
http://www.cdc.gov/ncidod/dpd/parasites/toxoplasmosis/factsht_toxoplasmosis.htm

(16) FSIS Food safety Research Agenda: Direction for the future,   May 1997
http://www.fsis.usda.gov/ophs/Sect63#Sect63

(17) USDA's Food Safety Policies and Challenges: Remarks prepared for delivery by Acting Under Secretary for Food Safety Dr. Merle Pierson, at the Food Safety Conference: From the Surface Up Conference Hosted by Clemson University, February 24, 2005, Myrtle Beach, SC

(18) Campylobacteriosis FSIS Status: Status of the Food Safety and Inspection Service Reinvention goals; Updated May 2000

 (19) Update: Isolation of Avian Influenza A (H5N1) Viruses from Humans - Hong Kong, 1997-1998. CDC. *MMWR Weekly*. January 9,1998. 46(52);1245-1247.
http://www.cdc.l,ov/epo/minwr/preview/mmwrlittnl/00050775.htm. Accessed July 16, 2002.

(20)  Dutch Staff culling infected poultry get eye infection; Surgeon dies. By Joshua Lipsky on 4/23/03.
http://www.fleischforum.de/bekanntmachungen/hitliste_bekanntmachungen.asp

| **From:** | Chowdhury, Khurshed [IMCEAEX-_O=USDA_OU=FSISHQTR_CN=RECIPIENTS_CN=KCHOWDHURY@fsis.usda.gov] |
| --- | --- |
| **Sent:** | Tuesday, July 19, 2005 3:42 PM |
| **To:** | Parham, Delila |
| **Subject:** | Reserach project |
| **Attachments:** | Thinking Paper for Zoonoses branch.doc |

Hi Delila,

Please find the attached my research project updated. You have first asked me to update thinking paper (some times last week) and then yesterday asked me again to update toxoplasmosis project before I go for vacation! Here are some misunderstandings. I thought you have asked me about thinking paper to update.

Early (perhaps) this year when I gave you toxoplasma project, you have asked me to make it a thinking paper for Zoonoses branch. From then, I am working on thinking paper only. While preparing my thinking paper, I have taken some special projects into consideration such as Avian Influenza, Campylobacter and included with them toxoplasmosis too. Toxoplasma paper has been incorporated into thinking paper. Otherwise the original toxoplasma paper remained the same. I thought you have meant thinking paper to update and give you before my vacation. I did not consider toxoplasma as a separate project anymore, after I have started thinking paper preparation. Thanks.

Have a nice day! Hope to see you in August, 2005.


Khurshed

1

1      UNITED STATES DISTRICT COURT
         District of Columbia
2

   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
3                        :
   KHURSHED A. CHOWDHURY,      :
4                        :
       Plaintiff,      : CASE NO.
5                        :
     v.              : 1:07-CV-99 (RCL)
6                        :
   ED SCHAFER and the       :
7  UNITED STATES DEPARTMENT OF  :
   AGRICULTURE,             :
8                        :
       Defendants.      :
9  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
10                  Washington, D.C.
11                  Tuesday, April 22, 2008
12  Deposition of:
13          NEENA ANANDARAMAN
14  called for oral examination by counsel for
15  Plaintiff, pursuant to notice, at the
16  United States Attorney's Office, 501 Third
17  Street, Northwest, Washington, D.C., before
18  Constance H. Rhodes of Capital Reporting Company,
19  a Notary Public in and for the District of
20  Columbia, beginning at 9:58 a.m., when were
21  present on behalf of the respective parties:

                                    * * *


                          12

8      Q   Were you ever asked to do a research
9  paper for any kind of peer-reviewed
10  publication?
11     A   Was I asked to?
12     Q   Yes.  While you were in your position.
13     A   For a peer-review publication?  Yes,
14  sir.
15     Q   And this in your position as veterinary
16  medical officer.  I'm not talking about during

17  your whole life but while you were in the
18  zoonosis branch.
19     A   Right.  Yes, sir.
20     Q   And did you ever end up publishing
21  anything in a peer-reviewed journal?
22     A   Yes, sir.


                        13
1      Q   I'm going to show you some examples that
2  I think were given to me.
3         MR. GOULD:  Why don't we have that marked
4  as 2.
5         (Plaintiff's Exhibit Number 2 was marked
6           for identification.)
7  BY MR. GOULD:
                                    * * *

21     Q   Why don't you identify to me, if there
22  are any here, type papers that you were involved


                        14
1  with?
2      A   Peer-reviewed only?
3      Q   Yes.
4      A   As in published in a journal?
5      Q   Yes.
6      A   Okay.  None on here that had been
7  published.
8      Q   Were any on here prepared with the hope
9  that they would be published or for the purpose
10  of trying to get them published?
11     A   The very last one.
12     Q   The one they have in box 43?
13     A   That's correct.
14     Q   How long did you work on that?
15     A   How long did I work on it?
16     Q   Yeah.
17     A   I've worked on it intermittently along
18  with the Agricultural Research Service.  So it
19  was intermittent and it was waiting for
20  information from the Agricultural Research
21  Service, and then other priorities intervened.
22     Q   What kind of priorities?


                        15
1      A   Other work priorities.

2      Q    In the right-hand box it says, "In
3   Progress:  Draft through 2003." Is that basically
4   an accurate assessment of what it took to prepare
5   this?
6      A    I think another draft was completed and
7   was waiting for comments from ARS and then --
8   it's waiting.
9      Q    I see.  And P. Fedorka-Cray, can you just
10  tell me who that is?
11     A    That's our ARS researcher, our sister
12  agency.
13     Q    They're the research arm at USDA?
14     A    That's correct.
15     Q    You don't do any such research like they
16  do in OPHS; is that correct?
17     A    Well, we don't do bench research, if
18  that's what you're asking.
19     Q    He does?  Doctor --
20     A    She.
21     Q    She -- I'm sorry -- Fedorka-Cray?
22     A    She, yes, that's our research arm.

                            16
1      Q    So you collaborated with her?
2      A    That's correct.
3      Q    And also there's a B. Rose.  Is that
4   Bonnie Rose?
5      A    Yes.
6      Q    And she was in the Microbiology Division;
7   is that right?
8      A    That's correct.
9      Q    So it was a collaboration with those two
10  other scientists?
11     A    That's correct.
12     Q    So you've never done one totally on your
13  own.
14     A    Well, there's one that's not on this
15  list.
16     Q    When did you do that?
17     A    That was done -- it was published in
18  2005.
19     Q    Okay.  What was that on?
20     A    That one was on Salmonella.  Also, I did
21  another one that I sent for publication that did
22  not get published.

17

1    Q    On Salmonella?
2    A    No.  That was on air saculitis.
3    Q    Can you just briefly describe to me the
4  Salmonella paper without being too technical?
5    A    Yeah.
6    Q    What that encompassed.
7    A    That encompassed looking at agency data
8  that the agents had collected on Salmonella and
9  summarizing that data.
10    Q    Speaking of data on Salmonella, was there
11  any particular report that Mr. Lange requested
12  that was assigned to the zoonosis branch at some
13  point while you were there on Salmonella
14  serotypes?
15    A    He requested information all the time on
16  Salmonella.
17    Q    Was there any special statistical
18  report?
19    A    A number of them.
20    Q    Did you do work on those?
21    A    I have.
22    Q    Can you just tell me what kinds of things

18

1  you did on those reports?
2    A    It depends what the request is.  A lot of
3  times it's summarizing data that the Agency
4  collects and reporting trends and incidents or
5  characterizing an organism as to its human health
6  and animal health implications.
7        (Plaintiff's Exhibit Number 3 was marked
8        for identification.)
9  BY MR. GOULD:
10    Q    I'm going to show you a copy of this, if
11  you can just briefly look through it.  I guess I
12  kind of want to concentrate on the second and
13  third page of the document.
14    A    Is this the second?
15    Q    Well, yeah.  The numbers are slightly --
16  when I say second and third, I mean of the actual
17  document you're looking at.  So that would be
18  here (indicating) because your name is there.
19    A    Okay.
20    Q    I see at some point Mr. Lange requested

21  some kind of Salmonella serotype data.  See that?
22      A   Shall I read all this second page.


                              19
                          * * *.
18      Q   Can you tell me either from looking at
19  this what Mr. Lange wanted with regard to -- I
20  mean other than just reading -- well, let's look
21  at number three.
22      A   Okay.


                              20
1       Q   Can you tell me what he was looking for
2   there as far as you understood?
3       A   Yeah.  He wants to know what the top 20
4   serotypes are and how those serotypes are
5   characterized in chickens in the scientific
6   literature.
                                      * * *


                              21
                          * * *
                              22
                                      * * *
5       Q   If you look at the report that
6   Dr. Chowdhury prepared that's attached there --
7       A   Okay.
8       Q   -- is that a brief summary of -- a brief
9   description of Salmonella serotypes that appear
10  in young chickens?
11      A   Probably briefer than what Dr. Lange
12  would have wanted.
13      Q   It's Mr. Lange, isn't it?
14      A   Mr. Lange, sorry.
15      Q   How would you know that?
16      A   Because he asks here about information
17  such as reservoirs, commonality, et cetera, and
18  it just doesn't look very -- doesn't look like
19  it's as extensive as what he usually asks for.
20      Q   Well, has he asked you for these things
21  before?
22      A   Not particularly like a statement like
                              23

1  this, no.
2      Q   So then how would you know -- you
3  wouldn't really know what he's asked for prior to
4  this, would you?
5      A   Well, just generally, any time I'm asked
6  for anything it usually needs more than this.
7      Q   Did Dr. Chowdhury come to you for some
8  assistance with this particular document?
9      A   I don't think so.  I don't remember him
10  coming to me for assistance.
11      Q   There is a response on commonality,
12  though, in this summary that he did, correct?
13      A   I don't know what that means, what
14  "commonality" here means exactly.
15      Q   It's listed under that category.  Let me
16  put it that way.
17      A   Well, are you asking me from like a
18  scientific standpoint because -- I mean I see --
19  I see it says "commonality," but you know, I'm
20  not sure how common it is from looking at this.
21      Q   Okay.  That's fair enough.  Do you
22  remember being particularly busy working on other

                             24
1  projects around June and early July of 2005 when
2  this was assigned to Dr. Chowdhury?
3      A   I can say that I'm always extremely busy.
4  I can't remember that exact date or time, but
5  I've been extremely busy.

                               * * *


                             25
                               * * *
                             26
                               * * *.

                             27
                               * * *

14          (Plaintiff's Exhibit Number 5 was marked
15            for identification.)
16  BY MR. GOULD:
17      Q   You don't need to go through this whole

18   document.  I want to focus on --
19       A    This document?
20       Q    Yes.  Page 7.
21       A    Are you talking about the Salmonella
22   serotype paper?

                            28
1        Q    Correct.  Now, does that refresh your
2    recollection at all about any other discussion?
3        A    I don't remember any paper like this at
4    all.
5        Q    Tell me what you understand the paper, in
6    terms of this description, what the paper was
7    supposed to look like, if you can.  I mean other
8    than just reading what's on here, how would you
9    go about preparing such a paper?

                                    * * *

19       MS. FIELDS:  If you can answer the
20   question, you can answer it.  If you can't answer
21   it then state whatever you can do with this.
22       THE WITNESS:  I'd just as soon not

                            29
1    comment on it, because I don't remember any paper
2    like this.
3    BY MR. GOULD:
4        Q    Okay.  But you're a doctor of veterinary
5    medicine, and you've dealt with Salmonella
6    serotypes on many occasions, have you not?
7        A    Yes, sir.
8        Q    Have you ever been asked to prepare a
9    paper like this on this issue?
10       A    On Salmonella I have, yes.
11       Q    A paper that would ask you to do the
12   things, the assignments that are here, have you
13   ever been asked to do anything like that?
14       A    Yes, I have.
15       Q    Okay.  When did you do a paper on these
16   issues?
17       A    Well, I did one on Salmonella Newport, a
18   particular serotype, describing information as it
19   says there.
20       Q    When did you do that?

21     A   I want to say -- I don't remember, maybe
22   2002, 2003.

                              30
1     Q   Who did you do it for?
2     A   For Dr. Parham.
3     Q   Okay.  What did you go about doing or how
4   did you go about preparing that paper?
5     A   Well, I evaluated agency data to see how
6   prevalent Salmonella Newport was and described
7   from the literature what the human health
8   implications and the animal health implications
9   were.
10    Q   What does it mean to you to "describe
11  serotype in detail"?  Isn't it in fact true a
12  serotype already is a description?
13    A   I'm sorry, I'm not sure --
14    Q   Isn't it in fact true that a serotype is
15  already a description?
16    A   A serotype is just a type of Salmonella.
17  It's not a description of it.  It's just like a
18  scientific name.
19    Q   So how would you describe a serotype, a
20  Salmonella serotype?
21    A   Well, I suppose in this context, I would
22  describe the ecology of the organism.

                              31
1     Q   Had you known Dr. Chowdhury to work on
2   Salmonella issues while you worked with him in
3   the zoonosis branch.
4     A   From these assignments, yes.
5     Q   But other than these assignments?
6     A   Yes.
7     Q   Do you think he had?
8     A   Yes.
9     Q   Had he worked on serotypes in
10  particular?
11    A   Yes.
12    Q   And so you don't remember him coming to
13  you specifically being for assistance on this
14  particular paper?
15    A   I don't remember this assignment.

Page 1 of 1

*July 2005*  SR-1

**Lange, Loren**

| | |
|---|---|
| **From:** | Thaler, Alice |
| **Sent:** | Friday, July 08, 2005 10:34 AM |
| **To:** | Lange, Loren |
| **Cc:** | Parham, Delila |

**Subject:** FW: Brief descriptions of Young chicken Salmonella serotypes.

This is an initial and partial draft about Salmonella serotypes. I would appreciate feedback about the adequacy of this level of information – we want to be responsive to your specific concerns. I asked Khurshed to also look for review articles about Salmonella serotypes and for information about antimicrobial resistance by serotype.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Thursday, July 07, 2005 4:10 PM
**To:** Parham, Delila
**Cc:** Thaler, Alice
**Subject:** Brief descriptions of Young chicken Salmonella serotypes.

Hi Delila,

Please find the attached partial work (Eleven from 20) done on the above project of serovar description. Sincerely, this is really very time consuming task. After searching many literature, books, and discussing with at least four microbiologists, I have learned that there is no such thing called 'serovar description' available any where. Perhaps, no body has done it! So there is no quick shot.

If we want to do it then one needs to read hundreds of articles in order to categorize their descriptions basically from the raw materials (articles). Again it varies so much place to place; authors to authors. One serovars may be highly prevalent in one geographical region, but the same serovar is not that frequent in the other region. So we shall have to evaluate into a valance of estimation only. But I believe it's worth doing it.

I suggest that this should be considered as an on-going project and continued for several months, or even years to make a comparatively completed list of descriptions. Because, information will keep changing and our descriptions also will need changing and updating time to time. Thanks.

Khurshed

Defendant Discovery Response 442 of 1539

The July 2005 looks like from a standard reference relationship from references ... No valid ... What to do the ...


PLAINTIFF'S
EXHIBIT NO. 3
FOR IDENTIFICATION
N.A
DATE:        RPTR:

Lange, Loren

| | |
|---|---|
| **From:** | Thaler, Alice |
| **Sent:** | Wednesday, July 06, 2005 6:47 AM |
| **To:** | Lange, Loren |
| **Cc:** | Parham, Delila |
| **Subject:** | RE: Loren's Request for Salmonella Serotype Data |

Delila is coordinating a single document.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Lange, Loren
**Sent:** Thursday, June 30, 2005 4:13 PM
**To:** Thaler, Alice
**Subject:** RE: Loren's Request for Salmonella Serotype Data

Thanks - should I ask HHSD to do the human part (and have me merge the two) or have Delila's staff
work with HHSD to put this into a single document

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Thursday, June 30, 2005 1:51 PM
**To:** Lange, Loren
**Subject:** FW: Loren's Request for Salmonella Serotype Data

Note I only forwarded this to you.  I leave it to you to share with David.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Parham, Delila
**Sent:** *Thursday, June 30, 2005 12:01 PM*
**To:** Thaler, Alice
**Cc:** Anandaraman, Neena
**Subject:** Loren's Request for Salmonella Serotype Data

Alice, I interpreted Loren's request as follows:

1.   **Young Chicken Serotypes:** Provide *Salmonella* serotype data for young chickens for

Defendant Discovery Response 443 of 1539

1998-2004 for all sets (A, B, and C sets) to see what is increasing and what is decreasing. Given the total number of serotypes in a year with the total number of serotypes being the denominator, what is number by percentage of the top 20? Give explanation of what is found. For example, Loren thinks we are likely to see that SE has increased substantially over the years.

2. **Human Serotypes:** What are the leading human isolates for *Salmonella*? (Similar information is needed for humans as that provided for young chickens. (He didn't seem to be asking us to do this.)

3. **Summary Statements for Young Chicken Serotypes:** Provide a brief summary statement about each of the top 20 serotypes for young chickens that include information such as reservoirs, commonality, etc. For example, the statement may indicate that the serotype is common in chickens, but is also common in [list other reservoirs/species].

Note: Neena talked with Bob Umholtz recently, and the 2004 database for serotypes is not ready. Therefore, we will only be able to look at data from 1998 – 2003.

As discussed, we can have a preliminary report ready as early as next week with the figures on young chickens. We will need additional time to prepare the additional information requested.

This seems to be a good time to also mention that this branch would be capable of providing this information on a quarterly basis or how ever frequently it is needed. However, if we will be doing it as assigned work, it should be known by others that this staff will be doing it, so we aren't doing things at cross purposes with the other staffs or divisions. Let me know.

**Defendant Discovery Response**
**444 of 1539**

*Original request*

**Defendant Discovery Response
445 of 1539**

Date: July 7, 2005

To: Delila Parham
    Chief, Zoonoses Branch, ZDRSD.

From: Khurshed Chowdhury
     VMO, Zoonoses branch

Subject:  Brief descriptions of Young chicken Salmonella serotypes.


(1) S. Typhimurium .

Reservoirs:  Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality:  Man, Cattle, Swine, Turkey

Public health significance:    Very High

Antigenic character:  1,4, [5],12, I


(2) S. Typhomurium (var. Copenhagen)

Reservoirs:  Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality:  Man, Cattle, Swine, Turkey

Public health significance:    Very High

Antigenic character: Not found


(3)  S. Enteritidis

Reservoirs:  Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality:  Man, cattle, Swine and Turkey

Public health significance:    Very high

Antigenic character:  1,9,12, f,g,t

Defendant Discovery Response
446 of 1539

### (4) S. Heidelberg.

Reservoirs:  Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man.

Commonality:  Man, Swine, Turkey and Cattle.

Public health significance:  High

Antigenic character: 1,4,[4],12,r


### (5) S. Kentucky

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Poultry, Turkey, wild birds and pets, man.

Public health significance: Low to rare.

Antigenic character: Not found.


### (6) S. Hadar

Reservoirs:  Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man

Commonality:  Poultry, Cattle, Turkey, man, wild animals.

Public health significance:   Moderate to low.

Antigenic character: Not found.


### (7) S. Schwarzengrund

Reservoirs: Poultry, swine, Turkey, cattle, wild animals

Commonality: Poultry, Turkey, Swine.

Public health significance:  Low to rare.

Antigenic character: 1, 4, 12, 27,d

Defendant Discovery Response
447 of 1539

### (8) S. Montevideo

Reservoirs: Poultry (chicks and ducklings), Domestic and wild animals, including wild birds, swine, rodents and pet animals.

Commonality: Poultry, cattle, swine, man, wild animals,

Public health significance: Moderate to high.

Antigenic character: 6,7 ,g,m,s,[p]

### (9) S. Monophasic

Reservoirs: Poultry (chicks and ducklings), Domestic and wild animals, including wild birds, swine, rodents and pet animals.

Commonality: Poultry, cattle, swine, man, wild animals.

Public health significance: Unknown

Antigenic Chracter: 9, 12:1,v:-

### (10) S. Thompson

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Poultry, Man, cattle, Swine and Turkey

Public health significance: High

### (11) S. Infantis

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Poultry, Man, cattle, Swine and Turkey

Public health significance: Moderate to high

Defendant Discovery Response
448 of 1539

## References:

1. Bergey's manual of determinative bacteriology: R.E. Buchanan & N.E. Gibbons, Eighth Edition, The Williams & Wilkins Company/Baltimore, 1975.

2. Evaluation of Salmonella serotype distributions from commercial broiler hatcheries and grower houses: Byrd JA, DeLoach JR, Corrier DE, Nisbet DJ, Stanker LH.; Avian Dis. 1999 Jan-Mar;43(1):39-47.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=10216758&dopt=Abstract

3. *Salmonella* serotypes isolated from raw meat and poultry: January 26, 1998 to January 25, 1999: U.S. Department of Agriculture, Food Safety and Inspection Service Washington, DC 20250. http://www.fsis.usda.gov/OPHS/haccp/sero1yr.htm

4. Prevalence of Salmonella in poultry carcasses and their products in Belgium: M.R. Uyttendale et al: International Journal of Food microbiology: 40 (1998) 1-8; Department of food technology, Faculty of Agricultural and Applied biological sciences, University of Ghent Coupure Links 653, 9000 Ghent, Belgium.

5. Results of salmonella isolation from poultry products, poultry, poultry environment, and other characteristics: Parimal Roy et al. Avian health and food safety laboratory, Avian diseases 46.17-24, 2002; Washington State University, Puyallup, 7613 Pioneer Way east, Puyallup, WA 98371-4998

6. Hospitalizations among cases with the most common serotypes of salmonella: FoodNet, 1996-2000. Finke M et al.
http://www.cdc.gov/foodnet/pub/publications/2002/finke_2002.pdf

7. A temporal study of Salmonella serovars in animals in Alberta between 1990 and 2001. Guerin MT, Martin SW, Darlington GA, Rajic A. Can J Vet Res. 2005 Apr;69(2):88-99. Department of Population Medicine, Ontario Veterinary College, University of Guelph, Guelph, Ontario. mguerin@uoguelph.ca.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstract&list_uids=15971672&query_hl=11.

8. Egg consumption is the principal risk factor for sporadic Salmonella serotype Heidelberg infections: a case-control study in FoodNet sites. Hennessy TW, Cheng LH, Kassenborg H, Ahuja SD, Mohle-Boetani J, Marcus R, Shiferaw B, Angulo FJ; Emerging Infections Program FoodNet Working Group.Clin Infect Dis. 2004 Apr 15;38 Suppl 3:S237-43.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstract&list_uids=15095195&query_hl=11

9. Restaurant foodhandler-associated outbreak of Salmonella Heidelberg gastroenteritis identified by calls to a local telehealth service, Edmonton, Alberta, 2004. Can Commun Dis Rep. 2005 May 15;31(10):105-10.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?CMD=Pager&DB=pubmed

10. Molecular Epidemiology of Salmonella enterica Serovar Typhimurium Isolates Determined by Pulsed-Field Gel Electrophoresis: Comparison of Isolates from Avian Wildlife, Domestic Animals, and the Environment in Norway **Thorbjørn Refsum:Even Heir,[2] Georg Kapperud,[2,3] Traute Vardund,[2] and Gudmund Holstad[1]**
http://aem.asm.org/cgi/content/full/68/11/5600

11. *Salmonella* Serovars from Humans and Other Sources in Thailand, 1993–2002:Aroon Bangtrakulnonth,* Srirat Pornreongwong,* Chaiwat Pulsrikarn,* Pathom Sawanpanyalert,* Rene S. Hendriksen,† Danilo M.A. Lo Fo Wong,† and Frank M. Aarestrup†
*World Health Organization (WHO) National Salmonella and Shigella Centre, Bangkok, Thailand; and †WHO Collaborating Center for Antimicrobial Resistance in Foodborne Pathogens, Copenhagen, Denmark. **http://www.cdc.gov/ncidod/EID/vol10no1/02-0781.htm**

12. Antimicrobial susceptibility and genetic relatedness of Salmonella serovars isolated from animal-derived dog treats in the *USA*: **D. G. White [1], A. Datta [2], P. McDermott [1], S. Friedman [1], S. Qaiyumi [1], S. Ayers [1], L. English [1], S. McDermott [1], D. D. Wagner [1], and S. Zhao [1 * 1]** Division of Animal and Food Microbiology, Office of Research, Center for Veterinary Medicine, [2] Division of Field Science, Office of Regulatory Affairs, US Food and Drug Administration, Rockville, MD 20708, USA
http://jac.oxfordjournals.org/cgi/content/short/dkg441v1

13. Salmomella surveillance: global survey of public health serotyping: H.Herikstad et al: Foodborne and diarrhoal diseases branch, Division of bacterial and mycotic diseases, National center for infectious diseases, CDC, Atlanta, Georgia, USA.
http://www.who.int/salmsurv/links/en/Salmonellasurv95paper.pdf

14.Invasive Salmonella infections in the United States, FoodNet, 1996-1999: incidence, serotype distribution, and outcome: Vugia DJ, Samuel M, Farley MM, Marcus R, Shiferaw B, Shallow S, Smith K, Angulo FJ; Emerging Infections Program FoodNet Working Group: Clin Infect Dis. 2004 Apr 15;38 Suppl 3:S149-56
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstract&list_uids=15095184&query_hl=1

15. Food safety Begins at the farm; IOWA State University Health: By George W. Beran.
http://www.extension.iastate.edu/Pages/ansci/swinereports/asl-1512.pdf

Defendant Discovery Response
449 of 1539

16. Salmonella Serotype Montevideo Infections Associated with Chicks -- Idaho, Washington, and Oregon, Spring 1995 and 1996 ; March 21, 1997 / 46(11);237-239
http://www.cdc.gov/mmwr/preview/mmwrhtml/00046940.htm

17. Evolutionary origin of a monophasic Salmonella serovar, 9,12:l,v:-, revealed by IS200 profiles and restriction fragment polymorphisms of the fljB gene: **AP Burnens, J Stanley, I Sechter and J Nicolet**: Journal of Clinical Microbiology, Jul 1996, 1641-1645, Vol 34, No. 7 : Institute for Veterinary Bacteriology, University of Berne, Switzerland. BURNENS@VBI.UNIBE.CH.
http://jcm.asm.org/cgi/content/abstract/34/7/1641

18. Human Salmonellosis Cases: Provinces/territories or regions. Volume 29S1; March 2003
http://www.phac-aspc.gc.ca/publicat/ccdr-rmtc/03vol29/29s1/29s1_2e.html

**Please Note**:  Information in the references above are some what overlapping, i.e. they are describing about most of the serovars that I have used here.  In fact, I got information for most of the serovars from all or most of the articles. Therefore, it would not be prudent to separate them as per single serovar, since they are talking about multiple serovars in the same article.

Defendant Discovery Response
450 of 1539



| United States Department of Agriculture | Food Safety and Inspection Service | Labor & Employee Relations Division | 1400 Independence Ave., SW Room 3175 South Bldg. Washington, DC 20250 (202) 720-5657 |
| | | Employee (or Labor) Relations Branch | (202) 690-3938 fax (800) 217-1886 toll-free |

FOR OFFICIAL USE ONLY                                                August 16, 2005

TO:        Dr. Khurshed Chowdhury
           Veterinary Medical Officer, Zoonoses Branch, ZDRSD, OPHS
           Washington, DC



FROM:      Dr. Delila Parham    *Delila Parham*
           Chief, Zoonoses Branch, ZDRSD, OPHS
           Washington, DC

SUBJECT:   Notification of Unacceptable Performance/Opportunity to Improve

This notice is written confirmation that I am providing you with an opportunity to improve your performance to the Fully Successful level. At your midyear appraisal on December 20, 2004, you were advised that you were not working at the Fully Successful level and given a document detailing the concerns about your work and actions needed to correct the concerns listed. (See Exhibits 1-5 that includes the midyear performance appraisal document and supporting email messages.) You have had two major projects since your midyear appraisal and from your work on these projects I have determined that your performance continues to be unacceptable in three elements of your position. The following Performance Improvement Plan (PIP) outlines activities that you must complete to attain a Fully Successful rating in the two critical and one non-critical element in which your performance has fallen to an unacceptable level. If you have any concerns about the PIP or require additional guidance in following it, please let me know as soon as the questions arise.

The PIP becomes effective today and will continue for 90 calendar days from today. It is important to perform well under the performance standards that were provided to you on July 18, 2005. A copy of the elements and standards for your job is attached. By the end of the opportunity period, you must have brought your performance up to at least the Fully Successful level in each of the critical elements that you are currently unacceptable in to avoid a reduction in grade or removal. This PIP is to assist you in reaching that objective.

During the period of the PIP, you are to report directly to me for problems relating to your performance. Given the nature of my duties, I realize that there are times when I may not be available for several hours at a time during the day. During these times, you should report any problems or address your questions to Dr. Alice Thaler, Director, Zoonotic Diseases and Residue Surveillance Division (ZDRSD). Beginning Monday at 9:00 a.m. we will hold our first weekly meeting, and every Monday morning throughout the PIP you and I will meet at least once a week to discuss the quality of your work. During these meetings, I will provide updates to your progress and constructive feedback. Although I don't foresee any long-term absences on my part, if I am gone for a full week, Dr. Thaler will meet with you to review your performance.

In December 2004, following a discussion that you had not accomplished any work on a particular project, I requested that you begin keeping a journal so you could track your time and make adjustments, as necessary, to use it more efficiently. Beginning this week, you will be required to complete a more expanded version of your journal. Currently, you provide a very general list of tasks that you are working on. I am now requesting that you expand this list to include the number of tasks that you have completed and more specific details about the work performed on each task. For example, one of your tasks in your

EXHIBIT 15

May 26, 2005, journal was "working on the thinking paper." (See Exhibit 6.) You will need to explain specifically what work was being done and at what stage you are in the paper; that is, you might indicate that you have contacted personnel at the National Agriculture library to begin the literature search, how much time was involved, how many references were ordered, and when you expect to receive the reference material. You will continue to submit the journal to me by close of business on the Thursday of the second week of the pay period. The new, expanded journal should prove helpful in our discussions on your progress in reaching the Fully Successful level during the next 90 days.

The deficiencies in your performance have been in the critical elements of Mission Support and Research and Analysis and the non-critical element of Communications. These elements reflect the complexity and nature of work that is performed and expected in the Zoonoses Branch at the GS-13 level. During your years working in FSIS, you have received both on the job and formal training associated with these elements. You were required to participate in two of FSIS' cross cutting training classes, Technical Writing (May 2005) and Clear Writing Through Critical Thinking (June 2005), and a project management course (May 2005). You also attended a weeklong training class, "Poultry Foreign Animal Disease Awareness Training," sponsored by the Animal and Plant Health Inspection Service (March 2005) in Ames, Iowa, and a one-day symposium on "Protecting the Global Food Supply: Growing Concerns for Emerging Zoonotic Disease" (April 2005) in Minneapolis, MN. Despite the training you have received, you seem unable to apply this training and demonstrate the necessary skills in these two critical elements.

**Standards, Goals, and Activities for the Elements**

*I. Mission Support (Critical)*

In the critical element of "Mission Support" your performance plan states that at the Fully Successful level of performance, you must demonstrate

  A. Basic understanding of mission and organizational goals and priorities that support or directly protect the public health from foodborne hazards.

  B. Complete assignments in accordance with applicable agency regulations, policies, procedures, and guidelines.

  C. Provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements.

  D. Adhere to safety and occupational health practices and procedures and maintain a safe and healthful work environment (where applicable).

To successfully meet the Mission Support element, you are required to meet the Agency's strategic goal to protect the public health by significantly reducing the prevalence of food borne hazards from meat, poultry, and egg products by meeting objectives 2 and 4 as follows:

*Objective 2:* Create a coordinated national and international food safety risk management system for meat, poultry, and egg products from farm to table.

  1. Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.

EXHIBIT __15__
__2__ th __12__

2

2.  Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.

3.  Respond to food safety emergencies and critical events with useful plans and recommendations.

4.  Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.

*Objective 4:* Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.

1.  Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.

## II. Research and Analysis (Critical)

In the critical element of "Research and Analysis" your performance plan states that at the Fully Successful level you must have done the following:

A.  Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate.

B.  Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations).

C.  Any recommendations or analysis provided must be based on available guidance and are generally accepted without major revision.

To successfully meet the Research and Analysis element, you must be involved in the following goals and activities:

1.  Conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific policy issues and the development of policy and programs.

2.  Identifying and compiling information, carrying out required analysis, establishing and maintaining working files, and developing and maintaining databases.

3.  Participating in project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research /study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work.

4.  Undertaking longer-term tracking and analysis of issues, identifying relevant scientific issues *that may have policy implications, analyzing the effect of policy proposals on projects and initiatives,* and formulating program and/or policy modifications for review by the management.

## III. Communication (Non-Critical)

EXHIBIT /5
3 th /2

3

In the non-critical element of "Communication" your performance plan states that at the Fully Successful level of performance, you must demonstrate the following:

A.  Oral and written communications were clear, correct, timely, and presented in an understandable manner.

B.  Supervisor and coworkers were kept informed of issues and problems when necessary.

C.  Information and guidance provided were timely and correct.

To successfully meet the Communication element, you must be involved in the following goals and activities:

1.  Maintain effective and collegial working relationships with other Branch, Division, Program, and other Agency employees, government officials, Congressional staffs, interest groups and other interested parties by:

    a.  Preparing and contributing to the development of discussion, position, and policy papers, briefing notes, presentations, and routine Agency correspondence.

    b.  Presenting written and/or oral findings and observations to project teams, colleagues, and managers in a manner that enhances confidence and credibility in the Branch, Division, Program, and Agency.

    c.  Preparing written reports, papers, and articles for Agency use and/or publication in peer-reviewed journals that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.

    d.  Attending branch, Division, Agency, and/or other interdepartmental or interagency meetings to discuss data/information requirements and results, assess trends, discuss policy issues, and analyze the effect of revised policies or programs in light of current science and public health implications.

    e.  Liaising with federal and state government personnel, academia, and stakeholders to obtain, exchange, and clarify data/information, describe policies and program activities, and remain abreast of trends and developments.

    f.  Responding to emergency and critical events by collaborating with appropriate staffs, internal and external to the Division, to develop a well-planned Program response that needs little modification and can be implemented with minor oversight from the Branch chief and/or Division director.

    g.  Conducting business in a manner that is professional, courteous, and exemplifies commitment to service.

**Unacceptable Task Performance**

Currently, your performance in these elements is at an unacceptable level as evidenced in the number of errors I have found in your work and the missed deadlines. As was discussed at the midyear appraisal, major projects were received late and only after I set a "final" due date. In addition, work products

EXHIBIT 15

received did not demonstrate the complexity and nature of work that should be performed by personnel in the Zoonoses Branch at the GS-13 grade level. You have had two major projects since the midyear evaluation, a "thinking paper" and a toxoplasmosis paper.   While unacceptable work performance was not limited to task associated solely to these projects, they will be discussed as representative examples of your work following the midyear appraisal in December.

*I. Mission Support (Critical)*

Your work did not meet the fully successful level under Mission Support element B and C, Objective 2, goals and activities #s 1, 2, and 4.

❖ Thinking Paper: The thinking paper, which you were asked to model after the Agency's bovine spongiform encephalopathy thinking paper, had to be returned to you to conduct more extensive scientific research and studies. You were asked to think broadly then began narrowing the paper down to a workable one. Your first draft was submitted on March 9, 2005; it was not well researched, lacked depth, and did not provide adequate support for the work suggested. The paper was returned to you with recommendations for conducting more thorough study and analysis, and you immediately requested an extension of one month without even attempting to meet the due date, delaying submittal of the paper until May 20. The second draft of the paper was longer and showed that you had done more work, but still could not be considered a comprehensive scientific review of the issues. You failed to fully develop the role of the Zoonoses Branch to the level of specific recommendations with the pros and cons of each and priority for meeting strategic goals. When the first draft was returned to you, I recommended that you consult others for input into the paper, providing you an opportunity to collaborate with other federal and state government personnel, academia, and others to clarify and exchange information on the branch's role, support information in the paper, and discuss potential research needs of the Agency related to zoonotic or emerging diseases. The second draft did not show that you had collaborated with others to assist you in your determinations. In addition, much of the material in the paper had been lifted directly from other sources, some without acknowledging the sources, which violates applicable Agency rules and regulations against this type of practice.   (See Exhibits 7- 9.)

❖ Toxoplasmosis Paper: For the toxoplasmosis project, an independent research project in which you were expected to develop the project plan and establish milestones, you have again performed no work on the project beyond submittal of the project plan in February. This project was carried over form the 2003-2004 rating cycle. Although no work had been done on the project prior to the midyear appraisal in December, during the appraisal you indicated to Dr. Thaler and me that you wished to retain the project and would begin the necessary research. You were given ideas for developing a feasible plan in February, and some work could have been completed within one month.  Only after a task request was sent via Outlook in July 2005 did you admit that no additional work had been done on the project, explaining that you thought that the thinking paper replaced the toxoplasmosis assignment. However, in August you submitted a new project plan indicating that you may have misunderstood. (See Exhibits 10, 11, and 14.)

*II. Research and Analysis (Critical)*

Your work did not meet the fully successful level under Research and Analysis element A, B, and C, and goals/activities #s 1 – 4. The Research and Analysis element is written to fully support the Mission Support element.  Therefore, any task failing to meet the Research and Analysis critical element is subject to failure in the Mission Support critical element.

EXIBIT  15

6  th  12

5

❖ Thinking Paper: As discussed in the Mission Support element, the thinking paper had to be returned to you to conduct more extensive scientific research and studies. The drafts you submitted were not comprehensive, did not provide an adequate analysis of the issues, and did not suggest an ability to design an effective study approach or utilize analytical methods and objectives. Although you were expected to write this as a scientific paper, no references were included with the first draft to support the ideas and conclusions drawn in the paper. There was little attempt to analyze the effect of Agency policy proposals on current projects and initiatives. As written, the paper would not allow you to make meaningful recommendations for future projects and initiatives, and of the recommendations made, most are currently being done or under discussion. (See Exhibits 7-9.)

❖ Toxoplasmosis Paper: As of July 19, by your own admission, no work had been done beyond the project plan. Incomplete work products during this rating period are evidence of unacceptable execution of your analytical skills. It would also indicate an inability to plan, organize, and prioritize assigned work. (See Exhibits 11 and 14.)

### III. Communications (Non-Critical)

Your work did not meet the fully successful level under Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

❖ Thinking Paper: The assignment was not timely.  The original assignment was discussed with you verbally at least one week prior to your formally receiving the task on February 25, 2005. You submitted the first draft on March 9, 2005. The paper was returned to you for corrections with a due date of April 22. You immediately requested an extension of one month without even attempting to meet the due date, submitting the paper on May 20. This branch is expected to produce well-written scientific papers; both drafts of the thinking paper were poorly written and could not be accepted for Agency use without much needed work. Some of the material lack references, especially the section on avian influenza. Much of the material has been lifted exactly as written from other documents. Lifting text from another manuscript without proper reference is not acceptable. In early July following training courses in May and June, you were given an opportunity to revise or modify the document but informed me that you were satisfied with the paper as written. Work on this paper presented an opportunity for you to liaison with federal and state government personnel, academia, and others to clarify and exchange information on the branch's role and support information in the paper, which was recommended when the first draft was returned to you, but there was no evidence in the second draft that you did this. (See Exhibits 6, 8, and 11—12.)

❖ Toxoplasmosis Paper: For the toxoplasmosis project, you failed to do work beyond drafting the project plan. When asked recently to give an update of the toxoplasmosis project, you indicated that you were not working on the project because you thought the thinking paper replaced the toxoplasmosis paper. This was not the case, and you made no attempt to clarify this. In August you sent an update of the toxoplasmosis project, admitting that I had not told you that the thinking paper replaced the toxoplasmosis paper, but I had never approved your project plan for the toxoplasmosis paper. You are correct that there is no written communication on this, but we have had verbal discussions in your office and at branch meetings.  This is a failure to communicate, orally or in *writing, to the supervisor to assist in clarifying or resolving a problem. In not continuing work on the* project or providing a work product, you have not conducted business in a professional manner or shown a commitment to service. (See Exhibits 11 and14.)

**Tasks to Improve Performance to the Fully Successful Level**

EXHIBIT 15
5 th 12

During this opportunity period, you must improve your performance to at least the Fully Successful level in order to continue in your position. The following is a list of specific tasks that have been assigned to you that must be completed during this opportunity period. You must meet all deadlines for the tasks described below. During this opportunity period there may be other related tasks such as review of notices and/or directives that are assigned to you that will also need to be completed timely and accurately.

1) **Toxoplasmosis Paper:** Prepare a scientific paper on toxoplasmosis as it relates to meat and poultry, written in a format prescribed by a peer-reviewed journal. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. Within two weeks of receiving this letter you are expected to provide me with your specific focus on the paper, provide the format for the paper, and establish milestones and delivery dates for completing all work on the paper within this 90-day opportunity period. The paper, if well written, properly researched and prepared for publication in a peer-reviewed journal, would indicate Fully Successful performance in the following:

   ❖ Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4.

      • Preparation of a paper for publication in a peer –reviewed journal would demonstrate your knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging diseases. It would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues.

   ❖ Research and Analysis element A, B, and C, and goals/activities #s 1 – 4.

      • Preparation of a paper for publication in a peer –reviewed journal would demonstrate your ability to research and analyze issues thoroughly and accurately. As discussed under Mission Support, it would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues.

   ❖ Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

      • Preparation of a paper for publication in a peer—reviewed journal would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show too that you can prepare documents that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.

2) **Salmonella Serotype Paper:** Prepare a scientific paper of the top five poultry Salmonella serotypes, describing each serotype in detail, such as reservoirs, its public health significance, related antimicrobial resistance issues, etc. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. The paper, if well written and properly researched, would address a request made by the Assistant Deputy Administrator to provide descriptive information on key poultry Salmonella serotypes. It would indicate Fully Successful performance in:

   ❖ Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4.

EXIBIT 15
7 th 12

7

- Preparation of the report would demonstrate your ability to provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements. It would show that you are capable of conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues

❖ Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4.

- Preparation of the paper would show that you are capable of researching and analyzing issues thoroughly and accurately, and in a timely manner, making use of available reference sources that would allow you to identify and compile information to carry out the required analysis.

❖ Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

- Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show that you can present written findings and observations to managers in a manner that enhances confidence and credibility in the Branch and Division.

3) **Zoonotic Disease Surveillance:** Prepare bi-monthly compilation of worldwide emerging zoonoses as indicated in scientific journals, newspapers, internet, and other available reference materials that may have potentially serious human health concerns and can possibly be foodborne (especially related to meat, poultry, and eggs). Submissions are due on Thursday by close of business and must be free of major errors and require few edits and revisions. The report, if conscientiously prepared and timely submitted, would provide the Zoonoses Branch with up-to-date information on zoonotic disease incidence worldwide and serve as a valuable reference source for Agency inquiries on the subject. It would indicate Fully Successful performance in:

❖ Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4.

- Preparation of the report would indicate your ability to provide a work product that is responsive to the supervisor's and the organization's stated priorities and requirements. In preparing the report, you would acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.

❖ Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4.

- Preparation of the report would demonstrate your ability to make use of available reference sources, research and analyze issues thoroughly and accurately, identify and compile information, establish and maintain working files, and identify relevant scientific issues that may have policy implications.

❖ Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

- Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, timely, and presented in an understandable manner. It would indicate an ability to present written findings to colleagues and managers in a manner that enhances confidence and credibility in the Branch and Division.

EXIBIT __15__
8 th __12__

8

To assist you in obtaining the Fully Successful level, I would suggest that when you receive assignments from me for specific work, take notes. If the assignment is sent electronically through our Outlook message or task system and you do not understand the assignment, I encourage you to visit with me so we can discuss the assignment further. I suggest too that you better develop your writing, research, and analysis skills; the writing courses you took in May and June should be helpful. Finally, make good use of your time to ensure that all work can be completed in a timely manner; you may have tips from the project management class you took in May that will be useful in scheduling your time. To further assist you, I would like to spend some time during our first weekly meeting next Monday to review the element(s) and go over with you the tasks that you are responsible for completing.

You are reminded that you are responsible for meeting the Fully Successful level of performance on the critical elements listed above for one year from the beginning of the opportunity period. Failure to achieve acceptable performance on the critical elements during the opportunity period or to maintain them during the remainder of the one-year period may result in removal or reduction in grade without any further opportunity to demonstrate acceptable performance. You should refer to this plan throughout the PIP period.

If you feel that you have a personal or medical problem that may be impeding your ability to perform your duties at an acceptable level, I suggest that you seek assistance through the Employee Assistance Program (EAP). This is a confidential program, and you may reach a counselor by calling 1-888-290-4EAP to schedule an appointment.

Please sign a copy of this memorandum, which serves only to acknowledge your receipt of this notice.

Receipt Acknowledged: *Khurshed Chowdhury*

*Employee Refused to sign*                                     *08/29/2005*

_____          _____
Signature                                                              Date

*Dr. Awnithat*

Enclosure

Cc:         Jose Calvo, Employee Relations Specialist
            Alice Thaler, Director, ZDRSD

EXHIBIT *15*
*9 th 12*

9

# Public Veterinary Medicine: Public Health

## *Salmonella* serotypes in selected classes of food animal carcasses and raw ground products, January 1998 through December 2000

Columb P. Rigney, DVM, MPA, MPH, DACVPM; Bernard P. Salamone, DVM, MPH, DACVPM;
Neena Anandaraman, DVM, MPH, DACVPM; Bonnie E. Rose, PhD; Robert L. Umholtz, MS;
Kathleen E. Ferris, MS; Delila R. Parham, DVM; William James, DVM, MPH

The Food Safety and Inspection Service (FSIS), the regulatory agency within the USDA that ensures the safety of federally inspected meat and poultry products, published the **Pathogen Reduction (PR)/Hazard Analysis and Critical Control Point (HACCP)** Systems Final Rule on July 25, 1996, to provide a framework for modernizing the traditional organoleptic-based system of meat and poultry inspection in the United States.[1] With the implementation of PR/HACCP, all facilities producing selected classes of food-animal carcasses and raw ground products were required to meet prescribed performance standards for *Salmonella* spp, which were established through previous baseline testing for prevalence of the organism by the FSIS.[2] Requisite testing for *Salmonella* spp began in January 1998 for large establishments with ≥ 500 employees, in January 1999 for small establishments with 10 to 499 employees, and in January 2000 for very small establishments with < 10 employees or < $2.5 million in annual sales.

*Salmonella* testing and subsequent serotyping of isolates serve as a basis for comparison for future post-HACCP collections and provide an opportunity to examine the association between serotypes isolated on-farm, serotypes isolated from meat and poultry products, and serotypes isolated from human cases of salmonellosis in the United States. This paper reports the most common *Salmonella* serotypes identified in samples from chicken carcasses, ground chicken, ground turkey, cattle carcasses, ground beef, and swine carcasses in the 3 years after implementation of PR/HACCP in federally inspected establishments.

## Materials and Methods

The FSIS personnel were directed through computer-generated sample request forms to collect compliance sets of various sample sizes based on performance standards established for each product class. Compliance sets consisted of 51 samples for chicken (broiler) carcasses; 53 samples for ground chicken, turkey, or beef; 82 samples for young cattle (steer or heifer) carcasses; 58 samples for mature cattle (cow or bull) carcasses; and 55 samples for swine carcasses. Field personnel were instructed to collect 1 sample for each day the respective product was produced until the sample set had been completed. Compliance sets were scheduled through either an ongoing directed sampling of all establishments at some fixed interval, irrespective of performance, or through targeted sampling that focused on establishments unable to meet performance standards defined in the PR/HACCP Final Rule.

Ongoing directed sampling of establishments, irrespective of prior compliance history, comprised A-set compliance testing. Subsequent targeted sampling of an establishment performed on the basis of its inability to meet regulatory performance standards during A-set testing constituted B-set compliance testing. Similarly, failure to meet prescribed performance standards during B-set sampling resulted in the collection of C-set compliance samples. After an establishment successfully meets performance standards during B, C, or subsequent targeted testing, the establishment is returned to the original ongoing schedule characterized by directed sampling at a fixed interval and the resulting samples comprising A-set compliance samples. Results from A-set samples are reported here because they represent an unbiased data set.

Broiler carcasses were randomly sampled after immersion in a chill tank. Broiler carcass sampling consisted of a whole-bird rinse. Each carcass was rinsed in a sterile 3,500-mL stomacher-type plastic bag with 400 mL of chilled **buffered peptone water (BPW)**. A minimum of 30 mL of the rinse fluid was decanted into a sterile sample container and shipped to an FSIS laboratory for analysis.

Raw ground product (chicken, turkey, and beef) samples were randomly selected after final grinding, before the addition of spices or seasonings if possible, and prior to

From the Zoonotic Diseases and Residue Surveillance Division (Rigney, Salamone, Anandaraman, Parham), Microbiology Division (Rose), Laboratory Sample Data Management Staff, (Umholtz), and Office of the Deputy Administrator (James), Office of Public Health and Science, Food Safety and Inspection Service, USDA, 1400 Independence Ave SW, 344 Aerospace Center, Washington, DC 20250-3700; and the National Veterinary Services Laboratories, Animal and Plant Health Inspection Service, USDA, 1800 Dayton Ave, Ames, IA 50010 (Ferris). Dr. Rigney's present address is USDA, APHIS, Plant Protection and Quarantine, 3375 Koapaka St, Ste G-330, Honolulu, HI 96819-1868.

Address correspondence to Dr. Anandaraman.

524    Vet Med Today: Public Veterinary Medicine

JAVMA, Vol 224, No. 4, February 15, 2004

final packaging. A 25-g sample of raw ground product was aseptically collected with a sterile, rigid plastic ring template, placed in a sterile plastic bag, and shipped to an FSIS laboratory for analysis.

Cattle (steer, heifer, cow, and bull) and swine (barrow and gilt) carcasses were randomly sampled via product that had been in a cooler for a minimum of 12 hours. Cattle carcasses were aseptically sampled by swabbing three 100-cm$^2$ sites (brisket, flank, and rump) with a sterile sponge moistened in 10 mL of chilled BPW. Swine carcasses were aseptically sampled by swabbing three 100-cm$^2$ sites (jowls, belly, and ham) with a sterile sponge moistened in 10 mL of chilled BPW. After swabbing, each cattle or swine sponge was placed in a sterile plastic bag and shipped to an FSIS laboratory for analysis. Samples were placed in insulated shippers with frozen gel packs capable of maintaining refrigeration temperatures and shipped on the day of collection via overnight delivery to 1 of 3 FSIS Field Service Laboratories in Athens, Georgia; St Louis, Missouri; or Alameda, California.

At the laboratory, samples were prepared for *Salmonella* analysis by the addition of 30 mL of BPW to 30 mL of broiler carcass rinse fluid, 225 mL of BPW to 25 g of raw ground product, or 50 mL of BPW to the premoistened sponge sample. The prepared samples were analyzed according to culture procedures described in the FSIS **Microbiology Laboratory Guidebook (MLG)**.[3] Sample enrichment cultures were screened with a commercially available automated immunoassay system; all presumptive positive results were confirmed via bacteriologic culture, as described in the MLG. One suspect *Salmonella* isolate per sample, selected from the most dominant colony type in culture medium, was confirmed biochemically and serologically (polyvalent H and O group antigens). Confirmed *Salmonella* isolates from each of the 3 FSIS laboratories were forwarded to the USDA, Animal and Plant Health Inspection Service, National Veterinary Services Laboratories, Ames, Iowa, for serotyping.

*Salmonella* isolates were serotyped via standard procedures, as described.[4] The cell wall antigen (somatic or O) was first identified by use of a saline (0.9% NaCl) solution suspension of cells mixed with antisera in a slide agglutination test. The flagellar (H) antigen was then determined by use of a formalin-killed broth culture mixed with antisera in a tube agglutination test. Absorbed single-factor antisera were used to confirm the specific antigens in O and H tests. After the first flagellar antigen was identified, a small tissue culture dish containing antisera mixed with motility media was inoculated with the isolate to force the salmonellae to change phase. The second phase was then identified in a tube agglutination test. Biochemical tests were completed to identify any bioserotypes such as *Salmonella* ser Choleraesuis. After all antigens were identified, the isolate was reported by serotype name. In the rare event that mixed cultures were identified while completing somatic or flagellar antigen testing, the isolate was reported as containing a multiple serotype. Samples were collected from January 1998 through December 2000.

## Limitations

The PR/HACCP verification program (compliance testing) for *Salmonella* was not developed as a sampling program to estimate *Salmonella* prevalence but to evaluate establishment performance with prescribed standards. Inasmuch as sample collection was not random or based on the production volume for specific product classes, the reliability of estimates of national serotype prevalence becomes difficult to determine.

Procedural aspects of compliance testing similarly lessen the ability to generalize verification findings. Because compliance testing was restricted to federally inspected establishments and implemented incrementally with all sized establishments represented in 2000 only, certain segments of the general population for all product classes were excluded from testing in 1998 and 1999. Moreover, because most of the compliance testing was performed during the first half of the calendar year, the testing schedule may have selected for serotypes with a greater prevalence during this time of the year. Lastly, because certain serotypes may be more prevalent within a specific establishment or geographic region, unequal sampling frequencies within an establishment or region from year-to-year may have resulted in variable rates of recovery for certain serotypes because of the specific frequency of sampling.

## Results

Overall, 98,204 samples were collected and analyzed from January 1998 through December 2000 from 7 classes of products, including chicken (broiler) carcasses, ground chicken, ground turkey, young cattle (steer or heifer) carcasses, mature cattle (bull or cow) carcasses, ground beef, and market hog (barrow or gilt) carcasses. Of the 98,204 samples, 91,192 (92.9%) were collected during A-set compliance testing and the remaining 7,012 (7.1%) samples were collected during B- and C-set compliance testing.

All serotyped *Salmonella* isolates entered into the official FSIS *Salmonella* database by September 22, 2001, pertaining to the 3-year collection period were included in this study. Serotyping was performed on all isolates, but a specific single serotype could not be determined for some. Similarly, isolates reported by National Veterinary Services Laboratories as monophasic, nonmotile, or having multiple serotypes were included in serotype lists, although all are considered untypable serotyped isolates. Those isolates were not included in statements regarding the number of serotypes identified for specific product classes. The 10 most prevalent serotypes isolated from A sets for individual product classes from 1998 through 2000 were determined.

**A-set samples from broiler carcasses**—Of the 22,484 analyzed broiler carcass rinse samples, 2,299 (10.2%) yielded *Salmonella* isolates.[5] Of the 2,299 *Salmonella* isolates, 2,111 (91.8%) were serotyped. Fifty-five serotypes were identified with the 5 most prevalent accounting for 67.2% of the 2,111 serotyped isolates. Eight serotypes that included Amager, Ferruch, Jedburgh, Lomalinda, Midway, Ouakam, Taksony, and Thomasville were isolated solely from the broiler product class. Although identified in 5 product classes, 546 of 656 (83.2%) isolates of Kentucky were collected from broilers. The 5 most commonly isolated serotypes in sampled broiler carcasses were Kentucky (25.9%), Heidelberg (20.3%), Hadar (7.5%), Typhimurium var Copenhagen (7.1%), and Typhimurium (6.4%).

Kentucky and Heidelberg were the first and second most prevalent serotypes isolated from broiler carcasses for each of the 3 years from 1998 through 2000 (**Table 1**).

Five serotypes that included Hadar, Schwarzengrund, Thompson, Typhimurium, and Typhimurium var Copenhagen, in addition to isolates classified as untypable (monophasic), were also among the 10 most commonly identified serotyped isolates in broilers for each year of the 3-year period.

**Ground chicken—A-sets—**Of the 735 analyzed ground chicken samples collected from January 1998 through December 2000 during A-set compliance testing, 106 (14.4%) yielded *Salmonella* spp.[5] Of the 106 *Salmonella* isolates, 94 (88.7%) were serotyped. Fifteen serotypes were identified, with the 4 most prevalent accounting for 59.6% of the 94 serotyped isolates. The 5 most commonly isolated serotypes in ground chicken samples were Heidelberg (17.0%), Hadar (16.0%), Kentucky (13.8%), Typhimurium var Copenhagen (12.8%), and Typhimurium (8.5%).

Three serotypes that included Thompson in 1998, Hadar in 1999, and Kentucky in 2000 were the most prevalent serotypes isolated from ground chicken during specific years of the 3-year period (**Table 2**). Thompson was the only serotype isolated from ground chicken in each of the 3 years. All 13 isolates of Kentucky identified in ground chicken were recovered in 2000.

**Chicken classes—A-sets—**The 6 most prevalent serotypes recovered from broiler and ground chicken samples during A-set compliance testing from January 1998 through December 2000 were common to both product classes, although differing in order of prevalence. Of the 15 serotypes isolated from sampled ground chicken, 14 (93.3%) were isolated from broilers. Reading was the only serotype identified in ground chicken that was not identified in broilers.

Of the 5 serotypes most commonly isolated from broiler carcasses in 1999, 4 were among the 5 most commonly identified serotypes in ground chicken in 1999 (Table 2). The 5 serotypes most commonly isolated from broiler carcasses and ground chicken in 2000 were common to both product classes, although differing in order of prevalence. Broiler and ground chicken product classes shared a most common serotype only in 2000 when Kentucky was most commonly isolated in both product classes.

Although isolated from 4, 5, and 6 product classes, respectively, 75 of 82 (91.5%) isolates of Thompson, 47 of 58 (81.0%) isolates of Enteritidis, and 105 of 126 (83.3%) isolates classified as untypable (monophasic) were identified in the combined isolate totals for broiler and ground chicken product classes.

Table 1—Distribution of *Salmonella* serotypes isolated from sampled broiler carcasses (A sets), 1998–2000

| Rank† and serotype | 1998–2000 (n = 2,111) No. (%)* | 1998 (521) Rank | 1998 (521) No. (%)* | 1999 (731) Rank | 1999 (731) No. (%)* | 2000 (859) Rank | 2000 (859) No. (%)* |
|---|---|---|---|---|---|---|---|
| 1. Kentucky | 546 (25.9) | 1 | 139 (26.7) | 1 | 188 (25.7) | 1 | 219 (25.5) |
| 2. Heidelberg | 428 (20.3) | 2 | 92 (17.7) | 2 | 138 (18.9) | 2 | 198 (23.1) |
| 3. Hadar | 158 (7.5) | 5 | 33 (6.3) | 3 | 83 (11.4) | 5 | 42 (4.9) |
| 4. Typhimurium var Copenhagen | 150 (7.1) | 3 | 41 (7.9) | 4 | 52 (7.1) | 3 | 57 (6.6) |
| 5. Typhimurium | 136 (6.4) | 4 | 40 (7.7) | 5 | 41 (5.6) | 4 | 55 (6.4) |
| 6. Untypable (monophasic) | 99 (4.7) | 6 | 33 (6.3) | 6 | 34 (4.7) | 7 | 32 (3.7) |
| 7. Thompson | 71 (3.4) | 10 | 14 (2.7) | 7 | 30 (4.1) | 8 | 27 (3.1) |
| 8. Montevideo | 59 (2.8) | 8 | 16 (3.1) | 17 | 6 (0.8) | 6 | 37 (4.3) |
| 9. Schwarzengrund | 58 (2.7) | 7 | 21 (4.0) | 10 | 12 (1.6) | 9 | 25 (2.9) |
| 10. Enteritidis | 45 (2.1) | 9 | 14 (2.7) | 16 | 7 (1.0) | 10 | 23 (2.7) |
| Other serotypes | 361 (17.1) | — | 78 (15.0) | — | 140 (19.2) | — | 144 (16.8) |

*Percentages are rounded to first decimal place. †Serotypes are ranked by number of isolations. Serotypes with the same isolation frequency are ranked alphabetically. — = Not applicable.

Table 2—Distribution of *Salmonella* serotypes isolated from sampled ground chicken (A sets), 1998–2000

| Rank† and serotype | 1998–2000 (n = 94) No. (%)* | 1998 (1) Rank | 1998 (1) No. (%)* | 1999 (44) Rank | 1999 (44) No. (%)* | 2000 (49) Rank | 2000 (49) No. (%)* |
|---|---|---|---|---|---|---|---|
| 1. Heidelberg | 16 (17.0) | — | — | 2 | 7 (15.9) | 2 | 9 (18.4) |
| 2. Hadar | 15 (16.0) | — | — | 1 | 12 (27.3) | 4 | 3 (6.1) |
| 3. Kentucky | 13 (13.8) | — | — | — | 0 | 1 | 13 (26.5) |
| 4. Typhimurium var Copenhagen | 12 (12.8) | — | — | 3 | 6 (13.6) | 3 | 6 (12.2) |
| 5. Typhimurium | 8 (8.5) | — | — | 4 | 5 (11.4) | 5 | 3 (6.1) |
| 6. Untypable (monophasic) | 6 (6.4) | — | — | 5 | 3 (6.8) | 6 | 3 (6.1) |
| 7. Thompson | 4 (4.3) | 1 | 1 (100) | 13 | 1 (2.3) | 9 | 2 (4.1) |
| 8. Infantis | 3 (3.2) | — | — | 9 | 1 (2.3) | 7 | 2 (4.1) |
| 9. Reading | 3 (3.2) | — | — | 7 | 2 (4.5) | 12 | 1 (2.0) |
| 10. Enteritidis | 2 (2.1) | — | — | 8 | 1 (2.3) | 11 | 1 (2.0) |
| Other serotypes | 4 (4.3) | — | — | — | 6 (13.6) | — | 6 (12.2) |

*See* Table 1 for key.

**Ground turkey—A-sets**—Of the 3,192 analyzed ground turkey samples collected from January 1998 through December 2000 during A-set compliance testing, 947 (29.7%) yielded *Salmonella* spp.[5] Of the 947 *Salmonella* isolates, 888 (93.8%) were serotyped. Forty-five serotypes were identified with the 4 most prevalent accounting for 54.6% of the 888 serotyped isolates. Three serotypes that included Chester, Minneapolis, and Putten were isolated solely from the ground turkey product class. The 5 most commonly isolated serotypes in ground turkey samples were Heidelberg (19.8%), Hadar (18.6%), Senftenberg (8.9%), Reading (7.3%), and Schwarzengrund (6.5%).

Hadar and Heidelberg were the 2 most prevalent serotypes isolated from ground turkey samples from 1998 through 2000, with Hadar being the most common isolate in 1998 and 1999 and Heidelberg being the most common isolate in 2000 (**Table 3**). Five additional serotypes that included Muenster, Reading, Saintpaul, Schwarzengrund, and Senftenberg were among the 10 most prevalent serotypes in ground turkey for each year of the 3-year period.

**Poultry classes—A-sets**—Hadar, Heidelberg, Typhimurium, and Typhimurium var Copenhagen were among the 10 most prevalent serotypes isolated during A-set compliance testing from each of the 3 poultry product classes (broilers, ground chicken, and ground turkey) during the 3-year period (Table 1). Of the 45 serotypes isolated from ground turkey, 36 (80.0%) were also isolated from broiler or ground chicken product classes. Binza, Blockley, Haardt, and

Istanbul were identified in more than 1 poultry class and isolated solely from poultry product classes. Although isolated from poultry and meat product classes, 338 of 350 (96.6%) isolates of Hadar, 30 of 32 (93.8%) isolates of Berta, 620 of 662 (93.7%) isolates of Heidelberg, and 118 of 127 (92.9%) isolates of Schwarzengrund were recovered from broiler, ground chicken, and ground turkey samples.

**Steer/heifer carcasses—A-sets**—Of the 2,088 analyzed steer and heifer carcass samples collected from January 1998 through December 2000 during A-set compliance testing, 6 (0.3%) yielded *Salmonella* spp.[5] Of the 6 *Salmonella* isolates, 6 (100%) were serotyped (**Table 4**). Five serotypes were identified, with Montevideo (33.3%) being the most commonly isolated serotype.

**Bull/cow carcasses—A-sets**—Of the 3,695 analyzed bull and cow carcass samples collected from January 1998 through December 2000 during A-set compliance testing, 78 (2.1%) yielded *Salmonella* spp.[5] Of the 78 *Salmonella* isolates, 70 (89.7%) were serotyped. Twenty-two serotypes were identified, with the 5 most prevalent accounting for 52.9% of the 70 serotyped isolates. Eleven of the 22 (50.0%) serotypes were single isolates, being recovered only once during the 3-year period. One serotype, Fresno, was isolated solely from the bull and cow product class. The 5 most commonly identified serotypes in sampled bull and cow carcasses were Muenster (12.9%), Kentucky (10.0%), Montevideo (10.0%), Newport (10.0%), and Typhimurium (10.0%).

Table 3—Distribution of *Salmonella* serotypes isolated from sampled ground turkey (A sets), 1998–2000

| Rank† and serotype | 1998–2000 (n = 888) | | 1998 (188) | | 1999 (325) | | 2000 (375) | |
|---|---|---|---|---|---|---|---|---|
| | No. (%)* | Rank | No. (%)* | Rank | No. (%)* | Rank | No. (%)* |
| 1. Heidelberg | 176 (19.8) | 2 | 35 (18.6) | 2 | 61 (18.8) | 1 | 80 (21.3) |
| 2. Hadar | 165 (18.6) | 1 | 36 (19.1) | 1 | 72 (22.2) | 2 | 57 (15.2) |
| 3. Senftenberg | 79 (8.9) | 3 | 21 (11.2) | 3 | 27 (8.3) | 4 | 31 (8.3) |
| 4. Reading | 65 (7.3) | 4 | 17 (9.0) | 4 | 26 (8.0) | 6 | 22 (5.9) |
| 5. Schwarzengrund | 58 (6.5) | 5 | 17 (9.0) | 8 | 12 (3.7) | 5 | 29 (7.7) |
| 6. Agona | 55 (6.2) | 11 | 4 (2.1) | 6 | 16 (4.9) | 3 | 35 (9.3) |
| 7. Saintpaul | 38 (4.3) | 7 | 7 (3.7) | 7 | 13 (4.0) | 7 | 18 (4.8) |
| 8. Muenster | 37 (4.2) | 6 | 7 (3.7) | 5 | 18 (5.5) | 8 | 12 (3.2) |
| 9. Typhimurium | 19 (2.1) | 10 | 5 (2.7) | 10 | 7 (2.2) | 12 | 7 (1.9) |
| 10. Typhimurium var Copenhagen | 15 (1.7) | — | 0 | 9 | 12 (3.7) | 22 | 3 (0.8) |
| Other serotypes | 181 (20.4) | — | 39 (20.7) | — | 61 (18.8) | — | 81 (21.6) |

*See* Table 1 for key.

Table 4—Distribution of *Salmonella* serotypes isolated from sampled steer and heifer carcasses (A sets), 1998–2000

| Rank† and serotype | 1998–2000 (n = 6) | | 1998 (0) | | 1999 (2) | | 2000 (4) | |
|---|---|---|---|---|---|---|---|---|
| | No. (%)* | Rank | No. (%)* | Rank | No. (%)* | Rank | No. (%)* |
| 1. Montevideo | 2 (33.3) | — | — | — | — | 1 | 2 (50.0) |
| 2. Heidelberg | 1 (16.7) | — | — | 1 | 1 (50.0) | — | — |
| 3. Minnesota | 1 (16.7) | — | — | — | — | 2 | 1 (25.0) |
| 4. Panama | 1 (16.7) | — | — | 2 | 1 (50.0) | — | — |
| 5. Typhimurium var Copenhagen | 1 (16.7) | — | — | — | — | 3 | 1 (25.0) |

*See* Table 1 for key.

A variety of serotypes were recovered most commonly from bull and cow carcasses in each of the 3 years. Derby and Muenchen were identified as most prevalent in 1998, Kentucky and Muenster in 1999, and Newport in 2000 (**Table 5**). Derby and Muenchen were the only serotypes identified in bull and cow carcasses for each year of the 3-year period.

**Ground beef—A-sets**—Of the 50,515 analyzed ground beef samples collected from January 1998 through December 2000 during A-set compliance testing, 1,873 (3.7%) yielded *Salmonella* spp.[5] Of the 1,873 *Salmonella* isolates, 1,752 (93.5%) were serotyped. Seventy-one serotypes were identified, with the 6 most prevalent accounting for 49.9% of the 1,752 serotyped isolates. Nineteen serotypes that included Bardo, Bareilly, Cambridge, Drypool, Finkenwerder, Havana, Hindmarsh, Java, Kinshasa, Memphis, Miami, Newhaw, Pomona, Presov, Rubislaw, San Diego, Soahanina, Sundsvall, and Weltevreden were isolated solely from the ground beef product class. The 5 most commonly isolated serotypes in ground beef samples were Montevideo (16.4%), Anatum (8.7%), Typhimurium var Copenhagen (6.4%), Newport (6.2%), and Senftenberg (6.2%).

Anatum was the most commonly isolated serotype in ground beef in 1998, and Montevideo was the most common isolate in ground beef in 1999 and 2000 (**Table 6**).

Four additional serotypes that included Kentucky, Muenster, Newport, and Typhimurium var Copenhagen were among the 10 most prevalent serotypes in ground beef for each year of the 3-year period.

**Cattle classes—A-sets**—Twenty-five serotypes were isolated during A-set compliance testing from the 2 cattle carcass product classes, with 2 serotypes, Montevideo and Typhimurium var Copenhagen, being common to the steer and heifer product class and the bull and cow product class. Cattle carcass product classes (steer/heifer and bull/cow) and the ground beef product class did not share a most commonly isolated serotype for any year in the 3-year period (Tables 4–6). However, 7 of the 10 most prevalent serotypes recovered from bull/cow and ground beef samples during A-set compliance testing from January 1998 through December 2000 were common to both product classes (Table 1). Berta and Fresno were the only serotypes identified in the bull/cow carcass class that were not also identified in sampled ground beef.

Two serotypes, Dublin and Meleagridis, were isolated solely from the bull/cow and ground beef product classes. Although isolated from poultry and meat product classes, 85 of 89 (95.5%) isolates of Cerro, 116 of 137 (84.7%) isolates of Newport, 27 of 32 (84.4%) isolates of Give, 154 of 188 (81.9%) isolates of Anatum, 297 of 367

Table 5—Distribution of *Salmonella* serotypes isolated from sampled bull and cow carcasses (A sets), 1998–2000

| Rank† and serotype | 1998–2000 (n = 70) No. (%)* | 1998 (2) Rank | No. (%)* | 1999 (28) Rank | No. (%)* | 2000 (40) Rank | No. (%)* |
|---|---|---|---|---|---|---|---|
| 1. Muenster | 9 (12.9) | — | — | 2 | 4 (14.3) | 2 | 5 (12.5) |
| 2. Kentucky | 7 (10.0) | — | — | 1 | 4 (14.3) | 5 | 3 (7.5) |
| 3. Montevideo | 7 (10.0) | — | — | 3 | 3 (10.7) | 3 | 4 (10.0) |
| 4. Newport | 7 (10.0) | — | — | 16 | 1 (3.6) | 1 | 6 (15.0) |
| 5. Typhimurium | 7 (10.0) | — | — | 4 | 3 (10.7) | 4 | 4 (10.0) |
| 6. Typhimurium var Copenhagen | 5 (7.1) | — | — | 5 | 2 (7.1) | 7 | 3 (7.5) |
| 7. Meleagridis | 4 (5.7) | — | — | 14 | 1 (3.6) | 6 | 3 (7.5) |
| 8. Derby | 3 (4.3) | 1 | 1 (50.0) | 9 | 1 (3.6) | 12 | 1 (2.5) |
| 9. London | 2 (2.9) | — | — | 12 | 1 (3.6) | 15 | 1 (2.5) |
| 10. Mbandaka | 2 (2.9) | — | — | 13 | 1 (3.6) | 16 | 1 (2.5) |
| Other serotypes | 17 (24.3) | — | 1 (50.0) | — | 7 (25.0) | — | 9 (22.5) |

*See* Table 1 for key.

Table 6—Distribution of *Salmonella* serotypes isolated from sampled ground beef (A sets), 1998–2000

| Rank† and serotype | 1998–2000 (n = 1,752) No. (%)* | 1998 (72) Rank | No. (%)* | 1999 (650) Rank | No. (%)* | 2000 (1,030) Rank | No. (%)* |
|---|---|---|---|---|---|---|---|
| 1. Montevideo | 288 (16.4) | 2 | 9 (12.5) | 1 | 148 (22.8) | 1 | 131 (12.7) |
| 2. Anatum | 153 (8.7) | 1 | 13 (18.1) | 2 | 70 (10.8) | 5 | 70 (6.8) |
| 3. Typhimurium var Copenhagen | 112 (6.4) | 6 | 4 (5.6) | 8 | 28 (4.3) | 4 | 80 (7.8) |
| 4. Newport | 109 (6.2) | 9 | 3 (4.2) | 10 | 21 (3.2) | 3 | 85 (8.3) |
| 5. Senftenberg | 109 (6.2) | — | 0 | 21 | 7 (1.1) | 2 | 102 (9.9) |
| 6. Typhimurium | 103 (5.9) | 11 | 2 (2.8) | 4 | 36 (5.5) | 6 | 65 (6.3) |
| 7. Muenster | 99 (5.7) | 4 | 7 (9.7) | 3 | 46 (7.1) | 8 | 46 (4.5) |
| 8. Cerro | 84 (4.8) | — | 0 | 5 | 32 (4.9) | 7 | 52 (5.0) |
| 9. Kentucky | 78 (4.5) | 8 | 3 (4.2) | 6 | 31 (4.8) | 10 | 44 (4.3) |
| 10. Mbandaka | 74 (4.2) | 19 | 1 (1.4) | 7 | 28 (4.3) | 9 | 45 (4.4) |
| Other serotypes | 543 (31.0) | — | 30 (41.7) | — | 203 (31.2) | — | 310 (30.1) |

*See* Table 1 for key.

| | | 1998–2000 (n = 493) | 1998 (63) | | 1999 (138) | | 2000 (292) | |
|---|---|---|---|---|---|---|---|---|
| Rank† and serotype | No. (%)* | Rank | No. (%)* | Rank | No. (%)* | Rank | No. (%)* |
| 1. Derby | 119 (24.1) | 1 | 13 (20.6) | 1 | 40 (29.0) | 1 | 66 (22.6) |
| 2. Typhimurium var Copenhagen | 68 (13.8) | 2 | 10 (15.9) | 2 | 11 (8.0) | 2 | 47 (16.1) |
| 3. Johannesburg | 32 (6.5) | 15 | 1 (1.6) | 6 | 7 (5.1) | 3 | 24 (8.2) |
| 4. Infantis | 29 (5.9) | 10 | 2 (3.2) | 5 | 7 (5.1) | 4 | 20 (6.8) |
| 5. Heidelberg | 28 (5.7) | 5 | 3 (4.8) | 3 | 8 (5.8) | 5 | 17 (5.8) |
| 6. Anatum | 18 (3.7) | 13 | 1 (1.6) | 4 | 7 (5.1) | 6 | 10 (3.4) |
| 7. Agona | 14 (2.8) | 3 | 5 (7.9) | 8 | 5 (3.6) | 16 | 4 (1.4) |
| 8. Typhimurium | 14 (2.8) | 11 | 2 (3.2) | 14 | 3 (2.2) | 7 | 9 (3.1) |
| 9. Manhattan | 13 (2.6) | 16 | 1 (1.6) | 9 | 5 (3.6) | 13 | 6 (2.1) |
| 10. Reading | 13 (2.6) | 21 | 1 (1.6) | 10 | 5 (3.6) | 10 | 7 (2.4) |
| Other serotypes | 145 (29.4) | — | 24 (38.1) | — | 40 (29.0) | — | 82 (28.1) |

*See* Table 1 for key.

(80.9%) isolates of Montevideo, and 76 of 96 (79.2%) isolates of Mbandaka were recovered from steer, heifer, bull, cow, and ground beef samples.

**Market hog carcasses—A-sets**—Of the 8,483 analyzed market hog carcass samples collected from January 1998 through December 2000 during A-set compliance testing, 593 (7.0%) yielded *Salmonella* spp.[5] Of the 593 *Salmonella* isolates, 493 (83.1%) were serotyped. Forty-five serotypes were identified, with the 5 most prevalent accounting for 56.0% of the 493 serotyped isolates. Four serotypes that included Chailey, Choleraesuis var Kunzendorf, Stanley, and Urbana were isolated solely from the market hog product class. Although identified in 5 product classes, 119 of 154 (77.3%) isolates of Derby were collected from market hogs. The 5 most commonly identified serotypes in sampled market hog carcasses were Derby (24.1%), Typhimurium var Copenhagen (13.8%), Johannesburg (6.5%), Infantis (5.9%), and Heidelberg (5.7%).

Derby and Typhimurium var Copenhagen were the first and second most prevalent serotypes isolated from market hog carcasses for each of the 3 years reviewed in this report (**Table 7**). Heidelberg and Infantis were the only other serotypes among the 10 most commonly identified serotypes in the barrow and gilt product class for each year of the 3-year period.

**Meat classes—A-sets**—Montevideo and Typhimurium var Copenhagen were the only serotypes isolated during A-set compliance testing from each of the 4 meat product classes (steer/heifer, bull/cow, ground beef, and market hog) during the 3-year period. Four serotypes that included Bovismorbificans, Menhaden, Newbrunswick, and Poona were identified in cattle (ground beef) and swine (market hog) classes and isolated solely from meat product classes.

## Discussion

Although beyond the scope of this study, certain biological, environmental, and physical factors potentially influencing serotype prevalence within a product class require evaluation. Live animal production practices,[6-11] transport,[6,11-13] lairage,[12,14-16] and other preharvest factors

contributing to serotype prevalence and distribution among live animal populations entering processing establishments, in addition to effects associated with geography,[17-21] seasonality,[19,22-24] and establishment size, need to be considered prior to attributing a definitive reason for any changes observed in serotype ranking or prevalence. Because the current regulatory sampling program was developed to evaluate establishment performance with prescribed regulatory standards and not to provide an estimate of national *Salmonella* prevalence, an analysis of serotype prevalence and distribution based solely on compliance testing results may be inadequate to fully discern the individual and aggregate effects of biological, environmental, or physical factors. The development of statistically based sampling protocols, separate from the current regulatory sampling program, may be required to evaluate the importance of preharvest factors, geographic features, seasonality, or establishment size on the serotype prevalence and distribution of salmonellae in raw meat and poultry products.

The data suggest that 1 or 2 serotypes were predominant within specific product classes during the 3 years of testing. Kentucky and Heidelberg were predominant for the broiler product class, Heidelberg and Hadar for the ground turkey class, Montevideo among cattle classes, and Derby for the swine product class.

Unlike the predominant serotypes that had a consistent ranking among certain product classes for each year in the 3-year period, other less consistently observed serotypes had greater variability in annual isolate ranking or prevalence for specific product classes during A-set compliance testing. Kentucky, not identified in sampled ground chicken in 1998 or 1999, was the most commonly isolated serotype in the ground chicken product class in 2000. Agona had a progressive increase in prevalence in sampled ground turkey from 2.1% in 1998 to 4.9% in 1999 and 9.3% in 2000. From 1999 to 2000, Newport increased from 3.6% to 15.0% of serotyped isolates in the bull/cow product class and from 3.2% to 8.3% of serotyped isolates in the ground beef product class, whereas the prevalence of Senftenberg increased from 1999 to 2000 in the ground beef product class from 1.1% to 9.9% of all serotyped isolates.

The results revealed that certain *Salmonella* serotypes were consistently associated with specific

classes of food animal carcasses and raw ground products. One or 2 predominant serotypes were identified for each product class, whereas other serotypes had notable changes in annual prevalence or ranking within a product class for consecutive years of the 3-year sampling period. Although limitations inherent in regulatory sampling restrict the ability to assert a definite association between compliance testing results and serotype prevalence in live animal populations, the distribution of serotypes reported from regulatory sampling in the 3 years following implementation of PR/HACCP reveals the diversity of serotypes present in food animals and indicates the variety of serotypes present in specific meat and poultry classes.

## References

1. USDA: Food Safety and Inspection Service. Pathogen reduction; hazard analysis and critical control point (HACCP) systems; final rule. Federal Register 1996. Available at http://www.fsis.usda.gov/OA/fr/haccp_rule.htm. Accessed Oct 3, 2003.

2. USDA: Food Safety and Inspection Service. The Baseline Data Collection Program 1996. Available at http://www.fsis.usda.gov/OPHS/baseline/contents.htm. Accessed Oct 3, 2003.

3. Rose BE. Isolation and identification of *Salmonella* from meat, poultry, and egg products. In: Dey BP, Lattuada CP, eds. *Microbiology laboratory guidebook*. Vol 1. 3rd ed. Washington, DC: US Government Printing Office, 1998:4-1. Available at: http://www.fsis.usda.gov/OPHS/microlab/mlgchp4.pdf. Accessed Oct 3, 2003.

4. Ewing WH. Genus *Salmonella*. In: *Edwards and Ewing's identification of Enterobacteriacae*. 4th ed. New York: Elsevier Science, 1986;181–245.

5. Rose BE, Hill WE, Umholtz RL, et al. Testing for *Salmonella* in raw meat and poultry products collected at federally inspected establishments in the United States, 1998 through 2000. *J Food Prot* 2002;65:937–947.

6. Barber DA, Bahnson PB, Isaacson R, et al. Distribution of *Salmonella* in swine production ecosystems. *J Food Prot* 2002; 65:1861–1868.

7. Beach JC, Murano EA, Acuff GR. Serotyping and antibiotic resistance profiling of *Salmonella* in feedlot and nonfeedlot beef cattle. *J Food Prot* 2002;65:1694–1699.

8. Bailey JS, Cox NA, Craven SE, et al. Serotype tracking of *Salmonella* through integrated broiler chicken operations. *J Food Prot* 2002;65:742–745.

9. Corry JE, Allen VM, Hudson WR, et al. Sources of *Salmonella* on broiler carcasses during transportation and processing: modes of contamination and methods of control. *J Appl Microbiol* 2002;92:424–432.

10. Huston CL, Wittum TE, Love BC, et al. Prevalence of fecal shedding of *Salmonella* spp. *J Am Vet Med Assoc* 2002;220: 645–649.

11. Berends BR, Urlings HA, Snijders JM, et al. Identification and quantification of risk factors in animal management and transport regarding *Salmonella* spp in pigs. *Int J Food Microbiol* 1996; 30:37–53.

12. Hurd HS, McKean JD, Griffith RW, et al. *Salmonella enterica* infections in market swine with and without transport and holding. *Appl Environ Microbiol* 2002;68:2376–2381.

13. Barham AR, Barham BL, Johnson AK, et al. Effects of the transportation of beef cattle from the feedyard to the packing plant on prevalence levels of *Escericia coli* O157 and *Salmonella* spp. *J Food Prot* 2002;65:280–283.

14. Hurd HS, McKean JD, Wesley IV, et al. The effect of lairage on *Salmonella* isolation from market swine. *J Food Prot* 2001;64: 939–944.

15. Hurd HS, Gailey JK, McKean JD, et al. Rapid infection in market-weight swine following exposure to a *Salmonella* Typhimurium-contaminated environment. *Am J Vet Res* 2001;62: 1194–1197.

16. Swanenburg M, Urlings HA, Keuzenkamp DA, et al. *Salmonella* in the lairage of pig slaughterhouses. *J Food Prot* 2001; 64:12–16.

17. Wray C, Davies RH. *Salmonella* infections in cattle. In: Wray C, Wray A, eds. *Salmonella in domestic animals*. London: CABI Publishing, 2000;169–190.

18. Fedorka-Cray PJ, Gray JT, Wray C. *Salmonella* infections in pigs. In: Wray C, Wray A, eds. *Salmonella in domestic animals*. London: CABI Publishing, 2000;191–207.

19. McDonough PL, Fogelman D, Shin SJ, et al. *Salmonella enterica* serotype Dublin infection: an emerging infectious disease for the northeastern United States. *J Clin Microbiol* 1999;37:2418–2427.

20. Borland ED. *Salmonella* infection in poultry. *Vet Rec* 1975; 97:406–408.

21. Faddoul GP, Fellows GW. A five-year survey of the incidence of *Salmonella* in avian species. *Avian Dis* 1966;10:296–304.

22. Skov MN, Angen O, Chriel M, et al. Risk factors associated with *Salmonella* serovar typhimurium in Danish broiler flocks. *Poultry Sci* 1999;78:848–854.

23. Sofos JN, Kochevar SL, Reagan JO, et al. Incidence of *Salmonella* on beef carcasses relating to the US meat and poultry inspection regulations. *J Food Prot* 1999;62:467–473.

24. Sofos JN, Kochevar SL, Bellinger GR, et al. Sources and extent of microbiological contamination of beef carcasses in seven United States slaughtering plants. *J Food Prot* 1999;62:140–145.

# ASM
# Style Manual
## *for Journals and Books*

American Society for Microbiology
Washington, D.C. 1991

in a table (see p. 122). An en dash should be marked $\frac{1}{N}$ on copy.

## Quotation Marks

Double quotation marks ('' '') are used to set off matter quoted verbatim in the text. Alterations of or additions to the quoted matter should be set off by square brackets ([ ]).

Double quotation marks may be used to set off unfamiliar terms or terms used in figurative or unfamiliar ways, but they should be used this way only sparingly; they serve no purpose in such cases as the following.

> Two ''peaks'' of activity, a ''heavy'' peak in fractions 10 to 15 and a ''light'' peak in fractions 26 to 29, were observed.

If quotation marks with a novel expression are considered necessary, use them only the first time the expression appears in the abstract and the first time it appears in the text; delete them thereafter. (''Gold standard'' is always set in quotation marks at first use: The ''gold standard'' for identification of *C. trachomatis* is tissue culture.) If in doubt about whether quotation marks are justified, leave them on the first occurrence and query.

Quotation marks (not italics) may sometimes be used to set off a word or phrase being used to indicate the term itself rather than the thing which it names, depending on whether the sentence would be sufficiently clear without them. Use your judgment.

> The names ''start'' and ''stop'' were given to the growth phases.
> ''And'' indicates that both strains were used; ''or'' indicates that only one was used.
> BUT
> The designation pXY1402 was given to this plasmid.

Single quotation marks (' ') are used for quoted matter within matter in double quotation marks. They are also used for the names of cultivated varieties (cultivars) of plants, unless the abbreviation cv. is used: *Glycine max* 'Chippewa' OR *Glycine max* cv. Chippewa (p. 33).

A comma or period at the end of quoted matter goes inside double quotation marks; a colon, semicolon, or other punctuation goes outside, unless it is part of the quoted matter. Punctuation usually goes outside single quotation marks.

## Hyphen

**Compound words.** Terms formed by combining two or more words or elements of words may be open (with a space between them), hyphenated, or solid (as one word). Examples: tap water, life cycle, life-style, time-consuming, cost-effective, cross-reaction, long-term, endpoint, crosswise, coverslip. If in doubt about how to treat a compound, consult (in order of preference) chapter 12 of this manual, *Webster's Ninth* (64), *Webster's Third* (65) (including the addenda), or an appropriate specialized dictionary such as *Stedman's Medical Dictionary* (57), the *Dictionary of Microbiology and Molecular Biology* (50), or *Webster's Medical Desk Dictionary* (62).

When a word element is listed in the dictionary as a prefix or suffix (it will be printed with a hyphen at the end or beginning, e.g., hetero- or -able), it may be attached to any reasonable root to form a new word. This new word will probably not be in the dictionary.

methylatable            heterodimer
glycosylate             formolize
evaluable               40-mer

If word elements are not listed in the dictionary as prefixes or suffixes and the compound is not listed separately, the compound should be hyphenated when used as a unit modifier (see below) and open otherwise.

> Food-borne contaminants were found.
> Contaminants were food borne.

> Pathogen-free mice were used.
> The mice were pathogen free.

The following are some common prefixes; these should always be solid except as noted below. The length of the compound has no effect on whether the prefix is solid: supramolecular, postinoculation, post-translational, semiquantitatively, counterimmunoelectrophoresis.

| | | | |
|---|---|---|---|
| ante- | inter- | over- | sub- |
| anti- | intra- | post- | super- |
| co- | macro- | pre- | supra- |
| counter- | micro- | pro- | trans- |
| de- | mid- | pseudo- | ultra- |
| extra- | multi- | re- | un- |
| infra- | non- | semi- | |

Under certain circumstances, even these prefixes should be hyphenated.

> before a capital letter: un-American
> before an abbreviation: non-mRNA, anti-SRBC
> before a numeral: pre-1970
> to avoid confusion with a similar unhyphenated word: re-cover (cf. recover), un-ionized (cf. unionized)

Most prefixes are hyphenated to avoid doubling a vowel, but compounds with co-, de-, pre-, pro-, and re- are exceptions: semi-invalid, intra-abdominal, BUT cooperation, reexamine, microorganism, photooxidation.

In addition, a prefix is hyphenated if it applies to a whole phrase, not just to the first element of the phrase. The mid-exponential phase of cell growth is the middle part of the exponential phase, not a phase that is ''midexponential''; non-life-threatening infections are nonthreatening to life, not ''nonlife.'' This point calls for special attention in dealing with immunological terms involving anti-. ''Goat anti-rabbit IgG'' means goat antiserum against rabbit IgG, NOT goat IgG which is antirabbit, so the

01/09/2001 09:47 FAX 2028726257    AMERICAN CHEMICAL SOCIET    ☑003/003

rearrangement of references necessary. The following names are listed in correct alphabetical order.

Smith, A. M.
Smith, P., and A. M. Smith
Smith, P. Q.
Smith, P. Q., B. G. Brown, S. Rodriguez, and A. M. Smith.
Smith, P. Q., S. Rodriguez, B. G. Brown, and A. M. Smith
Smith, P. Q., S. Rodriguez, A. M. Smith, and B. G. Brown
Smith, P. Q., S. Rodriguez, A. M. Smith, B. G. Brown, and R. M. Nixon
Smith, P. Q., and W. van Damm. 1979.
Smith, P. Q., and W. van Damm. 1981.
Smith, P. Q., and S. Vann.
Smith, P. Q., H. Van Willems, and S. Rodriguez
Smith, P. Q., and H. W. Van Willems
Smithers, A. M.

**Rearranging and renumbering.** If any references are rearranged, mark the transpositions clearly; do not count on renumbering alone to make the order clear to the printer (Fig. 7.2). If an item must be transferred from one page to another, write two circled notes for the printer, one by the item to be moved and one at the space where it is to be inserted. If more than one page of consecutive references needs to be renumbered, cut the entries apart and paste or tape them down in the correct order. Occasionally an author will number references in the order in which they are cited in the text, not in alphabetical order. Such a list must be cut apart and reordered. (Be sure not to cut off the old numbers.) Once the list is in correct alphabetical order, check to see whether the page count has been altered. If it has, make sure that the new count is properly marked on the cover sheet and article card.

If any reference numbers are changed, write a note to the author on the first page of the text (NOT the abstract): "Au/ Please check renumbered references throughout." Change reference numbers as you edit the text. This is why References should be edited before the body of the article.

## References and the Text

### Works Listed in References

**References not cited.** If four or more references are not cited in the text, call the author and ask where the references can be cited. For foreign papers, talk to the production editor. If fewer than four references are not cited, write a query at the beginning of the text (NOT the abstract) (be sure to give both old and new numbers if references have been renumbered).

**Reference numbers.** Citations of references in the text are given by numbers in parentheses on line after the matter which they support. Place references cited together in numerical order: Serotyping is based on immunofluorescence (10, 13, 27). If three or more consecutive references are cited in the same place, use an en dash instead of giving all the numbers: (9–12, 17, 22–24, 26, 27).

Do not mark spacing between reference numbers. The printers know from their format instructions what spacing to use.

If a reference is singled out for special mention or if it is incorporated into the syntax of a sentence, the word "reference" (not abbreviated) must precede the number: (3, 7–10, 16; for a review, see reference 7); for details, see reference 23.

References accompanying matter in parentheses may be enclosed in square brackets within the parentheses or placed outside the parentheses in parentheses of their own: A large number of genes (ca. 30 [10]) are required; Cells grown on a semisynthetic presporulation medium (PSP2) (30) were studied. The former is preferred if the references support matter within the parentheses, and the latter is preferred if they support matter outside the parentheses; follow the author if in doubt. When references and figures or tables are cited together, it is usually best to use separate parentheses: (Fig. 1) (12), NOT (Fig. 1; 12) OR (Fig. 1 [12]).

**Authors' names and references.** An author may wish to cite work by the authors' names as well as by numbers: as studied by Smith and Jones (25), by the procedure of Smith et al. (26). For a work by two authors, give the surnames (or initials and surnames); follow the author) of both. For three or more authors, use the surname (or initial[s] and surname; follow the author) of the first author followed by "et al.," "and coworkers," or "and colleagues."

If several works are mentioned together with authors' names, a few simplification are permitted. "Tweedle and Dee (6, 17, 18)" can be used for "Dee and Tweedle (6), Tweedle (17), and Tweedle and Dee (18)" because both authors are given credit, even though the order of names changes and one paper has only one author. "Smith et al. (17–20)" can be used for a series of articles with Smith as the first author, even if some of the articles have fewer than three authors. If the same research team has rotated the order of authors in a series of papers and the papers are cited together, it is better either to mention each first author by name or not to mention names at all: the work of Merrill et al. (11), Lynch et al. (8), Pierce et al. (12, 13), Fenner et al. (7), and Smith et al. (18) OR, simply, the work of others (7, 8, 11–13, 18). An author may, however, be permitted a passing reference to "reports from the laboratory of Smith and coworkers (7, 8, 11–13, 18)" if Smith is an author, but not necessarily the first author, of all the papers cited; the copy editor need not expand such a reference if expanding it would be too awkward. Note that these shortcuts should be used only to let stand short citations given by the author; do not use them to condense fuller citations.

Check citations given with authors' names against entries in References to make sure that the names and numbers agree. If they do not, change the number in the text and query if you can supply the correct

# Blue Exhibits Excerpted From United States Department of Agriculture, Food Safety & Inspection Service

## Report of Investigation

## Khurshed Chowdhury
## Case No. FSIS-2006-02551
## Volume 1 OF 1
## UNREDACTED COPY

Affidavit of William James
Complaint of Khurshed Chowdhury-FSIS-2006-002661
Page 1 of 3

## WITNESS AFFIDAVIT

I, William James, am an employee of the Food Safety & Inspection Service (FSIS), United States Department of Agriculture, located in Washington, D.C., in the capacity of Deputy Assistant Administrator, Grade Senior Executive Service. I have served with FSIS from March 1983 to the present date.

My telephone number during working hours is: (202) 720-5362

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and U.S. Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the USDA. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and USDA policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Agency officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear __X__ affirm _____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

Initials: _WLJ_

On January 29, 2007, EEO Investigator Paula Mazzoccante conducted a telephonic interview with Dr. William James regarding the EEO complaint filed by Khurshed Chowdhury against the Food Safety & Inspection Service, Case Number FS-2006-02551.

1.   **Please state and spell your name for the record.**
A.   William James

2.   **What is your current position and location?**
A.   Deputy Assistant Administrator, Washington, DC

3.   **How long have you worked for the Food Safety & Inspection Service?**
A.   Since March, 1983

4.   **What is your grade?**
A.   Senior Executive Service

5.   **What is your sex?**
A.   Male

6.   **What is your race?   What is your year of birth?**
A.   Caucasian and I was born in 1954.

7.   **How do you know the Complainant?**
A.   I was his previous supervisor for approximately 5 years.  During several reorganizations he was assigned to me.

8.   **How would you describe the Complainant and his work performance?**
A.   His demeanor toward me was professional and he treated me with respect.  He always seemed to be in good humor.  In terms of his work product, he could do simple things well, but assignments that were more complicated and required an analysis and original thinking, he was less competent.  A great deal of time that I was his immediate supervisor, I was on detail to other offices, so I was not around to give him hands on supervision.  I didn't have that many years of close supervision with him.  The last few years I was there, Drs. Parham and Thaler were his supervisors.

9.   **Those years that you supervised him, what performance rating did you give him?**
A.   I can't remember precisely but I probably gave him superior rating but I don't remember how many times I rated him myself.  He was respectful and professional and the projects I gave him he did in a satisfactory manner.  The more complicated projects were difficult for him.

10.  During the time you supervised him, do you know if he was ever assigned a peer review paper?



43

Affidavit of William James
Complaint of Khurshed Chowdhury-FSIS-2006-002661
Page 3 of 3

A.    He spoke to me when he began having problems and said he was assigned to write a peer review paper.  It is not an uncommon assignment to be told to write a paper.  I can't remember the details of him being assigned the paper but I do remember him telling me about it.

11.    **Were you at all involved in the removal of the Complainant?**
A.    No.

12.    **When you assigned the Complainant a superior performance rating, what did you base the superior rating on?**
A.    It's been to many years for me to recall, but it may have been because a superior rating is the most common rating at FSIS.  Not having been able to provide him any closer supervision than I did, I rated him according to the knowledge I had of his performance and it was probably influenced by what others who were working with him were getting.

13.    **Do FSIS employees conduct research?**
A.    FSIS employees don't do research but they do look at research material.   In the USDA, research is done by Agricultural Research Service.

14.    **Do you have any additional information?**
A.    Nothing I can add from personal knowledge.


I have reviewed this statement, which consists of 3 pages, and hereby solemnly  X
swear ____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          __2/9/07_____
William James                                     Date

_____          __2/13/2007____
Paula M. Mazzoccante, Investigator       Date

Initials: _____

Affidavit of Delila Parham
Complaint of Khurshed Chowdhury #FSIS-2006-02551
Page 1 of 5

## WITNESS AFFIDAVIT

I, Delila Robinson Parham, am an employee of the Food Safety & Inspection Service, located at the United States Department of Agriculture, Washington, D.C. in the capacity of Branch Chief, Supervisory Veterinarian Medical Officer, Grade 14 from February 1983 to the present date.

My telephone number during working hours is:  202 690-6573

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and U.S. Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the USDA. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint.  My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and USDA policy.  This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record.  In addition, the complainant and the appropriate Agency officials involved in the EEO complaint process will receive the entire investigative file.  I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate.  I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear _____ affirm _____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

Initials: DRP

On January 21, 2007, EEO Investigator Paula Mazzoccante conducted a telephonic interview with Delila Parham regarding the EEO complaint filed by Khurshed Chowdhury against the Food Safety & Inspection Service, Case Number FS-2006-02251.

1. Please state and spell your name
A. D-e-l-i-l-a R-o-b-i-n-s-o-n P-a-r-h-a-m

The issue accepted by the agency is whether Khurshed Chowdhury was subjected to discrimination based on his race (Asian), religion (Muslim), sex (male), national origin, age (YOB: 1941) and reprisal for prior EEO activity, when on September 1, 2006, he was terminated from his position as Veterinary Medical Officer, GS-701-13.

2. Please state your current position title, grade and series
A. Supervisory Veterinarian Medical Officer, Branch Chief, GS-701-14

3. What is your business telephone number?
A. 202-690-6573

4. Please identify the management official to whom you report
A. Dr. Bhabani Dey

5. What is your gender?
A. Female

6. What is your race?
A. African American

7. What is your National Origin?
A. American

8. What is your religion?
A. Protestant

9. What is your year of birth?
A. 1953

10. How long have you worked for FSIS?
A. Since February 1983

11. How do you know the Complainant?
A. I was his direct supervisor.

12. How long did you supervise the Complainant?
A. Since March 2001

13. Why was the Complainant removed?

Initials: DRP

A.   I provided information to my supervisor, Dr. Thaler that his performance was inadequate. His removal would have been decided by someone at a higher level, at least at Dr. Thaler's level or above.

14.   Please describe the Complainant's performance?
A.   He did not meet deadlines and when he did provide work it nearly always had to be rewritten. I would have to send it back to him several times before his work was satisfactory and then eventually I had to do it myself.

15.   When did his performance start to decline?
A.   His performance was never good. Probably, there were supervisors who would just tolerate it. He was never rated beyond fully successful by me. When Dr. Chowdhury and I started working together, I had a different supervisor. When Dr. Thaler became my supervisor, I told her his performance was not very good and she said he should go on a performance improvement plan (PIP). That is when this all began.

16.   Were you providing the Complainant regular counseling sessions regarding his performance?
A.   We don't really call them counseling sessions. I don't have much documented I will try that again. before he was put on the PIP. I verbally told him about his inadequate performance, and at his mid-year appraisal, he received a detailed account of his work performance. He never saw a problem with his work. He really didn't think anything was going to happen to him.

17.   Were there specific assignments the Complainant failed to complete or were completed untimely?
A.   He would eventually do assignments after numerous requests but everything was late.

18.   The Complainant alleges he was given many important tasks during the rating period that he completed well. The most important topic in 2004/2005 was Mad Cow Disease. Do you know if Dr.Chowdhury completed reports for this?

A.   Yes, he worked on Mad Cow Disease (Bovine Spongiform Encephalopathy) during the rating period as part of a group. He also had some independent projects on this. Many times I ended up changing what he prepared, sometimes without any discussion with him. He never contributed significantly to the team, so eventually he was pulled off for not contributing. It looked like he was doing a lot of the work because the group was working on it as a team, but, in reality, he didn't contribute very much.

19.   Did he receive credit for his work on Mad Cow Disease on his year end evaluation?
A.   What was written on his evaluation was more of the concerns about his performance. I don't remember if his work on Mad Cow Disease was written on his evaluation.

20.   Did the Complainant receive awards for his performance during the rating period?
A.   Yes he did. Anyone who worked on the project was recognized with an award, so he was recognized as part of the group.

21.   Dr. Chowdhury alleges the Toxo report he was assigned to provide is explained under communications. Is this assignment communications or mission support?

Initials: DRP

51

A. All the other elements are written in a manner to support the critical element of mission support. Writing the paper is also tied in with research and analysis. The paper did not show that he had done sufficient research and analysis. Even though communications is a non-critical element, you must be able to formulate or write a paper to the extent that it supports mission support and shows good research and analysis, both of which are critical elements. He wasn't removed for the communications element. You have to be able to write a report that shows you can perform research and analysis, which supports the mission support element.

22. Dr. Chowdhury alleges he was rated on an assignment given to him in July 2005 (*Salmonella*) after the rating period ended in June. Please respond.
A. That's not true. He is correct that the report was given to him near the end of June and was not due until July; however, it did not factor into his rating because he was not given a rating for this rating period. He was placed on a PIP.

23. Does a FSIS employee actually perform research or is this performed by outside agency scientists and the VMO provide the information in response to questions for reports?
A. We do not conduct research at FSIS, and Dr. Chowdhury is confused when we say research and analysis because he seems to think of bench research. You have to be able to review documents and get information from them. That is research and analysis. Research and analysis in our case is literature review and interpretation, and that is what is meant by research in our agency. Dr. Chowdhury could not take a scientific document and adequately interpret it.

24. Were other employees under your supervision tasked with writing peer review reports for publication in journals?
A. Yes, each person has to conduct independent research work. Dr. Chowdhury chose the Toxoplasmosis topic, and it is not agency critical right now. It is relevant to the agency but it is not critical right now. Everyone chose a topic relevant to the Agency's mission and the branch's work that they would become an expert in, but some of the topics chosen or work performed wouldn't necessarily get to peer review journals. The object is that everyone should be able to write a paper that may be accepted by a peer-reviewed journal. The expectation is that everyone should be able to write a paper of that quality and at the level of articles found in a peer-reviewed journal.

25. Was the Complainant given an opportunity to improve his performance?
A. Yes, he was on a PIP for 120 days. Initially, it was for 90 days, but it was extended for an additional 30 days through ADR.

26. The Complainant alleges he was removed because of his race. Please respond.
A. I don't know why he would be saying that. We have other Asians on the staff.

27. The Complainant alleges he was removed because of his age. Please respond.
A. I didn't know how old he was until he filed a complaint and the Civil Rights Division cited his age on the complaint. We don't receive personnel files that provide that kind of information. But, we don't have a particularly young staff in my branch.

28. The Complainant alleges he was removed because of his national origin being from Bangladesh and because he is Asian. Please respond.

Initials: DRP

29. The Complainant alleges he was removed because of his religion. Please respond

A. I knew he was Muslim because he would occasionally ask for time off on religious holidays. However, he always said he wasn't very religious, but his family wanted to observe the holiday.

30. The Complainant alleges he was removed because he is male. Please respond.

A. There are plenty of males in our agency.

31. Were you aware of the Complainant's previous EEO activity? How?

A. I wasn't aware of any other EEO complaints, at least, not any that involved me before the PIP. I am aware of one that occurred during this time that involved Dr. Thaler. He alleged she embarrassed him in some way. This happened about the same time that he was leaving. To my knowledge no EEO activity had occurred with Dr. Chowdhury prior to his being put on the performance improvement plan. The alternate dispute resolution occurred in relation to the PIP.

32. Did you at any time suggest to Dr. Chowdhury he should retire?

A. No, I didn't.

33. Do you know of other individuals who may have first-hand knowledge pertaining to the allegations?

A. Maybe Dr. William James, Deputy Assistant Administrator, his previous supervisor.

34. Do you know of any other documents that may exist related to the allegations discussed?

A. I will look for the documents we discussed and send them to you. These are the same documents that are included in the official Agency file – mid-year appraisal and PIP notification.

35. Is there anything else you believe is relevant to this investigation that I have not asked you about in this interview?

A. Dr. Chowdhury was very bitter once this process began. He didn't accept that his performance was deficient. He was told that if he successfully completed the performance improvement plan, we would consider placing him in another branch. He also expressed interest in leaving the Division; however, Human Resources Division said it was not Dr. Thaler or my responsibility to find another position for him in the agency. Dr. Chowdhury believed that anything he turned in would be acceptable and he would be off the improvement plan December 31, 2005. I don't think he believed the work he turned in would be evaluated.

I have reviewed this statement, which consists of 5 pages, and hereby solemnly _____ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_Delila R. Parham_       _2/01/2007_
Delila R. Parham, Affiant      Date

_Tank M Mengant_      _2/2/2007_
Signature of Investigator      Date

53

Initials: DRP

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 1 of 8

# ALICE THALER, WITNESS AFFIDAVIT

I _Alice M. Thaler_____

am an __X___ employee of ___ applicant to ___ former employee of the U.S. Department of Agriculture:

(Agency)      _Food Safety and Inspection Service_____

(Office)      __Office of Public Health
              Science_____

(Division)    __Office of the Assistant
              Administrator_____
              __

(Branch)      _____

Located in (city and state) ____Washington, D.C._____

In the capacity of (show both your organization title and the classification of your job, if different):

_____ Senior Director for Program Services _____

Grade ___GS-15__ in current position since 03/05/06____ worked for FSIS between (date) _May 1984___ and (date) ___to the present_____

My telephone number during working hours is: ____202-690-2687_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

54



Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 2 of 8

Having been advised of the above information about my role as a witness in the investigative process, I solemnly
swear __XX__ affirm _____ the statement which follows is true and complete to the best of my knowledge and belief,
and addresses the issues and concerns raised with me by the investigator.

Q.  Do you solemnly swear or affirm that the testimony you are about to give is true and correct to the best
of your knowledge?
A.  I do

Q.  Please state and spell your name
A.  A-l-i-c-e M. T-h-a-l-e-r

The issue accepted by the agency is whether Khurshed Chowdhury was subjected to discrimination based
on his race (Asian), religion (Muslim), sex (male), national origin, age (YOB: 1941) and reprisal for prior
EEO activity, when on September 1, 2006, he was terminated from his position as Veterinary Medical
Officer, GS-701-13.

Q.  Please state your current position title, grade and series
A.  Senior Director for Program Services, GS-701-15

Q.  What is your business telephone number?
A.  202-690-2687

Q.  Please identify the management official to whom you report
A.  David Goldman, Assistant Administrator

Q.  What is your gender?
A.  Female

Q.  What is your race?
A.  Caucasian

Q.  What is your National Origin?
A.  American

Q.  What is your religion?
A.  Catholic

Q.  What is your year of birth?
A.  1955

CRC Form 10
(Rev.9/01)

_____
Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 3 of 8

Q. How long have you worked for FSIS?
A. Since May 1984

Q. How do you know the Complainant?
A. He was a staff officer in policy when I was the Branch Chief in policy and he reported to me for a short time. In a reorganization he was reassigned to the Office of Public Health Science and I stayed in policy. Then in another reorganization, the staff that I was supervising in policy was reassigned to the Office of Public Health Science, and in 2003 I was asked to combine two divisions and serve as the Director and he was in one of the divisions. I was his second line supervisor and his immediate supervisor was Delila Parham.

Q. Why was the Complainant removed?
A. We had very carefully documented his failure to perform. His performance declined over a series of years and he reached the point where he refused to do the complex work assigned to him. It was at that point his supervisor was prepared to document and see if it would turn him around but he failed to improve his performance.

Q. Please describe the Complainant's performance?
A. It became apparent that when his supervisor would give him simple review work to do he wouldn't turn in a quality product, so he was assigned less complicated work because he was unable to do the complex work. So it got to the point where he wouldn't do anything meaningful and he would argue about assignments that were well within his scope as a veterinarian.

Q. When did his performance decline?
A. People noticed over time that he wasn't one of the star performers. He wasn't someone to whom you could assign complex work and be confident that he would get it done. He never got his performance to that quality. As we get to where we have more work to do and fewer people, I think it is necessary to get people to pull their weight. I think the performance improvement plan is a way to let someone know formally that their performance is falling below the "meets" standard. He would become argumentative and yell at his supervisor. At one point, he threatened his supervisor and she did file a workplace violence complaint against him. The workplace violence complaint was investigated at my level and at that point he had apologized to her and he explained he was under stress because we were trying to work on his performance. I was concerned that he was ignoring the fact that he was under a performance improvement plan and we even went to Alternate Dispute Resolution just trying to get him to accept that his performance was deficient. He continued to ignore the fact that he was on a performance improvement plan and pleaded to be left alone and taken off the performance improvement plan.

CRC Form 10
(Rev.9/01)


Initials

Q.  Are you aware of whether the Complainant received regular counseling sessions regarding his performance?

A.  Yes, he was set up to have weekly discussions with his supervisor and when she was not available to meet with him, she would let me know and I would arrange to have those discussions. We asked him to keep a log of his work so we could advise him of how to better utilize his time. He did not keep a log with enough detail to allow us to advise him and said that he found it demeaning to be asked to keep a log. He consistently would show up for the meetings and say he had no questions or problems and assured us that he would turn in acceptable work products by the deadlines. He didn't want to admit there was an issue or problem with his performance. Usually you sit and talk with an employee about their deficient performance and they quickly make a turnaround to improve. I haven't decided if he wasn't capable of improving his performance or he just decided he wasn't going to do it.

Q.  Dr. Chowdhury had 17 years with the agency; do you know how he performed for all those years?

A.  When he was in policy with me, I was on the verge of putting him on a performance improvement plan then, and that's when the reorganization happened. I thought in the interim he would have developed better skills. When I became Senior Director for Program Services, I discussed his performance with his supervisor and she did raise concern, but she wasn't to the point of putting him on a performance improvement plan yet. In fact, when she gave him one assignment and then later given him another assignment, he assumed he no longer had to work on the original assignment without discussing this with his supervisor. When she asked him how he was doing on the original assignment he told her everything was fine and never told her he stopped working on it. She got to the point that between him yelling at her, and saying he didn't finish an assignment because he assumed she wanted him to work on something else, that was it and she felt he stepped beyond the point of accepting assignments and seeking help when he needed it.

Q.  Were there specific assignments that the Complainant failed to complete or were completed untimely?

A.  There were three main assignments we gave him for the performance improvement plan period. He would spend a whole week working on the weekly emerging zoonoses update and then come up with one or two bullets. The assignment was searching the internet and look at emerging issues that people were starting to talk about on emerging zoonotic diseases. He would prepare a minimal synopsis with a couple of bullets and others on the staff were looking at other issues. He clearly did not want to accept Dr. Parham's authority or mine. We had a writer editor look at his work and she was the one who identified the plagiarism. Others who looked at his work, such as Loren Lange the Deputy Assistant Administrator identified that Dr. Chowdhury made no effort to identify the information he gathered on Salmonella serotypes with any relevance to the agency.
When information is gathered you should identify how the information is important to our agency.




Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 5 of 8

Q.    When did you become aware of the Complainant's deficient performance?
A.    Shortly after I took over the Division, I sat with Dr. Parham and she explained the problems she was having with Dr. Chowdhury's performance.

Q.    The Complainant alleges he was given many important tasks during the rating period that he completed well. The most important topic in 2004/2005 was Mad Cow Disease. Do you know if Dr.Chowdhury completed reports for this?
A.    During that rating period where his performance was determined to be unacceptable, Dr. Chowdhury had no significant work to do with Mad Cow Disease. He is reaching back to previous years when he was given small tasks to do on this. Most of his other assignments were reviews of others people's work and he would usually have no or few comments.

Q.During the entire performance improvement plan period for Dr. Chowdhury, was he only assigned the Toxo paper, the Salmonella report and the emerging zoonotic report?
A. Those were his assignments during the PIP period with the understanding that other work could also be assigned as needed. The other assignments he was referring back to were things that were considered when he was given his mid-year evaluation and told that his performance was deficient. Just doing review assignments is not enough and he failed to do the critical duties of his position.

Q.    Do you know whether Dr. Chowdhury received any awards for his performance during the rating period 2004/2005?
A.    I wouldn't think he received any performance awards because you have to be above meets to receive a performance award unless he was part of a group that got an award. We have a tendency to give group awards and you may get an award just for being part of the group even if you just sat in the room and didn't contribute anything.

Q.    Dr. Chowdhury alleges that the Toxo report he was assigned to provide is explained under communications. Is this assignment communications or mission support?
A.    The definition of preparing reports for publication under communications is to set the standard for the quality of the writing of the report. The substance of the paper is under the mission critical element because Toxoplasmosis is one of those mission critical emerging zoonotic issues.

Q.    Dr. Chowdhury alleges he was rated on an assignment given to him in July 2005 (Salmonella) after the rating period ended in June. Please respond.
A.    He was originally asked to look at 22 stereotypes and we had cut it down to 5 because he said it couldn't be done. He kept saying he wasn't a microbiologist, but all of us veterinarians qualify as microbiologists. He never understood how to network and pull others in to his efforts. He tried to sit in a corner and do it himself. We would give him contacts of people to talk to and he just wouldn't network effectively or pull others into his efforts. At mid-year he was told his performance was


Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 6 of 8

unacceptable and by the end of the rating period he was put on a PIP. He was not rated at the end of the rating period because the rating period was extended to allow time for the performance improvement plan period. He was rated unacceptable after evaluating his work products at the conclusion of the performance improvement plan period.

Q. Do FSIS employees actually perform research or is this performed by outside agency scientists and the VMO provide the information in response to questions for reports?

A. One of his assignments was on toxoplasmosis and to write about what the current issues relevant to the agency are on this topic. This would require him to reference the information he was using to make statements in the report. He cut and pasted information and did not properly acknowledge the references. He says that FSIS does not do research and this agency has no authority to perform laboratory type of research but the other part is that anyone who has an advanced degree as Dr. Chowdhury does, should know to do library research. You look up information and draw your own conclusions to substantiate the conclusions of others. That is my understanding of library research. He presented the information as his own work and when inconsistencies in the report were pointed out to him, he claimed it wasn't his fault because he just copied what others said, but without identifying the information sources or adding his own analysis and ideas. As a scientist he should be able to discuss the differences and not plagiarize.

Q. Were other employees under Dr. Parham's supervision tasked with writing peer review reports for publication in journals?

A. The point we were trying to get across to him was when you write a report it must be of the quality to actually be published. Sometimes things do actually get published if it is in the agency's interest. We don't say write something so it can get published. People are expected to write of the quality that reports may get published. Most of the staff are anxious to get things published and are working on documents suitable for publishing.

Q. Was the Complainant given an opportunity to improve his performance?

A. Yes, he was even given an extension on his PIP. You would hope during the time he was on the PIP he would have been working toward improving his performance.

Q. The Complainant's alleges he was removed because of his race. Please respond.

A. Until we began this process I had no idea where he was from. I acknowledge he has browner skin but I didn't have a clue. We have other similar situated people of the same race and age and they are doing fine.

Q. The Complainant alleges he was removed because of his age. Please respond.

A. I had no idea how old Dr. Chowdhury was because it is not an issue for discussion.

Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 7 of 8

Q.  The Complainant alleges he was removed because of his national origin being from Bangladesh and because he is Asian. Please respond.
A.  It is certainly not true; I certainly have very good relations with many Asian people.  My one Division Director is Asian.

Q.  The Complainant alleges he was removed because of his religion.  Please respond
A.  I had no idea of his religion.  His removal was based on his unacceptable performance and nothing more.

Q.  The Complainant alleges he was removed because he is male.  Please respond
A.  Most of the people in this agency are males.  I don't know how it is an issue.

Q.  Were you aware of the Complainant's previous EEO activity?  How?
A.  I'm not sure I was aware of it.  He has referred to previous activity but I am not aware of any.  I don't believe he was a member of a previous Asian Pacific American case action suit filed against the agency.

Q.  Did you at any time suggest to Dr.Chowdhury he should retire?
A.  That is the most interesting thing he came up with.  He said both Delila and I on separate occasions suggested he should retire.  I didn't want him to retire; I just wanted him to do his job.  The more that he repeated his allegation, the more he believed it.

Q.  Do you know of other individuals who may have first-hand knowledge pertaining to the allegations?
A.  No, because it is a private manner dealing with performance no one in the program should have been aware he was even on a performance improvement plan.

Q.  Do you know of any other documents that may exist related to the allegations discussed?
A.  Dr. Parham may have some documents.  The case file is with employee relations branch of our human resources division

Q.  Is there anything else you believe is relevant to this investigation that I have not asked you about in this interview?
A.  Dr. Chowdhury believed that if he just got to the end of the PIP improvement period and turned something in, it was automatically acceptable.  He was in denial that he had to turn something in that was acceptable.  We did tell him that if he improved his performance during the PIP, we would consider a detail to another area.  Turning in work that was plagiarized was evidence of not successfully completed work and overall his performance was determined to be not acceptable.

CRC Form 10
(Rev.9/01)



Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 8 of 8

I have reviewed this statement, which consists of __8__ pages, and hereby solemnly swear _XX_ affirm ____ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          __02/02/2007__
(Signature of Deponent)                              (Date)

Received by: __PAULA   MAZZOCCANTE_____

on this 6th day of __February_____, 20 07

_____
(Signature of Investigator)

CRC Form 10
(Rev.9/01)

61

_____
Initials

**Food Safety and Inspection Service**
**Office of Public Health and Science**
**Food Animal Sciences Division**
**Zoonoses Branch**
**Veterinary Medical Officer**
**GS-0701-13**

## INTRODUCTION

This position is located in the Food Animal Sciences Division (FASD), Zoonoses Branch, which plans, formulates, and establishes public health programs aimed at controlling the incidence of food borne disease linked to the consumption of meat, poultry, and egg products; provides direction on the development of policies related to public health; and assesses the effectiveness of Agency strategies and policies to ensure food safety and public health.

The incumbent serves as a Veterinary Medical Officer.

See functional statements.

## DUTIES

Analyzes and evaluates reported cases of meat and poultry borne illnesses and hazards. Analyzes reports and data for Director's office, for consumers, and for trends that would help identify emerging hazards.

Provides concise, factual, timely written oral reports of all situations required and/or requested.

Performs special epidemiological projects concerned with food hygiene, public health, and preventative medicine.

Expands personal knowledge for food production, food animal production, and agricultural and industrial practices that might impact on public health and medicine.

Represents the Agency in a professional manner at meetings, conferences, seminars, and training sessions as either a participant to obtain information, or as a speaker to impart information.

Researches literature and keeps abreast of advances in the field of epidemiology and assesses potential impacts on program activities.

**EEO Responsibilities**
Applies a knowledge of and adheres to Agency civil rights policies, goals, objectives, and the philosophy of valuing diversity in performing everyday duties and responsibilities. The incumbent contributes to a productive and nondiscriminatory work environment through written and oral communications and interpersonal relations. In addition, the

67

incumbent avoids offensive or discriminatory displays (e.g., posters, pictures), language, or nonverbal behavior (e.g., hand gestures).

## KNOWLEDGE REQUIRED

Mastery of a diverse range of medical sciences (such as microbiology, bacteriology, pathology, parasitology, immunology, and virology) and a demonstrated mastery in the field of epidemiology and public health, particularly as related to the origin and transmission of food borne pathogens.

Comprehensive knowledge of the full range of infectious and noninfectious diseases and methods of measuring disease frequency, associations, and potential impact. Must be knowledgeable of methods of statistical inferences, epidemiologic investigations, methods of sampling and estimation of sample sizes, population dynamics, biases, and designing survey and surveillance studies.

An in depth knowledge of clinical veterinary medicine and a general knowledge of food animal production and processing. This includes knowledge of food science and technology principles.

Ability to work in a team concept and effectively function in a highly visible program environment. Ability to manage public tasks, dynamic program activities, and be a problem-solver.

Provides expertise in the development of epidemiological studies to ensure accurate and timely identification of and to minimize food borne disease originating from meat, poultry, and egg food items.

Current knowledge of recent developments in the epidemiology of food borne hazards. Incumbent identifies actual or potential food borne hazards associated with food animal production practices in order to assess causes and control of meat, poultry, or egg borne human illness.

Knowledge in identification of principles of food hygiene, public health, and preventative medicine to ensure production of safe, wholesome foods and to identify and prevent health hazards from reaching consumers of meat, poultry, or egg disease agents.

Ability to utilize sound epidemiological principles to evaluate and identify contributing factors and to prevent either the occurrence or reoccurrence of food borne illness due to meat, poultry, or egg consumption.

Knowledge of methods used to examine trends that could contribute to preventative actions relating to emerging pathogens.

Skill to communicate effectively in both oral presentation and writing which includes presenting seminars and publishing articles in professional journals.



Skill and knowledge in telecommunications and applicable computer programs.

**SUPERVISORY CONTROLS**

The Branch Chief establishes the goals and assignments. The VMO and Branch Chief consult to establish major activities and priorities. The incumbent independently plans, coordinates, and conducts studies as assigned; alerts team director of significant trends, outbreaks or emerging hazards associated with consumption of meat, poultry, or eggs.

Work is reviewed in terms of the ability to alert and notify the supervisor and other officials of food safety trends and potential risk-associated problems, success of program objectives, and adherence to Agency regulations. Accomplishments are reviewed in broad program terms on the basis of results in monitoring and surveillance, risk assessment, and reducing the incidence of human food-borne pathogens.

Written reports include accomplishments and project evaluations on actual or potential meat, poultry, or egg food borne illnesses and are submitted as requested or required by the director. This may require partial, interim, or progress reports prior to completion of a project. The same scope of oral reports may also be required.

**GUIDELINES**

Due to the unique nature of this assignment, rapidly emerging scientific knowledge, and technological developments, the incumbent must be flexible, enterprising, and expedient in utilizing the full range of professional abilities. There are high requirements for good judgement and ability to conceptualize. To accomplish this, one must utilize personal contacts, regulations, policies, manuals, professional texts, technical publications, professional journals, and guidance from the Branch Chief to ensure timely completion of selected projects.

**COMPLEXITY**

The nature of investigations is complex and may involve in-depth probing into practices and procedures of food animal production, processing, transportation, distribution, consumer purchasing, and preparation. This all has to be conducted within a framework of compliance with the needs and concerns of the individuals concerned or involved and within the needs of regulatory programs. Much of this may be highly sensitive and good judgement with prudence must prevail. Tact must be exercised at all time when dealing with livestock producers, company executives, plant personnel, other FSIS personnel, industry scientists, academics, and above all consumers and local public health officials.

**SCOPE AND EFFECT**

The primary purpose of this position is to investigate and study potential meat and poultry borne enteric disease; determine and document their cause and extent; and, develop sound scientific, factually supported recommendations to correct and prevent such conditions. The incumbent's investigation, analysis, conclusions, and

recommendations may have an immediate impact on food hygiene programs, which affect the public's health.

The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens. The need for an interdisciplinary approach to problem definition and resolution requires the ability to coordinate efforts with both officials within and outside the Agency, as well as with the meat, poultry, and egg products industries and related organizations. Problems solved are extremely difficult in nature and the results have a significant impact on program direction.

## PERSONAL CONTACTS

Personal contacts include Agency officials and subject matter experts in Federal or state governments, public health organizations, educational institutions, and representatives from all phases of the meat, poultry, and egg products industries.

## PURPOSE OF CONTACTS

Personal contacts are essential to obtaining critical information with which to properly investigate and evaluate food borne illness due to meat, poultry, and egg consumption. They are also desirable to help advise, interpret, and explain investigative findings. Personal contacts are essential to gain cooperative and possible assistance with investigations. These contacts may often be with individuals, groups, or agencies whose goals and objectives are not the same as FSIS. Personal contacts can include face-to-face meetings, telephone conversations, written communication, or e-mail.

## PHYSICAL DEMANDS

The usual routine would be in an office setting. However, may be required to do extensive travel by air, automobile, or commercial land conveyance on weekends or at hours well outside the usual workday. Must be physically able to perform optimally in a variety of environments, such as: farms, ranches, livestock feeding facilities, livestock transportation equipment, slaughter facilities, further processing facilities, transportation or finished products, wholesale and retail facilities. Must also be able to fully function over sustained periods in widely varying scenarios until the problem is resolved. This may require extended periods away from home.

## WORK ENVIRONMENT

The usual work site would be in an office area but mirrors conditions outlined under physical demands. Periodically, the incumbent may travel to the areas listed under physical demands. The work environment danger could increase by exposure to moving carcasses, machinery, crowded work areas with wet floors, stairs, unusual room layouts, unpredictable animals, unsafe industrial and farm practices, driving on unfamiliar roads that may be wet, icy, or snow covered, and fatigue.

70

**Exhibit 1: Document Provided to Dr. Chowdhury at Midyear Appraisal (December 20, 2004)**

Dr. Khurshed Chowdhury
Mid-Year Performance Appraisal (July 2004-December 2004)
Rating: Unacceptable

<u>Mission Support:</u>
- Standard: Has demonstrated basic understanding of mission and organizational goals and priorities that support or directly protected the public health from foodborne hazards. Assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines.   Work product was responsive to the supervisor's and the organization's stated priorities and requirements. Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable). (Must show link towards Agency strategic mission and goals.
  - o  Goals/Activities:
    - ▪  Strategic Goals: Protect the public health by significantly reducing the prevalence of foodborne hazards form meat, poultry, and egg products.
    - ▪  Objective 2:  Create a coordinated national and international food safety risk management system for meat, poultry, and egg products from farm to table.
      - •  Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.
      - •  Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.
      - •  Respond to food safety emergencies and critical events with useful plans and recommendations.
      - •  Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.
    - ▪  Objective 4:   Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.
      - •  Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.
- Actions: Dr. Chowdhury's work has not been responsive to the supervisor's and the organizations' stated priorities and requirements.  Major projects were received late and only after setting a "final" due date.  On one project, no work was being done, and there was no discussion with the supervisor to apprise her of the situation.
  - o  Columbia and Thailand Review: Dr. Chowdhury was asked to provide written documentation of his review.  He did not do so, even after a request was made in August to provide a written document. In order to get him to complete the assignment, he was given a week to provide the two documents (December 1-8). He provided the review on Thailand, but requested that he be given until after Christmas to complete the Columbia review; *his request was denied and he was asked to complete the assignment by December 13*.  The reviews lacked depth.  He was asked to continue the review, especially for Thailand, since he missed major issues such as handling of avian influenza, a major concern in Thailand.
  - o  Toxoplasmosis:  Dr. Chowdhury has not worked on this project during the time he received it as a project.  In his performance review for 2003, Dr. Chowdhury discussed

other projects he was interested in working on that fitted into the branches mission. One was toxoplasmosis, and he agreed to research and write an article on it for publication in a peer-reviewed journal. It was understood that he would be working on this when he was not working on higher priority assignments. In August he was sent a reminder that he should have at least completed the literature review on the article, and should provide me with an update of his progress. It was in December that he finally told the supervisor that he had never started working on the article. It seems that he called Dr. Dubey, an expert on toxoplasmosis, and as a result of their discussion, he was discouraged from working on the article. That he was not working on the article was never discussed with his supervisor although it was mentioned in several branch meetings and other occasions that Dr. Chowdhury was interested and/or working on toxoplasmosis.

- Recommendation for Improvement: 1. Provide firm due dates to Dr. Chowdhury on all work assigned. 2. Accept only work that is well done and meets all requirements. 3. Have Dr. Chowdhury provide a daily journal of all work done including amount of time spent on each assignment and/or task.

2. Research and Analysis:
   - Standard: Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate. Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations.) Recommendations or analysis provided were based on available guidance and were generally accepted without major revision.
   - Action: Dr. Chowdhury struggles with providing well-researched, well-written assignments. He does not ensure that all relevant and technical scientific issues are fully analyzed, and, therefore, much of his work is returned to him for more in-depth analysis. Moreover, the majority of his work requires major edits and revisions. Few rush assignments can be given to Dr. Chowdhury because the quality of his work is such that it cannot be forwarded to others without major rework. His need to improve his writing skills has been discussed with him several times, but he does not feel he needs to take a writing course.
   - Recommendation for Improvement: The supervisor should require that Dr. Chowdhury attend a technical writing class to improve his writing skills.

3. Personal Contacts -- EO/CR:
   - Standard: Projected a positive and professional image of USDA. Performed all duties in a manner which consistently demonstrated fairness, cooperation, and respect toward coworkers, customers, and all others in the performance of official business. Complied with EO/CR guidelines and policies.
   - Action: Dr. Chowdhury does not accept supervision well. When attempting to discuss additional work needed on projects that he is assigned, he has become loud and disruptive with his supervisor. (Example: tonsil paper; discussion on August 30 with supervisor.) He has been informed that supervisors are expected to review work performed by employees and discuss it with them without the employee being loud and disruptive or shouting at the supervisor. 2. Dr. Chowdhury does not provide the supervisor with information that would inform the decision. (Example: toxoplamosis paper and discussion with Dr. Dubey; Thailand and Columbia review; discussion with Todd Furey and Nancy Goodwin). In some situations he discussed assignments with personnel outside the branch and made a decision that he would not continue to work on the assignment based on his discussion with these individuals. Although he discontinued work on the assignment, he did not inform his supervisor.
   - Recommendation for Improvement: 1. Supervisor should schedule frequent meetings with Dr. Chowdhury to ensure that all assignments are understood and work is being done. 2. Dr.

11 12

Chowdhury should provide the supervisor with a journal of his daily activities: the activities, including phone calls, he is engaged in and the amount of time spent on each. 2. Work related problems may be the result of personal situations. While this may not be the case, Dr. Chowdhury may wish to consult the Employee Assistance Program to assist him in assessing any problems he may have.

| USDA-FSIS<br>PERFORMANCE APPRAISAL | INSTRUCTIONS: Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From 07/01/04   To 06/30/05 |
|---|---|---|

2. NAME (Last, First, Middle Initial)

CHOWDHURY, KHURSHED A

3. SOCIAL SECURITY NO.
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

| 4. OFFICIAL POSITION TITLE<br>VETNRY MEDCL OFFCR | 5. PAY PLAN / OCCUP. SERIES / GRADE / STEP<br>GM-0701-13/00 | 6. ORGANIZATION<br>37 09 45 0010 00 |
|---|---|---|

| 7. DUTY STATION<br>WASHINGTON, DC | 8. STANDARD JOB #<br>0 | 9. FUNDING UNIT NO. | 10. AGENCY USE |
|---|---|---|---|

| 11. COMPLETE AT THE BEGINNING OF APPRAISAL PERIOD<br>PERFORMANCE ELEMENTS | 16. COMPLETE AT THE END OF APPRAISAL PERIOD<br>APPRAISAL UNITS |
|---|---|

Check appropriate performance elements for this rating cycle.
See descriptions on reverse. Sign blocks 12, 13 & 14.

(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.)

Check box if element is critical →

| | | | EXCEEDS<br>Fully Successful | MEETS<br>Fully Successful | DOES NOT MEET<br>Fully Successful |
|---|---|---|---|---|---|
| ✓ | 1) Mission Support *(Mandatory critical for all employees)* | X | | | 2 |
| ✓ | 2) Communications | | | | 1 |
| | 3) Supervision *(Mandatory for supervisors)* | | | | |
| | 4) Program Management | | | | |
| ✓ | 5) ~~Special Projects~~   No special projects to rate | | | | Not rated. |
| ✓ | 6) Research and Analysis | X | | | 2 |
| | 7) Customer Service | | | | |
| | 8) Equal Opportunity & Civil Rights *(Mandatory critical for supv.)* | | | | |
| ✓ | 9) Personal Contacts - EO/CR *(Mandatory critical for all nonsupv.)* | X | | 2 | |
| | 10) Resource Management | | | | |
| | 11) Individual Contributions to the Team | | | | |
| | 12) | | | | |
| | 13) | | | | |
| | 14) | | | | |
| | At the end of the appraisal period, enter TOTAL APPRAISAL UNITS for each column) → | EXCEEDS | MEETS<br>2 | DOES NOT MEET<br>5 |

| 12. EMPLOYEE SIGNATURE<br>*Khurshed A. Chowdhury* | DATE<br>7/21/04 |
|---|---|
| 13. SUPERVISOR'S SIGNATURE<br>*Delia R. Parham* | DATE<br>7/21/04 |
| 14. REVIEWER'S SIGNATURE | DATE<br>7/30/04 |

17. RATING / DECISION TABLE (check the correct rating)

| OUTSTANDING ☐ | All appraisal units are at "EXCEEDS" |
|---|---|
| SUPERIOR ☐ | More appraisal units are at "MEETS FULLY SUCCESSFUL" than at "EXCEEDS" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL ☐ | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE ☑ | One or more critical elements are appraised at "DOES NOT MEET" |

15. PROGRESS REVIEW (Initial & date to certify progress review discussions took place)

| EMPLOYEE | SUPERVISOR | EMPLOYEE | SUPERVISOR |
|---|---|---|---|
| KAC 12/20/04 | DR 12/20/04 | | |

18. EMPLOYEE (Check appropriate box)

I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction ............... ☐ YES  ☐ NO

My official position description adequately describes my duties and responsibilities .................... ☐ YES  ☐ NO

My supervisor has discussed my training needs with me .................... ☐ YES  ☐ NO

My supervisor has discussed this appraisal with me .................... ☐ YES  ☐ NO

| 19. EMPLOYEE'S SIGNATURE<br>*Refused to sign 2/08/06 DR* | DATE | IF EMPLOYEE DID NOT SIGN, STATE REASON. |
|---|---|---|
| 20. SUPERVISOR'S SIGNATURE<br>*Delia R Parham* | DATE<br>2/08/06 | 21. REVIEWER'S SIGNATURE   DATE 02/08/06<br>                              7/30/04 |

Designed on FormFlow software.

FSIS FORM 4430-10 (04/20/2004)

DISTRIBUTION: 1 copy to employee & supervisor at the beginning of the rating cycle.   1 copy to employee, supervisor and SHRO at the end of the rating cycle.

74

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From 7/01/04    To 6/30/05 |
|---|---|---|

2. NAME *(Last, First, Middle)*

Chowdhury, Khurshed

Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors *must* define goals and activities in the results oriented format, for each performance element established. The element and standard *must* be listed below, along with the goals and activities for the rating cycle.

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| **Mission Support** *(Mandatory critical element for all employees)* | [X] CRITICAL (if critical, must be reflected in employee's position description.)<br>[ ] NON-CRITICAL |

5. STANDARD (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Has demonstrated basic understanding of mission and organizational goals and priorities that support or directly protected the public's health from foodborne hazards. Assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines. Work product was responsive to the supervisor's and the organization's stated priorities and requirements. Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable). NOTE: Must show link towards Agency strategic mission and goals.

6. GOALS/ACTIVITIES FOR THE CYCLE *(mandatory entry):*

Links to FSIS Strategic Plans

Strategic Goals: Protect the public health by significantly reducing the prevalence of foodborne hazards from meat, poultry, and egg products.

Objective 2: Create a coordinated national and international food safety risk management system for meat, poultry, and egg products from farm to table.
- Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.
- Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.
- Respond to food safety emergencies and critical events with useful plans and recommendations.
- Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.

Objective 4: Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.
- Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.

7. DOCUMENTATION OF ACCOMPLISHMENTS *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

75

| PERFORMANCE STANDARD | INSTRUCTIONS: Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD From 7/01/04 | To: 6/30/05 |
|---|---|---|---|

**2. NAME** (Last, First, Middle)
Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| Communications | ☐ CRITICAL (If critical, must be reflected in employee's position description.) <br> ☒ NON-CRITICAL |

**5. STANDARD** (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Oral and written communications were clear, correct, timely, and presented in an understandable manner. Supervisor and coworkers were kept informed of issues and problems when necessary. Information and guidance provided was timely and correct.

**6. GOALS/ACTIVITIES FOR THE CYCLE** (mandatory entry):

Maintains effective and collegial working relationships with other Branch, Division, Program, and other Agency employees, government officials, Congressional staffs, interest groups and other interested parties by:

- Preparing and contributing to the development of discussion, position, and policy papers, briefing notes, presentations, and routine Agency correspondence,
- Presenting written and/or oral findings and observations to project teams, colleagues, and managers in a manner that enhances confidence and credibility in the Branch, Division, Program, and Agency.
- Preparing written reports, papers, and articles for Agency use and/or publication in peer-reviewed journals that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.
- Attending branch, Division, Agency, and/or other interdepartmental or interagency meetings to discuss data/information requirements and results, assess trends, discuss policy issues, and analyze the effect of revised policies or programs in light of current science and public health implications.
- Liaising with federal and state government personnel, academia, and stakeholders to obtain, exchange, and clarify data/information, describe policies and program activities, and remain abreast of trends and developments.
- Responding to emergency and critical events by collaborating with appropriate staffs, internal and external to the Division, to develop a well-planned Program response that needs little modification and can be implemented with minor oversight from the Branch chief and/or Division director.
- Conducting business in a manner that is professional, courteous, and exemplifies commitment to service.

**7. DOCUMENTATION OF ACCOMPLISHMENTS** (Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)

FSIS FORM 4430-10a (04/20/2004)
DISTRIBUTION (for each performance element established): 1 copy to employee & supervisor at the beginning of the rating cycle & 1 copy for the SHRO at the end.
Designed on FormFlow software.

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From: 07/01/04 | To: 06/30/05 |
| --- | --- | --- | --- |

2. NAME *(Last, First, Middle)*

Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors **must** define goals and activities in the results oriented format, for each performance element established. The element and standard **must** be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
| --- | --- |
| **Special Projects** | ☐ CRITICAL *(if critical, must be reflected in employee's position description.)*<br>☒ NON-CRITICAL |

5. STANDARD *(Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)*

Special projects were completed on time in a competent, accurate, and thorough manner. Completed projects complied with regulations and procedures. Special projects were completed independently, or reflected research and collaboration with others as required.

6. GOALS/ACTIVITIES FOR THE CYCLE *(mandatory entry)*:

Designs and implements major projects that address Agency special needs or issues by:
- Quickly assimilating the science as it impacts or addresses the arena of special projects.
- Developing specific areas of expertise and advancing knowledge of domestic and, to some extent, international scientific issues, conditions and trends as related to meat, poultry, and egg products.
- Conceptualizing, designing, and managing and/or leading projects of varying degrees of complexity.
- Having strong organizational skills, exceptional time management abilities, and the capacity to deliver on goals under constrained timeframes.
- Functioning effectively within a fast-paced environment with high expectations for maintaining a significant level of quality in the delivery of the work.
- Working effectively with scientific and technical representatives, internal and external to the Division and Agency, and supporting their efforts to achieve successful projects.
- Working effectively with management to devise, analyze, modify, and evaluate the overall effort.

7. DOCUMENTATION OF ACCOMPLISHMENTS *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

77

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From: 7/01/04     To: 6/30/05 |
| --- | --- | --- |

**2. NAME** *(Last, First, Middle)*

Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
| --- | --- |
| **Research and Analysis** | [X] CRITICAL (If critical, must be reflected in employee's position description.)<br>[ ] NON-CRITICAL |

**5. STANDARD** *(Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)*

Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate. Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations). Recommendations or analysis provided were based on available guidance and were generally accepted without major revision.

**6. GOALS/ACTIVITIES FOR THE CYCLE** *(mandatory entry):*

Conducts needed research and analysis by:

- Conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific policy issues and the development of policy and programs.
- Identifying and compiling information, carrying out required analysis, establishing and maintaining working files, and developing and maintaining data bases.
- Participating in project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research /study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work.
- Undertaking longer-term tracking and analysis of issues, identifying relevant scientific issues that may have policy implications, analyzing the effect of policy proposals on projects and initiatives, and formulating program and/or policy modifications for review by the management.

**7. DOCUMENTATION OF ACCOMPLISHMENTS** *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD |  |
|---|---|---|---|
|  |  | From: 7/01/04 | To: 6/30/05 |

2. NAME *(Last, First, Middle)*

Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| **Personal Contacts - EO/CR**  *(Mandatory critical element for nonsupv. employees)* | [X] CRITICAL (if critical, must be reflected in employee's position description.)<br><br>[ ] NON-CRITICAL |

5. STANDARD (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Projected a positive and professional image of USDA. Performed all duties in a manner which consistently demonstrated fairness, cooperation, and respect toward coworkers, customers, and all others in the performance of official business. Complied with EO/CR guidelines and policies.

6. GOALS/ACTIVITIES FOR THE CYCLE *(mandatory entry)*:

Carry out duties in a manner that is non-discriminatory and impartial towards others by:

- Conducting business in a manner that is professional, courteous, and exemplifies commitment to service.
- Demonstrating fairness, cooperation, and respect toward coworkers, subordinates, supervisors, and all internal and external customers.
- Working cooperatively with other Agency personnel and organizations to further Agency goals by listening to and respecting the views of others, promoting expression of diverse opinions and collaborating on solutions to Agency problems. Promoting a cooperative spirit and team approach to program delivery.
- Adhering to an applying knowledge of Agency civil rights policies, goals, and objectives that contribute to a productive and nondiscriminatory work environment through written and oral communication and interpersonal relations.

7. DOCUMENTATION OF ACCOMPLISHMENTS  *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

79

FSIS FORM 4430-10a(04/20/2004)                                                                     Designed on FormFlow software.

DISTRIBUTION (for each performance element established): 1 copy to employee & supervisor at the beginning of the rating cycle & 1 copy for the SHRO at the end.

 United States
Department of
Agriculture

Food Safety
And Inspection
Service

Office of Public
Health and
Science

Washington, D.C.
20250

February 8, 2006

TO:        Dr. Khurshed Chowdhury
           Veterinary Medical Officer, Zoonoses Branch, ZDRSD, OPHS
           Washington, DC

FROM:      Dr. Delila Parham   *Delila Parham*
           Chief, Zoonoses Branch, ZDRSD, OPHS
           Washington, DC

SUBJECT:   Unacceptable Performance Rating for July 1, 2004 – December 31, 2005

The purpose of this memo is to notify you that your performance rating for July 1, 2004 –
December 31, 2005, is Unacceptable.  A copy of your performance appraisal for this
rating period indicating Unacceptable performance is attached. In December 2004 at the
midyear appraisal, you were informed that your performance needed improvement. In
July 2005, I determined that your performance was unacceptable in two critical elements
and one non-critical element of your position: Mission Support (critical), Research and
Analysis (critical), and Communications (non-critical). You were placed on a
performance improvement plan (PIP) for 90 days beginning August 29, 2005.  The
opportunity period was extended to December 31, 2005, in a settlement agreement
reached with the Agency on October 11, 2005, to your informal EEO complaint.

The PIP outlined activities that you had to complete satisfactorily to attain the Fully
Successful rating in the three elements in which your performance had fallen to an
unacceptable level. You were tasked with three major projects: (1) write a paper on
toxoplasmosis, (2) write a paper on poultry *Salmonella* serotypes, and (3) compile a
bimonthly report on zoonotic and emerging diseases.

It was determined that the zoonotic disease report was the only acceptable final product,
although you required extensive guidance to develop the report for this project, which
was the simplest of the three PIP projects.  The papers on toxoplasmosis and poultry
*Salmonella* serotypes did not meet the Fully Successful level for the Mission Support,
Research and Analysis, and Communications elements as indicated below.  Only a few
examples from the papers are included in the discussion below. For a more thorough
assessment of each work product you produced under the PIP, see the attached PIP
Summary Assessment Report. The examples, while not comprehensive in this
memorandum or in the PIP Summary Assessment Report, were seen as evidence of
failure and used to determine your Unacceptable rating.

80

Dr. Khurshed Chowdhury

1.  Mission Support:  Your performance on this critical element is at an unacceptable
    level due to the number of errors found in your work on the toxoplasmosis and
    poultry *Salmonella* serotypes papers, which misstated significant research
    conclusions and lack any substantive analysis.

- Toxoplasmosis Paper: The paper indicates a misunderstanding or inability to
  accurately interpret the literature.  For example, you portrayed narrow,
  geographically based studies limited to a single state or a few states as
  representative of the wider, national picture.  You also made word changes in
  some of the referenced materials that caused the statements to be inaccurate.  For
  example, in changing "definitive host" to primary host in the paper, the reader
  might assume that there is more than one host in which the *Toxoplasma gondii*
  parasite can complete its life cycle.  In the paper, you make statements that would
  seem to indicate action that the Agency is contemplating such as examination of
  meat for *T. gondii* in the slaughterhouse when in reality no such action is being
  considered by the Agency.
- *Salmonella* Serotypes Paper: Much of the information provided is very general
  and does not address the specific needs of the Office of Public Health Science
  (OPHS) as would have been seen if you had discussed issues like presence in
  FSIS regulated products and/or documentation of outbreaks attributed to FSIS
  regulated products. You present information in a careless manner, not checking
  for inaccuracies such as the isolation rate for *S. Heidelberg* from lowest to
  highest. In addition, you fail to mention that the HACCP data that you cite is not
  published, making the reader question the validity of the data that you used.

2.  Research and Analysis: You have not met the Fully Successful level of
    performance under this element.  Your performance on the toxoplasmosis and
    poultry *Salmonella* serotypes papers demonstrates an inability to properly
    research and analyze the literature.

- Toxoplasmosis Paper: You cite a number of studies and quote a lot of figures, but
  fail to explain or analyze the results appreciably.  You do not provide a
  perspective on when many of the studies were conducted, but refer to them in
  vague terms such as a "more recent" or "much earlier" study.  One of the more
  serious errors noted in the paper is the inconsistent presentation of information.
  For example, you state that confinement rearing is expected to reduce exposure to
  toxoplasmosis.  Yet, you do not explain adequately why pigs raised in
  confinement rearing pose the highest risk of infecting people while cattle raised
  on pasture pose the least risk of infecting people.  Another inconsistency is seen
  *in statements in the paper regarding handling of cats by pregnant women.*
- *Salmonella* Serotypes Paper:  The paper has several references, but the
  information that you provide is general and of little relevance to the OPHS.  Of
  the information provided, no real analysis is done. Material that would be relevant
  to the OPHS such as swine being reservoirs for *S. Heidelberg* is omitted. In most
  cases, you simply indicate the public health risk as a range from low to high with
  no additional analysis as seen for *S. Heidelberg*.  In some cases, the information

Dr. Khurshed Chowdhury

provided is outside the scope of the paper as seen in the discussion on the usage of antimicrobial drugs in food producing animals.

3.  Communications: You have not met the Fully Successful level of performance under this element. Both the toxoplasmosis and the poultry Salmonella serotypes papers were poorly written. Many errors could have been eliminated by simply proof-reading the documents.

- Toxoplasmosis Paper: There are numerous grammatical, spelling, and punctuation errors in the paper. The order and style of presentation is not consistent throughout the paper. You switch at random between words or terms like pigs, swine, and hogs, and US, USA, United States, America, and United States of America. Phrasing is awkward or unclear leaving the reader unsure of what is intended. The paper fails to adequately or properly cite sources, failings that could expose the Agency to liability because of plagiarism.
- *Salmonella* Serotypes Paper: There are many incomplete sentences, and many are unclear or ambiguous. Like the toxoplasmosis paper, there are numerous grammatical, spelling, and punctuation errors. There is failure to adequately or properly cite sources. The paper switches at random between terms like "multiple drugs resistant" (s should be omitted) and "multiple antimicrobial resistant," both terms incorrectly used in the paper.

During the PIP, you were given every opportunity to improve to the Fully Successful level, but you failed to do so. You were provided assistance throughout the PIP. If you wish to discuss further your Unacceptable rating, feel free to contact Dr. Alice Thaler, Director, Zoonotic Diseases and Residue Surveillance Division, OPHS, or me. Please sign and date a copy of this memorandum, which serves only to acknowledge the date on which you received it.

Receipt Acknowledged

*Khurshed A. Chowdhury*
Signature

*2/8/06*
Date

Enclosures:
Performance Appraisal
PIP Summary Assessment Report

cc: A. Thaler
    K. Kelm

| United States Department of Agriculture | Food Safety and Inspection Service | Labor & Employee Relations Division<br><br>Employee Relations Branch | ~ .J0 Independence Ave., SW<br>Room 3175 South Bldg.<br>Washington, DC   20250<br>(202) 720-5657<br>(202) 690-3938 fax<br>(800) 217-1886 toll-free |
|---|---|---|---|

FOR OFFICIAL USE ONLY

May 19, 2006

TO:              Dr. Khurshed A. Chowdhury
                           Veterinary Medical Officer
                           Washington, DC

**RECEIPT COPY**

THROUGH:      Dr. Alice Thaler, Director,
                           Zoonotic Diseases & Residue Surveillance Division (ZDRSD)
                           Office of Public Health Science (OPHS)

SUBJECT:        Notice of Proposed Removal

Dear Dr. Chowdhury:

This notice constitutes a proposal to remove you from your position as a Veterinary Medical Officer, GM-0701-13, from the Food Safety and Inspection Service. This proposal is based on the reason of: **Unacceptable Performance** under the provisions of Title 5, Code of Federal Regulations, Part 432 (5 CFR Part 432). This action, if taken, will be effective no sooner than thirty (30) calendar days from your receipt of this proposal.

**Specification 1:**

At the conclusion of your Performance Improvement Plan (PIP), which ran from August 29, 2005, through December 31, 2005, you failed to raise your performance to the meets the fully successful standard for the critical elements of "Mission Support" and "Research and Analysis."

**Background for Specification 1:**

On August 29, 2005, you were issued a PIP based on your failure in the critical performance elements listed above. During the PIP period, you failed to achieve the required level of performance in these elements. In a memorandum dated February 8, 2006, Chief Zoonoses Branch Dr. Delila Parham notified you that your performance during the PIP was rated unsatisfactory.

**BACKGROUND**

You are a Veterinary Medical Officer, GM-0701-13, in the Zoonoses Branch of the OPHS, Food Safety and Inspection Service (FSIS). You received formal training associated with the elements applicable to your position. A review of your training record shows that you received the following training: (1) Technical Writing (May 2005); (2) Clear Writing Through Critical Thinking (June 2005); (3) Poultry Foreign Animal Disease Awareness Training (March 2005); and (4) Project Management (May 2005). On July 21, 2004, Chief Zoonoses Branch Dr. Delila Parham placed you under performance standards covering the rating period from July 1, 2004 through June 30, 2005. The standards consisted of four (4) performance elements:

93

(1) Mission Support; (2) Communications; (3) Research and Analysis; and (4) Personal Contacts. During your December 20, 2004 mid-year review, Dr. Parham informed you that improvement in your performance was needed. Circa July 2005, Dr. Parham determined that your performance was unacceptable in the critical elements of Mission Support and Research and Analysis, and the non-critical element of Communications. You were placed on a performance improvement plan (PIP) for ninety (90) days beginning August 16, 2005. However, the PIP did not actually begin until August 29, 2005. On October 11, 2005, you entered into a settlement agreement of an informal Equal Employment Opportunity complaint with the Agency. As a result of the settlement agreement, the PIP period was extended until December 31, 2005 (from ninety to one hundred and twenty days).

The performance elements and standards in which you were deemed unacceptable are identified below.

## Mission Support (Critical Element):

In this critical element your performance plan stated that at the Fully Successful level of performance, you were required to demonstrate:

A.    Basic understanding of mission and organizational goals and priorities that support or directly protected the public's health from food borne hazards.

B.    Complete assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines.

C.    Provide work products were responsive to the supervisor's and the organization's stated priorities and requirements.

D.    Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable).

## Research and Analysis (Critical Element):

In this critical element your performance plan stated that at the Fully Successful level of performance, you must have done the following:

A.    Researched and analyzed issues thoroughly, accurately, and timely manner, probing for detail, as appropriate.

B.    Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations).

C.    Any recommendations or analysis provided must be based on available guidance and are generally accepted without major revision.

To demonstrate Fully Successful performance in the above critical elements under the PIP, you were tasked with three major projects: (1) write a paper on toxoplasmosis; (2) write a paper on

poultry *Salmonella* serotypes; and (3) compile a bimonthly report on zoonotic and emerging diseases. The results of your performance for each of the projects assigned are described below.

## Paper on Toxoplasmosis

You were assigned the task of writing a scientific paper on toxoplasmosis at the beginning of the 2004-2005 rating cycle as an independent research project. You were unable to show progress on the paper by the end of the 2004-2005 rating cycle. With the issuance of the PIP, the deadline for providing an acceptable paper was extended first to November 30, 2005, and then to December 31, 2005. For the PIP, you were expected to prepare a scientific paper on the subject as it related to meat and poultry that was well researched with references. The paper was expected to be free of major errors that required edits and revisions. Within two weeks of receiving the PIP notification letter, you were expected to provide your focus, the format for the paper, establish milestones and delivery dates, for completion of the work within the opportunity period. You were also expected to prepare the paper in a format suitable for publication in a peer-reviewed journal. Completing this task would demonstrate your knowledge and expertise of zoonotic diseases and pathogens, and the impact on food safety to address emerging and re-emerging diseases. It would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations for specific Agency issues. Lastly, the task would show that you were capable of providing written documents that were clear, concise, and presented in an organized manner that were well researched and reflected sound scientific principles.

This project was not completed successfully. You submitted the review paper ("Seroprevalence of Toxoplasma Gondii Infection in Various Food Animal Species in the United States of America and its Public Health Significance") on December 30, 2005. The submission was timely, but the work product was not completed to the required level of quality for work of this type. Director, Zoonotic Diseases & Residue Surveillance Division (ZDRSD) Dr. Alice Thaler, Chief of the Animal and Egg Production Food Safety Branch Dr. Erich Hemphill, Dr, Parham, and Katrine Pritchard of the OPHS Management Support Staff, reviewed the final paper. All the reviewers agreed that the paper was poorly written and had major errors that would require significant edits or revisions before it would be cleared by the Agency for submittal to a peer-review journal. The work product did not meet the Fully Successful level for the elements described above. The examples were not comprehensive, but were meant to illustrate a general pattern that indicated less than acceptable performance for each element.

The paper portrayed narrow geographically based studies in single states or few states as representative of a national picture. You made word changes from referenced materials which substantially altered their meaning and made statements that seemed to indicate the Agency was contemplating taking actions such as examining meat for Toxoplasma Gondii in slaughterhouses when there is no such action being considered.

Despite citing studies and quoting figures, you failed to explain or analyze the results. Rather than using dates, you describe studies as "more recent" or "much earlier." You also had serious errors related to your inconsistent presentation of information, e.g., you stated confinement rearing is expected to reduce exposure to toxoplasmosis, but did not adequately explain why pigs raised in confinement rearing pose the highest risk of infecting people, while cattle raised on pastures pose the least risk. You also made inconsistent statements about risks associated with

95

pregnant women handling cats. Further, you failed to properly cite sources, which could expose the Agency to liability due to plagiarism.

## Scientific Paper on the Top Five Poultry Salmonella Serotypes

In response to a request in June 2005 from the OPHS Deputy Assistant Administrator Loren Lange, you were given the task of providing a paper with brief descriptions for several poultry Salmonella serotypes. You initially completed the task in July 2005, but it was found to be unacceptable. For the PIP, you were asked to continue working on the paper, but limit it to the top five poultry Salmonella serotypes. The scientific paper was expected to describe each serotype in detail, such as reservoirs, its public health significance, related antimicrobial resistance issues, and other information useful to the agency. The paper was expected to be well researched and referenced and free of major errors, requiring few edits and revisions. It was intended to address the request made by the Deputy Assistant Administrator to provide descriptive information on key poultry Salmonella serotypes.

This project was not completed successfully. The paper was submitted on November 30, 2005, at the time required, however, it was not completed to the required level of quality for work of this type. Dr. Parham forwarded the paper to Deputy Assistant Administrator Lange to determine its adequacy in meeting his request. Mr. Lange commented that the data was carelessly or inaccurately presented, and there were inaccuracies in the text. He did not think the material was presented in a format that addressed OPHS's issues such as presence in FSIS regulated products and/or documentation of outbreaks attributed to FSIS regulated products. Mr. Lange did not find that this report reflected management's expectations of a GS-13 analyst in OPHS. The work product did not meet the fully successful level for the elements discussed above.

The information provided was general and failed to address the needs of OPHS. You didn't discuss FSIS regulated products or outbreaks attributed to FSIS regulated products. Your presentation was careless and inaccurate. Further, you failed to mention that the Hazard Analysis and Critical Control Point (HACCP) data you cite is unpublished, making the validity of the data questionable.

The paper was general with little analysis, and of little relevance to OPHS. Relevant materials such as swine being reservoirs for S. Heidelberg were omitted, while some of the other information that is presented is outside the scope of the paper, such as the usage of antimicrobial drugs in food producing animals.

## Bimonthly Compilation of World Wide Emerging Zoonoses

You were assigned the task of preparing a bimonthly compilation of worldwide emerging zoonoses, as seen in scientific journals, newspapers, internet, and other available reference materials that may have potentially serious human health concerns that may be food borne, especially related to meat, poultry, and eggs. The submissions were expected to be free of major errors, requiring few edits, and revisions. The report was intended to provide Zoonoses Branch personnel with up-to-date information on zoonotic disease worldwide and serve as a valuable reference source for Agency inquiries on the subject. This was a new project assigned under the PIP.

The work product met the Fully Successful level for the elements of Mission Support (Critical) and Research and Analysis (Critical). Each submission was timely. Chief of the Residue Branch Dr. Harry Walker was asked to review the final report. Dr. Walker had a few comments on the report, but indicated it was a good report. While you required a lot of guidance, the final report was considered acceptable.

FSIS Directive 4430.1, Part One, XI. G states:

> "Reassignment, Demotion, or Removal for Unacceptable Performance. Supervisor shall assist employees in improving less than fully successful performance. Such assistance may include, but is not limited to formal training, on-the-job training, counseling, and closer supervision. If the employee's performance is unacceptable in one or more critical elements, at any time during the performance appraisal cycle, the supervisor shall inform the employee, in writing, of the standard(s) or requirement(s) that must be met for fully successful performance. Management may reduce in grade, remove, or reassign employees whose performance continues to be unacceptable."

FSIS Directive 4430.1, Part Two, XI. Annual Rating of Performance, B(2)(c) states:

> "Does not Meet Fully Successful. Performance falls below performance standards established at the fully successful level."

FSIS Form 4430-5, Performance Appraisal, block 18, states:

> "UNACCEPTABLE ☐ One or more critical elements are appraised at "DOES NOT MEET.""

FSIS Directive 4430.1, Part Two, XII. Unacceptable Performance, states:

> "A. Supervisors should inform an employee in writing if performance on a critical element falls below the fully successful level as soon as that fact becomes apparent. (See "Performance Guidelines for Supervisors.") The Supervisor must:
>   1. Identify the performance element(s) and standards which have not be accomplished at the fully successful level.
>   2. Describe specific incidents that illustrate the failure to meet the standards.
> B. Employees must be given a reasonable time (usually no less than 30 days) to demonstrate performance at the fully successful level."

Your performance has had a negative impact on Agency operations. Your work has required close monitoring by Agency supervisory personnel. Despite weekly meetings, management intervention, and the extended timeframe, you were unable to raise your performance to the "MEETS Fully Successful" level at the end of the PIP.

The U.S. Office of Personnel Management approved the Performance Management System pursuant to 5 CFR 430 on September 10, 1986. Personnel Bulletin No. 430-1 reissued the Performance Management Plan on November 16, 1995, in accordance with new Departmental Personnel Manual guidelines.

Dr. Khurshed A. Chowdhury    FOR OFFICIAL USE ONLY    Page 6

## RIGHTS

The procedures governing this action, as well as the rights extended to you, are set forth in 5 CFR, Part 432.

 You have the right to be represented during these proceedings by any person of your choice, or you may represent yourself. Your representative must be designated by you, in writing, to the Deciding Official named below before he/she can represent you.

You have the right to reply to this notice either orally (personally), in writing or both. Your reply need not be restricted to matters relating solely to the Reason or Reasons for the proposed action. You may cite extenuating circumstances, make any other representations you consider appropriate, and/or submit affidavits or other evidence you wish to have considered in support of your reply.

The evidence and material upon which this proposal is based are enclosed.

You will be allowed a reasonable amount of official time, not to exceed **one (1) working day**, to review this material and prepare your reply to this notice. Your request for official time to review the evidence and to prepare your reply should be made to your supervisor.

 You will be allowed **ten (10) calendar days** from the date you receive this notice to reply. Consideration will be given to extending this period if you submit a request stating your reasons for desiring more time. Your written reply, request for personal conference, and/or request for an extension of time should be directed to the Employee Relations Branch Chief at the above letterhead address.

 If you wish to be heard in person, you must request an oral conference either in your written reply to this notice or separately, if you do not wish to submit a written answer. The request must be submitted in writing to the Employee Relations Branch Chief at the above letterhead address and received in this office within **ten (10) calendar days** of your receipt of this letter. If you request an oral conference, you will be notified of the arrangements for such a meeting. The oral conference will be conducted by the Oral Conference Officer to be named later. You will be notified of the time, date, and place of the oral conference. You will be allowed official time to present your oral reply.

At the conference you have the right to be represented by any person of your choice, and to discuss fully the matters relating to this notice. If the person of your choice is a U.S. Department of Agriculture employee, he or she must notify his or her supervisor in order to be away from normal duties. It is preferred you submit a full and complete answer, in writing, prior to the holding of such a conference.

If you do not reply within the **ten (10) calendar day** period allowed, the Deciding Official will make a decision based on the evidence now available. If you do reply to this notice, the decision will be based on careful consideration of the evidence of record, your written and/or oral replies to this notice, and any additional affidavits or other evidence you submit in support of your reply. A written notice of decision will be given to you. This decision will be to either (1) take the  proposed action, (2) lessen the proposed penalty, or (3) not take the proposed action.

Dr. Khurshed A. Chowdhury       FOR OFFICIAL USE ONLY                    Page 7

If the proposed action is taken, it will not be effective for at least **thirty (30) calendar days** following your receipt of this notice.

The Deciding Official for this action is:



Tia Denise Gayle
Supervisory Employee Relations Specialist
USDA, Food Safety and Inspection Service
1400 Independence Ave S.W., Room 347-ES
Washington, D.C. 20250

Any questions concerning the contents of this letter, your rights, or the procedures involved, should be directed to me at the above telephone or address.

Sincerely,

Quentin Barrett
Human Resources Specialist (ER)

Enclosure

cc:

Dr. Alice Thaler, Director, ZDRSD
Representative
Receipt Acknowledged Copy
File Copy

**I received the original of this notice on**

_____
**Signature of Employee**

$\underline{5/22/06}$ .
**Date**

$\underline{\hspace{3cm}}$ 5/22/06
**Signature of Witness**



| United States Department of Agriculture | Food Safety and Inspection Service | Labor & Employee Relations Division<br><br>Employee Relations Branch | 1400 Independence Ave., SW<br>Room 3175 South Bldg.<br>Washington, DC   20250<br>(202) 720-5657<br>(202) 690-3938 fax<br>(800) 217-1886 toll-free |

FOR OFFICIAL USE ONLY

September 1, 2006

TO:                 Dr. Khurshed A. Chowdhury
                    Veterinary Medical Officer
                    Washington, DC

THROUGH:            Dr. Alice Thaler, Director,
                    Zoonotic Diseases & Residue Surveillance Division (ZDRSD)
                    Office of Public Health Science (OPHS)

SUBJECT:            Decision on Proposed Removal for Unacceptable Performance

Dear Dr. Chowdhury:

In a notice dated May 19, 2006, Human Resources Specialist (Employee Relations) Quentin
Barrett, proposed to remove you from your Veterinary Medical Officer, GS-0701-13, position
with the Food Safety and Inspection Service on the basis of **Unacceptable Performance**.

After you received the notice proposing to remove you, you requested an Oral Conference to
provide your response. The Oral Conference was conducted by Oral Conference Officer Larry
Janney on June 15, 2006. You provided both oral and written responses. As the deciding
official, I have carefully reviewed all the evidence of record, including the letter of proposal, and
your oral and written responses to the proposal.

**Specification 1:**

At the conclusion of your Performance Improvement Plan (PIP), which ran from August 29,
2005, through December 31, 2005, you failed to raise your performance to the meets the fully
successful standard for the critical elements of "Mission Support" and "Research and Analysis."

**Background for Specification 1:**

On August 29, 2005, you were issued a PIP based on your failure in the critical performance
elements listed above. During the PIP period, you failed to achieve the required level of
performance in these elements. In a memorandum dated February 8, 2006, Chief Zoonoses
Branch Dr. Delila Parham notified you that your performance during the PIP was rated
unsatisfactory.

**Oral and Written Responses**

You were represented in this matter by Jonathan Gould, Esquire of Kestell and Associates
Attorneys and Counselors at Law. Mr. Gould stated you would address the specifics as
contained in the proposal notice. Mr. Gould pointed out that have been a Federal employee for
sixteen (16) years, possessed a PhD, and this is the first time your performance had ever become

163

an issue. Mr. Gould raised the issue of age discrimination based on an allegation that in December 2004 comments were made that you were too old and should retire. Mr. Gould pointed out that the agency must follow procedures, and that the reasons cited for the action taken violate the rules. It was argued that the scientific project (spinal) assigned should be under a non-critical element. Mr. Gould further argued that the performance projects were NOT poorly written, adding that researching scientific documents for use in an article for publication takes a long time to prepare. Further, the salmonella project was also misplaced and that the criticism/failure was not accurate.

Mr. Gould provided a written reply on your behalf dated May 31, 2006. (Hereafter referred to as REPLY) Mr. Gould alleged that your proposed removal was based on discriminatory and retaliatory motives. Mr. Gould claimed that Drs. Delila Parham (hereafter referred to as PARHAM) and Alice Thaler (hereafter referred to as THALER) treated you differently from other Veterinary Medical Officers (VMO) in the branch, and prior to the proposed removal both PARHAM AND THALER told you that you were too old to perform the job and should retire.

Mr. Gould also asserted the agency violated your rights under the civil rules by failing to ensure that you were judged on objective and attainable job standards, that the standards conformed to your performance plan and that you were provided with a meaningful chance to successfully perform the job. Based on these factors, Mr. Gould requested that the proposed removal be rejected and that you be allowed to return to your VMO job with an acceptable performance review.

Mr. Gould stated in the written reply that, you never received specific instructions as to the contents of the toxoplasmosis research project for publication in a scientific journal that hadn't been assigned to you until October 2005, which was well after you were into the PIP period. Mr. Gould pointed out that you never received credit for the more than thirty reports you completed during the rating period. The reports completed during the rating period were related to your job that supported FSIS' critical mission. The toxoplasmosis and salmonella papers, on the other hand, were not related to your job that supported FSIS' critical mission. Further, Mr. Gould argued that FSIS' mission did not involve, and it is prohibited from, conducting scientific research. He added that publication of papers based on independent scientific research is not described as part of FSIS' Agency Mission and Objectives according to 9 CFR Part 300. It is for this reason the agency should not have required you to submit a paper for peer-review publication in order to keep your job.

Mr. Gould contended that research for publication of an article in a scientific journal could not be considered a critical element of your job because it was originally assigned as a special project and concerned communications. According to Mr. Gould, the agency's performance plan, did not list performance on special projects as part of the job's critical element. He surmised that the performance plan lists publications for scientific journals as part of communications which is also a non-critical element.

Mr. Gould pointed out that PARHAM and THALER did not assign this research and publishing project to anyone else in the branch. Mr. Gould stressed that nobody in the branch received his/her performance rating solely because they failed to perform acceptable on a peer-review research paper.

Mr. Gould pointed out that as part of the PIP, you were required to prepare a microbiology paper on salmonella that was not within your area of expertise. He added that OPHS has a division of microbiology that has many qualified microbiologists who the agency should have assigned to write this paper. Mr. Gould complained that despite heavy pressure and very rigid PIP deadlines, you prepared and submitted the paper on time, in addition to the paper on world wide emerging zoonoses that was deemed acceptable. Mr. Gould contended that PARHAM and THALER had predetermined that they were not going to accept the toxoplasmosis and salmonella work as satisfactory, and without any sound basis or scientific accuracy, they (PARHAM and THALER) found fault with both the toxoplasmosis and salmonella work.

Mr. Gould argued that the agency proposed your removal for discriminatory and retaliatory reasons. He claimed that the reasons PARHAM and THALER provided you with poor performance evaluations were pretexts for their discrimination and retaliation against you because you filed an EEO complaint. Further, you were singled out by PARHAM and THALER, and treated differently than other similarly situated VMOs in the branch, including Jane Harman, Dr. Maqbool Quereshi and Barnard Salamone. According to Mr. Gould, the other VMOs are not from Bangladesh, are substantially younger than you, have not previously filed EEO complaints against the agency, and none of them had to publish any peer-review articles to receive a satisfactory performance rating.

Mr. Gould stated that not only did PARHAM and THALER treat you differently from others, but as early as December 2004 PARHAM told you that you were too old to continue in the job and that she wanted you to retire. THALER purportedly made similar remarks in a separate meeting, and criticism of the toxoplasmosis and salmonella papers was their means of accomplishing their goal of removing you from your position.

Mr. Gould asserted that prior to June 2005, your past performance ratings were satisfactory or superior. In the middle of 2004, you received a letter of appreciation from FSIS Administrator Dr. Barbara Masters for your work on Bovine Spongiform Encephalopathy (BSE) prevention. The sudden change in your performance rating was more likely related to the decision of managers to remove you for discriminatory and retaliatory reasons than it was to any alleged unacceptable performance.

According to Mr. Gould, removing you would violate the Civil Service Rules. Mr. Gould cited the statute governing performance (5 U.S.C. chapter 43, 5 U.S.C. §4301, et. Seq.) and various case law arguing performance standards must be valid and may not be so vague or unreasonable as to deprive the employee of proper notice as to what is expected of him. He goes on to point out that standards must be reasonable, sufficient to permit accurate measurement, and adequate to inform the employee of what is necessary to achieve a satisfactory or acceptable rating. Moreover, performance standards should be specific enough to provide an employee with a 'firm benchmark' toward which to aim his performance. (citations provided in written reply) Finally, Mr. Gould pointed out that in taking a performance related removal, the agency must provide a meaningful opportunity to demonstrate acceptable performance. Mr. Gould argued that the agency did not meet any of the standards (requirements) with regard to your proposed removal.

Mr. Gould asserted that PARHAM and THALER failed to provide you with meaningful direction and feedback as to what was necessary to meet their expectations. Despite you repeatedly informing PARHAM that the description of serovars on which you were required to

102

report did not exist in any books or articles and therefore the assignment was not intelligible or possible to perform successfully. PARHAM and THALER allegedly ignored your claims and never gave you any direction as to what was expected. Mr. Gould argued that because of their pre-determined decision to remove you, PARHAM and THALER never intended to make the PIP process one that could lead you to demonstrate satisfactory performance; thereby, violating your fundamental rights.

Mr. Gould also argued that PARHAM and THALER illegally changed the performance standards and performance plan during the PIP. In support of his argument, Mr. Gould pointed out that the plan listed research for scientific journals as part of "communications" which is not listed as a critical job element. In the proposed removal PARHAM and THALER changed the classification of the project from communications to mission support and research and analysis. In so doing, Mr. Gould claimed that transforming a special communications project, such as the toxoplasmosis paper which was not a normal part of your job and was therefore not a critical element, into one that was critical was "illegal." In citing <u>Betters v. federal Emergency Management Agency</u>, 57 M.S.P.R. 405, 410 (1993), Mr. Gould quoted: "Agencies may not use a PIP either to reduce or increase the standards of performance established at the beginning of the appraisal period." Mr. Gould argued that even if your toxoplasmosis paper was unacceptable, the paper should not have been included as a critical job element, it cannot be a basis for removal.

In arguing the performance standards PARHAM and THALER used were not reasonable or attainable, Mr. Gould stated it was simply impossible in the time period allotted for someone who was not trained as a microbiologist and who was also not a research scientist, to assemble and complete a paper on a topic such as toxoplasmosis that would be publishable in a scientific journal. Such articles, he added, are almost always performed by research scientists and often take months, if not years, to complete. Any mentoring you received, according to Mr. Gould, was totally irrelevant and inadequate for writing a research project on toxoplasmosis.

Finally, Mr. Gould argued that the agency failed to use objective standards in assessing your performance as deficient. In response to the charges regarding the alleged deficiencies, Mr. Gould provided the following rebuttal:

**Toxoplasmosis Review Paper**

1) Allegation: "The paper was poorly written".

Response: CHOWDHURY's article was supposed to be a "first draft." The report, if intended for scientific publication, is not final without peer review for criticism and modifications. This did not happen. Individuals who reviewed the paper lacked the expertise in toxoplasmosis necessary to serve as appropriate reviewers if the real intent was to submit the paper to a scientific journal.

2) Allegation: "Paper portrayed narrow geographical based studies in single states as representative of the national picture".

Response: "This statement is untrue." The paper was a review article prepared from other people's research findings that applied to the entire United States. CHOWDHURY never

represented that the statement in the article were his conclusions, but were quotes from available scientific statements performed by other people. It was also noted that CHOWDHURY stated at the beginning of the paper that seroprevalence research studies were inadequate in the U.S. The statements about the examination of meat in the slaughterhouse were cited from a published article by Drs. J.P. Dubey and H.R. Gamble.

3) Allegation re: "FSIS Meat checking policy."

Response: The proposed removal misstates some of the content of the report regarding FSIS meat-checking policy. CHOWDHURY never wrote that FSIS had a plan to implement examining meat for toxoplasmosis in slaughterhouses.

4) Allegation: "Statement re: inadequate explanation as to why pigs raised in confinement rearing pose the highest risk of infecting people while cattle raised on pasture pose the least risk of infecting people."

Response: CHOWDHURY does not make such a claim. His paper clearly stated that seroprevalence studies in cattle were very limited. Also, CHOWDHURY suggested that further studies were required to determine whether beef plays any important role in the epidemiology of toxoplasmosis in humans.

5) Allegation: "Inconsistency regarding handling cats by pregnant women."

Response: This is a misunderstanding. CHOWDHURY merely cited a scientific statement cautioning pregnant women to keep away from cat contaminated soil and its litter boxes. Further, the section discussing pregnant women also cautioned women to avoid cat litter or soil contaminated by cats. This precautionary advice is consistent with the advice given by toxoplasma experts. In any case, CHOWDHURY didn't make the statement, but rather it came from the author of a published paper on the subject.

6) Allegation: "Improperly cited sources that could expose the Agency to liability because of plagiarism."

Response: CHOWDHURY's paper is purely a review paper from other people's research articles for which he provided proper references and attributions. Under no circumstances did he represent that the conclusions in the paper where his own work. Merriam's On Line Dictionary defines Plagiarism as using the ideas or writings of another as one's own without attribution. Therefore, CHOWDHURY did not engage in any plagiarism.

7) Allegation: "Using vague terms such as a "more recent" or "much earlier" study."

Response: CHOWDHURY's paper does, at times, make these references. He was using shorthand to refer to studies done in the 1950s or 1960s. Each statement is, in fact, cross referenced by numbers that allow the reader to easily find the year of that particular study conducted. These references could always be changed by simple editing.

104

Dr. Khurshed A. Chowdhury        FOR OFFICIAL USE ONLY                    Page 6

### Salmonella Serovars Paper

1) Allegation: "The study did not address specific needs of OPHS."

Response: This paper assignment had no model and no clear cut objective. CHOWDHURY received no guidance from PARHAM other than to instruct him to "make a brief description of 20 serovars." There was no request or model given to him to address any specific needs of OPHS.

Also, the assignment was beyond CHOWDHURY's area of expertise since he is not a qualified microbiologist. OPHS has an independent microbiology division with microbiology experts and researchers who were more qualified to perform this task than CHOWDHURY was. This assignment should have been assigned to the microbiologists in the division.

Moreover, CHOWDHURY repeatedly cautioned his managers in numerous memos and verbally that he did not understand what they expected of him with this assignment because no microbiologist has ever written a paper describing serovars. The serovars descriptions he was asked to provide simply do not exist. In an effort to better understand the assignment, CHOWDHURY consulted with well-respected microbiologists. Some didn't understand the question of "serovar description." CHOWDHURY was told by those he consulted with that his assignment was simply an impossible project that would take years to complete.

2) Allegation: "Swine being the reservoir of S. Heidelberg is omitted."

Response: CHOWDHURY's paper mentioned domestic animals. Swine is also a domestic animal, so he did not omit swine from the reservoir list. Also, PARHAM's editing suggested that CHOWDHURY did not need to list specifically the domestic animals affected.

3) Allegation: "uses of antimicrobial drugs in food producing animals were outside the scope of paper."

Response: This is yet another incorrect statement. CHOWDHURY simply quoted the statement from other published scientific paper. Also, the statement is without any doubt a genuine factor of antimicrobial resistance.

Second, it is customary when describing the antimicrobial resistance of any chemical agent to provide the source from which this chemical agent developed antimicrobial resistance. Scientists generally describe why certain disease causing agents are antimicrobial resistant. This statement cannot reasonably be considered as "outside the scope" of this part of the paper.

In his conclusion, Mr. Gould stated that based on the foregoing reasons and those presented at oral hearing, he is requesting the proposed removal be rejected and you be allowed to return to your VMO job with an acceptable performance review.

In giving his oral reply, you claimed you are a BSE Expert, received a Certificate of Appreciation from Dr. Masters in March 2004 for Outstanding Public Service, and received a Spot Award from PARHAM in August 2004, which was approved by THALER. You submitted the followings documents for consideration:

168

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY          Page 7

1. FSIS Mission Objectives, dated May 24, 2006.
2. Accomplishments for 04-05 rating period, dated June 7, 2006.
3. My rating history in the FSIS for the past years: 1990 through 2005.
4. Recent FSIS Regulations affected by my reports.
5. Exhibits – cover letter to Exhibits (There are 9 exhibits).
6. Email dated June 12, 2006, subject: RE: BSE Questions from Peru.
7. Email dated June 05, 2006, subject: BSE Questions from Peru.
8. Email dated July 01, 2005, subject: RE: subject: Task on Salmonella Project.
9. * Proposed drafts for Research Projects. Toxo-Project; Exhibit 5.
10. Toxo-project: Sequence of events: 6/15/06.

You stated that you were working on many reports throughout the performance year, and then all of a sudden comes these special project reports. You stated that Notices created and issued were developed from reports presented by you. You asserted that your reports were always good technically, but you questioned why all of a sudden your skills were no longer acceptable. You contended that for the past fifteen (15) years you averaged about 12 assignments per year, and this year you were overloaded.

In reference to the toxoplasmosis assignment, from September to December 2004, you claimed there was never a discussion about the toxoplasmosis process. The Serovar assignment given was not something that neither PARHAM nor you knew anything about. You stated that four (4) months had passed before PARHAM asked for anything on the toxoplasmosis report, and that she timed it so that you were asked about the report several days before you were going on leave. (asked for report on July 15th and leave was to begin July 19th)

You alleged that PARHAM:

1. did not take into consideration critical work accomplishments;
2. you were the only person assigned special projects;
3. forced you to write a paper a outside your specialized field (i.e., a microbiology assignment for which he is not qualified); and
4. your supervisor is punishing and harassing you.

**ANALYSIS AND FINDING:**

CHOWDHURY, through his representative, asserted that removing him would violate the Civil Service Rules, arguing the performance standards were not valid because they were vague and unreasonable thereby depriving him of proper notice as to what was expected of him. Further, the standards must be reasonably sufficient to permit accurate measurement and adequate to inform the employee of what is necessary to achieve a satisfactory or acceptable rating. CHOWDHURY also argued, through his representative, that before the agency can effect a removal action the employee must be given a meaningful opportunity to demonstrate acceptable performance. According to Mr. Gould, the agency did not meet any of the requirements with regard to what CHOWDHURY was entitled to and, therefore, the removal action should be withdrawn and CHOWDHURY restored to his position.

An agency may give content to performance standards by informing the employee of specific work requirements through other methods, including written instructions regarding the

employee's duties, written notice of deficiencies in the employee's work, and written memoranda about steps to take to improve her work. *See Sampson v. Department of the Navy*, 103 LRP 16427 (2003)

In the August 16, 2005, memorandum (subject: Notification of Unacceptable Performance/Opportunity to Improve), your performance deficiencies were carefully articulated and detailed. The PIP notification initially provided a ninety (90) day period. That period was extended for an additional thirty (30) days. In addition to identifying the critical elements and standard, it explained to you how you failed to meet the fully successful level under the Missions Support and Research and Analysis critical elements. Moreover, tasks to improve your performance to the fully successful level were identified. In the PIP memorandum, you were informed that to assist you in reaching the Fully Successful level, you should take notes when receiving assignments from PARHAM. If the assignments were sent electronically through Outlook message or task system and you did not understand the assignment, you were encouraged to visit with PARHAM so further discussion about the assignment could occur. The PIP notification also provided that you and PARHAM would meet at least once a week to discuss the quality of your work, and to provide you with updates and constructive feedback. Further, you were advised that you should report any problems or address any questions to PARHAM, and in her absence to THALER.

It is clear that the purpose of the PIP was to afford you an opportunity to demonstrate improvement in you performance under critical elements: Mission Support and Research and Analysis. It is also clear that the PIP helped to define and flesh out your performance standards and how to meet them. The weekly meetings also provided you with a meaningful opportunity to discuss your progress. Moreover, the evidence file contains voluminous documentation of the errors and shortcomings of the quality of your work, as determined by PARHAM and others reviewing the work, during the PIP period.

The evidence also demonstrates that you had been provided numerous opportunities to correct mistakes. Therefore, you were adequately informed of how you could succeed in the critical elements during the PIP. *See e.g. Neal v. Defense Logistics Agency*, 72 M.S.P.R. 158, 161 (1996) (an agency may give content to performance standards by informing the employee of specific work requirements through written instructions, information concerning deficiencies and methods of improving performance, memoranda describing unacceptable performance, and responses to the employee's questions concerning performance); *Donaldson v. Department of Labor*, 27 M.S.P.R. 293, 302 (1985).

Upon reviewing the position description of the Veterinary Medical Officer, GS-0701-13, I found that an incumbent is expected to analyze, evaluate, and provide concise, factual, timely written and oral reports of all situations required and/or requested. Also, the incumbent performs special epidemiological projects concerned with food hygiene, public health, and preventative medicine. Further, the incumbent researches literature and keeps abreast of advances in the field of epidemiology and assess potential impacts on program activities.

Under "Knowledge Required" for the position, the incumbent has a mastery of a diverse range of medical sciences (such as microbiology, bacteriology, pathology, parasitology, immunology, and virology) and a demonstrated mastery in the field of epidemiology and public health, particularly as related to the origin and transmission of food borne pathogens. The incumbent, among other

107

things, is required to possess the skill to communicate effectively in both oral presentation and writing which includes presenting seminars and publishing articles in professional journals.

Under "Scope and Effect," the incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health. The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens. The need for an interdisciplinary approach to problem definition and resolution requires the ability to coordinate efforts with both officials within and outside the Agency, as well as with the meat, poultry, and egg products industries and related organizations. Problems solved are extremely difficult in nature and the results have a significant impact on program direction.

It is true that your performance has always been fully successful or better in previous rating years. However, that does not guarantee fully successful or better performance each new rating year. Based on the requirements of the position, coupled with your years of successful performance, assignment of the toxoplasmosis and salmonella projects is within the duties of the position for which you are qualified to perform.

The allegation that PARHAM and THALER treated you differently from other VMOs in the branch and that your removal was based on discriminatory and retaliatory motives is unsubstantiated. There was no corroboration by others that PARHAM and THALER told you they wanted you to retire because you were too old. No evidence such as statements from witnesses or any other supportable evidence was proffered.

Mr. Gould submitted that the performance plan lists publications for scientific journals as part of communications which is a non-critical element. The performance plan reflects under Mission Support Goals/Activities for the Cycle-Objective 2: "Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs." Under Objective 4: "Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met. The performance plan also requires under critical element Research and Analysis Goals/Activities for the Cycle – Conducts needed research and analysis by: "Participating in project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research/study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work." I find the projects assigned to you were more closely aligned with Mission Support and Research and Analysis. Further, it was noted that PARHAM had indicated the projects should be prepared as if they were going to be published for scientific journals, and NOT that you were to prepare your report for publication in a scientific journal.

In reviewing the plethora of material submitted, what you were asked to do falls most closely under critical elements Mission Support, and Research and Analysis. As a side note, you suggested that you prepare a paper on toxoplasmosis in response to PARHAM's request that you provide topics for the team to consider as project work.

In summary, I find substantial evidence exists in support of: (1) the performance standards under which you worked were valid; (2) your performance in a t least one critical element was deficient as charged; and (3) you were provided with a reasonable opportunity to demonstrate acceptable

Dr. Khurshed A. Chowdhury      FOR OFFICIAL USE ONLY                    Page 10

performance prior to proposing your removal under 5 U.S.C. Chapter 43. Therefore, the evidence substantiated that you failed to raise your performance to an acceptable level and the specification is sustained.

**Decision on Penalty**:

I find that you were given a reasonable opportunity to demonstrate acceptable performance, but failed to do so. The instances of unacceptable performance specified in the proposal notice of May 19, 2006, are sustained, and your performance in the critical elements, Mission Support and Research and Analysis, failed to meet the Fully Successful standard. Therefore, it is my decision that you be removed from your position of Veterinary Medical Officer, GS-0701-13 position in Washington, DC, effective September 1, 2006. I have determined that this action is fully warranted and is for just and sufficient cause in order to promote the efficiency of the Service.

**RIGHTS**

You have the right to (1) appeal this decision to the Merit Systems Protection Board (MSPB) or (2) file a discrimination complaint.

If you believe this action was based on discrimination because of race, color, religion, sex, age, national origin, marital status, or physical/mental disability, you may file a complaint of discrimination. You may do this by <u>either</u> (1) filing an appeal based on discrimination with the MSPB <u>or</u> (2) filing a complaint through the USDA's discrimination complaint process, <u>but not both</u>.

An appeal of this action to MSPB on the basis of discrimination, other factors, or a combination of the two, should be addressed to:

> Merit Systems Protection Board
> Washington DC Regional Office
> 1800 Diagonal Road, Suite 205
> Alexandria, VA 22314-2840

In order for your appeal to be considered by the MSPB it must be submitted no later than **thirty (30) calendar days** after the effective date of this action. This period may be extended by 30 days should the parties attempt to resolve the matter through alternative dispute resolution. Your appeal must contain the information specified in Part 1201, Section 1201.24(a) of the MSPB's Rules and Regulations (enclosed). Please note that completion of the form entitled "U.S. Merit Systems Protection Board Appeal Form" constitutes compliance with Section 1201.24(a), and Section 1201.31, if you designate a representative on the form.
If you file an appeal with the MSPB, you have the right to be represented and advised by a representative of your own choosing, or you may represent yourself.

Should you decide to file a complaint through the USDA's discrimination complaint process, you must contact the Agency's Civil Rights Division, at 800-269-6912, within **forty-five (45) calendar days** of the effective date of this action. They will assign a counselor who will attempt to resolve the complaint and/or give notice of how to file a formal complaint.

Dr. Khurshed A. Chowdhury        FOR OFFICIAL USE ONLY                    Page 11

Any questions concerning the contents of this letter, your rights, or the procedures involved, should be directed to me at the above telephone or address.

Sincerely,

Tia Denise Gayle
Supervisory Employee Relations Specialist

Enclosure

cc:

    Dr. Alice Thaler, Director, ZDRSD
    Representative
    Receipt Acknowledged Copy
    File Copy

**I received the original of this notice on**    _____.

                                 **Date**

_____                    _____
   **Signature of Employee**                    **Signature of Witness**

110

# Kestell & Associates

Attorneys and Counselors at Law
1012 14th Street NW, Suite 630
Washington, DC 20005-3423

James L. Kestell*
Tel. No. (703) 237-2912
Fax No. (703) 237-4321
email jlkestell@cox.net

Jonathan L. Gould***
Tel. No. (202) 347-3889
Fax No. (202) 347-4482
email jgould@igc.org

Michael P. Deeds**
Tel. No. (202) 347-4481
Fax No. (202) 347-4482
email mikedeeds@juno.com

Bianca Karim****
Tel. No. (202) 347-0090
Fax No. (202) 347-4482
email karim@kestellassociates.com

May 31, 2006

HAND DELIVERED

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relations Division
Employee Relations Branch, FSIS
1400 Independence Avenue, NW
Washington, DC 20250

RE: REQUEST FOR ORAL CONFERENCE: Khurshed A. Chowdhury--Proposed
Notice of Removal

Dear Ms. Kelm:

As per the proposed notice of removal letter dated May 19, 2006 and received on
May 22, 2006, Dr. Chowdhury hereby requests an oral conference to present his
objections. Thank you.

Very truly yours,

Jonathan L. Gould

Cc:    Dr. K. Chowdhury

Dr. David Goldman,
Assistant Administrator, OPHS, FSIS

William P. Milton, Jr.
Assistant Administrator, Office of Management
FSIS

Quentin Barrett, Human Resources Specialist (ER)

*Admitted in DC, CT, WI, Not Admitted in VA
*Admitted in DC, VA
***Admitted in DC, CT, Of Counsel
****Admitted in Maryland

Virginia Office
209 Midvale Street
Falls Church, VA 22046
Tel. No. (703) 237-2912
Fax No. (703) 237-4321

114

# Kestell & Associates

### Attorneys and Counselors at Law
### 1012 14th Street NW, Suite 630
### Washington, DC 20005-3423

James L. Kestell*
Tel. No. (703) 237-2912
Fax No. (703) 237-4321
email jlkestell@cox.net

Jonathan L. Gould***
Tel. No. (202) 347-3889
Fax No. (202) 347-4482
email jgould@igc.org

Michael P. Deeds**
Tel. No. (202) 347-4481
Fax No. (202) 347-4482
email mikedeeds@juno.com

Bianca Karim****
Tel. No. (202) 347-0090
Fax No. (202) 347-4482
email karim@kestellassociates.com

May 31, 2006

HAND DELIVERED

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relations Division
Employee Relations Branch, FSIS
1400 Independence Avenue, NW
Washington, DC 20250

RE: WRITTEN OBJECTION TO: Khurshed A. Chowdhury--Proposed Notice of
Removal

Dear Ms. Kelm:

I represent Dr. Khurshed A. Chowdhury in the above matter. We are filing this
response and objection to the proposed notice of removal of Dr. Chowdhury from his
position as a Veterinary Medical Officer dated May 19, 2006, which Dr. Chowdhury
received on May 22, 2006. We are also requesting the right to present an oral response as
well as this written response to the proposed removal.

**Introduction**

For the reasons outlined below, it is clear that Dr. Chowdhury's removal was
based on discriminatory and retaliatory motives. His first and second level supervisors
involved in the proposed removal, Drs. Delila Parham and Alice Thaler, treated him
differently from the other Veterinary Medical Officers in his branch. Further, prior to the
removal, they both told him that he was too old to perform the job and should retire.

The agency also violated Dr. Chowdhury's rights under the civil rules by failing to
ensure that, prior to proposing his removal, he was judged on objective and attainable job
standards, that these standards conformed to his performance plan and that he was
provided with a meaningful chance to successfully perform his job. We request that you
reject the proposed removal and that you allow Dr. Chowdhury to return to his job as a

*Admitted in DC, CT, WI, Not Admitted in VA
 *Admitted in DC, VA
***Admitted in DC, CT, Of Counsel
 ****Admitted in Maryland

Virginia Office
209 Midvale Street
Falls Church, VA 22046
Tel. No. (703) 237-2912
Fax No. (703) 237-4321



Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
2

Veterinary Medical Officer with an acceptable performance review.

## Background of the Charges

The charges against Dr. Chowdhury are that he failed in two critical elements of his job: mission support and research and analysis. This failure was based on his submission of two allegedly unacceptable papers during his performance improvement plan (PIP): one on toxoplasmosis and the other on poultry salmonella serotypes.

Drs. Parham and Thaler had originally placed Dr. Chowdhury on a PIP in August, 2005 based on his alleged failure to write a research project on toxoplasmosis for publication in a scientific journal. In fact, Dr. Chowdhury never received specific instructions as to the contents of this paper or any form of written toxoplasma project to work on until October 2005 or after he was well into the PIP. (See sequence of events for toxoplasmosis project).

Further, in placing him on a PIP for unacceptable performance, Parham and Thaler did not give him any credit for the more than thirty reports that he completed during the same rating period. Unlike the toxoplasmosis and salmonella papers that he was assigned during the PIP, these reports were directly related to the part of Dr. Chowdhury's job that supported FSIS' critical mission. The central part of that job was to prepare reports to serve as a scientific basis for the agency's rules and regulations to prevent the spread of food borne diseases, especially of BSE (Bovine Spongiform Encephalopathy), an extremely critical food safety issue for the agency.

For all these reasons, Dr. Chowdhury should not even have received an unacceptable performance review or been subject to a PIP for allegedly failing to complete the toxoplasmosis paper. At the oral conference Dr. Chowdhury can demonstrate more exactly the sequence of events that led to this assignment.

Moreover, FSIS' mission does not involve, and it is prohibited from, conducting scientific research. Publication of papers based on independent scientific research is not described as part FSIS' Agency Mission and Objectives according to 9 CFR part 300. Therefore, the agency should not have required Dr. Chowdhury to submit a paper for peer-review publication in order to keep his job.

Further, research for publication of an article in a scientific journal could not be considered a critical element of his job because it was originally assigned as a special project and concerned communications. The agency performance plan does not list performance on special projects as part of the job's critical element. It also lists publications for scientific journals as part of communications which is also a non-critical

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
3

element. In addition, Drs. Parham and Thaler did not assign this research and publishing project to any others in her branch. In fact, nobody in the branch has been received his/her performance rating solely because they failed to perform acceptably on a peer-review research paper.

As part of the PIP, Dr. Parham also required that Dr. Chowdhury prepare a microbiology paper on salmonella that he was not fully qualified for. OPHS has a full fledged division of microbiology that has many qualified microbiologists who the agency should have assigned to write this paper.

Despite the heavy pressure and very rigid PIP-deadlines, Dr. Chowdhury prepared and submitted the paper on time, in addition to his paper on world wide emerging zoonoses that was judged acceptable. However, Dr. Parham and Dr. Thaler had pre-determined that they were not going to accept the toxoplasmosis and salmonella work as satisfactory. Instead, without any sound basis or scientific accuracy, they found fault with both.

For instance, they criticized some of the scientific statements in the papers even though Dr. Chowdhury was merely including information from other published scientific articles. They unjustly accused him of errors based upon factual statements of others in these articles that he used to support the reports.

They also brought false allegations about the contents of the reports, thereby punishing him for mistakes which he did not commit. Even though the reports were only initial drafts, they did not have major grammatical, spelling errors or major scientific flaws as they claimed. Further, as with any other paper prepared for a scientific journal, it was expected that the toxoplasmosis paper was a draft that would be reviewed by other experts before it became final. It is not possible that the non-critical task of preparing this report could have a negative impact on the agency as claimed in the proposed removal notice.

**The Agency Proposed Dr. Chowdhury's Removal for Discriminatory and Retaliatory Reasons**

It is clear that Dr. Parham's and Dr. Thaler's reasons for providing Dr. Chowdhury with poor performance evaluations were pretexts for their discrimination and retaliation l against him because he filed an EEO complaint. In declaring Dr. Chowdhury's performance unacceptable, Drs. Parham and Thaler singled him out for treatment that is different from the treatment they have given other similarly situated Veterinary Medical Officers in his branch, including Jane Harman, Dr. Maqbool Quereshi and Bernard Salamone. These other employees are not originally from Bangladesh, are substantially

117

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
4

younger than Dr. Chowdhury and have not previously filed EEO complaints against the agency. None of them had to publish any peer-review article to receive a satisfactory performance rating.

Not only did they treat him differently from others on Dr. Chowdhury's level in the branch, as early as December 2004, Dr. Parham told him that he was too old to continue in his job and that she wanted him to retire. Dr. Thaler also made similar remarks in a separate meeting. Their criticism of his work on the toxoplasmosis and salmonella papers was their means of accomplishing their goal of removing him from his position.

Further, after Dr. Chowdhury filed his EEO complaint, he was assured that he would receive a fair review of his work during the PIP. That did not happen. In fact, his treatment worsened and he was accused of having poor performance when that was not the case.

Moreover, Dr. Chowdhury's past record shows that prior to June 2005 he had always received satisfactory or superior ratings. He also had received several awards. In fact, in the middle of 2004 he received a letter of appreciation from FSIS Administrator Barbara Master for his work on BSE prevention. Thus, the sudden change in Dr. Chowdhury's performance ratings was more likely related to the decision of his managers to remove him for discriminatory and retaliatory reasons than it was to any alleged unacceptable performance.

**Dr. Chowdhury's Removal Would Violate the Civil Service Rules**

In addition to the fact that the proposed removal was based on discriminatory and retaliatory motives, the removal would violate civil service rules. The agency proposes removal of Dr. Chowdhury for performance under 5 U.S.C. Chapter 43, 5 U.S.C. §4301, et. seq. In such an action, the agency must use valid performance standards. Burnett v. Department of Health & Human Services, 51 M.S.P.R. 615, 617 (1991). The agency must prove that the standards meet the statutory requirements of 5 U.S.C. §4302(b)(1), and do not constitute an abuse of discretion. Johnson v. Department of the Interior, 87 M.S.P.R. 359, 362 (2000). Although an agency may use absolute performance standards, Guillebeau v. Department of Navy, 362 F.3d 1329, 1338 (Fed. Cir. 2004) reversing Callaway v. Department of the Army, 23 M.S.P.R. 592, 597-600 (1984), the standards may still not be so vague or unreasonable as to deprive the employee of proper notice as to what is expected of him.

An agency is required to establish standards, which, to the maximum extent feasible, permit the accurate appraisal of performance, based on objective criteria. Neal v.

118

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
5

Defense Logistics Agency, 72 M.S.P.R. 158, 161 (1996). "Performance standards must be reasonable, sufficient under the circumstances to permit accurate measurement of the employee's performance, and adequate to inform the employee of what is necessary to achieve a satisfactory or acceptable rating." Wilson v. Department of Health and Human Services, 770 F.2d 1048, 1052 (Fed. Cir. 1985) Performance standards should be specific enough to provide an employee with a 'firm benchmark' toward which to aim his performance. Greer v. Department of the Army, 79 M.S.P.R. 477, 483 (1998); Gondek v. Department of the Army, MSPR No. CH-0432-03-0299-I-1; 2003 WL 22364232, *affirmed*, 99 M.S.P.R. 589 (2005).

Further, in a performance related removal, the agency must provide a meaningful opportunity to demonstrate acceptable performance. This involves providing proper mentoring to improve the employee's performance. Sandland v. General Services Administration, 23 M.S.P.R. 583, 587 (1984); Beasley v. Department of Air Force, 25 MSPR 213 (1984); Adorador v. Department of the Air Force, 38 M.S.P.R. 461, 464 (1988); Zang v. Defense Investigative Services, 26 M.S.P.R. 155 (1985); Thompson v. Farm Credit Administration, 51 M.S.P.R. 569, 578 (1991); Vines v. Department of Defense, 67 M.S.P.R. 667, 671 (1995). The agency bears the burden of proving by substantial evidence that it afforded the employee that substantive right. For the following reasons, the agency did not meet any of the above standards with regard to Dr. Chowdhury's proposed removal.

The agency managers involved in the PIP, Drs. Parham and Thaler, failed to provide Dr. Chowdhury with meaningful direction and feedback as to what was necessary to meet their expectations. With regard to the salmonella assignment in particular, Dr. Chowdhury repeatedly informed Dr. Parham that the so-called description of serovars on which he was required to report did not exist in any books or articles and that therefore the assignment was not intelligible or possible to perform successfully. However, they ignored his claims and never gave him any direction as to what was expected of him. Because Drs. Parham and Thaler had pre-determined their decision to remove him, they never intended to make the PIP process one that could lead Dr. Chowdhury to demonstrate satisfactory performance. The agency violated Dr. Chowdhury's fundamental rights in this regard.

Further, Parham and Thaler illegally changed the performance standards and *performance plan during Dr. Chowdhury's PIP. The plan lists research for scientific journals* as part of "communications" which is not listed as a critical job element. However, in the proposed removal Parham and Thaler changed the classification of this project from communications to mission support and research and analysis.

119

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
6

Thus it is clear that Parham and Thaler transformed a special communications project, such as the toxoplasmosis paper, that was not a normal part of Dr. Chowdhury's job, and was therefore not a critical element, into one that they claimed was critical. This was illegal. "Agencies may not use a PIP either to reduce or increase the standards of performance established at the beginning of the appraisal period." Betters v. Federal Emergency Management Agency, 57 M.S.P.R. 405, 410 (1993). Therefore, even if Dr. Chowdhury's toxoplasmosis paper was unacceptable, because his work on the paper should not have been included as a critical job element, it cannot be a basis for his removal.

In addition, the performance standards Parham and Thaler used to judge Dr. Chowdhury were not reasonable or attainable. It was simply impossible in the time period allotted for someone who was not trained as a microbiologist and who was also not a research scientist, to assemble and complete a paper of on a topic such as toxoplasmosis that would be publishable in a scientific journal. Such articles are almost always performed by research scientists and often take months, if not years, to complete. Any mentoring that Dr. Chowdhury received was totally irrelevant and inadequate for writing a research project on toxoplasmosis.

Finally, the agency failed to use objective standards in assessing Dr. Chowdhury's performance as deficient. The following is a detailed rebuttal of the charges regarding the alleged deficiencies and shows why this is the case:

**Toxoplasmosis Review Paper**

**1) Allegation: "The paper was poorly written ".**

**Response:** Dr. Chowdhury's article was supposed to be a "first draft". No report intended for scientific publication is final without a submission to peer review, criticism and modifications. This did not happen. None of the individuals who reviewed the paper had the expertise in toxoplasmosis necessary to serve as appropriate reviewers if the real intent was to submit the paper to a scientific journal. Moreover, the agency held Dr. Chowdhury to very rigid deadlines for its submission. Despite this fact, the article contained very few grammatical errors or punctuation problems.

**2) Allegation: "Paper portrayed narrow geographical based studies in single states as representative of the national picture".**

**Response:** This statement is untrue. The paper was purely a review article prepared from other people's research findings that applied to the entire Unites States. Whatever statements Dr. Chowdhury has quoted in this article were on the basis of the

120

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
7

available scientific performed by other people (See Exhibit 2). He never represented that the statements in the article were his conclusions.

Moreover, contrary to the allegations in the proposed removal, at the beginning of the abstract of this paper he stated that seroprevalence research studies were inadequate in the U.S. His statements about the examination of meat in the slaughterhouse were cited from a published article by Drs. J.P. Dubey and H.R. Gamble (See Exhibit 1).

### 3) Allegation re: FSIS meat checking policy

**Response:** The proposed removal misstates some of the content of the report regarding FSIS meat-checking policy. The report merely states that, until there is a system of checking meat in the slaughterhouse, meat should be eaten after proper cooking. Dr. Chowdhury never wrote that FSIS had a plan to implement examining meat for toxoplasmosis in slaughterhouses. (See Exhibit 1).

### 4) Allegation: "Statement re: inadequate explanation as to why pigs raised in confinement rearing pose the highest risk of infecting people while cattle raised on pasture pose the least risk of infecting people".

**Response:** Dr. Chowdhury's paper does not contain such a statement. In fact, Dr. Chowdhury clearly stated that seroprevalence studies in cattle were very limited. He also suggested that further studies were required to determine whether beef plays any important role in the epidemiology of toxoplasmosis in humans.

### 5) Allegation: "Inconsistency regarding handling cats by pregnant women".

**Response:** This is again misunderstanding of Dr. Chowdhury's paper. He merely cited a scientific statement cautioning pregnant women to keep away from cat contaminated soil and its litter boxes. The paper says only that: "Pregnant women may not get Toxoplasma infection by the direct contact with cats" and that "…..and pregnant women probably get the disease from the contaminated soil by cat feces."

Further, the section discussing pregnant women contained more than just a caution against touching cat's fur by pregnant women. It cautioned them to avoid cat litter or soil contaminated by cats. Almost all toxoplasma experts have given this precautionary advice. In any case, Dr. Chowdhury did not make this statement. It came from the author of a published paper on the subject. (See Exhibit 3).

### 6) Allegation: "Improperly cited sources that could expose the Agency to liability because of plagiarism".

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
8

**Response:** Plagiarism is defined as using the ideas or writings of another as one's own without attribution. Merriam's On Line Dictionary. The article Dr. Chowdhury prepared is purely a review paper from other people's research articles for which he provided proper references and attributions. In addition, Dr. Chowdhury merely followed the style of the journal where he thought his paper might be published. Under no circumstances did he represent that the conclusions in the paper were his own work. Therefore, he did not engage in any plagiarism.

**7) Allegation: "Using vague terms such as a "more recent" or "much earlier" study".**

**Response:** At times, Dr. Chowdhury's paper made these references. However, he was only using shorthand to refer to studies done in the 1950s or 1960s. In fact, each statement is cross referenced by numbers that allow the reader to easily find the year of that particular study conducted. In any event, these references could always be changed by simple editing.

### Salmonella Serovars Paper

**1) Allegation: "The study did not address specific needs of OPHS".**

**Response:** This salmonella paper assignment had no model and no clear cut objective. Dr. Parham gave Dr. Chowdhury's no guidance other than to instruct him to "make a brief description of 20 serovars". There was no request or model given to him to address any specific needs of OPHS.

In addition, this assignment was beyond Dr. Chowdhury's area expertise since he is not a qualified microbiologist. Whatever he wrote in this report came from published articles of others. OPHS has an independent microbiology division with microbiology experts and researchers who were more qualified to perform this task than he was. The agency should have assigned this study to the microbiologists in this division.

Further Dr. Chowdhury repeatedly cautioned his managers in numerous memos and verbally that he did not understand what they expected of him with this assignment because no microbiologist has ever written a paper describing serovars. The serovars descriptions he was asked to provide simply do not exist. In fact, the term means only the name and formula of its antibody, which Dr. Chowdhury did provide in his report.

To try to make some sense out of the assignment, Dr. Chowdhury consulted with well-respected microbiologists. Some did even not understand the question of "serovar

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
9

description". They all told him that his assignment was simply an impossible project that would take years to complete.  (See Exhibit 9).

**2) Allegation: "Swine being the reservoir of S. Heidelberg is omitted".**

 **Response:**  Dr. Chowdhury's paper mentioned domestic animals. Since swine is also a domestic animal, he did not omit swine from the reservoir list. Moroever, Dr. Parham's editing suggested to Dr. Chowdhury that he did not need to list specifically the domestic animals affected.  (See Exhibit 7).

**3) Allegation: "Uses of antimicrobial drugs in food producing animals were outside the scope of paper".**

 **Response:**  This is yet another incorrect statement. First, this was not Dr. Chowdhury's own statement or finding. He simply quoted it from other published scientific paper. Also, without any doubt the statement is a genuine factor of antimicrobial resistance (See Exhibit 8).

 Second, when describing the antimicrobial resistance of any chemical agent, it is customary to provide the source from which this chemical agent developed antimicrobial resistance. Scientists generally describe why certain disease causing agents are antimicrobial resistant.  This statement cannot reasonably be considered as "outside the scope" of this part of the paper.

**Conclusion**

 For all the foregoing reasons, and for any reasons we present at the oral hearing, we request that you reject the proposed removal and that you allow Dr. Chowdhury to return to his job as a Veterinary Medical Officer with an acceptable performance review.

 Thank you.

123

Ms. Kristie Kelm
Branch Chief, Labor and Employee Relation Division
10

Very truly yours,

Jonathan L. Gould

Enclosures: Exhibits
           Rating history
           Sequence of events for toxoplasmosis paper
           List of accomplishments for mission support during the last rating period

Cc:    Dr. K. Chowdhury

       Dr. David Goldman,
       Assistant Administrator, OPHS, FSIS,
       U.S. Department of Agriculture
       1400 Independence Ave, SW,
       Room-341E, Washington, DC 20250

       William P. Milton, Jr.
       Assistant Administrator
       Office of Management
       FSIS, U.S. Department of Agriculture
       1400 Independence Ave, SW,
       Washington, DC 20250

       Quentin Barrett
       Human Resources Specialist (ER)
       U.S. Department of Agriculture
       1400 Independence Ave,
       Washington, DC. 20250

124

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                    1

# FOR OFFICIAL USE ONLY

# ORAL CONFERENCE REPORT OF

## Dr. Khurshed A. Chowdhury

| | |
|---|---|
| Organization: | FSIS, Zoonotic Diseases & Residue Surveilance Division |
| | (ZDRSD), Office of Public Health Science (OPHS) |
| Date of Conference: | June 15, 2006; 1:30 PM (EST) |
| Place of Conference: | District Office (Conference Room), Beltsville, MD |
| Present at Conference: | Dr. Khurshed A. Chowdhury |
| | Veterinary Medical Officer (VMO) |
| | Jonathan L. Gould, Esq., Representative |
| | Larry G. Janney, Oral Conference Officer |

**INTRODUCTION:** By notice dated May 19, 2006, Dr. Khurshed A. Chowdhury was issued a Notice of Proposed Removal based on **Unacceptable Performance**. Dr. Chowdhury received the notice on May 22, 2006.

I advised Dr. Chowdhury and Mr. Gould the purpose of our meeting was to afford Dr. Chowdhury the opportunity to reply, orally, to the notice issued to him. Also, I stated that there were no other parties attending the conference and that no formal transcript would be prepared, but I would be taking notes throughout the reply period in order to capture his and Dr. Chowdhury's rebuttal to the charge and specification contained in the proposal notice. I did advise the attendees that this Report would be prepared and made available to the deciding official for consideration. I read the opening paragraph of the Notice of Proposed Removal and the one (1) specification, and then invited the parties to reply.

**REASON:     UNACCEPTABLE PERFORMANCE**

**Specification 1:**

At that conclusion of your Performance Improvement Plan (PIP), which ran from August 29, 2005 through December 31, 2005, you failed to raise your performance to the meets the fully successful standard for the critical elements of "Mission Support" and "Research and Analysis."

**Background for Specification 1:**

On August 29, 2005, you were issued a PIP based on your failure in the critical performance elements listed above. During the PIP period, you failed to achieve the required level of performance in these elements. In a memorandum dated February 8, 2006, Chief Zoonoses Branch Dr. Delila Parham notified you that your performance during the PIP was rated unsatisfactory.

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                    2

**Oral Conference:**

Mr. Jonathan Gould began the oral conference by stating that Dr. Chowdhury will
address the specifics as contained in the proposal notice. The charge, according to
Mr. Gould, came out of the blue. He pointed out that Dr. Chowdhury is a sixteen (16)
year Federal employee, has a PhD, and this is the first time Dr. Chowdhury's
performance has ever become an issue. Mr. Gould raised the issue of age discrimination
based on an allegation that in December 2004 comments were made about Dr.
Chowdhury that he is too old and should retire. Mr. Gould pointed out that the agency
must follow procedures, and that the reasons cited for the action taken violate the rules.
It was argued that the scientific project (spinal) assigned should be under non-critical
element. Mr. Gould further argued that the performance projects were NOT poorly
written, adding that researching scientific documents for use in an article for publication
takes a long time to prepare. Further, the salmonella project was also misplaced and that
the criticism/failure was not accurate.

Mr. Gould provided a written reply dated May 31, 2006. (Hereafter REPLY) In his
REPLY, Mr. Gould began by alleging that Dr. Chowdhury's (hereafter CHOWDHURY)
removal was based on discriminatory and retaliatory motives. Mr. Gould alleges further
that Drs. Delila Parham (hereafter PARHAM) and Alice Thaler (hereafter THALER)
treated CHOWDHURY differently from other Veterinary Medical Officers (VMO) in his
branch, and prior to the removal both PARHAM AND THALER told CHOWDHURY
that he was too old to perform the job and should retire.

Mr. Gould also alleges the agency also violated CHOWDHURY's rights under the civil
rules by failing to ensure that CHOWDHURY was judged on objective and attainable job
standards, that the standards conformed to his performance plan and that he
(CHOWDHURY) was provided with a meaningful chance to successfully perform his
job. Based on these factors, Mr. Gould requested that the proposed removal be rejected
and that CHOWDHURY be allowed to return to his VMO job with an acceptable
performance review.

In the background of the charges, Mr. Gould stated in his written reply that CHOWDHURY
never received specific instructions as to the contents of the toxoplasmosis research project
for publication in a scientific journal that had been assigned to CHOWDHURY until October
2005, well after he was into the PIP period. Mr. Gould pointed out that CHOWDHURY
never received credit for the more than thirty reports that CHOWDHURY completed during
the rating period. The reports completed during the rating period were related to
CHOWDHURY's job that supported FSIS' critical mission. The toxoplasmosis and
salmonella papers, on the other hand, were not related to his job that supported FSIS' critical
mission. Mr. Gould further argues that FSIS' mission does not involve, and it is prohibited
from, conducting scientific research. He adds that publication of papers based on
independent scientific research is not described as part of FSIS' Agency Mission and
Objectives according to 9 CFR Part 300. It is for this reason the agency should not have

126

Dr. Khurshed A. Chowdhury              FOR OFFICIAL USE ONLY                    3

required CHOWDHURY to submit a paper for per-review publication in order to keep his job.

Mr. Gould contends that research for publication of an article in a scientific journal could not be considered a critical element of his job because it was originally assigned as a special project and concerned communications. The agency's performance plan, according to Mr. Gould, does not list performance on special projects as part of the job's critical element. Further, he submits that the performance plan lists publications for scientific journals as part of communications which is also a non-critical element. Mr. Gould points out that PARHAM and THALER did not assign this research and publishing project to any others in the branch. Also, Mr. Gould stresses that nobody in the branch has received his/her performance rating solely because they failed to perform acceptable on a peer-review research paper.

It was pointed out in Mr. Gould's written reply that as part of the PIP, CHOWDHURY was required to prepare a microbiology paper on salmonella that he was not fully qualified for. He added that OPHS has a full fledged division of microbiology that has many qualified microbiologists who the agency should have assigned to write this paper. Mr. Gould complains that despite heavy pressure and very rigid PIP-deadlines, CHOWDHURY prepared and submitted the paper on time, in addition to his paper on world wide emerging zoonoses that was deemed acceptable. Mr. Gould contends that PARHAM and THALER had predetermined that they were not going to accept the toxoplasmosis and salmonella work as satisfactory, and without any sound basis or scientific accuracy, they (PARHAM and THALER) found fault with both the toxoplasmosis and salmonella work.

Mr. Gould argues that the agency proposed CHOWDHURY's removal for discriminatory and retaliatory reasons. He claims that the reasons PARHAM and THALER provided CHOWDHURY with poor performance evaluations were pretexts for their discrimination and retaliation against him because he filed an EEO complaint. Further, CHOWDHURY was singled out by PARHAM and THALER, and treated differently than other similarly situated VMOs in the branch, including Jane Harman, Dr. Maqbool Quereshi and Barnard Salamone. According to Mr. Gould, the other VMOs are not from Bangladesh, are substantially younger than CHOWDHURY, have not previously filed EEO complaints against the agency, and none of them had to publish any peer-review article to receive a satisfactory performance rating.

Mr. Gould states that not only did they treat CHOWDHURY differently from others, but as early as December 2004 PARHAM told CHOWDHURY that he was too old to continue in his job and that she wanted him to retire. THALER purportedly made similar remarks in a separate meeting, and criticism of the toxoplasmosis and salmonella papers was their means of accomplishing their goal of removing CHOWDHURY from his position.

It was pointed out by Mr. Gould that prior to June 2005, CHOWDHURY's past performance ratings had always been satisfactory or superior. In the middle of 2004,

CHOWDHURY received a letter of appreciation from FSIS Administrator Barbara Master for his work on BSE prevention. The sudden change in CHOWDHURY's performance rating was more likely related to the decision of his managers to remove him for discriminatory and retaliatory reasons than it was to any alleged unacceptable performance.

Removing CHOWDHURY, according to Mr. Gould, would violate the Civil Service Rules. Mr. Gould cited the statute governing performance (5 U.S.C. chapter 43, 5 U.S.C. §4301, et. Seq.) and various case law arguing performance standards must be valid and may not be so vague or unreasonable as to deprive the employee of proper notice as to what is expected of him. He goes on to point out that standards must be reasonable, sufficient to permit accurate measurement, and adequate to inform the employee of what is necessary to achieve a satisfactory or acceptable rating. Moreover, performance standards should be specific enough to provide an employee with a `firm benchmark` toward which to aim his performance. (citations provided in written reply) Finally, Mr. Gould pointed out that in taking a performance related removal, the agency must provide a meaningful opportunity to demonstrate acceptable performance. Mr. Gould argues that the agency did not meet any of the standards (requirements) with regard to CHOWDHURY's proposed removal.

PARHAM and THALER, according to Mr. Gould, failed to provide CHOWDHURY with meaningful direction and feedback as to what was necessary to meet their expectations. Despite CHOWDHURY repeatedly informing PARHAM that the description of serovars on which he was required to report did not exist in any books or articles and therefore the assignment was not intelligible or possible to perform successfully, PARHAM and THALER ignored CHOWDHURY's claims and never gave him any direction as to what was expected of him. Mr. Gould argues that because of their pre-determined decision to remove CHOWDHURY, PARHAM and THALER never intended to make the PIP process one that could lead CHOWDHURY to demonstrate satisfactory performance; thereby, violating CHOWDHURY's fundamental rights.

Mr. Gould also argues that PARHAM and THALER illegally changed the performance standards and performance plan during CHOWDHURY's PIP. In support of his argument, Mr. Gould points out that the plan lists research for scientific journals as part of "communications" which is not listed as a critical job element. In the proposed removal PARHAM and THALER changed the classification of the project from communications to mission support and research and analysis. In so doing, Mr. Gould claims that transforming a special communications project, such as the toxoplasmosis paper which was not a normal part of CHOWDHURY's job and was therefore not a critical element, into one that was critical was "illegal." In citing Betters v. federal Emergency Management Agency, 57 M.S.P.R. 405, 410 (1993), Mr. Gould quotes: "Agencies may not use a PIP either to reduce or increase the standards of performance established at the beginning of the appraisal period." As such, argues Mr. Gould, even if CHOWDHURY's toxoplasmosis paper was unacceptable, because his work on the paper

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                              5

should not have been included as a critical job element, it cannot be a basis for his removal.

In arguing the performance standards PARHAM and THALER used were not reasonable or attainable, he states it was simply impossible in the time period allotted for someone who was not trained as a microbiologist and who was also not a research scientist, to assemble and complete a paper on a topic such as toxoplasmosis that would be publishable in a scientific journal. Such articles, he adds, are almost performed by research scientists and often take months, if not years, to complete. Any mentoring CHOWDHURY received, according to Mr. Gould, was totally irrelevant and inadequate for writing a research project on toxoplasmosis.

Finally, Mr. Gould argues that the agency failed to use objective standards in assessing CHOWDHURY's performance as deficient. In response to the charges regarding the alleged deficiencies, Mr. Gould provided the following rebuttal:

**Toxoplasmosis Review Paper**

1) Allegation: "The paper was poorly written".

   Response: CHOWDHURY's article was supposed to be a "first draft." The report, if intended for scientific publication, is not final without peer review for criticism and modifications. This did not happen. Individuals who reviewed the paper lacked the expertise in toxoplasmosis necessary to serve as appropriate reviewers if the real intent was to submit the paper to a scientific journal.

2) Allegation: "Paper portrayed narrow geographical based studies in single states as representative of the national picture".

   Response: "This statement is untrue." The paper was a review article prepared from other people's research findings that applied to the entire United States. CHOWDHURY never represented that the statement in the article were his conclusions, but were quotes from available scientific statements performed by other people. It was also noted that CHOWDHURY stated at the beginning of the paper that seroprevalence research studies were inadequate in the U.S. The statements about the examination of meat in the slaughterhouse were cited from a published article by Drs. J.P. Dubey and H.R. Gamble.

3) Allegation re: "FSIS Meat checking policy."

   Response: The proposed removal misstates some of the content of the report regarding FSIS meat-checking policy. CHOWDHURY never wrote that FSIS had a plan to implement examining meat for toxoplasmosis in slaughterhouses.

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                    6

4) Allegation: "Statement re: inadequate explanation as to why pigs raised in confinement rearing pose the highest risk of infecting people while cattle raised on pasture pose the least risk of infecting people."

Response: CHOWDHURY does not make such a claim. His paper clearly states that seroprevalence studies in cattle were very limited. Also, CHOWDHURY suggested that further studies were required to determine whether beef plays any important role in the epidemiology of toxoplasmosis in humans.

5) Allegation: "Inconsistency regarding handling cats by pregnant women."

Response: This is a misunderstanding. CHOWDHURY merely cited a scientific statement cautioning pregnant women to keep away from cat contaminated soil and its litter boxes. Further, the section discussing pregnant women also cautioned women to avoid cat litter or soil contaminated by cats. This precautionary advice is consistent with the advice given by toxoplasma experts. In any case, CHOWDHURY didn't make the statement, but rather it came from the author of a published paper on the subject.

6) Allegation: "Improperly cited sources that could expos the Agency to liability because of plagiarism."

Response: CHOWDHURY's paper is purely a review paper from other people's research articles for which he provided proper references and attributions. Under no circumstances did he represent that the conclusions in the paper where his own work. Merriam's On Line Dictionary defines Plagiarism as using the ideas or writings of another as one's own without attribution. Therefore, CHOWDHURY did not engage in any plagiarism.

7) Allegation: "Using vague terms such as a "more recent" or "much earlier" study."

Response: CHOWDHURY's paper does, at times, make these references. He was using shorthand to refer to studies done in the 1950s or 1960s. Each statement is, in fact, cross referenced by numbers that allow the reader to easily find the year of that particular study conducted. These references could always be changed by simple editing.

**Salmonella Serovars Paper**

1) Allegation: "The study did not address specific needs of OPHS."

Response: This paper assignment had no model and no clear cut objective. CHOWDHURY received no guidance from PARHAM other than to instruct him to "make a brief description of 20 serovars." There was no request or model given to him to address any specific needs of OPHS.

130

Dr. Khurshed A. Chowdhury             FOR OFFICIAL USE ONLY                        7

Also, the assignment was beyond CHOWDHURY's area of expertise since he is
not a qualified microbiologist. OPHS has an independent microbiology division
with microbiology experts and researchers who were more qualified to perform
this task than CHOWDHURY was. This assignment should have been assigned to
the microbiologists in the division.

Moreover, CHOWDHURY repeatedly cautioned his managers in numerous
memos and verbally that he did not understand what they expected of him with
this assignment because no microbiologist has ever written a paper describing
serovars. The serovars descriptions he was asked to provide simply do not exist.
In an effort to better understand the assignment, CHOWDHURY consulted with
well-respected microbiologists. Some didn't understand the question of "serovar
description." CHOWDHURY was told by those he consulted with that his
assignment was simply an impossible project that would take years to complete.

2) Allegation: "Swine being the reservoir of S. Heidelberg is omitted."

   Response: CHOWDHURY's paper mentioned domestic animals. Swine is also a
   domestic animal, so he did not omit swine from the reservoir list. Also,
   PARHAM's editing suggested that CHOWDHURY did not need to list
   specifically the domestic animals affected.

3) Allegation: "uses of antimicrobial drugs in food producing animals were outside
   the scope of paper."

   Response: This is yet another incorrect statement. CHOWDHURY simply quoted
   the statement from other published scientific paper. Also, the statement is without
   any doubt a genuine factor of antimicrobial resistance.

   Second, it is customary when describing the antimicrobial resistance of any
   chemical agent to provide the source from which this chemical agent developed
   antimicrobial resistance. Scientists generally describe why certain disease causing
   agents are antimicrobial resistant. This statement cannot reasonably be considered
   as "outside the scope" of this part of the paper.

In his conclusion, Mr. Gould states that based on the foregoing reasons and those
presented at oral hearing, he is requesting the proposed removal be rejected and
CHOWDHURY be allowed to return to his VMO job with an acceptable performance
review.

In giving his oral reply, CHOWDHURY claimed he is a BSE Expert, received a
Certificate of Appreciation from Dr. Masters in March 2004 for Outstanding Public
Service, and received a Spot Award from PARHAM in August 2004, which was
approved by THALER. He submitted the followings documents for consideration:

   1. FSIS Mission Objectives, dated May 24, 2006

131

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                    8

    2. Accomplishments for 04-05 rating period, dated June 7, 2006
    3. My rating history in the FSIS for the past years: 1990 through 2005.
    4. Recent FSIS Regulations affected by my reports.
    5. Exhibits – cover letter to Exhibits (There are 9 exhibits)
    6. Email dated June 12, 2006, subject: RE: BSE Questions from Peru
    7. Email dated June 05, 2006, subject: BSE Questions from Peru
    8. Email dated July 01, 2005, subject: RE: subject: Task on Salmonella Project
    9. * Proposed drafts for Research Projects. Toxo-Project; Exhibit 5
   10. Toxo-project: Sequence of events: 6/15/06

CHOWDHURY stated that he was working on many reports throughout the performance year, and then all of a sudden comes these special project reports. He stated that Notices created and issued were developed from reports presented by him. His reports were always good technically, but questioned why all of a sudden skills no longer acceptable. He contends that for the past fifteen (15) years he has averaged about 12 assignments per year, and this year he was overloaded.

In reference to the toxoplasmosis assignment, from September to December 2004, there was never a discussion about the toxoplasmosis process. The Serovar assignment given was not something that PARHAM or he knew anything about. CHOWDHURY stated that 4 months had passed before PARHAM asked for anything on the toxoplasmosis report, and that she timed it so that he was asked about the report several days before he was going on leave. (asked for report on July 15th and leave was to begin July 19th)

According to CHOWDHURY, PARHAM

    1. did not take into consideration critical work accomplishments.
    2. CHOWDHURY only one assigned special projects
    3. forced to write paper outside specialized field; microbiology assignment for which he is not qualified.
    4. supervisor is punishing and harassing him.

**ANALYSIS AND FINDING:**

CHOWDHURY, through his representative, asserts that removing him would violate the Civil Service Rules, arguing the performance standards were not valid because they were vague and unreasonable thereby depriving him of proper notice as to what was expected of him. Further, the standards must be reasonably sufficient to permit accurate measurement and adequate to inform the employee of what is necessary to achieve a satisfactory or acceptable rating. CHOWDHURY also argued, through his representative, that before the agency can effect a removal action the employee must be given a meaningful opportunity to demonstrate acceptable performance. According to Mr. Gould, the agency did not meet any of the requirements with regard to what CHOWDHURY was entitled to and, therefore, the removal action should be withdrawn and CHOWDHURY restored to his position.

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                    9

An agency may give content to performance standards by informing the employee of specific work requirements through other methods, including written instructions regarding the employee's duties, written notice of deficiencies in the employee's work, and written memoranda about steps to take to improve her work. *See Sampson v. Department of the Navy*, 103 LRP 16427 (2003)

In the August 16, 2005 memorandum, subject: Notification of Unacceptable Performance/Opportunity to Improve, the performance deficiencies of CHOWDHURY were carefully articulated and detailed. The PIP notification initially provided a 90-day period, and was extended for an additional 30-day period. In addition to identifying the critical elements and standard, it was explained to CHOWDHURY how he failed to meet the fully successful level under the Missions Support and Research and Analysis critical elements. Moreover, tasks to improved performance to the fully successful level were identified. It is also noted that in the PIP memorandum, CHOWDHURY was informed that to assist him in reaching the Fully Successful level, he should take notes when he receives assignments from PARHAM. If the assignment is sent electronically through Outlook message or task system and he does not understand the assignment, he was encouraged to visit with PARHAM so further discussion about the assignment may occur. It was also provided to CHOWDHURY that every Monday morning throughout the PIP, he and PARHAM would meet at least once a week to discuss the quality of his work, and to provide him with updates to his progress and constructive feedback. CHOWDHURY was advised that he should report any problems or address any questions to PARHAM, and in her absence to THALER.

It is clear that the purpose of the PIP was to afford CHOWDHURY an opportunity to demonstrate improvement in his performance under critical elements: Mission Support and Research and Analysis. It is also clear that the PIP helped to define and flesh out CHOWDHURY's performance standards and how to meet them. Further, the weekly meetings also provided CHOWDHURY with a meaningful opportunity to discuss his progress. Moreover, the evidence file contains voluminous documentary of the errors and shortcomings of the quality of CHOWDHURY's work, as determined by PARHAM and others reviewing the work, during the PIP period.

The evidence also demonstrates that CHOWDHURY had been provided numerous opportunities to correct mistakes. Therefore, CHOWDHURY was adequately informed of how he could succeed in the critical elements during the PIP. *See e.g. Neal v. Defense Logistics Agency*, 72 M.S.P.R. 158, 161 (1996) (an agency may give content to performance standards by informing the employee of specific work requirements through written instructions, information concerning deficiencies and methods of improving performance, memoranda describing unacceptable performance, and r3esponses to the employee's questions concerning performance); *Donaldson v. Department of Labor*, 27 M.S.P.R. 293, 302 (1985).

Upon reviewing the position description of the Veterinary Medical Officer, GS-0701-13, I found that an incumbent is expected to analyze and evaluate, provide concise, factual, timely written and oral reports of all situations required and/or requested. Also, the

Dr. Khurshed A. Chowdhury          FOR OFFICIAL USE ONLY                     10

incumbent performs special epidemiological projects concerned with food hygiene, public health, and preventative medicine. Further, the incumbent researches literature and keeps abreast of advances in the field of epidemiology and assess potential impacts on program activities.

Under "Knowledge Required" for the position, the incumbent has a mastery of a diverse range of medical sciences (such as microbiology, bacteriology, pathology, parasitology, immunology, and virology) and a demonstrated mastery in the field of epidemiology and public health, particularly as related to the origin and transmission of food borne pathogens. The incumbent, among other things, is required to possess the skill to communicate effectively in both oral presentation and writing which includes presenting seminars and publishing articles in professional journals.

Under "Scope and Effect," the incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health. The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens. The need for an interdisciplinary approach to problem definition and resolution requires the ability to coordinate efforts with both officials within and outside the Agency, as well as with the meat, poultry, and egg products industries and related organizations. Problems solved are extremely difficult in nature and the results have a significant impact on program direction.

It is true that CHOWDHURY's performance has always been fully successful or better in previous rating years. However, that does not guarantee fully successful or better performance each new rating year. Based on the requirements of the position, coupled with CHOWDHURY's years of successful performance, assignment of the toxoplasmosis and salmonella projects is within the duties of the position for which CHOWDHURY is qualified to perform.

The allegation that PARHAM and THALER treated CHOWDHURY differently from other VMOs in his branch and that his removal was based on discriminatory and retaliatory motives is unsubstantiated. There was no corroboration by others that PARHAM and THALER told CHOWDHURY they wanted him to retire because he was too old. No evidence such as statements from witnesses or any other supportable evidence was proffered.

Mr. Gould submits that the performance plan lists publications for scientific journals as part of communications which is a non-critical element. The performance plan reflects under Mission Support Goals/Activities for the Cycle-Objective 2: "Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs." Under Objective 4: "Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.: The performance plan also requires under critical element Research and Analysis Goals/Activities for the Cycle -- Conducts needed research and analysis by: "Participating in

134

Dr. Khurshed A. Chowdhury        FOR OFFICIAL USE ONLY                        11

project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research/study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work." I find the projects assigned to CHOWDHURY are more closely aligned with Mission Support and Research and Analysis. Further, it was noted that PARHAM had indicated the projects should be prepared as if they were going to be published for scientific journals, and NOT that he was to prepare for his report for publication in a scientific journal.

In reviewing the plethora of material submitted, what CHOWDHURY was asked to do falls most closely under critical elements Mission Support, and Research and Analysis. As a side note, it was CHOWDHURY who suggested that he prepare a paper on toxoplasmosis in response to PARHAM's request that he provide topics for the team to consider as project work.

In summary, I find substantial evidence exists in support of the performance standards under which CHOWDHURY worked were valid, CHOWDHURY's performance in a t least one critical element was deficient as charged, and CHOWDHURY was provided with a reasonable opportunity to demonstrate acceptable performance prior to proposing his removal under 5 U.S.C. Chapter 43. Therefore, it appears that Agency officials met its burden of proof and the removal action should go forward.

/S/ Larry G. Janney, Oral Conference Officer            8/15/2006
                                                        Date

135

**Exhibit 6: Journal submitted May 26, 2005, indicating completion of second draft of thinking paper**

**From:** Chowdhury, Khurshed
**Sent:** Thursday, May 26, 2005 8:35 AM
**To:** Parham, Delila
**Subject:** Daily journal
5/9/05  7:20-4:50PM   Email checking and working on thinking paper.

5/10/05-5/12/05----Attending Technical writing course.

5/13/05    SDO

5/16/05 7:20AM-12:50PM   Email checking and working on thinking paper.
,,    ,,    12:50PM-4:50PM----sick leave

5/17/05 7:20AM-4:50PM   Email checking and working on thinking paper.

5/18/05 7:20AM-4:50PM   Email checking, working with thinking paper, and
                        attended branch meeting.

5/19/05 7:20AM-4:50PM   Email checking, working with thinking paper, and
                        attended Division meeting.

5/20/05 7:20AM-3:50PM   Email checking, working to complete thinking paper
                        and submitted to the supervisor after completion.

5/23/05 7:20AM-4:50PM   Email checking, reading Regs for 610 review, email
                        checking.

5/24/05 7:20-4:50PM     Email checking, attended Asian-Pacific festivals, 610
                        review meeting, email checking and reading messages.

5/25/05 7:20-4:50PM     Email Checking, reading various messages,
                                     reading journals, email checking.

5/26/05 7:20-12:50PM    Email checking, reading messages and journals.
        12:50PM-4:50PM   Sick leave

Khurshed

MN-2

arham, Delila

**From:** Chowdhury, Khurshed
**Sent:** Thursday, September 01, 2005 4:32 PM
**To:** Parham, Delila
**Subject:** daily journal

Hi Delila,

Below is the daily journal for the last two weeks.  Thanks.

Khurshed


8/8/05  7:20AM-4:50PM  Email Checking, working with Serobars paper, email
                       checking and reading.

8/9/05 7:20AM-4:50PM   Email checking, meeting with competency group, email
                       checking, working serobars paper.

   9/05 7:20AM-4:50PM  Email checking, Computer training for Introduction  to
                       Excel. Meeting with Dr. Alice Thaler. Email checking and
                       Reading messages.


8/11/05 7:20AM-4:50PM  Email checking, working with serobars paper. Email
                       checking and reading messages.

8/12/05  7:20AM-3:50PM  Sick leave for annual check-up.


8/15/05 to 8/26/05—Sick leave

8/29/05 7:20AM-2:50PM  Email checking, telephone message checking and deleting,
                       reading messages, meeting with Dr. Thaler about PIP
                       Notice.

8/30/05 7:20AM-4:50PM  Email checking and reading messages, reading PIP
                       notice and understanding the task, meeting with Dr.
                       Parham about PIP, email checking and reading.

8/31/05 7:20AM-4:50PM  Email checking and reading messages, reading FSIS news
                       letters, memos, reading PIP notice for more complex
                       stuffs and clarity, telephone interview with EEO
                       Counselor, preparing document for EEO counselor,
                       email reading.

9/01/05  7:20AM-4:50PM  Email checking and reading messages, spent quite a bit

193

of time on reloading Excel-program for TNA 2005,
Literature search for Toxo project, reading PIP notice
to understand what to do, collecting docs. For EEO
Complaint, checking email and reading messages.

9/02/05     SDO

194

'arham, Delila                                                    **MN-5**

---

**From:**    Chowdhury, Khurshed
**Sent:**    Thursday, September 15, 2005 4:15 PM
**To:**      Parham, Delila
**Subject:** Daily Journal

9/6/05   7:20AM-4:50PM   Email checking and reading messages, telephone message
                         listening and deleting, meeting with supervisor, reading
                         articles given by Dr. Thaler, searching related articles for
                         toxo paper, email checking.

9/7/05   7:20AM-4:50PM   Email checking and reading messages, reading
                         articles for toxo-paper, searching related articles for
                         toxo paper, branch meeting, email checking.

9/8/05   7:20AM-4:50PM   Email checking and reading messages, telephone message
                         listening and deleting, reading articles formatting toxo,
                         working plan , search emerging diseases. Email chcking.

9/9/05   7:20AM-3:50PM   Email checking, reading messages and FSIS news
                         materials, searching literature, formulating toxo
                         work plan, email checking.

9/12/05  7:20AM-4:50PM   Email checking, reading messages, meeting with Super
                         visor, materials, searching literature for Zoonosis disease,
                         plan, email checking.

9/13/05  7:20AM-4:50PM   Email checking, reading messages and FSIS news
                         materials, searching literature for Zoonotic disease,
                         Security training but failed to take, spend 3 hours, email
                         Checking.

9/14/05  7:20AM-4:50PM   Email checking, reading messages and FSIS news
                         materials, searching literature for Zoonotic disease,
                         Security training completed, Branch meeting, Email
                         Checking.

9/15/05  7:20AM-4:50PM   Email checking, reading messages and FSIS news
                         materials, searching literature for Zoonotic disease,
                         and formulating report and submitted, email
                         Checking.

9/16/05        SDO

195

rham, Delila                                                    **MN - 12**

**From:** Chowdhury, Khurshed
**Sent:** Friday, October 21, 2005 2:10 PM
**To:** Parham, Delila
**Cc:** Thaler, Alice
**Subject:** Progress report

Hi Delila,

This week I made some headway in my serovars assignments. That is I have decided to stop running door to door to ask for help from experts/Microbiologists and making phone calls and sending emails **(which has absorbed my enormous amount of time)** which has turned out to be unproductive. I get same old answer from everybody. Name of the game is—I shall have to make it up myself. Best is to spend my time on literature search and pick something related to my purpose. I will need to search thousands of articles to do a moderate job.

However, I will try my best to do what I can achieve within this short period having two other lengthy assignments to go alongside. I am planning to finish Serovars project by the end of November, 2005, so that I can concentrate to finish toxoplasma project by the end of December 31, 2005.

I have also made some clear target for Zoonoses diseases surveillance project and hope to finish it by the end of November 2005.

I urge you to click to the attachment above to learn about some comments made by some renown microbiologists whom I have ¬tacted.   Thanks.

Khurshed

$1^{~}$ 196

rham, Delila

**MN-19**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Thursday, October 27, 2005 3:36 PM |
| **To:** | Parham, Delila |
| **Subject:** | Progress report |

Hi Delila,

This week I have made some literature search for both serovars and toxo projects and have ordered some articles from NAL.

I have also received some web addresses from Bonnie Rose and Kristina Barlow which I will check when I get time. Although, most of them I have already seen before, and they all have the names of serovars isolated from different species only, I doubt if they will be of any help for serovars descriptions that I need.

However, I will check them all just in case I get some new information.  Thanks.


Khurshed

197

**ırham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Thursday, November 03, 2005 4:29 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Weekly Progress report |

Hi Delila,

This week I have spent most of my time on serovars project and made some progress in final compilation of the paper.  Also some articles on toxo have been ordered from NAL.  Thanks.


Khurshed

## arham, Delila

**From:**  Chowdhury, Khurshed
**Sent:**  Tuesday, November 15, 2005 9:59 AM
**To:**  Parham, Delila
**Subject:** Working at the Library

Hi Delila,

On Monday the November 14, 2005, I have spent most of the day (7:30AM-3:30PM) in the NAL, at Beltsville, MD. I have returned home at 4:00PM and spent time reading some articles until 5:00PM.  Thanks.

Khurshed

**ırham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Tuesday, November 15, 2005 10:34 AM |
| **To:** | Parham, Delila |
| **Subject:** | RE: Working at the Library |

Hi Delila,

On Monday the November 14, 2005, I have spent most of the day (7:30AM-3:30PM) in the NAL, at Beltsville, MD. I have searched articles on sero-prevalence of toxoplasmosis suggested by Dr. Dubey. I have found all of the suggested articles plus a few more on toxoplasmosis in humans.

I have returned home at 4:00PM and spent time reading some articles until 5:00PM. Thanks.

Khurshed


-----Original Message-----
**From:** Parham, Delila
**Sent:** Tuesday, November 15, 2005 10:21 AM
**To:** Chowdhury, Khurshed
**Subject:** RE: Working at the Library

Khurshed, please indicate what you were working on in the library.

Delila

    -----Original Message-----
    **From:** Chowdhury, Khurshed
    **Sent:** Tuesday, November 15, 2005 9:59 AM
    **To:** Parham, Delila
    **Subject:** Working at the Library

    Hi Delila,

    On Monday the November 14, 2005, I have spent most of the day (7:30AM-3:30PM) in the NAL, at Beltsville, MD. I have returned home at 4:00PM and spent time reading some articles until 5:00PM. Thanks.

    Khurshed

**ırham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, November 18, 2005 2:58 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Weekly progress report |

Hi Delila,

This week I have made good progress on the literature collection on Toxo project. I have spent one day in NAL at the Beltsville, and was able to procure some most valuable literature for which I was waiting for long. I have started to read those articles and have begun to writing the paper on the issue of toxoplasma seroprevalence in the US.   Thanks.


Khurshed

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, November 18, 2005 2:58 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Weekly progress report |

Hi Delila,

This week I have made good progress on the literature collection on Toxo project. I have spent one day in NAL at the Beltsville, and was able to procure some most valuable literature for which I was waiting for long. I have started to read those articles and have begun to writing the paper on the issue of toxoplasma seroprevalence in the US.   Thanks.


Khurshed

202

**ᴧrham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Tuesday, November 15, 2005 10:34 AM |
| **To:** | Parham, Delila |
| **Subject:** | RE: Working at the Library |

Hi Delila,

On Monday the November 14, 2005, I have spent most of the day (7:30AM-3:30PM) in the NAL, at Beltsville, MD. I have searched articles on sero-prevalence of toxoplasmosis suggested by Dr. Dubey. I have found all of the suggested articles plus a few more on toxoplasmosis in humans.

I have returned home at 4:00PM and spent time reading some articles until 5:00PM.  Thanks.

Khurshed


-----Original Message-----
**From:** Parham, Delila
**Sent:** Tuesday, November 15, 2005 10:21 AM
**To:** Chowdhury, Khurshed
**Subject:** RE: Working at the Library

Khurshed, please indicate what you were working on in the library.

Delila

        -----Original Message-----
        **From:** Chowdhury, Khurshed
        **Sent:** Tuesday, November 15, 2005 9:59 AM
        **To:** Parham, Delila
        **Subject:** Working at the Library

        Hi Delila,

        On Monday the November 14, 2005, I have spent most of the day (7:30AM-3:30PM) in the NAL, at Beltsville, MD. I have returned home at 4:00PM and spent time reading some articles until 5:00PM.  Thanks.

        Khurshed

203

~ham, Delila

**From:**     Chowdhury, Khurshed
**Sent:**     Tuesday, November 15, 2005 9:59 AM
**To:**       Parham, Delila
**Subject:**  Working at the Library

Hi Delila,

On Monday the November 14, 2005, I have spent most of the day (7:30AM-3:30PM) in the NAL, at Beltsville, MD. I have returned home at 4:00PM and spent time reading some articles until 5:00PM.  Thanks.

Khurshed

204

**·ham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Thursday, November 03, 2005 4:29 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Weekly Progress report |

Hi Delila,

This week I have spent most of my time on serovars project and made some progress in final compilation of the paper.  Also some articles on toxo have been ordered from NAL.  Thanks.

Khurshed

**~ham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Thursday, November 03, 2005 4:29 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Weekly Progress report |

Hi Delila,

This week I have spent most of my time on serovars project and made some progress in final compilation of the paper.  Also some articles on toxo have been ordered from NAL.  Thanks.


Khurshed

206

**MN-1**

# MEMO ZDRSD ZB

To:     Khurshed Chowdhury
        Veterinary Medical Officer
        Zoonotic Diseases and Residue Surveillance Division, OPHS

From:   Delila Parham
        Branch Chief
        Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:  Meeting Notes for Tuesday, August 30, 2005

This memorandum is written to provide you with a summary of our meeting on Tuesday, August 30, 2005. The intent of the meeting was to provide the two of us the opportunity to discuss your performance improvement plan (PIP), which began on Monday, August 29, address any questions or concerns you may have, and give you an opportunity to speak directly with me. I was on leave on Monday, August 29, 2005, and Dr. Alice Thaler met with you on Monday to discuss the PIP.

When asked if you had questions about the PIP, you had two. You asked what I was referring to in the memo that had been signed on July 18, 2005. I explained that this referred to the performance standards that you are under currently for the 2005-2006 rating cycle. You also asked about the date when the PIP began; you were concerned that it started on August 16, 2005, when the memo was dated. I explained that the PIP began on August 29, 2005, when you had your first discussion with Dr. Thaler.

In the PIP memo, I indicated that I would go over the performance standards with you, and asked if you would like for me to do that. You indicated that you are familiar with the standards and did not wish to go through them again. I asked if you were comfortable with the assignments, and you indicated that you are. You did mention that you have email messages that counter some of the statements in the memo, and we agreed that they would not become part of the memo that has been issued, but can be provided and included in the files. I explained that not all email messages between the two of us were included in the memo.

I tried to emphasize Dr. Thaler and my willingness to work with you on the PIP so that you can be successful. I tried to emphasize too the importance of our holding the weekly meetings, but noted that you are encouraged to talk with me at any time prior to the scheduled meeting if I can be of assistance. If illnesses, family emergencies, or other matters prevent you from coming into the office on Monday, you should notify Dr. Thaler or me as you normally would. The meeting will be rescheduled for later in the week if you, Dr. Thaler, or I are not available to meet on Monday.

207

When you met with Dr. Thaler you did not sign the last page of the memo acknowledging receipt of the memo. You told me that you did not realize that signing it meant simply that you had received it, and you asked if you could sign it at the meeting. I explained that I would copy that page, and bring it to your office for you to sign. You signed it acknowledging receipt of the memo.

The meeting was short, about 15 minutes. I think I have captured the essentials of our meeting, but welcome any additional comments you wish to add.

Enclosure: Signature page

Cc: Alice Thaler

208

**MN-3**

# MEMO        ZDRSD        ZB

To:        Khurshed Chowdhury
           Veterinary Medical Officer
           Zoonotic Diseases and Residue Surveillance Division, OPHS

From:      Delila Parham    *Delila Parham*    9/6/05
           Branch Chief
           Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:   Meeting Notes for Tuesday, September 6, 2005


This memorandum is written to provide you with a summary of our meeting on Tuesday, September 6, 2005. This is the second of our weekly meetings to discuss your performance improvement plan that began on Monday, August 29. The meeting was short. We discussed the following:

1.  Toxoplasmosis Paper: You said you would present a plan for the paper at the next meeting scheduled for Monday, September 12.

2.  *Salmonella* Serotype Paper: I clarified that this assignment involves poultry *Salmonella* serotypes, not human *Salmonella* serotypes, since the original request from the Assistant Deputy Administrator was on poultry *Salmonella* serotypes. However, since the top five human *Salmonella* serotypes are not the same as poultry, there is a possibility that you may need to conduct a similar study on key human serotypes. You were advised to see Dr. Neena Anandaraman to obtain information on the top five poultry *Salmonella* serotypes as determined by Agency data on *Salmonella* performance standards.

3.  Zoonotic Disease Surveillance: You asked if your first report was due in October since the memo referred to a bi-monthly compilation. You were right to ask for clarification. In this case, bi-monthly was meant to be twice per month or semimonthly. I apologize for any confusion that this may have caused. We discussed also the need to provide updates in succeeding compilations and likely sources of information such as Internet sites such as the World Health Organization and ProMed websites. You were also encouraged to consult colleagues or other experts who might have information to share. For example, for information on avian influenza you might consult Dr. Maqbool Qureshi, Zoonoses Branch, or Drs. Bhabani Dey or John Ragan, Animal and Egg Production Branch.

MN-4

# MEMO          ZDRSD          ZB

To:        Khurshed Chowdhury
           Veterinary Medical Officer
           Zoonotic Diseases and Residue Surveillance Division, OPHS

From:      Delila Parham   *Delila Parham*  9/15/05
           Branch Chief
           Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:   Meeting Notes for Tuesday, September 12, 2005

This memorandum is written to provide you with a summary of our meeting on Monday,
September 12, 2005. This is the third of our weekly meetings to discuss your performance
improvement plan that began on Monday, August 29. This was a short meeting, lasting
approximately 10 to 15 minutes. Our discussion was as follows:

1.  Toxoplasmosis Paper: You gave me the project title and a very brief work plan. (See
    enclosure.) When asked why you chose this particular focus, you indicated that it met the
    requirements that it should be related to the Agency's mission and our work, it was of
    public health importance, and it was meat-related. You said that you had talked with Dr.
    Dubey, and he found this to be an acceptable focus and you should be able to develop a
    good paper. We discussed your using personal communication from Dr. Dubey and
    others as acceptable references. When asked about the format of the paper and if you had
    chosen one, you indicated that you had not but would have more to say about the paper's
    format at the next meeting. During our discussion, you commented about the short time
    of 90 days to develop the paper.

2.  *Salmonella* Serotype Paper: You told me that you would look at the paper that Dr. Neena
    Anandaraman had provided, and would determine the top five serotypes based on
    information in the paper. We discussed that in your paper you should explain how you
    selected the top five serotypes. Once selected, we agreed that you would send me the list
    of serotypes that you will be reviewing.

3.  Zoonotic Disease Surveillance: Given the confusion over the term bimonthly, you said
    you would have the first report ready next week. I accepted that.

I asked if you were comfortable with the assignments or had any specific questions for me. You
said you were fine and had no further questions about the work. With that, the meeting was
concluded.

If anything has been omitted, please let me know.

Enclosure

213

MN-6

# MEMO          ZDRSD          ZB

To:        Khurshed Chowdhury
           Veterinary Medical Officer
           Zoonotic Diseases and Residue Surveillance Division, OPHS

From:      Delila Parham   *Delila Parham*   9/13/05
           Branch Chief
           Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:   Meeting Notes for Tuesday, September 19, 2005

This memorandum is written to provide you with a summary of our meeting on Monday,
September 19, 2005. This is the fourth of our weekly meetings to discuss your performance
improvement plan (PIP) that began on Monday, August 29. Like all of our meetings, this one
was short, lasting no more than 20 minutes. I asked if you wished to have Dr. Thaler join us for
the meeting, and you said no. You were invited to at the beginning of the meeting to share any
concerns thoughts and/or concerns so we could be sure to address them first. At that time, you did
not indicate any specific concerns but later in the meeting, you expressed concern about not
having enough time. More details of our meeting are provided below:

1.  Toxoplasmosis Paper: You indicated that you have started work on the toxoplasmosis
    paper. You said you have begun the literature review and have selected articles that
    address your focus area. Initially, you said you hope to start writing this week, but later in
    the conversation said you would not start writing the paper until the end of October. I
    Right now, you are receiving articles, sorting them, and setting them aside to read later. I
    asked what you planned to do should you determine that you do not have the needed
    materials to write the paper as planned. Could the focus of the paper be changed based
    on the literature received? I also mentioned that I had sent you an article that had
    numerous references that may prove helpful especially if you did not find enough
    references on the subject selected. You replied that you could do as you wanted with the
    paper, and I agreed that this was an independent project and you are at liberty to handle it
    as you want provided it meets the requirements established.

2.  *Salmonella* Serotype Paper: You shared the five poultry Salmonella serotypes that you
    selected, and indicated that you have just begun the literature review for this project. You
    said you used the material provided by Dr. Neena Anandaraman and selected the
    serotypes seen most commonly in 2003 and 2004. The third serotype on your list was
    Typh (COPE). When I asked which one that was, you said it was another kind of
    Typhimurium, but did not provide specifics. You were asked to email the list to me.

3.  Zoonotic Disease Surveillance: You emailed the report to me on Thursday, September
    15. In the report you used only one source, ProMed; we discussed that the need to
    expand your sources, use of other listserves, and so forth to ensure that the report was
    complete  You said you had checked other sources, and the information was the same in
    all the sources you checked. I asked that you include all your sources even if the

information is the same. We also discussed that the cases listed in each report should be updated in the subsequent report if updates are available.

4.  Journal: You emailed the journal to me on Thursday, September 15. The journal was written in the same manner as it was before the PIP, and I reminded you that the August 12, 2005, memorandum requested that the journal be expanded to explain more specifically what work was accomplished. You opposed expanding the form, indicating that you would have to include bathroom breaks. I explained that the journal was not intended to capture things like bathroom breaks, but is meant for you to see how you use your time and what has actually been accomplished, which should lead to better use of your time and establishment of realistic project goals and milestones based on time available. I explained too that the expanded journal was meant to assist us in our discussions on your progress during the PIP. I asked that you review the discussion in the memorandum on expanding your journal.

I asked what you considered your greatest challenge in meeting the requirements of the PIP, and you said it was time. You expressed concern about the short time you have to write the toxoplasmosis and serotype papers, conduct the surveillance, and keep up your journal. You were not receptive to my suggestions for approaches in getting the work done, but indicated that you could decide. I agreed that it was your decision.

If anything has been omitted, please let me know.

Enclosures
1. Five Selected Poultry *Salmonella* Serotypes
2. Zoonotic Disease Surveillance List – Cases
3. September 15 Journal
4. PIP Memorandum, August 12, 2005, Pages 1, 2 (for discussion on journal)

215

MN·7

**ZDRSD**

# Memo

**To:**    PIP file Dr. Khurshed Chowdhury

**From:** Dr. Alice M. Thaler, Director

**CC:**    Dr. Delila Parham, Branch Chief

**Date:** October 03, 2005

**Re:**    Weekly progress meeting

---

Dr. Parham was in training and Dr. Thaler met with Dr. Chowdhury to discuss his progress and concerns. The meeting lasted 25 minutes.   At the end of the discussion Dr. Chowdhury stated that he had no questions that he needed to ask.

Dr. Thaler asked Dr. Chowdhury to describe his work plans for this week.  He said that he was reviewing two reports assigned by Dr. Parham that are in addition to his three main assignments and these are due on Friday.  I asked him to submit these reviews to me as well as to his supervisor, because Dr. Parham will still be in training.  He said he would prepare for the EU meeting, continue working on the Toxoplasmosis paper, and work on the Salmonella serovar paper.  Dr. Chowdhury had one question about the list of participants from the Salmonella preharvest meeting.  His printout of this file lacked phone numbers or email addresses.  Dr. Thaler opened the file and that information is in the file, but the document is formatted to only print on legal sized paper.  Sharon Oatman informed us that legal sized paper is in the copy room.  Dr. Thaler printed out the file and gave a copy to Dr. Chowdhury.  Dr. Chowdhury's did not present his work log for review and Dr. Thaler did not request to see it.

Last week Dr. Chowdhury informed Dr. Thaler that he will start to write the documents for his three major projects starting the first week in October.  When he said he would be working on his main projects this week, she understood that to mean he would begin the writing phase of his three projects. Dr. Thaler asked him to not wait until next Monday's meeting if any question or concern arises during the week.

1

209

MN-8

ZDRSD

# Memo

**To:**   PIP file Dr. Khurshed Chowdhury

**From:** Dr. Alice M. Thaler, Director

**CC:**   Dr. Delila Parham, Branch Chief

**Date:** October 11, 2005

**Re:**   Weekly progress meeting

---

Dr. Parham was in training and Dr. Thaler met with Dr. Chowdhury to discuss his progress and concerns. The meeting lasted 25 minutes.  At the end of the discussion Dr. Chowdhury stated that he had no questions that he needed to ask.

Dr. Thaler asked Dr. Chowdhury to describe his work plans for this week. He said that he was reviewing two reports assigned by Dr. Parham that are in addition to his three main assignments and these are due on Friday. I asked him to submit these reviews to me as well as to his supervisor, because Dr. Parham will still be in training. He said he would prepare for the EU meeting, continue working on the Toxoplasmosis paper, and work on the Salmonella serovar paper. Dr. Chowdhury had one question about the list of participants from the Salmonella preharvest meeting.  His printout of this file lacked phone numbers or email addresses.  Dr. Thaler opened the file and that information is in the file, but the document is formatted to only print on legal sized paper.  Sharon Oatman informed us that legal sized paper is in the copy room.  Dr. Thaler printed out the file and gave a copy to Dr. Chowdhury.  Dr. Chowdhury's did not present his work log for review and Dr. Thaler did not request to see it.

Last week Dr. Chowdhury informed Dr. Thaler that he will start to write the documents for his three major projects starting the first week in October. When he said he would be working on his main projects this week, she understood that to mean he would begin the writing phase of his three projects. Dr. Thaler asked him to not wait until next Monday's meeting if any question or concern arises during the week.

1

218

MN-10

# MEMO            ZDRSD         ZB

---

To:          Khurshed Chowdhury
             Veterinary Medical Officer
             Zoonotic Diseases and Residue Surveillance Division, OPHS

From:        Delila Parham  *Delila Parham*  10/19/05
             Branch Chief
             Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:     Meeting Notes for October 11 and October 17, 2005

This memorandum is written to provide you with a summary of our meetings on Tuesday, October 11, 2005, and Monday, October 17, 2005. These were the seventh and eighth meetings with you to discuss your performance improvement plan (PIP) that began on Monday, August 29.

The October 11 meeting was very short. Both Dr. Thaler and I participated since Dr. Thaler had met with you the previous two weeks when I was out of the office. Dr. Thaler indicated that she would share comments later that she received from your peers on the zoonotic disease report that would be helpful in improving the format of the report. You had no additional questions or concerns, and requested that the meeting be concluded so you could prepare for another meeting.

In the October 17 meeting, we discussed the following:

1. Toxoplasmosis Paper: Based on the settlement agreement reached on October 11 with the mediator, you have until December 31, 2005, to submit the toxoplasmosis paper. You indicated that you are still making calls to researchers and would like to spend two or three days in the library to look for an article in a journal that had been recommended. I agreed that a library visit might be helpful, but suggested that you might also consider conducting your searches electronically and discussing your needs with the librarians by telephone rather than spend a lot of your time searching through journals yourself. I sent you a link to the NAL.

2. *Salmonella* Serotype Paper: You said that the microbiologist you consulted indicated that you will need to review several articles to find the information you need for the paper since the material is not available in a single source. You seemed to have an idea how to proceed to get the material you need to write the paper although you expressed concern about the number of articles you will need to read to do so.

3. Zoonotic Disease Surveillance: I shared a memorandum from Dr. Thaler on the comments she received from the staff on ways you can make the report useful and user-friendly. We went over the comments. We agreed that you would not continue to simply copy and send the ProMed report, but would review the comments received and work to provide a useful report. You will provide me with a new format for the report on Wednesday, and we hope to discuss it on Thursday.

4. Journal: As agreed in the October 11 settlement agreement, in lieu of a daily journal you will submit a substantive progress report by close of business each Friday.

211

MN-13

# MEMO          ZDRSD          ZB

To:           Khurshed Chowdhury
              Veterinary Medical Officer
              Zoonotic Diseases and Residue Surveillance Division, OPHS

From:         Delila Parham  *Delila Parham*  11/15/05
              Branch Chief
              Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:      Meeting Notes: October 24, October 31, and November 7, 2005

This memorandum is written to provide you with a summary of our meetings on October 24, 2005, October 31, 2005, and November 7, 2005. These were meetings 9 through 11 of the regularly scheduled meetings with you to discuss your performance improvement plan (PIP), which began on Monday, August 29.

Our meetings continue to be short, but over the past three meetings the focus seems to have changed with your expressing confidence in your ability to get the work done. This is a summary of our discussions from the past three meetings.

1.  Toxoplasmosis Paper: You have not had an opportunity to work as much as you would like on the paper, but you are making progress. In the November 7 meeting, you indicated that you had spoken with Dr. Dubey, and he recommended that you search copies of the 1990 JAVMA for articles on toxoplasmosis. You contacted the library and without journal titles, the librarian suggested that you might visit the library and look through the 1990 journals yourself. You will spend Monday, November 14, in the library reviewing literature.

2.  *Salmonella* Serotype Paper: After much discussion with others, you have determined that the information does not reside in a single article or publication, and you will need to conduct an extensive literature review to get the information needed. You have developed a format for the paper that allows you to plug the information in as you find it in the literature. You continue to express concern about the number of articles needed to write this paper and the paucity of information for some of the serovars. Nonetheless, you expressed confidence that you know how to proceed now that you understand that the information needed does not reside in a single source. Since the paper is due at the end of the month, we agreed that you would provide a draft or outline of your paper at our next meeting on November 15.

3.  Zoonotic Disease Surveillance: We have had several discussions about the report, its format, and how to make it more useful. Dr. Thaler sent the report to a limited number of people in the Division and requested their comments on the paper. After receiving their comments, Dr. Thaler provided a written summary of their comments to the two of us. We reviewed the comments in our meeting, and you later met with Dr. Thaler to discuss this further. You said the two of you agreed on the format for the last report submitted. We discussed my sending your last report out to Zoonoses Branch personnel and a few others for another review, requesting comments on content, format, and overall utility of the paper. We will discuss comments received at the next meeting.

Since you will be working in the library on Monday, November 14, we agreed to meet on Tuesday, November 15, at 9:00 a.m.

216

**MN-14**

# MEMO          ZDRSD          ZB

To:          Khurshed Chowdhury
             Veterinary Medical Officer
             Zoonotic Diseases and Residue Surveillance Division, OPHS

From:        Delila Parham  _Delila Parham_  11/18/05
             Branch Chief
             Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:     Meeting Notes: November 14

This memorandum is written to provide you with a summary of our meeting on Tuesday, November 14. The meeting was rescheduled from Monday, November 13, to Tuesday to allow you time in the National Agriculture Library on Monday. This was meeting 12 of the regularly scheduled meetings with you to discuss your performance improvement plan (PIP), which began on Monday, August 29. This is a summary of our discussion during the meeting.

1. Toxoplasmosis Paper: You had an opportunity to look through 1990 copies of JAVMA, and found approximately 16 relevant articles, several written by Dr. Dubey. You were confident of the tremendous help these articles would be in writing the paper.

2. *Salmonella* Serotype Paper: You provided a draft copy of the paper for my review. You were confident that you would have the final draft next week.

3. Zoonotic Disease Surveillance: We again discussed the paper, its format, and the utility. We also discussed comments received, especially those from Drs. Walker and Salamone. Since you seemed to dismiss some of Dr. Walker's comments as not relating to format, we discussed what persons would look for in a professional paper, including subheadings, correct punctuation, and so forth. In the last paper submitted, you did include a list of topics covered in the paper.

I told you that I would try to limit your tasks to those required under the PIP, but let you know that I could not guarantee this. You accepted this, but hoped that you would not have other tasks to do so you complete the PIP assignments.

217

MN-15

# MEMO          ZDRSD          ZB

To:        Khurshed Chowdhury
           Veterinary Medical Officer
           Zoonotic Diseases and Residue Surveillance Division, OPHS

From:      Delila Parham  *Delila Parham*  11/22/05
           Branch Chief
           Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:   Meeting Notes: November 21, 2005


This memorandum is written to provide you with a summary of our meeting on Monday, November 21, 2005. This was meeting 13 of the regularly scheduled meetings with you to discuss your performance improvement plan (PIP), which began on Monday, August 29. This is a summary of our discussion during the meeting.

1. Toxoplasmosis Paper: You did not seem to be very far along on the paper, and we had little discussion about it. You indicated that once you completed the other assignments, you could turn your attention to this paper, which is due at the end of December 2005.

2. *Salmonella* Serotype Paper: At our meeting last week, you said you would have the final paper ready this week; however, given the short work week, it will not be ready for submittal until November 30. We discussed needed changes to the draft. I suggested too that you might have a colleague review the paper, but you seemed reluctant to do so. You thought, perhaps, the only person who might provide you with comments would be Dr. Bonnie Rose. As discussed at our meeting, I am including a few of the corrections and/or changes needed. While the list below is not intended to be exhaustive, it should give you an idea of what is needed to write the final paper:

   • Paper Format: Make this a more readable paper by considering how the information is presented. Be consistent throughout the paper. For example, there is no heading for the percentages provided.

   • Grammar, Punctuation, Spelling Errors: Check for noun/verb agreement, misspellings, like "Cpenhagen," and incomplete sentences. You use various terms throughout the paper, likely meaning the same thing; for example, there is multiple drug resistant, multiple drugs resistant, and multi drug resistant.

   • Repeated Sentences: Eliminate repetitive sentences which are found throughout the paper for several of the serotypes. If this is general information about *Salmonella* serotypes, consider including this in the introductory material. Limit information to the individual serotype under discussion.

   • Understandable Statements: Use plain English to explain what some of the statements mean at a practical level. For example, the text sates, "The number of viable intracellular *S. typhimurium* Copenhagen bacteria remained constant 6 h after infection of Caco-2 cells, but the viability of *S. typhimurium* KY32H1 decreased significantly by 4 h postinfection, suggesting that this mechanism may play a role in the virulence and/or intracellular growth of numerous bacteria." What does this mean? Consider too sentences that you have included that may need additional

218

explanation for the reader to fully understand what is meant. For example, the text reads, "Strains isolated from pigeons are drug sensitive but same strain isolated from other species (crows, kites) were drug resistant." Not everyone will appreciate the difference.

- Headings: As written, some of the headings do not adequately explain the material that follows or the material that follows is not complete enough for the reader to understand what is being presented. Therefore, it may be helpful to explain your approach to the paper; that is, how you will present the material before discussing the individual serotypes. Consider the following:

    o You have a heading, "public health significance" in which you give a rating of rare to very high, but the explanation for your rating isn't explained until the end of the document under "glossaries of public health significance." Moreover, the glossary discusses the significance according to human incidence. There is no indication of significance according to animal incidence. You might consider providing a schema for the animal isolates and discuss how this differs and suggest why this is so.
    o It is unclear what is meant by the heading "commonality" and how this differs from "reservoir." For example, the text reads: Reservoirs: Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man; Commonality: Man, Swine, Turkey and Cattle. In addition, the reservoir list is not well constructed. For example, as written, domestic animals include cattle, but the listing states "domestic animals, cattle, etc.
    o Why did you include antigenic characteristics? What is this meant to tell the reader?
    o There is no heading for the percentages. In addition, there should be a frame of reference for the percentages discussed. If this came from the HACCP data then this should be explained.

- Relevancy of Material: Consider the relevancy of the material included and linkage of material that is cited. It is obvious that snippets have been taken from several documents, but, as written in the report, it is unclear how the material relates or how you intend the reader to interpret it. Examples follow:

    o In the text, see "Mode of transmission: Contaminated meat and egg-associated." If this serotype is isolated in young chickens, why is it egg associated? Where are the statistics on egg contamination?
    o The text states, "In one outbreak, a resistant S. Heidelberg strain was traced from ill dairy calves to a farmer's pregnant daughter, who subsequently transmitted the organism to her newborn infant." What is the connection between this statement and what precedes it? How is this supportive of gentamicin injection of eggs as a potential source of resistance development?
    o The text states, "In the chicken industry there is a widespread injection of broiler eggs with gentamicin prior to hatch. Use of gentamicin in the poultry industry needs to be examined in light of these findings." There is no explanation why gentamicin is given to poultry or why further examination is needed, especially as it relates to your paper.
    o For S. Typhimurium, there is a long discussion under antimicrobial resistance. While you may have found a lot of information on the topic for this serotype, consider the relevancy of the information provided for this paper.

- References: The material needs to be properly referenced in the text. It is unacceptable to reference material by placing all the references at the beginning of the topic area such as S. Kentucky [4, 5, 20, 24, 26, 28] or S. Heidelberg [20, 18, 24, 26, 29, 30]. Also, the list of references should be in an acceptable format for scientific articles.

3.  Zoonotic Disease Surveillance Report:  We agreed that you would submit the last report that will be evaluated for the PIP on November 28.  However, we did discuss that you may be asked to continue this as a branch task. We discussed too that the November 28 report should be well written and reflect the comments and suggestions made that would make it an acceptable report.

MN-16

# MEMO          ZDRSD          ZB

To:        Khurshed Chowdhury
           Veterinary Medical Officer
           Zoonotic Diseases and Residue Surveillance Division, OPHS

From:      Delila Parham *Delila Parham* 12/05/05
           Branch Chief
           Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:   Meeting Notes: December 1, 2005


This memorandum is written to provide you with a summary of our meeting on Thursday, December 1, 2005. This was meeting 14 to discuss your work under the performance improvement plan (PIP), which began on Monday, August 29. Although all work assigned under the PIP was originally scheduled to be completed by November 30, it was agreed during negotiations that you would continue work on the toxoplasmosis paper until the end of December. Therefore, I decided to continue our meetings through the month of December.

During the meeting, you said that you have begun the writing on the toxoplasmosis paper. You seemed comfortable that the references that you have are adequate for the paper. When asked if I could review your outline of the paper, you said that you are not working from an outline, but have a work plan, which, at my request, you agreed to send me electronically along with the title of the paper. (See enclosure.) You reminded me that this will be a review article, and you will use the *Journal of Food Protection* format for the paper. You had no specific questions for me and indicated that you did not need any assistance at this time with the paper. However, you did voice concern that there is little time remaining for you to complete the paper.

When the toxoplasmosis paper is submitted at the end of December, you will have completed all requirements of the PIP. The assignments will be reviewed to determine if work performed under the PIP is acceptable.

Enclosure

MN-17

# MEMO                 ZDRSD                 ZB

To:       Khurshed Chowdhury
          Veterinary Medical Officer
          Zoonotic Diseases and Residue Surveillance Division, OPHS

From:     Delila Parham  *Delila Parham*  12/20/05
          Branch Chief
          Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:  Meeting Notes: December 19, 2005


This memorandum is written to provide you with a summary of the last three meetings that were
held on December 6, 12, and 19. The meetings on December 6 and 12 were very short with your
indicating that you were progressing on the paper and nothing was needed except time to write
the paper. Our meeting on December 19 was longer than the previous two meetings. In this
meeting you indicated that you are "patching" the paper together. You have now read all the
articles and are drafting the paper, which will be written in the *Journal of Food Protection*
format. When asked about your familiarity with this particular journal and its format, you said
you obtained a copy of the journal and review articles that are similar to the one you are writing
from Dr. Bonnie Rose. Based on our discussion, you will spend next week reviewing and
making corrections to the paper, which will be submitted on December 30. In response to my
question to assist you by reviewing your outline or the draft, you said that assistance is not
needed since you do not have an outline or draft that you are ready to show. You explained too
that it would be difficult to have someone review the paper because they will want to have at
least one week to perform the review. While you again expressed concern about the time
remaining to complete the paper, you expressed confidence in having it ready on the due date.

As you know, Dr. Thaler and I will not be in the office the next two weeks: December 26 –
January 6. Therefore, no meeting will be held next week. If you have questions or concerns that
we can address, please feel free to see one of us this week.

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Tuesday, December 27, 2005 8:32 AM |
| **To:** | Thaler, Alice |
| **Cc:** | Parham, Delila; Walker, Harry |
| **Subject:** | RE: notes from our 12/22/05 meeting |

Hi Alice,

Thank you for your notes from our 12/22/05 meeting with your careful decision. I do accept your decision fully, and I consider its better that you have very kindly kept several options open for me. It is good for both for me and for the host branch also. However, I have one request to you. Please do not ask me to move physically at this time, until I settle in some branch permanently.

Regarding my toxoplasmosis paper you got it absolutely right. At this time, though I have styled it for Journal of Food Protection, after the PIP period is over I shall style it for JAVMA, or some other suitable journal who might welcome it better than Journal of Food Protection. Most importantly, I will try my level best to publish it in some journal, since I have spent my time and so much efforts to this paper.

Thanks again for your decision.


Sincerely,


Khurshed Chowdhury
VMO, Zoonoses branch, ZDRSD.




-----Original Message-----
**From:** Thaler, Alice
**Sent:** Friday, December 23, 2005 8:07 AM
**To:** Chowdhury, Khurshed
**Cc:** Parham, Delila
**Subject:** notes from our 12/22/05 meeting

To make sure I clearly expressed myself at the meeting you requested on 12/22/2005, I am providing a written summary of the key points.

I understand from what you stated that you have styled the Toxoplasmosis paper for the *Journal of Food Protection* and will submit it to me and Dr. Parham by the agreed to deadline of December 30, 2005. You explained that you want to actually publish the paper in the Journal of the Veterinary Medical Association, which you now realize would be more receptive to a review article that the Journal of Food Protection. After the PIP is completed you plan to reformat your paper for JAVMA.

You requested that your detail to the Residue Branch be for at least 6 months instead of just 90 days, to avoid just getting projects started and having the detail end before the projects were finished. I noted that the agreement was for 90 days and did not specify which branch, although we had talked about your interest in Residue Branch work. I said that at the end of 90

227

days your work in the Residue Branch would be evaluated to determine where you would be assigned within the division. I did not agree to extending the 90 day detail at this time but asked you to be open to various options. Options include:

- Return to Zoonoses Branch
- Extend the detail in Residue Branch
- Permanent reassignment to Residue Branch
- Start a new detail in Animal and Egg production Food Safety Branch

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

228

**Exhibit 8: Instructions on additional work needed on the thinking paper**

| | |
|---|---|
| **From:** | Parham, Delila |
| **Sent:** | Friday, July 29, 2005 9:29 AM |
| **To:** | Parham, Delila |
| **Subject:** | Thinking Paper on Zoonoses Branch Work |
| | |
| **Importance:** | High |

---

| | |
|---|---|
| **Subject:** | Thinking Paper on Zoonoses Branch Work |
| **Due Date:** | Friday, April 22, 2005 |
| **Priority:** | High |
| | |
| **Status:** | In Progress |
| **Percent Complete:** | 0% |
| | |
| **Total Work:** | 0 hours |
| **Actual Work:** | 0 hours |
| | |
| **Owner:** | Chowdhury, Khurshed |

----------

**Khurshed, thanks for your first draft. In the paper, you state the following:**

"Therefore under the above circumstance I do consider that, Zoonoses Branch can investigate the risk profiles of the following foodborne pathogens listed below, (most priority item at the top of the list):

1. Campylobacteriosis
2. Listeriosis
3. Toxoplasmosis
4. Avian Influenza A (H5B1)

Many chicken flocks are silently infected with Campylobacter; that is, the chickens are infected with the organism but show no signs of illness. Campylobacter can be easily spread from bird to bird through a common water source or through contact with infected feces. When an infected bird is slaughtered, Campylobacter can be transferred from the intestines to the meat. More than half of the raw chicken in the United States market has Campylobacter on it. Campylobacter is also present in the giblets, especially the liver.

Poultry get infected with Campylobacter most likely during the pre-harvesting stage. We can discuss how we can assess the risks and what will be the mode of our investigations. Finally we can recommend our *suggestions to intervene the risk factors.*"

**The next draft of your thinking paper should include an explanation of where the Agency is now on these issues; that is, what is being done to address these things. Be very specific. In being specific you may want to look through Agency speeches, policy documents, and contact specific programs and or divisions. For example, is a risk assessment or baseline being conducted on any of these illnesses? Also, you did not discuss world or global issues. Is there anything that we should be**



aware of? Include recommendations and options for Zoonoses Branch involvement in these issues. As written, it is very general. Be more specific. Include references including personal communication.

Please develop the paper into a "complete" thinking paper, addressing all the information discussed above. (See the Agency's BSE thinking paper published in the Federal Register if you need a guide.) See me if you have questions.

*Note: This is being sent to you again as a task, but this time there is a due date. (The original request was sent to you on February 25.) I know you will be out on travel for one week, and I have taken that into consideration.*

**Thanks.**

**Delila**

**Exhibit 2: Request to Complete the Equivalency Review**

| | |
|---|---|
| **From:** | Parham, Delila |
| **Sent:** | Wednesday, December 01, 2004 10:59 AM |
| **To:** | Chowdhury, Khurshed |
| **Cc:** | Brewer, Robert |
| **Subject:** | FW: For August 9-13 |

Khurshed,

I am again asking that you prepare answers and/or comments for the questions asked for the Columbia and Thailand review. Your paper is being prepared for the Zoonoses Branch. Having a written document will ensure that we can compare answers to these types of questions that come in from the various countries and that we are consistent in our response.

Please do not contact Todd Furey or Nancy Goodwin again. In my last message from Todd (November), he assured me that he will let me know when he will hold the first meeting. If you have questions, please let me know.

Thanks.

Delila

-----Original Message-----
**From:** Parham, Delila
**Sent:** Thursday, August 05, 2004 5:11 PM
**To:** Chowdhury, Khurshed
**Subject:** FW: For August 9-13



For August 9-13

Information in the task in the event it cannot be opened:

Dr. Chowdhury,

As discussed, please do the following:
1. Continue your research on the toxoplasmosis paper that you would like to write. We will discuss your progress when I return. From the time you mentioned it to me and we agreed that this is something that you can do, I believe you should have done quite a bit on the literature review.
2. Please review the questions that I gave you from Todd Furey, and began answering them if you have not begun already. As mentioned, we will not wait for a meeting to begin answering them. You have had this for some time, so you should have looked it over. Get as many answered as you can. We will discuss your progress on this when I return.

Thanks.

Delila



Khurshed,

I think this states that you will begin August 13.  The start date is August 9.

Delila

**Exhibit 5: Discussions about toxoplasmosis project**

**From:** Chowdhury, Khurshed
**Sent:** Wednesday, December 08, 2004 1:53 PM
**To:** Parham, Delila
**Subject:** RE: Toxoplasmosis
Hi Delila,

Sorry that I was wrong to tell you that this mail of yours did not reach me. Actually it did, but by mistake I probably clicked the size icon (on the right side) so your mail came to the bottom of the page and I did not see it. This morning, after coming from your room, when I clicked the icon of receiving order—your mail did appear to the top of my page. Actually there is no problem in my outlook system. Sorry for that. Thanks.

Khurshed

-----Original Message-----
**From:** Parham, Delila
**Sent:** Tuesday, December 07, 2004 4:33 PM
**To:** Chowdhury, Khurshed
**Subject:** Toxoplasmosis

Khurshed,

That you are not working on a toxoplasmosis article is very disappointing This was something that you told me that you really wanted to work on, and you were given adequate time to conduct the literature search and write the article – or at least develop a very good draft. While your conversation with Dr. Dubey may have caused you to re-think writing the article, you should have informed me that you had decided not to write one. I inquired as recently as Thursday about your progress, and you did not respond to the email. Only after going to talk with you today about an opportunity for you to sit in on a toxoplasmosis presentation next week with Dr. Faye Bressler's branch and inquiring again about your progress on your article, did you mention that you are not writing one. This is very serious since I allotted you adequate time to write the article, and no work has being done.

If you wish to discuss this further or share other insights on this subject, please come and talk with me.

Delila

-----Original Message-----
**From:** Parham, Delila
**Sent:** Thursday, December 02, 2004 10:04 AM
**To:** Chowdhury, Khurshed
**Subject:** Toxoplasmosis

Khurshed,

Please send me a status report on where you are with your paper on toxoplasmosis. Have you completed the literature search? Where are you with the writing? Have you considered which journal would be best for the type of article you are writing?



Thanks.

Delila

ZDRSD

# Memo

TP-3

| | |
|---|---|
| **To:** | Memo to the file |
| **From:** | Dr. Alice Thaler, Director |
| **To:** | Dr. Delila Parham |
| **Date:** | January 11, 2006 |
| **Re:** | Review comments for Dr. Khurshed Chowdhury's Toxoplasmosis paper |

I acknowledge that Dr. Khurshed Chowdhury has been diligent in making an effort to complete his work and has shown a much improved attitude and a new enthusiasm. He met the timeframes for submitting his PIP work products. He told me that he is very anxious to bring the PIP to a conclusion and hopes to begin his 90-day detail.

I completed my initial review of Dr. Chowdhury's Toxoplasmosis paper. At a GS-13 level, I expect an initial work product to be ready to review for substance, without significant basic editing mistakes. As stated in the PIP letter *The paper must be well researched with references and it must be free of major errors requiring few edits and revisions.* A GS-13 level staff officer would be expected to independently determine when to use his professional contacts to assist in review of a paper prior to submitting it to his supervisor. A GS-13 level staff officer also is expected to prioritize the work to meet quality and timeliness goals. Dr. Chowdhury informed me that he decided to devote only the 30-day extension of the PIP to writing the Toxoplasmosis paper.

**From the perspective of being ready for supervisory review, the paper is disappointing:**

There are numerous style inconsistencies: Dr. Chowdhury used different terms when a single term would be clearer – "US; U.S., U.S.A., America, United States of America" ; the main subject of the paper is Toxoplasmosis – this word is typed and formatted in every conceivable way, plain text, italics, lower case, title case, etc.

There are a number of grammatical errors: – noun/verb agreement, missing commas, to name a few

Dr. Chowdhury did not even spell check this document: - as evidenced by obvious misspelled words – "Toxoplasm" instead of "Toxoplasmosis".

**The substance of the paper is poor. There is no analysis. Conclusions are not logical and contradict the data presented. The scientific information in the references used demonstrates an inability to extract and use the data properly.**

The document does not flow well: Many data are presented, but the data are not organized or analyzed in any fashion. It is unclear what the main point are. There are no graphs or tables that might help the reader grasp the main points.

1

<u>Statements are made that do not match the data:</u>  Some statements contradict the data and there is nothing that points out that the inconsistencies in the data; there is no attempt to describe or explain possible reasons for these inconsistencies. Dr. Chowdhury states that confinement operations are expected to reduce exposure to Toxoplasmosis; however pigs are raised in confinement yet pose a high risk of infecting people.  Conversely, he states animal raised outdoors risk greater exposure to Toxoplasmosis, but does not explain why cattle, which are raised outdoors, pose a low risk to people.  Apart from not explaining this discrepancy, Dr. Chowdhury does not even identify in the paper that it is a discrepancy. Doing this would require only the most basic scientific analysis of the information being presented.

<u>Statements made are not scientifically sound.  Information referenced has not been correctly interpreted and is described inaccurately in the document :</u>

The references Dr. Chowdhury gathered had a lot of information about the relationship of management practices to various aspects of Toxoplasma gondii prevalence that he did not adequately analyze. Instead Dr. Chowdhury made a simplistic statement, which did not adequately consider all references, that confinement operations have lower prevalence and outdoor facilities have higher prevalence. Although other references supported this statement, Dr. Chowdhury needed to analyze and offer an explanation for references not supporting his statement. Dr. Chowdhury also needed to put into perspective the declining national prevalence of toxoplasmosis and the increasing use of confinement operations to raise swine.

**On page 3  Seroprevalence of *Toxoplasma gondii* in various food animal species. Swine**

1.  Dr. Chowdhury misinterpreted the data as fact rather than as an estimate and wrote:

    *Seroprevalence by using 'enzyme-linked immunosorbent assay' (ELISA) test was 5.4% in finishing swine and 11.4% among sows and gilts (1).*

    Dr. Chowdhury has misrepresented the data in reference (1), which actually states:

    **The true prevalence** of toxoplasmosis was **estimated** as 5.4% among finishing swine and 11.4% among sows and gilts.

2.  Reference (1) goes on to make several important observations that led me to the following conclusions that Dr. Chowdhury did not make in his analysis nor include in his paper, such as:

    - In infected herds, herd size did not affect to seropositivity rate, which suggests that herd size is not predictive of the likelihood a herd will be positive.
    - Finishing swine had the same seropositivity independent of total confinement rearing compared to all other types of facilities, which data suggests that the type of facility does not affect prevalence, ie.., facility type alone is not predictive of the likelihood a herd will be positive..
    - <u>Infected</u> swine herds raised in total confinement appeared to have a lower with-in herd prevalence than herds raised in other facilities, which suggests that type of facility only affects prevalence in herds already infected, with confinement appearing to prevent further spread.

● Page 2

273

3.  I checked the information that Dr. Chowdhury presented against several of the references he cited. Reference (22) used in developing the abstract clearly states that of the 13 toxoplasma seropositive pigs, 12 had been raised on pasture and 1 in confinement. For the one positive pig raised in confinement the building was not properly bird proofed. From this, the authors conclude that in North Carolina, confinement management practices appeared adequate to eliminate the risk of infection by this parasite.

4.  Dr. Chowdhury wrote on page 2 in the 2nd paragraph in the Introduction section:

*Both lamb and pork carry a higher risk of toxoplasma infection than beef and poultry, because of the fact that, animal that is reared outdoors may have greater risk of environmental exposure to the disease than the animal reared indoors (22).*

The reference (22) study compared 14 swine confinement operations with 14 operations that raised swine outdoors. These operations were not randomly selected so the data cannot be extrapolated to be representative of the national herd. Dr. Chowdhury correctly captures the idea that animals raised indoors are thought to be at less risk for toxoplasmosis than animals raised outdoors; however, he includes in his statement an unreferenced point *Both lamb and pork carry a higher risk of toxoplasma infection than beef and poultry* and makes an erroneous association between the two facts without any evidence to support his conclusion that the two facts are related. In fact, lamb and beef are mostly raised outdoors, but beef has low prevalence of Toxoplasmosis. Pigs and poultry are mostly raised indoors, but pork is associated with toxoplasmosis risk to humans. Also, the statement would be clearer if it said "*..carry a higher risk of toxoplasma infection* **[to humans]**...", which I presume to be the intent because lamb, pork, beef and poultry are descriptors for animal-derived food products for human consumption.

5.  Dr. Chowdhury uses reference (22) in the Risk Factors section on page 7. Apart from errors in capitalization and a repeat word, he extracts the less pertinent fact of who wrote the paper instead of the important scientific fact of where the study was conducted. North Carolina is now the second-largest swine-producing state and accounts for over 10% of production in the USA; the authors of reference (22) include this statement in their paper.

*Studies conducted by the Department of economics[sic], IOWA State University (11, 12) and the department [sic] of Food Animal and and [sic] Equine Medicine, College of Veterinary Medicine, North Carolina State University (22)*

Reference (22) study work was conducted in North Carolina, but the collaborators included scientists from the College of Veterinary Medicine at North Carolina State University, ARS Beltsville, MD, and the Collage of Veterinary Medicine at the University of Tennessee. He should have either stated that the study was led by the department of Food Animal and Equine Medicine, College of Veterinary Medicine, North Carolina State University in collaboration with the other authors or simply used the more important fact that the study was conducted on swine in the state of North Carolina

6.  In the section Human Infection on page 6, 2nd paragraph Dr. Chowdhury wrote:

*Humans can become infected when they come into contact with T. gondii eggs while cleaning a cat's litter box, gardening, or playing in a sandbox (13, 20, 21, 22, 23, 24, 25, 33, 36). Humans can also get toxoplasma infection by congenital transmission from the infected mother (21, 22, 25, 36)*

The paper states the Risk Factors section on page 8:

274

*The association of cats and infection of toxoplasmosis among pregnant women is difficult to assess by epidemiological surveys because soil, not the cats, is the main culprit; and oocysts are not found on cat fur and are often buried in soil along with cat feces. Therefore, direct contact with cats is irrelevant with respect to T gondii transmission, and soil contact is universal and difficult to avoid (24).*

The statement that contact with cats poses no risk and contact with cat feces poses a risk is correct.    Dr. Chowdhury substituted "pregnant women" when "human" was used by the authors in reference (24).  Pregnant women is a subset of human, but the original author may have selected a broader term because the point made applies to people overall and is not limited to pregnant women. It is unclear why Dr. Chowdhury made this change.  Other than this change the text is inappropriately lifted verbatim from the reference.

Reference (24):

The association of cats and human toxoplasmosis is difficult to assess by epidemiological surveys because soil, not the cats, is the main culprit.  Oocysts are not found on cat fur and are often buried in soil along with cat faeces.  Therefore, direct contact with cats is irrelevant with respect to T. gondii transmission, and soil contact is universal and difficult to avoid.

Later in the paper the author recommends that pregnant women and children should avoid contact with household cats and their feces.  There is no explanation why the cats should be avoided when, as Dr. Chowdhury previously stated, there is no risk from cats.  Additionally this assertion is unreferenced.  I found a statement in reference (36), which Dr. Chowdhury did not use, that states people can be exposed if they put their hands in their mouths without washing them after handling cats There is also no mention in Dr. Chowdhury's discussion of this issue a most basic veterinary scientific fact that only sporulated oocysts pose a risk of infection, and it take time for cysts to sporulate in cat feces. This point exists in reference (33) but not used by Dr. Chowdhury in his paper.

The organization of the paper needs significant improvement:

The abstract includes a lot of data.  It is a compilation of facts strung together with no apparent key points.  Identifying key points would have required analysis of the information found in the references used by Dr. Chowdhury.  Apparently there was little to no analysis. There are no topic sentences.  There are no summary statements that would inform the reader what the paper includes or concludes.

Dr. Chowdhury stated that it is a paradox that pork is considered a main source of Toxoplasmosis but the long standing cooking practices in the United Stated (consumers cook pork well done) should eliminate the risk.  The paper mentions a few alternative sources of Toxoplasmosis in people, but never explores alternative reasons for pork being high risk.

Dr. Chowdhury includes geographical data that suggests, but no analysis or explanation of how climate or geography might contribute to the prevalence of Toxoplasmosis.

In the body of the paper, paragraphs in many instances lack a topic sentence and supporting facts. Dr. Chowdhury was encouraged to develop an outline for his paper and share it with his supervisor.  An outline would have helped ensure that there were topic sentences describing key points from his analysis of the information he researched.  An outline would also have organized supporting facts for the key points.  He chose not to do this.

Dr. Chowdhury cites reference (22) in the Risk Factors section on page 7:

*have found significant associations between toxoplasma infections and factors*

275

*of herd management. These factors were: 1) method of rodent control, 2) type of production facility, and 3) access of cats to production facilities. Sows and market hogs exposed to cats in the production facilities were significantly more likely to be positive for T. gondii than sows and market hogs not exposed to cats. Pig herds in confinement have lower levels of T. gondii infection (2.3%) than pig herds in non-confinement facilities (4.4%). Significant relation was seen between the T. gondii positive hogs and farm management practice to control cats and rodent access to hogs. These studies concluded that management practice in modern production systems appear to be adequate to virtually eliminate the risk of infection of finishing pigs (12, 22).*

He lists three factors but then does not follow a parallel order for the supporting statements. The first supporting statement is about cats in production facilities but this is the third point on his list of factors. This makes the information hard to follow and does not clearly support the point being made. He lists rodent control as a separate factor from access to cats when is more scientifically sound to cover both under a single topic -- exclusion of pests that carry Toxoplasmosis cysts, including flies, birds, cats and rodents. All of these pests are described within reference (22). He does not provide enough detail from reference (22) about specific management practices that would support his point that confinement operations differ from outdoor operations in Toxoplasmosis prevalence and explain the difference.

7.    Under the Etiology and Transmission Section

*Oocysts shed in cat feces can persist for months or years in the environment in an infectious form (12, 25, 33, 36).*

This is lifted verbatim from reference (11) but in not properly referenced in Dr. Chowdhury's paper.

<u>Oocysts shed in cat feces can persist for months or years in the environment in an infectious form</u> (Frenkel et al., 1975)

In addition, Dr. Chowdhury lists references (12), (33) or (36)that do not support the point that oocycts persist in the environment. These references only contains the information that cats shed oocysts in their feces. Reference (25) does contain a statement about oocysts persisting in the environment.

8.    The Etiology and Transmission section is a compilation of sentences, lifted for the most part verbatim from the references which are underlined below:

*<u>Toxoplasmosis is caused by a single-celled microscopic intracellular protozoan parasite called as [sic] Toxoplasma gondii.</u>*[from (25) one word change from **"known" to "called"**] *Cats are the only primary host since all the developing stages occur in the cat and not in other animals. <u>Cats become infected by eating rodents and birds infected with the organism.</u>* **[from (25) with deletion of "the primary carriers of the organism" after the word "cat"]** *<u>Once ingested, the organism reproduces in the cat intestine producing millions of oocysts, which are excreted in cat feces daily approximately for two weeks.</u>* **[from (25) with "cat intestine" used in place of "the intestines of cats"** *<u>Oocysts shed in cat feces can persist for months or years in the environment in an infectious form (12, 25, 33, 36).</u>* **[from (11) which was not cited in this instance by Dr. Chowdhury, only (25) of the four references cited addresses this specific point, and this is not a peer reviewed reference]** *In the*

276

*United States, it is estimated that approximately 30% of cats have been infected by T. gondii (25).* **[(25) verbatim]** *However, all species of birds and mammals can be carriers of T. gondii.* **[(12) verbatim]***Humans can get the infection by eating contaminated raw or partly cooked meat especially pork, lamb, or venison; or by touching contaminated hands to the mouth (33).* **[(33) verbatim, also not a peer reviewed reference]** *Domestic animals can become infected by eating oocysts from a contaminated environment (feed contaminated by cat's feces) or by eating raw or poorly cooked meats that are contaminated by the cat feces or rodents (12).* **[(12) verbatim replacing "Hogs" with "Domesticated animal"; this makes a broader claim than is supported by this one reference].**

Also, the statement *"Cats are the only primary host since all the developing stages occur in the cat and not in other animals."* is not scientifically accurate. Cats and other felines are the only *definitive* host – meaning the **only** host where the parasite completes its life cycle and produces oocysts (eggs). This is clearly stated in reference (12) and is a basic fact learned by every veterinarian during their training in parasitology.  By using "primary host" and only discussing household cats, Dr. Chowdhury misleads the reader to believe there are several hosts where the parasite can complete its life cycle .

Dr. Chowdhury also does not clearly explain in the paper the life cycle of *Toxoplasma gondii,* which would made it clearer to the reader the foodborne significance of the parasite because of the intermediate hosts – sheep, goats, rodents, swine, cattle, chickens and birds – which carry the infective stage (cystozoite or bradyzoite) encysted in tissues, especially muscle and brain, and persist possibly for the life of the animal.

277

TP-4

# MEMO           ZDRSD           ZB

To:        File

From:      Delila Parham

Subject:   Review of the paper, "Seroprevalence of *Toxoplasma gondii* infection on various
           food animal species in the United States of America and its public health
           significance," written by Dr. Khurshed Chowdhury

**General:** The paper is poorly written. Most apparent is the number of edits needed in the paper
for grammar, punctuation, and spelling errors, making it difficult to concentrate on the paper's
scientific content. In the paper, data are strung together with little attempt to analyze or interpret
it or arrange it in a coherent and rational manner that provides order throughout the paper. There
is inconsistency in style and use of terms; for example, the paper uses USA, United States, states
of America, United States of America, and so forth. Material is often improperly referenced or
missing a reference and much of it has been plagiarized. In some cases the literature seems to be
misunderstood or misinterpreted. Several sentences are lifted directly from the literature and
given what may have been considered minor word changes that resulted in erroneous statements.
A statement made at one point in the paper may contradict itself later in the paper. It lacks a
proper summary, conclusion, or discussion that pulls all the material together and makes the
review relevant.

As written, the paper falls far short of its intended purpose, and would require extensive changes
and modifications to make it acceptable for publication. The following is a more detailed review
of the paper by sections. Not all changes or modifications needed are discussed here. Few, if any,
grammar, spelling, and punctuation errors are discussed.

**Abstract:**
- The abstract is too long and does not highlight the relevant aspects of the paper.
- Several studies are mentioned, but without dates it is unclear when the studies were done or if
  they would be considered relevant today.
- Several statements are contradictory in the abstract. For example, at the beginning of the
  abstract it states that seroprevalence studies for sheep are rare or inadequate for proper survey
  of the status in this species. Yet, later in the abstract, extensive percentages for sheep are
  provided.
- *Trichinella spiralis* is mentioned in the abstract, but no clear explanation is given about the
  relationship between this organism and *T. gondii*.
- *Human infection is related to infection in pigs without a clear explanation why it is related.*
- As written, it is unclear how the other sources of infection such as dietary sources would
  contribute to toxoplasmosis infection in humans, which may be more related to punctuation
  than the examples given.
- The statement that "pregnant women may not get *T. gondii* infection by direct contact with
  cats, as the oocysts are not found on the cat fur and are often buried in soil along with cat

278

TP-5

Hi Alice,

I appreciate the opportunity to review this document. To put it bluntly, this document should not proceed further in the review or clearance process without first undergoing substantial changes and rewriting. I would not clear this document if it was sent to me for that purpose, nor would I attempt to edit it because there are simply too many problems. This document is not ready for review. Overall, the main idea of the paper is lost on the reader. It is poorly organized and difficult to follow. The document seems as though it is pieced together. As a result, there is no flow of information and the document seems to jump from idea to idea, never fully explaining the main point.

To simplify some of my comments, I've tried to organize them in to several categories. These by no means covers all of my comments, but it does provide a general overview of the types of errors I've noted. If necessary, I would be happy to further explain any of these comments or discuss additional items that I did not include here.

Katie

References to Studies

Many studies are 'cited' throughout this paper, but no real information on what these studies are or what the results show is presented. Percentages are used as evidence of various points, but since the true numbers from the studies are not shown (i.e. When 20% is presented as a finding from a study, what does that mean? Is it 20/100? 1/5?). The percentages cannot be truly helpful if they are not put in context.

Timeframes of when studies were conducted are also not used, and instead, vague references are used. Referring to a study as "more recent" or "much earlier" is not helpful unless you have a proper timeline on which to view the results. One study is referred to as "very recent." This is ambiguous though since 'recent' is not a standard unit of measuring time.

In addition to the use of undefined timeframes, geographical regions are referred to throughout the paper without being explained. On page 4, the first sentence in the second paragraph includes the phrase, "…samples from pork obtained from the US retail meat stores from 28 major geographic areas (the Midwest, South, Western, and Northeastern) of the United States…" There are several problems with this. First, it refers to 28 regions, then goes on to parenthetically mention four regions. Where are the other 24? In addition, the four U.S. regions that are cited are not defined. Where are the lines drawn between the Midwest, South, Western, and Northeastern regions? The information associated with this is not useful if the reader does not know what is being referred to. Beyond the regional references, the sentence says that samples were collected from "…the US retail meat stores…" This seems to imply that samples were collected from all retail meat stores, when it was likely just a sampling. Similar references to undefined regions, and at least one other reference to what could imply sampling from all stores in a region, are found in the paper.



When percentages from one of the many studies mentioned in this paper are cited, the sentences are often phrased poorly and confuse the true meaning of the percentage. For example, on page 1, a sentence reads (as written), "Average sero-positive sheep were 20.1%, and average seropositive goats were 22.1% in the US, and sheep slaughtered in the northeastern United States have an average of 58.6%, which may indicates that sheep industry of these areas are having economic impact due to toxoplasma infection." It is not clear what the 20.1% refers to. How are average sheep 20.1%? If the intended meaning was that 20.1% of sheep were seropositive, then the sentence in the document is written incorrectly. Also, by saying that, "...the sheep industry of these areas are having economic impact due to toxoplasma infection..." the sentence implies that the sheep industry is having an impact, not that it is being impacted.

On page 3, in the first full paragraph, it reads, "In a national survey of seroprevalenc for *T. gondii* in pigs from various pig producing states of America the seropositive pigs were highly variable..." This implies that the pigs themselves were highly variable, when I assume that the intended meaning is that the levels of *T. gondii* in these pigs were varied. Also, how is a survey national if it is representing only various pig producing states?

I chose to simply highlight a few examples regarding references to studies, but the point is that overall, the information reads as a list of random percentages and points that do not come together.

Inconsistencies
Throughout the paper, the author seems to switch at random between using the words pigs, swine, and hogs. While similar, these terms cannot be used interchangeably.

Related to the first item, references to 'pork' are varied. The author refers to "pig meat" on page 1, "meat (pork)" also on page 1, and "pork meat" on page 3. There are other instances of these same phrases being used in the paper. FSIS refers to the meat simply as pork.

The United States is referred to alternately as "US," "America," "United States of America," and even "United Sates of America." The author must be consistent.

Awkward Phrasing
There are numerous instances of awkwardly phrased sentences throughout the paper. The odd wording makes sentences difficult to understand and often times, not make sense at all.

On page 1, one sentence includes the phrase, "...consumer risk of purchasing pork from *the retail stores in the US is 0.4765% for ten year period.*" What does this mean? The same sentence is repeated on page 4.

On page 4, in the first paragraph, one sentence reads, "High prevalence of viable *T. gondii* in 51 out of 55 market weight pigs (destined for human consumption) were seen in

280

a known *T. gondii* positive pig farm in Massachusetts." Is there a particular level that characterizes "high prevalence?"

Also on page 4, in the third paragraph, it reads, "Toxoplasmosis in sheep occurs in all countries where the sheep industry developed. The disease has considerable economic importance and public health significance among sheep of Australia, New Zealand, Britain, Denmark, Russia, Turkey, and America. The disease can be spread by meat borne source." In the first sentence, it is not clear what countries are being referred to. Is it referencing the countries listed in the next sentence? The second sentence implies that the disease is economically important amongst sheep, when in fact the disease's impact on sheep is economically important. The final sentence is poorly written.

On page 5, in the last paragraph on the page, the second sentence begins with "Nevertheless..." though nothing in it contradicts or disagrees with the information in the first sentence.

On page 6, in the first full paragraph, the third sentence reads, "Others claimed that 30 to 60% of adult human beings in the United States have been infected with *Toxoplasma gondii* judging from antibody data." What others are being referenced?

On page 8, in the fourth paragraph, under "Consumer's safe practices," the information does not just apply to protecting consumers from *T. gondii*. The first sentence, that says all meat should be cooked according to standards until regulations requiring examination for *T. gondii* infection are implemented, is simply incorrect. Even if the agency does implement this testing, consumers should still following safe handling and preparation guidance to avoid potential illness or cross contamination from other pathogens. Advising otherwise is irresponsible.

On page 8 and in to page 9, the author recommends that pregnant women and children stay away from household cats and cat litter, yet on page 1, the author says that, "Pregnant women may not get *T. gondii* infection by the direct contact with cats..." This is a major inconsistency in the paper.

Other errors
It is also very clear that this document was not spell checked nor does it seem that the author reviewed his or her own work in anyway. "United States" is misspelled in the very first line of the document. In many instances, words are missing from sentences. In other places, there are extra words in sentences. Either way, these errors should have been caught in an initial review by the author. Spelling, punctuation, grammatical, and other such errors are prevalent in the document. I will not list them here since they are extensive, but I would be happy to discuss them if necessary.

Katie Pritchard
Office of Public Health Science

281

Food Safety and Inspection Service
(734) 769-0253

282

*TP-b*

*Confidential    1-11-06*

Dr. Parham (Delila)

I'm not good with electronic correction/editing etc., so please accept my comments in traditional style.

In general, the document is a helpful regurgitation (review) of information on Toxoplasmosis. There are, however, numerous grammatical errors and needs additional/critical wordsmithing. I suggest that the author review and make appropriate corrections, entries and changes prior to further distribution.

A paragraph or so on conclusion of the paper and future considerations for research (i.e., developing a vaccine) may be useful, but not necessary.

Other than that, please note comments re the paper. FEH

P.S. Author also leans heavily on Dubey et. al., in same 1990 AVMA journal.


F. Erich Hemphill, DVM, Ph.D.
Chief, OPHS - AEPFSB

-----Original Message-----
**From:** Parham, Delila
**Sent:** Monday, January 09, 2006 2:45 PM
**To:** Hemphill, Erich
**Subject:** FW: Toxoplasma Review Paper (First Draft)

Dr. Hemphill, please review as discussed. Your comments on all aspects of the paper will be greatly appreciated.

Delila

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Friday, December 30, 2005 11:01 AM
**To:** Parham, Delila
**Cc:** Thaler, Alice
**Subject:** Toxoplasma Review Paper (First Draft)

Hi Delila,

Please find the attached toxoplasma literature review paper for your perusal. I am happy that finally I have completed the paper which I am hoping to publish in some journal. I have put my 100% efforts and concentration to make this review paper within this short period upon the available targeted literature. In January 2006, I am hoping to make another fine tuning in the related literature search (if I have missed anything on seroprevalence study in the US), which I am planning to ad in this paper, to make its validity more prudent. Of course, I shall have to send this paper to some expert/experts to review before I submit it to the journal.

Although, I have styled this paper for the J. of food protection, I might chose some other journal (such as JAVMA who will welcome this paper better), and then I will simply change the style of the respective journal. Thank you very much.

Have a nice holiday and a happy new year!


Khurshed

*283*

Date: December 30, 2005
(First Draft)

**Title: Seroprevalence of *Toxoplasma gondii* infection in various food animal species in the United States of America and its public health significance**

(Authors)

## Abstract

Available seroprevalence studies conducted on the swine populations in the United States were moderately adequate. Seroprevalence studies conducted for sheep, goats, cattle, and chicken were either inadequate for proper survey of the status of toxoplasma prevalence in these species. Seropositive pigs are highly variable from state to state, also from one study to another study—ranging from as low as1% in Colorado to 36% in Wisconsin and 69% in Georgia. In the swine populations, *Toxoplasma gondii* antibodies were more prevalent in breeding swine (An average: 13.2%) than among finishing swine (An average: 4.3%), and prevalence of *T. gondii* was markedly lower among the swine raised in confinement (An average: 9.3%) than the pig herds in non-confinement facilities (An average: 14.1%). Significant relation was seen between the *T. gondii* positive hogs and farm management practices and control of cats and rodent access to hogs. About 15 to 25% apparently healthy pigs in the US are estimated to be infected by *T. gondii* as determined by serological survey. Average seropositive pig meat from the US retail stores was 0.38%; and consumer risk of purchasing pork from the retail stores in the US is 0.4765% for ten year period. And meat (pork) sampled from the northeastern United States had a higher seroprevalence for *T. gondii* than the Midwest, and Southwestern US. The incidence of Toxoplasma infection in pigs has decreased significantly in the past decades coinciding with the change from outdoor rearing systems to modern confinement operations. Average sero-positive sheep were 20.1%, and average seropositive goats were 22.1% in the US, and sheep slaughtered in the northeastern United States have an average of 58.56%, which may indicate that sheep industry of these areas are having economic impact due to toxoplasma infection. Although the general consensus is that ingestion of raw or undercooked pork is the prime source of *T. gondii* infection in humans, but it remains somewhat paradoxical because most consumers, since childhood, are aware of the danger of eating raw pork for fear of *Trichinella spiralis* infection. The prevalence of *T. gondii* infection in the human population is fairly stable (average around 30-40%) and has not been decreased in spite of a decrease of *T. gondii* infection in pigs. Therefore, extensive studies are needed to learn about the other sources of *T. gondii* infection in humans, such as dietary habits (e.g., soil on fruits and vegetables, from gardening, and soil related occupations, unfiltered water) and other sources of meat consumed in the United States. Seropositive cattle and chicken for *T. gondii* antibodies were uncommon in several studies, and risk to consumers of purchasing beef and poultry from the US retail stores is considered to be zero at this time. Pregnant women may not get *T. gondii* infection by the direct contact with cats, as the oocysts are not found on cat fur and are often buried in soil along with

284

cat feces, and pregnant women probably get the diseases from the contaminated soil by cat feces. General sanitation and steps to consume safe foods, minimizing environmental exposure to the *toxoplasma oocysts,* are the best possible methods of controlling toxoplasma gondii infection in man and animals.

## Introduction

Toxoplasmosis is an infectious disease caused by the protozoan parasite *Toxoplasma gondii* which affects enzootically a wide variety of animal hosts including man. The parasite is worldwide in distribution. Serologic surveys indicate that infection is widespread in most domestic animals; however, except for abortions in sheep and goats, overt disease is sporadic and rare. Although variable in different parts of the United States, the proportion of swine and sheep with *T. gondii* antibodies ranges from 15 to 50%. The acute parasitemia manifestations of the diseases are characterized by pneumonia, trembling, shaking of the head, lymphadenitis, hepatitis, splenomegaly, ulcerative and fibronecrotic colitis, and acute inflamed musculature. The organism may be demonstrated in tissue sections, but diagnosis should be supported by serology since it can be confused with other protozoans *(20, 25).*

Antibody titers are common in pigs, sheep, and goats; less common or rare in horses and cattle. Congenital infections are an important cause of abortions and stillbirths in humans and animals. Both lamb and pork carry a higher risk of *toxoplasma* infection than beef and poultry, because of the fact that, animal that is reared outdoors may have greater risk of environmental exposure to the disease than the animal reared indoors *(22).* The purpose of this review report was to investigate the prevalence of *T. gondii* in various food animal species in the United States of America and to examine the potential role of meat as the vehicle of *T. gondii* infection in humans.

## Etiology and Transmission

Toxoplasmosis is caused by a single-celled microscopic intracellular protozoan parasite called as *Toxoplasma gondii.* Cats are the only primary host since all the developing stages occur in the cat and not in other animals. Cats become infected by eating rodents and birds infected with the organism. Once ingested, the organism reproduces in the cat intestine producing millions of oocysts, which are excreted in cat feces daily approximately for two weeks. Oocysts shed in cat feces can persist for months or years in the environment in an infectious form *(12, 25, 33, 36).* In the United States, it is estimated that approximately 30% of cats have been infected by *T. gondii (25).* However, all species of birds and mammals can be carriers of *T. gondii.* Humans can get the infection by eating contaminated raw or partly cooked meat especially pork, lamb, or venison; or by touching contaminated hands to the mouth *(33).* Domestic animals can become infected by eating oocysts from a contaminated environment (feed, contaminated by cat's feces) or by eating raw or poorly cooked meats that are contaminated by the cat feces or rodents *(12).*

In a field epidemiological surveillance study in 47 swine farms in Illinois, USA, it was

confirmed that the rodents, contaminated feed, and soil was the main source of toxoplasma gondii transmission to swine in the farm. This same investigation also confirmed that all mammalian wild animals (cats, raccoons, opossums, skunks, house mice, white-footed mice, rats) serve as the main reservoirs of *T. gondii* infection in swine *(23)*.

**Seroprevalence of *Toxoplasma gondii* in various food animal species.**

**Swine**

*Toxoplasma* infection in swine is believed to be widespread and is an important food safety issue, though some controversy or doubt does exists about the role of pork meat as a risk factor for human toxoplasmosis, and it is believed that a number of studies have found no association between meat consumption and human toxoplasmosis *(11)*. *T. gondii* generally does not make pigs ill and the parasites can stay in the edible tissues of pigs for years, perhaps for life. *T. gondii* cysts can be found in virtually all body muscles of pigs *(20)*. Experimental survey by the department of veterinary microbiology and preventive medicine in Iowa has found that toxoplasma was more prevalent in breeding swine (sows and gilts) than among finishing (market hogs) swine. Seroprevalence by using 'enzyme-linked immunosorbent assay' (ELISA) test was 5.4% in finishing swine and 11.4% among sows and gilts *(1)*. In a national survey of seroprevalenc for *T. gondii* in pigs from various pig producing states of America the seropositive pigs were highly variable; and seroprevalence of *T. gondii* in pigs revealed an infection rate ranging from less than 2% to up to 69%, and the Georgia had the highest (69%) of seroprevalence *(2)*. In a seroprevalence study among the swine population from 47 swine farms in Illinois, USA, it was found that the rates of *T. gondii* infection was 15.1% in sows and 2.3% in finisher pigs. About 15 to 25% of apparently healthy pigs in th US are estimated to be infected by *T. gondii*, as determined by serological tests *(23)*.

IOWA State University conducted two major seroprevalence studies *(11, 12)* for estimations of *T. gondii* levels in different swine operations by different States, by using Modified Agglutination test (MAT). First study included 16 (sixteen) States (Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Carolina, Ohio, Pennsylvania, South Dakota, Tennessee, and Wisconsin). Data have been obtained from the National Animal Health Monitoring System (NAHMS) swine survey in 1995. Variations of seropositive pigs for *T. gondii* was from 2-22% with an average of 15.1% in sows (breeding pigs); and 0.3-10% with an average of 3.2% in market hogs (Finishers), and over all seropositive pigs were 8% percent *(11)*. The second study (Iowa State University) included 17 States (Alabama, California, Colorado, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Nebraska, N. Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Virginia, and Wisconsin) and study was conducted between the period from 1989-1990. Random serum samples were collected from farrowing sows from 394 hog farms in the above mentioned states of the U.S. as part of NAHMS 1990 National Swine Survey for *T. gondii* antibodies. In this study range of seropositive pigs for *T. gondii* prevalence among the various states of America varied from as low as 1% in Colorado and as high as 36% in Wisconsin, and average

286

seroprevalence was 19% positive for *T. gondii* antibody *(12)*.

An earlier study of seroprevalence of *T. gondii* in swine in Lousiana was 24.6%; and pigs slaughtered during cold weather months had higher (28.0%) *toxo* antibodies than pigs slaughtered during warmer months which had (17.6%) *toxoplasma* antibodies (27). High prevalence of viable *T. gondii* in 51 out 55 market weight pigs (destined for human consumption) were seen in a known *T. gondii* positive pig farm in Massachusetts. This farm was considered as isolated foci of infected pigs, because, in general prevalence of *T. gondii* in market pigs (finishers) in the United States is declining because of good management *(16)*. In a recent serological survey of pigs of variable age from 85 New England pig farms showed an overall seroprevalence of 47%, with 91% of the herds having at least one seropositive pig, and within-herd prevalence varied between 4 and 100%. Seroprevalence of *T. gondii* antibodies in 163 wild mammals and birds captured around the pig farms were an average of 13.1% percent *(13)*.

Most recent study for surveying the prevalence of *T. gondii* in 2,094 meat samples from pork obtained from the US retail meat stores from 28 major geographic areas (the Midwest, South, Western, and Northeastern) of the United States have been conducted. This was a statistically valid study for the actual prevalence of *T. gondii* in **pork** from the retail meat stores in the United States of America. Among the pork samples, 7 cats fed pooled samples (of pork), were positive for *T. gondii* in cats and mouse bioassay. Out of 2,094 pork samples only 12 samples were ELISA positive for *T. gondii* antibody. Based on the findings of bioassay and ELISA test positive pork samples, the percentage of positive pork meat from retail stores were only 0.38%. According to this study risk of purchasing *T. gondii* contaminated pork meat from the US retail stores is .4765% over a period of ten years *(10)*.

**Sheep and Goats**

Ovine *toxoplasmosis*, a sub acute or chronic infection, is characterized by placentitis, fetal encephalitis, abortions, and stillbirths and is caused by *Toxoplasma gondii*, an isoporal coccidium of cats. Toxoplasmosis in sheep occurs in all countries where the sheep industry developed. The disease has considerable economic importance and public health significance among sheep of Australia, New Zealand, Britain, Denmark, Russia, Turkey, and America. The disease can be spread by meat borne source *(31)*. Literature search indicate that seroprevalence studies in sheep and goats are very limited in the United States of America, though studies on sheep and goats are fairly extensive in other countries of the world.

In an experimental seroprevalence survey of blood samples of 654 slaughtered sheep from 9 states, it was observed that the sheep slaughtered in the northeastern United States have an average of 58.56% prevalence of antibodies to Toxoplasma,i.e. adult sheep had 62.46% and lambs had 55.07% infection. It was also observed that sheep's immunity due to *T. gondii* is life-long and that sheep rarely abort twice because of *toxoplasmosis (5)*. Seroprevalence study using fluids from a total of 1,064 aborted fetuses and dead lambs from the north central United States were carried out in which it was observed that 20.9%

fluid samples were positive for toxoplasma gondii antibodies. In the same study the cause of abortion in sheep by toxoplasmosis infections were 17.5%. By examining tissues from the fetuses and dead lambs it was also observed that *T. gondii* infection can cause hepatitis, myocarditis, encephalitis, and pneumonia in aborted lambs *(6)*. Other seroprevalence study using body fluids from the total of 586 aborted fetuses and dead lambs were conducted in Oregon diagnostic laboratory, United States of America during1983-89. Seropositive *T. gondii* antibodies were found in 20.1% of the fluid samples, and the cause of abortion due to *toxoplasma gondii* infection in sheep was found to be 12.6%. Epizotic inquiry indicated that most ewes in the above study in the Oregon became infected with the *T. gondii* via contaminated feed, because cats are known to defecate in hay used to feed sheep (7).

Among domestic food animals, *T. gondii* is most pathogenic for domestic goats, because ingestion of toxoplasma oocysts from cat feces is the main mode of primary infection in goats. *Toxoplasma gondii* can cause abortion, stillbirth, weak kids, and death in young and adult goats *(29)*. In a serological study *Toxoplasma gondii* antibodies were detected in 22.1% of 1000 goats tested from the northwestern states of US during the period of 1982-1984. Seroprevalence was higher in the older (1 year old) goats than the younger goats (six month old) *(3)*. Prevalence of *T. gondii* in dairy goats is 21 to 60%, and clinical infection and unlike sheep; *T. gondii* can cause encephalitis, nephritis, hepatitis, necrotizing abomasitis, enteritis, and cystitis in adult goats *(4)*.

## Cattle

Sero-prevalence and clinical disease is uncommon in cattle and naturally acquired disease in cattle has not been detected after inoculating with *Toxoplasma gondii (8, 30)*. The importance of seroprevalence in cattle with respect to persistent infection is not known. A mixer of various tissues from 350 cattle Ohio abattoir fed to 12 specific-pathogen-free cats failed to exhibit *toxoplasma oocysts* from the cat feces *(30)*. Results from experimentally infected cattle indicated that, at least dairy cattle are resistant to *T. gondii* and eliminate the number of *T. gondii* from their tissues *(8)*.

In a recent study for surveying the seroprevalence of *T. gondii* in 2,094 meat samples from beef from the retail stores in the Midwest, South, Western, and Northeastern United States were all negative for ELISA test and also negative in bioassay (cat and mouse). Risk to consumers of purchasing *T. gondii* contaminated beef from US retail stores is zero *(10)*. Further investigative studies of the seroprevalence of *T. gondii* antibodies in live cattle should be done in the United States before it can be determine whether beef plays any important role in the epidemiology of *toxoplasmosis* in humans *(10, 30, 32, 35)*.

## Chicken

Only sporadic outbreaks of toxoplasmosis in chickens have been reported. Nevertheless, the disease is uncommon in chickens and is of little significance to the poultry industry *(32)*. In a very recent study for surveying the seroprevalence of *T. gondii* in 2,094 meat

288

samples from chicken from the retail stores in the Midwest, South, Western, and Northeastern United States were negative for ELISA test and also negative in bioassay by using cat and mouse. Risk to consumers of purchasing *T. gondii* contaminated chicken from US retail stores is zero *(10)*

*Conclusion of the study ??*

## Human infection

Approximately 30%-40% of human adults in the USA are estimated to have antibodies to *Toxoplasma gondii*. In the U.S. and similar urbanized societies, most people become infected during their teens or adulthood *(33)*. Others claimed that 30 to 60% of adult human beings in the United States have been infected with *Toxoplasma gondii* judging from antibody data *(9, 20, 23)*. Worldwide, the infection rates could range from 3%-70% depending on the populations or geographic areas studied *(18)*. Most infections by *Toxoplasma* in humans are asymptomatic, and only a small number give rise to a brief flu like illness that usually remains undiagnosed. However, persons with weakened immune systems such as those with HIV/AIDS infection, organ transplant recipients, individuals undergoing chemotherapy, and infants may develop **severe toxoplasmosis**. Severe toxoplasmosis may result in damage to the eyes or brain *(36)*. Once infected an individual is immune to reinfection. The incubation period ranges from several days to months *(9, 33, 36)*.

The main method of human contracting *T. gondii* is by eating cyst contaminated raw or undercooked meat from pork, lamb, goat, venison or wild game meat, vegetables, fruits, or milk products; or by drinking untreated water, or by touching contaminated hands to mouth after handling undercooked meat *(33, 36)*. Humans can become infected when they come into contact with *T. gondii* eggs while cleaning a cat's litter box, gardening, or playing in a sandbox *(13, 20, 21, 22, 23, 24, 25, 33, 36)*. Humans can also get *toxoplasma* infection by congenital transmission from the infected mother *(21, 22, 25, 36)* *Toxoplasma* infection acquired during pregnancy is rarely recognized; however, because of maternal parasitemia, the fetus is always at risk. The rate of placental transmission has been calculated to be between 17 and 25% when maternal infection develop during the first and second trimester, and 65% when infection develops in the third trimester *(9)*. It is estimated that approximately 400-4,000 children are born with congenital *T. gondii* infection in the United States each year *(9, 36)*. Toxoplasma gondii may cause mental retardation, loss of vision, and birth defects in children whose mothers acquired *T. gondii* during their first time pregnancy *(20, 36)*. Estimated national average of American pregnant women exposure to Toxoplasm is about 14-15%, and total annual economical loss could be between in the range of $368 million to $8.7 billion for the infants estimated to be born each year with congenital *toxoplasmosis (15, 19)*.

## Public health risk from the meat

Meat from pork, lamb and goat carry a higher risk of *toxoplasma* infection for humans than beef and poultry, because of the fact that, animal that are reared outdoors may have greater risk of environmental exposure to the disease than the animal reared indoors *(12, 22)*. Risk to consumers of purchasing *T. gondii* contaminated beef and chicken from US



289

6

retail stores is zero, according to a recent study *(10)*. Traditionally, pork has been considered a major source of *T. gondii* for humans *(18)*. Recently, the Centers for Disease Control reported that up to half of human exposures to *Toxoplasma* are from foodborne sources and consumer advocacy groups are now pointing to meat especially pork as a source of infection causing birth defects in newborns *(19, 37)*.

However, according to a very recent study risk of purchasing *T. gondii* contaminated pork meat from the US retail stores is .4765% over a period of ten years. Risk of purchasing *T. gondii* contaminated pork meat from the retail stores in the Midwest, South, and Western United States is .3391% (over a ten year period); and in the retail stores in the northeastern United States is .7812% (over a ten year period). This study has concluded that meat (pork) sampled from the northeastern United States had a higher prevalence for *T. gondii* than the Midwest, and Southwestern United States *(10)*. This study has provided an accurate picture of the risk of exposure to *T. gondii* in the retail meats in the US markets. Over all, the prevalence of viable *T. gondii* in retail meat (pork) was very low in meat sold in retail stores in the the United States. Moreover, modern procedures of improved management and production practices have dramatically decreased the prevalence of *T. gondii* infection in pigs *(18)*.

Although, the general consensus is that ingestion of uncooked pork is the prime source of *T. gondii* infection in humans, but it is somewhat paradoxical because most consumers, since childhood, are aware of the danger of eating raw pork for fear of *Trichinella spiralis* infection. Since the prevalence of *T. gondii* infection in the human population is fairly stable (around 20%), and has not been decreased in spite of a decrease of *T. gondii* infection in pigs, it is questionable whether humans get *T. gondii* infection from pork meat or from other foods. Therefore, extensive studies are needed to learn about the human dietary habits (e.g., soil on fruits and vegetables, from gardening, and soil related occupations, unfiltered water) and other sources of meat (wild game meats) consumed in the United States *(10)*

**Risk Factors**

Studies conducted by the Department of economics, IOWA State University *(11, 12)* and the department of Food Animal and and Equine Medicine, College of Veterinary Medicine, North Carolina State University *(22)* have found significant associations between *toxoplasma* infections and factors of herd management. These factors were: 1) method of rodent control, 2) type of production facility, and 3) access of cats to production facilities. Sows and market hogs exposed to cats in the production facilities were significantly more likely to be positive for *T. gondii* than sows and market hogs not exposed to cats. Pig herds in confinement have lower levels of *T. gondii* infection (2.3%) than pig herds in non-confinement facilities (4.4%). Significant relation was seen between the *T. gondii* positive hogs and farm management practice to control cats and rodent access to hogs. These studies concluded that management practice in modern production systems appear to be adequate to virtually eliminate the risk of infection of finishing pigs *(12, 22)*.

290

The association of cats and infection of toxoplasmosis among pregnant women is difficult to assess by epidemiological surveys because soil, not the cats, is the main culprit; and oocysts are not found on cat fur and are often buried in soil along with cat feces. Therefore, direct contact with cats is irrelevant with respect to *T gondii* transmission, and soil contact is universal and difficult to avoid *(24)*. Climate and to survival of oocysts in the environment may play important role,i,e. toxoplasmosis is more prevalent in warm, moist weather than cold or hot dry weather *(28)*. Receiving an infected organ transplant or blood transfusion, though this is rare, is the other risk factor of toxoplasma infection to humans *(33, 36)*.

## Control

Adequate preventive measures are the most practical methods to control the potential infection of *toxoplasma gondii*. General sanitation and steps to consume safe foods, minimizing environmental exposure to the *toxoplasma oocysts* are the best possible methods of controlling toxoplasma infection in man and animals *(26, 9, 3, 25, 14, 16, 17, 18, 33, 22)*. There are no efficient drugs to kill *toxoplasma gondii* cysts in animal and human tissues. Therefore, *Toxoplasma gondii* infection can best be prevented by minimizing exposure to the infective agent by adopting following measures.

**Pre-slaughter management:** These include total confinement of swine herd in bird-proofed buildings (likely to be cat proof), feed storage in enclosed silos. Do not feed uncooked garbage to swine and do not allow cats near swine houses. Keep cats out of the swine facilities and ensure cat feces do not contaminate feed and water. Adopt an effective rodent control program to minimize mouse and rat populations. Tighten biosecurity programs to keep wildlife, such as birds, skunks and raccoons, from accessing pigs and facilities. Remove dead pigs immediately to prevent cannibalism.

**Consumer's safe practices:** Ingestion of uncooked infected meat could be the main source of human infection with *T. gondii*. It has been recommended that until examination of meat for *T. gondii* infection is implemented in the slaughterhouse; all meat should be cooked according to industry guidelines before human consumption,in order to reduce the potential for transmission of *T. gondii* in humans,Fully cook all meats and poultry (micro waving may not adequately cook all portions fully and evenly) and consume only pasteurized dairy products. Freezing (to 10.4 F or -12C) and cooking foods to an internal temperature of 152 F will kill oocysts. When preparing raw meat, wash any cutting boards, sinks, knives, and other utensils that might have touched the raw meat thoroughly with soap and hot water to avoid cross-contaminating other foods. Wash vegetables and fruits thoroughly before eating. Those from home gardens are at higher risk of infection than commercially acquired. Wash hands thoroughly with soap and water after handling *potentially contaminated soil or after handling raw meats, poultry, or vegetables. Wear cotton or leather gloves when working in soil.

Pregnant women or women contemplating pregnancy should take extra precautions to prevent a toxoplasmosis infection. Keep pregnant woman and children away from household cats and cat litter. Vaccination of cats could reduce transmission of

*Need to check this here. Available commercial vaccines for cats etc.*

8

*Toxoplasma*, because all *Toxoplasma* infections, whether intermediate hosts or cats, ultimately depend on oocyst shedding from cats. To lessen the risk of cats becoming infected and shedding the oocyst, don't allow them outside; feed them only cooked meats or commercially dry, canned, or cooked cat foods. Cats often become infected by catching and eating rodents, birds, or other small mammals. Cats that become infected will shed the infective stage for approximately two weeks. Change litter boxes daily, disposing of used litter in sealed plastic bag or other container, before the infective stage matures. Cover sand boxes when not in use to prevent outdoor cats from using them as litter boxes and wash hands of children well after playing in the sandbox and prior to consuming food or drink.

## References

1. Zimmerman, Jeff J., David, W. Dreesen, William J. Owen, George W. Beran. 1990. Prevalence of toxoplasmosis in swine from Iowa. JAVMA, Vol. 196, No. 2, January 15.

2. Dubey, J.P. 1990. Status of toxoplasmosis in pigs in the United States. JAVMA, Vol. 196, No. 2, January 15.

3. Dubey, J.P., D.S. Adams. 1990. Prevelance of Toxoplasma gondii antibodies in dairy goats from 1982 to 1984. JAVMA, Vol. 196, No. 2, January 15.

4. Dubey, J.P. 1990. Status of toxoplasmosis in sheep and goats in the United States. JAVMA, Vol. 196, No. 2, January 15.

5. Masoud A. Malik, David W. Dreesen, Armah de la Cruz. 1990. Toxoplasmosis in sheep in northeastern United States. JAVMA, Vol. 196, No. 2, January 15.

6. Dubey, J.P., C.A. Kirkbride. 1990. Toxoplasmosis and other causes of abortions in sheep from north central United States. JAVMA, Vol. 196, No. 2, January 15.

7. Dubey, J.P., R.J. Sonn, O. Hedstrom, S.P. Snyder, E.D. Lassen. 1990. Serological and histological diagnosis of toxoplasmic abortions in sheep in Oregon. JAVMA, Vol. 196, No. 2, January 15.

8. Dubey, J.P. 1990. Status of toxoplasmosis in cattle in the United States. JAVMA, Vol. 196, No. 2, January 15.

9. Frenkel, J.K. 1990. Toxoplasmosis in human beings. JAVMA, Vol. 196, No. 2, January 15.

10. Dubey, J.P., D.E. Hill, J.L. Jones, A.W. Hightower, E. Kirkland, J.M. Roberts, P.L. Marcet, T. Lehmann, M.C.B. Vianna, K. Miska, C. Sreekumar, O.C.H. Kwok, S. K. Shen, and H.R. Gamble. 2005. Prevalence of viable *Toxoplasma gondii* in Beef, Chicken and Pork from retail meat stores in the United States; Risk Assesment to Consumers. J. Parasitol. 91(?), accepted in July 22, 2005. American Society of parasitologists.

292

11. Chun-Hsuan Wang, Vina Diderrich, James Kliebenstein, Sharon Patton, Jeff Zimmerman, Arne Hallan, Eric Bush, Charles Faulkner, Raymond McCord. 2000. Toxoplasma gondii Levels in Swine Operations: Differences Due to Technology Choice and Impact on Costs of Production. Iowa State University, Department of Economics, Staff Paper No. 337, September 2000.

12. Xianfeng Hu, James Kleibenstein, Sharon Patton, Jeffrey Zimmerman, Arne Hallam, Tanya Roberts, Eric Bush. 1997. Toxoplasma gondii in U.S. Swine Operations: An Assessment of Management factors. Iowa State University Staff Paper No. 288, July 1997.

(13) Tovi Lehmann, Douglas H. Graham, Erica Dahl, C. Sreekumar, Fred Launer, Joseph L. Corn, H.Ray Gamble, J.P. Dubey. 2003. Transmission dynamics of Toxoplasma gondii on a pig farm. Infectious Genetics and Evolution 3 (2003) 135-141. http://www.uga.edu/scwds/documents/lehmann2003.pdf

14. Frenkel, J.K. 1990. Transmission of toxoplasmosis and the role of immunity in limiting transmission and illness. JAVMA, Vol. 196, No. 2, January 15.

15. Tanya Roberts, J.K. Frenkel. 1990. Estimating income losses and other preventable costs caused by congenital toxoplasmosis in people in the United States. JAVMA, Vol. 196, No. 2, January 15.

(16) Dubey, J. P., H. R. Gamble,, D. Hill, C. Sreekumar, S. Romand, and P. Thulliez. 2002. High prevalence of viable *Toxoplasma gondi* infection in market weight pigs from a farm in Massachusetts: *Journal of Parasitology:* Vol. 88, No. 6, pp. 1234–1238.

17. Zarnke RL, Dubey JP, Kwok OC, Ver Hoef JM. 2000. Serologic survey for Toxoplasma gondii in selected wildlife species from Alaska. J Wildl Dis. April; 36(2):219-224.

18. Wayne Du. 2004. Pork Safety: managing Toxoplasma in Swine. Ministry of Agriculture, Food and Rural Affairs, Ontario, CA. http://www.omafra.gov.on.ca/english/livestock/swine/facts/04-055.htm

19. U.S. Agriculture Research Service, Annual Report. 2002. Risk-based management systems for Control of Zoonotic Parasites in Swine. http://www.ars.usda.gov/research/projects/projects.htm?ACCN_NO=403986&fy=2002

20. Dubey, J.P. 2000. Swine Toxoplasmosis: USDA, ARS, Beltsville, Maryland Reviewers: R.M. Weigel, University of Illinois; E.S. Lindsay, Auburn University; B.E. Stromberg, University of Minnesota http://www.ncagr.com/vet/Toxoplasmosis.htm



21. Leighty, J.C.1990. Strategies for control of toxoplasmosis. JAVMA, Vol. 196, No. 2, January 15.

22. Davies, P.R., Morrow, W.E., Deen, J, Gamble, H.R., Patton, S. 1998.  Seroprevalence of Toxoplasma gondii and Trichinella spiralis in finishing swine raised in different production systems in North Carolina, USA. 1: Prev Vet Med. Jul 17;36(1):67-76. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=9677628&dopt=Abstract

23. Dubey J.P., Weigel R.M., Siegel A.M., Thulliez P, Kitron U.D., Mitchell M.A.,  A. Mannelli, N.E. Mateus-Pinilla, S.K., Shen, O.C.H. Kwok, and K.S. Todd. 1995. Sources and reservoirs of Toxoplasma gondii infection on 47 swine farms in Illinois. J Parasitol ; 81: 723-729. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=retrieve&db=pubmed&list_uids=7472862&dopt=Abstract

24. Editorials. 2000. Sources of Toxoplasma gondii infection in pregnancy. BMJ, 321:127-128 (15 July): http://bmj.bmjjournals.com/cgi/content/full/321/7254/127

25. Anonymous. 2003. Toxoplasmosis fact sheet. http://www.chclibrary.org/micromed/00068580.html

26. Anonymous. 2004. Toxoplasmosis quick facts: Indiana State Department of Health. http://www.in.gov/isdh/healthinfo/Toxoplasmosis.htm

27. Hugh-Jones M.E., Broussard J.J., Stewart T.B. 1986.  Prevalence of Toxoplasma gondii antibodies in southern Louisiana swine in 1980 and 1981. Am J Vet Res; 47: 1050-1051

28. Jacobs L. 1957. The interrelation of toxoplasmosis in swine, cattle, dogs and man. Public Health Rep, 72:872-882

29. Dubey J.P. 1987. Toxoplasmosis in goats. Agric pract ;8: 43-52.

30. Dubey, J.P., Streitel, R.H. 1976. Prevalence of Toxoplasma infection in cattle slaughtered at an Ohio abattoir. J Am Vet Med Assoc; 169: 1197-1199.

31. Rue Jensen. 1974. Diseases of Sheep. Lea & Febiger, Philadelphia.

32. Calnek, B.W., H. John Barnes, C.W. Beard, W.M. Reid, H.W. Yoder, Jr. (ed).1991. Diseases of Poultry. Ninth edition; Iowa State University Press, Ames, Iowa, USA.

33. Anonymous. 2004. Toxoplasmosis: CDC Parasitic Disease Information. http://www.cdc.gov/ncidod/dpd/parasites/toxoplasmosis/factsht_toxoplasmosis.htm

294

(34). Kijlstra A, Eissen OA, Carnelissen J, Munniksma K, Eijck I, Kortbeek. 2004. Toxoplasma gondii infection in animal-friendly pig production systems. Invest Ophthalmol Vis Sci. 45:3165-3169. http://www.aasv.org/news/story.php?id=1293

(35) Dubey, J.P. 1986. A review of toxoplasmosis in cattle. Vet Parasitol. Dece: 22(3-4):177-202

36. Food Safety Focus. May 2001. Food Safety and Inspection Service, United States Department of Agriculture, Washington, D.C. 20250-3700.
        http://www.fsis.usda.gov/oa/pubs/parasite.htm

37. The Food Safety Educator. 2000. Food Safety and Inspection Service, United States Department of Agriculture, Washington, D.C. 20250-3700
http://www.fsis.usda.gov/OA/educator/educator5-2.htm

258

**Exhibit 11:  Response indicating that work on the toxoplasmosis paper was discontinued**

**From:** Chowdhury, Khurshed
**Sent:** Tuesday, July 19, 2005 3:42 PM
**To:** Parham, Delila
**Subject:** Reserach project
Hi Delila,

Please find the attached my research project updated.  You have first asked me to update thinking paper (some times last week) and then yesterday asked me again to update toxoplasmosis project before I go for vacation!  Here are some misunderstandings. I thought you have asked me about thinking paper to update.

Early (perhaps) this year when I gave you toxoplasma project, you have asked me to make it a thinking paper for Zoonoses branch. From then, I am working on thinking paper only. While preparing my thinking paper, I have taken some special projects into consideration such as Avian Influenza, Campylobacter and included with them toxoplasmosis too.  Toxoplasma paper has been incorporated into thinking paper.  Otherwise the original toxoplasma paper remained the same. I thought you have meant thinking paper to update and give you before my vacation.  I did not consider toxoplasma as a separate project anymore, after I have started thinking paper preparation.  Thanks.

Have a nice day! Hope to see you in August, 2005.


Khurshed

36

**Exhibit 14: Response admitting that supervisor did not state that work on toxoplasmosis paper should be discontinued**

**From:** Chowdhury, Khurshed
**Sent:** Thursday, August 04, 2005 1:55 PM
**To:** Parham, Delila
Hi Delila,

Please find the attached (First one) my updated 'Toxoplasma Research Project' you have requested. Since my return from my vacation, I have been working on this project and I am submitting it today to you.

You are right that in words you did not tell me to replace toxo project with the Thinking paper project. But when I gave you my updated toxo project for your approval on 2-25-05, you did not respond to that, instead on 2-28-05 you have requested me to formulate Thinking paper for Zoonoses branch, which has confused me and I thought you have abandoned toxo project idea and asked me to concentrate my efforts on the "Thinking paper" only.

I have spent considerable time on it and I have proposed "Thinking paper" and submitted to you on 3-16-05. Then you have again requested me to elaborate it. Then I have done a thorough literature search and finally gave you final product (Eleven pages) on 5-20-05. In my thinking paper I have incorporated Toxo project and considered toxo project is the part of thinking paper project, since it does not make sense to me to continue Toxo work in two different projects.

Besides, in my original submission of toxo project I had requested for your approval to the idea and expressed my desire to start after **your approval only** (please see the 2nd attachment). But in the midst of thinking paper issue which has absorbed at two months, also my trips to IWOA and WI, Salmonella serobar descriptions, and many other brief assignments kept me terribly busy. And I have also thought that toxo project is already in continuation in the "Thinking Paper" project. Besides, I did not get your approval to start my original toxo plan separately also.

Sorry for my misunderstanding to these. As you requested here I am submitting my updated toxo work plan again for your approval. Thanks.


Khurshed


39 ꝳꞬꭒ

If you have questions, please see me.
Thanks.

Delila

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Monday, February 07, 2005 11:01 AM
**To:** Parham, Delila
**Subject:** Toxoplasmosis work plan

Hi Delila,

Please find the attached my work plan for Toxoplasmosis. Since Dr. Sherie Zahn will not available to be a partner, I have decided to continue alone in this venture. Thanks.


Khurshed.


To:  Delila Parham                                          Date: February 7, 2005
     Chief, Zoonoses Branch, ZDRSD.

From: Khurshed Chowdhury
      VMO, Zoonoses Branch, ZDRSD.

Subject:  **Toxoplasmosis work plan**


Considering the fact that Dr. Sherie Zahn (USDA, Foodborne Disease Investigation Branch, Atlanta, GA.) is no longer available to be a partner of this project, I have decided to proceed alone with this toxo work plan, of course, if you agree with this idea. Let me continue to work on the following two phages of work (A and B).

(A) **Investigate the status of developing any rapid test for T. gondii to be used as to identify infected animals for human consumption during (a) ante mortem inspections, and (b) meats at the slaughter plants.**

- Check with manufacturers of parasitic diagnostics to ascertain what is being done, and by whom. One such manufacturer could be **Safe-Path Lab.** at California, which does produce rapid test for parasitic diagnosis.

- Check whether this test will be feasible both by **economical and technical    point** of views?

- *Who is funding it, or whether the FSIS can in anyway support/provide partial funding of this project?*

- Check what such work may be underway in Europe?

- Check with academic researchers in the field to ascertain what is being done, and by whom?

34 ﾞ297

- What are the obstacles to such research?

- How is this prioritized relative to developing such tests for other pathogens?

- Contact Ms. Patricia Lee's (CDC) what was the status of her desire to developing a Diagnostic Test for Toxoplasmosis to be used in the Slaughter Plants (on raw meat only)?

**(B) Investigating the prevalence of toxoplasma gondii infections in the US meat and poultry raw products (in the slaughter plants) and assessing economic impact and public health burden of foodborne toxo infections.**

**Time period to complete the investigations:**

Part A:

I would like to finish my investigation by the end of April, 2005 and a concise report of my findings will be produced by the end of June, 2005.

Part B:

This part will need enough literature searches to make the proper assessment of toxoplasma situation in the US. Assessing economic impact and public health burden of food borne toxo infections should take ample time. So, I would like to finish my search by the end of December, 2005. And the final report will be ready by the end of March, 2006.


Khurshed A. Chowdhury, DVM. Ph.D.
VMO, Zoonoses Branch,
ZDRSD, OPHS.

**Exhibit 10: Discussions on work plan for toxoplasmosis project**

**From:** Chowdhury, Khurshed
**Sent:** Friday, February 11, 2005 12:58 PM
**To:** Parham, Delila
**Subject:** RE: Toxoplasmosis work plan
Thanks. Please let me think and I will talk to you next week.

Khurshed

     -----Original Message-----
     **From:** Parham, Delila
     **Sent:** Thursday, February 10, 2005 5:02 PM
     **To:** Chowdhury, Khurshed
     **Cc:** Thaler, Alice
     **Subject:** FW: Toxoplasmosis work plan

Khurshed,

This is a follow-up to our conversation this afternoon. As discussed, please review the proposal and consider the following:

A.   Rapid Tests: Please conduct some exploratory work to determine how much information is available on rapid tests and the feasibility of use in slaughter plants. If the work is in its infancy, there is little that we (Zoonoses Branch) will be able to do or recommend and need not spend a great deal of time pursuing this. In looking at the majority of the questions put forward in your work plan, you should be able to find answers and prepare a summary report in less than a month. Of course, your summary report may be the basis for recommending that the Agency include development of rapid tests for toxoplasmosis on its research agenda.

B.   Prevalence at Slaughter: Again, I recommend that you conduct an initial literature review to assist you in developing an approach to your paper. You need to know what recent work has been done on this issue; this will to guide you in developing your thesis statement (approach) for your paper. Ask yourself, what would your paper provide of interest to the scientific community and the public and be of benefit to FSIS? If approved to proceed, you should be able to complete a literature review and draft your article much sooner than March 2006, even with our fluctuating workload and priorities.

C.   Other Thoughts: (1) I don't think a risk profile has been conducted for *T. gondii* in US meat products. While risk assessments are not in our purview, it seems reasonable that we would be able to work with someone in the Risk Assessment Division to look at this issue. (2) I know you consulted Dr. J.P. Dubey on this issue, but for economic info, you may want to talk with Jean Buzby or Tanya Roberts in the Economic Research Service; for grant information, Mary Torrence in the Cooperative State, Research, Education and Extension Service; and for other cooperative agreement info, our own John Ragan.

Please plan to talk with me again in the next two weeks to advise me of your progress. If you need time at the library, please let me know. Or, you may want to contact the NAL to get assistance with your literature review on the subject. Having a few abstracts and/or articles should be useful in directing you on this issue.

Parham, Delila                                                    TP-1

**From:**    Parham, Delila
**Sent:**    Thursday, December 01, 2005 9:32 AM
**To:**      Chowdhury, Khurshed
**Subject:** RE: Toxo paper work plan

Thank you.

> -----Original Message-----
> **From:** Chowdhury, Khurshed
> **Sent:** Thursday, December 01, 2005 9:30 AM
> **To:** Parham, Delila
> **Cc:** Thaler, Alice
> **Subject:** Toxo paper work plan
>
> Hi Delila,
>
> Below is the work plan for toxo paper you have requested. I will follow the style for the Journal of Food
> Protection. I am hoping to submit the final draft to you by the 30th December, 2005.  Thanks.
>
> Khurshed
>
>
> Work plan on Toxoplasmosis:
>
> <u>Title</u>: Sero-prevalence of Toxoplasma Infection in various Food Animal species in the United States of
> America and its Public Health significance.
>
> <u>Work plan</u>:  Available literature on sero-prevalence in the US will be collected and will be reviewed to make a
> comprehensive review article having recent survey of toxoplasma infections of Food animal species in the US,
> and its public health danger.  FSIS current status on toxoplasma will be high lighted.  Suggestions to protect
> consumer's health will be summarized.

300

Parham, Delila                                 **TP-2**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, December 30, 2005 11:01 AM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Toxoplasma Review Paper (First Draft) |

Hi Delila,

Please find the attached toxoplasma literature review paper for your perusal. I am happy that finally I have completed the paper which I am hoping to publish in some journal. I have put my 100% efforts and concentration to make this review paper within this short period upon the available targeted literature. In January 2006, I am hoping to make another fine tuning in the related literature search (if I have missed anything on seroprevalence study in the US), which I am planning to ad in this paper, to make its validity more prudent. Of course, I shall have to send this paper to some expert/experts to review before I submit it to the journal.

Although, I have styled this paper for the J. of food protection, I might chose some other journal (such as JAVMA who will welcome this paper better), and then I will simply change the style of the respective journal. Thank you very much.

Have a nice holiday and a happy new year!

Khurshed

Date: December 30, 2005
(First Draft)

**Title: Seroprevalence of *Toxoplasma gondii* infection in various food animal species in the United States of America and its public health significance**

(Authors)

## Abstract

Available seroprevalence studies conducted on the swine populations in the United Sates were moderately adequate. Seroprevalence studies conducted for sheep, goats, cattle, and chicken were either rare or inadequate for proper survey of the status of toxoplasma prevalence in these species. Seropositive pigs are highly variable from state to state, also from one study to another study—ranging from as low as1% in Colorado to 36% in Wisconsin and 69% in Georgia. In the swine populations, *Toxoplasma gondii* antibodies were more prevalent in breeding swine (An average: 13.2%) than among finishing swine (An average: 4.3%), and prevalence of *T. gondii* was markedly lower among the swine raised in confinement (An average: 9.3%) than the pig herds in non-confinement facilities (An average: 14.1%). Significant relation was seen between the *T. gondii* positive hogs and farm management practices and control of cats and rodent access to hogs. About 15 to 25% apparently healthy pigs in the US are estimated to be infected by *T. gondii* as determined by serological survey. Average seropositive pig meat from the US retail stores was 0.38%; and consumer risk of purchasing pork from the retail stores in the US is 0.4765% for ten year period. And meat (pork) sampled from the northeastern United States had a higher seoprevalence for *T. gondii* than the Midwest, and Southwestern US. The incidence of Toxoplasma infection in pigs has decreased significantly in the past decades coinciding with the change from outdoor rearing systems to modern, confinement operations. Average sero-positive sheep were 20.1%, and average seropositive goats were 22.1% in the US, and sheep slaughtered in the northeastern United States have an average of 58.56%, which may indicates that sheep industry of these areas are having economic impact due to toxoplasma infection. Although, the general consensus is that ingestion of raw or undercooked pork is the prime source of *T. gondii* infection in humans, but it remains somewhat paradoxical because most consumers, since childhood, are aware of the danger of eating raw pork for fear of *Trichinella spiralis* infection. The prevalence of *T. gondii* infection in the human population is fairly stable (average around 30-40%) and has not been decreased in spite of a decrease of *T. gondii* infection in pigs. Therefore, extensive studies are needed to learn about the other sources of *T. gondii* infection in humans, such as dietary habits (e.g., *soil on fruits and vegetables, from gardening, and soil related occupations, unfiltered water*) and other sources of meat consumed in the United States. Seropositive cattle and chicken for *T. gondii* antibodies were uncommon in several studies, and risk to consumers of purchasing beef and poultry from the US retail stores is considered to be zero at this time. Pregnant women may not get *T. gondii* infection by the direct contact with cats, as the oocysts are not found on cat fur and are often buried in soil along with

302

1

cat feces, and pregnant women probably get the diseases from the contaminated soil by cat feces. General sanitation and steps to consume safe foods, minimizing environmental exposure to the *toxoplasma oocysts,* are the best possible methods of controlling toxoplasma gondii infection in man and animals.

## Introduction

Toxoplasmosis is an infectious disease caused by the protozoan parasite *Toxoplasma gondii* which affects enzootically a wide variety of animal hosts including man. The parasite is worldwide in distribution. Serologic surveys indicate that infection is widespread in most domestic animals; however, except for abortions in sheep and goats, overt disease is sporadic and rare. Although variable in different parts of the United States, the proportion of swine and sheep with *T. gondii* antibodies ranges from 15 to 50%. The acute parasitemia manifestations of the diseases are characterized by pneumonia, trembling, shaking of the head, lymphadenitis, hepatitis, splenomegaly, ulcerative and fibronecrotic colitis, and acute inflamed musculature. The organism may be demonstrated in tissue sections, but diagnosis should be supported by serology since it can be confused with other protozoans *(20, 25).*

Antibody titers are common in pigs, sheep, and goats; less common or rare in horses and cattle. Congenital infections are an important cause of abortions and stillbirths in humans and animals. Both lamb and pork carry a higher risk of *toxoplasma* infection than beef and poultry, because of the fact that, animal that is reared outdoors may have greater risk of environmental exposure to the disease than the animal reared indoors *(22).* The purpose of this review report was to investigate the prevalence of *T. gondii* in various food animal species in the United States of America and to examine the potential role of meat as the vehicle of *T. gondii* infection in humans.

## Etiology and Transmission

Toxoplasmosis is caused by a single-celled microscopic intracellular protozoan parasite called as *Toxoplasma gondii.* Cats are the only primary host since all the developing stages occur in the cat and not in other animals. Cats become infected by eating rodents and birds infected with the organism. Once ingested, the organism reproduces in the cat intestine producing millions of oocysts, which are excreted in cat feces daily approximately for two weeks. Oocysts shed in cat feces can persist for months or years in the environment in an infectious form *(12, 25, 33, 36).* In the United States, it is estimated that approximately 30% of cats have been infected by *T. gondii (25).* However, all species of birds and mammals can be carriers of *T. gondii.* Humans can get the infection by eating contaminated raw or partly cooked meat especially pork, lamb, or venison; or by touching contaminated hands to the mouth *(33).* Domestic animals can become infected by eating oocysts from a contaminated environment (feed contaminated by cat's feces) or by eating raw or poorly cooked meats that are contaminated by the cat feces or rodents *(12).*

In a field epidemiological surveillance study in 47 swine farms in Illinois, USA, it was

303

2

confirmed that the rodents, contaminated feed, and soil was the main source of toxoplasma gondii transmission to swine in the farm. This same investigation also confirmed that all mammalian wild animals (cats, raccoons, opossums, skunks, house mice, white-footed mice, rats) serve as the main reservoirs of *T. gondii* infection in swine *(23)*.

## Seroprevalence of *Toxoplasma gondii* in various food animal species.

### Swine

*Toxoplasma* infection in swine is believed to be widespread and is an important food safety issue, though some controversy or doubt does exists about the role of pork meat as a risk factor for human toxoplasmosis, and it is believed that a number of studies have found no association between meat consumption and human toxoplasmosis *(11)*. *T. gondii* generally does not make pigs ill and the parasites can stay in the edible tissues of pigs for years, perhaps for life. *T. gondii* cysts can be found in virtually all body muscles of pigs *(20)*. Experimental survey by the department of veterinary microbiology and preventive medicine in Iowa has found that toxoplasma was more prevalent in breeding swine (sows and gilts) than among finishing (market hogs) swine. Seroprevalence by using 'enzyme-linked immunosorbent assay' (ELISA) test was 5.4% in finishing swine and 11.4% among sows and gilts *(1)*. In a national survey of seroprevalenc for *T. gondii* in pigs from various pig producing states of America the seropositive pigs were highly variable; and seroprevalence of *T. gondii* in pigs revealed an infection rate ranging from less than 2% to up to 69%, and the Georgia had the highest (69%) of seroprevalence *(2)*. In a seroprevalence study among the swine population from 47 swine farms in Illinois, USA, it was found that the rates of *T. gondii* infection was 15.1% in sows and 2.3% in finisher pigs. About 15 to 25% of apparently healthy pigs in th US are estimated to be infected by *T. gondii*, as determined by serological tests *(23)*.

IOWA State University conducted two major seroprevalence studies *(11, 12)* for estimations of *T. gondii* levels in different swine operations by different States, by using Modified Agglutination test (MAT). First study included 16 (sixteen) States (Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Carolina, Ohio, Pennsylvania, South Dakota, Tennessee, and Wisconsin). Data have been obtained from the National Animal Health Monitoring System (NAHMS) swine survey in 1995. Variations of seropositive pigs for *T. gondii* was from 2-22% with an average of 15.1% in sows (breeding pigs); and 0.3-10% with an average of 3.2% in market hogs (Finishers), and over all seropositive pigs were 8% percent *(11)*. In the second study (Iowa State University) included 17 States (Alabama, California, Colorado, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Nebraska, N. Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Virginia, and Wisconsin) and study was conducted between the period from 1989-1990. Random serum samples were collected from farrowing sows from 394 hog farms in the above mentioned states of the U.S. as part of NAHMS 1990 National Swine Survey for *T. gondii* antibodies. In this study range of seropositive pigs for *T. gondii* prevalence among the various states of America varied from as low as 1% in Colorado and as high as 36% in Wisconsin, and average

304

seroprevalence was 19% positive for *T. gondii* antibody *(12)*.

Much earlier study of seroprevalence of *T. gondii* in swine in Lousiana was 24.6%; and pigs slaughtered during cold weather months had higher (28.0%) *toxo* antibodies than pigs slaughtered during warmer months which had (17.6%) *toxoplasma* antibodies (27). High prevalence of viable *T. gondii* in 51 out 55 market weight pigs (destined for human consumption) were seen in a known *T. gondii* positive pig farm in Massachusetts. This farm was considered as isolated foci of infected pigs, because, in general prevalence of *T. gondii* in market pigs (finishers) in the United States is declining because of good management *(16)*. In a recent serological survey of pigs of variable age from 85 New England pig farms showed an overall seroprevalence of 47%, with 91% of the herds having at least one seropositive pig, and within-herd prevalence varied between 4 and 100%. Seroprevalence of *T. gondii* antibodies in 163 wild mammals and birds captured around the pig farms were an average of 13.1% percent.*(13)*.

Most recent study for surveying the prevalence of *T. gondii* in 2,094 meat samples from pork obtained from the US retail meat stores from 28 major geographic areas (the Midwest, South, Western, and Northeastern) of the United States have been conducted. This was a statistically valid study for the actual prevalence of *T. gondii* in **pork** from the retail meat stores in the United States of America. Among the pork samples, 7 cats fed pooled samples (of pork), were positive for *T. gondii* in cats and mouse bioassay. Out of 2,094 pork samples only 12 samples were ELISA positive for *T. gondii* antibody. Based on the findings of bioassay and ELISA test positive pork samples, the percentage of positive pork meat from retail stores were only 0.38%. According to this study risk of purchasing *T. gondii* contaminated pork meat from the US retail stores is .4765% over a period of ten years *(10)*.

## Sheep and Goats

Ovine *toxoplasmosis*, a sub acute or chronic infection, is characterized by placentitis, fetal encephalitis, abortions, and stillbirths and is caused by *Toxoplasma gondii*, an isoporal coccidium of cats. Toxoplasmosis in sheep occurs in all countries where the sheep industry developed. The disease has considerable economic importance and public health significance among sheep of Australia, New Zealand, Britain, Denmark, Russia, Turkey, and America. The disease can be spread by meat borne source *(31)*. Literature search indicate that seroprevalence studies in sheep and goats are very limited in the United States of America, though studies on sheep and goats are fairly extensive in other countries of the world.

In an experimental seroprevalence survey of blood samples of 654 slaughtered sheep from 9 states, it was observed that the sheep slaughtered in the northeastern United States have an average of 58.56% prevalence of antibodies to Toxoplasma,i.e. adult sheep had 62.46% and lambs had 55.07% infection. It was also observed that sheep's immunity due to *T. gondii* is life-long and that sheep rarely abort twice because of *toxoplasmosis (5)*. Seroprevalence study using fluids from a total of 1,064 aborted fetuses and dead lambs from the north central United States were carried out in which it was observed that 20.9%

305

fluid samples were positive for toxoplasma gondii antibodies. In the same study the cause of abortion in sheep by toxoplasmosis infections were 17.5%. By examining tissues from the fetuses and dead lambs it was also observed that *T. gondii* infection can cause hepatitis, myocarditis, encephalitis, and pneumonia in aborted lambs *(6)*. Other seroprevalence study using body fluids from the total of 586 aborted fetuses and dead lambs were conducted in Oregon diagnostic laboratory, United States of America during1983-89. Seropositive *T. gondii* antibodies were found in 20.1% of the fluid samples, and the cause of abortion due to *toxoplasma gondii* infection in sheep was found 12.6%. Epizotic inquiry indicated that most ewes in the above study in the Oregon became infected with the *T. gondii* via contaminated feed, because cats are known to defecate in hay used to feed sheep (7).

Among domestic food animals, *T. gondii* is most pathogenic for domestic goats, because ingestion of toxoplasma oocysts from cat feces is the main mode of primary infection in goats. *Toxoplasma gondii* can cause abortion, stillbirth, weak kids, and death in young and adult goats *(29)*. In a serological study *Toxoplasma gondii* antibodies were detected in 22.1% of 1000 goats tested from the northwestern states of US during the period of 1982-1984. Seroprevalence was higher in the older (1 year old) goats than the younger goats (six month old) *(3)*. Prevalence of *T. gondii* in dairy goats is 21 to 60%, and clinical infection and unlike sheep; *T. gondii* can cause encephalitis, nephritis, hepatitis, necrotizing abomasitis, enteritis, and cystitis in adult goats *(4)*.

### Cattle

Sero-prevalence and clinical disease is uncommon in cattle and naturally acquired disease in cattle has not been detected after inoculating with *Toxoplasma gondii (8, 30)*. The importance of seroprevalence in cattle with respect to persistent infection is not known. A mixer of various tissues from 350 cattle Ohio abattoir fed to 12 specific-pathogen-free cats failed to exhibit *toxoplasma oocysts* from the cat feces *(30)*. Results from experimentally infected cattle indicated that, at least dairy cattle are resistant to *T. gondii* and eliminate the number of *T. gondii* from their tissues *(8)*.

In a recent study for surveying the seroprevalence of *T. gondii* in 2,094 meat samples from beef from the retail stores in the Midwest, South, Western, and Northeastern United States were all negative for ELISA test and also negative in bioassay (cat and mouse). Risk to consumers of purchasing *T. gondii* contaminated beef from US retail stores is zero *(10)*. Further investigative studies of the seroprevalence of *T. gondii* antibodies in live cattle should be done in the United States before it can be determine whether beef plays any important role in the epidemiology of *toxoplasmosis* in humans *(10, 30, 32, 35)*.

### Chicken

Only sporadic outbreaks of toxoplasmosis in chickens have been reported. Nevertheless, the disease is uncommon in chickens and is of little significance to the poultry industry *(32)*. In a very recent study for surveying the seroprevalence of *T. gondii* in 2,094 meat

samples from chicken from the retail stores in the Midwest, South, Western, and Northeastern United States were negative for ELISA test and also negative in bioassay by using cat and mouse. Risk to consumers of purchasing *T. gondii* contaminated chicken from US retail stores is zero *(10)*.

## Human infection

Approximately 30%-40% of human adults in the USA are estimated to have antibodies to *Toxoplasma gondii*. In the U.S. and similar urbanized societies, most people become infected during their teens or adulthood *(33)*. Others claimed that 30 to 60% of adult human beings in the United States have been infected with *Toxoplasma gondii* judging from antibody data *(9, 20, 23)*. Worldwide, the infection rates could range from 3%-70% depending on the populations or geographic areas studied *(18)*. Most infections by *Toxoplasma* in humans are asymptomatic, and only a small number give rise to a brief flu like illness that usually remains undiagnosed. However, persons with weakened immune systems such as those with HIV/AIDS infection, organ transplant recipients, individuals undergoing chemotherapy, and infants may develop **severe toxoplasmosis**. Severe toxoplasmosis may result in damage to the eyes or brain *(36)*. Once infected an individual is immune to reinfection. The incubation period ranges from several days to months *(9, 33, 36)*.

The main method of human contracting *T. gondii* is by eating cyst contaminated raw or undercooked meat from pork, lamb, goat, venison or wild game meat, vegetables, fruits, or milk products; or by drinking untreated water, or by touching contaminated hands to mouth after handling undercooked meat *(33, 36)*. Humans can become infected when they come into contact with *T. gondii* eggs while cleaning a cat's litter box, gardening, or playing in a sandbox *(13, 20, 21, 22, 23, 24, 25, 33, 36)*. Humans can also get *toxoplasma* infection by congenital transmission from the infected mother *(21, 22, 25, 36)*. *Toxoplasma* infection acquired during pregnancy is rarely recognized; however, because of maternal parasitemia, the fetus is always at risk. The rate of placental transmission has been calculated to be between 17 and 25% when maternal infection develop during the first and second trimester, and 65% when infection develops in the third trimester *(9)*. It is estimated that approximately 400-4,000 children are born with congenital *T. gondii* infection in the United States each year *(9, 36)*. Toxoplasma gondii may cause mental retardation, loss of vision, and birth defects in children whose mothers acquired *T. gondii* during their first time pregnancy *(20, 36)*. Estimated national average of American pregnant women exposure to Toxoplasm is about 14-15%, and total annual economical loss could be between in the range of $368 million to $8.7 billion for the infants estimated to be born each year with congenital *toxoplasmosis (15, 19)*.

## Public health risk from the meat

Meat from pork, lamb and goat carry a higher risk of *toxoplasma* infection for humans than beef and poultry, because of the fact that, animal that are reared outdoors may have greater risk of environmental exposure to the disease than the animal reared indoors *(12, 22)*. Risk to consumers of purchasing *T. gondii* contaminated beef and chicken from US

307

retail stores is zero, according to a recent study *(10)*. Traditionally, pork has been considered a major source of *T. gondii* for humans *(18)*. Recently, the Centers for Disease Control reported that up to half of human exposures to *Toxoplasma* are from foodborne sources and consumer advocacy groups are now pointing to meat especially pork as a source of infection causing birth defects in newborns *(19, 37)*.

However, according to a very recent study risk of purchasing *T. gondii* contaminated pork meat from the US retail stores is .4765% over a period of ten years. Risk of purchasing *T. gondii* contaminated pork meat from the retail stores in the Midwest, South, and Western United States is .3391% (over a ten year period); and in the retail stores in the northeastern United States is .7812% (over a ten year period). This study has concluded that meat (pork) sampled from the northeastern United States had a higher prevalence for *T. gondii* than the Midwest, and Southwestern United States *(10)*. This study has provided an accurate picture of the risk of exposure to *T. gondii* in the retail meats in the US markets. Over all, the prevalence of viable *T. gondii* in retail meat (pork) was very low in meat sold in retail stores in the the United States. Moreover, modern procedures of improved management and production practices have dramatically decreased the prevalence of *T. gondii* infection in pigs *(18)*.

Although, the general consensus is that ingestion of uncooked pork is the prime source of *T. gondii* infection in humans, but it is somewhat paradoxical because most consumers, since childhood, are aware of the danger of eating raw pork for fear of *Trichinella spiralis* infection. Since the prevalence of *T. gondii* infection in the human population is fairly stable (around 20%), and has not been decreased in spite of a decrease of *T. gondii* infection in pigs, it is questionable whether humans get *T. gondii* infection from pork meat or from other foods. Therefore, extensive studies are needed to learn about the human dietary habits (e.g., soil on fruits and vegetables, from gardening, and soil related occupations, unfiltered water) and other sources of meat (wild game meats) consumed in the United States *(10)*

## Risk Factors

Studies conducted by the Department of economics, IOWA State University *(11, 12)* and the department of Food Animal and and Equine Medicine, College of Veterinary Medicine, North Carolina State University *(22)* have found significant associations between *toxoplasma* infections and factors of herd management. These factors were: 1) method of rodent control, 2) type of production facility, and 3) access of cats to production facilities. Sows and market hogs exposed to cats in the production facilities were significantly more likely to be positive for *T. gondii* than sows and market hogs not exposed to cats. Pig herds in confinement have lower levels of *T. gondii* infection (2.3%) than pig herds in non-confinement facilities (4.4%). Significant relation was seen between the *T. gondii* positive hogs and farm management practice to control cats and rodent access to hogs. These studies concluded that management practice in modern production systems appear to be adequate to virtually eliminate the risk of infection of finishing pigs *(12, 22)*.

268

The association of cats and infection of toxoplasmosis among pregnant women is difficult to assess by epidemiological surveys because soil, not the cats, is the main culprit; and oocysts are not found on cat fur and are often buried in soil along with cat feces. Therefore, direct contact with cats is irrelevant with respect to *T gondii* transmission, and soil contact is universal and difficult to avoid *(24)*. Climate and to survival of oocysts in the environment may play important role,i,e. toxoplasmosis is more prevalent in warm, moist weather than cold or hot dry weather *(28)*. Receiving an infected organ transplant or blood transfusion, though this is rare, is the other risk factor of toxoplasma infection to humans *(33, 36)*.

**Control**

Adequate preventive measures are the most practical methods to control the potential infection of *toxoplasma gondii*. General sanitation and steps to consume safe foods, minimizing environmental exposure to the *toxoplasma oocysts* are the best possible methods of controlling toxoplasma infection in man and animals *(26, 9, 3, 25, 14, 16, 17, 18, 33, 22)*. There are no efficient drugs to kill *toxoplasma gondii* cysts in animal and human tissues. Therefore, *Toxoplasma gondii* infection can best be prevented by minimizing exposure to the infective agent by adopting following measures.

**Pre-slaughter management:** These include total confinement of swine herd in bird-proofed buildings (likely to be cat proof), feed storage in enclosed silos. Do not feed uncooked garbage to swine and do not allow cats near swine houses. Keep cats out of the swine facilities and ensure cat feces do not contaminate feed and water. Adopt an effective rodent control program to minimize mouse and rat populations. Tighten biosecurity programs to keep wildlife, such as birds, skunks and raccoons, from accessing pigs and facilities. Remove dead pigs immediately to prevent cannibalism.

**Consumer's safe practices:** It has been recommended that until examination of meat for *T. gondii* infection is implemented in the slaughterhouse; all meat should be cooked according to industry guidelines before human consumption. In order to reduce the potential for transmission of *T. gondii* in humans, meat of wildlife animals should be thoroughly cooked before consumption. Ingestion of uncooked infected meat could be the main source of human infection with *T. gondii*. Fully cook all meats and poultry (micro waving may not adequately cook all portions fully) and consume only pasteurized dairy products. Freezing (to 10.4 F or -12C) and cook foods to an internal temperature of 152 F will kill oocysts. When preparing raw meat, wash any cutting boards, sinks, knives, and other utensils that might have touched the raw meat thoroughly with soap and hot water to avoid cross-contaminating other foods. Wash vegetables and fruits thoroughly before eating. Those from home gardens are at higher risk of infection than commercially acquired. *Wash hands thoroughly with soap and water after handling potentially contaminated soil or after handling raw meats, poultry, or vegetables.* Wear cotton or leather gloves when working in soil.

Pregnant women or women contemplating pregnancy should take extra precautions to prevent a toxoplasmosis infection. Keep pregnant woman and children away from

304

household cats and cat litter. Vaccination of cats could reduce transmission of *Toxoplasma,* because all *Toxoplasma* infections, whether intermediate hosts or cats, ultimately depend on oocyst shedding from cats. To lessen the risk of cats becoming infected and shedding the oocyst, don't allow them outside; feed them only cooked meats or commercially dry, canned, or cooked cat foods. Cats often become infected by catching and eating rodents, birds, or other small mammals. Cats that become infected will shed the infective stage for approximately two weeks. Change litter boxes daily, disposing of used litter in sealed plastic bag or other container, before the infective stage matures. Cover sand boxes when not in use to prevent outdoor cats from using them as litter boxes and wash hands of children well after playing in the sandbox and prior to consuming food or drink.

**References**

1. Zimmerman, Jeff J., David, W. Dreesen, William J. Owen, George W. Beran. 1990. Prevalence of toxoplasmosis in swine from Iowa. JAVMA, Vol. 196, No. 2, January 15.

2. Dubey, J.P. 1990. Status of toxoplasmosis in pigs in the United States. JAVMA, Vol. 196, No. 2, January 15.

3. Dubey, J.P., D.S. Adams. 1990. Prevelance of Toxoplasma gondii antibodies in dairy goats from 1982 to 1984. JAVMA, Vol. 196, No. 2, January 15.

4. Dubey, J.P. 1990. Status of toxoplasmosis in sheep and goats in the United States. JAVMA, Vol. 196, No. 2, January 15.

5. Masoud A. Malik, David W. Dreesen, Armah de la Cruz. 1990. Toxoplasmosis in sheep in northeastern United States. JAVMA, Vol. 196, No. 2, January 15.

6. Dubey, J.P., C.A. Kirkbride. 1990. Toxoplasmosis and other causes of abortions in sheep from north central United States. JAVMA, Vol. 196, No. 2, January 15.

7. Dubey, J.P., R.J. Sonn, O. Hedstrom, S.P. Snyder, E.D. Lassen. 1990. Serological and histological diagnosis of toxoplasmic abortions in sheep in Oregon. JAVMA, Vol. 196, No. 2, January 15.

8. Dubey, J.P. 1990. Status of toxoplasmosis in cattle in the United States. JAVMA, Vol. 196, No. 2, January 15.

9. Frenkel, J.K. 1990. Toxoplasmosis in human beings. JAVMA, Vol. 196, No. 2, January 15.

10. Dubey, J.P., D.E. Hill, J.L. Jones, A.W. Hightower, E. Kirkland, J.M. Roberts, P.L. Marcet, T. Lehmann, M.C.B. Vianna, K. Miska, C. Sreekumar, O.C.H. Kwok, S. K. Shen, and H,R. Gamble. 2005. Prevalence of viable *Toxoplasma gondii* in Beef, Chicken

ٟ١٥

and Pork from retail meat stores in the United States; Risk Assesment to Consumers. J. Parasitol. 91(?), accepted in July 22, 2005. American Society of parasitologists.

11. Chun-Hsuan Wang, Vina Diderrich, James Kliebenstein, Sharon Patton, Jeff Zimmerman, Arne Hallan, Eric Bush, Charles Faulkner, Raymond McCord. 2000. Toxoplasma gondii Levels in Swine Operations: Differences Due to Technology Choice and Impact on Costs of Production. Iowa State University, Department of Economics, Staff Paper No. 337, September 2000.

12. Xianfeng Hu, James Kliebenstein, Sharon Patton, Jeffrey Zimmerman, Arne Hallam, Tanya Roberts, Eric Bush. 1997. Toxoplasma gondii in U.S. Swine Operations: An Assessment of Management factors. Iowa State University Staff Paper No. 288, July 1997.

(13) Tovi Lehmann, Douglas H. Graham, Erica Dahl, C. Sreekumar, Fred Launer, Joseph L. Corn, H.Ray Gamble, J.P. Dubey. 2003. Transmission dynamics of Toxoplasma gondii on a pig farm. Infectious Genetics and Evolution 3 (2003) 135-141. http://www.uga.edu/scwds/documents/lehmann2003.pdf

14. Frenkel, J.K. 1990. Transmission of toxoplasmosis and the role of immunity in limiting transmission and illness. JAVMA, Vol. 196, No. 2, January 15.

15. Tanya Roberts, J.K. Frenkel. 1990. Estimating income losses and other preventable costs caused by congenital toxoplasmosis in people in the United States. JAVMA, Vol. 196, No. 2, January 15.

(16) Dubey, J. P., H. R. Gamble,, D. Hill, C. Sreekumar, S. Romand, and P. Thulliez. 2002. High prevalence of viable *Toxoplasma gondi* infection in market weight pigs from a farm in Massachusetts: *Journal of Parasitology:* Vol. 88, No. 6, pp. 1234–1238.

17. Zarnke RL, Dubey JP, Kwok OC, Ver Hoef JM. 2000. Serologic survey for Toxoplasma gondii in selected wildlife species from Alaska. J Wildl Dis. April; 36(2):219-224.

18. Wayne Du. 2004. Pork Safety: managing Toxoplasma in Swine. Ministry of Agriculture, Food and Rural Affairs, Ontario, CA. http://www.omafra.gov.on.ca/english/livestock/swine/facts/04-055.htm

19. U.S. Agriculture Research Service, Annual Report. 2002. Risk-based management systems for Control of Zoonotic Parasites in Swine. http://www.ars.usda.gov/research/projects/projects.htm?ACCN_NO=403986&fy=2002

20. Dubey, J.P. 2000. Swine Toxoplasmosis: USDA, ARS, Beltsville, Maryland Reviewers: R.M. Weigel, University of Illinois; E.S. Lindsay, Auburn University; B.E. Stromberg, University of Minnesota http://www.ncagr.com/vet/Toxoplasmosis.htm

311

21. Leighty, J.C.1990. Strategies for control of toxoplasmosis. JAVMA, Vol. 196, No. 2, January 15.

22. Davies, P.R., Morrow, W.E., Deen, J, Gamble, H.R., Patton, S. 1998. Seroprevalence of Toxoplasma gondii and Trichinella spiralis in finishing swine raised in different production systems in North Carolina, USA. 1: Prev Vet Med. Jul 17;36(1):67-76. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=9 677628&dopt=Abstract

23. Dubey J.P., Weigel R.M., Siegel A.M., Thulliez P, Kitron U.D., Mitchell M.A., A. Mannelli, N.E. Mateus-Pinilla, S.K., Shen, O.C.H. Kwok, and K.S. Todd. 1995. Sources and reservoirs of Toxoplasma gondii infection on 47 swine farms in Illinois. J Parasitol ; 81: 723-729. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=retrieve&db=pubmed&list_uids=74 72862&dopt=Abstract

24. Editorials. 2000. Sources of Toxoplasma gondii infection in pregnancy. BMJ, 321:127-128 (15 July): http://bmj.bmjjournals.com/cgi/content/full/321/7254/127

25. Anonymous. 2003. Toxoplasmosis fact sheet. http://www.chclibrary.org/micromed/00068580.html

26. Anonymous. 2004. Toxoplasmosis quick facts: Indiana State Department of Health. http://www.in.gov/isdh/healthinfo/Toxoplasmosis.htm

27. Hugh-Jones M.E., Broussard J.J., Stewart T.B. 1986. Prevalence of Toxoplasma gondii antibodies in southern Louisiana swine in 1980 and 1981. Am J Vet Res; 47: 1050-1051

28. Jacobs L. 1957. The interrelation of toxoplasmosis in swine, cattle, dogs and man. Public Health Rep, 72:872-882

29. Dubey J.P. 1987. Toxoplasmosis in goats. Agric pract ;8: 43-52.

30. Dubey, J.P., Streitel, R.H. 1976. Prevalence of Toxoplasma infection in cattle slaughtered at an Ohio abattoir. J Am Vet Med Assoc; 169: 1197-1199.

31. Rue Jensen. 1974. Diseases of Sheep. Lea & Febiger, Philadelphia.

32. Calnek, B.W., H. John Barnes, C.W. Beard, W.M. Reid, H.W. Yoder, Jr. (ed).1991. Diseases of Poultry. Ninth edition; Iowa State University Press, Ames, Iowa, USA.

33. Anonymous. 2004. Toxoplasmosis: CDC Parasitic Disease Information. http://www.cdc.gov/ncidod/dpd/parasites/toxoplasmosis/factsht_toxoplasmosis.htm

312

(34). Kijlstra A, Eissen OA, Carnelissen J, Munniksma K, Eijck I, Kortbeek. 2004. Toxoplasma gondii infection in animal-friendly pig production systems. Invest Ophthalmol Vis Sci. 45:3165-3169. http://www.aasv.org/news/story.php?id=1293

(35) Dubey, J.P. 1986. A review of toxoplasmosis in cattle. Vet Parasitol. Dece: 22(3-4):177-202

36. Food Safety Focus. May 2001.  Food Safety and Inspection Service, United States Department of Agriculture, Washington, D.C. 20250-3700.
     http://www.fsis.usda.gov/oa/pubs/parasite.htm

37. The Food Safety Educator. 2000. Food Safety and Inspection Service, United States Department of Agriculture, Washington, D.C. 20250-3700
http://www.fsis.usda.gov/OA/educator/educator5-2.htm

313

## Lange, Loren

| | |
|---|---|
| **From:** | Thaler, Alice |
| **Sent:** | Wednesday, July 06, 2005 6:47 AM |
| **To:** | Lange, Loren |
| **Cc:** | Parham, Delila |
| **Subject:** | RE: Loren's Request for Salmonella Serotype Data |

Delila is coordinating a single document.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

> -----Original Message-----
> **From:** Lange, Loren
> **Sent:** Thursday, June 30, 2005 4:13 PM
> **To:** Thaler, Alice
> **Subject:** RE: Loren's Request for Salmonella Serotype Data
>
> Thanks - should I ask HHSD to do the human part (and have me merge the two) or have Delila's staff work with HHSD to put this into a single document
>
> > -----Original Message-----
> > **From:** Thaler, Alice
> > **Sent:** Thursday, June 30, 2005 1:51 PM
> > **To:** Lange, Loren
> > **Subject:** FW: Loren's Request for Salmonella Serotype Data
> >
> > Note I only forwarded this to you. I leave it to you to share with David.
> >
> > Alice M. Thaler, DVM, DACVPM
> > Director ZDRSD
> > Office of Public Health Science
> > 202-690-2687
> > Fax 202-720-8213
> > alice.thaler@fsis.usda.gov
> >
> > > -----Original Message-----
> > > **From:** Parham, Delila
> > > **Sent:** *Thursday, June 30, 2005 12:01 PM*
> > > **To:** Thaler, Alice
> > > **Cc:** Anandaraman, Neena
> > > **Subject:** Loren's Request for Salmonella Serotype Data
> > >
> > > Alice, I interpreted Loren's request as follows:
> > >
> > > 1. **Young Chicken Serotypes:** Provide *Salmonella* serotype data for young chickens for

327

1998-2004 for all sets (A, B, and C sets) to see what is increasing and what is decreasing. Given the total number of serotypes in a year with the total number of serotypes being the denominator, what is number by percentage of the top 20? Give explanation of what is found. For example, Loren thinks we are likely to see that SE has increased substantially over the years.

2. **Human Serotypes:** What are the leading human isolates for *Salmonella*? (Similar information is needed for humans as that provided for young chickens. (He didn't seem to be asking us to do this.)

3. **Summary Statements for Young Chicken Serotypes:** Provide a brief summary statement about each of the top 20 serotypes for young chickens that include information such as reservoirs, commonality, etc. For example, the statement may indicate that the serotype is common in chickens, but is also common in [list other reservoirs/species].

Note: Neena talked with Bob Umholtz recently, and the 2004 database for serotypes is not ready. Therefore, we will only be able to look at data from 1998 – 2003.

As discussed, we can have a preliminary report ready as early as next week with the figures on young chickens. We will need additional time to prepare the additional information requested.

This seems to be a good time to also mention that this branch would be capable of providing this information on a quarterly basis or how ever frequently it is needed. However, if we will be doing it as assigned work, it should be known by others that this staff will be doing it, so we aren't doing things at cross purposes with the other staffs or divisions. Let me know.

Original request.

328

arham, Delila

## SR-3

**From:** Thaler, Alice
**Sent:** Monday, November 21, 2005 3:41 PM
**To:** Parham, Delila
**Subject:** RE: Serovars description paper

This needs significant proofreading and editing for format and content.

Repeated sentences
Misspellings - Cpenhagen
Incorrect punctuation
Need to use plain English to explain what some of the statements mean at a practical level - The number of viable intracellular S. typhimurium Copenhagen bacteria remained constant 6 h after infection of Caco-2 cells, but the viability of S. typhimurium KY32H1 decreased significantly by 4 h postinfection, suggesting that this mechanism may play a role in the virulence and/or intracellular growth of numerous bacteria.

Poor grammar -- noun/verb agreement
Inconsistent formatting
Should limit information to the individual serovar under discussion
Need a frame of reference for the percentage isolated data
'' lear what is meant by the heading "commonality" and how this differs from "reservoir"
. _ervoir list is poorly constructed – domestic animals include cattle, for example, but the listing states "domestic animals,....cattle,..."
Information provided needs to be more complete: He writes -  **(2) S. Heidelberg.** [20, 18, 24, 26, 29, 30] 16.84-22.9% isolated from young chicken.
**Reservoirs:** Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man.
**Commonality:** Man, Swine, Turkey and Cattle.
**Mode of transmission:** Contaminated meat and egg-associated .
- for example, if this serotype is isolated in young chickens why is it egg associated? Where are the statistics on egg contamination?

- In one outbreak, a resistant S. Heidelberg strain was traced from ill dairy calves to a farmer's pregnant daughter, who subsequently transmitted the organism to her newborn infant. – What is the connection between this statement and what precedes it? How is this supportive of gentamicin injection of eggs as a potential source of resistance development?

He has defined high, medium, low in terms of human infection – need to also have a schema for the animal isolates and discuss how this differs and suggest why this is so.

Most of the references are websites.  Where are the numerous articles that he talked about?

   M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687

329

1/27/06  **SR-5**

Alice,

I've read enough to see that data is carelessly or inaccurately presented. The text as written is inaccurate — see sentence — "This serovar is multiple drug resistent." We all know that resistance varies by serotype

The material doesn't present the information in a format that addresses OPHS issues. I would expect a GS-13 analyst to organize material to address a literature in the follow manner:

Heidelberg:

1. Presence in FSIS regulated products.

Yes chicken is high, but how could one not mention Heidelberg in market hogs?

2. Then ~~discuss~~ discuss some documentation of outbreaks attributed to FSIS regulated products.

3. Finally summarize some "expert opinion" about links to specific products. What do experts think are the likely sources of human illness? .231 While this may go

beyond the letter of the
original request, it is
what we would expect of
a GS-13 analyst in
OPHS.

**Parham, Delila**

SR-4

**From:** Chowdhury, Khurshed
**Sent:** Wednesday, November 30, 2005 3:55 PM
**To:** Parham, Delila
**Cc:** Thaler, Alice
**Subject:** Brief description of salmonella serovars

Hi Delila,

Please find the attached my final report on "Salmonella serovars descriptions". I have tried my best to follow your critical comments and corrected whatever possible. I have dropped the unnecessary side heading "Commonality" which was confusing with the side heading "Reservoirs", which is actually somewhat synonymous to reservoir. No article or books use this term at all. After discussing with two microbiologists I have decided to drop the heading commonality.

Because of the fact that I had to gather information about these serovars from various articles, and all most all articles are written about 5-15 different serovars together, most findings/comments are made for a group of serovars, and not for any single serovars. As a result, most findings and comments from the article seemed similar for most serovars. That is the reason you will find similar comments in most of the serovars that I have described in this paper.

'Sensitivity' is the exact opposite word for 'resistant'—and widely used by medical and pharmaceutical science including microbiologists. This paper is written with the pure medical science (microbiology) and meant for scientists people from medical background. One has to have the knowledge of medical science or microbiological science to understand fully what is being described in this article. As for example, the very word "serovar" will not be understood by most general (layman) readers. There are many terminologies (besides sensitivity) in this paper which general readers will fail to understand.

Public health significance means human health and not animal health. Therefore, everything I have described under this heading is about human health. Glossary is always given at the end of the article. Anybody needs glossary will automatically go at the bottom of the paper for explanation.

By the way, I was not reluctant to show my paper, actually there was no time to show anybody because my paper was not in final shape until today. And Dr. Bonnie Rose was absent until Tuesday the November 29, 2005. She came only today and I have showed her the paper (she was very busy but agreed to have a glance to it) today. She has considered the paper is o.k., and she also liked the format of the paper.

Antigenic formula is the "identity mark" on the basis of which each serovar got its own name. It is very prudent to mention at least the antigenic formula of the serovar. It will be too highly technical job and enormously time consuming to describe the molecular characters of antigenic formula, and also will be unnecessary for this paper. I have put the literature in general fashion since this paper was not prepared for any particular journal to publish.

*I have checked all spellings and grammars and I have done my best to make it as good as possible within this short period of time.* Hope you remember the comments made by the renowned microbiologist Dr. Gast how lengthy and time consuming work it is to describe salmonella serovars! I am hoping that you would like this final paper in which I have spent much of my available time. Thanks.

Khurshed

333

## Brief descriptions of five Salmonella serotypes

Five most frequently isolated Salmonella serovars from young chicken have been selected (*From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004*) for writing brief descriptions. The Salmonella serovars (in order from their most frequently isolated to less frequently isolated from the broilers) are: *S. Kentucky, S. Heidelberg, S. Typimurium var. Copenhagen, S. Typhimurium, and S. Enteritidis.*

## General information [16]

Family: Enterobacteriaceae; Genus: *Salmonella*, named after United States Department of Agriculture vet Daniel E Salmon.

> **Comment:** Use the full word

Species: *Salmonella enterica*, and *Salmonella bongori*. *S. enterica* has six subspecies. Isolates from humans and warm-blooded animals belong to *Salmonella enterica* subspecies *enterica*

Serotypes: More than 2,400 *Salmonella* serotypes have been described and reported. All *Salmonella enterica* subspecies *enterica* serotypes are considered potentially pathogenic. Some serotypes are host specific, but the majority can affect different hosts.

> **Deleted:**
>
> **Deleted:** All *Salmonella* serotypes are considered potentially pathogenic. Some serotypes are host specific, but the majority can affect different hosts. ¶

## Characteristics of *Salmonella* serotypes in general

- Gram-negative non-spore-forming rods (2-4X0.5μm), do not have capsules.
- Usually motile with long flagella.
- Non-motile variants may occur e.g *S. Pullorum* , *S. Gallinarum.*
- Optimal growth between 35-37°C and pH 7-7.5.
- Can survive several months away from the host.
- Can survive refrigeration, freezing (much reduced growth at temperatures <15°C and above 6°C) and dry conditions.
- Sensitive to most disinfectants.
- Killed at high temperatures. In general 60°C for 2-6 minutes or 70°C for 1 minute will kill the bacteria.

> **Deleted:** sporing

## (1) *S. Kentucky*

**Antigenic formula:** I, 8, 20 : i: z, 6

**Rate of isolation:** Very high percentages (32.14-44.39%) were isolated from the young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, poultry, including wild birds, rodents and pet animals, and also man[1, 2].

> **Comment:** Why have these specific examples been used? Seems redundant.

1

334

**Mode of transmission to humans**: By ingestion of the organisms with contaminated food and water, raw or improperly cooked foods[1, 2, 17, 18]. Also organisms can be transmitted by the direct contact with infected man and animals.

**Public health significance**: Low to rare (*Please see the glossary below for explanation*). In 2003 CDC's Public Health Laboratory Information System (PHLIS) survey[28] isolated about 15 cases of *S. Kentucky* from the States of Massachusetts, New Jersey, New York, and Pennsylvania.

**Antimicrobial Resistance**: Multiple antimicrobial resistant[5, 4] especially to tetracycline and gentamicin. In an antimicrobial study by the Canadian scientists[26] the most common profile of multiple-antimicrobial resistance was that which included resistance to ampicillin, chloramphenicol, streptomycin, sulfamethoxazole, tetracycline, and ticarcillin. In one study[24] multiple drugs resistance of various degrees was seen in top 5 isolates from Chicken breast, Ground Turkey and Pork chop. S. Kentucky was 100% resistant to most drugs tested.

> Deleted: were

> Comment: Limit the description to the organism being profiled

> Deleted: and S. Heidelberg were

In another study, [20] high percentage of gentamicin resistance was seen in S. Kentucky which was isolated from chicken. It was concluded[20] that the use of gentamicin, which is frequently used in the poultry industry for growth promoting, needs to be examined in light of these findings.

### (2) *S.* Heidelberg.

**Antigenic formula**: 1,4, [4], 12, r, 1, 2

**Rate of isolation**: 16.84-22.9% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs**: Domestic and wild animals, poultry, including wild birds, rodents and pet animals, and also man[1, 2].

**Mode of transmission to humans**: By ingestion of the organisms with contaminated food and water, meat and egg-associated infections were reported[1, 2, 18, 17]. Also organisms can be transmitted by the direct contact with infected man and animals.

**Public health significance**: Moderate to High. About 5.39- 8.0% was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003

**Antimicrobial Resistance**: This serovar is multiple drugs resistant. In an antimicrobial study by the Canadian scientists[26] the most common profile of multiple-antimicrobial resistance was that which included resistance to ampicillin, chloramphenicol, streptomycin, sulfamethoxazole, tetracycline, and ticarcillin. In one study[24] multiple

2

drugs resistance of various degrees were seen in top 5 isolates from Chicken breast, Ground Turkey and Pork chop. S. Heidelberg were 100% resistant to most drugs tested.

*Deleted: S. Kentucky and*

In another study [20] high percentage of gentamicin resistance were seen in *S. Heidelberg* that was isolated from chicken. In the chicken industry there is widespread injection of broiler eggs with gentamicin prior to hatch. Use of gentamicin in the poultry industry needs to be reevaluated. Experimental study by CDC[29] found that antimicrobial-resistant *Salmonella Heidelberg* frequently arise from food animals and can cause serious infections in humans. In one outbreak, a resistant *S. Heidelberg* strain was traced[30] from ill dairy calves to a farmer's pregnant daughter, who subsequently transmitted the organism to her newborn infant via placenta.

*Deleted: which*

*Comment: Did this result in treatment failure because of antimicrobial resistance?*

### (3) S. Typhimurium (var. Copenhagen)

**Antigenic formula:** 1, 4, 12:i: 1,2

*see earlier comment*

**Rate of isolation:** 6.97-9.40% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, chickens, ducks, pigeons, rodents, pet animals, and also man[1, 2].

**Mode of transmission to humans:** By ingestion of the organisms with contaminated foods, raw or uncooked foods, contaminated water[1, 2, 18, 17, 6]. Also organisms can be transmitted by the direct contact with infected man and animals.

In an experimental study[17] *Salmonella typhimurium* var.Copenhagen variety was the predominant Salmonella isolated from domestic pigeons. Same serotype was isolated from animals, chickens and wild birds, which indicated pigeons have the role in the epidemiology of salmonellas in animals and man.

*Comment: Meaning what? What animals?*

**Public health significance:** Low to Moderate. About 1.08-1.30% of *S. Typhimurium* var. Copenhagen was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003.

**Antimicrobial Resistance:** This serovar is multiple drugs resistant. Strains isolated from pigeons were drug sensitive (lethal) but same strain isolated from other species (crows, kite) were drug resistant[17]. Studies[26, 14] also have found that, *S. Copenhagen*, was the most common serovars among isolates resistant to individual antimicrobials and multiple antimicrobials. *S. Typhimurium* var. Copenhagen is resistant to amphicillin, ticarcillin, sulfamethoxazole, streptomucin, and tetracycline.

*Deleted: and S. Heidelberg*

*Deleted: were*

In several experimental studies[13, 14, 17] it was observed that the number of viable intracellular *S. typhimurium* Copenhagen bacteria remained constant 6 hrs after infection of Caco-2 cells, but the viability of *S. typhimurium* KY32H1 decreased significantly by 4

*Comment: The format of the organisms name varies here from how it is stated in the rest of this document. Is there a reason for this?*

3

336

hrs post infection, suggesting that this mechanism may play a role in the antimicrobial resistance and virulence and/or intracellular growth of numerous bacteria.

Comment: Spell out

Comment: What does "this" refer to?

Comment: This entire paragraph is unclear.

### (4) S. Typhimurium

**Antigenic formula:** 1, 4, [5], 12: i: 1, 2

**Rate of isolation:** 3.83-6.97% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, including poultry, rodents, reptiles, and pet animals, and also man[1, 2].

**Mode of transmission to humans:** By ingestion of the organisms with food and water contaminated by feces or urine of a patient or carrier. Consuming shellfish taken from sewage-contaminated beds and raw fruits, vegetables, milk and milk products contaminated by carriers[1, 2, 17, 18, 6]. Also organisms can be transmitted by the direct contact with infected man and animals.

Pet cats, rodents and reptiles can shed multiple drug-resistant S. Typhimurium and can infect humans through contaminated foods by pet's feces[6]. To prevent the transmission of *Salmonella* from chicks, ducklings, and other young fowl to humans, persons should avoid contact with feces and carefully wash their hands with soap and water after handling young fowl or anything that has come in contact with them[7]. It has been recommended[5] that the public health practitioners should consider pet rodents a potential source of salmonellosis and, when indicated, should obtain cultures from pet rodents during an investigation.

**Public health significance:** Very high public health significance. Very high percentages (22-26%) was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003. Ubiquitous and frequently the cause of infections in man and animals; the most frequent agent of food poisoning in man[2]. In England and Wales[23] during the period of 1981-1988 one of the most common serotypes isolated from humans was S. *typhimurium*.

Deleted: were

Deleted: , and S. Enteritidis

**Antimicrobial Resistance:** This serovar is multiple drugs resistant. S. Typhimurium were resistant to ampicillin, ceftriaxone, cephalothin, chloramphenicol, clavulanic acid/amoxicillin, gentamicin, kanamycin, streptomycin, sulfamethoxazole, and tetracycline[31, 8, 9, 10, 11, 3, 6].

In an experimental study[26] (by the Canadian scientists from Alberta Agriculture department) the sensitivity of 17 antimicrobials were tested for 3553 Salmonella isolates from food animals and foods. Of the 3553 antimicrobial susceptibility tests on *Salmonella* isolates, 11.8% were positive for resistance. The Canadian scientists[26] found these serotypes commonly resistant to tetracycline (35.4%), streptomycin (32.5%),

4

337

sulfamethoxazole (28.7%), ticarcillin (27.3%), and ampicillin (26.8%). Resistance to at least 1 antimicrobial was observed in 112 isolates (53.6%). *Salmonella* Typhimurium, was one of the most common serovars among isolates resistant to individual antimicrobials and multiple antimicrobials.

Deleted: S. Typhimurium var. Copenhagen, and S. Heidelberg were
Formatted: Font: Not Italic
Formatted: Font: Not Italic
Formatted: Font: Not Italic

Experimental study[26] has determined that among all antimicrobial groups, the quinolone antimicrobials, nalidexic acid and ciprofloxacin, had the greatest activity against the Salmonella isolates. Cross-resistance to amphicillin and ticarcillin was evident; 56 of the 57 isolates that were resistant to ticarcillin were also resistant to ampicillin.

Of particular concern[21, 22] is the increasing number of infections with antimicrobial drug-resistant *Salmonella*, including the recent emergence of drug-resistant *Salmonella enterica* serotype Typhimurium (*S.* Typhimurium) definitive phage type 104 (DT104). This strain is usually resistant to at least five drugs: ampicillin, chloramphenicol, streptomycin, sulfonamides, and tetracycline (R-type ACSSuT) and has become a predominant *Salmonella* type in many countries, including the United States, United Kingdom, Germany, and France . Experimental study by CDC[29] has found that antimicrobial-resistant *Salmonella Typhimurium* frequently arise from food animals and can cause serious infections in humans.

The study[22] also suggests that *S.* Typhimurium of R-type ACSSuT does not cause invasive disease more often than *Salmonella* Enteritidis. However, the overall mortality in relation to *S.* Typhimurium infection is higher.  *S.* Typhimurium with excess[21] mortality and the demonstration of a hazard to human health underscores the need for restrictions in the use of antimicrobial drugs in the production of food from animals. A particular risk was associated with quinolone resistance, indicating that the use of fluoroquinolones for food production animals should be discontinued.

The extensive use[31, 10, 29] of antimicrobial agents as feed additives for farm animals and in the control and treatment of *Salmonella* infection has been suggested as a predisposing factor in the evolution of multiple drugs resistant strains. Antibiotics are used extensively in the poultry industry to reduce mortality and to increase the body weight of the animals.

Experimental data[30] also suggests that antimicrobial use by humans in the United States or in other countries does not play a major role in the emergence or persistence of antimicrobial-resistant strains in the United States. But epidemiologic and laboratory studies[29, 31] have traced antimicrobial-resistant salmonella to foods of animal origin.

Deleted: indicated

*Salmonella* Typhimurium[14, 11] strains resistant to ampicillin, chloramphenicol, streptomycin, sulfonamide, and tetracycline (hereafter referred to as penta-resistant) were associated with higher death rates than infections with non–penta-resistant *S.* Typhimurium. Patients infected with strains[15] S. Typhimurium resistant to ampicillin, chloramphenicol, streptomycin, sulfonamide, and tetracycline were 4.8 times (95% CI 2.2 to 10.2) more likely to die, whereas quinolone resistance was associated with a mortality rate 10.3 times higher than the general population.

5

338

In an experimental study by the University of Maryland[25], College Park MD, it was found that all *Salmonella enterica* serovar Typhimurium isolates from conventional chickens were resistant to five or more antimicrobials, whereas most *S. enterica* serovar Typhimurium isolates (79%) from organic chickens were susceptible to 17 antimicrobials tested. ***

> **Deleted:** p

> **Comment:** Meaning what? Commercial?

In analysis of data[27] collected by local and state health departments and public health laboratories (CDC) between the periods: 1979-1996, it was found that Multiple-drug-resistant typhimurium DT104 has become a widespread pathogen in the United States. More prudent use of antimicrobial agents in farm animals and more effective disease prevention on farms are necessary to reduce the dissemination of multiple drug-resistant typhimurium DT104 and to slow the emergence of resistance to additional agents in this and other strains of salmonella.

### (5) *S. Enteritidis*

**Antigenic formula:** 1,9,12: g, m:

**Rate of isolation:** 2.38-6.38% isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, including poultry, rodents and pet animals, and also man[1, 2].

**Mode of transmission to humans:** By ingestion of the organisms with contaminated food and water [1, 2, 6, 17], uncooked/imperfectly cooked meat, contaminated eggs, direct contact with infected man and animals, Pet rodents and reptiles can shed multiple drug-resistant *S.* Enteritidis and can infect humans through contaminated foods. Contamination of poultry meat appears to be a lesser cause of *S.* Enteritidis infection in humans than contaminated eggs[18].

To prevent the transmission[7] of *Salmonella* from chicks, ducklings, and other young fowl to humans, persons should avoid contact with feces and carefully wash their hands with soap and water after handling young fowl or anything that has come in contact with them.

**Public health significance:** Very high significance. Very high percentages (14.48-19.44%) was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003. *S.* Enteritidis is a frequently isolated pathogen[1, 2] in humans and animals in the US. *S.* Enteritidis is one of the three top isolates from non-human sources[3]. It has been recommended[6] that the public health practitioners should consider pet rodents a potential source of salmonellosis and, when indicated, should obtain cultures from pet rodents during an investigation.

In the United States and throughout the world, human illness caused by *S.* Enteritidis a *prototypic emerging pathogen has dramatically increased due to mainly by consuming*

6

undercooked or raw shell eggs[19]. In England and Wales[23] during the period of 1981-1988 the most common serotypes isolated from humans were *S. typhimurium*, and S. *Enteritidis*.

**Antimicrobial Resistance:** This serovar is multiple drugs resistant[6] such as to ampicillin, chloramphenicol, streptomycin, sulfizoxazole, and tetracycline.

In the experiments [10, 12,] *Salmonella Enteritidis* is resistant to the penicillin and cephalosporin classes of antibiotics. Additionally, this serovar is resistant to gentamicin, tobramycin, chloramphenicol, and tetracycline and remained susceptible to quinolones (pefloxacin, norfloxacin, and nalidixic acid) and amikacin.

The extensive use of antimicrobial agents[10, 31, 29] as feed additives for farm animals and in the control and treatment of *Salmonella* infection has been suggested as a predisposing factor in the evolution of multiple resistant strains. Antibiotics are used extensively in the poultry industry to reduce mortality and to increase the body weight of the animals.

**Glossaries of Public Health Significance**: As per rate or frequency of isolation of the causal serovar from human salmonella incidences, I have designated the following terminology against each Salmonella serovar of their approximate public health significance.

Rare: Very rarely or occasionally isolated.

Low: Low percentage of isolations.

Moderate: Moderate percentage of isolations.

High: Frequently high percentage of isolations.

Very high: Frequently very high percentage of isolations.

**References:**

1. Control of communicable diseases in man: by Abram S. Benenson, 14th Edition; 1985; an official report of the public association.

(2) Bergey's Manual of Determinative Bacteriology: R.E. Buchanan and N.E. Gibbons; Eighth Edition; 1975; The Williams and Wilkins Company/Baltimore.

(3) Antimicrobial Resistance in Pathogenic and commensal Bacteria of food animals. http://www.ars.usda.gov/research/publications/publications.htm?SEQ_NO_115=130172

(4) Sheep Anti-Salmonella kentucky, group C3 Polyclonal Antibody, Unconjugated http://www.biocompare.com/itemdetails.asp?itemid=413825&catid=3194

7

340

(5) Serotyping and Antibiotic Resistance Profiling of Salmonella in Feedlot and Nonfeedlot Beef cattle: John C. Beach et al; Journal of Food Protection: Vol. 65, No. 11, pp. 1694–1699.
http://apt.allenpress.com/aptonline/?request=get-abstract&issn=0362-028X&volume=065&issue=11&page=1694

(6) Outbreak of Multidrug-Resistant *Salmonella* Typhimurium Associated with Rodents Purchased at Retail Pet Stores --- United States, December 2003--October 2004
http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5417a3.htm

(7) Salmonellosis Associated with Chicks and Ducklings ---- Michigan and Missouri, Spring 1999. MMWR; April 14, 2000/ 49(14): 297-9
http://www.cdc.gov/mmwr/preview/mmwrhtml/mm4914a1.htm

(8) Outbreaks of Multidrug-Resistant *Salmonella* Typhimurium Associated With Veterinary Facilities ---Idaho, Minnesota, and Washington, 1999; MMWR; August 24 24, 2001/ 50(33): 701-4. http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5033a1.htm

(9) Occurrence of *Salmonella enterica* Serotype Typhimurium DT104A in Retail Ground Beef: Zhao T.[1]; Doyle M.P.[1]; Fedorka-Cray P.J.[2]; Zhao P.[1]; Ladely S.[3] Journal of Food Protection, Volume 65, Number 2, 1 February 2002, pp. 403-407(5) Richard Russell Research Center, Athens, Georgia 30605, USA
http://www.ingentaconnect.com/content/iafp/jfp/2002/00000065/00000002/art00023

(10) Dual Emergence in Food and Humans of a Novel Multiresistant Serotype of *Salmonella* in Senegal: *Salmonella enterica* subsp. *enterica* Serotype 35:c:1,2; Journal of Clinical Microbiology, June 2001, p. 2373-2374, Vol. 39, No. 6.
http://jcm.asm.org/cgi/content/full/39/6/2373

(11) Antimicrobial Resistance of *Salmonella* in Raw Retail Chickens, Imported Chicken Portions, and Human Clinical Specimens: Wilson I. G.; Journal of Food Protection; Volume 67, Number 6, 1 June 2004, pp. 1220-1225(6).
http://www.ingentaconnect.com/content/iafp/jfp/2004/00000067/00000006/art00021

(12) Microbial Drug Resistance: Antimicrobial Resistance and Serotype Prevalence of *Salmonella* Isolated from Dairy Cattle in the Southwestern United States.
http://www.liebertonline.com/doi/abs/10.1089/107662904323047808;jsessionid=jJDZlGIV-cr8?cookieSet=1&journalCode=mdr

(13) Decreased intracellular survival of an fkpA mutant of Salmonella typhimurium Copenhagen: SM Horne, TJ Kottom, LK Nolan and KD Young : Department of Microbiology and Immunology, School of Medicine, University of North Dakota, Grand Forks 58202-9037, USA. **http://iai.asm.org/cgi/content/abstract/65/2/806**



341

(14) Antimicrobial Drug–resistant *Salmonella* Typhimurium (Reply to Helms): CDC Emerging Infectious Diseases.
http://www.cdc.gov/ncidod/EID/vol9no10/02-0716.htm

(15) Excess mortality associated with antimicrobial drug-resistant *Salmonella* Typhimurium. Helms M, Vastrup P, Gerner-Smidt P, Mølbak K.; Emerg Infect Dis 2002;8:490–5.

(16) Salmonella Bacteria Classification.
http://www.safe-poultry.com/AboutSalmonella.asp

(17) Biochemical characteristics and in-vitro drug sensitivity of Salmonella typhimurium, Copenhagen variety isolated from domestic and feral pigeons, crows, a kite, chickens and animals in Japan: Sato G, Ishiguro N, Asagi M, Oka C, Kawanishi T, Inoue T: Nippon Juigaku Zasshi, 1977, Dece;39(6):609-17
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=3 40743&dopt=Abstract

(18) Epidemiology of *Salmonella* enteritica Serovar Enteritidis: C. Poppe: Salmonella enterica Serovar Enteritidis in Humanms and Animals: Edited by: A.M.Saeed et al. IOWA State University Press/AMES, First Edition 1999.

(19) Epidemiology og Human salmonella enterica Serovar Enteritidis infections in the United States: F.J. Angulo and D.L. Swerdlow: Salmonella enterica Serovar Enteritidis in Humanms and Animals: Edited by: A.M.Saeed et al. IOWA State University Press/AMES, First Edition 1999.

(20) Antibiotic ressistance in Salmonella Enterica serotypes Heidelberg, Kentucky and Thompson isolated from human and broiler chicken sources: Hollinger K et al.
http://www.cdc.gov/narms/publications/1999/Hollinger-Silvers_1999.pdf

(21) Excess Mortality Associated with Antimicrobial Drug-Resistant *Salmonella*Typhimurium: Morten Helms,* Pernille Vastrup,* Peter Gerner-Smidt,* and Kåre Mølbak*; *Statens Serum Institut, Copenhagen, Denmark
http://www.cdc.gov/ncidod/EID/vol8no5/01-0267.htm  (For S. Tiphimurium)

(22) Antimicrobial Drug–resistant *Salmonella* Typhimurium (Reply to Dahl):Morten Helms,* Pernille Vastrup,* and Kåre Mølbak*:*Statens Serum Institut, Copenhagen, Denmark.
http://www.cdc.gov/ncidod/EID/vol9no10/03-0029.htm

(23) Multiple drug resistance in salmonellae in England and Wales: a comparison between 1981 and 1988.:Ward LR, Threlfall EJ, Rowe B: J. Clin Pathol. 1990 Jul; 43(7):563-6
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=2 199536&dopt=Abstract

342

(24) Antimicrobial Resistance among Salmonella by Meat type in Overall Top Five Sertotypes, 2002.: http://www.fda.gov/cvm/Documents/Table13.pdf

(25) Prevalence and Antimicrobial Resistance of *Campylobacter* spp. and *Salmonella* Serovars in Organic Chickens from Maryland Retail Stores: Shenghui Cui, Beilei Ge, Jie Zheng, and Jianghong Meng* :Department of Nutrition and Food Science, University of Maryland, College Park, Maryland 20742. http://aem.asm.org/cgi/content/abstract/71/7/4108

(26) Antimicrobial resistance of selected *Salmonella* isolates from food animals and food in Alberta: Julie M. Johnson, Andrijana Rajic, and Lynn M. McMullen: Can Vet J. 2005 February; 46(2): 141–146. http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=1082862

(27) Emergence of multidrug-resistant Salmonella enterica serotype typhimurium DT104 infections in the United States: Glynn MK, Bopp C, Dewitt W, Dabney P, Mokhtar M, Angulo FJ: Centers for Disease Control and Prevention, Atlanta, GA 30333, USA. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=9 571252&dopt=Abstract

(28) Salmonella isolates from Human sources by serotype, Geographic region and State, 2003 by Public Health laboratory Information System. http://www.cdc.gov/ncidod/dbmd/phlisdata/salmtab/2003/SalmonellaTable4_2003.pdf

(29) Animal-to-man transmission of antimicrobial-resistant Salmonella: investigations of U.S. outbreaks, 1971-1983: Holmberg SD, Wells JG, Cohen ML; Science. 1984 Aug 24;225(4664):833-5. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=6 382605&dopt=Abstract

(30)Drug-resistant Salmonella in the United States: an epidemiologic perspective: Cohen ML, Tauxe RV; Science. 1986 Nov 21;234(4779):964-9. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=3 535069&dopt=Abstract

(31) Medical consequences of antibiotic use in agriculture. Science 1998; 279:996-7. Witte W; Science, Vol.279; February 13, 1998

(32) Most frequently reported Salmonella serotypes from human source reported to CDC from 1998-2003-(Public Health Laboratory Information Systems (PHLIS). http://www.cdc.gov/ncidod/dbmd/phlisdata/salmonella.htm

10

343

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Tuesday, December 20, 2005 6:35 AM
**To:** Parham, Delila
**Subject:** RE: Dr. Chowdhury's serotype report to Loren

Go ahead and send it with this note:

"The original request for this document came from you. This new version has been developed by Dr. Chowdhury to address the deficiencies noted in the first draft. We would appreciate your review and comment to assist us in judging this work product. To be acceptable under the employee's performance improvement plan, Dr. Parham and I will evaluate it for general acceptability as presented by the employee as a complete and accurate GS-13 level work product. As the customer, please let us know the document contains the amount and level of information you expect from ZDRSD."

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

    -----Original Message-----
    **From:** Parham, Delila
    **Sent:** Monday, December 19, 2005 5:06 PM
    **To:** Thaler, Alice
    **Subject:** Dr. Chowdhury's serotype report to Loren

    Reminder: I believe we were going to send Khurshed's serotype report to Loren. I don't think we did that yet.

    Thanks.

    Delila

**Lange, Loren**

SR-6

| From: | Thaler, Alice |
|---|---|
| **Sent:** | Tuesday, January 10, 2006 7:50 AM |
| **To:** | Lange, Loren |
| **Cc:** | Parham, Delila |
| **Subject:** | FW: Poultry Salmonella Serotype Report |
| **Importance:** | High |

This message is sent marked high importance, because I want to complete the evaluation of Dr. Khurshed Chowdhury's performance in as short a timeframe as possible.

Please review the attached Salmonella serotype report that was developed at your request. It is one of three work products prepared by Dr. Khurshed Chowdhury during his 120-day performance improvement plan that ended Dec 31, 2005. You reviewed an earlier version, which was unacceptable and, in part, led to the PIP.

I need your independent evaluation of whether this Salmonella Serotype Paper was useful and met your needs. Also please comment on whether in your opinion it meets what would be expected from a GS-13 level scientist.

Delila and I are evaluating all three work products, including peer review within the staff. We must reach agreement on whether the quality of the PIP work products meets the fully successful level, i.e., do they meet the quality standards that all ZDRSD staff are expected to meet?

Once I have all the documentation about the three work products, I will need to meet with you and David to ask your support of my final decision regarding the PIP.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Parham, Delila
**Sent:** Tuesday, December 20, 2005 8:02 AM
**To:** Lange, Loren
**Cc:** Thaler, Alice
**Subject:** Poultry Salmonella Serotype Report

Alice Thaler asked that I forward this report prepared by Khurshed Chowdhury to you. Please see her note below.

Thanks.

Delila Parham

345

**UNITED STATES DEPARTMENT OF AGRICULTURE**
FOOD SAFETY AND INSPECTION SERVICE
WASHINGTON, DC

| FSIS DIRECTIVE | 4430.1 REVISION 4 | 6/13/05 |
|---|---|---|

## PERFORMANCE EVALUATION PLAN

## PART ONE—BASIC PROVISIONS

I.          **PURPOSE**

This directive:

    A.      Defines FSIS performance appraisal policy for all employees except those included in the SES. Senior executives are covered by the USDA SES Performance Management Plan.

    B.      Establishes procedures for results-oriented performance standards.

II.          **CANCELLATION**

This directive cancels FSIS Directive 4430.1, dated 1/15/88 and Amendments 1 through 3.

III.          **REASON FOR REISSUANCE**

This directive

    A.      Aligns performance plans with Agency organizational goals and strategic plans.

    B.      Describes a performance evaluation program using generic performance elements and standards.

    C      Reduces the performance appraisal cycles from three to one. The new cycle begins July 1 through June 30 of the following year.

---

**DISTRIBUTION:**
All Offices

**OPI:**
HRD – Performance, Evaluation, and Recognition Branch



3.    Who has not received a rating of record during the 4-year period shall receive credit for performance based on a modal rating. (See FSIS Directive 4351.1.)

G.    **Reassignment, Demotion, or Removal for Unaccceptable Performance.**

1.    The supervisor shall assist employees in improving less than fully successful performance. Such assistance may include, but is not limited to formal training, on-the-job training, counseling, and closer supervision. If an employee's performance is unacceptable in one or more critical elements, at any time during the performance appraisal cycle, the supervisor shall inform the employee, in writing, of the standard(s) or requirement(s) that must be met for fully successful performance and provide an opportunity period to demonstrate fully successful performance.

2.    Management may reduce in grade, remove, or reassign employees whose performance continues to be unacceptable.

XII.    **INFORMING EMPLOYEES AND SUPERVISORS**

Each covered employee and the employee's supervisor receives a copy of this Directive.

A.    **All Employees.** Use this Directive and FSIS Forms 4430-10 and 4430-10a to establish performance elements and standards, and designate elements as critical or non-critical. Supervisors are ultimately responsible for:

1.    Orientation of employee on all aspects of this Directive.

2.    Establishing written performance elements and standards within 30 days of the employee's entrance on duty.

3.    Discussing both the elements and standards with the employee and providing him or her with a copy

B.    **Bargaining Unit Employee.** Use this directive with the LMA when dealing with the performance of bargaining unit employees. The LMA supplements this Directive for bargaining unit employees and takes precedence when conflicts arise between the Directive and the LMA.

**Performance Improvement Plan.** A formal document that initiates a performance improvement period. The Plan identifies:

      1.     The critical element the employee is failing.

      2.     What the employee must do to bring performance to the successful level.

      3.     The timeframe provided to improve performance.

      4.     The assistance that is offered.

      5.     The consequences of failure to bring performance to the fully successful level.

**Performance Standard.** The management-approved expression of the performance thresholds, requirements, results, or expectations that must be met to be appraised at a particular level of performance. A performance standard may include, but is not limited to, factors such as quality, quantity, cost-efficiency, timeliness, and manner of performance.

**Progress Review.** Communication between the supervisor and employees about performance compared to the performance standards, elements, and goals or activities.

**Rating of Record.** The performance rating and assignment of a summary rating level prepared either at the end of the appraisal period for performance of duties during the period and the assignment of a summary rating level, OR, when needed to make the rating of record consistent with a determination to grant or withhold a WGI.

**Reviewing Official.** A higher level official who concurs with the rating official's determination of an employee's performance before the rating is issued to the employee. Assistant Administrators may require a designated reviewing official to review performance plans before plans are put into place and to review all ratings of record before they are issued.

**Summary Rating.** The written record of performance and appraisal of each critical and noncritical element and assignment of a summary rating level.

**Summary Rating Level.** Five adjective levels of achievement.

      *1.*     **Unacceptable (Level 1).** Performance which does not meet established fully successful performance standards in one or more critical elements of the employee's position. When performance is unacceptable, corrective action must be taken consistent with required procedures.

      *2.*     **Marginal (Level 2).** Performance which needs improvement to achieve the fully successful level. This may be evidenced by the need for close supervisory review, discussion, and correction of work products.

D.    **Discussion.** When the rating is returned to the supervisor, he or she will:

1.    Meet with the employee and conduct a performance evaluation discussion.

2.    Obtain the employee's signature certifying that:

a.    The supervisor has discussed the performance rating with the employee.

b.    Any questions regarding USDA and FSIS directives on employee responsibilities and conduct have been answered.

c.    Employee's training needs have been discussed.

E.    **Distribution of Forms.** Distribute forms as follows:

1.    **SHRO.** Receives one copy of FSIS Form 4430-10 and 4430-10a for processing into the NFC database and filing in the employee's EPF.

2.    **Rating Supervisor.** Retains one copy of FSIS Form 4430-10 and 4430-10a.

3.    **Employee.** Receives the original copy of FSIS Form 4430-10.

VII.    **UNACCEPTABLE PERFORMANCE**

A.    Supervisors should inform an employee in writing if performance on a critical element falls below the fully successful level **as soon as** that fact becomes apparent. The supervisor should place the employee under a PIP. The PIP provides the employee a reasonable opportunity to improve performance to the fully successful level before the employee receives a rating of record of "Unacceptable". The supervisor must:

1.    Identify the performance elements and standards which were not accomplished at the fully successful level and provide reasonable means to assist employees in improving performance. Such assistance may include training, closer supervision, revision of assignments, or coaching.

2.    Describe specific incidents that illustrate the failure to meet the standards.

B.    Employees must receive a reasonable time (usually no less than 30 days) to demonstrate performance at the fully successful level. Contact LERD for advice and assistance in implementing a PIP.



## CHAPTER 430 - PERFORMANCE APPRAISAL
## SUBCHAPTER 1 - GENERAL PROVISIONS

### 1-1.   INTRODUCTION

a.    Authority.  The regulations contained in this Chapter constitute the Department's Performance Appraisal Plan for all non-SES employees who are not excepted by law or regulation.  This Plan has been approved by OPM as meeting the requirements set forth in Chapter 43, Title 5 U.S.C., other provisions of law or Executive Order, and Part 430 of Title 5 CFR.  The OPM letter of approval is attached.  Agency supplements to these regulations shall be submitted to the Office of Personnel (OP) for review and clearance. Approval of this Chapter by OPM constitutes the Department's authority to approve agency plans which conform to this plan.

b.    Purpose.  The purpose of this Plan is to ensure that the performance appraisal is used as a tool for executing basic management and supervisory responsibilities by:

   (1)  Communicating and clarifying agency goals and objectives;

   (2)  Identifying individual accountability for the accomplishment of organizational goals and objectives;

   (3)  Evaluating and improving individual and organizational accomplishments; and

   (4)  Using performance ratings as a basis for rewarding employees and for other personnel actions.

   "Fully Successful" performance is the expected level of performance under this plan.

c.    Definitions.  The following definitions are applicable to the Department's Performance Appraisal Plan and other personnel systems involving the use of performance appraisals:

   (1)  Appointing Authority.  The Secretary of Agriculture or other official(s) designated by the Secretary as appointing authorities.

   (2)  Appraisal.  The act or process of reviewing and evaluating the performance of an employee against the described performance standard(s), including oral or written progress reviews.

   (3)  Appraisal Period.  The period of time established by an appraisal system for which an employee's performance will be reviewed.

   (4)  Appraisal System.  The method used to identify critical and non-critical elements; establish performance standards; communicate elements and standards to employees; establish methods and procedures to appraise performance against established standards; and provide appropriate use of appraisal information in making personnel decisions.

354

f.    Conversions.  When an employee's position is converted from another Federal pay system with no change in duties or responsibilities, the employee's rating of record will be considered to have been based on the position which the employee occupies after the conversion and for all other purposes under this chapter.

g.    Collateral Duties.  Employees performing officially assigned collateral duties should be given performance appraisals which reflect both their primary duties and responsibilities and the collateral duties.  This is a joint responsibility of the primary supervisor and the collateral duty supervisor.

h.    Employee's Certification.  The supervisor shall review the rating of record with the employee.  The employee's signature on the AD-435 or approved equivalent shall serve as certification that such a discussion took place.  If this discussion cannot be held, the supervisor shall document the reason on the AD-435 or the equivalent.

i.    Grievances.  Grievances of performance appraisals shall be handled using the administrative grievance procedure or negotiated grievance procedure, as appropriate.

## 2-8.  LINKAGE TO OTHER PERSONNEL ACTIONS AND DECISIONS

The following pertains to the use of performance appraisals as a basis for the specified personnel actions:

(a)    Within-grade Increase (WGI).  Eligible employees may be granted within-grade increases only when the employee's rating of record is "Fully Successful" or better.  The decision to grant or withhold a WGI is based upon the employee's "rating of record" within the appropriate waiting period.  When a WGI decision is not consistent with the employee's most recent rating of record, a more current rating of record must be prepared.

(b)    Promotion.  Performance ratings shall be considered in evaluating employees for promotion and reassignment to positions with greater promotion potential.  No employee shall receive a career promotion unless his/her current rating of record is "Fully Successful" or higher.

(c)    Training and Development.  The performance appraisal process may be used as a basis for determining the training needs of employees.

(d)    Pay Increases and Performance Awards.  Performance ratings shall be used as a basis for granting pay increases and performance awards.

(e)    Reduction-in-Force.  Performance ratings are used to establish service credit for reduction-in-force (RIF) purposes.  For RIF purposes, rating of record means an annual summary rating required at the time specified in this plan.  An employee will not be assigned a new rating of record for the sole purposes of affecting his or her retention standing.  Performance ratings that were due before the date of specific RIF notices but were not officially approved and put on record until on or after the date of the specific notices are not used to determine additional service credit.

355
10



United States
## Office of
## Personnel Management

Washington, D.C. 20415

In Reply Refer To                    Your Reference

SEP 1 0 1986

Mr. William J. Riley, Jr.
Director of Personnel
United States Department of Agriculture
Washington, D.C.   20250

Dear Mr. Riley:

The purpose of this letter is to approve the Performance
Management System (PMS) Plans required under section
430.103(b) of Title 5, Code of Federal Regulations.

The following plans for the U.S. Department of Agriculture
are approved:

Performance appraisal plan for GS and Prevailing Rate
employees (required at 5 U.S.C. 4302 and 4304).

Performance appraisal plan for the SES (required at
5 U.S.C. 4312).

Plan for making within-grade increase and quality step
increase determinations (required under 5 CFR Part 531,
Subparts D and E).

Superior Accomplishment Awards plan (required under
Part 451, Subpart A).

We are also approving your request for exceptions to the
implementation schedule to allow conformity with certain
negotiated agreements and the extension of our December 24,
1985, approval of the interim performance appraisal plan for
PMRS employees of the FSIS.

Any proposed changes to the PMS plans must be submitted to
this office for prior approval if the change would affect a
provision of the plan covered by regulation or law. Any
other changes also should be sent to us in order that we are
assured of maintaining updated copies of your plans in our
files.

Sincerely,

Barbara L. Fiss
Acting Assistant Director
for Performance Management/PSO

356

UNITED STATES DEPARTMENT OF AGRICULTURE
OFFICE OF PERSONNEL
WASHINGTON, D.C. 20250

NOV 16 1995

PERSONNEL BULLETIN NO. 430-1

SUBJECT: Performance Appraisal


On September 10, 1986, the Office of Personnel Management (OPM) approved the U.S. Department of Agriculture's (USDA) Performance Management Plan. This Personnel Bulletin contains the Performance Appraisal component of the USDA Performance Management Plan, pursuant to 5 CFR 430 (51 FR 8396, March 11, 1986). This plan applies to all non-Senior Executive Service (SES) USDA employees except those excluded in Section 1-2 of this plan. A separate USDA SES performance plan was issued August 4, 1994, as part of a USDA SES Handbook.

This plan has been updated to delete references to the Performance Management Recognition System (PMRS) which terminated November 1, 1993. All employees in positions formerly covered by the PMRS were automatically covered by the provisions of the USDA plan contained within. References to various Schedule A appointing authorities in Section 1-2 of the July 31, 1987, plan have also been updated to reflect their incorporation under the new Schedule B Student Temporary Employment Program appointing authority. This plan also incorporates revisions to the former Personnel Letter 430-15, which were published under Personnel Letters 430-16 and 430-17.

This plan is being reissued in accordance with new Departmental Personnel Manual guidelines. A committee to draft a USDA Performance Management System has been formed, and upon Office of Personnel Management approval, mission areas will be able to design their own Performance Management programs within the parameters of the Departmental System. Employees will continue to be covered by the provisions of this plan until a new program is approved for their organization.

Evelyn M. White
Director of Personnel

Attachment


INQUIRIES: Compensation Division, Susan Fonte, (202) 720-6104, Rm 311-W


DISTRIBUTION: Mission Area Personnel Offices

EXPIRATION DATE: January 31, 1998

357

# Chowdhury Depo Excerpts

.

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

                            :

KHURSHED A. CHOWDHURY        :

                            :

        Plaintiff,       :

                            :

        v.                :  Case No. 1:07-CO-

                            :  00997

MIKE JOHANNS, SECRETARY,    :

U.S. DEPARTMENT OF AGRICULTURE,  :

                            :

        Defendant.       :

                            :

- - - - - - - - - - - - - - - - x

Washington, D.C.

Friday, May 2, 2008

Deposition of

KHURSHED A. CHOWDHURY

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Jennifer M. O'Connor,

Notary Public in and for the District of Columbia, in the

offices of the AUSA, 501 Third Street, N.W., Fourth Floor,

Washington, D.C.  20001, commencing at 10:23 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

1    A    That is where I believe the bitterness started.

2    Q    **What did she respond?**

3    A    She responded, no, you must give it.  After I gave

4  that long memo, she did not respond anything.  I came back on

5  first week of August and I was waiting -- that is the time

6  for my ratings for 2004-2005.  I asked my colleague, Ben

7  Salamone, Kureshee, Harmon, I believe, she said we have been

8  ready.  We got it.  So I'm the only one that did not get

9  ready.

10         August 1, 2, 3, 4, 8, still Dr. Parham is not

11  coming to tell me anything, not sending me any e-mail that

12  Khurshed -- usually, she usually does.  Khurshed, come to my

13  room, I'll give you performance.  So she never did it.  So I

14  was very fishy -- very suspicious, what is going on.

15         Then I got an e-mail on 8th of August, 2005.

16    Q    **August the 8th?**

17    A    Come to me tomorrow at 2:00 p.m., I'll talk about

18  your performance.

19    Q    **And --**

20    A    Then I went to her room on the 9th.

21    Q    **August the 9th?**

22    A    She immediately took to Dr. Thaler's room, next

23  room -- Dr. Thaler's room.  Then the three are sitting.

24  Dr. Thaler said, "Dr. Parham said your performance is very

25  bad, and she gave you unsatisfactory."

Page 64

1          I fell from the sky.  I said in my entire 17 years

2     of time with FSIS I have worked much, much more than the

3     previous year that I've been working.  I probably have made

4     probably ten, seven, five reports, but this year I report

5     more than 25 reports on BSE, the hottest issue, and you are

6     telling me my performance is bad.  That was a horrific

7     suggestion.  And they both said your performance is very bad.

8          You did not write -- Dr. Thaler said, "Dr. Parham

9     asked you to write a toxoplasma.  Did you write it?"  I said,

10    "My plan was never approved."

11         Dr. Parham said, "Because you did not write peer

12    review paper, I ask you, I'm giving you unsatisfactory, and

13    we are putting you on a PIP."

14         I said, "That is not fair to me.  You are doing

15    injustice to me.  I do not deserve it.  And peer review is a

16    non-critical; you cannot do it to me."

17         So then I left that room and meeting was over.

18    Q    **So that was basically everything that happened?**

19    A    Basically everything.  Then next day I went to

20    Dr. Thaler with the work that I did a list of the report that

21    BSE that I made.  I showed her, Dr. Thaler, please intervene.

22    I'm senior; I'm getting older.  I'm planning to retire

23    within a few years, and please do not punish me.  I have made

24    so many reports.  The toxo, I still can do it if you want.

25    That's the peer review paper.  That is nothing.  Nobody does

Page 65

1    it.   Ninety-nine percent FSIS employee does not do it.   But I

2    have done so much work.   Let me go and please convince

3    Dr. Parham she's probably mad at because of that serovar

4    paper I made lots of argument with her.   I explain to her.

5              She said, Dr. Chowdhury -- Dr. Thaler said, if you

6    think you are old, you should be retiring by now.   Same thing

7    was told in December by Dr. Parham.

8         Q    How did this come up about you retiring?

9         A    Because I said I'm older, I'm going to be retired

10   in a few more years, please do not put me on this hassle.

11        Q    Don't put you on the PIP?

12        A    Don't put me on PIP.

13        Q    This is what you're telling Dr. Parham?

14        A    Right.   Please, you are mission director, you can

15   convince Dr. Parham.   Please excuse me if she misunderstood

16   me.   I mean, please don't put me in PIP, and I promise I'll

17   write this salmonella -- sorry, toxoplasma project.   I'll

18   implement it.   If you don't want the research part, I'll

19   abort the research part.   But I'll do a literary review.   A

20   literary review is nothing for your time.   I can read some

21   literature and write what -- nothing is mine.   It's everybody

22   who did who.   It's like a reporter and reporting.

23             Dr. Thaler said no, you must go through PIP.   We'll

24   help you.   You must go through a PIP.   We'll assign you three

25   projects, same projects, toxoplasma -- then I said, why toxo?

Page 68

1    November these two reports, serovar and zoonoses, and I'll

2    give you the plan, what I'm doing in toxo, the 1st of

3    December.  So I finished this, too, on 1st December.

4        **Q    And did you work 100 percent on those two during**

5    **that time period?**

6        A    Kind of 100 percent, but we had have a meeting,

7    this and seminar --

8        **Q    Right.**

9        A    There was a day off like that, okay.  But actually,

10   I worked not in the office, I worked in evening time.  It was

11   everywhere I worked.  You know, I would spend in the library

12   at work.  So I wanted to finish it and get out of this mess.

13            Then came the toxoplasma.  First December I

14   submitted the toxo plan I would like --

15       **Q    The plan?**

16       A    Plan.  Only plan.  Just plan.

17       **Q    So you still hadn't started working on the actual**

18   **paper?**

19       A    Oh, no, nothing, because I was busy with that other

20   paper.  There was no possibility for my divert.  Then I would

21   lose everything.  So she approved it same day, 1st December.

22    She said, "Okay, I agree, go ahead and do it."

23            Then I had four weeks time to do it.  Two weeks I

24   collected literature.

25       **Q    What did she agree on December --**

1          Hold on a minute.

2     A    First December.

3     Q    What did she agree on December the 1st that you

4   were supposed to do?

5     A    The plan that I gave.  I gave that I will work on

6   sero prevalence of toxoplasma in the United States of America

7   in food animals.  That means the serum will turn positive if

8   that animal was exposed to toxoplasma at any time.  We, too,

9   human also if I am exposed, say in my childhood, to

10  toxoplasma.  I did not develop any disease --

11    Q    I'm sorry; what did you agree that you were going

12  to do on the toxo paper again?

13    A    Sero prevalence.

14    Q    Sero prevalence?

15    A    That means there is percentage of serum positive

16  animal, another way to say it.  We call it sero prevalence.

17    Q    Okay, talk to me like I'm your fourth-grade child.

18    A    Right.

19    Q    What --

20         Don't talk in science, talk like I'm in the fourth

21  grade.  What was it agreed that you were going to do for the

22  toxoplasmosis paper on December 1st?

23    A    I agreed to find out what percentage of animal in

24  the United States of America only, not outside, that animal

25  are cattle, poultry, swine, sheep and goat, okay.  So

Page 71

1    literature.  And Dr. Dubey suggested me some recent work that

2    had been done, literature, and I request it.  There's a

3    format how I can request them in the library.  So I requested

4    them.  I requested 12 -- I remember I requested 12 articles.

5    I only received five, and remaining, I did not.  They said

6    it will take time.  Maybe it will be in January.  But I must

7    give my paper on 30th of December.

8            So I started writing --

9            In middle of December I started reading them and

10   writing.  Exactly I probably put this report into format by

11   one week.  Before that I was writing.  And I asked Dr. Parham

12   that it is inhuman -- it is not humanly possible to write a

13   peer review paper with such a short time.  Allow me to -- I

14   have made this paper as a skeleton.  I have jot down my

15   interested portion of that percentage of the serovar from

16   that articles.  Articles are talking different thing; I'm not

17   supposed to pay attention to those things only thing that

18   they talked about they say 25 percent of sheep was positive.

19   That was my interest because I am doing sero prevalence.

20   I'm not doing everything in that paper.  I'm not supposed to.

21       Q    Okay.  So and you said --

22       A    So then I gave it -- excuse me --

23       Q    Just hold on, then I'll let you go on, so I

24   understand.  So you're saying that you got approved for what

25   you were supposed to do on December the 1st.  That you didn't

Page 72

1    get your literature until sometime after December the 15th.

2    And that you actually started writing and wrote the document

3    within one week?

4         A    Exactly one week.

5         Q    Exactly, okay, one week.

6         A    Day and night, evenings --

7              I didn't get much sleep.

8         Q    Now, during this time period, did you tell

9    Dr. Parham that you were having problems with this paper?

10        A    Every meeting I said.

11        Q    What did you say?

12        A    Every meeting I said give me some literature if you

13   could.  She said no, you go to library.  And she send me an

14   e-mail how to apply in the library.  I said I know already

15   that.

16             So Dr. Thaler, she sent me some website.  I said I

17   already checked; there's nothing.  There's no helpful.  They

18   could not provide any help.  And I only told both of them

19   gently and very smoothly that please consider that it is

20   impossible for me, humanly impossible -- unless I am a

21   superman, it is impossible to write a peer review which would

22   be up to the standard of a journal publishable.  No draft can

23   be publishable; it is only first draft.  So please take it as

24   a first draft, review it, let me change it, add it, subtract

25   it.  And I'm going to get more publication, maybe I'll have

Page 77

1        A    Okay.

2        Q    **There are three sentences in Mr. Smith's article**

3   **and you -- exactly what is in those three sentences in**

4   **Mr. Smith's article, you placed into your paper; okay?**

5        A    Mm-hmm.

6        Q    **Did you put any quotation marks around that?**

7        A    I'm not supposed to because that journal doesn't

8   give quotation, only citation.  One --

9        Q    **So under that journal you don't put quotation**

10  **marks?**

11       A    No.

12       Q    **Under that journal do you indent it?**

13       A    In parentheses.  That's how they instruct it.

14       Q    **You put the words in parentheses?**

15       A    No.  No, I'm not supposed to -- not word, the

16  number of that journal.  That number gives what journal --

17       Q    **But you're saying that the journal you were using**

18  **says that if you take a direct quotation from somebody else's**

19  **article, that you don't either put it in quotation marks nor**

20  **do you indent it to show --**

21       A    In parentheses.

22       Q    **-- in the paper that it is a direct quotation?**

23       A    No, I'm not supposed to put in the paper as a

24  quotation; I'm supposed to give only parentheses and the

25  number.

Page 78

1          Q    And which journal's style is that?

2          A    Journal of Food Protection.

3          Q    Journal of Food Protection.

4          A    One article I showed you that you have --

5          Q    And let me ask you, does the Journal of Food

6    Protection issue any directions to authors concerning how

7    they're supposed to --

8          A    It does.

9          Q    Where are those directions?

10         A    I have it.

11         Q    Do you have them with you?

12         A    Yes.

13         Q    Could I see a copy of it, please?

14         A    This is the instruction Dr. Bonnie Rose gave me and

15   followed this.

16         Q    Do you have another copy of this?

17         A    No, I don't have.  I ask her if I can put in

18   quotation.  She said no, you're not supposed to, you should

19   follow the journal's style.

20         Q    So Dr. Bonnie Rose told you that if you take direct

21   quotations from somebody else's work, you don't put it in

22   parentheses and you don't indent it; you're supposed to --

23         A    She said you are not supposed to put any

24   quotations.  It doesn't matter if you took directly or

25   translated it.  Even if you translate it, it's still their

Page 79

1    idea.  You must put in parentheses.  Even if you translate

2    the whole article, it doesn't make yours, so it doesn't make

3    any difference how you take it.  You took the idea.  That's

4    it.  You put it in parentheses.

5          I mean, in scientific paper, there's not much

6    language change because you are taking that data that person

7    takes.

8        Q    Does that --

9             Let me just Xerox this real quick.

10            (A brief recess was taken.)

11            BY MS. FIELDS:

12       Q    Dr. Bonnie Rose works where?

13       A    I beg your pardon?

14       Q    You said this was given to you by Dr. Bonnie Rose?

15       A    Right.  She works --

16       Q    Where does she work?

17       A    When I started in December -- in November I ask

18   her.

19       Q    Excuse me.  Where does she work?

20       A    She work in the OPHS.  She's retired now.

21       Q    Do you know where she is now?

22       A    She is at home.  She lives --

23       Q    Where is home?  Where does she live?

24       A    -- somewhere in Silver Spring.

25       Q    Do you know how to contact her?

Page 80

```
 1      A    I don't know how, but I have her phone number.

 2      Q    Do you have it on you?

 3      A    No, not here.

 4      Q    Could you give me her phone number?

 5      A    Yeah, I could.

 6           MR. GOULD:  I think her phone number is in some of

 7  the discovery responses.

 8           MS. FIELDS:  Is it in what you gave me?

 9           MR. GOULD:  I think so, but I'm not 100 percent

10  certain.

11           MS. FIELDS:  Okay.

12                     (Chowdhury Exhibit 5 was marked for

13                      identification.)

14           BY MS. FIELDS:

15      Q    So Number 5.  You said these are the instructions

16  for the Journal of Food Protection, and you received these as

17  the instructions of how you should prepare your paper; is

18  that correct?

19      A    Right.

20      Q    And did you show this document to Drs. Parham and

21  Thaler in relation to their comments on your paper?

22      A    I discussed with both of them.  I have a memorandum

23  written by Dr. Thaler.  I think I can produce it.  I have it.

24   In that memo it is recorded that I discussed with her that

25  I'm following Journal of Food Protection, the instruction I'm
```

1    following for their journal.

2        Q    And --

3        A    But later we like to publish this same paper

4    because this journal doesn't --

5        Q    This is my question.  When they made a criticism of

6    your paper, when the criticism was made --

7        A    Oh, after --

8        Q    -- that there was plagiarism because you had not

9    given the correct attributions to direct quotations in your

10   paper, did you show to Dr. Thaler or Dr. Parham what's been

11   marked as Chowdhury 5?  Did you show them this document?

12       A    I showed them, told them, insisted them that I had

13   followed this instruction.  They did not like to have it.

14   They did not like to even see it.  Then I said I followed

15   Journal of Food Protection.  And with your memo you told me,

16   okay, go ahead, style it for Food Protection.  Later, you

17   change it for Journal of American -- because this kind of

18   paper for Journal of Food Protection rarely published, very

19   difficult.  So she asked me, okay, go ahead style it for

20   Journal of Food Protection as you are saying, but later you

21   change it to another journal style change.

22       Q    Here's my question.  The paper that you submitted

23   was -- you said was supposed to be styled under Journal of

24   Food Protection.  When they said that the way you had not

25   made attribution to things that had been lifted directly from

Page 82

1    other people's articles was wrong and was plagiarism, did you

2    show them this document and tell them that document says that

3    I'm not supposed to put it in quotes or show that it's a

4    quotation?

5        A    I showed them and I also told them, requested them

6    to see Journal of Food Protection how they put it.

7        Q    Now, show me in this document where it discusses

8    taking direct quotations out of other people's works.

9        A    Is the reference how to quote it.  And there is no

10   direction quotation.  It did not mention it that way and I do

11   not think I have put any direct quotation.  I do not think,

12   because those quotation are such a quotation that those are

13   mathematical figure -- I would put their figure anyway.  It's

14   not a direct quotation, I'm saying what they did.  That's it.

15    It's not mine.

16       Q    Are you saying that you made no direct quotations

17   out of people's articles?

18       A    No.

19       Q    Are you saying that if I go -- if I look at your

20   paper and I find two or three sentences, I will not find the

21   two or three sentences appear in one of the references you

22   used?

23       A    Even if I taken some sentences, I put citation

24   there for them.

25       Q    But you didn't put it in quotes?

Page 83

1    A    Without citation, no.

2    Q    You didn't show that kind of citation?

3    A    No.

4    Q    And this document does not address direct

5    quotations, does it?

6    A    No.

7    Q    So this document doesn't say you're not supposed to

8    put it into quotation marks, does it?

9    A    Either way, it doesn't say it.

10    Q    This document doesn't say you're not supposed to

11    either put it in quotation marks or indent it, does it?

12    A    No.  But I discussed this with Dr. Bonnie Rose.

13    She said you're not supposed to -- follow this instruction,

14    that's it.

15    Q    So you asked Dr. Bonnie Rose whether or not if you

16    lifted language from somebody else's article, you had to show

17    that it was a quotation in your paper?  You asked her that

18    specifically?

19    A    Yeah, I asked her.  She said you're not supposed to

20    put quotation.  It doesn't allow to put in quotation.  And

21    also she said it -- plagiarism is not just quotation, because

22    you are taking idea of anybody.  It doesn't matter in what

23    language.  Paraphrasing or changing the language doesn't

24    help.  It must be cited.  So that's -- she did -- various

25    people have various opinion, but not just taking somebody's

Page 96

1                    (Chowdhury Exhibit 12 was marked for

2                    identification.)

3          BY MS. FIELDS:

4      Q    Did you receive Exhibit Number 12 from Dr. Parham?

5      A    Yes, I received and --

6      Q    And Exhibit Number 12 lists some websites and a

7  couple of papers; is that correct?

8      A    Mm-hmm.

9      Q    And that was received from Dr. Parham; is that

10  correct?

11     A    Right.  And I received it even before then.  I

12  received it from Bonnie Rose.  And they helped me nothing.

13  They did not have anything called description.  I discussed

14  it with Dr. Bonnie Rose.

15                    (Chowdhury Exhibit 13 was marked for

16                    identification.)

17          BY MS. FIELDS:

18     Q    Now, in December 2004, there was a meeting with

19  you, Dr. Brewer and Dr. Parham; is that correct?

20     A    Yes.

21     Q    What happened at that meeting?

22     A    That was the meeting that I already referred with

23  you that she was very serious about toxo review publication,

24  and she was really mad with me why I did not write any

25  article on toxoplasma.  And then I was agreeing with her that

1   I did not have any plan yet.  You give me a plan.  They said,

2   no, you find out a plan.  You talk with the expert.  This

3   kind of dialogue was there, and then that was the meeting

4   where I promised that I discuss with Dr. Dubey or other

5   experts.  And that is how the end of December I gave her the

6   project for toxoplasma.  That was the discussion we had.

7           And she, in that meeting, threatened me, if you do

8   not write peer review article, I will give you

9   unsatisfactory.  She told.  And that's where I recall she's

10  serious.  So that's the I mentioned she was really serious in

11  December.  So okay, I'll give you a plan at the end.

12          And then I was also asking her why you are

13  insisting me only, why you are singling me out for this peer

14  review.  Did you ask others?  She said no, I'll ask

15  everybody.

16          Then I immediately asked my colleagues.  They said,

17  no, we are not asked.  But later at the end of the year they

18  said yes, she finally asked us also.  And then I asked them

19  did you write.

20          So in that meeting, there more thing happened.  She

21  also asked me to write daily journal.  She asked me to give

22  her the remaining Colombia plan.  There's two projects in my

23  desk sitting; one was Thailand and the other was Colombia.

24  So this was also Dr. Brewer's leftover kind of job.  He used

25  to do this thing.  I never did it.

# Journal of Food Protection
# Instructions for Authors



## SCOPE OF THE JOURNAL

The *Journal of Food Protection* (*JFP*) is an international monthly scientific journal in the English language published by the International Association for Food Protection (IAFP). *JFP* is intended for publication of research and review articles on all aspects of food protection and safety. Major emphases of *JFP* are placed on studies dealing with (i) causes (microorganisms, chemicals, natural toxicants) and control of all forms of foodborne illness; (ii) hazards (microorganisms, allergens, chemicals), contamination (feces, insects, rodents) and their control in raw foods and in foods during processing, distribution, preparation, and service to consumers; (iii) causes of food spoilage and its control through processing (low or high temperatures, preservatives, drying, fermentation, irradiation, pressure, and other innovative technologies); (iv) microbiological food quality and methods to assay microbiological food quality; and (v) wastes from the food industry and means to use or treat the wastes.

**Manuscripts of a sensitive nature.** Bioterrorism and food security are of major concern to all involved in food production, processing, evaluation and distribution including members of IAFP. Manuscripts dealing with sensitive issues are expected to approach the subject from a preventative stance and not provide a how to guide. A review policy is used in the evaluation of manuscripts submitted for publication in journals printed by IAFP to minimize the possibility that their contents may be used to pose a food security threat.

**Suitability of publication.** Prospective authors with questions about the suitability of their research are invited to request an opinion from the Scientific Editors.

## HOW TO SUBMIT MANUSCRIPTS

Submit manuscripts online at http://foodprotection.allentrack.net. Instructions for online submission are available at that site. Within 24 hours after receiving a confirmation E-mail from the Editorial Assistant containing links to the Mandatory Copyright form, a copy of the form must be E-mailed, faxed or mailed to the Editorial Assistant (address at the end of these instructions). All material dealing with affairs of the Association, book reviews, or news and events of interest to Members is published in *Food Protection Trends* (*FPT*). Such material should be sent directly to Donna Bahun, *FPT* Production Editor at the Administrative Editor's address (address at the end of these instructions).

## TYPES OF PAPERS

**Research papers.** Research papers report the results of original research which have not been published elsewhere. If the research has in part been previously reported, such as on a Web site, in a thesis or dissertation, or in another journal, this must be disclosed in the author's letter of submission. The journal will consider for publication research reports, which due to government regulations, have previously appeared on Web sites. A research paper usually consists of 10-12 double-spaced typewritten pages of text, the reference list, tables and figures. Research papers deal with its subject in some depth.

**Research notes.** A research note is a short paper that describes observations made in a limited area of investigation. Negative results are sometimes best reported in the form of a research note. However, the research note should not be used as a vehicle for reporting results of inferior research. A research note usually consists of nine or fewer double-spaced typewritten pages of text and appropriate figures and tables. The author must specify that a manuscript is submitted as a research note so it can be properly evaluated during the review process.

**Letter to the Editor.** *JFP* invites Letters to the Editor. Letters commenting on articles printed in this publication are subject to review from the Scientific Editors before acceptance. Letters to the Editor are limited to no more than 5 double-spaced pages. The author of the article that is the focus of the letter is provided the opportunity to respond to the comments. This response is sent back to the author of the letter who is then given the option to continue with the publication process or to withdraw the Letter to the Editor. If withdrawn, neither the Letter to the Editor nor the author's response will be published. If not withdrawn, both the Letter to the Editor and the author's response will be published in their entirety. Please send all Letters to the Editor to the Administrative Editor at the address below.

## PREPARATION OF MANUSCRIPTS

All parts of manuscripts must be typed fully double-spaced, at least 10-pt. type including references, tables, table captions, footnotes, and figure legends. Manuscripts must be in Word, WordPerfect or text formats. Page margins on all sides must be at least 1 in. (2.5 cm) wide. Lines on each page must be numbered to facilitate review of papers, but final revised manuscripts must NOT have line numbers. Number all pages, including tables and figures. *JFP* uses American conventions of spelling and punctuation.

Manuscripts are divided into sections, which must be arranged in the following order: Title page, Abstract, Introduction, Materials and Methods, Results, Discussion, Acknowledgments, References, Figure legends, Tables, and Figures. Except for the introduction, all of these sections have separate headings, which should appear in the manuscript worded exactly as above. Subheadings take the form of paragraph lead-ins. Paragraph lead-ins should be boldface, indented, and run in with the text, separated by a period. Third-order subheadings will not be accepted. *JFP* follows many of the recommendations for manuscript preparation in the *ASM Style Manual*, 2nd ed., 1991, published by the American Society for Microbiology. Authors will find useful guidance concerning scientific nomenclature, abbreviations, numbers and measurement, English, references, tables, and figures, as well as a helpful bibliography. For further reference, see *Scientific Style and Format: The CBE Manual*, 6th ed., Cambridge University Press, 1994; and *The Chicago Manual of Style*, 15th ed., University of Chicago Press, 2003; and the bibliographies in these guides.

## ORGANIZATION OF RESEARCH PAPERS AND RESEARCH NOTES

**Title page.** Type double-spaced on a separate page. At the top provide a running head indicating the topic of the paper. Then list the full title of the paper; the names of all authors; and name and address of the institution(s) or organization(s) where the work was done. When authors are affiliated with more than one department or unit within an institution or

with more than one institution, superscript numbers are used to indicate each author's address. Above the footnotes, supply a short title or running head and three to five key words, indicating the principal topics of the paper, to be used for indexing. Footnotes are used to give the present addresses of authors who are no longer at the institution(s) where the work was done. A footnote asterisk (*) must be placed after the name of the author to whom correspondence about the paper and proofs are to be sent. The telephone, fax, and E-mail numbers of this author are placed in the footnote of the author for correspondence. No manuscript text appears on the title page.

**Abstract.** An abstract of no more than 250 words must be placed on the second page of the paper to summarize the principal points of the study. The abstract does not contain references, figures, or tables. Abstracts are reprinted separately by abstracting services and therefore must be meaningful without reference to the body of the paper.

**Introduction.** The introductory section has no title and begins on the page following the abstract. It provides the reader with sufficient background information to evaluate the results of the research. An extensive review of the literature is not needed. The introduction also gives the rationale for and objectives of the study that is being reported.

**Materials and Methods.** Sufficient information must be provided so that another researcher can repeat the experiments that are described in the paper. If reference is made to a method published elsewhere in a journal or document that may not be readily available to most readers, then details of the method are to be included. If a published method is modified, such modifications must be described. Sources (company, city, state, or country) of unusual chemicals, bacterial strains, reagents, and equipment must be identified. Delete registered and trademarks given with trade names.

**Results.** The Results section provides information by means of text, tables, and figures. Results and Discussion may be combined or there may be a separate Discussion section. If a Discussion section is to be included, place extensive interpretations of results in the Discussion section. Tables and figures must be numbered in the order in which they are mentioned in the text. All tables and figures must be cited in the text. Tables and figures reporting results should not be cited in the Materials and Methods section.

**Discussion.** Do not extensively repeat the introduction or Results sections. Provide an interpretation of the results in relation to known information. Conclusions should be included in this section.

**Acknowledgments.** Acknowledge financial and personal assistance (sources other than your institution or any potential conflict of interest).

**References.** Number and order the references alphabetically by the last names of the authors between and within each reference. Order references chronologically only when all authors' names are the same. Only the first author's name and initials are inverted. All references **must** be cited in the text by italicized numbers in parentheses, with a space between the numbers of the references (*3, 7, 22*). Journal names are italicized and abbreviated according to the style of *BIOSIS*. References may be made to papers that are in press, i.e., that have been accepted for publication. References for papers that have not been accepted for publication should be listed by the authors' names, as submitted for publication. Tables and figures follow the references (see preparation of figures section). Examples of different types of references are given below.

**Paper in a journal**

Cabedo, L., J. N. Sofos, and G. C. Smith. 1996. Removal of bacteria from beef tissue by spray washing after different times of exposure to fecal material. *J. Food Prot.* 12:1284–1287.

**Paper or chapter in a book**

West, D. L., and L. B. Bullerman. 1992. Physical and chemical separation of mycotoxins from agricultural products, p. 52–57. *In* J. E. Smith (ed.), Mycotoxins and animal feeding stuffs, vol. 1. CRC Press, Boca Raton, FL.

**Book by author(s)**

Pitt, J. L., and A. D. Hocking. 1997. Fungi and food spoilage. Blackie Academic and Professional, London.

**Book by editor(s)**

Doyle, M. P., L. R. Beuchat, and T. J. Montville (ed.). 1997. Food microbiology: fundamentals and frontiers. ASM Press, Washington, D.C.

**Patent**

Hussong, R. V., E. H. Marth, and D. G. Vakaleris. January 1964. Manufacture of cottage cheese. U.S. patent 3,117,870.

**Publication with no identifiable author or editor**

Anonymous. 1998. Guide to minimize microbial food safety hazards for fresh fruits and vegetables. U.S. Department of Health and Human Services, Food and Drug Administration, Center for Food Safety and Applied Nutrition, Washington, D.C.

**Electronic mail**

E-mail messages should include the name of the person who sent the message, the date, the subject, the sender's E-mail address, and availability (if appropriate). Noturo, J. 13 June 1994. Banned in the USA [E-mail:noturo@ukans.edu]. Available from the author at Smith@odo.msoe.edu. If the subject is not available, the message should be listed as a Personal Communication. Sofos, J. N. 3 January 2001. Personal communication [E-mail: sofos@ceres.agsci.colostate.edu].

**Web pages**

Include author, date, title, availability information, and accession date, if needed. Anonymous. 19 February 2000. Avis du Centre national de reference des *listeria* de l'Institut Pasteur [press release]. Available at: http://www.agriculture.gouv.fr/actu/doss/com190200.htm.U.S. Food and Drug Administration. 1999. Guidance for industry: reducing microbial food safety hazards for sprouted seeds. Docket no. 99D-1488. Available at: http://vm.cfsan.gov/~dms/sprougd1.html. Accessed 17 July 1999. Wang, S. L., and G. C. L. Chu. 2001. Evaluation of modified atmosphere packaging systems for retaining freshness of Ontario's fruit and vegetables. Available at: http://gov.on.ca/OMAFRA.../archives/research/fund/ofpdocs/fp1041.html. Accessed 9 November 2001.

**Full-text articles obtained from an online source**

For journals without volume and page information, a document number may be used.

Harrison, C. L., P. Q. Schmidt, and J. D. Jones. 2 January 1992. Aspirin compared with acetaminophen for relief of headache. *Online J. Therap.* [serial online]. Doc. no. 1.

For journals with volume and page information, include same information as print journals as well as availability information and accession date:

Friedman SA. January 1988. Preeclampsia: a review of the role of prostaglandins. *Obstet Gynecol* [serial online] 71:22–37. Available from: BRS Information Technologies, McLean VA. Accessed 15 December 1990.

## ORGANIZATION OF REVIEW OR GENERAL INTEREST PAPERS

Review or general interest papers must have a title page and an abstract as described in the section on research papers. The remainder of the text begins with an introductory statement and then is divided into appropriate sections with headings and subheadings. An acknowledgment section may come at the end of the text, followed by the references, as described for a research paper. Authors are encouraged to cite appropriate recent review papers in lieu of discussing numerous older papers.

## PREPARATION OF TABLES

If submitting tables, the format must be XLS or DOC. Each table, comprising the title, body, and footnotes, must be typed double-spaced on a sheet of paper separate from the text. Number tables consecutively as cited in the text. The title is brief but fully descriptive of the information in the table. Headings and subheadings must be concise; abbreviations are used. Use no vertical rules and only three full horizontal rules: under the title, under the box heads, and at the bottom of the table. Use italic superscript letters for footnotes. Like data in columns reads down, not across. A well-organized table should be understandable without extensive reference to the text.

## PREPARATION OF FIGURES

Type figure legends double-spaced in a list on a page separate from the figures. Number each consecutively as cited in the text. All illustrations, both line drawings and halftones (e.g., photographs), must be scanned prior to submission. Original figures should be not less than 85 mm wide and should not be framed with a box. Figures containing multiple components (e.g., 1A, 1B, 1C, etc.) should be mounted together on the same page with appropriate labels. Place the figure number on the upper-right hand corner of the page. Data presented in figures must not be repeated in tables.

Photographs can be printed in color, but there is an additional cost to the author. Authors who wish to publish color photographs must contact the Administrative Editor for cost estimates immediately upon acceptance of the manuscript.

Embed fonts when using Photoshop, CorelDraw, Illustrator and other graphics programs. If you do not embed your fonts, and we do not have them in our library, your figure will not convert to PDF.

If submitting electronic figures, the preferred formats are TIF, EPS, JPG, PDF or PS. The following native application file formats are also acceptable for final figures: Adobe Photoshop, Adobe Acrobat, Illustrator, Macromedia FreeHand, Corel Draw, Canvas, PowerPoint, Word and Excel. If you have other software, you should scan your figures and submit as TIF files. The resolution required for halftone and color images is 300 dots per inch (dpi); line is usually good at 300 dpi, but if there are fine lines and screens, figures should be scanned at 600 dpi. Please note that images that are in JPG or GIF format are normally 72 dpi and not acceptable for printing. Digital color files must be submitted in CMYK mode.

All images that have been placed or imported into your figure file must accompany the figure file at the final submission. Rationally name each figure or photo. For example, save a photograph as photo.tif.

## COMMON ABBREVIATIONS

Frequently used acceptable abbreviations are given below. For further details on abbreviations, see the current edition of the *ASM Style Manual*. Note that a period is used with some but not all abbreviations. Abbreviations of non-SI units (e.g., atm) must be followed by the corresponding converted quantity and SI unit in parentheses: 1 atm = 101.29 kPa. (Exception: lb in² )

angström, Å
atmosphere, atm
base pairs, bp
British thermal unit, BTU
calorie, cal
centimeter, cm
CFU (never spelled out; colony-forming units)
cubic centimeter, cm³
day (no abbreviation)
degree Celsius, °C
degree Fahrenheit, °F
diameter, diam
enzyme-linked immunosorbent assay, ELISA
equivalent weight, equiv wt
fluid ounce, fl oz
foot (feet), ft
gallon, gal
gram, g
gravity, g
hour(s), h
inch, in
international unit, IU
intramuscular, i.m.
intraperitoneal, i.p.
intravenous, i.v.
kilocalorie, kcal
kilogram, kg
kilometer, km
lethal dose, median, LD₅₀
liter (no abbreviation)
logarithm (base 10), log
logarithm (base e), ln
lumen, lm

lux, lx
meter, m
microequivalent, μeq
microgram, μg
microliter, μl
micrometer, μm
micromole, μmol
milliequivalent, meq
milligram, mg
milliliter, ml
millimeter, mm
millimolar, mM
minute(s), min
molar, M
mole, mol
most probable number, MPN
nanometer, nm
normal, N
number, no.
parts per billion, ppb
parts per million, ppm
percent, %
PCR (never spelled out; polymerase chain reaction)
pound, lb
pounds per square inch, lb in²
revolutions per minute, rpm
second, s
species (singular), sp.
species (plural), spp.
specific activity, sp act
UV (never spelled out; ultraviolet)
volume, vol
weight, wt

## POLICY ON COMMERCIALISM

Manuscripts submitted for consideration for publication in *JFP* are not to be used as a platform for commercialism or the promotion of branded products or services. References to branded products or services except as may be warranted by scientific merit and research data or as are necessary for the understanding, evaluation and replication of the work described are to be avoided. However, scientific merit should not be diluted by proprietary secrecy. The excessive use of brand names, product names, logos or trade names, failure to substantiate performance claims, and the failure to objectively discuss alternative methods, processes, products and equipment may be considered indicators of commercialism. Disclosure and acknowledgment of both funding sources and any conflicts of interest by the authors is encouraged. Restricting commercialism benefits the authors and the audience of *JFP*.

The Scientific Editor shall in his or her sole discretion, determine whether a submitted manuscript violates this policy on commercialism.

## REVIEW PROCEDURE

Authors of manuscripts submitted for consideration to be published in *JFP* are notified by E-mail when the manuscripts are received. Authors can monitor the status of their papers by logging on to http://foodprotection.allentrack.net. Authors are responsible their login ID and password throughout the review process. The manuscript number assigned must be included in all future correspondence and on the revised manuscript for identification. Manuscripts are accepted for publication after they have been reviewed by two or more members of the Editorial Board or by others with the requisite expertise. After review, the manuscript is returned to the author for revision in accord with suggestions made by the reviewers and the Editor. Authors can hasten publication of their papers by submitting well-written manuscripts conforming to *JFP* style and by revising and returning manuscripts promptly. If, after review of a manuscript is completed, the author chooses to withdraw rather than to revise the paper, the Scientific Editor must be notified promptly. If the author does not respond within two months after a reviewed paper is returned, the paper will be considered withdrawn. Authors are notified by E-mail when a manuscript has or has not been accepted for publication. Page proofs of accepted manuscripts are sent to the author for correction. They should be proofread carefully according to the instructions attached and returned within four days. Authors will be charged for major revisions to their manuscripts.

Membership in the Association is not a prerequisite for acceptance of a manuscript for publication. Non-member scientists are invited to submit papers for consideration for publication.

The Scientific Editors assume that the corresponding author has received proper clearance from his or her organization and from co-authors for review and publication of the paper. It is also med that the paper is not being considered for publication in any other journal or publication.

Authors are responsible for the scientific accuracy of their papers. *JFP* assumes no responsibility for errors made, including those that may be made in the copy-editing process, or conclusions reached by authors.

Papers accepted for publication become the copyrighted property of *JFP* and IAFP. No part of the publication may be reproduced or transmitted in any form, or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, except in limited quantities for the non-commercial purposes of scientific or educational advancement, without permission in writing from the Administrative Editor.

## MANUSCRIPT SERVICE CHARGE

A page charge of US$90 per printed page for Members of IAFP, or US$120 per printed page for nonmembers for publication of all research papers and notes, and US$15 per printed page of all submitted review and general interest papers will be assessed. Review papers invited by one of the Scientific Editors are exempt from the manuscript service charge.

Organizations and institutions commonly accept the manuscript service charge as a necessary cost of conducting research and communicating the results. An exemption from payment of the page charge will be made only under extenuating circumstances that must be described by the author(s) when it is first submitted.

Authors will be informed of the actual cost of the manuscript service charge upon receipt of proofs of the paper. Arrangements for payment of the manuscript service charge must be made at that time.

## REPRINTS

Reprints of a paper may be ordered by the author when the page proofs are returned. Reprint orders must be received prior to the printing of the journal. An appropriate form for this purpose is attached to the proofs. Paper or electronic reprints are available. The cost varies according to the number of pages in a paper and whether or not covers are ordered. No free reprints are provided.

The Association office can supply photocopies of any papers published in *JFP* or its predecessors, the *Journal of Milk and Food Technology* and the *Journal of Milk Technology*. Arrangements to obtain such reprints are made with the Order Processing Department.

## INDEXES

The *Journal of Food Protection* is indexed in *Index Medicus, Current Contents, Biological Abstracts, Chemical Abstracts, Food Science and Technology Abstracts, Microbiological Abstracts (CAS), BIOSIS, Dairy Science Abstracts, Zeitschrift fur Lebensmittel untersuchung und Forschung, Milchwissenschaft, and Barbour Index.*

## CORRESPONDING ADDRESS

*Journal of Food Protection*
Attn: Tamara P. Ford, Administrative Editor
Didi Loynachan, Editorial Assistant
6200 Aurora Avenue, Suite 200W
Des Moines, IA 50322-2864, USA
Phone: 515.276.3344
Fax: 515.276.8655
E-mail: tford@foodprotection.org
        dloynachan@foodprotection.org

# DDR/IPRO
# Exhibits

**MN-1**

# MEMO       ZDRSD       ZB

To:       Khurshed Chowdhury
              Veterinary Medical Officer
              Zoonotic Diseases and Residue Surveillance Division, OPHS

From:     Delila Parham
              Branch Chief
              Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:  Meeting Notes for Tuesday, August 30, 2005

This memorandum is written to provide you with a summary of our meeting on Tuesday, August 30, 2005. The intent of the meeting was to provide the two of us the opportunity to discuss your performance improvement plan (PIP), which began on Monday, August 29, address any questions or concerns you may have, and give you an opportunity to speak directly with me. I was on leave on Monday, August 29, 2005, and Dr. Alice Thaler met with you on Monday to discuss the PIP.

When asked if you had questions about the PIP, you had two. You asked what I was referring to in the memo that had been signed on July 18, 2005. I explained that this referred to the performance standards that you are under currently for the 2005-2006 rating cycle. You also asked about the date when the PIP began; you were concerned that it started on August 16, 2005, when the memo was dated. I explained that the PIP began on August 29, 2005, when you had your first discussion with Dr. Thaler.

In the PIP memo, I indicated that I would go over the performance standards with you, and asked if you would like for me to do that. You indicated that you are familiar with the standards and did not wish to go through them again. I asked if you were comfortable with the assignments, and you indicated that you are. You did mention that you have email messages that counter some of the statements in the memo, and we agreed that they would not become part of the memo that has been issued, but can be provided and included in the files. I explained that not all email messages between the two of us were included in the memo.

I tried to emphasize Dr. Thaler and my willingness to work with you on the PIP so that you can be successful. I tried to emphasize too the importance of our holding the weekly meetings, but noted that you are encouraged to talk with me at any time prior to the scheduled meeting if I can be of assistance. If illnesses, family emergencies, or other matters prevent you from coming into the office on Monday, you should notify Dr. Thaler or me as you normally would. The meeting will be rescheduled for later in the week if you, Dr. Thaler, or I are not available to meet on Monday.

Defendant Discovery Response
283 of 1539

When you met with Dr. Thaler you did not sign the last page of the memo acknowledging receipt of the memo. You told me that you did not realize that signing it meant simply that you had received it, and you asked if you could sign it at the meeting. I explained that I would copy that page, and bring it to your office for you to sign. You signed it acknowledging receipt of the memo.

The meeting was short, about 15 minutes. I think I have captured the essentials of our meeting, but welcome any additional comments you wish to add.

Enclosure: Signature page

Cc: Alice Thaler

**Defendant Discovery Response
284 of 1539**

To assist you in obtaining the Fully Successful level, I would suggest that when you receive assignments from me for specific work, take notes. If the assignment is sent electronically through our Outlook message or task system and you do not understand the assignment, I encourage you to visit with me so we can discuss the assignment further. I suggest too that you better develop your writing, research, and analysis skills; the writing courses you took in May and June should be helpful. Finally, make good use of your time to ensure that all work can be completed in a timely manner; you may have tips from the project management class you took in May that will be useful in scheduling your time. To further assist you, I would like to spend some time during our first weekly meeting next Monday to review the element(s) and go over with you the tasks that you are responsible for completing.

You are reminded that you are responsible for meeting the Fully Successful level of performance on the critical elements listed above for one year from the beginning of the opportunity period. Failure to achieve acceptable performance on the critical elements during the opportunity period or to maintain them during the remainder of the one-year period may result in removal or reduction in grade without any further opportunity to demonstrate acceptable performance. You should refer to this plan throughout the PIP period.

If you feel that you have a personal or medical problem that may be impeding your ability to perform your duties at an acceptable level, I suggest that you seek assistance through the Employee Assistance Program (EAP). This is a confidential program, and you may reach a counselor by calling 1-888-290-4EAP to schedule an appointment.

Please sign a copy of this memorandum, which serves only to acknowledge your receipt of this notice.

Receipt Acknowledged:

_Thresh A. Chou_
Signature

_8/30/05_
Date

Enclosure

Cc:     Jose Calvo, Employee Relations Specialist
        Alice Thaler, Director, ZDRSD

Defendant Discovery Response
285 of 1539

9

00000285
00000285

Lange, Loren

*July 2005*    **SR-1**

| | |
|---|---|
| **From:** | Thaler, Alice |
| **Sent:** | Friday, July 08, 2005 10:34 AM |
| **To:** | Lange, Loren |
| **Cc:** | Parham, Delila |
| **Subject:** | FW: Brief descriptions of Young chicken Salmonella serotypes. |

This is an initial and partial draft about Salmonella serotypes. I would appreciate feedback about the adequacy of this level of information -- we want to be responsive to your specific concerns. I asked Khurshed to also look for review articles about Salmonella serotypes and for information about antimicrobial resistance by serotype.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Thursday, July 07, 2005 4:10 PM
**To:** Parham, Delila
**Cc:** Thaler, Alice
**Subject:** Brief descriptions of Young chicken Salmonella serotypes.

Hi Delila,

Please find the attached partial work (Eleven from 20) done on the above project of serovar description. Sincerely, this is really very time consuming task. After searching many literature, books, and discussing with at least four microbiologists, I have learned that there is no such thing called 'serovar description' available any where. Perhaps, no body has done it! So there is no quick shot.

If we want to do it then one needs to read hundreds of articles in order to categorize their descriptions basically from the raw materials (articles). Again it varies so much place to place; authors to authors. One serovars may be highly prevalent in one geographical region, but the same serovar is not that frequent in the other region. So we shall have to evaluate into a valance of estimation only. But I believe it's worth doing it.

I suggest that this should be considered as an on-going project and continued for several months, or even years to make a comparatively completed list of descriptions. Because, information will keep changing and our descriptions also will need changing and updating time to time. Thanks.

Khurshed

*The July 2005 report, looks like copied from a standard reference. Not relationship from references to presentation. No value added. What to do the findings mean for FSIS.*

Defendant Discovery Response 442 of 1539

1/26/2006

## Lange, Loren

| | |
|---|---|
| **From:** | Thaler, Alice |
| **Sent:** | Wednesday, July 06, 2005 6:47 AM |
| **To:** | Lange, Loren |
| **Cc:** | Parham, Delila |
| **Subject:** | RE: Loren's Request for Salmonella Serotype Data |

Delila is coordinating a single document.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Lange, Loren
**Sent:** Thursday, June 30, 2005 4:13 PM
**To:** Thaler, Alice
**Subject:** RE: Loren's Request for Salmonella Serotype Data

Thanks - should I ask HHSD to do the human part (and have me merge the two) or have Delila's staff work with HHSD to put this into a single document

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Thursday, June 30, 2005 1:51 PM
**To:** Lange, Loren
**Subject:** FW: Loren's Request for Salmonella Serotype Data

Note I only forwarded this to you. I leave it to you to share with David.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Parham, Delila
**Sent:** *Thursday, June 30, 2005 12:01 PM*
**To:** Thaler, Alice
**Cc:** Anandaraman, Neena
**Subject:** Loren's Request for Salmonella Serotype Data

Alice, I interpreted Loren's request as follows:

    1.  **Young Chicken Serotypes:** Provide *Salmonella* serotype data for young chickens for

**Defendant Discovery Response
443 of 1539**

1/26/2006

1998-2004 for all sets (A, B, and C sets) to see what is increasing and what is decreasing. Given the total number of serotypes in a year with the total number of serotypes being the denominator, what is number by percentage of the top 20? Give explanation of what is found. For example, Loren thinks we are likely to see that SE has increased substantially over the years.

2.  **Human Serotypes:** What are the leading human isolates for *Salmonella*? (Similar information is needed for humans as that provided for young chickens. (He didn't seem to be asking us to do this.)

3.  **Summary Statements for Young Chicken Serotypes:** Provide a brief summary statement about each of the top 20 serotypes for young chickens that include information such as reservoirs, commonality, etc. For example, the statement may indicate that the serotype is common in chickens, but is also common in [list other reservoirs/species].

Note: Neena talked with Bob Umholtz recently, and the 2004 database for serotypes is not ready. Therefore, we will only be able to look at data from 1998 – 2003.

As discussed, we can have a preliminary report ready as early as next week with the figures on young chickens. We will need additional time to prepare the additional information requested.

This seems to be a good time to also mention that this branch would be capable of providing this information on a quarterly basis or how ever frequently it is needed. However, if we will be doing it as assigned work, it should be known by others that this staff will be doing it, so we aren't doing things at cross purposes with the other staffs or divisions. Let me know.

**Defendant Discovery Response**
**444 of 1539**

*Original request.*

1/26/2006

00000444
00000444

Date: July 7, 2005

To: Delila Parham
    Chief, Zoonoses Branch, ZDRSD.

From: Khurshed Chowdhury
      VMO, Zoonoses branch

Subject: Brief descriptions of Young chicken Salmonella serotypes.

## (1) S. Typhimurium .

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Man, Cattle, Swine, Turkey

Public health significance:   Very High

Antigenic character:  1,4, [5],12, I

## (2) S. Typhomurium (var. Copenhagen)

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Man, Cattle, Swine, Turkey

Public health significance:   Very High

Antigenic character: Not found

## (3) S. Enteritidis

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Man, cattle, Swine and Turkey

Public health significance:   Very high

Antigenic character:  1,9,12, f,g,t

Defendant Discovery Response
445 of 1539

Defendant Discovery Response
446 of 1539

### (4) S. Heidelberg.

Reservoirs:  Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man.

Commonality:  Man, Swine, Turkey and Cattle.

Public health significance:  High

Antigenic character: 1,4,[4],12,r

### (5) S. Kentucky

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Poultry, Turkey, wild birds and pets, man.

Public health significance: Low to rare.

Antigenic character: Not found.

### (6) S. Hadar

Reservoirs:  Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man

Commonality:  Poultry, Cattle, Turkey, man, wild animals.

Public health significance:   Moderate to low.

Antigenic character: Not found.

### (7) S. Schwarzengrund

Reservoirs: Poultry, swine, Turkey, cattle, wild animals

Commonality: Poultry, Turkey, Swine.

Public health significance:  Low to rare.

Antigenic character:  1, 4, 12, 27,d

### (8) S. Montevideo

Reservoirs: Poultry (chicks and ducklings), Domestic and wild animals, including wild birds, swine, rodents and pet animals.

Commonality: Poultry, cattle, swine, man, wild animals,

Public health significance: Moderate to high.

Antigenic character: 6,7 ,g,m,s,[p]

### (9) S. Monophasic

Reservoirs: Poultry (chicks and ducklings), Domestic and wild animals, including wild birds, swine, rodents and pet animals.

Commonality: Poultry, cattle, swine, man, wild animals.

Public health significance: Unknown

Antigenic Chracter: 9, 12:1,v:-

### (10) S. Thompson

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Poultry, Man, cattle, Swine and Turkey

Public health significance: High

### (11) S. Infantis

Reservoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man.

Commonality: Poultry, Man, cattle, Swine and Turkey

Public health significance: Moderate to high

Defendant Discovery Response
447 of 1539

Defendant Discovery Response
448 of 1539

## References:

1. Bergey's manual of determinative bacteriology: R.E. Buchanan & N.E. Gibbons, Eighth Edition, The Williams & Wilkins Company/Baltimore, 1975.

2. Evaluation of Salmonella serotype distributions from commercial broiler hatcheries and grower houses: Byrd JA, DeLoach JR, Corrier DE, Nisbet DJ, Stanker LH.; Avian Dis. 1999 Jan-Mar;43(1):39-47.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=10216758&dopt=Abstract

3. *Salmonella* serotypes isolated from raw meat and poultry: January 26, 1998 to January 25, 1999: U.S. Department of Agriculture, Food Safety and Inspection Service Washington, DC 20250. http://www.fsis.usda.gov/OPHS/haccp/sero1yr.htm

4. Prevalence of Salmonella in poultry carcasses and their products in Belgium: M.R. Uyttendale et al: International Journal of Food microbiology: 40 (1998) 1-8; Department of food technology, Faculty of Agricultural and Applied biological sciences, University of Ghent Coupure Links 653, 9000 Ghent, Belgium.

5. Results of salmonella isolation from poultry products, poultry, poultry environment, and other characteristics: Parimal Roy et al. Avian health and food safety laboratory, Avian diseases 46.17-24, 2002; Washington State University, Puyallup, 7613 Pioneer Way east, Puyallup, WA 98371-4998

6. Hospitalizations among cases with the most common serotypes of salmonella: FoodNet, 1996-2000. Finke M et al.
http://www.cdc.gov/foodnet/pub/publications/2002/finke_2002.pdf

7. A temporal study of Salmonella serovars in animals in Alberta between 1990 and 2001. Guerin MT, Martin SW, Darlington GA, Rajic A. Can J Vet Res. 2005 Apr;69(2):88-99. Department of Population Medicine, Ontario Veterinary College, University of Guelph, Guelph, Ontario. mguerin@uoguelph.ca.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstract&list_uids=15971672&query_hl=11

8. Egg consumption is the principal risk factor for sporadic Salmonella serotype Heidelberg infections: a case-control study in FoodNet sites. Hennessy TW, Cheng LH, Kassenborg H, Ahuja SD, Mohle-Boetani J, Marcus R, Shiferaw B, Angulo FJ; Emerging Infections Program FoodNet Working Group.Clin Infect Dis. 2004 Apr 15;38 Suppl 3:S237-43.
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstract&list_uids=15095195&query_hl=11

9. Restaurant foodhandler-associated outbreak of Salmonella Heidelberg gastroenteritis identified by calls to a local telehealth service, Edmonton, Alberta, 2004. Can Commun Dis Rep. 2005 May 15;31(10):105-10.
    http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?CMD=Pager&DB=pubmed

10. Molecular Epidemiology of Salmonella enterica Serovar Typhimurium Isolates Determined by Pulsed-Field Gel Electrophoresis: Comparison of Isolates from Avian Wildlife, Domestic Animals, and the Environment in Norway **Thorbjørn Refsum:Even Heir,[2] Georg Kapperud,[2,3] Traute Vardund,[2] and Gudmund Holstad[1]**
http://aem.asm.org/cgi/content/full/68/11/5600

11. *Salmonella* Serovars from Humans and Other Sources in Thailand, 1993–2002:Aroon Bangtrakulnonth,* Srirat Pornreongwong,* Chaiwat Pulsrikarn,* Pathom Sawanpanyalert,* Rene S. Hendriksen,† Danilo M.A. Lo Fo Wong,† and Frank M. Aarestrup†
*World Health Organization (WHO) National Salmonella and Shigella Centre, Bangkok, Thailand; and †WHO Collaborating Center for Antimicrobial Resistance in Foodborne Pathogens, Copenhagen, Denmark. **http://www.cdc.gov/ncidod/EID/vol10no1/02-0781.htm**

12. Antimicrobial susceptibility and genetic relatedness of Salmonella serovars isolated from animal-derived dog treats in the *USA:* **D. G. White[1], A. Datta[2], P. McDermott[1], S. Friedman[1], S. Qaiyumi[1], S. Ayers[1], L. English[1], S. McDermott[1], D. D. Wagner[1], and S. Zhao[1]** [*][1] Division of Animal and Food Microbiology, Office of Research, Center for Veterinary Medicine, [2] Division of Field Science, Office of Regulatory Affairs, US Food and Drug Administration, Rockville, MD 20708, USA
http://jac.oxfordjournals.org/cgi/content/short/dkg441v1

13. Salmomella surveillance: global survey of public health serotyping: H.Herikstad et al: Foodborne and diarrhoal diseases branch, Division of bacterial and mycotic diseases, National center for infectious diseases, CDC, Atlanta, Georgia, USA.
http://www.who.int/salmsurv/links/en/Salmonellasurv95paper.pdf

14.Invasive Salmonella infections in the United States, FoodNet, 1996-1999: incidence, serotype distribution, and outcome: Vugia DJ, Samuel M, Farley MM, Marcus R, Shiferaw B, Shallow S, Smith K, Angulo FJ; Emerging Infections Program FoodNet Working Group: Clin Infect Dis. 2004 Apr 15;38 Suppl 3:S149-56
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=pubmed&dopt=Abstract&list_uids=15095184&query_hl=1

15. Food safety Begins at the farm; IOWA State University Health: By George W. Beran.
http://www.extension.iastate.edu/Pages/ansci/swinereports/asl-1512.pdf

Defendant Discovery Response 449 of 1539

16. Salmonella Serotype Montevideo Infections Associated with Chicks -- Idaho, Washington, and Oregon, Spring 1995 and 1996 ; March 21, 1997 / 46(11);237-239
http://www.cdc.gov/mmwr/preview/mmwrhtml/00046940.htm

17. Evolutionary origin of a monophasic Salmonella serovar, 9,12:l,v:-, revealed by IS200 profiles and restriction fragment polymorphisms of the fljB gene: **AP Burnens, J Stanley, I Sechter and J Nicolet**: Journal of Clinical Microbiology, Jul 1996, 1641-1645, Vol 34, No. 7 : Institute for Veterinary Bacteriology, University of Berne, Switzerland. BURNENS@VBI.UNIBE.CH.
http://jcm.asm.org/cgi/content/abstract/34/7/1641

18. Human Salmonellosis Cases: Provinces/territories or regions. Volume 29S1; March 2003
http://www.phac-aspc.gc.ca/publicat/ccdr-rmtc/03vol29/29s1/29s1_2e.html


**Please Note**:  Information in the references above are some what overlapping, i.e. they are describing about most of the serovars that I have used here.  In fact, I got information for most of the serovars from all or most of the articles. Therefore, it would not be prudent to separate them as per single serovar, since they are talking about multiple serovars in the same article.

Defendant Discovery Response
450 of 1539

Heidelberg:

1. Presence in FSIS regulated products.

Yes chicken is high, but how could one not mention Heidelberg in market hogs?

2. Then ~~discuss~~ discuss some documentation of outbreak attributed to FSIS regulated products.

3. Finally summarize some "expert opinion" about links to specific products. What do experts think are the likely sources of human illness)? While this may go

Defendant Discovery Response
477 of 1539

00000477
00000477

beyond the letter of the original request, it is what we would expect of a GS-13 analyst in OPHS.

Defendant Discovery Response
478 of 1539

SR-6

Lange, Loren

| From: | Thaler, Alice |
|---|---|
| Sent: | Tuesday, January 10, 2006 7:50 AM |
| To: | Lange, Loren |
| Cc: | Parham, Delila |
| Subject: | FW: Poultry Salmonella Serotype Report |
| Importance: | High |

This message is sent marked high importance, because I want to complete the evaluation of Dr. Khurshed Chowdhury's performance in as short a timeframe as possible.

Please review the attached Salmonella serotype report that was developed at your request. It is one of three work products prepared by Dr. Khurshed Chowdhury during his 120-day performance improvement plan that ended Dec 31, 2005. You reviewed an earlier version, which was unacceptable and, in part, led to the PIP.

I need your independent evaluation of whether this Salmonella Serotype Paper was useful and met your needs. Also please comment on whether in your opinion it meets what would be expected from a GS-13 level scientist.

Delila and I are evaluating all three work products, including peer review within the staff. We must reach agreement on whether the quality of the PIP work products meets the fully successful level, i.e., do they meet the quality standards that all ZDRSD staff are expected to meet?

Once I have all the documentation about the three work products, I will need to meet with you and David to ask your support of my final decision regarding the PIP.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
From: Parham, Delila
Sent: Tuesday, December 20, 2005 8:02 AM
To: Lange, Loren
Cc: Thaler, Alice
Subject: Poultry Salmonella Serotype Report

Alice Thaler asked that I forward this report prepared by Khurshed Chowdhury to you. Please see her note below.

Thanks.

Delila Parham

1/23/2006

Defendant Discovery Response 479 of 1539

00000479
00000479

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Tuesday, December 20, 2005 6:35 AM
**To:** Parham, Delila
**Subject:** RE: Dr. Chowdhury's serotype report to Loren

Go ahead and send it with this note:

"The original request for this document came from you. This new version has been developed by Dr. Chowdhury to address the deficiencies noted in the first draft. We would appreciate your review and comment to assist us in judging this work product. To be acceptable under the employee's performance improvement plan, Dr. Parham and I will evaluate it for general acceptability as presented by the employee as a complete and accurate GS-13 level work product. As the customer, please let us know the document contains the amount and level of information you expect from ZDRSD."

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Parham, Delila
**Sent:** Monday, December 19, 2005 5:06 PM
**To:** Thaler, Alice
**Subject:** Dr. Chowdhury's serotype report to Loren

Reminder: I believe we were going to send Khurshed's serotype report to Loren. I don't think we did that yet.

Thanks.

Delila

Defendant Discovery Response
480 of 1539

1/23/2006

00000480
00000480

**Brief descriptions of five Salmonella serotypes**

Five most frequently isolated Salmonella serovars from young chicken have been selected (*From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004*) for writing brief descriptions. The Salmonella serovars (in order from their most frequently isolated to less frequently isolated from the broilers) are: *S. Kentucky, S. Heidelberg, S. Typimurium var. Copenhagen, S. Typhimurium, and S. Enteritidis.*

**General information** [16]

Family: Enterobacteriaceae; Genus: *Salmonella*, named after United States Department of Agriculture vet Daniel E Salmon.

> Comment: Use the full word

Species: *Salmonella enterica*, and *Salmonella bongori*. *S. enterica* has six subspecies. Isolates from humans and warm-blooded animals belong to *Salmonella enterica* subspecies *enterica*

Serotypes: More than 2,400 *Salmonella* serotypes have been described and reported. All *Salmonella enterica subspecies enterica* serotypes are considered potentially pathogenic. Some serotypes are host specific, but the majority can affect different hosts.

> Deleted:
>
> Deleted: All *Salmonella* serotypes are considered potentially pathogenic. Some serotypes are host specific, but the majority can affect different hosts. ¶
>
> Deleted: spacing

**Characteristics of *Salmonella* serotypes in general**

- Gram-negative non-spore-forming rods (2-4X0.5µm), do not have capsules.
- Usually motile with long flagella.
- Non-motile variants may occur e.g *S. Pullorum* , *S. Gallinarum.*
- Optimal growth between 35-37°C and pH 7-7.5.
- Can survive several months away from the host.
- Can survive refrigeration, freezing (much reduced growth at temperatures <15°C and above 6°C) and dry conditions.
- Sensitive to most disinfectants.
- Killed at high temperatures. In general 60°C for 2-6 minutes or 70°C for 1 minute will kill the bacteria.

**(1) *S. Kentucky***

**Antigenic formula**: I, 8, 20 : i: z, 6

**Rate of isolation**: Very high percentages (32.14-44.39%) were isolated from the young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs**: Domestic and wild animals, poultry, including wild birds, rodents and pet animals, and also man [1,2]

> Comment: Why have these specific examples been used? Seems redundant.

1

Defendant Discovery Response 481 of 1539

00000481
00000481

Mode of transmission to humans: By ingestion of the organisms with contaminated food and water, raw or improperly cooked foods[1, 2, 17, 18]. Also organisms can be transmitted by the direct contact with infected man and animals.

Public health significance: Low to rare (*Please see the glossary below for explanation*). In 2003 CDC's Public Health Laboratory Information System (PHLIS) survey[28] isolated about 15 cases of *S. Kentucky* from the States of Massachusetts, New Jersey, New York, and Pennsylvania.

Antimicrobial Resistance: Multiple antimicrobial resistant[5, 4] especially to tetracycline and gentamicin. In an antimicrobial study by the Canadian scientists[26] the most common profile of multiple-antimicrobial resistance was that which included resistance to ampicillin, chloramphenicol, streptomycin, sulfamethoxazole, tetracycline, and ticarcillin. In one study[24] multiple drugs resistance of various degrees was seen in top 5 isolates from Chicken breast, Ground Turkey and Pork chop. S. Kentucky was 100% resistant to most drugs tested.

> Deleted: were
>
> Comment: Limit the description to the organism being profiled
>
> Deleted: and S. Heidelberg were

In another study,[20] high percentage of gentamicin resistance was seen in S. Kentucky which was isolated from chicken. It was concluded[20] that the use of gentamicin, which is frequently used in the poultry industry for growth promoting, needs to be examined in light of these findings.

(2) *S. Heidelberg.*

Antigenic formula: 1,4, [4], 12, r, I, 2

Rate of isolation: 16.84-22.9% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

Reservoirs: Domestic and wild animals, poultry, including wild birds, rodents and pet animals, and also man[1, 2].

Mode of transmission to humans: By ingestion of the organisms with contaminated food and water, meat and egg-associated infections were reported[1, 2, 18, 17]. Also organisms can be transmitted by the direct contact with infected man and animals.

Public health significance: Moderate to High. About 5.39- 8.0% was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003.

Antimicrobial Resistance: This serovar is multiple drugs resistant. In an antimicrobial study by the Canadian scientists[26] the most common profile of multiple-antimicrobial resistance was that which included resistance to ampicillin, chloramphenicol, streptomycin, sulfamethoxazole, tetracycline, and ticarcillin. In one study[24] multiple

*[handwritten annotations in margins:]*

*Left margin (vertical):* Limited, incorrect Defendant Discovery Response 482 of 1539 representation of Heidelberg even from 8/8/2

*Right margin:* Carelessly written. I assume the intent was to talk about the % of young chicken isolates that are Heidelberg

*Bottom:* And, is this even correct? The draft web paper has 27.9% for "A" sets in 2002. All sets was 27.97% for 2002.

*(circled)* over

2

drugs resistance of various degrees were seen in top 5 isolates from Chicken breast, Ground Turkey and Pork chop. S. Heidelberg were 100% resistant to most drugs tested.

> Deleted: S. Kentucky and

In another study [20] high percentage of gentamicin resistance were seen in *S. Heidelberg* that was isolated from chicken. In the chicken industry there is widespread injection of broiler eggs with gentamicin prior to hatch. Use of gentamicin in the poultry industry needs to be reevaluated. Experimental study by CDC[29] found that antimicrobial-resistant *Salmonella Heidelberg* frequently arise from food animals and can cause serious infections in humans. In one outbreak, a resistant *S. Heidelberg* strain was traced[30] from ill dairy calves to a farmer's pregnant daughter, who subsequently transmitted the organism to her newborn infant via placenta.

> Deleted: which

> Comment: Did this result in treatment failure because of antimicrobial resistance?

### (3) *S. Typhimurium* (var. Copenhagen)

**Antigenic formula:** 1, 4, 12:i: 1,2

*see earlier comment*

**Rate of isolation:** 6.97-9.40% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, chickens, ducks, pigeons, rodents, pet animals, and also man[1, 2].

**Mode of transmission to humans:** By ingestion of the organisms with contaminated foods, raw or uncooked foods, contaminated water[1, 2, 18, 17, 6]. Also organisms can be transmitted by the direct contact with infected man and animals.

In an experimental study[17] *Salmonella typhimurium* var.Copenhagen variety was the predominant Salmonella isolated from domestic animals. Same serotype was isolated from animals, chickens and wild birds, which indicated pigeons have the role in the epidemiology of salmonellas in animals and man.

> Comment: Meaning what? What animals?

**Public health significance:** Low to Moderate. About 1.08-1.30% of *S. Typhimurium* var. Copenhagen was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003.

**Antimicrobial Resistance:** This serovar is multiple drugs resistant. Strains isolated from pigeons were drug sensitive (lethal) but same strain isolated from other species (crows, kite) were drug resistant[17]. Studies[26, 14] also have found that, *S. Copenhagen* was the most common serovars among isolates resistant to individual antimicrobials and multiple antimicrobials. *S. Typhimurium* var. Copenhagen is resistant to ampicillin, ticarcillin, sulfamethoxazole, streptomucin, and tetracycline.

> Deleted: and *S. Heidelberg*

> Deleted: were

In several experimental studies[13, 14, 17] it was observed that the number of viable intracellular *S. typhimurium* Copenhagen bacteria remained constant 6 hrs after infection of Caco-2 cells, but the viability of *S. typhimurium* KY32H1 decreased significantly by 4

> Comment: The format of the organisms name varies here from how it is stated in the rest of this document. Is there a reason for this?

3

Defendant Discovery Response 483 of 1539

00000483
00000483

hrs post infection, suggesting that this mechanism may play a role in the antimicrobial resistance and virulence and/or intracellular growth of numerous bacteria.

*Comment: Spell out*

*Comment: What does "this" refer to?*

*Comment: This entire paragraph is unclear.*

**Defendant Discovery Response 484 of 1539**

### (4) *S.* Typhimurium

**Antigenic formula:** 1, 4, [5], 12: i: 1, 2

**Rate of isolation:** 3.83-6.97% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, including poultry, rodents, reptiles, and pet animals, and also man[1, 2].

**Mode of transmission to humans:** By ingestion of the organisms with food and water contaminated by feces or urine of a patient or carrier. Consuming shellfish taken from sewage-contaminated beds and raw fruits, vegetables, milk and milk products contaminated by carriers[1, 2, 17, 18, 6]. Also organisms can be transmitted by the direct contact with infected man and animals.

Pet eats, rodents and reptiles can shed multiple drug-resistant *S.* Typhimurium and can infect humans through contaminated foods by pet's feces[6]. To prevent the transmission of *Salmonella* from chicks, ducklings, and other young fowl to humans, persons should avoid contact with feces and carefully wash their hands with soap and water after handling young fowl or anything that has come in contact with them[7]. It has been recommended[6] that the public health practitioners should consider pet rodents a potential source of salmonellosis and, when indicated, should obtain cultures from pet rodents during an investigation.

**Public health significance:** Very high public health significance. Very high percentages (22-26%) was isolated from the human source by Public Health Laboratory Systems (PHLIS)[32], reported to CDC (Center for Disease Control) from 1998-2003. Ubiquitous and frequently the cause of infections in man and animals; the most frequent agent of food poisoning in man[2]. In England and Wales[23] during the period of 1981-1988 one of the most common serotypes isolated from humans was *S. typhimurium*.

*Deleted: were*

*Deleted: , and S. Enteritidis*

**Antimicrobial Resistance:** This serovar is multiple drugs resistant. *S. Typhimurium* were resistant to ampicillin, ceftriaxone, cephalothin, chloramphenicol, clavulanic acid/amoxicillin, gentamicin, kanamycin, streptomycin, sulfamethoxazole, and tetracycline[31, 8, 9, 10, 11, 3, 6].

In an experimental study[26] (by the Canadian scientists from Alberta Agriculture department) the sensitivity of 17 antimicrobials were tested for 3553 Salmonella isolates from food animals and foods. Of the 3553 antimicrobial susceptibility tests on *Salmonella* isolates, 11.8% were positive for resistance. The Canadian scientists[26] found these serotypes commonly resistant to tetracycline (35.4%), streptomycin (32.5%),

4

sulfamethoxazole (28.7%), ticarcillin (27.3%), and ampicillin (26.8%). Resistance to at least 1 antimicrobial was observed in 112 isolates (53.6%). *Salmonella* Typhimurium, was one of the most common serovars among isolates resistant to individual antimicrobials and multiple antimicrobials.

Experimental study[26] has determined that among all antimicrobial groups, the quinolone antimicrobials, nalidixic acid and ciprofloxacin, had the greatest activity against the Salmonella isolates. Cross-resistance to amphicillin and ticarcillin was evident; 56 of the 57 isolates that were resistant to ticarcillin were also resistant to ampicillin.

Of particular concern[21, 22] is the increasing number of infections with antimicrobial drug-resistant *Salmonella*, including the recent emergence of drug-resistant *Salmonella enterica* serotype Typhimurium (*S.* Typhimurium) definitive phage type 104 (DT104). This strain is usually resistant to at least five drugs: ampicillin, chloramphenicol, streptomycin, sulfonamides, and tetracycline (R-type ACSSuT) and has become a predominant *Salmonella* type in many countries, including the United States, United Kingdom, Germany, and France . Experimental study by CDC[29]  has found that antimicrobial-resistant *Salmonella* Typhimurium frequently arise from food animals and can cause serious infections in humans.

The study[22] also suggests that *S.* Typhimurium of R-type ACSSuT does not cause invasive disease more often than *Salmonella* Enteritidis. However, the overall mortality in relation to *S.* Typhimurium infection is higher. *S.* Typhimurium with excess[21] mortality and the demonstration of a hazard to human health underscores the need for restrictions in the use of antimicrobial drugs in the production of food from animals. A particular risk was associated with quinolone resistance, indicating that the use of fluoroquinolones for food production animals should be discontinued.

The extensive use[31, 10, 29] of antimicrobial agents as feed additives for farm animals and in the control and treatment of *Salmonella* infection has been suggested as a predisposing factor in the evolution of multiple drugs resistant strains. Antibiotics are used extensively in the poultry industry to reduce mortality and to increase the body weight of the animals.

Experimental data[30] also suggests that antimicrobial use by humans in the United States or in other countries does not play a major role in the emergence or persistence of antimicrobial-resistant strains in the United States. But epidemiologic and laboratory studies[29, 31] have traced antimicrobial-resistant salmonella to foods of animal origin.

*Salmonella* Typhimurium[14, 11] strains resistant to ampicillin, chloramphenicol, streptomycin, sulfonamide, and tetracycline (hereafter referred to as penta-resistant) were associated with higher death rates than infections with non–penta-resistant *S.* Typhimurium. Patients infected with strains[15] *S.* Typhimurium resistant to ampicillin, chloramphenicol, streptomycin, sulfonamide, and tetracycline were 4.8 times (95% CI 2.2 to 10.2) more likely to die, whereas quinolone resistance was associated with a mortality rate 10.3 times higher than the general population.

5

*Deleted: S. Typhimurium var. Copenhagen, and S. Heidelberg were*

*Formatted: Font: Not Italic*

*Formatted: Font: Not Italic*

*Formatted: Font: Not Italic*

*Deleted: indicated*

**Defendant Discovery Response 485 of 1539**

In an experimental study by the University of Maryland[25], College Park MD, it was found that all *Salmonella enterica* serovar Typhimurium isolates from conventional chickens were resistant to five or more antimicrobials, whereas most *S. enterica* serovar Typhimurium isolates (79%) from organic chickens were susceptible to 17 antimicrobials tested.[***]

Deleted: p

Comment: Meaning what? Commercial?

In analysis of data[27] collected by local and state health departments and public health laboratories (CDC) between the periods: 1979-1996, it was found that Multiple-drug-resistant typhimurium DT104 has become a widespread pathogen in the United States. More prudent use of antimicrobial agents in farm animals and more effective disease prevention on farms are necessary to reduce the dissemination of multiple drug-resistant typhimurium DT104 and to slow the emergence of resistance to additional agents in this and other strains of salmonella.

### (5) *S. Enteritidis*

**Antigenic formula:** 1,9,12: g, m:

**Rate of isolation:** 2.38-6.38% isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs:** Domestic and wild animals, including poultry, rodents and pet animals, and also man[1, 2].

**Mode of transmission to humans:** By ingestion of the organisms with contaminated food and water[1, 2, 6, 17], uncooked/imperfectly cooked meat, contaminated eggs, direct contact with infected man and animals, Pet rodents and reptiles can shed multiple drug-resistant *S. Enteritidis* and can infect humans through contaminated foods. Contamination of poultry meat appears to be a lesser cause of *S. Enteritidis* infection in humans than contaminated eggs[18].

To prevent the transmission[7] of *Salmonella* from chicks, ducklings, and other young fowl to humans, persons should avoid contact with feces and carefully wash their hands with soap and water after handling young fowl or anything that has come in contact with them.

**Public health significance:** Very high significance. Very high percentages (14.48-19.44%) was isolated from the human source by Public Health Laboratory Systems (PHLIS)[31], reported to CDC (Center for Disease Control) from 1998-2003. *S. Enteritidis* is a frequently isolated pathogen[1, 2] in humans and animals in the US. *S. Enteritidis* is one of the three top isolates from non-human sources[3]. It has been recommended[6] that the public health practitioners should consider pet rodents a potential source of salmonellosis and, when indicated, should obtain cultures from pet rodents during an investigation.

In the United States and throughout the world, human illness caused by *S. Enteritidis* a prototypic emerging pathogen has dramatically increased due to mainly by consuming

Defendant Discovery Response
486 of 1539

6

undercooked or raw shell eggs[19]. In England and Wales[23] during the period of 1981-1988 the most common serotypes isolated from humans were *S. typhimurium*, and S. *Enteritidis*.

**Antimicrobial Resistance:** This serovar is multiple drugs resistant[6] such as to ampicillin, chloramphenicol, streptomycin, sulfizoxazole, and tetracycline.

In the experiments [10, 12,] *Salmonella Enteritidis* is resistant to the penicillin and cephalosporin classes of antibiotics. Additionally, this serovar is resistant to gentamicin, tobramycin, chloramphenicol, and tetracycline and remained susceptible to quinolones (pefloxacin, norfloxacin, and nalidixic acid) and amikacin.

The extensive use of antimicrobial agents[10, 31, 29] as feed additives for farm animals and in the control and treatment of *Salmonella* infection has been suggested as a predisposing factor in the evolution of multiple resistant strains. Antibiotics are used extensively in the poultry industry to reduce mortality and to increase the body weight of the animals.

<span style="text-decoration: underline">**Glossaries of Public Health Significance:**</span> As per rate or frequency of isolation of the causal serovar from human salmonella incidences, I have designated the following terminology against each Salmonella serovar of their approximate public health significance.

Rare: Very rarely or occasionally isolated.

Low: Low percentage of isolations.

Moderate: Moderate percentage of isolations.

High: Frequently high percentage of isolations.

Very high: Frequently very high percentage of isolations.

<span style="text-decoration: underline">References:</span>

1. Control of communicable diseases in man: by Abram S. Benenson, 14th Edition; 1985; an official report of the public association.

(2) Bergey's Manual of Determinative Bacteriology: R.E. Buchanan and N.E. Gibbons; Eighth Edition; 1975; The Williams and Wilkins Company/Baltimore.

(3) Antimicrobial Resistance in Pathogenic and commensal Bacteria of food animals. http://www.ars.usda.gov/research/publications/publications.htm?SEQ_NO_115=130172

(4) Sheep Anti-Salmonella kentucky, group C3 Polyclonal Antibody, Unconjugated http://www.biocompare.com/itemdetails.asp?itemid=413825&catid=3194

7

**Defendant Discovery Response 487 of 1539**

Defendant Discovery Response
488 of 1539

(5) Serotyping and Antibiotic Resistance Profiling of Salmonella in Feedlot and
Nonfeedlot Beef cattle: John C. Beach et al; Journal of Food Protection: Vol. 65, No. 11,
pp. 1694–1699.
http://apt.allenpress.com/aptonline/?request=get-abstract&issn=0362-
028X&volume=065&issue=11&page=1694

(6) Outbreak of Multidrug-Resistant *Salmonella* Typhimurium Associated with Rodents
Purchased at Retail Pet Stores — United States, December 2003–October 2004
http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5417a3.htm

(7) Salmonellosis Associated with Chicks and Ducklings —– Michigan and Missouri,
Spring 1999. MMWR; April 14, 2000/ 49(14): 297-9
http://www.cdc.gov/mmwr/preview/mmwrhtml/mm4914a1.htm

(8) Outbreaks of Multidrug-Resistant *Salmonella* Typhimurium Associated With
Veterinary Facilities —-Idaho, Minnesota, and Washington, 1999; MMWR; August 24
24, 2001/ 50(33): 701-4. http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5033a1.htm

(9) Occurrence of *Salmonella enterica* Serotype Typhimurium DT104A in Retail Ground
Beef: Zhao T.[1]; Doyle M.P.[1]; Fedorka-Cray P.J[2]; Zhao P.[1]; Ladely S.[3] Journal of Food
Protection, Volume 65, Number 2, 1 February 2002, pp. 403–407(5) Richard Russell
Research Center, Athens, Georgia 30605, USA
http://www.ingentaconnect.com/content/iafp/jfp/2002/00000065/00000002/art00023

(10) Dual Emergence in Food and Humans of a Novel Multiresistant Serotype of
*Salmonella* in Senegal: *Salmonella enterica* subsp. *enterica* Serotype 35:c:1,2; Journal of
Clinical Microbiology, June 2001, p. 2373-2374, Vol. 39, No. 6.
http://jcm.asm.org/cgi/content/full/39/6/2373

(11) Antimicrobial Resistance of *Salmonella* in Raw Retail Chickens, Imported Chicken
Portions, and Human Clinical Specimens: Wilson I. G.;  Journal of Food Protection;
Volume 67, Number 6, 1 June 2004, pp. 1220-1225(6).
http://www.ingentaconnect.com/content/iafp/jfp/2004/00000067/00000006/art00021

(12) Microbial Drug Resistance: Antimicrobial Resistance and Serotype Prevalence of
*Salmonella* Isolated from Dairy Cattle in the Southwestern United States.
http://www.liebertonline.com/doi/abs/10.1089/107662904323047808;jsessionid=jJDZlGI
V-cr8?cookieSet=1&journalCode=mdr

(13) Decreased intracellular survival of an fkpA mutant of Salmonella typhimurium
Copenhagen: SM Horne, TJ Kottom, LK Nolan and KD Young : Department of
Microbiology and Immunology, School of Medicine, University of North Dakota, Grand
Forks 58202-9037, USA. http://iai.asm.org/cgi/content/abstract/65/2/806

8

Defendant Discovery Response
489 of 1539

(14) Antimicrobial Drug-resistant *Salmonella* Typhimurium (Reply to Helms): CDC Emerging Infectious Diseases.
http://www.cdc.gov/ncidod/EID/vol9no10/02-0716.htm

(15) Excess mortality associated with antimicrobial drug-resistant *Salmonella* Typhimurium. Helms M, Vastrup P, Gerner-Smidt P, Mølbak K.; Emerg Infect Dis 2002;8:490-5.

(16) Salmonella Bacteria Classification.
http://www.safe-poultry.com/AboutSalmonella.asp

(17) Biochemical characteristics and in-vitro drug sensitivity of Salmonella typhimurium, Copenhagen variety isolated from domestic and feral pigeons, crows, a kite, chickens and animals in Japan: Sato G, Ishiguro N, Asagi M, Oka C, Kawanishi T, Inoue T: Nippon Juigaku Zasshi, 1977, Dece;39(6):609-17
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=3
40743&dopt=Abstract

(18) Epidemiology of *Salmonella* enteritica Serovar Enteritidis: C. Poppe: Salmonella enterica Serovar Enteritidis in Humanms and Animals: Edited by: A.M.Saeed et al. IOWA State University Press/AMES, First Edition 1999.

(19) Epidemiology og Human salmonella enterica Serovar Enteritidis infections in the United States: F.J. Angulo and D.L. Swerdlow: Salmonella enterica Serovar Enteritidis in Humanms and Animals: Edited by: A.M.Saeed et al. IOWA State University Press/AMES, First Edition 1999.

(20) Antibiotic ressistance in Salmonella Enterica serotypes Heidelberg, Kentucky and Thompson isolated from human and broiler chicken sources: Hollinger K. et al.
http://www.cdc.gov/narms/publications/1999/Hollinger-Silvers_1999.pdf

(21) Excess Mortality Associated with Antimicrobial Drug-Resistant *Salmonella*Typhimurium: Morten Helms,* Pernille Vastrup,* Peter Gerner-Smidt,* and Kåre Mølbak*; *Statens Serum Institut, Copenhagen, Denmark
http://www.cdc.gov/ncidod/EID/vol8no5/01-0267.htm (For S. Tiphimurium)

(22) Antimicrobial Drug-resistant *Salmonella* Typhimurium (Reply to Dahl):Morten Helms,* Pernille Vastrup,* and Kåre Mølbak*:*Statens Serum Institut, Copenhagen, Denmark.
http://www.cdc.gov/ncidod/EID/vol9no10/03-0029.htm

(23) Multiple drug resistance in salmonellae in England and Wales: a comparison between 1981 and 1988.:Ward LR, Threlfall EJ, Rowe B: J. Clin Pathol. 1990 Jul; 43(7):563-6
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=2
199536&dopt=Abstract

9

(24) Antimicrobial Resistance among Salmonella by Meat type in Overall Top Five Sertotypes, 2002.: http://www.fda.gov/cvm/Documents/Table13.pdf

(25) Prevalence and Antimicrobial Resistance of *Campylobacter* spp. and *Salmonella* Serovars in Organic Chickens from Maryland Retail Stores: Shenghui Cui, Beilei Ge, Jie Zheng, and Jianghong Meng* :Department of Nutrition and Food Science, University of Maryland; College Park, Maryland 20742. http://aem.asm.org/cgi/content/abstract/71/7/4108

(26) Antimicrobial resistance of selected *Salmonella* isolates from food animals and food in Alberta: Julie M. Johnson, Andrijana Rajic, and Lynn M. McMullen: Can Vet J. 2005 February; 46(2): 141–146. http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=1082862

(27) Emergence of multidrug-resistant Salmonella enterica serotype typhimurium DT104 infections in the United States: Glynn MK, Bopp C, Dewitt W, Dabney P, Mokhtar M, Angulo FJ:  Centers for Disease Control and Prevention, Atlanta, GA 30333, USA. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=9571252&dopt=Abstract

(28) Salmonella isolates from Human sources by serotype, Geographic region and State, 2003 by Public Health laboratory Information System. http://www.cdc.gov/ncidod/dbmd/phlisdata/salmtab/2003/SalmonellaTable4_2003.pdf

(29) Animal-to-man transmission of antimicrobial-resistant Salmonella: investigations of U.S. outbreaks, 1971-1983: Holmberg SD, Wells JG, Cohen ML; Science. 1984 Aug 24;225(4664):833-5. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=6382605&dopt=Abstract

(30)Drug-resistant Salmonella in the United States: an epidemiologic perspective: Cohen ML, Tauxe RV; Science. 1986 Nov 21;234(4779):964-9. http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=3535069&dopt=Abstract

(31) Medical consequences of antibiotic use in agriculture. Science 1998; 279:996-7. Witte W; Science, Vol.279; February 13, 1998

(32) Most frequently reported Salmonella serotypes from human source reported to CDC from 1998-2003-(Public Health Laboratory Information Systems (PHLIS). http://www.cdc.gov/ncidod/dbmd/phlisdata/salmonella.htm

**Defendant Discovery Response
490 of 1539**

10

00000490

00000490

December 21, 2004

To the files: Re: Khurshed Chowdhury's Mid-Year Review – Unacceptable

On December 8, I met informally with Dr. Chowdhury to discuss my concerns with his work. (See details below.) No rating was given, and he was not requested to sign the appraisal. Dr. Robert Brewer sat in on the meeting.

Dr. Chowdhury will be out for the entire month of January 2005. It was decided that he should be rated prior to his leave. Drs. Chowdhury, Thaler, and I met yesterday, December 20, 2004, to discuss his mid-year performance, which has been found unacceptable. I explained this to Dr. Chowdhury, and provided him and Dr. Thaler with a document outlining the concerns about his work. Dr. Chowdhury was given an opportunity to address the concerns raised. He contends that his performance has been acceptable although he admits that he did not complete or perform work on major projects he was assigned: Review of Thailand and Columbia Equivalency and researching and drafting of a document on toxoplasmosis for possible publication in a peer-reviewed journal. Although Dr. Chowdhury has done work on other projects such as Bovine Spongiform Encephalopathy, he has been notified many times that his work lacked in-depth review and analysis, and much of his work is returned for further research and analysis. Dr. Chowdhury has been told also that his writing skills need to be improved, and that he would benefit in taking a technical writing course. He has been informed too that his manner when dealing with me as a supervisor is also unacceptable. He refuses to come and clarify any questions he has about projects and when asked why he did something a particular way after receiving an assignment he says he checked with someone in another office, in the Zoonoses Branch, or ZDRSD staff, but never with me. When I try to discuss things with him, he becomes loud and confrontational or dismissive of the concerns I am raising. Dr. Chowdhury listened and addressed some of the concerns raised and while he did not agree with them overall, he said he would do whatever I wanted him to do. He was given a memo from Dr. Thaler that captured the concerns expressed by me and made recommendation to him for improvement.

This meeting followed a meeting held with Drs. Chowdhury, Brewer and me on December 8 in which the same information and concerns were expressed to Dr. Chowdhury.

DRP

Addendum: Dr. Chowdhury came to my office this morning and asked that I "forgive" him for his past performance and that he was willing to work to rectify the situation. He asked leniency in that he cannot afford to lose his job since he is the only one working to take care of his family. Dr. Thaler joined us at the meeting, and we reiterated the things that he must do to improve his performance. He expressed concern about taking his vacation (January 3-25, 2005) because of this situation, and we encouraged him to take his vacation and return ready to work.

Defendant Discovery Response
548 of 1539

December 21, 2004

To the files: Re: Khurshed Chowdhury's Mid-Year Review – Unacceptable

On December 8, I met informally with Dr. Chowdhury to discuss my concerns with his work. (See details below.) No rating was given, and he was not requested to sign the appraisal. Dr. Robert Brewer sat in on the meeting.

Dr. Chowdhury will be out for the entire month of January 2005. It was decided that he should be rated prior to his leave. Drs. Chowdhury, Thaler, and I met yesterday, December 20, 2004, to discuss his mid-year performance, which has been found unacceptable. I explained this to Dr. Chowdhury, and provided him and Dr. Thaler with a document outlining the concerns about his work. Dr. Chowdhury was given an opportunity to address the concerns raised. He contends that his performance has been acceptable although he admits that he did not complete or perform work on major projects he was assigned: Review of Thailand and Columbia Equivalency and researching and drafting of a document on toxoplasmosis for possible publication in a peer-reviewed journal. Although Dr. Chowdhury has done work on other projects such as Bovine Spongiform Encephalopathy, he has been notified many times that his work lacked in-depth review and analysis, and much of his work is returned for further research and analysis. Dr. Chowdhury has been told also that his writing skills need to be improved, and that he would benefit in taking a technical writing course. He has been informed too that his manner when dealing with me as a supervisor is also unacceptable. He refuses to come and clarify any questions he has about projects and when asked why he did something a particular way after receiving an assignment he says he checked with someone in another office, in the Zoonoses Branch, or ZDRSD staff, but never with me. When I try to discuss things with him, he becomes loud and confrontational or dismissive of the concerns I am raising. Dr. Chowdhury listened and addressed some of the concerns raised and while he did not agree with them overall, he said he would do whatever I wanted him to do. He was given a memo from Dr. Thaler that captured the concerns expressed by me and made recommendation to him for improvement.

This meeting followed a meeting held with Drs. Chowdhury, Brewer and me on December 8 in which the same information and concerns were expressed to Dr. Chowdhury.

DRP

Addendum: Dr. Chowdhury came to my office this morning and asked that I "forgive" him for his past performance and that he was willing to work to rectify the situation. He asked leniency in that he cannot afford to lose his job since he is the only one working to take care of his family. Dr. Thaler joined us at the meeting, and we reiterated the things that he must do to improve his performance. He expressed concern about taking his vacation (January 3-25, 2005) because of this situation, and we encouraged him to take his vacation and return ready to work.

Defendant Discovery Response
549 of 1539

**Dr. Khurshed Chowdhury**
Mid-Year Performance Appraisal (July 2004–December 2004)

Rating: Unacceptable

1.  Mission Support :
    - Standard: Has demonstrated basic understanding of mission and organizational goals and priorities that support or directly protected the public health from foodborne hazards. Assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines. Work product was responsive to the supervisor's and the organization's stated priorities and requirements. Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable). (Must show link towards Agency strategic mission and goals.
        - o   Goals/Activities:
            - ▪ Strategic Goals: Protect the public health by significantly reducing the prevalence of foodborne hazards form meat, poultry, and egg products.
            - ▪ Objective 2: Create a coordinated national and international food safety risk management system for meat, poultry, and egg products from farm to table.
                - • Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.
                - • Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.
                - • Respond to food safety emergencies and critical events with useful plans and recommendations.
                - • Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.
            - ▪ Objective 4: Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.
                - • Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.
    - Actions: Dr. Chowdhury's work has not been responsive to the supervisor's and the organizations' stated priorities and requirements. Major projects were received late and only after setting a "final" due date. On one project, no work was being done, and there was no discussion with the supervisor to apprise her of the situation.
        - o   Columbia and Thailand Review: Dr. Chowdhury was asked to provide written documentation of his review. He did not do so, even after a request was made in August to provide a written document. In order to get him to complete the assignment, he was given a week to provide the two documents (December 1-8). He provided the review on Thailand, but requested that he be given until after Christmas to complete the Columbia review; his request was denied and he was asked to complete the assignment by December 13. The reviews lacked depth. He was asked to continue the review, especially for Thailand, since he missed major issues such as handling of avian influenza, a major concern in Thailand.
        - o   Toxoplasmosis: Dr. Chowdhury has not worked on this project during the time he received it as a project. In his performance review for 2003, Dr. Chowdhury discussed other projects he was interested in working on that fitted into the branches mission. One was toxoplasmosis, and he agreed to research and write an article on it for publication in a peer-reviewed journal. It was understood that he would be working on this when he was not working on higher priority assignments. In August he was sent a reminder that he should have at least completed the literature review on the article, and should provide me with an update of his progress. It was in December that he finally told the supervisor that he had never started working on the article. It seems that he called Dr. Dubey, an expert on toxoplasmosis, and as a result of their discussion, he was discouraged from working on the article. That he was not working on the article was never discussed with his supervisor although it was mentioned in several branch meetings and other occasions that Dr. Chowdhury was interested and/or working on toxoplasmosis.

Defendant Discovery Response
550 of 1539

- Recommendation for Improvement: 1. Provide firm due dates to Dr. Chowdhury on all work assigned. 2. Accept only work that is well done and meets all requirements. 3. Have Dr. Chowdhury provide a daily journal of all work done including amount of time spent on each assignment and/or task.

2.  Research and Analysis:
    - Standard: Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate. Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations.) Recommendations or analysis provided were based on available guidance and were generally accepted without major revision.
    - Action: Dr. Chowdhury struggles with providing well-researched, well-written assignments. He does not ensure that all relevant and technical scientific issues are fully analyzed and, therefore, much of his work is returned to him for more in-depth analysis. Moreover, the majority of his work requires major edits and revisions. Few rush assignments can be given to Dr. Chowdhury because the quality of his work is such that it cannot be forwarded to others without major rework. His need to improve his writing skills has been discussed with him several times, but he does not feel he needs to take a writing course.
    - Recommendation for Improvement: The supervisor should require that Dr. Chowdhury attend a technical writing class to improve his writing skills.

3.  Personal Contacts – EO/CR:
    - Standard: Projected a positive and professional image of USDA. Performed all duties in a manner which consistently demonstrated fairness, cooperation, and respect toward coworkers, customers, and all others in the performance of official business. Complied with EO/CR guidelines and policies.
    - Action: Dr. Chowdhury does not accept supervision well. When attempting to discuss additional work needed on projects that he is assigned, he has become loud and disruptive with his supervisor. (Example: tonsil paper; discussion on August 30 with supervisor.) He has been informed that supervisors are expected to review work performed by employees and discuss it with them without the employee being loud and disruptive or shouting at the supervisor. 2. Dr. Chowdhury does not provide the supervisor with information that would inform the decision. (Example: toxoplamosis paper and discussion with Dr. Dubey; Thailand and Columbia review; discussion with Todd Furey and Nancy Goodwin). In some situations he discussed assignments with personnel outside the branch and made a decision that he would not continue to work on the assignment based on his discussion with these individuals. Although he discontinued work on the assignment, he did not inform his supervisor.
    - Recommendation for Improvement: 1. Supervisor should schedule frequent meetings with Dr. Chowdhury to ensure that all assignments are understood and work is being done. 2. Dr. Chowdhury should provide the supervisor with a journal of his daily activities: the activities, including phone calls, he is engaged in and the amount of time spent on each. 2. Work related problems may be the result of personal situations. While this may not be the case, Dr. Chowdhury may wish to consult the Employee Assistance Program to assist him in assessing any problems he may have.

Defendant Discovery Response
551 of 1539

**Exhibit 1: Document Provided to Dr. Chowdhury at Midyear Appraisal (December 20, 2004)**

Dr. Khurshed Chowdhury
Mid-Year Performance Appraisal (July 2004–December 2004)
Rating: Unacceptable

Mission Support:

- Standard: Has demonstrated basic understanding of mission and organizational goals and priorities that support or directly protected the public health from foodborne hazards. Assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines.   Work product was responsive to the supervisor's and the organization's stated priorities and requirements.  Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable). (Must show link towards Agency strategic mission and goals.
  - o Goals/Activities:
    - ▪ Strategic Goals: Protect the public health by significantly reducing the prevalence of foodborne hazards form meat, poultry, and egg products.
    - ▪ Objective 2:  Create a coordinated national and international food safety risk management system for meat, poultry, and egg products from farm to table.
      - • Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.
      - • Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.
      - • Respond to food safety emergencies and critical events with useful plans and recommendations.
      - • Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.
    - ▪ Objective 4:   Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.
      - • Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.
- Actions: Dr. Chowdhury's work has not been responsive to the supervisor's and the organizations' stated priorities and requirements. Major projects were received late and only after setting a "final" due date.  On one project, no work was being done, and there was no discussion with the supervisor to apprise her of the situation.
  - o Columbia and Thailand Review: Dr. Chowdhury was asked to provide written documentation of his review. He did not do so, even after a request was made in August to provide a written document. In order to get him to complete the assignment, he was given a week to provide the two documents (December 1–8). He provided the review on Thailand, but requested that he be given until after Christmas to complete the Columbia review; *his request was denied and he was asked to complete the assignment by December 13.*  The reviews lacked depth.  He was asked to continue the review, especially for Thailand, since he missed major issues such as handling of avian influenza, a major concern in Thailand.
  - o Toxoplasmosis:  Dr. Chowdhury has not worked on this project during the time he received it as a project. In his performance review for 2003, Dr. Chowdhury discussed

10

other projects he was interested in working on that fitted into the branches mission. One was toxoplasmosis, and he agreed to research and write an article on it for publication in a peer-reviewed journal. It was understood that he would be working on this when he was not working on higher priority assignments. In August he was sent a reminder that he should have at least completed the literature review on the article, and should provide me with an update of his progress. It was in December that he finally told the supervisor that he had never started working on the article. It seems that he called Dr. Dubey, an expert on toxoplasmosis, and as a result of their discussion, he was discouraged from working on the article. That he was not working on the article was never discussed with his supervisor although it was mentioned in several branch meetings and other occasions that Dr. Chowdhury was interested and/or working on toxoplasmosis.

- Recommendation for Improvement: 1. Provide firm due dates to Dr. Chowdhury on all work assigned. 2. Accept only work that is well done and meets all requirements. 3. Have Dr. Chowdhury provide a daily journal of all work done including amount of time spent on each assignment and/or task.

2. Research and Analysis:
   - Standard: Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate. Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations.) Recommendations or analysis provided were based on available guidance and were generally accepted without major revision.
   - Action: Dr. Chowdhury struggles with providing well-researched, well-written assignments. He does not ensure that all relevant and technical scientific issues are fully analyzed, and, therefore, much of his work is returned to him for more in-depth analysis. Moreover, the majority of his work requires major edits and revisions. Few rush assignments can be given to Dr. Chowdhury because the quality of his work is such that it cannot be forwarded to others without major rework. His need to improve his writing skills has been discussed with him several times, but he does not feel he needs to take a writing course.
   - Recommendation for Improvement: The supervisor should require that Dr. Chowdhury attend a technical writing class to improve his writing skills.

3. Personal Contacts – EO/CR:
   - Standard: Projected a positive and professional image of USDA. Performed all duties in a manner which consistently demonstrated fairness, cooperation, and respect toward coworkers, customers, and all others in the performance of official business. Complied with EO/CR guidelines and policies.
   - Action: Dr. Chowdhury does not accept supervision well. When attempting to discuss additional work needed on projects that he is assigned, he has become loud and disruptive with his supervisor. (Example: tonsil paper; discussion on August 30 with supervisor.) He has been informed that supervisors are expected to review work performed by employees and discuss it with them without the employee being loud and disruptive or shouting at the supervisor. 2. Dr. Chowdhury does not provide the supervisor with information that would inform the decision. (Example: toxoplamosis paper and discussion with Dr. Dubey; Thailand and Columbia review; discussion with Todd Furey and Nancy Goodwin). In some situations he discussed assignments with personnel outside the branch and made a decision that he would not continue to work on the assignment based on his discussion with these individuals. Although he discontinued work on the assignment, he did not inform his supervisor.
   - Recommendation for Improvement: 1. Supervisor should schedule frequent meetings with Dr. Chowdhury to ensure that all assignments are understood and work is being done. 2. Dr.

11

00001808
00001808

Chowdhury should provide the supervisor with a journal of his daily activities: the activities, including phone calls, he is engaged in and the amount of time spent on each. 2. Work related problems may be the result of personal situations. While this may not be the case, Dr. Chowdhury may wish to consult the Employee Assistance Program to assist him in assessing any problems he may have.

00001809
00001809

 United States          Food Safety          Office of Public          Washington, D.C.
Department of          And Inspection          Health Science          20250
Agriculture            Service

August 11, 2005


To:          David Goldman
             Assistant Administrator, OPHS

Through:     Alice Thaler
             Director, Zoonotic Diseases and Residue Surveillance Division, OPHS

From:        Delila Parham
             Branch Chief, Zoonotic Diseases and Residue Surveillance Division, OPHS

Subject:     Bovine Spongiform Encephalopathy Manuscript


Please see the attached manuscript on bovine spongiform encephalopathy prepared by Drs. Jane
Harman, Food Safety and Inspection Service (FSIS), and Chris Silva, Agricultural Research
Service. Dr. Harman is the lead author. After FSIS clearance, the manuscript will be submitted
to the Journal of the American Veterinary Medical Association (JAVMA). Dr. Harman has made
contact with the editors of JAVMA, and they are awaiting the manuscript for review. Your
assistance in moving this through the Agency clearance process is appreciated.

Dr. Harman will be out of the office beginning Friday, August 12, and will return on Monday,
August 22. If you have questions, please feel free to contact Dr. Harman upon her return by
email at jane.harman@fsis.usda.gov or by telephone at 202- 690-6404.

7/1/2005 3:57 PM
Draft_July 1_changes accepted.doc
**Bovine Spongiform Encephalopathy**
**Jane Harman**
**Chistopher Silva**

## History of the BSE epizootic

Bovine spongiform encephalopathy (BSE) was identified as a new disease of cattle in 1986[298]. From its first demonstrated appearance in England in 1985, an epizootic quickly became evident throughout the UK, peaking in 1992 with 37,280 cases identified that year[73]. Since 1986, more than 180,000 BSE cases of BSE have been confirmed in the UK[85]. However, because the incubation period of this disease usually exceeds the slaughter age for cattle, the identified cases represent only those that lived long enough to express clinical disease or—after the advent of postmortem rapid tests— to result in a positive BSE test at slaughter. Judging from the ages of known clinical cases, the estimated length of the incubation period, and the composition of the British national herd, it has been calculated that since 1980[69], approximately 2 million cattle were infected by BSE in the UK since the beginning of the epizootic[93]. For reference, the combined cattle population for England and Scotland in 1990 was approximately 9 million head[84,280].

By 1989, the disease had appeared in cattle in Ireland, 1990 in Switzerland[132], 1991 in France, and by 2004, the disease had been confirmed in native-born cattle in 20 European countries, Japan, Canada, and Israel[208]. Canada identified its first case in a native-born animal in May, 2003, a case yielding a molecular profile indistinguishable from that of BSE isolates from the UK[267]; as of January, 2005, there have been three confirmed cases among native-born cattle in Canada[86]. In the U.S., in December, 2003, an infected Canadian-born cow was detected at slaughter in the state of Washington [4,75, 174,202,203].

From the beginning of the BSE epizootic, veterinarians and physicians recognized the similarity of this new disease in cattle to the clinical and histopathological presentation of scrapie in sheep[87], transmissible mink encephalopathy (TME) [189], chronic wasting disease (CWD) of cervids[197], and several rare human neurodegenerative diseases[31,270], all collectively known as transmissible spongiform encephalopathies (TSEs). BSE in cattle is an insidiously developing neurodegenerative disease, as are all of these diseases, and, similar to the brains of other TSE-affected animals, brains of BSE-affected cattle demonstrate the vacuolated appearance of a transmissible spongiform encephalopathy [146,294].

It had been known for some time that TSEs can be spread to a new host by the ingestion of infected tissue[217]}, leading to an immediate suspicion of transmission through the recycling of infected cattle into meat and bone meal (MBM). Indeed, during earlier investigations of TME by Marsh et al.[188], mink ranchers had told of regularly feeding downer cattle to their mink. Brain tissue from TME-affected mink was intracranially injected into cattle, producing a disease that bore similarities to experimentally induced BSE[242]. Recently, frozen tissue from TME-affected mink were fed to cattle, producing a disease indistinguishable from BSE (Amir Hamir IN PRESS) ahamir@nadc.ars.usda.gov). **

Epidemiological evidence from the UK indicated that BSE was indeed spreading through feed.[307]. Cases clustered within geographic regions and within farms, as one might expect of a feed-associated epizootic. Although most farms had only a few cases, there was significantly increased likelihood of finding new cases on the same farm within 3 years of the birth year of a case and within 5 years of the year-of-onset of the first case[95]. Unlike classical infectious diseases, there was no indication that the infection was being transmitted directly from animal to animal. It was as though a 'packet' of infectious material was being delivered to some animals and not to others.

*The implication of ruminant-derived meat and bone meal (MBM)*

In the UK, the practice of MBM supplementation had gained acceptance in the 1950s and was very common by the 1970s and 80s. [261](check dates in ref*). The rendered carcasses were subjected to heat and solvent extraction to remove the fats; the remaining protein comprised MBM. In the late 1970s, the oil crisis caused the price of the extracting solvents to rise such that their use was no longer justified for recovery of animal fat; solvent fat extraction began to be omitted during processing. It has been postulated that this change, plus some reduction in processing temperatures, may have set the stage for the continued survival of infective material in the MBM; recent experiments show that this processing change probably did not have as potent an effect as initially suspected[276]; However, because cattle are so exquisitely susceptible to oral exposure from infective tissue, even a small increase in survival of infectious agent may have been enough to amplify infectivity through rendering and re-feeding. By the 1980s, almost all cattle born in Great Britain consumed MBM at some time during their lives [95], and MBM was being produced in many locations throughout the UK from the carcasses of sheep and cattle. Because of the high proportion of sheep carcasses in MBM in the UK, it is possible that BSE originated as a cattle-adapted scrapie that was amplified through this process of unknowingly feeding infected carcasses back to susceptible animals[164,252].

Suspecting that a new TSE was circulating via meat-and-bone meal, effective July, 1988, UK authorities instituted a ban on feeding ruminants any ruminant-derived protein[83]. Subsequent record review showed that of all cattle birth cohorts affected by the UK epidemic, those born in the year *preceding* July 1988 were most likely to become infected by BSE; relative to this most-affected cohort, those born in the year *following* the July 1988 feed ban showed an 80% drop in infection rate. Following the feed ban, there was also much less within-farm correlation of cases, *i.e.* the cases became distributed more sporadically as the feed infectivity dropped[95].

Although the number of clinical cases continued to climb until 1992, due largely to animals infected before the feed ban, the dramatic drop in cases born after the ban substantiated the supposition that ruminant-derived MBM was indeed the primary source of infection. In order to lessen the risk of infection via feed meant for other livestock, and to protect other susceptible species, in 1990, the UK forbade feeding cattle parts known to contain the highest level of infectivity, tissue designated as "specified risk material", to *any* animal. [95].

Disturbingly, despite the ruminant-to-ruminant feed ban and the ban on feeding specified risk material to any animal, the UK continued to experience tens of thousands of cases of BSE in cattle born in the UK after these bans (check number in Bradley, liberski 2004 review **). Now that BSE was a reportable disease, information on cases

2

could be collected and carefully evaluated for common links. Investigators found that cattle born after the feed ban were more likely to originate in areas of Britain that had a substantial swine and poultry industry, where these species were often maintained on the same premises with cattle[141]. It appeared that infection of cattle continued from cross-contamination of cattle rations by feed intended for non-ruminant farm animals. Therefore, in 1996, it became illegal in the UK to prepare feed containing *any* mammalian protein for *any* farm animal; it became illegal even to store such feed on farm premises; all farmers were notified to clean their feed storage areas to remove any trace of contaminated feed. This reinforced feed ban became effective throughout the European Union in 2001 [100].

Since the 1996 feed ban, the annual number of cases of BSE in the UK has declined steadily each year; in 2003, there were 612 cases identified; during 2004, only 291 new cases were found (17 tests pending**update at publication time), most born before the 1996 feed ban[85].

Notwithstanding these difficulties in eradicating the disease from the UK, the dramatic decrease in new infections that followed each subsequent feed ban provided irrefutable evidence that BSE was indeed spreading through contaminated feed, true to the nature of a transmissible spongiform encephalopathy.

*Previous knowledge of Transmissible Spongiform Encephalopathies (TSEs)*

TSEs are a collection of rare but fatal neurodegenerative diseases, remarkable for the absence of any inflammatory or other host immune response and for their ability to be transmitted by the ingestion or inoculation of tissue from an infected animal to another of the same species[72]. Until the appearance of BSE, these diseases did not appear to be naturally transmissible across species. The known human TSEs had never been linked to animals.

Prior to the advent of BSE, scrapie was the best-known example of an animal TSE, first described in the 18th century[48]. The hallmark of the disease was the vacuolization observed in the brain of afflicted animals, hence the term *spongiform encephalopathy* used to describe the disease. In spite of marked damage to the brain, there was no inflammation or increase in antibody titer, no discernable immune response by the infected sheep. In 1936, experiments by veterinarians showed that scrapie was transmissible by inoculation [77], although the agent of contagion was different from any known infectious agent, for it remained infectious despite Formalin sterilization [125,212]. Pattison demonstrated oral transmissibility of scrapie via placental tissue in 1972 [216,217]

By the time that scrapie was shown to be transmissible, two spongiform encephalopathies of humans had been described: Creutzfeldt-Jakob Disease (CJD)[76,152] and Gerstmann-Sträussler-Scheinker Disease (GSS)[117]; later, a third human disease, fatal familial insomnia (FFI)[184] would be identified. These diseases all showed characteristic spongiform degeneration in the brains of the afflicted. As observed in sheep scrapie, these human patients mounted no immune response. At the time, it was not suspected that these rare human neurodegenerative diseases could be transmissible (as later proved to be the case). Some of these human diseses—GSS, FFI, and at least some instances of CJD—appeared to be inherited, familial diseases[270].

The first demonstration of transmissibility of this type of human disease was for the geographically unique disease known as kuru. Kuru was a spongiform

3

encephalopathy afflicting the Fore people of the highlands of New Guinea, a group that regularly engaged in ritual cannibalism. The physician team of Zigas and Gadjusek described this disease in medical journals in 1957[115] but with no real notion that it was transmissible. William Hadlow, an American veterinary pathologist who had been sent to Compton, UK to study scrapie, read their report of this strange new disease of humans and wrote a brief letter to the Lancet that changed the direction of kuru research. Hadlow observed that this new neurodegenerative disease of humans was redolent of scrapie in sheep by the similarity of histopathological changes in the brain and by the absence of an immune response, and knowing that scrapie could be transmitted by inoculation of infected central nervous tissue, albeit with a long incubation period, he suggested that kuru may also be a transmissible encephalopathy; he ended his letter with the suggestion that primate transmission studies might be considered [128].

Gajdusek's reaction was to visit Hadlow and other veterinary researchers to learn more about scrapie[214], then to attempt to transmit kuru to monkeys. Subsequently, Gajdusek's Nobel-prize-winning research on TSEs demonstrated intracerebral transmission of kuru to chimpanzees[113,114], then intracerebral transmission of CJD and scrapie to primates[120,121]. By 1980, Gajdusek's research group had achieved oral transmission of kuru and CJD to primates, the first demonstration of transmissibility of a human neurodegenerative disease by a natural route; they also succeeded in transmitting scrapie to squirrel monkeys via ingestion [119].

Despite numerous transmission studies, the infectious agent of scrapie, and of all other TSEs, remained unidentified. Experiments conducted in the 1960s showed that the scrapie agent—whatever it was—was a very unusual pathogen. The causative agent was extremely resistant to Formalin inactivation [212]. It was sensitive to base hydrolysis and to protein denaturing agents, and had only limited vulnerability to proteases. It was resistant to both DNA-degrading enzymes[220] and to UV wavelengths that destroyed nucleic acids[10,32]. Radiation experiments indicated that this agent was exceptionally small for an infectious agent, about the size of a large protein (50 – 150 Kda)[11,33]. Other radiation experiments, however, showed that it possessed the susceptibility to radiation predicted of a small virus[243].

This odd collection of empirical data led to three novel hypotheses on the nature of the infectious agent[118]. One proposed that it was some sort of replicating polysaccharide[103]. Another suggested it was a mutant membrane[145]. The last was a proposal that the infectious agent was a protein[218], but a protein resistant to common proteases. Among the three proposed mechanisms was a proposal that an infectious protein could somehow induce a change in a native protein to yield more infectious proteins, which propagated the infection. In 1982, professor Stanley Prusiner coined the term *prion* to denote an unprecedented pathogenic entity, a "proteinaceous infectious particle that lacks nucleic acid" [232]. Interestingly, the concept that protein might be able to reproduce itself without the need of nucleic acid template came from a theory presented by a mathematician, not a biologist[127]. More will be said of Prusiner's work.

By the mid-1980's, it had become clear that human spongiform encephalopathies were considerably more dangerous than had been thought. Conventionally sterilized surgical instruments could transmit CJD[97,271]. It was soon determined that CJD had been iatragenically transmitted through corneal transplants; the increasing use of pituitary-derived human growth hormone and dura matter transplants would lead to widespread

4

iatrogenic transmission of CJD[1-3,20,50,169].  At that time, though, notwithstanding the experimental transmission of several TSEs to primates, none of the TSEs of animals had been shown to be transmissible to humans, despite more than two hundred years of exposure to scrapie through infected sheep[67].

*BSE begins to appear in species other than cattle*

However, as the BSE epizootic matured in the UK, medical scientists recognized it as a TSE that was, indeed, transmissible across species.  Close on the heels of the appearance of BSE epizootic in cattle, novel spongiform encephalopathies began to be reported in zoo collections[165], appearing in nyala[154], eland[104], oryx[167], kudu[78,166], puma[312], and imported cheetahs in the UK and in France[22,224].  Similar cases were being reported in domestic cats[222,314].

The contemporaneous occurrence of these novel spongiform encephalopathies in other animals was evidence that BSE of bovines was not caused by the scrapie agent, long present in the UK.  Experiments in rodent models demonstrated that the agent associated with these cases was indistinguishable from the agent causing BSE in cattle[52,110].  Most disturbingly, a novel spongiform encephalopathy was reported in a captive primate[42].  Experimental oral dosing of BSE infectious material also resulted in infection of nonhuman primates[41]

Reasoning that if BSE were transmissible to humans, it would be most likely to reveal itself as a CJD-like disease, in 1990, the UK established a national CJD surveillance unit to look for atypical cases[279].  CJD is very unusual in persons under age 50, but, by 1996, there was an emerging pattern of unusually young CJD patients with no history of treatment with human growth hormone[26,30].  As well as appearing among younger persons, 'variant' CJD (vCJD) followed a markedly different clinical course, demonstrated a different EEG pattern, and revealed a different pattern of neurodegenerative changes at autopsy from the patients with classic CJD, now called 'sporatic' CJD (sCJD) [151,309].

Analysis of the prion isoform found in vCJD patients showed the same biochemical properties as that found in BSE, distinct from prion molecules associated with any other spongiform encephalopathy, and any found in sCJD patients. [71]. Inoculation of mice with brain material from vCJD patients produced a disease indistinguishable from that caused by inoculation with brain material from BSE-infected cattle[56].  The same results were obtained from experiments using humanized transgenic rodents[137] and from studies transmitting vCJD and BSE to non-human primates, in each instance finding the resulting diseases indistinguishable from one another[178,179].

The UK's tremendous accomplishment in quelling the BSE epizootic was overshadowed by the events of March 20, 1996, when the House of Commons was told that BSE was the most likely cause of this new variant form of Creutzfeldt-Jakob disease (vCJD)[73,309].

How did all of this arise from an initially obscure neurological disease of cattle? The answer lies in the nature of the prion.  Prions are very stable molecules that persist in the environment for years and are resistant to traditional means of microbial or viral decontamination, such as autoclaving, formalin treatment, and irradiation.  Prions possess the worst properties of persistent toxins and virulent pathogens.   How can such an entity exist, much less replicate?

**The nature of prions**

*A proteinaceous infectious agent*

     Stanley Prusiner was awarded the Nobel Prize subsequent to his identification of prions in TSEs [232]. He had found that this proteinaceous material is always present in the infectious fraction separated from tissue of TSE-affected animals, and postulated that this protein was the causative agent. Because the infectious fraction appeared to lack nucleic acid, the never-identified "slow viruses" could no longer be considered the putative cause of TSEs. A revolutionary concept began to take hold, as it became evident that this infectious agent—unlike any known previously—may not be dependent on nucleic acid for its propagation. The prion hypothesis is now the widely accepted model of causation for TSEs, asserting that these diseases are transmitted by a protein capable of causing its own replication [265].

     Following Prusiner's identification of this proteinaceous infectious fraction came the remarkable discovery that all mammals carry the prion gene that creates this protein, and that the gene is expressed in the manufacture of a common membrane glycoprotein. In all animal species from which TSEs have arisen or have adapted to, the normal cellular prion protein and the infectious prion protein are identical in amino acid sequence, have the same disulfide linkage, cell membrane anchor, and same two sugar antennae[19,268]. The normal protein and its pathogenic isoform differ only in the tertiary structure, *i.e.,* the complicated folding pattern of the protein, and the tendency to aggregate into fibrils; in fact, the normal cellular form does not aggregate into fibrils at all. The protein-only theory of prion infectivity has been supported by fascinating investigations of prion molecules used by yeast to transmit phenotypic changes to following generations [301] and by production of synthetic prion-like molecules[180,182].

*Native prion protein*

     The native cellular protein, $PrP^C$, is highly conserved across mammals, implying that it fulfills some necessary role in the proper functioning of the organism. Its natural function is an area of active research; it may be involved in metal chelation, protection from oxidative stress, control of circadian rhythms, sleep, and long-term memory **other refs needed? [181] [211,259]. Animals engineered to be devoid of $PrP^C$ seem to function normally[57]). $PrP^C$ is expressed in many tissues, but is most abundant in the brain and other nervous tissue[34,106].

     The fully formed $PrP^C$ is a globular protein composed of approximately 210 amino acids, depending on the species. As with other proteins, the secondary structure follows two basic patterns: coiling the sequential amino acids into alpha-helices or pleating alternately upward or downward into sheet-like folds called beta sheets. Beta sheets are notoriously insoluble and are the secondary structure that predominates in insoluble amyloid-type deposits of proteins. In the normal cellular form of $PrP^C$, the molecule is predominantly in a soluble alpha-helical conformation[241,268].

*Infectious prion isoforms*

     During the course of a transmissible spongiform encephalopathy, $PrP^C$ apparently undergoes a post-translational conformational change to the beta-sheet-rich isoform that renders it infectious; the infectious isoform of $PrP^C$ associated with disease is called $PrP^{Sc}$. This notation is a reminder of the important role that scrapie has played in prion

research, although Weissman has recently made a convincing appeal for a change in nomenclature to PrP$^{iso}$ to indicate all of these isoforms, regardless of disease association [291]. Some writers denote the aberrant isoforms as PrP$^{res}$ in recognition of its resistance to proteases. In this review, we will use the more familiar PrP$^{Sc}$ notation to designate any beta-sheet rich, disease-associated isoform of the native protein PrP$^{C}$.

The unusual conformation of a PrP$^{Sc}$ appears in some way to act as a template for other, normal cellular prion proteins to convert to the aberrant conformation. *For a given genetically-encoded primary amino acid sequence, there are apparently multiple PrP$^{Sc}$ isoforms that can develop.* This concept is important for the understanding of prion disease strains, as shall be discussed later.

Although accumulation of PrP$^{Sc}$ is one of the hallmarks of TSE disease, and its presence is used as a dependable diagnostic marker, the molecule itself may not be the substance that causes neurodegeneration. It appears that there may be a toxic intermediary in the conversion of PrP$^{C}$ to PrP$^{Sc}$ that acts to cause disease and death of the animal[9,187].

*Stability and enzymatic actions*

The normal cellular protein has a half-life of only about 14 hours in vivo. It was previously believed that PrP$^{Sc}$ isoforms are much more thermodynamically stable and long-lived than the normal PrP$^{C}$, thereby, once production of PrP$^{Sc}$ began, it would soon predominate. However, the abnormal isoform has a half-life of less than 24 hours in tissue culture [68], so it may be that accumulation of PrP$^{Sc}$ occurs only in tissue in which its production exceeds its degradation [291].

The PrP$^{Sc}$ isoform is highly resistant to degradation by usual protein-digesting enzymes and to heat. The resistance of PrP$^{Sc}$ to protease K is used to differentiate it from PrP$^{C}$ ; this is the basis of many of the important diagnostic tests for prion diseases. Proteinase K will completely digest PrP$^{c}$ and no detectable electrophoretic band will be present. When PrP$^{Sc}$ is exposed to Proteinase K, the enzyme will cleave approximately 70 amino acids from the N-terminul of PrP$^{Sc}$ to yield a characteristic infectious core [231]. Upon subsequent Western blot immunoelectrophoresis, the infectious core is detected as three bands; recalling that a PrP molecule contains two glycoslyation sites, each fragment represents one of the three glycoforms: unglycosylated, monoglycosylated, or diglycosylated PrP$^{Sc}$. The molecular weight of each of these three fragments and the relative degree of glycosylation is used to characterize different strains of PrP$^{Sc}$ [135].

Complete susceptibility to proteinase K indicates non-infectivity. But the inverse is not true: resistance to proteinase K does not equate with infectivity. There are some isoforms of PrP$^{Sc}$ that are proteinase K resistant but that are nonetheless non-infectious [130].

*Decontamination of infectious prions*

Because these abnormal protein isoforms are so stable, it is extremely difficult to deactivate PrP$^{Sc}$ in infectious tissue, in liquids, or upon contaminated surfaces[272]. In laboratory or surgical settings, when human patients or animal subjects are known or suspected to be infected with TSEs, disposable instruments are preferred, which are incinerated after use. Non-disposable instruments are soaked in high concentrations of corrosive agents—strong acid or alkaline solutions—followed by autoclaving. For TSE

decontamination of medical and veterinary necropsy and surgery facilities there are several best practices guidelines, generally based upon the guidelines published by the World Health Organization [ref** AAVLP, CDC, WHO]. Some of these disinfection measures are not possible in slaughter and processing plants; it may be possible to use effective modifications of these measures when the need arises.

WHO guidelines recommend flooding floors and equipment surfaces or soaking instruments with either undiluted household hypochlorite bleach (NaOCl) (comprising at least 2% available chlorine) or 2 N NaOH, maintaining contact time of at least one hour. However, up to 2 hours of exposure to 2 N NaOH did not completely inactivate BSE infectivity in samples of bovine brain[275]. A phenolic compounded disinfectant product has been shown to have some activity against prions [237].

Prion-contaminated materials should never be allowed to dry onto surfaces, as drying renders the prions more difficult to remove. Some disinfection practices are *contraindicated* for prions. Formaldehyde or aldehyde cleaners (e.g. glutaraldehyde-based) actually stabilize the prion molecule by cross-linking or fixing the protein chains; BSE infectivity remained almost unaltered in tissue exposed to formol saline for two years[109]. Steam cleaning is *not recommended*, as the increased temperature can actually make the prions more resistant to removal from contaminated surfaces. Heat treatment via autoclaving is not necessarily more effective against prions in proportion to the degree of heat used and time of exposure, in fact higher temperatures may stabilize some prion strains[272]. Ashing scrapie-infected brain material at 600C for 15 minutes in a carefully controlled furnace minutes was not sufficient to eliminate infectivity[51].

Although neither heat nor NaOH alone is sufficient for decontaminating surgical instruments, a combination of the two appears to work. Unfortunately, this combination is dangerous to autoclave operators and corrosive to stainless steel instruments and equipment. Future work is focusing on less corrosive alternatives such as hot solutions of sodium dodecyl sulfate[274], and enzymes isolated from thermophilic bacteria[282]

In the quest for effective means of deactivating prions, researchers have sought a standardized test system for assessing the effectiveness of various disinfection protocols. At this time there are no widely accepted *in vitro* tests for the survival of infectious prions on contaminated media other than bioassay in live animals[262].

*Disease requirement for normal PrPc*

Molecules of the beta-sheet isoform, PrP$^{Sc}$ , with the help of apparently necessary chaperone molecules[277], are capable of converting native cellular prion protein into more PrP$^{Sc}$, and thereby propagating an infection; the reverse process is not known to happen. In order for a TSE to develop, normal cellular prion must be present in the host; animals genetically engineered to lack PrP$^{C}$ cannot develop TSE disease. Wild-type mice naturally expressing PrP$^{C}$ will develop TSE if injected with brain homogenate from infected wild-type mouse. However, the same infectious material causes no disease in transgenic mice engineered not to express PrP$^{C}$ (PrP-null). If dura mater from a wild-type animal is transplanted into a PrP-null mouse and the PrP-null mouse is subsequently injected with infectious material, the wild-type graft will become infected, but the surrounding PrP-null brain tissue will remain healthy. And, furthermore, if a mouse is engineered to express PrP$^{C}$ only transiently during its lifetime, and that animal is injected with infectious material, the resulting TSE will begin to propagate and result in cell death

only until the expression of PrP[C] ceases; at that point, the progression of the TSE will stop and damage will start to be repaired. The cell death that is characteristic to TSEs is somehow caused by the conversion of PrP[C] to PrP[Sc] and not by the presence of PrP[Sc] [9,187].

*Prion genetics*

For disease passed between members of the same species, polymorphism in the native prion gene of the host species can have a significant effect on the course of prion disease. Early in the study of scrapie, veterinarians noticed that some strains of inbred laboratory mice had a distinctive clinical response to scrapie with an uncharacteristic incubation period; an analogous nonclassical phenotype of scrapie in sheep was also reported. [88,90]. Subsequently, these differing presentations of scrapie within a single species were determined to be due to polymorphism within the host species prion gene, the expression of which strongly influences the course of prion disease[60,148].

In sheep, susceptibility to scrapie is affected by polymorphism, particularly at position 136, 154, and 171 of the prion gene [27,177]. Sheep homozygous for the ARR (136-alanine, 154-arginine, 171-arginine) genotype were thought to be resistant to natural scrapie[28]. However, homozygous ARR/ARR sheep from France, Germany, and Portugal have been found harboring a natural form of scrapie. [58,186,210]. Sheep with the ARR genotype are also susceptible to BSE by experimental intracranial injection[144].

For elk, M/M homozygosity at position 132 of the prion gene appears to confer heightened susceptibility to CWD [205]. Recently, a free-ranging elk, homozygous for V/V, was diagnosed with CWD, so it would appear that this polymorphism provides only partial protection against CWD (O'Rourke, personal communication). Deer have polymorphism in their prion gene, but these variations seem to provide only limited protection from CWD in wild or captive populations[156,206].

Although there are number of polymorphic sites in the bovine prion gene[139,256], none of the known genotypes appear to offer any protection from BSE infection[79,131,149,302,303].

All familial TSEs in humans are associated with one or more genetic mutations of the prion gene[234]; inherited forms of human TSE are identified and categorized by the site of the mutation [171]. Among the general human population, the most common polymorphism is methionine/valine (M/V) at codon 129, and this polymorphism has a substantial influence on the susceptibility to and course of human TSEs. Sporadic CJD patients are more likely to be M/M or V/V homozygous, than heterozygous[12] Erratum in : Lancet 2000, 355:72. A similar result is found in patients infected from contaminated pituitary-derived HGH[47,70]. During the kuru epizootic in Papua New Guinea, M/M and V/V homozygotes predominated among the earlier cases; M/V cases occurred much later, with incubation periods of over 30 years[65].

All known clinical cases of vCJD, the manifestation of BSE infection of humans, have occurred in persons that were homozygous M/M, including the first case thought to have occurred as a result of a blood transfusion[183,316]. Recently, however, an person of M/V genotype who had received blood from a vCJD-infected donor was shown upon post-mortem examination to harbor an asymptomatic vCJD infection, the first known case of vCJD in a heterozygote[223].

Experiments with transgenic animals indicate that human V/V homozygotes may be resistant to classical vCJD infection from BSE exposure[289]. Humanized 129VV mice

are quite resistant to BSE or vCJD, with only about 50% becoming infected with detectable PrP$^{Sc}$; the PrP$^{Sc}$ detected in these humanized VV mice did not show the same conformation as that of typical vCJD, however. On second passage, no clinical disease was evident and only this new type of prion isoform could be found in animals with subclinical disease, *i.e.*, the genetic barrier to disease persisted and no disease adaptation occurred within these VV mice. Upon passage from humanized VV to humanized MM mice, however, the usual clinical and molecular patterns of vCJD disease was seen in the MM mice. This demonstrates that, in humans, although valine at position 129 of PrP$^{C}$ impedes the development of clinical prion disease, the infectious prions may still reproduce, perhaps causing a different syndrome in the valine-possessing individuals and remaining capable of secondary transmission of typical vCJD to persons homozygous for methionine.

Valine at this location is unique to the human species[249,250,289] It has been suggested that cannibalism among our human ancestors may have favored the survival of heterozygotes at this position of the prion gene, heterozygotes being less susceptible to kuru and other prion diseases[194]. In Europe and among populations of European ancestry, the more vCJD-susceptible M/M genotype comprises about 40% of the population, but in Japan and Korea, approximately 95% of the population are M/M homozygotes[12] Erratum in : Lancet 2000, 355:72[155]. A different human prion polymorphism may provide some protection from prion disease among Asian populations[194].

*Species barriers*

An exogenous PrP$^{Sc}$ is most infectious when it closely matches the sequence of the host's own normal cellular prions. When the exogenous, infectious prion arises from a different species or even from an allogenic animal with a genetically determined difference in its normally expressed cellular prion, there will be a lower chance of infection by the exogenous PrP$^{Sc}$; if infection occurs, the incubation period is generally lengthened by this so-called 'species barrier'[159]. The initial incompatibility of the injected PrP$^{Sc}$ with the hosts PrP$^{C}$ slows down the progress of the infection.

As mentioned earlier, the propagation of a TSE requires the existence of normal cellular PrP$^{C}$. Other cellular components are also necessary to propagate a TSE, and these co-factors appear to be available across species. Animals that are genetically engineered to express the cellular prion protein of another species readily propagate infections TSE infections originating from that donor species[233,255].

*Host adaptation:*

Prion diseases originating in a different species can become host-adapted upon passage through the recipient host species. As the infection progresses, more of the PrP$^{Sc}$ contains host sequence, so that when it is passaged to another animal of the same species, it is now compatible with the host PrP$^{C}$. The result is that the incubation period of the disease shortens upon repeated passages, until it stabilizes at a distinct, reproducible length of time for that species and that strain of TSE[219].

Much of the research on prion disease has been conducted on a hamster-adapted form of scrapie. This strain (called 263K[161] or Sc 237[190]) originated as a natural sheep isolate. It was transmitted to goats and serially passaged to develop a strain that had a

more regular disease course[215]. It was transmitted to mice to yield the "Chandler" mice strain[66]. This mouse strain was transmitted to hamsters and after several passages, became the hamster-adapted strain, with a dramatically shorter incubation time, that became the working strain for much of the TSE research to date. [161,190].

There has been conjecture that the UK epidemic began as a sheep scrapie strain entered the bovine feed chain through the rendering of sheep carcasses to MBM, and that following multiple cycles of ingestion and infection, this strain became host-adapted to cattle. The current classic BSE strain found in the UK epidemic can infect sheep if injected intracranially, but does not resemble scrapie, neither in sheep nor experimental rodent host [107,111].

*Subclinical infections may result from incomplete species barrier:*

Although the concept of species barriers to TSEs is real, these barriers are not as complete as once believed[136,138,235]. It is now recognized that many apparently non-susceptible animals exposed to infectious prions from another species (or another of the same species but with differing native prion genotype) do, in fact, support the replication of the infectious prions in the absence of clinical disease. The tissue of these infected asymptomatic hosts can be infective if introduced back into a host of the susceptible genotype. The tissue of these subclinical carriers may also cause overt clinical disease on second passage to the apparently nonsusceptible animals, as the infectious prion becomes host-adapted[63].

The phenomenon of subclinical infection has implications for humans, as a species with apparent genetic variability in their susceptibility to a TSE. It appears that humans who may have ingested infectious material or who had infectious material iatrogenically introduced (e.g. surgery, blood donation, tissue transplant), but who are genetically resistant to clinical disease, may still support the reproduction of the infectious material in their body, ready to infect a more susceptible human. The recent case of probable human bloodborne transmission of vCJD to an asymptomatic prion codon 129 MV heterogygote[223]shows that vCJD infection may have a non-classical, even asymptomatic, presentation in non-MM homozygotes, but may possibly retain capability to infect others.

*Prion strains*

A further enigma of TSEs is the existence of multiple distinct prion disease phenotypes within a given host species, even among hosts with identical genotypes. Multiple strains of PrP$^{Sc}$ are capable of propagating within a given host, even a host with homozygous prion genotype. The strain differences cannot be due to differences in amino acid sequence, as these are determined by the host's genome. It is believed that strains represent different isoforms formed from the host's native PrP$^C$ primary protein structure; among strains infecting the same native genotype, only the folding and aggregation patterns differ [6,225,247]. These "strains" are reproducible when passaged between animals or even between species[162]. Each strain causes a distinct disease pattern that demonstrates a predictable incubation time and disease course, *i.e.*, a reproducible phenotype of disease. Each strain also converts the host's PrP$^C$ into a strain-specific PrP$^{Sc}$ isoform with distinct molecular properties that differentiate it from other PrP$^{Sc}$ strains[247]. The definitive means of differentiating strains of TSEs is to inoculate mice and

11

observe the pattern of pathogenicity and length of incubation period. The prions from different strains can also be distinguished from one another by a conformational dependent assay (CDI)[247]. Strains may differ in their susceptibility to proteinase K degradation, another indication that prion strains represent different conformations of the same primary protein structure; different folding patterns allow the enzyme access at different sites, therefore cleavage occurs at different locations[38]. Strains also may show different glycosylation patterns; there may be differing sugar moieties, or the two glycosylation positions on the molecule may be occupied in differing proportions between strains[71].

Recent in-vitro experiments have demonstrated that the concept of 'species barrier' and 'prion strains' are related phenomena. Cell-free conversion of $PrP^C$ to $PrP^{Sc}$ showed that strain-specific qualities of the prion were faithfully propagated [35,64,170]. To do this, these researchers explored the following phemonenon: there is a fragment of the normal $PrP^C$ molecule that, after a latency period, undergoes spontaneous conformational change to $PrP^{Sc}$ and subsequent development of beta-sheet fibers; seeding with pre-formed $PrP^{Sc}$ fibers from the same species erases the latency period, causing immediate formation of fibers. Interestingly, this seeding process demonstrates a pattern of interspecies barriers and susceptibility. If the $PrP^{Sc}$ fibers formed spontaneously by prion from one species were used to seed prion protein of a second species, the newly formed $PrP^{Sc}$ retained the transmissibility capabilities of the original donor species, even though it now had the primary amino acid sequence of the receptor species. This resulted in a new 'strain' of prion[285].

It has also been observed that the same host can harbor two different 'strains' of $PrP^{Sc}$ during a single infection. It appears that different body tissues within the same host may cause an infectious prion to assume a different configuration or with a different glycosylation pattern than in other tissue[227,288]. Different locations in the brain of the same animal may produce different $PrP^{Sc}$ or eye tissue may express a different conformation of $PrP^{Sc}$ from that found in the brain [263,264].

*Strains of BSE in cattle*

There are more than 20 strains of scrapie in animal models[53]. There are at least eight strains of scrapie studied in hamsters and two strains of transmissible mink encephalopathy[36,247]. Since the 1960s, it has been known that French sheep seemed to be infected with a different strain of scrapie than were British flocks[221]. Now, it appears that there may also be multiple strains of BSE in cattle.

Throughout the UK epizootic of BSE, all cases seemed to have arisen from the same prion strain. Affected tissue from genetically unrelated and geographically dispersed cases all demonstrated a similar banding pattern on Western blot, when performed, and all transmitted a distinct and characteristic prion disease to mice. However, rare strains may have been missed using the testing protocols then available[52,95,109]. Recently, evidence that there may be several strains of BSE found in cattle has motivated plans for testing of UK archived bovine tissue to search for evidence of atypical strains of BSE. (personal communication, Danny Matthews)(**send to DM for approval of wording)

Experiments with humanized transgenic mice support the existence of at least two strains of BSE. When BSE infective material is injected into humanized mice

12

homozygous for methionine at locus 129 of the prion gene, there are two different clinical and pathological syndromes seen. One of the syndromes, as expected, resembles vCJD in humans. However, the second group of mice injected with BSE develop a disease that resembles the most common form of sCJD[16].

Atypical strains of BSE have now been found in cattle in Italy, Japan, France, Belgium, Denmark, the Netherlands and Poland [39,62,81,230]. Thus far, all reports have been of cattle that appeared healthy at slaughter. The atypical BSE cases in France and Italy were found in cattle that were older than typical BSE cases [39,62]; however, in Japan, an atypical case was found in a 23-month-old animal presented for slaughter[315].

By molecular strain typing using proteinase K treatment followed by western blot and antibody staining, the atypical BSE strains differ among themselves. They differ in the glycoform ratios (i.e., proportion of the prion that is unglycoslyated, mono-, or di-glycosylated), in the molecular weight of the three glycoforms, and by the optimal anti-cattle-prion antibody used to stain them [135]. Upon histological examination, the Italian atypical BSE cases showed amyloid plaques in the brain, a characteristic of human kuru but not of typical BSE. Examination of these atypical cases showed, interestingly, that prions were not detected in the same areas of the brain as classical bovine BSE[62].

The 23-month-old Japanese case and the 64-month-old Belgian case did not show typical pathological lesions found in the brain and did not show a positive reading for the immunohistochemical test. However, samples of obex tissue from both of these cases were positive for BSE by western blot[81,315]. The Japanese case demonstrated the same glycoform pattern seen in the atypical Italian cases, a pattern was very similar to that seen in the most common form of human sCJD[62,239].

The report of French cases of atypical BSE did not, unfortunately, include any results of detailed histopathological examination. The molecular strain typing pattern of the French atypical strains was found to be similar to that of cattle inoculated with sheep scrapie[39].

It may be postulated that genetic differences in cattle account for the appearance of BSE strains. However, genetic testing of two of the French cattle showing atypical BSE did not show any differences from the usual cattle prion genotype [39]. Similarly, genetic testing of the prion gene in Italian cattle demonstrating atypical and typical BSE did not find any differences between the two sets of cattle[62].

Speculation about the relation of these atypical strains to sCJD, scrapie, or other TSEs cannot be substantiated without further animal testing[135]. Each of these recently discovered atypical BSE strains must be inoculated into mice to be properly characterized and compared to the typical BSE strain; such experiments have been initiated (

Personal communication, C. Casalone) (*permission).

13

**Transmission of BSE**

The prototypical prion disease, scrapie, transmits horizontally from sheep to sheep and vertically from dam to lamb[87,89,216]. Scrapie-infected tissue has been shown to retain infectivity at least 3 years in the environment[49]. Chronic wasting disease of cervids appears to have horizontal transmission capabilities similar to that of scrapie[310].

In contrast to these two naturally occurring TSEs, BSE does not appear to be horizontally transmissible between cattle. Early on in the UK epizootic, careful observation and epizootic modeling of case records ruled out any substantive role for animal-to-animal transmission of BSE [307].

Due to the etiological and pathological similarity of this disease to scrapie, the possibility of maternal transmission of BSE was of real concern. An experiment to measure any possible risk of maternal transmission was somewhat flawed by the inadvertent exposure of control animals to contaminated feed[94,308]. Nevertheless, the best interpretation of these trials seemed to indicate that there was some increased risk (5-14% above normal) for the development of BSE for calves born to dams that were subsequently diagnosed with BSE. The risk was enhanced for calves born near the end of their dam's own incubation period, and was higher still for calves born after the dam began showing clinical signs of the disease[94,308]. From the evaluation of UK BSE field data by Anderson et al.[13], the disease model that showed the best fit to the data allowed for maternal transmission to occur 10% of the time during a pregnancy that encompasses the last 6 months of a dam's own incubation period.

However, evaluation of BSE cases born after the 1988 feed ban determined that cases were just as likely have BSE-free dams as dams that subsequently developed BSE[141]. More recently, the careful investigation of all BSE cases (99 cases through 2004) born after the strict UK feed ban rules of 1996 have found that maternal transmission could not explain the majority of these cases, as most traced dams were BSE-free for the duration of follow-up[304]**still need to find more current Wilesmith cited as In Press on SEAC report (this only reports first 66 cases investigated)[266] Infectivity has not been found in any male or female reproductive tissue, including mammary glands. Neither bovine milk nor placenta has been found infective in BSE-infected cattle [44,195,273]

Transmission via embryo transfer has also been investigated and discounted. Neither infected donor bulls nor infected donor cows have been shown capable of transmitting BSE to the offspring or to the recipient heifers [313].

Environmental contamination is apparently not an important source of BSE infection. Cases of BSE in cattle born after the reinforced ban do not have an increased likelihood of originating from UK herds that had high incidence of BSE in the past[266]. Because infective prions are so highly resistant to degradation, however, it remains possible that carcasses buried on farms in the early days of the epizootic may be a source of infection upon leaching into groundwater[254]. There is an ongoing study of possible prion contamination into groundwater from buried carcasses.[266]. Sewage sludge from abattoirs was judged unable to sustain an epizootic, but could pose a small risk of infecting the occasional ox that grazes on pasture spread with sewage sludge[116].

14

The risk of BSE transmission via birds, rodents and other vectors has been considered, but not studied explicitly; if possible at all, these routes must be, at most, minor routes of transmission. [74,266]. (*remove tracking line in margin – how?)

Ingestion of infectious tissue from BSE-infected animals remains the primary mode of transmission that has withstood epidemiological and experimental scrutiny. The cause of BSE cases that continue to develop in cattle born after the reinforced ban of 1996 is hypothesized to be exposure to MBM-contaminated feed that was imported into the UK and that has cross-contaminated UK cattle feed at some low level. (Until 2001, the trade of MBM was legal in continental Europe, and large amounts of feed were imported into the UK.)

In November 2004, the UK announced an independent review of all BSE cases in cattle born after the 1996 reinforced ban.[82]. These cases of BSE in cattle born after it became illegal merely to *store* ruminant-derived feed components on farm premises, are evidence of the exquisite susceptibility of cattle to oral transmission from BSE-infected tissue. Indeed, the experimental ingestion of a mere 1 milligram (0.001 g) of brain slurry from clinically affected cattle has transmitted BSE to 1 of 15 calves, albeit after an extended incubation period (personal communication D Matthews,UK Veterinary Laboratory Agency*correct agency name?).

*Transmissibility of BSE to other species*

BSE has been experimentally transmitted to sheep and goats by inoculation with infectious material from BSE-confirmed cattle [107,108]. BSE infection in small ruminants shows a characteristic pattern of neuropathology in the brain and PrP[Sc] immunoblot molecular characterization, such that BSE infection in goats and sheep can be reliably differentiated from any known strain of scrapie[23,146]. There have been no cases of naturally occurring BSE in sheep; recently, however, there has been confirmation of BSE occurring naturally in a goat slaughtered in France in 2002 [228,251].

Pigs are susceptible to BSE via parenteral injection[244], but following oral ingestion of BSE infectious material they do not develop clinical disease, detectable PrP[Sc], or tissue infectivity [192,295]. Recent trials with porcinized transgenic mice, however, shows that subclinical BSE on first passage converts into clinical and histopathologically recognizable spongiform encephalopathy on second passage, an apparent species adaptation; the authors note that their "observations raise the possibility of subclinical infection occurring in pigs" [63].

Natural, oral transmission of BSE has been documented for several species of zoo animals and for domestic cats (see *History of the epizootic*, above). Rabbits, dogs, and avian species appear unable to propagate TSEs; in rabbits this appears to be due to the relative inability of its native prion protein to assume the form of the resistant beta-sheet isoform [287]. Although dog and cat native prion molecules are very similar, amino acid substitutes in critical areas appear to protect dogs from forming the infectious isoform [185]. Poultry inoculated or orally dosed with BSE-infective material do not show histopathological changes consistent with the disease nor was infectivity detected in their tissue via mouse bioassay[192]. It is not known whether fish are susceptible to BSE, but experimental exposures to fish are now underway[192].

15

**Age-related susceptibility to BSE**

During the UK epizootic, age susceptibility appeared to play a bigger role than age-related dietary patterns[95], although it is difficult to separate these two factors in any evaluation of case records[13] There is some evidence of varying susceptibility by age for other TSEs; for vCJD in humans, after controlling for age-related consumption patterns, susceptibility remains highest for adolescents and young adults [18,40]. The necessity of a competent immune system may increase the susceptibility of young animals; senescence of the follicular dendritic cells that escort prions through the immune system to the nervous system may be a factor in lessening the susceptibility of older animals to TSEs [133].

Early epidemiological evidence from field data in the UK pointed to an age-specific susceptibility for BSE in cattle that peaked between 6-18 months of age[13]. There were differences in the age of first introduction to MBM, depending on the season of a calf's birth; upon careful evaluation of records, the relative amounts of MBM in the diet between the ages of 6 and 12 months closely paralleled the relative differences in BSE incidence later in life[95] When the data from all of the UK cases were modeled, the actual field data fit best in a model that assumed that the highest degree of age susceptibility peaked very strongly at one year of age[102]. Using an assumption of greatest susceptibility soon after birth and diminishing thereafter, the models did not fit the field data; likewise, whenever an assumption was made of no age-related susceptibility to BSE, the field data was found to be incompatible with that assumption.

Although not as susceptible as younger animals, it is evident by field data from the UK epizootic that older animals are, indeed, susceptible to infection by contaminated feed. Animals born as early as 1977 developed clinical BSE, albeit at an advanced age. That older animals are susceptible to infection is also supported by the observation of cases in the UK that were not fed MBM until after their first two years of life[306].

**Incubation period**

Because of its transmissibility to humans, it is of great importance to accurately estimate the distribution of incubation periods for cattle naturally infected with BSE. Only with this knowledge is it possible to decide at what age high risk cattle tissue should be condemned for consumption.

*Dose-response of incubation period*

For scrapie, it has been observed that the mean incubation period for the disease is inversely related to the dose of infectious material[213]. For scrapie in mice, there was a linear rise in mean incubation period with logarithmic decreasing dose; however, the estimation of titre was much less accurate at low doses (i.e. greater variability was seen in incubation periods)[193]. There has been some debate as to whether the relation between dose and length of incubation period is sufficiently predictable to use for the estimation of titre[191].

In a trial that orally dosed calves with a slurry prepared from the brains of clinically affected cattle, a range of doses were administered, starting with 1 dose of 1 gram, increasing to 3 doses of 100 grams of infective material. Within this dose range, there was an inverse dose-response in the length of the incubation period. By 42 months post-dosing, all of the cattle given the highest dose had succumbed; the proportion still

16

surviving among the other dose categories was inversely related to the dose administered[13].

More recently, the inverse relationship between dose and incubation period was weakly evident in oral dosing experiments of cattle using much lower doses: 1.0, 0.1, 0.01, and 0.001 gram of infected brain. As of September, 2004, at 79 months post-dosing, interim results were available: whereas 3 of 5 dosed at 1 g have become clinically affected (at 59-73 months post-dosing) and 3 of 15 dosed at 0.1 g (at 55 -62 months post-dosing), only 1 of 15 dosed at 0.01g (at 57 months post-dosing) and one animal of 15 dosed at 0.001g affected (at 69 months post-dosing) have shown clinical signs to date. [personal communication, Danny Matthews, VLA, Weybridge, UK]. (*update post-dosing dates and results)

*Age of onset of natural field cases*

According to the OIE, most cases of clinical BSE occur in animals 4–5 years of age (OIE Manual of Dx and testing 2004)(*ref). During the UK epizootic, the age of onset decreased for progressive birth cohorts until the imposition of the feed ban. For the UK cattle cohort born during 1980-81, almost no case of BSE was detected in animals younger than 6 years of age, evidence that most of the cattle from this earlier birth cohort were not exposed to the BSE agent until the epizootic was well underway in the mid-1980s. But for most birth cohorts experiencing the epizootic, the greatest number of clinical cases occurred at 5 years of age, and for the cohort that experienced the highest exposure (born in the year preceding the July 1988 feed ban), there were nearly as many cases among 4-year-olds[102]. With MBM in the UK presumably attaining its highest level of contamination just prior to the 1988 feed ban, cattle of this birth cohort received an infectious dose at an earlier age than other cohorts, and probably a higher cumulative dose. During these peak years for exposure, the incubation period may truly have been shorter, *i.e.*, the higher dose shortened the incubation period; alternatively, this apparent shortening of the incubation period may have been simply an artifact of sufficient exposure occurring at a younger age.

Shortening of incubation period is a classic indication of prion strain adaptation to a particular species, and there has been some speculation that age of onset dropped as the epizootic matured because of increasing adaptation of this prion to cattle. But, because the age of onset reversed its course and began to increase after the feed ban, this explanation is doubtful[13]. Contrary evidence is also provided by the consistent clinical presentation of BSE throughout the epizootic[305]. Similarly, bioassays on mice conducted during the later stages of the UK epizootic showed a pattern of pathogenesis indistinguishable from those conducted with infectious material harvested from cattle during early years, evidence that the pathogen did not evolve to any great degree during the epizootic[52].

Nor has there been any evidence that difference in the age of onset throughout the epizootic have been due to differences in genetic susceptibility to BSE within populations of cattle. Despite the finding of genetic predispositions of sheep to scrapie that lead to variations in the length of the incubation period, no such phenomenon has been observed in cattle [79,131,149,302,303]..

*Estimating incubation period of naturally occurring cases*

The incubation period for naturally occurring BSE has been calculated using the records from the UK epizootic through 1996 of cases for which the age at clinical onset was known, about 120,000 cattle. The analysts had two major challenges in using these field data: 1) lack of explicit knowledge about age at first exposure, and 1) lack of information about the incubation period of infected animals that were sent to slaughter before the onset of disease. The second problem arose from the fact that the majority of cattle in the UK are killed before 2 years of age, generally before infection can be recognized by clinical signs or tests.

Models for the UK epizootic used all of the data known about these animals and their national herdmates during the 1980s and 1990s; this included the pattern of slaughter by age in the UK and the usual time of first dietary exposure to meat and bone meal; the models also included estimated rates for non-reporting of field cases[13,95,102]. By taking into account the patterns of slaughter by age, these calculations were able to account for 'censored' information about animals that may have been incubating BSE at the time of slaughter. Using standard criteria to determine the best fit for all the known data going into a model, they determined the best estimate for the distribution of incubation periods for the population of cattle experiencing the UK epizootic.

The best-fitting determination for incubation period assumed that animals were infected with an initial dose of infectious material (and it was assumed that infectious material was distributed asymmetrically in the feed such that most animals got low doses and only a few received very high doses); from this distribution, a randomized initial prion dose was then assumed to multiply exponentially in the animal until it reached some critical level that was able to cause disease. Graphical representation of this distribution shows that the most common incubation period by this best fitting model was between 4-5 years[102].

Alternative estimates commonly reported for incubation period modeled these same data using a gamma distribution for incubation period. This model estimated a mean incubation period between 4.75-5 years[102]. But it is important to keep in mind that the gamma distribution is assymetrical with a long right tail representing incubation periods much greater than the average value. The 50th percentile value for length of incubation period is a value shorter than the average value, the average value being 'pulled' to a higher number by the extremely long incubation periods of relatively few animals. This concept has an important consequence. It means that the majority of animals had incubation periods shorter than the estimated mean of 4.75-5.0 years. This explains how animal aged 4 and 5 years comprised the largest number of cases despite the fact that most infections did not appear to start before 12 months of age.

The French BSE epizootic has been modeled with similar methods and the incubation period was again estimated as the same general type of asymmetric gamma distribution with an average incubation period of 4.5 years. Again, this estimate was derived from a distribution with a long right tail, meaning that, if this model is reasonably correct, the majority of animals had an incubation period shorter than 4.5 years(Calavas, Ducrot 2004?)(Abrial, Calavas 2003 spatial analysis?)(REF**). (*Not reported in Supervie—their assumption was 5 years, but results of sensitivity testing unreported)

**BSE in cattle**
*Clinical signs*

In cattle with BSE, a drop in milk yield and loss of body weight usually precedes the onset of neurological signs[45]. Neurological signs can be vague and nonspecific, such as exaggerated or repetitious patterns of normal behaviors, such as hypermetria or repeated licking. The rubbing seen in scrapie of sheep is sometimes seen, but is not a consistent sign in cattle with BSE. Abnormal postures are commonly seen. Although neurological signs may take many forms, the most commonly observed in cattle with BSE are apprehension, pelvic limb ataxia, and hyperaesthesia to both touch and sound. Muscle tremors are a frequent sign, although hypersalivation is not.[45,158,298]. A thorough neurological examination is useful in differentiating BSE from other clinical neurological syndromes, particularly an examination that evaluates the animal's response to sudden auditory, visual, or tactile stimuli [172].

Bradycardia and reduced rumination are often observed, indicating involvement of disturbance in autonomic innnervation.[17,45]

*Tissue infectivity from cattle with BSE*

The identification of potentially infectious tissue in cattle that may be incubating BSE is an issue of paramount importance in order to protect cattle, other susceptible animals, and humans from exposure through bovine tissue. Lacking any ante-mortem test for cattle that may be incubating BSE, avoidance of affected tissue is the best protection to human consumers of beef. To do this, it is important to identify the route of propagation and the timing of prion propagation from ingestion to the bovine central nervous system.

*Detection of infectivity from tissue from natural field cases of BSE*

Approximately 50 different tissue samples were taken from cattle naturally infected with BSE during the UK epizootic, and were injected intracranially into mice[111]. This bioassay detected infectivity only in the CNS (brain, cervical spinal cord, terminal spinal cord) and retina. Unfortunately, compared to cattle, the mouse bioassay was determined to be only 1/1000[th] as sensitive as a cattle bioassay, that is to say, a bioassay in which test material is injected intracranially into cattle [46]. The mice used for these bioassays were common inbred laboratory strains; at this time, the more sensitive transgenic mice—mice genetically modified to express bovine prion—were not available[248].

*The Veterinary Laboratory Agency (UK) pathogenesis study of BSE in cattle*

Because of the expense and time involved in BSE oral feeding trials, there has, to date, been only one comprehensive study of the pathogenesis of BSE in cattle. Although thoughtfully designed and carefully conducted, this seminal study used only a small number of test animals, and further work is underway to more fully understand the pathogenesis of BSE in cattle. This study, begun in 1991, was performed at the UK Veterinary Laboratory Agency (VLA). Follow-up of this trial remains ongoing, as the multiyear observation period continues for cattle bioassays of tissue from the original exposed animals.[292,296] Nevertheless, the current restrictions on beef for human consumption in North America and Europe are based on the results to date of this VLA pathogenesis study, with some inference from studies of scrapie.

In order to appreciate what is known and not known about the pathogenesis of BSE in cattle, one must understand both the scope and the limitations of this important study. Thirty 4-month-old calves were orally dosed with 100 grams of brainstem pooled from confirmed clinical cases of BSE; ten control calves were used. Beginning two months post-dosing, groups of calves (from one to three calves per group) were sacrificed and samples were taken from approximately 44 different tissues per animal. Whenever more than one dosed animal was sacrificed at the same stage post-dosing, analogous tissue samples were pooled into one sample for prion testing. These tissue samples were then tested for the presence of infectious prions by mouse bioassay.

Because of the relative insensitivity of the mouse bioassay, some of the tissue collected from the orally dosed cattle from this first phase of the trial was subjected to the more sensitive cattle bioassay to detect BSE infectivity that may have been missed by mouse testing. For both mice and cattle bioassay, tissue from the original orally dosed cattle was intracerebrally injected into the bioassay animal. (It is important to remember that when cattle are used this way as a bioassay subject, the purpose is only to determine whether the original, injected material is infectious. Infectivity results reported below describe tissue collected from the *orally dosed* cattle; infectivity was *detected* by means of the intracerebral bioassays.)

*Current BSE pathogenesis studies of cattle*

With the more sensitive PrP$^{Sc}$ tests available today, newer and better information on pathogenesis in cattle should be forthcoming. Two studies are in progress: The UK VLA has recently finished harvesting more than 100 tissue samples per animal from an oral dosing trial of 200 four-month-old calves with 100 controls, but these tissue samples have not yet been tested for infectivity (**personal communication, D. Matthews, UK VLA). German BSE researchers initiated a 56-calf oral-dosing pathogenesis study in early 2003, slated to be completed in 2007. Approximately 120 tissue and body fluid samples will be collected from these animals; serial sacrifice will be performed as in the original UK study. Collected tissue samples will be bioassayed for BSE infectivity using transgenic mice that over-express bovine PrP$^c$, a more sensitive and rapid manner of bioassay than that available to researchers of the 1990s[229].

*Proposed route of prion propagation in cattle*

Following oral ingestion of BSE-infective material, the route by which prions propagate through the body of cattle is still unknown. However, extensive experimental induction of TSEs in sheep and laboratory animals provides strong evidence that ingested prions first enter lymphoid tissue, replicate in the lymphoreticular system, and from there, travel to the CNS via peripheral nerve tracts. There is some evidence for an alternative, and perhaps faster, route via direct infection of peripheral nerve tracts innervating the buccal cavity, tongue, or gastrointestinal tract.

*Lymphoreticular system (LRS)*

For experimental animals to become infected with scrapie via the LRS, B-cell competence is a necessary condition, probably because B-cells are needed to make the follicular dendritic cells mature fully; these cells appear to be the cells in which prions

multiple within the LRS. When prions accomplish direct neuroinvasion, B-cell competency is irrelevant[168].

In sheep naturally infected with scrapie[283,284], in sheep experimentally infected with BSE[153], and in elk and deer infected with CWD[310] there is widespread accumulation of PrP$^{Sc}$ throughout the LRS. Orally ingested PrP$^{Sc}$ appears to invade gut-associated lymphoid tissue, then spread to closely associated sympathetic neural tissue[8,14,124].

The tissue distribution of infectivity in human vCJD resembles scrapie in sheep, with widespread infectivity in lymphoreticular tissue, of particularly high level in the tonsils [55,290]. This extensive LRS involvement in vCJD enables tonsil biopsy of the living patient to help differentiate this disease from sporatic CJD. PrP$^{Sc}$ has also been found in the spleen of patients with vCJD[240] as well as those with sCJD[122].    **this needs to go after the Transmission section, which introduces vCJD as distinct from sCJD.

In contrast, BSE-infected cattle do not appear to become widely infected throughout the LRS[153]. Peyers patches become infected by prions: in the VLA study of orally dosed cattle, infectivity was detected by bioassay of the date-pooled samples of distal ileum of the calves killed 6, 10, 14, and 18 months post-dosing, as well from the calves killed at 36, 38, and 40 months[293]. In these same samples of distal ileum, immunohistochemical studies of these tissue samples identified PrP$^{Sc}$ in Peyer's patches [278].

Tonsil from BSE-infected cattle is presumed to be infectious[253]. In the VLA study, pooled tonsil harvested from the three calves sacrificed at 10 months post-oral-dosing was found to be infective in the more sensitive cattle bioassay, but not in the mouse bioassay. However, because only one of the five bioassay animals (as of April 2005) has become clinically affected (at 45 months post-dosing), the level of infectivity in the pooled tonsil sample must have been quite low. Infectivity has not been found in any lymph nodes collected from BSE-dosed cattle in the VLA study. Regional and mesenteric lymph nodes and spleen harvested from cattle up to 26 months post-dosing have been subjected to the sensitive cattle bioassay, but no infectivity has been detected. Neither has infectivity been detected from the thymus of any of the original VLA study calves[253].

These results are comforting, in that the presence of infective PrP$^{Sc}$ is certainly not as widespread throughout the LRS of cattle as in sheep or rodents with scrapie or in humans with vCJD, but disconcerting in that, based on the study of other TSEs, it appears that the LRS is consistently used to attain access to the CNS via peripheral nerves. Lacking any other clear evidence of how infective prions invade the CNS of cattle, we must for the time being assume that the LRS is involved, at least to some extent, in BSE pathogenesis.

*Peripheral nerves*

In most TSEs, it appears that infectious prions travel from the LRS to the CNS via peripheral nerves, and that if exposure occurs via ingestion, prions travel preferentially along the gut-associated sympathetic noradrenergic tracts. [124,129,226]. The celiac and stellate ganglia provide most of the gut with sympathetic innervation, and PrP$^{Sc}$ has been detected from these ganglia in patients with vCJD [129]. In cattle orally dosed with BSE-infected material in the VLA study, PrP$^{Sc}$ was detected in the myenteric nerve plexus in the distal ileum from two cattle—one each of the groups of three animals killed at 38 and

21

at 40 months post-dosing [278]. Immunostaining of myenteric plexus from other locations along the intestinal tract has not been conducted (but bioassay of tissue from other intestinal sites has been negative). (*specify which locations).

It is becoming increasingly evident that in laboratory animal models of prion disease, the LRS may be bypassed and infectious prions may directly infect cranial nerves and the vagus nerve[25,200], offering a speedier route to the brain. In cattle with the classical UK strain of BSE, the parasympathetic nucleus of the vagus nerve is one of the first areas of the brain to show significant accumulation of PrP$^{Sc}$ [153]; similarly, the dorsal motor nucleus of the vagus nerve shows early PrP$^{Sc}$ staining in preclinical natural scrapie of sheep[98]. Sheep with lacerated gingiva are more susceptible to oral transmission of scrapie relative to uninjured animals[61].

In the recently described Italian cattle demonstrating a variant strain of BSE, PrP$^{Sc}$ was not found in the dorsal motor nucleus of the vagus nerve nor was the brainstem involved, both of which suggest that invasion was not via the alimentary tract. In these cases of BSE, the olfactory bulb stained heavily for PrP$^{Sc}$, indicating possible infection via the olfactory nerve to the brain. [62] However, the variant BSE cases in Italy described in this report were older than the cattle that expressed the usual prion pattern, so it has been postulated that this variant strain could be a spontaneous disease. Interestingly, PrP$^{Sc}$ staining of the olfactory tract is also observed in humans who have died from sCJD(*need reference).

There is increasingly convincing evidence that, in TSEs, travel (**this is anterograde direction-check refs) of infective prions outward from the brain can also proceed along peripheral nerve tracts. [24,160,200]. There has been a recent report that BSE PrP$^{Sc}$ has been detected in peripheral nerve of a 94-month-old cow detected in Japan in 2004[86] However, it is likely of a much lower level of concentration than that found in central nervous tissue, as none of the limited samples of peripheral nerve samples tested in the original VLA study were infectious by cattle bioassay; **name those tested. We await confirmatory bioassay for infectivity of peripheral nerve sample from this Japanese case of BSE.

Because cranial nerves and gastrointestinal nerve tracts appear to be used for prion invasion of the CNS, and because prions may also propagate outward from the CNS along peripheral nerves, it is important to determine definitively whether peripheral nerves possess sufficient infectivity to transmit BSE, and if so, which nerve tracts, to what degree, and during which stage of disease development.

*Central nervous tissue*

In cattle clinically affected with BSE, the CNS contains the largest concentration of tissue infectivity, as determined by bioassay in test animals[253]. By comparing the relative infectivity to mice from the CNS of clinically-affected cattle compared to that resulting from the distal ileum, retina, or tonsil of such animals, and accounting for the relative weight of the respective organs in adult cattle, it is estimated that 90 % of the prions are present the brain or spinal column[253]. Based on the results of the VLA study, infectivity in the CNS seems to be present only near the end of the incubation period. The single animal sacrificed at 26 months post-dosing possessed no infectivity in its CNS tissue, similar to the 19 cattle sacrificed from 3 to 22 months post-dosing. However, at 32 months post-dosing, infectivity was detected in pooled samples of brain, spinal cord,

dorsal root ganglia, and trigeminal ganglia from the two cattle sacrificed at that stage; neither of the pair had shown clinical signs of BSE. These same CNS tissues were also infective from at least one of each group (samples within groups were pooled) of cattle remaining in the VLA trial: three cattle sacrificed at 36 months post-oral-dosing, three at 38 months, and two at 40 months [296]. (*ask Danny for more current information – is it ok to relate current findings)

In the VLA trial, clinical expression of disease was first evident in two of the three animals sacrificed at 36 months post-dosing, although signs were still somewhat equivocal. By 38 months post-dosing, one of the three animals sacrificed showed clinical signs of BSE, as did one of the last two calves killed at 40 months post-dosing[296].

The brains of cattle clinically affected with BSE during the UK epizootic and for most cases worldwide show a consistent pattern of pathological changes[260]. The typical spongiform vacuolated changes are most noticeable in the medulla oblongata at the level of the obex[153]. Tissue slices treated with antibody raised against cattle prion proteins will stain PrP$^{Sc}$ accumulations that generally reflect the same distribution as that of vacuolation in the brain. Of course, normal prion protein will stain as well as the disease-associated PrP$^{Sc}$ isoform, but the increased amount and the pattern of staining will be diagnostic of prion disease. Unlike kuru and vCJD in humans, the PrP$^{Sc}$ found in cattle with BSE does not form florid plaques[299].

Details of neuropathological changes of cattle with BSE are described by veterinary pathologists working in the UK during the epizootic [294,299]; a recent review by Jeffrey and Gonzalez of the UK VLA describes the histopathology of BSE and compares the pathological changes of BSE and scrapie in cattle and sheep[153]. On the basis of histopathology and molecular typing of PrP$^{Sc}$, inoculation-induced scrapie in cattle (scrapie cannot be orally transmitted to cattle[153]) can be differentiated from BSE in cattle; likewise, experimentally-induced BSE in sheep can be differentiated from scrapie in sheep[54].

*Blood*

There has been some conjecture that infected follicular dendritic cells or macrophages enter the bloodstream and may act to spread prions via the circulatory system (Paul Brown *ref), but when disease is experimentally introduced through peripheral routes of inoculation, the time of travel between the detection of prions in the lymphatic tissue and their first appearance in the brain indicates spread via the peripheral nervous system, rather than via a hematogenous route [163]. However, others have inoculated mice intracerebrally and detected abnormal PrP in lymphoid tissue of the GI tract as early as 28 days after inoculation, well before it was detectable in the brain; hematogenous spread outward from these injections seemed the most rational explanation.[238].

In the VLA pathogenesis trial, blood from the BSE-infected cattle was not infective by bioassay. However, in rodent models of TSEs, low levels of infectivity have been found in the buffy coat fraction of blood.(*ref) Following the report of bloodborne transmission of natural scrapie between sheep[143,147], the medical community increased surveillance for possible bloodborne transmission of vCJD between humans.

Recently, two cases of vCJD in the UK have been strongly linked to blood transfusions from donors who were incubating vCJD at the time of their donation[183,223].

The evidence that these cases resulted from blood transfusion was based on the ages of the blood-recipient cases (too old to be fit the usual profile of vCJD from dietary exposure) and on the almost impossible odds of two blood-transfusion linked persons both acquiring such a rare disease merely by chance. Although these instances of probable blood-borne infection have underlined the danger of iatragenic transmission of vCJD, there has not been any detection of BSE infectious prion in the blood of cattle.

*Muscle*

Disease-associated prions have been detected in the muscles of patients with sCJD [122]and from muscle cells in the tongue of hamsters with TME [200], both when infected orally or when infected by intracerebral injection. The infected tongue cells found in hamsters were adjacent to infected neurons at the neuromuscular junction, indicating that infection arrived via cranial nerve infection traveling from the brain in animals that had been infected via intracranial injection. PrP$^{Sc}$ has also been found in the hindlimb muscles of hamster subjected to intracranial inoculation of scrapie [43].

For hamsters orally dosed with TME, it seemed that tongue infection may have occurred initially through the mucosal surface, traveling to the brain via the cranial nerves[200]. When hamsters were orally infected with scrapie, widespread PrP$^{Sc}$ was detected in muscles of many locations, including tongue, with the highest level of muscle infectivity found in the hindlimbs [281] Samples of semitendinosis, longissumus dorsi, and masseter muscles of some of the orally dosed cattle used in the VLA pathogenesis study were not found to contain infectivity even when subjected to the sensitive cattle bioassay [253] Tongue from BSE-infected cattle lacked infectivity, according to one report, but it was not stated whether or not the cattle bioassay was used[300].

*Bone marrow*

BSE-infective bone marrow was detected from the pooled sample from the three calves killed at 38 months post-dosing in the VLA study[297]; it was not found infective in the two animals killed at 40 months post-dosing. This infectivity may have been the result of tissue cross-contamination, as this was the last sample of many taken at necropsy. If truly infective, it may be surmised that bone marrow can become so either through its autonomic innervation (to the walls of marrow vasculature) or via the bloodstream. The hematogenous route, however, would seem unlikely, as the neither the spleen nor any sample lymph nodes of cattle were found to be infective. The brains of mice used as bioassay subjects for bone marrow of cattle used in the VLA pathogenesis study are currently being revisited and stained for evidence of PrP$^{Sc}$. (personal communication, Danny Matthews, UK VLA) (*check with Danny).

## BSE Diagnostics

Currently, there is no test for BSE in living animals. As capability to detect extremely low levels of PrP$^{Sc}$ continues to improve, the hope is that there will be a test for the presence of this indicator protein in an easily accessible body compartment prior to the onset of clinical signs. Human vCJD infection and chronic wasting disease in deer can be confirmed by immunohistochemical examination of tonsil biopsy, and sheep scrapie can be confirmed in nictitating membrane samples from living animals[150] [196,204].

24

Although tonsil and nictitating membrane have been infectious by bioassay from a few samples from BSE-infected cattle[253], the more rapid tests are currently not sensitive enough to detect PrP$^{Sc}$ from these tissue in cattle, regardless of the stage of infection.

Even in central nervous tissue taken from slaughtered infected animals, the detection of infectious prion protein remains a challenging endeavor. The structure of PrP$^{Sc}$ is not completely known. Few antibodies have been reported to be able to distinguish between PrP$^{C}$ from PrP$^{Sc}$ and none of these are commercially available[173]. Most of the current tests are dependent on a prior proteinase K digestion to remove the endogenous PrP$^{C}$, a step which also lowers the concentration of PrP$^{Sc}$ available for detection. [37]

The concentration of infectious prions increases throughout the incubation period, during most of which the animal is asymptomatic. In the hamster scrapie model, prion detection below about $10^6$ ID$_{50}$/g of brain material requires the use of animal bioassays (an ID$_{50}$ is the dose capable of infecting 50% of assay subjects). [21] Above that titer, prions can be detected by means of rapid immunoassay tests, Western blots, and immunohistochemistry. Clinical signs become apparent only when the prion titer is $>10^8$ ID$_{50}$/g of brain. In the terminal stages of the disease, when symptoms are most obvious, the brain of an infected hamster contains prion titers approaching $10^{10}$ ID$_{50}$/g of brain[21].

The most sensitive assay for BSE prions, the cattle bioassay, requires an intracranial injection of the assay material into cattle. Proof of negative tissue infectivity requires observed survival up to two years for rodent bioassay and 8-9 years for cattle bioassay, precluding its use as a routine prion screen. Unfortunately, there is currently no approved and convenient assay for prion concentrations below $10^6$ ID$_{50}$/g of brain material. (what about phosphotungsic acid WB?)**

In formalin-fixed brainstem tissue, the immunohistochemistry test (IHC) stains PrP$^{Sc}$ deposits, using fixed tissue slices treated with antibody raised against normal cattle PrP$^{C}$ (these antibodies also react against PrP$^{Sc}$)[126,157]. In brainstem from an animal at or near the clinical stage of BSE, the IHC ideally demonstrates both the distinctive pattern of vacuolation and PrP$^{Sc}$ deposition in characteristic locations in the brainstem[299]. But, because the IHC test requires a skilled pathologist to interpret the results, the test is not suitable for high-throughput surveillance systems. In addition, unusual strains of BSE may cause these PrP$^{Sc}$ deposits in locations in the brain outside the areas typically affected by the classical UK strain, and these tissue locations may not get sampled in a typical screening program.

The Western blot (*i.e.,* immunoblot) technique possesses sensitivity similar to that of IHC, but also allows molecular strain typing of the TSE infection. A fresh sample of brain tissue is first subjected to Proteinase K to digest endogenous prion protein. The resistant infection-associated prion that remains is subjected to electrophoresis, transferred to a nitrocellulose gel, and stained with reactive antibodies. Not only is infectious PrP$^{Sc}$ detected, but the electrophorectic migration patterns and relative amounts of the resulting three bands—representing mono-, di-, and unglycosylated prion protein—can identify different strains prion diseases[29,101,142].

Autolysis of the sample will obscure the pattern of PrP$^{Sc}$ deposition relative to histological features of the sample. However, because of the extreme stability of PrP$^{Sc}$, the infectious prion remains intact and can be detected in samples autolyzed to the point of liquefaction[198]. In autolyzed samples, BSE infection can still be confirmed by

detection of PrP[Sc] with an immunoblotting migration pattern that matches that of known BSE cases[207].

Rapid acting, high throughput immunoassay tests have become the first line of testing for BSE surveillance programs. These tests can detect the presence of PrP[Sc] in brain at least several months before the onset of visible histopathological change[91,209]. These post-mortem tests are conducted on fresh tissue samples from the obex region of the midbrain[207]. The European Union has approved 11 rapid tests for BSE screening of cattle[99], and, currently, there are 7 rapid BSE screening tests licensed for use in the United States (personal communication, Dr. Rick Hill, Center for Veterinary Biologics, Animal and Plant Health Inspection Service, U.S. Dept of Agriculture).

Rapid tests use several different methodologies to detect PrP[Sc], usually preceded by a proteinase K digestion step to degrade the endogengous PrP[C]. Detection of PrP[Sc] may then proceed by means of Western blot immunoassay, enzyme-linked immunosorbent assay (ELISA), or lateral flow immunoassay (a modified dipstick version of ELISA). These methods are much faster than IHC, but only detect prions at a level that can be seen by IHC.

The newer conformation-dependent immunoassay depends on the fact that PrP[Sc] binds to sodium phosphotungstate, while PrP[C] does not; the two can be then separated by centrifugation. [248]. Another newer test system uses a proprietary ligand that binds PrP[Sc] and not PrP[C]. The ligand is bound to a solid matrix, so the unbound PrP[C] can be washed away, leaving the PrP[Sc] bound to the surface [176]. Because these tests do not use proteinase K, they have the potential to be more sensitive than the other tests, since even PrP[Sc] has some sensitivity to degradation by this enzyme. Both are indirect tests, in that they use antibodies that cannot distinguish between PrP[Sc] and PrP[C].

Following a positive result on a rapid screening test, current methods of BSE confirmation rely on the IHC test of formalin-fixed brain slices and the detection of PrP[Sc] in fresh or frozen brain extracts by Western blot immunoblotting, as described above. According to recent OIE guidelines, "Both approaches are now widely used as confirmatory diagnostic methods"[207]. Western blot has the advantage of BSE strain determination, and IHC is able to simultaneously show histopathological changes with PrP[Sc] deposition, but the test or tests chosen for confirmation may depend upon the prior knowledge of BSE prevalence in the region. In clinically affected cattle from a region where BSE is known to exist, the appearance of the characteristic patterns of vacuolation may be sufficient for diagnosis. However, lack of vacuolation is not proof of absence of infection. If case confirmation is required in a region where BSE has rarely or never been found, the OIE recommends the use of immunoblotting and the examination of tissue from other regions of the brain in order to distinguish the pathological phenotype of any BSE discovered[207]. If rapid screening tests of brainstem are used, the head should be held in reserve for detailed confirmatory testing, if necessary[207].

There are a number of promising strategies that may improve the sensitivity of current BSE detection assays by improving the antibodies used in these tests. Recently, antibodies specific for PrP[Sc] have been reported. These antibodies were produced when chromosomal DNA was used as the hapten, an approach never before tried[317]. Previous results have shown that the natural tolerance to PrP[C] in wild-type animals has a significant effect on the kind of anti-PrP[Sc] antibodies produced[311]. Work is being done to

improve antibodies by producing them in genetically engineered organisms that lack the prion protein. Such animals would have no natural tolerance to PrP[C].

Researchers are developing methods to amplify existing PrP[Sc] by exploiting its ability to replicate. One group uses brain homogenate from uninfected animals to amplify PrP[Sc] by a process referred to as cyclic amplification of protein misfolding[245]. They reported amplification of infectious material by a factor 10 to 100. Several in vitro systems have been developed to amplify prions[170,201]. These systems are able to produce greater amounts of proteinase K resistant protein, but not an equivalent increase in infectivity. The significance of this difference is unclear, but may be exploited as a detection method. There are also new systems being explored to amplify the signal from the disease-associated prion isoforms, exploiting the ability of these isoforms to act as seed molecules for the generation of other beta-sheet proteins that fluoresce upon assumption of that conformation (*ref to Proteins, in press).

In the future, cell culture may be a convenient means of amplifying PrP[Sc] [15].PrP[Sc] can be propagated in cell culture[236]. The number of cell lines able to propagate is PrP[Sc] limited and the PrP[Sc] isolated is different from that isolated in the brain of infected animals[59]. Transgenic cell lines expressing different sheep PrP[C] polymorphism behave in a fashion similar to that found in sheep[246,286]. Recently, scrapie has been propagated in cell cultures from neonatal brain cells.

A cautionary tale on the pitfalls of indirect assays was noted recently after a research group reported the detection of prions in urine based on western blots[258]. They were puzzled that the observed prions were not infectious, and subsequent work showed that the prion detection was an artifact[112,257]. It appears that certain bacteria have proteins that are resistant to proteinase K degradation, have a molecular weight similar to that of PrP[C], and bind the reporter antibody, yielding a Western blot with a signal at the expected molecular weight.

As newer, more sensitive tests evolve, the question arises: How does one validate a test that may be more sensitive than IHC and immunoblotting[80](*ref?) Transgenic mice expressing bovine cellular prion genes show promise for faster bioassay, and may find use in the validation of newly developed test methods with high sensitivity.

## Measuring the prevalence of BSE in a cattle population

Until better detection tools are available, surveillance for BSE will continue to challenge the veterinary community. The clinical signs of BSE are indistinguishable from those of many other CNS disorders. There is a long period—it may be several years—from infection to clinical onset; during most of that incubation period, the disease is undetectable by currently available tests. Today's tests have only enough sensitivity to detect infection when the animal is at or nearing the stage of clinical expression[91]. By the very nature of cattle production systems, any cattle disease with a long incubation period is difficult to detect. When few animals mature to the age at which the disease becomes clinically evident, that disease can circulate silently, and without vigilant surveillance systems in place, the spread of BSE can remain undetected for years.

The story of BSE in France is also a sobering one in this regard. During the 1980s, while the epizootic continued to expand in the UK, the French assumed that their herd was not infected. Following the 1987 MBM ban instituted in the UK, France continued to import British MBM.(*ref) There was no mandatory surveillance and

27

reporting of CNS-like diseases in cattle in France until after their first case was confirmed in 1991. However, back-calculations of French surveillance data, similar to those performed for UK cattle populations, indicate that the undetected epizootic began in France in 1980, and that about 300,000 cattle were likely infected in that country in the intervening years[92,175,269].

Throughout Europe, BSE detection at first depended on a passive surveillance system, *i.e.*, veterinarians and farmers were required to report animals with CNS signs compatible with BSE, but there was no organized effort to search for them. In 1996, the startling confirmation that BSE was a zoonosis gave new impetus to a search for the means to conduct active surveillance of cattle, and in 2001, several rapid screening tests were approved to be used on brain samples.

The presence of an active surveillance system using these rapid screening tests can ~~also~~ clarify the nature of the disease by its more complete reporting of cases. For example, in the U K, over 90% of clinical cases of BSE were found in dairy or mixed herds[13]. This was similar to the findings from the first years of the French outbreak, as well, before France instituted targeted active surveillance by means of rapid tests. Upon careful analysis of cases found by the French active surveillance system, it appeared that dairy cattle were no more likely to be detected as cases than beef cattle[199]. Subject only to the a passive reporting of clinical cases, the large excess of cases among dairy cattle may have been partly the result of more intensive observation of dairy cattle by farmers and veterinarians. In fact, both beef and dairy cattle were receiving MBM supplements in the UK and in France, particularly at younger ages[96]. **RECHECK

The principles of BSE surveillance are similar to those for polio, a human disease targeted for global eradication. All cases of human flaccid paralysis are not due to polio, just as all cases of bovine central nervous disease are not due to BSE. However, knowing what the usual background level of non-polio flaccid paralysis is in a human population, polio eradication teams set target investigation rates with the goal of capturing all cases that could possibly be polio[5]. Similarly, to assure a high probability that any BSE case will be captured in a surveillance system, the Organization International d'Epizootiologie has recommended that field investigations of adult cattle showing compatible CNS signs should be conducted at the rate of at least 100 investigations annually for every million cattle over the age of 30 months; fewer investigations would indicate that some BSE cases could remain unidentified and unreported[269]. From the results of an active surveillance program that includes a sufficient level of field investigations and targeted testing, national prevalence is estimated as the number of positive cattle among the cattle population over 24 or 30 months of age.

**Eradicating BSE**

BSE appears to be declining in prevalence throughout most countries of Europe. Similarly, although it has only recently been detected in North America, it is likely to be declining in prevalence here as well. However, the path toward BSE eradication in the UK—still incomplete—required a draconian feed ban that has not been replicated worldwide. Because of the difficulty of detecting this disease in populations of cattle and the difficulties in enforcing effective feed bans, there were probably other countries where the disease silently infected animals that went to slaughter before clinical signs were evident or where clinical signs were attributed to other conditions, and this may

continue even today in some parts of the world. It remains critical that ruminant feeds are not contaminated by tissue of any animal capable of supporting BSE prion replication nor by farm waste from non-susceptible animals that may contain particles of ruminant-origin feeds.

As BSE has caused fewer than 200 human cases worldwide, some wonder whether we should resign ourselves to living with a low level of BSE rather than incur the expense of eradicating this disease. Public health considerations argue for eradication: notwithstanding the low incidence of clinical vCJD, there is evidence that as many as 1 person in 4000 exposed to the UK epizootic may be sub-clinical carriers, capable of very efficient iatrogenic transmission to others of more susceptible genotype[140,223]. Infectivity can be found in many non-CNS tissues of vCJD patients, posing a serious risk of iatrogenic transmission, perhaps even through routine surgical procedures[55,123,134 7]. Blood transfusion from scrapie-infected sheep has a transmission efficiency of about 20% (**CHECK HUNTER REF); current vCJD donation surveillance in the UK indicates that transfusion from preclinical vCJD blood donors may effect a similar level of transmission efficiency (personal communication, David Asher, NIH**). A requirement for routine PrP[Sc] decontamination or disposal of surgical equipment and blood donation equipment would be a very costly burden on the public health system; blood donation deferrals due to potential BSE exposure have already compromised the nation's blood supply[105]

The costs of BSE to the cattle and meat industry have been tremendous. But, the prevention of additional healthcare costs required to prevent human-to-human transmission may justify the difficulties of eliminating BSE in cattle. The costs incurred to eliminate BSE will also be a solid investment in reassuring consumers that beef is a wholesome, and not worrisome, source of nutrition.

Reference List

1.  Anonymous. Fatal degenerative neurologic disease in patients who received pituitary-derived human growth hormone. MMWR Morb Mortal Wkly Rep 1985; 34:359-60, 365-6.

2.  Anonymous. Rapidly progressive dementia in a patient who received a cadaveric dura mater graft. MMWR Morb Mortal Wkly Rep 1987; 36:49-50, 55.

3.  Anonymous. Update: Creutzfeldt-Jakob disease associated with cadaveric dura mater grafts--Japan, 1979-2003. MMWR Morb Mortal Wkly Rep 2003; 52:1179-81.
    Notes: CORPORATE NAME: Centers for Disease Control and Prevention (CDC).

4.  Anonymous. Bovine spongiform encephalopathy in a dairy cow--Washington state, 2003. MMWR Morb Mortal Wkly Rep 2004; 52:1280-5.
    Notes: CORPORATE NAME: Centers for Disease Control and Prevention (CDC).

5.  Anonymous. Acute flaccid paralysis surveillance systems for expansion to other diseases, 2003-2004. MMWR Morb Mortal Wkly Rep 2004; 53:1113-6.
    Notes: CORPORATE NAME: Centers for Disease Control and Prevention (CDC).

6.  Aguzzi A. Understanding the diversity of prions. Nat Cell Biol 2004; 6:290-2.

7.  Aguzzi A, Glatzel M. vCJD tissue distribution and transmission by transfusion--a worst-case scenario coming true? Lancet 2004; 363:411-2.

8.  Aguzzi A, Heppner FL, Heikenwalder M, Prinz M, Mertz K, Seeger H, et al.  Immune system and peripheral nerves in propagation of prions to CNS. Br Med Bull 2003; 66:141-59.

9.  Aguzzi A, Klein MA, Musahl C, Raeber AJ, Blattler T, Hegyi I, et al.  Use of brain grafts to study the pathogenesis of prion diseases. Essays Biochem 1998; 33:133-47.

10. Alper T, Cramp WA, Haig DA, Clarke MC.  Does the agent of scrapie replicate without nucleic acid? Nature 1967; 214:764-6.

11. Alper T, Haig DA, Clarke MC.  The exceptionally small size of the scrapie agent.  Biochem Biophys Res Commun 1966; 22:278-84.

12. Alperovitch A, Zerr I, Pocchiari M, Mitrova E, de Pedro Cuesta J, Hegyi I, et al.  Codon 129 prion protein genotype and sporadic Creutzfeldt-Jakob disease. Lancet 1999; 353:1673-4. Notes: Erratum in : Lancet 2000, 355:72.

13. Anderson RM, Donnelly CA, Ferguson NM, Woolhouse ME, Watt CJ, Udy HJ, et al.  Transmission dynamics and epidemiology of BSE in British cattle. Nature 1996; 382:779-88.

14. Andreoletti O, Berthon P, Marc D, Sarradin P, Grosclaude J, van Keulen L, et al.  Early accumulation of PrP(Sc) in gut-associated lymphoid and nervous tissues of susceptible sheep from a Romanov flock with natural scrapie. J Gen Virol 2000; 81:3115-26.

15. Archer F, Bachelin C, Andreoletti O, Besnard N, Perrot G, Langevin C, et al.  Cultured peripheral neuroglial cells are highly permissive to sheep prion infection. J Virol 2004; 78:482-90.

16. Asante EA, Linehan JM, Desbruslais M, Joiner S, Gowland I, Wood AL, et al.  BSE prions propagate as either variant CJD-like or sporadic CJD-like prion strains in transgenic mice expressing human prion protein. EMBO J 2002; 21:6358-66.

17. Austin AR, Simmons MM.  Reduced rumination in bovine spongiform encephalopathy and scrapie. Vet Rec 1993; 132:324-5.

18. Bacchetti P.  Age and variant Creutzfeldt-Jakob disease. Emerg Infect Dis 2003; 9:1611-2.

19. Baldwin MA SNHRPK-MBAPS.  Glycosylinositol phospholipid anchors of prion proteins. In: Anonymous Prion diseases of humans and animals. New York: Ellis Horwood, 380-397.

20. Balter M.  Human growth hormone. French scientists may face charges over CJD outbreak. Science 1993; 261:543

21. Baringer JR, Bowman KA, Prusiner SB.  Replication of the scrapie agent in hamster brain precedes neuronal vacuolation. J Neuropathol Exp Neurol 1983; 42:539-47.

22. Baron T, Belli P, Madec JY, Moutou F, Vitaud C, Savey M.  Spongiform encephalopathy in an imported cheetah in France. Vet Rec 1997; 141:270-1.

23. Baron T, Crozet C, Biacabe AG, Philippe S, Verchere J, Bencsik A, et al.  Molecular analysis of the protease-resistant prion protein in scrapie and bovine spongiform encephalopathy transmitted to ovine transgenic and wild-type mice.  J Virol 2004; 78:6243-51.

24. Bartz JC, Kincaid AE, Bessen RA.  Retrograde transport of transmissible mink encephalopathy within descending motor tracts. J Virol 2002; 76:5759-68.

25. Bartz JC, Kincaid AE, Bessen RA.  Rapid prion neuroinvasion following tongue infection. J Virol

2003; 77:583-91.

26. Bateman D, Hilton D, Love S, Zeidler M, Beck J, Collinge J. Sporadic Creutzfeldt-Jakob disease in a 18-year-old in the UK. Lancet 1995; 346:1155-6.

27. Baylis M, Chihota C, Stevenson E, Goldmann W, Smith A, Sivam K, et al. Risk of scrapie in British sheep of different prion protein genotype. J Gen Virol 2004; 85:2735-40.

28. Baylis M, Goldmann W. The genetics of scrapie in sheep and goats. Curr Mol Med 2004; 4:385-96.

29. Beekes M, Baldauf E, Cassens S, Diringer H, Keyes P, Scott AC, et al. Western blot mapping of disease-specific amyloid in various animal species and humans with transmissible spongiform encephalopathies using a high-yield purification method. J Gen Virol 1995; 76 ( Pt 10):2567-76.

30. Beer L, Britten JF, Cordes AW, Clements OP, Oakley RT, Pink M, et al. Benzo[2,1-c:3,4-c']bis(1,2,3-thiaselenazole) (BSe) and its charge trasfer chemistry. Crystal and electronic structure of. Inorg Chem 2001; 40:4705-9.
   Notes: 3[ClO4]2

31. Belay ED. Transmissible spongiform encephalopathies in humans. Annu Rev Microbiol 1999; 53:283-314.

32. Bellinger-Kawahara C, Cleaver JE, Diener TO, Prusiner SB. Purified scrapie prions resist inactivation by UV irradiation. J Virol 1987; 61:159-66.

33. Bellinger-Kawahara CG, Kempner E, Groth D, Gabizon R, Prusiner SB. Scrapie prion liposomes and rods exhibit target sizes of 55,000 Da. Virology 1988; 164:537-41.

34. Bendheim PE, Brown HR, Rudelli RD, Scala LJ, Goller NL, Wen GY, et al. Nearly ubiquitous tissue distribution of the scrapie agent precursor protein. Neurology 1992; 42:149-56.

35. Bessen RA, Kocisko DA, Raymond GJ, Nandan S, Lansbury PT, Caughey B. Non-genetic propagation of strain-specific properties of scrapie prion protein. Nature 1995; 375:698-700.

36. Bessen RA, Marsh RF. Identification of two biologically distinct strains of transmissible mink encephalopathy in hamsters. J Gen Virol 1992; 73 ( Pt 2):329-34.

37. Bessen RA, Marsh RF. Biochemical and physical properties of the prion protein from two strains of the transmissible mink encephalopathy agent. J Virol 1992; 66:2096-101.

38. Bessen RA, Marsh RF. Distinct PrP properties suggest the molecular basis of strain variation in transmissible mink encephalopathy. J Virol 1994; 68:7859-68.

39. Biacabe AG, Laplanche JL, Ryder S, Baron T. Distinct molecular phenotypes in bovine prion diseases. EMBO Rep 2004; 5:110-5.

40. Boelle PY, Cesbron JY, Valleron AJ. Epidemiological evidence of higher susceptibility to vCJD in the young. BMC Infect Dis 2004; 4:26

41. Bons N, Mestre-Frances N, Belli P, Cathala F, Gajdusek DC, Brown P. Natural and experimental oral infection of nonhuman primates by bovine spongiform encephalopathy agents. Proc Natl Acad Sci U S A 1999; 96:4046-51.

42. Bons N, Mestre-Frances N, Charnay Y, Tagliavini F. Spontaneous spongiform encephalopathy in a young adult rhesus monkey. Lancet 1996; 348:55

43. Bosque PJ, Ryou C, Telling G, Peretz D, Legname G, DeArmond SJ, et al. Prions in skeletal muscle. Proc Natl Acad Sci U S A 2002; 99:3812-7.

44. Bradley R. Experimental transmission of bovine spongiform encephalopathy. In: Court L, Dodet B, editors. Transmissible sub-acute spongiform encephalopathies. Paris: Elsevier, 51-56.

45. Bradley R. Bovine spongiform encephalopathy (BSE): the current situation and research. Eur J Epidemiol 1991; 7:532-44.

46. Bradley R. BSE transmission studies with particular reference to blood. Dev Biol Stand 1999; 99:35-40.

47. Brandel JP, Preece M, Brown P, Croes E, Laplanche JL, Agid Y, et al. Distribution of codon 129 genotype in human growth hormone-treated CJD patients in France and the UK. Lancet 2003; 362:128-30.

48. Brown P, Bradley R. 1755 and all that: a historical primer of transmissible spongiform encephalopathy. BMJ 1998; 317:1688-92.

49. Brown P, Gajdusek DC. Survival of scrapie virus after 3 years' interment. Lancet 1991; 337:269-70.

50. Brown P, Preece M, Brandel JP, Sato T, McShane L, Zerr I, et al. Iatrogenic Creutzfeldt-Jakob disease at the millennium. Neurology 2000; 55:1075-81.

51. Brown P, Rau EH, Johnson BK, Bacote AE, Gibbs CJ Jr, Gajdusek DC. New studies on the heat resistance of hamster-adapted scrapie agent: threshold survival after ashing at 600 degrees C suggests an inorganic template of replication. Proc Natl Acad Sci U S A 2000; 97:3418-21.

52. Bruce M, Chree A, McConnell I, Foster J, Pearson G, Fraser H. Transmission of bovine spongiform encephalopathy and scrapie to mice: strain variation and the species barrier. Philos Trans R Soc Lond B Biol Sci 1994; 343:405-11.

53. Bruce ME. Scrapie strain variation and mutation. Br Med Bull 1993; 49:822-38.

54. Bruce ME, Boyle A, Cousens S, McConnell I, Foster J, Goldmann W, et al. Strain characterization of natural sheep scrapie and comparison with BSE. J Gen Virol 2002; 83:695-704.

55. Bruce ME, McConnell I, Will RG, Ironside JW. Detection of variant Creutzfeldt-Jakob disease infectivity in extraneural tissues. Lancet 2001; 358:208-9.

56. Bruce ME, Will RG, Ironside JW, McConnell I, Drummond D, Suttie A, et al. Transmissions to mice indicate that 'new variant' CJD is caused by the BSE agent. Nature 1997; 389:498-501.

57. Bueler H, Fischer M, Lang Y, Bluethmann H, Lipp HP, DeArmond SJ, et al. Normal development and behaviour of mice lacking the neuronal cell-surface PrP protein. Nature 1992; 356:577-82.

58. Buschmann A, Luhken G, Schultz J, Erhardt G, Groschup MH. Neuronal accumulation of abnormal prion protein in sheep carrying a scrapie-resistant genotype (PrPARR/ARR). J Gen Virol

2004; 85:2727-33.

59. Butler DA, Scott MR, Bockman JM, Borchelt DR, Taraboulos A, Hsiao KK, et al.  Scrapie-infected murine neuroblastoma cells produce protease-resistant prion proteins.  J Virol 1988; 62:1558-64.

60. Carlson GA, Kingsbury DT, Goodman PA, Coleman S, Marshall ST, DeArmond S, et al.  Linkage of prion protein and scrapie incubation time genes.  Cell 1986; 46:503-11.

61. Carp RI.  Transmission of scrapie by oral route: effect of gingival scarification.  Lancet 1982; 1:170-1.

62. Casalone C, Zanusso G, Acutis P, Ferrari S, Capucci L, Tagliavini F, et al.  Identification of a second bovine amyloidotic spongiform encephalopathy: molecular similarities with sporadic Creutzfeldt-Jakob disease.  Proc Natl Acad Sci U S A 2004; 101:3065-70.

63. Castilla J, Gutierrez-Adan A, Brun A, Doyle D, Pintado B, Ramirez MA, et al.  Subclinical bovine spongiform encephalopathy infection in transgenic mice expressing porcine prion protein.  J Neurosci 2004; 24:5063-9.

64. Caughey B.  Interactions between prion protein isoforms: the kiss of death?  Trends Biochem Sci 2001; 26:235-42.

65. Cervenakova L, Goldfarb LG, Garruto R, Lee HS, Gajdusek DC, Brown P.  Phenotype-genotype studies in kuru: implications for new variant Creutzfeldt-Jakob disease.  Proc Natl Acad Sci U S A 1998; 95:13239-41.

66. CHANDLER RL.  Encephalopathy in mice produced by inoculation with scrapie brain material.  Lancet 1961; 1:1378-9.

67. Chatelain J, Cathala F, Brown P, Raharison S, Court L, Gajdusek DC.  Epidemiologic comparisons between Creutzfeldt-Jakob disease and scrapie in France during the 12-year period 1968-1979.  J Neurol Sci 1981; 51:329-37.

68. Chesebro B.  Prion protein and the transmissible spongiform encephalopathy diseases.  Neuron 1999; 24:503-6.

69. Cohen CH, Valleron AJ.  When did bovine spongiform encephalopathy (BSE) start? Implications on the prediction of a new variant of Creutzfeldt-Jakob disease (nvCJD) epidemic.  Int J Epidemiol 1999; 28:526-31.

70. Collinge J, Palmer MS, Dryden AJ.  Genetic predisposition to iatrogenic Creutzfeldt-Jakob disease.  Lancet 1991; 337:1441-2.

71. Collinge J, Sidle KC, Meads J, Ironside J, Hill AF.  Molecular analysis of prion strain variation and the aetiology of 'new variant' CJD.  Nature 1996; 383:685-90.

72. Collins SJ, Lawson VA, Masters CL.  Transmissible spongiform encephalopathies.  Lancet 2004; 363:51-61.

73. Committee of the Inquiry.  The BSE Inquiry: The inquiry into BSE and vCJD in the United Kingdom.  2000.
Note: Return to an Order of the Honourable the House of Commons dated October 2000 for the Report, evidence and supporting papers of the Inquiry into the emergence and identification of Bovine Spongiform Encephalopathy (BSE) and variant Creutzfeldt-Jakob

Disease (vCJD) and the action taken in response to it up to 20 March 1996

74. Concepcion GP, Padlan EA. Are humans getting 'mad-cow disease' from eating beef, or something else? Med Hypotheses 2003; 60:699-701.

75. Coulthart MB , Mogk R, Rancourt JM, Godal DL, Czub S. Prion protein gene sequence of Canada's first non-imported case of bovine spongiform encephalopathy (BSE). Genome 2003; 46:1005-9.

76. Creutzfeldt HG. Über eine eigenartige herdförmige Erkrankung des Zentralnervensystems. Z Gesamte Neurol Psychiatr 1920; 57:1-18.
    Notes: From Chris

77. Cuille J, Chelle PL. La maladie dite tremblante du mouton est-elle inoculable? C R Acad Sci 1936; 26:1552-1554. Abstract.
    Notes: Cuille J., Chelle P.L., 1936. Pathologie animale. La maladie dite de la tremblante du mouton est-elle inoculable? *Comptes Rendus de l'Académie des Sciences*, 26, 1552-1554.
    http://www.inra.fr/Internet/Produits/dpenv/vfol__11.htm
    Chris' ref is different

78. Cunningham AA, Kirkwood JK, Dawson M, Spencer YI, Green RB, Wells GA. Bovine spongiform encephalopathy infectivity in greater kudu (Tragelaphus strepsiceros). Emerg Infect Dis 2004; 10:1044-9.

79. Curnow RN, Hau CM. The incidence of bovine spongiform encephalopathy in the progeny of affected sires and dams. Vet Rec 1996; 138:407-8.

80. Dabaghian RH, Mortimer PP, Clewley JP. Prospects for the development of pre-mortem laboratory diagnostic tests for Creutzfeldt-Jakob disease. Rev Med Virol 2004; 14:345-61.

81. De Bosschere, H, Roels, S., and  Vanopdenbosch, E. Atypical Case of Bovine Spongiform Encephalopathy in an East-Flemish Cow in Belgium. Intl J Appl Res in Vet Med 2: No 1, 52-55. 2004.

82. Department for Environment, Food and Rural Affairs UK. Independent Expert to Review DEFRA's work on BSE cases born since 1 August 1996 in the UK.

83. Department for Environment Food and Rural Affairs (UK). Defra, UK - BSE. 2004. 2004.

84. Department for Environment Food and Rural Affairs (UK) . The June Agricultural Census. 2004.

85. Department for Environment Food and Rural Affairs (UK). BSE: Statistics - BSE - GB weekly cumulative statistics. 2005.

86. Department of Health (UK). Monthly Creutzfeldt Jakob disease statistics. Reference number: 2005/0161. 2005. 2005.

87. Detwiler LA, Baylis M. The epidemiology of scrapie. Rev Sci Tech 2003; 22:121-43.

88. Dickinson AG, Meikle VM, Fraser H. Identification of a gene which controls the incubation period of some strains of scrapie agent in mice. J Comp Pathol 1968; 78:293-9.

34

89. Dickinson AG, Stamp JT, Renwick CC. Maternal and lateral transmission of scrapie in sheep. J Comp Pathol 1974; 84:19-25.

90. Dickinson AG, Stamp JT, Renwick CC, Rennie JC. Some factors controlling the incidence of scrapie in Cheviot sheep injected with a Cheviot-passaged scrapie agent. J Comp Pathol 1968; 78:313-21.

91. Doherr MG, Heim D, Fatzer R, Cohen CH, Vandevelde M, Zurbriggen A. Targeted screening of high-risk cattle populations for BSE to augment mandatory reporting of clinical suspects. Prev Vet Med 2001; 51:3-16.

92. Donnelly CA. Likely size of the French BSE epidemic. Nature 2000; 408:787-8.

93. Donnelly CA, Ferguson NM, Ghani AC, Anderson RM. Implications of BSE infection screening data for the scale of the British BSE epidemic and current European infection levels. Proc R Soc Lond B Biol Sci 2002; 269:2179-90.

94. Donnelly CA, Ferguson NM, Ghani AC, Wilesmith JW, Anderson RM. Analysis of dam-calf pairs of BSE cases: confirmation of a maternal risk enhancement. Proc R Soc Lond B Biol Sci 1997; 264:1647-56.

95. Donnelly CA, Ferguson NM, Ghani AC, Woolhouse ME, Watt CJ, Anderson RM. The epidemiology of BSE in cattle herds in Great Britain. I. Epidemiological processes, demography of cattle and approaches to control by culling. Philos Trans R Soc Lond B Biol Sci 1997; 352:781-801.

96. Ducrot C, Roy P, Morignat E, Baron T, Calavas D. How the surveillance system may bias the results of analytical epidemiological studies on BSE: prevalence among dairy versus beef suckler cattle breeds in France. Vet Res 2003; 34:185-92.

97. Duffy P, Wolf J, Collins G, DeVoe AG, Streeten B, Cowen D. Letter: Possible person-to-person transmission of Creutzfeldt-Jakob disease. N Engl J Med 1974; 290:692-3.

98. Ersdal C, Ulvund MJ, Benestad SL, Tranulis MA. Accumulation of pathogenic prion protein (PrPSc) in nervous and lymphoid tissues of sheep with subclinical scrapie. Vet Pathol 2003; 40:164-74.

99. Commission Regulation (EC) No 260/2005 of 16 February 2005 amending Regulation (EC) No 999/2001 of the European Parliament and of the Council as regards rapid tests. Official Journal of the European Union No. L 46/31 of 17.2.2005:

100. Commission Regulation (EC) No 999/2001 of 22 May 2001 laying down rules for the prevention, control and eradication of certain transmissible spongiform encephalopathies. Official Journal of the European Union No. L 147/1 of 31.5.2001:

101. Farquhar CF, Somerville RA, Ritchie LA. Post-mortem immunodiagnosis of scrapie and bovine spongiform encephalopathy. J Virol Methods 1989; 24:215-21.

102. Ferguson NM , Donnelly CA, Woolhouse ME, Anderson RM. The epidemiology of BSE in cattle herds in Great Britain. II. Model construction and analysis of transmission dynamics. Philos Trans R Soc Lond B Biol Sci 1997; 352:803-38.

103. Field EJ. Invasion of the mouse nervous system by scrapie agent. Br J Exp Pathol 1967; 48:662-4.

104. Fleetwood AJ, Furley CW. Spongiform encephalopathy in an eland. Vet Rec 1990; 126:408-9.

105. Anonymous editor. ()

106. Ford MJ, Burton LJ, Morris RJ, Hall SM. Selective expression of prion protein in peripheral tissues of the adult mouse. Neuroscience 2002; 113:177-92.

107. Foster JD, Hope J, Fraser H. Transmission of bovine spongiform encephalopathy to sheep and goats. Vet Rec 1993; 133:339-41.

108. Foster JD, Hope J, McConnell I, Bruce M, Fraser H. Transmission of bovine spongiform encephalopathy to sheep, goats, and mice. Ann N Y Acad Sci 1994; 724:300-3.

109. Fraser H, Bruce ME, Chree A, McConnell I, Wells GA. Transmission of bovine spongiform encephalopathy and scrapie to mice. J Gen Virol 1992; 73 ( Pt 8):1891-7.

110. Fraser H, Pearson GR, McConnell I, Bruce ME, Wyatt JM, Gruffydd-Jones TJ. Transmission of feline spongiform encephalopathy to mice. Vet Rec 1994; 134:449

111. Fraser HFJ. Transmission to mice, sheep and goats and bioassay of bovine tissues. In: R. Bradley BM, editor. Transmissible Spongiform Encephalopathy. A consultation on BSE with the Scientific Veterinary Committee of the Commission of the European Communities held in Brussels, 14-15 September 1993. Brussels: European Commission Agriculture, 1994:145-159.

112. Furukawa H, Doh-ura K, Okuwaki R, Shirabe S, Yamamoto K, Udono H, et al. A pitfall in diagnosis of human prion diseases using detection of protease-resistant prion protein in urine. Contamination with bacterial outer membrane proteins. J Biol Chem 2004; 279:23661-7.

113. Gajdusek DC, Gibbs CJ, Alpers M. Experimental transmission of a Kuru-like syndrome to chimpanzees. Nature 1966; 209:794-6.

114. Gajdusek DC, Gibbs CJ Jr, Alpers M. Transmission and passage of experimenal "kuru" to chimpanzees. Science 1967; 155:212-4.

115. GAJDUSEK DC, ZIGAS V. Degenerative disease of the central nervous system in New Guinea; the endemic occurrence of kuru in the native population. N Engl J Med 1957; 257:974-8.

116. Gale P, Stanfield G. Towards a quantitative risk assessment for BSE in sewage sludge. J Appl Microbiol 2001; 91:563-9.

117. Gerstman J, Straussler E, Scheinker I. Über eine eigenartige heraditar-familiare Erkrankung des Zentralnervensystems. Zugleich ein Beitrag zur Frage des vorzeitigen likal Alterns. Z Neurol Psychiatr 1936; 154:736-762.
     Notes: . From Chris

118. Gibbons RA, Hunter GD. Nature of the scrapie agent. Nature 1967; 215:1041-3.

119. Gibbs CJ Jr, Amyx HL, Bacote A, Masters CL, Gajdusek DC. Oral transmission of kuru, Creutzfeldt-Jakob disease, and scrapie to nonhuman primates. J Infect Dis 1980; 142:205-8.

120. Gibbs CJ Jr, Gajdusek DC. Transmission of scrapie to the cynomolgus monkey (Macaca fascicularis). Nature 1972; 236:73-4.

121.  Gibbs CJ Jr, Gajdusek DC, Asher DM, Alpers MP, Beck E, Daniel PM, et al.  Creutzfeldt-Jakob disease (spongiform encephalopathy): transmission to the chimpanzee.  Science 1968; 161:388-9.

122.  Glatzel M, Abela E, Maissen M, Aguzzi A.  Extraneural pathologic prion protein in sporadic Creutzfeldt-Jakob disease.  N Engl J Med 2003; 349:1812-20.

123.  Glatzel M, Giger O, Seeger H, Aguzzi A.  Variant Creutzfeldt-jakob disease: between lymphoid organs and brain.  Trends Microbiol 2004; 12:51-3.

124.  Glatzel M, Heppner FL, Albers KM, Aguzzi A.  Sympathetic innervation of lymphoreticular organs is rate limiting for prion neuroinvasion.  Neuron 2001; 31:25-34.

125.  Gordon WS.  Advances in veterinary research: Louping-ill tick-borne fever and scrapie.  Vet Res 1946; 58:516-520.

126.  Graber HU, Meyer RK, Fatzer R, Vandevelde M, Zurbriggen A.  In situ hybridization and immunohistochemistry for prion protein (PrP) in bovine spongiform encephalopathy (BSE). Zentralbl Veterinarmed A 1995; 42:453-9.

127.  Griffith JS.  Self-replication and scrapie.  Nature 1967; 215:1043-4.

128.  Hadlow WJ.  Scrapie and kuru.  Lancet 1959; 2:289-290.

129.  Haik S, Faucheux BA, Sazdovitch V, Privat N, Kemeny JL, Perret-Liaudet A, et al.  The sympathetic nervous system is involved in variant Creutzfeldt-Jakob disease.  Nat Med 2003; 9:1121-3.

130.  Harris DA, Chiesa R, Drisaldi B, Quaglio E, Migheli A, Piccardo P, et al.  A transgenic model of a familial prion disease.  Arch Virol Suppl 2000; 103-12.

131.  Hau CM, Curnow RN.  Separating the environmental and genetic factors that may be causes of bovine spongiform encephalopathy.  Philos Trans R Soc Lond B Biol Sci 1996; 351:913-20.

132.  Heim D, Kihm U.  Bovine spongiform encephalopathy in Switzerland--the past and the present.  Rev Sci Tech 1999; 18:135-44.

133.  Heisey DM, Joly DO.  Age and transmissible spongiform encephalopathies.  Emerg Infect Dis 2004; 10:1164-5.

134.  Herzog C, Sales N, Etchegaray N, Charbonnier A, Freire S, Dormont D, et al.  Tissue distribution of bovine spongiform encephalopathy agent in primates after intravenous or oral infection. Lancet 2004; 363:422-8.

135.  Hill AF.  Identification of a new prion strain in cattle--is there more than one form of BSE?  Aust Vet J 2004; 82:288-91.

136.  Hill AF, Collinge J.  Prion strains and species barriers.  Contrib Microbiol 2004; 11:33-49.

137.  Hill AF, Desbruslais M, Joiner S, Sidle KC, Gowland I, Collinge J, et al.  The same prion strain causes vCJD and BSE.  Nature 1997; 389:448-50, 526.

138.  Hill AF, Joiner S, Linehan J, Desbruslais M, Lantos PL, Collinge J.  Species-barrier-independent prion replication in apparently resistant species.  Proc Natl Acad Sci U S A 2000;

97:10248-53.

139.  Hills D, Schlaepfer J, Comincini S, MacLean I, Dolf G, Ferretti L, et al.   Sequence variation in the bovine and ovine PRNP genes. Anim Genet 2003; 34:183-90.

140.  Hilton DA, Fathers E, Edwards P, Ironside JW, Zajicek J.  Prion immunoreactivity in appendix before clinical onset of variant Creutzfeldt-Jakob disease. Lancet 1998; 352:703-4.

141.  Hoinville LJ, Wilesmith JW, Richards MS.  An investigation of risk factors for cases of bovine spongiform encephalopathy born after the introduction of the 'feed ban'. Vet Rec 1995; 136:312-8.

142.  Hope J, Reekie LJ, Hunter N, Multhaup G, Beyreuther K, White H, et al.  Fibrils from brains of cows with new cattle disease contain scrapie-associated protein. Nature 1988; 336:390-2.

143.  Houston F, Foster JD, Chong A, Hunter N, Bostock CJ.  Transmission of BSE by blood transfusion in sheep. Lancet 2000; 356:999-1000.

144.  Houston F, Goldmann W, Chong A, Jeffrey M, Gonzalez L, Foster J, et al.  Prion diseases: BSE in sheep bred for resistance to infection. Nature 2003; 423:498

145.  Hunter GD, Kimberlin RH, Gibbons RA.  Scrapie: a modified membrane hypothesis. J Theor Biol 1968; 20:355-7.

146.  Hunter N.  Scrapie and experimental BSE in sheep. Br Med Bull 2003; 66:171-83.

147.  Hunter N, Foster J, Chong A, McCutcheon S, Parnham D, Eaton S, et al.  Transmission of prion diseases by blood transfusion. J Gen Virol 2002; 83:2897-905.

148.  Hunter N, Foster JD, Dickinson AG, Hope J.  Linkage of the gene for the scrapie-associated fibril protein (PrP) to the Sip gene in Cheviot sheep. Vet Rec 1989; 124:364-6.

149.  Hunter N, Goldmann W, Smith G, Hope J.  Frequencies of PrP gene variants in healthy cattle and cattle with BSE in Scotland. Vet Rec 1994; 135:400-3.

150.  Ironside JW, Hilton DA, Ghani A, Johnston NJ, Conyers L, McCardle LM, et al.  Retrospective study of prion-protein accumulation in tonsil and appendix tissues. Lancet 2000; 355:1693-4.

151.  Ironside JW, Sutherland K, Bell JE, McCardle L, Barrie C, Estebeiro K, et al.  A new variant of Creutzfeldt-Jakob disease: neuropathological and clinical features. Cold Spring Harb Symp Quant Biol 1996; 61:523-30.

152.  Jakob A.  Über eine der multiplen sklerose klinisch nahenstehende erkrankung des Zentralnervensystems (spatiche pseudosklerose) mit bemerkswertem anatomishen befunde. Med Klin 1921; 13:372-376.
      Notes: From Chris

153.  Jeffrey M, Gonzalez L.  Pathology and pathogenesis of bovine spongiform encephalopathy and scrapie. Curr Top Microbiol Immunol 2004; 284:65-97.

154.  Jeffrey M, Wells GA.  Spongiform encephalopathy in a nyala (Tragelaphus angasi). Vet Pathol 1988; 25:398-9.

155.   Jeong BH, Nam JH, Lee YJ, Lee KH, Jang MK, Carp RI, et al.   Polymorphisms of the prion protein gene (PRNP) in a Korean population.  J Hum Genet 2004;  49:319-24.

156.   Johnson C, Johnson J, Clayton M, McKenzie D, Aiken J.  Prion protein gene heterogeneity in free-ranging white-tailed deer within the chronic wasting disease affected region of Wisconsin.  J Wildl Dis 2003;  39:576-81.

157.   Katz JB, Shafer AL, Miller JM.  Production of antiserum for the diagnosis of scrapie and bovine spongiform encephalopathy using a baculovirus-expressed prion protein antigen.  J Vet Diagn Invest 1995;  7:245-7.

158.   Kimberlin RH.  Bovine spongiform encephalopathy.  Rev Sci Tech 1992;  11:347-489.

159.   Kimberlin RH, Cole S, Walker CA.  Temporary and permanent modifications to a single strain of mouse scrapie on transmission to rats and hamsters.  J Gen Virol 1987;  68 ( Pt 7):1875-81.

160.   Kimberlin RH, Field HJ, Walker CA.  Pathogenesis of mouse scrapie: evidence for spread of infection from central to peripheral nervous system.  J Gen Virol 1983;  64 Pt 3:713-6.

161.   Kimberlin RH, Walker C.  Characteristics of a short incubation model of scrapie in the golden hamster.  J Gen Virol 1977;  34:295-304.

162.   Kimberlin RH, Walker CA.  Evidence that the transmission of one source of scrapie agent to hamsters involves separation of agent strains from a mixture.  J Gen Virol 1978;  39:487-96.

163.   Kimberlin RH, Walker CA.  Pathogenesis of scrapie (strain 263K) in hamsters infected intracerebrally, intraperitoneally or intraocularly.  J Gen Virol 1986;  67 ( Pt 2):255-63.

164.   Kimberlin RH, Wilesmith JW.  Bovine spongiform encephalopathy. Epidemiology, low dose exposure and risks.  Ann N Y Acad Sci 1994;  724:210-20.

165.   Kirkwood JK, Cunningham AA.  Epidemiological observations on spongiform encephalopathies in captive wild animals in the British Isles.  Vet Rec 1994;  135:296-303.

166.   Kirkwood JK, Wells GA, Cunningham AA, Jackson SI, Scott AC, Dawson M, et al.   Scrapie-like encephalopathy in a greater kudu (Tragelaphus strepsiceros) which had not been fed ruminant-derived protein.  Vet Rec 1992;  130:365-7.

167.   Kirkwood JK, Wells GA, Wilesmith JW, Cunningham AA, Jackson SI.  Spongiform encephalopathy in an arabian oryx (Oryx leucoryx) and a greater kudu (Tragelaphus strepsiceros).  Vet Rec 1990;  127:418-20.

168.   Klein MA, Frigg R, Raeber AJ, Flechsig E, Hegyi I, Zinkernagel RM, et al.   PrP expression in B lymphocytes is not required for prion neuroinvasion.  Nat Med 1998;  4:1429-33.

169.   Koch TK, Berg BO, De Armond SJ, Gravina RF.  Creutzfeldt-Jakob disease in a young adult with idiopathic hypopituitarism. Possible relation to the administration of cadaveric human growth hormone.  N Engl J Med 1985;  313:731-3.

170.   Kocisko DA, Come JH, Priola SA, Chesebro B, Raymond GJ, Lansbury PT, et al.   Cell-free formation of protease-resistant prion protein.  Nature 1994;  370:471-4.

171.   Kong Q, Surewicz WK, Petersen RB, Zou W, Chen S.G., Gambetti P, et al.   Inherited prion diseases. In: Prusiner S, editor.  Prion Biology and Diseases.  2nd ed.  Cold Spring Harbor,

NY: Cold Spring Harbor Laboratory Press, 2004:673-775.

172. Konold T, Bone G, Ryder S, Hawkins SA, Courtin F, Berthelin-Baker C. Clinical findings in 78 suspected cases of bovine spongiform encephalopathy in Great Britain. Vet Rec 2004; 155:659-66.

173. Korth C, Stierli B, Streit P, Moser M, Schaller O, Fischer R, et al. Prion (PrPSc)-specific epitope defined by a monoclonal antibody. Nature 1997; 390:74-7.

174. Kuehn BM. USDA ends BSE investigation; experts call for more safeguards. J Am Vet Med Assoc 2004; 224:818, 822, 825.

175. La Bonnardiere C, Calavas D, Abrial D, Morignat E, Ducrot C. Estimating the trend of the French BSE epidemic over six birth cohorts through the analysis of abattoir screening in 2001 and 2002. Vet Res 2004; 35:299-308.

176. Lane A SCDSWS. Abstracts of Oak Ridge Posters: Polymeric ligands with specificity for aggregated prion proteins. Clin Chem 2003; 49:1774-1775.

177. Laplanche JL, Chatelain J, Westaway D, Thomas S, Dussaucy M, Brugere-Picoux J, et al. PrP polymorphisms associated with natural scrapie discovered by denaturing gradient gel electrophoresis. Genomics 1993; 15:30-7.

178. Lasmezas CI. The transmissible spongiform encephalopathies. Rev Sci Tech 2003; 22:23-36.

179. Lasmezas CI, Deslys JP, Demaimay R, Adjou KT, Lamoury F, Dormont D, et al. BSE transmission to macaques. Nature 1996; 381:743-4.

180. Legname G, Baskakov IV, Nguyen HO, Riesner D, Cohen FE, DeArmond SJ, et al. Synthetic mammalian prions. Science 2004; 305:673-6.

181. Li L, Lindquist S. Creating a protein-based element of inheritance. Science 2000; 287:661-4.

182. Lindquist SL, Henikoff S. Self-perpetuating structural states in biology, disease, and genetics. Proc Natl Acad Sci U S A 2002; 99 Suppl 4:16377

183. Llewelyn CA, Hewitt PE, Knight RS, Amar K, Cousens S, Mackenzie J, et al. Possible transmission of variant Creutzfeldt-Jakob disease by blood transfusion. Lancet 2004; 363:417-21.

184. Lugaresi E, Medori R, Montagna P, Baruzzi A, Cortelli P, Lugaresi A, et al. Fatal familial insomnia and dysautonomia with selective degeneration of thalamic nuclei. N Engl J Med 1986; 315:997-1003.

185. Lysek DA, Schorn C, Nivon LG, Esteve-Moya V, Christen B, Calzolai L, et al. Prion protein NMR structures of cats, dogs, pigs, and sheep. Proc Natl Acad Sci U S A 2005; 102:640-5.

186. Madec JY, Simon S, Lezmi S, Bencsik A, Grassi J, Baron T. Abnormal prion protein in genetically resistant sheep from a scrapie-infected flock. J Gen Virol 2004; 85:3483-6.

187. Mallucci G, Dickinson A, Linehan J, Klohn PC, Brandner S, Collinge J. Depleting neuronal PrP in prion infection prevents disease and reverses spongiosis. Science 2003; 302:871-4.

188. Marsh RF, Bessen RA, Lehmann S, Hartsough GR. Epidemiological and experimental studies on a new incident of transmissible mink encephalopathy. J Gen Virol 1991; 72 ( Pt 3):589-94.

189. Marsh RF, Hadlow WJ. Transmissible mink encephalopathy. Rev Sci Tech 1992; 11:539-50.

190. Marsh RF, Kimberlin RH. Comparison of scrapie and transmissible mink encephalopathy in hamsters. II. Clinical signs, pathology, and pathogenesis. J Infect Dis 1975; 131:104-10.

191. Masel J, Jansen VA. The measured level of prion infectivity varies in a predictable way according to the aggregation state of the infectious agent. Biochim Biophys Acta 2001; 1535:164-73.

192. Matthews D, Cooke BC. The potential for transmissible spongiform encephalopathies in non-ruminant livestock and fish. Rev Sci Tech 2003; 22:283-96.

193. McLean AR, Bostock CJ. Scrapie infections initiated at varying doses: an analysis of 117 titration experiments. Philos Trans R Soc Lond B Biol Sci 2000; 355:1043-50.

194. Mead S, Stumpf MP, Whitfield J, Beck JA, Poulter M, Campbell T, et al. Balancing selection at the prion protein gene consistent with prehistoric kurulike epidemics. Science 2003; 300:640-3.

195. Middleton DJ, Barlow RM. Failure to transmit bovine spongiform encephalopathy to mice by feeding them with extraneural tissues of affected cattle. Vet Rec 1993; 132:545-7.

196. Miller MW, Williams ES. Detection of PrP(CWD) in mule deer by immunohistochemistry of lymphoid tissues. Vet Rec 2002; 151:610-2.

197. Miller MW, Williams ES. Chronic wasting disease of cervids. Curr Top Microbiol Immunol 2004; 284 :193-214.

198. Monleon E, Monzon M, Hortells P, Vargas A, Badiola JJ. Detection of PrP(sc) in samples presenting a very advanced degree of autolysis (BSE liquid state) by immunocytochemistry. J Histochem Cytochem 2003; 51:15-8.

199. Morignat E, Ducrot C, Roy P, Baron T, Vinard JL, Biacabe AG, et al. Targeted surveillance to assess the prevalence of BSE in high-risk populations in western France and the associated risk factors. Vet Rec 2002; 151:73-7.

200. Mulcahy ER, Bartz JC, Kincaid AE, Bessen RA. Prion infection of skeletal muscle cells and papillae in the tongue. J Virol 2004; 78:6792-8.

201. Nishina K, Deleault NR, Lucassen RW, Supattapone S. In vitro prion protein conversion in detergent-solubilized membranes. Biochemistry 2004; 43:2613-21.

202. Nolen RS. Washington state dairy cow nation's first case of BSE. J Am Vet Med Assoc 2004; 224:345-6.

203. Nolen RS. USDA: Cow with BSE likely to be only infected animal in herd. J Am Vet Med Assoc 2004; 224:489-90.

204. O'Rourke KI, Baszler TV, Parish SM, Knowles DP. Preclinical detection of PrPSc in nictitating membrane lymphoid tissue of sheep. Vet Rec 1998; 142:489-91.

205. O'Rourke KI, Besser TE, Miller MW, Cline TF, Spraker TR, Jenny AL, et al. PrP genotypes of captive and free-ranging Rocky Mountain elk (Cervus elaphus nelsoni) with chronic wasting disease. J Gen Virol 1999; 80 ( Pt 10):2765-9.

206. O'Rourke KI, Spraker TR, Hamburg LK, Besser TE, Brayton KA, Knowles DP. Polymorphisms in

the prion precursor functional gene but not the pseudogene are associated with susceptibility to chronic wasting disease in white-tailed deer. J Gen Virol 2004; 85:1339-46.

207.  Office International des Epizooties (OIE) [World Organisation for Animal Health].  Chapter 2.3.13. Bovine Spongiform Encephalopathy. In: OIE [Organisation Internationale d'Epizootie / World Organisation for Animal Health], editor.  Manual of Diagnostic Tests and Vaccines for Terrestrial Animals.  Paris:  OIE: Organization Internationale d'Epizootie / World Organisation for Animal Health, 2004:

208.  Office International des Epizooties (OIE) [World Organisation for Animal Health]. BSE Health Status Information Page.  2005.

209.  Office International des Epizooties(OIE) [World Organization for Animal Health].  Bovine spongiform encephalopathy: an update.  Rev Sci Tech 1996;  15:1087-189.

210.  Orge L, Galo A, Machado C, Lima C, Ochoa C, Silva J, et al.   Identification of putative atypical scrapie in sheep in Portugal.  J Gen Virol 2004;  85:3487-91.

211.  Osherovich LZ, Weissman JS.  The utility of prions.  Dev Cell 2002;  2:143-51.

212.  PATTISON IH.  RESISTANCE OF THE SCRAPIE AGENT TO FORMALIN.  J Comp Pathol 1965;  75:159-64.

213.  Pattison IH.  The relative susceptibility of sheep, goats and mice to two types of the goat scrapie agent.  Res Vet Sci 1966;  7:207-12.

214.  Pattison IH .  Fifty years with scrapie: a personal reminiscence.  Vet Rec 1988;  123:661-6.

215.  PATTISON IH, GORDON WS, MILLSON GC.  Experimental production of scrapie in goats.  J Comp Pathol 1959;  69:300-12.

216.  Pattison IH , Hoare MN, Jebbett JN, Watson WA.  Spread of scrapie to sheep and goats by oral dosing with foetal membranes from scrapie-affected sheep.  Vet Rec 1972;  90:465-8.

217.  Pattison IH , Hoare MN, Jebbett JN, Watson WA.  Further observations on the production of scrapie in sheep by oral dosing with foetal membranes from scrapie-affected sheep.  Br Vet J 1974; 130:lxv-lxvii

218.  Pattison IH , Jones KM.  The possible nature of the transmissible agent of scrapie.  Vet Rec 1967; 80:2-9.

219.  Pattison IH, Jones KM.  Modification of a strain of mouse-adapted scrapie by passage through rats. Res Vet Sci 1968; 9:408-10.

220.  PATTISON IH , MILLSON GC.  Further observations on the experimental production of scrapie in goats and sheep.  J Comp Pathol 1960;  70:182-93.

221.  PATTISON IH , MILLSON GC.  Scrapie produced experimentally in goats with special reference to the clinical syndrome.  J Comp Pathol 1961;  71:101-9.

222.  Pearson GR, Gruffydd-Jones TJ, Wyatt JM, Hope J, Chong A, Scott AC, et al.   Feline spongiform encephalopathy.  Vet Rec 1991;  128:532

223.  Peden AH, Head MW, Ritchie DL, Bell JE, Ironside JW.  Preclinical vCJD after blood transfusion in

a PRNP codon 129 heterozygous patient. Lancet 2004; 364:527-9.

224.  Peet RL, Curran JM. Spongiform encephalopathy in an imported cheetah (Acinonyx jubatus). Aust
        Vet J 1992; 69:171

225.  Peretz D, Scott MR, Groth D, Williamson RA, Burton DR, Cohen FE, et al. Strain-specified
        relative conformational stability of the scrapie prion protein. Protein Sci 2001; 10:854-63.

226.  Prinz M, Heikenwalder M, Junt T, Schwarz P, Glatzel M, Heppner FL, et al. Positioning of
        follicular dendritic cells within the spleen controls prion neuroinvasion. Nature 2003;
        425:957-62.

227.  Priola SA, Vorberg I. Molecular aspects of disease pathogenesis in the transmissible spongiform
        encephalopathies. Methods Mol Biol 2004; 268:517-40.

228.  ProMED-mail . BSE, GOAT - FRANCE 2002: CONFIRMED. 312. International Society for
        Infectious Diseases
        <http://www.isid.org>. 2005.

229.  ProMED-mail . BSE, ORAL CHALLENGE TRIAL (03). ProMED-mail 2004 20040524.1384.
        2004. International Society for Infectious Diseases
        <http://www.isid.org>. 2004.

230.  ProMED-mail. BSE UPDATE 2004 (11). ProMED-mail 2004 20041001.2704. International
        Society for Infectious Diseases
        <http://www.isid.org>. 2004.
        Notes: ProMED-mail. West Nile virus, humans - USA (Louisiana). ProMED-mail 2002; 12
        Jul: 20020712.4737. <http://www.promedmail.org>. Accessed 18 July 2002.

        [Author. Title. Journal/bulletin name followed by year; volume/date: Archive number.
        <URL>. Access date.]

231.  Prusiner S. An introduction to prion biology and diseases. In: Prusiner S, editor. Prion Biology and
        Diseases. 2nd ed. Cold Spring Harbor, NY: Cold Spring Harbor Laboratory Press,
        2004:1-87.

232.  Prusiner SB. Novel proteinaceous infectious particles cause scrapie. Science 1982; 216:136-44.

233.  Prusiner SB, Scott M, Foster D, Pan KM, Groth D, Mirenda C, et al. Transgenetic studies implicate
        interactions between homologous PrP isoforms in scrapie prion replication. Cell 1990;
        63:673-86.

234.  Prusiner SB, Scott MR. Genetics of prions. Annu Rev Genet 1997; 31:139-75.

235.  Race R, Chesebro B. Scrapie infectivity found in resistant species. Nature 1998; 392:770

236.  Race RE, Fadness LH, Chesebro B. Characterization of scrapie infection in mouse neuroblastoma
        cells. J Gen Virol 1987; 68 ( Pt 5):1391-9.

237.  Race RE, Raymond GJ. Inactivation of transmissible spongiform encephalopathy (prion) agents by
        environ LpH. J Virol 2004; 78:2164-5.

238.  Radebold K, Chernyak M, Martin D, Manuelidis L. Blood borne transit of CJD from brain to gut at
        early stages of infection. BMC Infect Dis 2001; 1:20

43

239.  Raeber, A. J. and Oesch, B. Detection of atypical BSE cases. Pipette 1. Swiss Union for Laboratory
        Medicine. 2004.
        Notes: Atypical cases: Raeber, Oesch, (Prionics) 2004 Pipette
        http://www.sulm.ch/PDF/pipette_1_04/BSE.pdf
        Swiss Union for Laboratory Medicine

240.  Ramasamy I, Law M, Collins S, Brooke F.  Organ distribution of prion proteins in variant
        Creutzfeldt-Jakob disease. Lancet Infect Dis 2003; 3:214-22.

241.  Riesner D.  Biochemistry and structure of PrP(C) and PrP(Sc).  Br Med Bull 2003; 66:21-33.

242.  Robinson MM , Hadlow WJ, Knowles DP, Huff TP, Lacy PA, Marsh RF, et al.  Experimental
        infection of cattle with the agents of transmissible mink encephalopathy and scrapie. J
        Comp Pathol 1995; 113:241-51.

243.  Rohwer RG.  Estimation of scrapie nucleic acid MW from standard curves for virus sensitivity to
        ionizing radiation. Nature 1986; 320:381

244.  Ryder SJ, Hawkins SA, Dawson M, Wells GA.  The neuropathology of experimental bovine
        spongiform encephalopathy in the pig. J Comp Pathol 2000; 122:131-43.

245.  Saborio GP, Permanne B, Soto C.  Sensitive detection of pathological prion protein by cyclic
        amplification of protein misfolding.  Nature 2001; 411:810-3.

246.  Sabuncu E, Petit S, Le Dur A, Lan Lai T, Vilotte JL, Laude H, et al.  PrP polymorphisms tightly
        control sheep prion replication in cultured cells. J Virol 2003; 77:2696-700.

247.  Safar J, Wille H, Itri V, Groth D, Serban H, Torchia M, et al.  Eight prion strains have PrP(Sc)
        molecules with different conformations. Nat Med 1998; 4:1157-65.

248.  Safar JG, Scott M, Monaghan J, Deering C, Didorenko S, Vergara J, et al.  Measuring prions
        causing bovine spongiform encephalopathy or chronic wasting disease by immunoassays
        and transgenic mice. Nat Biotechnol 2002; 20:1147-50.

249.  Schatzl HM, Da Costa M, Taylor L, Cohen FE, Prusiner SB. Prion protein gene variation among
        primates. J Mol Biol 1995; 245:362-74.

250.  Schatzl HM, Wopfner F, Gilch S, von Brunn A, Jager G.  Is codon 129 of prion protein polymorphic
        in human beings but not in animals? Lancet 1997; 349:1603-4.

251.  Schreuder BE, Somerville RA.  Bovine spongiform encephalopathy in sheep?  Rev Sci Tech 2003;
        22:103-20.

252.  Scientific Steering Committee . SSC Opinion: Hypotheses on the origin and transmission of BSE
        (Adopted by the Scientific Steering Committee Meeting of 29-30 November 2001). 2001.
        Health and Consumer Protection Directorate-General (EC).

253.  Scientific Steering Committee . SSC Update of the Opinion on TSE infectivity distribution in
        ruminant tissues (initially adopted on 10-11 January 2002 and amended on 7-8 November
        2002) following the submission of (1) a risk assessment by the German Federal Ministry of
        Consumer Protection, food and Agriculture and (2) new scientific advice regarding BSE
        infectivity distribution in tonsils. 2002. Health and Consumer Protection Directorate-
        General (EC).

254. Scientific Steering Committee . SSC Opinion on BSE risk of the bovine autonomic nervous system (Adopted by the Scientific Steering Committee Meeting at its meeting of 6-7 March 2003). 2003. Health and Consumer Protection Directorate-General (EC).

255. Scott M, Foster D, Mirenda C, Serban D, Coufal F, Walchli M, et al. Transgenic mice expressing hamster prion protein produce species-specific scrapie infectivity and amyloid plaques. Cell 1989; 59:847-57.

256. Seabury CM, Honeycutt RL, Rooney AP, Halbert ND, Derr JN. Prion protein gene (PRNP) variants and evidence for strong purifying selection in functionally important regions of bovine exon 3. Proc Natl Acad Sci U S A 2004; 101:15142-7.

257. Serban A, Legname G, Hansen K, Kovaleva N, Prusiner SB. Immunoglobulins in urine of hamsters with scrapie. J Biol Chem 2004; 279:48817-20.

258. Shaked GM, Shaked Y, Kariv-Inbal Z, Halimi M, Avraham I, Gabizon R. A protease-resistant prion protein isoform is present in urine of animals and humans affected with prion diseases. J Biol Chem 2001; 276:31479-82.

259. Si K, Lindquist S, Kandel ER. A neuronal isoform of the aplysia CPEB has prion-like properties. Cell 2003; 115:879-91.

260. Simmons MM, Harris P, Jeffrey M, Meek SC, Blamire IW, Wells GA. BSE in Great Britain: consistency of the neurohistopathological findings in two random annual samples of clinically suspect cases. Vet Rec 1996; 138:175-7.

261. Smith PG, Bradley R. Bovine spongiform encephalopathy (BSE) and its epidemiology. Br Med Bull 2003; 66:185-98.

262. Solassol J, Arlotto M, Lehmann S. Detection of prion after decontamination procedures: comparative study of standard Western blot, filter retention and scrapie-cell assay. J Hosp Infect 2004; 57:156-61.

263. Somerville RA. Host and transmissible spongiform encephalopathy agent strain control glycosylation of PrP. J Gen Virol 1999; 80 ( Pt 7):1865-72.

264. Somerville RA, Chong A, Mulqueen OU, Birkett CR, Wood SC, Hope J. Biochemical typing of scrapie strains. Nature 1997; 386:564

265. Soto C, Castilla J. The controversial protein-only hypothesis of prion propagation. Nat Med 2004; 10 Suppl:S63-7.

266. Spongiform Encephalopathy Advisory Committee (SEAC) (UK). Epidemiological update on BARB BSE Cases. SEAC 80/4.

267. Stack MJ, Balachandran A, Chaplin M, Davis L, Czub S, Miller B. The first Canadian indigenous case of bovine spongiform encephalopathy (BSE) has molecular characteristics for prion protein that are similar to those of BSE in the United Kingdom but differ from those of chronic wasting disease in captive elk and deer. Can Vet J 2004; 45:825-30.

268. Stahl N, Baldwin M, Teplow D, Hood L, Bevis R, Chait B, et al. Cataloging post-translational modifications of the scrapie prion protein by mass spectrometry. In: Anonymous Prion diseases of humans and animals. New York: Ellis Horwood, 361-379.

269. Supervie V, Costagliola D. The unrecognised French BSE epidemic. Vet Res 2004; 35:349-62.

270. Sy MS, Gambetti P, Wong BS. Human prion diseases. Med Clin North Am 2002; 86:551-71, vi-vii.

271. Taylor DM. Inactivation of transmissible degenerative encephalopathy agents: A review. Vet J 2000; 159:10-7.

272. Taylor DM. Resistance of transmissible spongiform encephalopathy agents to decontamination. Contrib Microbiol 2004; 11:136-45.

273. Taylor DM, Ferguson CE, Bostock CJ, Dawson M. Absence of disease in mice receiving milk from cows with bovine spongiform encephalopathy. Vet Rec 1995; 136:592

274. Taylor DM, Fernie K, McConnell I, Steele PJ. Survival of scrapie agent after exposure to sodium dodecyl sulphate and heat. Vet Microbiol 1999; 67:13-6.

275. Taylor DM, Fraser H, McConnell I, Brown DA, Brown KL, Lamza KA, et al. Decontamination studies with the agents of bovine spongiform encephalopathy and scrapie. Arch Virol 1994; 139:313-26.

276. Taylor DM, Woodgate SL. Rendering practices and inactivation of transmissible spongiform encephalopathy agents. Rev Sci Tech 2003; 22:297-310.

277. Telling GC, Scott M, Mastrianni J, Gabizon R, Torchia M, Cohen FE, et al. Prion propagation in mice expressing human and chimeric PrP transgenes implicates the interaction of cellular PrP with another protein. Cell 1995; 83:79-90.

278. Terry LA, Marsh S, Ryder SJ, Hawkins SA, Wells GA, Spencer YI. Detection of disease-specific PrP in the distal ileum of cattle exposed orally to the agent of bovine spongiform encephalopathy. Vet Rec 2003; 152:387-92.

279. The National Creutzfeldt-Jakob Disease Surveillance Unit (UK). 2004. 16 Dec 2004.

280. The Scottish Executive. Abstract of Scottish Agricultural Statistics 1982 to 2003: page 12. 2004. 2004.

281. Thomzig A, Kratzel C, Lenz G, Kruger D, Beekes M. Widespread PrPSc accumulation in muscles of hamsters orally infected with scrapie. EMBO Rep 2003; 4:530-3.

282. Tsiroulnikov K, Rezai H, Bonch-Osmolovskaya E, Nedkov P, Gousterova A, Cueff V, et al. Hydrolysis of the amyloid prion protein and nonpathogenic meat and bone meal by anaerobic thermophilic prokaryotes and streptomyces subspecies. J Agric Food Chem 2004; 52:6353-60.

283. van Keulen LJ, Schreuder BE, Meloen RH, Mooij-Harkes G, Vromans ME, Langeveld JP. Immunohistochemical detection of prion protein in lymphoid tissues of sheep with natural scrapie. J Clin Microbiol 1996; 34:1228-31.

284. van Keulen LJ, Vromans ME, van Zijderveld FG. Early and late pathogenesis of natural scrapie infection in sheep. APMIS 2002; 110:23-32.

285. Vanik DL, Surewicz KA, Surewicz WK. Molecular basis of barriers for interspecies transmissibility of mammalian prions. Mol Cell 2004; 14:139-45.

286. Vilette D, Andreoletti O, Archer F, Madelaine MF, Vilotte JL, Lehmann S, et al. Ex vivo propagation of infectious sheep scrapie agent in heterologous epithelial cells expressing

ovine prion protein. Proc Natl Acad Sci U S A 2001; 98:4055-9.

287.  Vorberg I, Groschup MH, Pfaff E, Priola SA.  Multiple amino acid residues within the rabbit prion
      protein inhibit formation of its abnormal isoform. J Virol 2003; 77:2003-9.

288.  Vorberg I, Priola SA.  Molecular basis of scrapie strain glycoform variation.  J Biol Chem 2002;
      277:36775-81.

289.  Wadsworth JD, Asante EA, Desbruslais M, Linehan JM, Joiner S, Gowland I, et al.  Human prion
      protein with valine 129 prevents expression of variant CJD phenotype. Science 2004;
      306:1793-6.

290.  Wadsworth JD, Joiner S, Hill AF, Campbell TA, Desbruslais M, Luthert PJ, et al.  Tissue
      distribution of protease resistant prion protein in variant Creutzfeldt-Jakob disease using a
      highly sensitive immunoblotting assay. Lancet 2001; 358:171-80.

291.  Weissmann C .  The state of the prion. Nat Rev Microbiol 2004; 2:861-71.

292.  Wells GA.  Pathogenesis of BSE.  Vet Res Commun 2003; 27 Suppl 1:25-8.

293.  Wells GA, Dawson M, Hawkins SA, Green RB, Dexter I, Francis ME, et al.  Infectivity in the ileum
      of cattle challenged orally with bovine spongiform encephalopathy. Vet Rec 1994;
      135:40-1.

294.  Wells GA, Hancock RD, Cooley WA, Richards MS, Higgins RJ, David GP.  Bovine spongiform
      encephalopathy: diagnostic significance of vacuolar changes in selected nuclei of the
      medulla oblongata. Vet Rec 1989; 125:521-4.

295.  Wells GA, Hawkins SA, Austin AR, Ryder SJ, Done SH, Green RB, et al.  Studies of the
      transmissibility of the agent of bovine spongiform encephalopathy to pigs. J Gen Virol
      2003; 84:1021-31.

296.  Wells GA, Hawkins SA, Green RB, Austin AR, Dexter I, Spencer YI, et al.  Preliminary
      observations on the pathogenesis of experimental bovine spongiform encephalopathy
      (BSE): an update. Vet Rec 1998; 142:103-6.

297.  Wells GA, Hawkins SA, Green RB, Spencer YI, Dexter I, Dawson M.  Limited detection of sternal
      bone marrow infectivity in the clinical phase of experimental bovine spongiform
      encephalopathy (BSE). Vet Rec 1999; 144:292-4.

298.  Wells GA, Scott AC, Johnson CT, Gunning RF, Hancock RD, Jeffrey M, et al.  A novel progressive
      spongiform encephalopathy in cattle. Vet Rec 1987; 121:419-20.

299.  Wells GA, Wilesmith JW.  The neuropathology and epidemiology of bovine spongiform
      encephalopathy. Brain Pathol 1995; 5:91-103.

300.  Wells GAH, Kretzschmer HA.  Pathogenesis, tissue infectivity distribution and specified risk
      materials. In: Scientific Steering Committee (EU), editor.  Overview of the BSE risk
      assessments of the European Commission's Scientific Steering Committee (SSC) and its
      TSE/BSE ad hoc Group.  European Commission, 2003:75-84.

301.  Wickner RB, Edskes HK, Roberts BT, Baxa U, Pierce MM, Ross ED, et al.  Prions: proteins as
      genes and infectious entities. Genes Dev 2004; 18:470-85.

302.  Wijeratne WV, Curnow RN.  A study of the inheritance of susceptibility to bovine spongiform

encephalopathy. Vet Rec 1990; 126:5-8.

303.  Wijeratne WV, Curnow RN.  Inheritance of BSE.  Vet Rec 1990;  126:176

304.  Wilesmith JW.  Preliminary epidemiological analyses of the first 16 cases of BSE born after July 31,
      1996, in Great Britain.  Vet Rec 2002; 151:451-2.

305.  Wilesmith JW, Hoinville LJ, Ryan JB, Sayers AR.  Bovine spongiform encephalopathy: aspects of
      the clinical picture and analyses of possible changes 1986-1990.  Vet Rec 1992; 130:197-
      201.

306.  Wilesmith JW, Ryan JB, Hueston WD.  Bovine spongiform encephalopathy: case-control studies of
      calf feeding practices and meat and bonemeal inclusion in proprietary concentrates.  Res
      Vet Sci 1992; 52:325-31.

307.  Wilesmith JW, Wells GA, Cranwell MP, Ryan JB.  Bovine spongiform encephalopathy:
      epidemiological studies.  Vet Rec 1988; 123:638-44.

308.  Wilesmith JW, Wells GA, Ryan JB, Gavier-Widen D, Simmons MM.  A cohort study to examine
      maternally-associated risk factors for bovine spongiform encephalopathy.  Vet Rec 1997;
      141:239-43.

309.  Will RG, Ironside JW, Zeidler M, Cousens SN, Estibeiro K, Alperovitch A, et al.   A new variant of
      Creutzfeldt-Jakob disease in the UK.  Lancet 1996; 347:921-5.

310.  Williams ES, Miller MW.  Chronic wasting disease in deer and elk in North America.  Rev Sci Tech
      2002; 21:305-16.

311.  Williamson RA, Peretz D, Smorodinsky N, Bastidas R, Serban H, Mehlhorn I, et al.   Circumventing
      tolerance to generate autologous monoclonal antibodies to the prion protein.  Proc Natl
      Acad Sci U S A 1996; 93:7279-82.

312.  Willoughby K, Kelly DF, Lyon DG, Wells GA.  Spongiform encephalopathy in a captive puma
      (Felis concolor).  Vet Rec 1992; 131:431-4.

313.  Wrathall AE, Brown KF, Sayers AR, Wells GA, Simmons MM, Farrelly SS, et al.   Studies of
      embryo transfer from cattle clinically affected by bovine spongiform encephalopathy
      (BSE).  Vet Rec 2002; 150:365-78.

314.  Wyatt JM, Pearson GR, Smerdon TN, Gruffydd-Jones TJ, Wells GA, Wilesmith JW.  Naturally
      occurring scrapie-like spongiform encephalopathy in five domestic cats.  Vet Rec 1991;
      129:233-6.

315.  Yamakawa Y, Hagiwara K, Nohtomi K, Nakamura Y, Nishijima M, Higuchi Y, et al.   Atypical
      proteinase K-resistant prion protein (PrPres) observed in an apparently healthy 23-month-
      old Holstein steer.  Jpn J Infect Dis 2003;  56:221-2.
      Notes: CORPORATE NAME: Expert Committee for BSE Diagnosis, Ministry of Health,
      Labour and Welfare of Japan.

316.  Zeidler M, Stewart G, Cousens SN, Estibeiro K, Will RG.  Codon 129 genotype and new variant
      CJD.  Lancet 1997;  350:668

317.  Zou WQ, Zheng J, Gray DM, Gambetti P, Chen SG.  Antibody to DNA detects scrapie but not
      normal prion protein.  Proc Natl Acad Sci U S A 2004;  101:1380-5.

**From:** Parham, Delila
**Sent:** Wednesday, July 06, 2005 2:03 PM
**To:** Thaler, Alice
**Cc:** Anandaraman, Neena; Qureshi, Maqbool; Chowdhury, Khurshed
**Subject:** FW: Loren's Request for Salmonella Serotype Data

Alice, please see the attached file with information on the top 20 *Salmonella* serotypes for poultry and humans. The tables were put together by Neena with assistance from Maq. For poultry, there are tables for broilers, ground chicken, and ground turkey. Please note Neena's comment that the 2004 data are preliminary and contains information on antigenic formulas not used in previous years.

Khurshed is working on the descriptive data on serotypes and should have a first draft ready by COB on Thursday. He will send you a copy of the document.

Delila

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Wednesday, July 06, 2005 6:47 AM
**To:** Lange, Loren
**Cc:** Parham, Delila
**Subject:** RE: Loren's Request for Salmonella Serotype Data

Delila is coordinating a single document.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Lange, Loren
**Sent:** Thursday, June 30, 2005 4:13 PM
**To:** Thaler, Alice
**Subject:** RE: Loren's Request for Salmonella Serotype Data

Thanks - should I ask HHSD to do the human part (and have me merge the two) or have Delila's staff work with HHSD to put this into a single document

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Thursday, June 30, 2005 1:51 PM
**To:** Lange, Loren
**Subject:** FW: Loren's Request for Salmonella Serotype Data

Note I only forwarded this to you.  I leave it to you to share with David.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Parham, Delila
**Sent:** Thursday, June 30, 2005 12:01 PM
**To:** Thaler, Alice
**Cc:** Anandaraman, Neena
**Subject:** Loren's Request for Salmonella Serotype Data

Alice, I interpreted Loren's request as follows:

1.  **Young Chicken Serotypes:** Provide *Salmonella* serotype data for young chickens for 1998-2004 for all sets (A, B, and C sets) to see what is increasing and what is decreasing.  Given the total number of serotypes in a year with the total number of serotypes being the denominator, what is number by percentage of the top 20?  Give explanation of what is found. For example, Loren thinks we are likely to see that SE has increased substantially over the years.

2.  **Human Serotypes:** What are the leading human isolates for *Salmonella*?  (Similar information is needed for humans as that provided for young chickens.  (He didn't seem to be asking us to do this.)

3.  **Summary Statements for Young Chicken Serotypes:** Provide a brief summary statement about each of the top 20 serotypes for young chickens that include information such as reservoirs, commonality, etc.  For example, the statement may indicate that the serotype is common in chickens, but is also common in [list other reservoirs/species].

Note: Neena talked with Bob Umholtz recently, and the 2004 database for serotypes is not ready.  Therefore, we will only be able to look at data from 1998 – 2003.

As discussed, we can have a preliminary report ready as early as next week with the figures on young chickens. We will need additional time to prepare the additional information requested.

This seems to be a good time to also mention that this branch would be capable of providing this information on a quarterly basis or how ever frequently it is needed.  However, if we will be doing it as assigned work, it should be known by others that this staff will be doing it, so we aren't doing things at cross purposes with the other staffs or divisions.  Let me know.

**From:** Lange, Loren [Loren.Lange@fsis.usda.gov]
**Sent:** Wednesday, June 29, 2005 8:28 AM
**To:** Thaler, Alice
**Subject:** FW: OFO Request

Re:  my voicemail I just left.

OFO wants us to look at:

Top 20 Serotypes in young chickens 1998-2005 .  Number and % of total samples with Serotypes (All sets)

Top 20 human illness by year (maybe just last couple years).

Trends or changes

What is known about sources


ZDRSD should take lead and get help from HHSD on human data.


Thanks,


Loren

**Chowdhury, Khurshed**

| | |
|---|---|
| **Subject:** | Toxoplasmosis Outline |
| **Status:** | Not Started |
| **Percent Complete:** | 0% |
| **Total Work:** | 0 hours |
| **Actual Work:** | 0 hours |
| **Owner:** | Chowdhury, Khurshed |

*\* New beggining after December 7th 2004 meeting.*

We will consider that you are <u>starting anew with your toxoplas</u>mosis proposal.  Please provide an outline of what you would like to do.  This is just a rough sketch of what you have in mind, and how you plan to proceed with some estimates of dates and time for completion of parts of the work.

Thanks.

(Happy Holidays, and have a safe and enjoyable trip.)

Delila

1

*5*

**Chowdhury, Khurshed**

**From:**    Parham, Delila  ·
**Sent:**    Monday, February 07, 2005 11:03 AM
**To:**      Chowdhury, Khurshed
**Subject:** RE: Toxoplasmosis work plan

Thank you.  I will look it over, and we can discuss it.

Delila

> -----Original Message-----
> **From:** Chowdhury, Khurshed
> **Sent:** Monday, February 07, 2005 11:01 AM
> **To:** Parham, Delila
> **Subject:** Toxoplasmosis work plan
>
> Hi Delila,
>
> Please find the attached my work plan for Toxoplasmosis. Since Dr. Sherie Zahn will not available to be a partner, I have decided to continue alone in this venture. Thanks.
>
>
> Khurshed.

To: Delila Parham
    Chief, Zoonoses Branch, ZDRSD.

Date: February 7, 2005

From: Khurshed Chowdhury
      VMO, Zoonoses Branch, ZDRSD.

Subject: **Toxoplasmosis work plan**

Considering the fact that Dr. Sherie Zahn (USDA, Foodborne Disease Investigation Branch, Atlanta, GA.) is no longer available to be a partner of this project, I have decided to proceed alone with this toxo work plan, of course, if you agree with this idea. Let me continue to work on the following two phages of work (A and B).

(A)**Investigate the status of developing any rapid test for T. gondii to be used as to identify infected animals for human consumption during (a) ante mortem inspections, and (b) meats at the slaughter plants.**

- Check with manufacturers of parasitic diagnostics to ascertain what is being done, and by whom. One such manufacturer could be **Safe-Path Lab**. at California, which does produce rapid test for parasitic diagnosis.

- Check whether this test will be feasible both by **economical and technical point** of views?

- Who is funding it, or whether the FSIS can in anyway support/provide partial funding of this project?

- Check what such work may be underway in Europe?

- Check with academic researchers in the field to ascertain what is being done, and by whom?

- What are the obstacles to such research?

- How is this prioritized relative to developing such tests for other pathogens?

- Contact Ms. Patricia Lee's (CDC) what was the status of her desire to developing a Diagnostic Test for Toxoplasmosis to be used in the Slaughter Plants (on raw meat only)?

(B)**Investigating the prevalence of toxoplasma gondii infections in the US meat and poultry raw products (in the slaughter plants) and assessing economic impact and public health burden of foodborne toxo infections.**

## Time period to complete the investigations:

Part A:

I would like to finish my investigation by the end of April, 2005 and a concise report of my findings will be produced by the end of June, 2005.

Part B:

This part will need enough literature searches to make the proper assessment of toxoplasma situation in the US. Assessing economic impact and public health burden of food borne toxo infections should take ample time. So, I would like to finish my search by the end of December, 2005. And the final report will be ready by the end of March, 2006.

Khurshed A. Chowdhury, DVM. Ph.D.
VMO, Zoonoses Branch,
ZDRSD, OPHS.

Defendant Discovery Response
869 of 1599

## Parham, Delila

| From: | Parham, Delila |
|---|---|
| Sent: | Thursday, February 10, 2005 5:02 PM |
| To: | Chowdhury, Khurshed |
| Cc: | Thaler, Alice |
| Subject: | FW: Toxoplasmosis work plan |
| Attachments: | Toxo workplan-2.doc |

Khurshed,

This is a follow-up to our conversation this afternoon. As discussed, please review the proposal and consider the following:

A. **Rapid Tests:** Please conduct some exploratory work to determine how much information is available on rapid tests and the feasibility of use in slaughter plants. If the work is in its infancy, there is little that we (Zoonoses Branch) will be able to do or recommend and need not spend a great deal of time pursuing this. In looking at the majority of the questions put forward in your work plan, you should be able to find answers and prepare a summary report in less than a month. Of course, your summary report may be the basis for recommending that the Agency include development of rapid tests for toxoplasmosis on its research agenda.

B. **Prevalence at Slaughter:** Again, I recommend that you conduct an initial literature review to assist you in developing an approach to your paper. You need to know what recent work has been done on this issue; this will to guide you in developing your thesis statement (approach) for your paper. Ask yourself, what would your paper provide of interest to the scientific community and the public and be of benefit to FSIS? If approved to proceed, you should be able to complete a literature review and draft your article much sooner than March 2006, even with our fluctuating workload and priorities.

C. **Other Thoughts:** (1) I don't think a risk profile has been conducted for *T. gondii* in US meat products. While risk assessments are not in our purview, it seems reasonable that we would be able to work with someone in the Risk Assessment Division to look at this issue. (2) I know you consulted Dr. J.P. Dubey on this issue, but for economic info, you may want to talk with Jean Buzby or Tanya Roberts in the Economic Research Service; for grant information, Mary Torrence in the Cooperative State, Research, Education and Extension Service; and for other cooperative agreement info, our own John Ragan.

Please plan to talk with me again in the next two weeks to advise me of your progress. If you need time at the library, please let me know. Or, you may want to contact the NAL to get assistance with your literature review on the subject. Having a few abstracts and/or articles should be useful in directing you on this issue.

If you have questions, please see me.

Thanks.

Delila

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Monday, February 07, 2005 11:01 AM
**To:** Parham, Delila
**Subject:** Toxoplasmosis work plan

Hi Delila,

0044

Draft - 3

Page 1 of 1

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, February 25, 2005 2:55 PM |
| **To:** | Parham, Delila |
| **Subject:** | Updated Toxo working plan |
| **Attachments:** | Toxo work plan 3.doc |

Hi Delila,

Please find the attached updated working plan for toxoplasmosis.  Thanks.

Khurshed

To: Delila Parham                                         Date: February 25, 2005
     Chief, Zoonoses Branch, ZDRSD.

From: Khurshed Chowdhury
      VMO, Zoonoses Branch, ZDRSD.

Subject: **Toxoplasmosis work plan**

Considering your suggestions (Feb. 10, 2005) and having discussions on several
occasions with Drs. Dubey, Gamble, I have made some changes of my work plan and
following are my work plans on toxoplasmosis which I would like to continue after you
approve it. Regarding the investigational works on the issue of rapid test for toxo, both
Drs. Gamble and Dubey was not sure if anybody was/is working for it and they suggested
me to do an investigational search, especially if anything was done in Europe. Therefore,
I have decided to continue on this rapid test investigation. Here are my suggested plans
on toxoplasmosis.

(A) **Investigate the status of developing any rapid test for T. gondii to be used as to
     identify infected animals for human consumption during (a) ante mortem
     inspections, and (b) meats at the slaughter plants.**

- Check with manufacturers of parasitic diagnostics to ascertain what is being done,
  and by whom. One such manufacturer could be **Safe-Path Lab**. at California,
  which does produce rapid test for parasitic diagnosis.

- Check whether this test will be feasible both by **economical and technical
  point** of views?

- Who is funding it, or whether the FSIS can in anyway support/provide partial
  funding of this project?

- Check what such work may be underway in Europe?

- Check with academic researchers in the field to ascertain what is being done, and
  by whom?

- What are the obstacles to such research?

- How is this prioritized relative to developing such tests for other pathogens?

- Contact Ms. Patricia Lee's (CDC) what was the status of her desire to developing
  a Diagnostic Test for Toxoplasmosis to be used in the Slaughter Plants (on raw
  meat only)?

Defendant Discovery Response

**Time period to complete the investigations:**

Part A:

I would like to finish my investigation by the end of April 15, 2005 and a concise report of my findings will be produced by the end of April, 2005.

**(B) Investigating the prevalence of toxoplasma gondii infections in the US meat and poultry raw products (in the slaughter plants), and assessing risk of eating US meat product (namely pork and poultry meat), and economic impact and public health burden of foodborne toxo infections.**

Part B:

This part will need enough literature searches to make the proper assessment of toxoplasma situation in the US. **Assessing risk profile, economic impact and public health burden of food borne toxo infections in the US** should take ample time. So, I would like to finish my search by the end of December, 2005. And the final report will be ready by the end of March, 2006.

I really don't know how much works and time will be involved to get all the above information but this is only my guess that I probably will be able to come up with the adequate information within the period that I have suggested to you. I urge you to allow me enough time so that I can accomplish this work, in addition to my priority workload that might come time and again.

I have briefly discussed economic source with Dr. John Ragan and he told me that we may approach the Cooperative State Research, Education and Extension Service for economic support when we need, but it will be unusual to get economic support, since this kind of support is only given to land grant University projects. However, this work might lead to a prudent suggestion to recommend a research proposal in toxoplasmosis.

Thanks.

Khurshed A. Chowdhury, DVM. Ph.D.
VMO, Zoonoses Branch,
ZDRSD, OPHS.

## Chowdhury, Khurshed

**From:** Parham, Delila
**Sent:** Friday, February 25, 2005 3:22 PM
**To:** Chowdhury, Khurshed
**Subject:** RE: Updated Toxo working plan

Thank you.  I have a very full schedule next week, but will try very hard to sit down with you and discuss it.

Have a nice weekend!

Delila

> -----Original Message-----
> **From:** Chowdhury, Khurshed
> **Sent:** Friday, February 25, 2005 2:55 PM
> **To:** Parham, Delila
> **Subject:** Updated Toxo working plan
>
> Hi Delila,
>
> Please find the attached updated working plan for toxoplasmosis.  Thanks.
>
> Khurshed

(b)

(b)

**Chowdhury, Khurshed**

**From:** Parham, Delila
**Sent:** Friday, July 15, 2005 8:49 AM
**To:** Chowdhury, Khurshed
**Subject:** Toxoplasmosis Update

Khurshed, please provide me with an update on the Toxoplasmosis project before you go on vacation.

Thanks.

Delila

(b)

(b)

8/29/2005

# Chowdhury, Khurshed

**From:** Chowdhury, Khurshed
**Sent:** Tuesday, July 19, 2005 3:42 PM
**To:** Parham, Delila
**Subject:** Reserach project

Hi Delila,

Please find the attached my research project updated.  You have first asked me to update thinking paper (some times last week) and then yesterday asked me again to update toxoplasmosis project before I go for vacation!  Here are some misunderstandings. I thought you have asked me about thinking paper to update.

Early (perhaps) this year when I gave you toxoplasma project, you have asked me to make it a thinking paper for Zoonoses branch. From then, I am working on thinking paper only. While preparing my thinking paper, I have taken some special projects into consideration such as Avian Influenza, Campylobacter and included with them toxoplasmosis too. Toxoplasma paper has been incorporated into thinking paper.  Otherwise the original toxoplasma paper remained the same. I thought you have meant thinking paper to update and give you before my vacation.  I did not consider toxoplasma as a separate project anymore, after I have started thinking paper preparation.  Thanks.

Have a nice day! Hope to see you in August, 2005.


Khurshed

## Chowdhury, Khurshed

**From:** Chowdhury, Khurshed
**Sent:** Thursday, August 04, 2005 1:55 PM
**To:** Parham, Delila

Hi Delila,

Please find the attached (First one) my updated 'Toxoplasma Research Project' you have requested. Since my return from my vacation, I have been working on this project and I am submitting it today to you.

You are right that in words you did not tell me to replace toxo project with the Thinking paper project. But when I gave you my updated toxo project for your approval on 2-25-05, you did not respond to that, instead on 2-28-05 you have requested me to formulate Thinking paper for Zoonoses branch, which has confused me and I thought you have abandoned toxo project idea and asked me to concentrate my efforts on the "Thinking paper" only.

I have spent considerable time on it and I have proposed "Thinking paper" and submitted to you on 3-16-05. Then you have again requested me to elaborate it. Then I have done a thorough literature search and finally gave you final product (Eleven pages) on 5-20-05. In my thinking paper I have incorporated Toxo project and considered toxo project is the part of thinking paper project, since it does not make sense to me to continue Toxo work in two different projects.

Besides, in my original submission of toxo project I had requested for your approval to the idea and expressed my desire to start after **your approval only (**please see the 2nd attachment). But in the midst of thinking paper issue which has absorbed at two months, also my trips to IWOA and WI, Salmonella serobar descriptions, and many other brief assignments kept me terribly busy. And I have also thought that toxo project is already in continuation in the "Thinking Paper" project. Besides, I did not get your approval to start my original toxo plan separately also.

Sorry for my misunderstanding to these. As you requested here I am submitting my updated toxo work plan again for your approval.  Thanks.


Khurshed

8/10/2005

*10*

(b)

Date: December 17, 2004

Toxoplasmosis Project?

Hi Delila,

Please be informed that it was not actually true that I did not produce anything on toxoplasmosis at all. Actually, I did produce some products on the issues of toxoplasmosis (please see attachments). Besides these attachments, I have also written some small memos to the consumers on toxoplasma risks on sheep and rabbit meat and also commented on CDC toxoplasma diagnostic test project.

I am not blaming anybody but myself. In the midst of tremendous business with various issues—I have totally forgot about what I have done on toxoplasmosis. Also, during my changing room and changing furniture, while packing my office stuffs, I misplaced the floppy disks in which I wrote these toxoplasma works. Therefore, even though I barely remembered, I could not locate what I have done on this subject. As a result, when you have asked last week about toxo project, erroneously I told you that I did not have anything to produce to you.  However, after a thorough search I have found them.

About the "Toxoplasmosis Project" I really never considered it as the project assigned to me having any deadline to finish.  I have only considered it as the possibility of working in this field.  It was I myself volunteered to work on this issue, because early 2003, I did not have much to do other then attending to some periodical working group meetings on BSE/TSE, National Trichinae Oversight Committee (TOC), Egg Products and ADRS.  It was at that time I did express my desire to you to work on toxoplasmosis but did not know what could I do? Then I have told you that I will consult with some expert like Dr. Dubey and will try to fix an objective what I will do.

In our discussion Dr. Bubey asked me what actually I plan to do.  When I said that may be literature review and writing a review paper to publish, Dr. Dubey was highly pessimistic about review paper and said nobody will publish your paper. And it will be wastage of your time and energy. He rather suggested me to find some funding to start a project in the field situation. I do admit that I should have informed you my conversation with Dr. Dubey.

Immediately after that I became busy and got to do whole lot of works like: CWD, Issue paper on T.B., Issue paper on Avian Influenza, Issue paper on AMR, Updating Swine condemnation table, Reindeer table review, reviewing various papers, and of course many requests on BSE etc.  Almost every week we did have something to do, and I was passing pretty busy time.  As a result, I almost forgot about Toxoplasmosis.

Now that you are still interested in this issue, and also things are a bit slow on BSE issue, I believe I can work on this project of toxoplasmosis. I can still continue working on this issue and if you want I can formulate some idea which will be appropriate for the public

health protection on the area of FSIS.  At least I can prepare a presentable issue paper after sufficient literature survey.  After coming from my vacation in January, I can start working on this issue again.

Please let me know your opinion.  Thanks.


Khurshed



**RESPONSE TO PRODUCTION REQUEST # 6 and # 7**

**Chowdhury, Khurshed**

*First Response*

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, July 01, 2005 3:45 PM |
| **To:** | Parham, Delila |
| **Subject:** | Subject: Task on Salmonella Project |

Hi Delila,

I am sorry that possibly I did not quite understand clearly what exactly you have asked me to do with all those S. serotypes. As I have understood (perhaps erroneously) yesterday that you requested me to write briefly description about each serotypes, I thought I might find them in the internet/books some kind of brief description about each of them. Today, I have spent all day on this—searching internet, reading microbiology books and articles on salmonella, unfortunately I did not find anything called description of serotypes separately. Only thing I can find are their antigenic character for each serotype. Other things available are prevalence, and data collections from various food animal species by various authors, which I believe Neena is already doing.

Would you please specify (item wise) exactly what Dr. Loren Lang wants from these serotypes? I will appreciate if you please give me a clear idea in writing about this task next week. Then I will try to find them for you. Thanks.

Have a nice Holiday!!

Khurshed

0241

**Chowdhury, Khurshed**

| | |
|---|---|
| **Subject:** | Young Chicken Serotype Information |
| **Start Date:** | Thursday, June 30, 2005 |
| **Due Date:** | Thursday, July 07, 2005 |
| **Status:** | Not Started |
| **Percent Complete:** | 0% |
| **Total Work:** | 0 hours |
| **Actual Work:** | 0 hours |
| **Owner:** | Chowdhury, Khurshed |
| **Requested By:** | Parham, Delila |

(b)

(b)

------------

Khurshed, as discussed yesterday, I would like to have a first draft of the young chicken Salmonella serotype paper on Thursday, July 7, using the list that I gave you yesterday.  I know that you talked with Neena and she gave you a reference and suggested an Internet search site.  Again, you are providing a brief statement (paragraph) on each of the young chicken serotypes listed.  (You may have additional ones next week depending on what is found in the dataset.)  You will indicate the reservoirs, commonality, public health significance, other pertinent facts, etc.  The paper must include references.

See me if you have questions.

Thanks.

Delila

.).

[

1

## Parham, Delila

| From: | Chowdhury, Khurshed |
|---|---|
| Sent: | Thursday, July 07, 2005 4:10 PM |
| To: | Parham, Delila |
| Cc: | Thaler, Alice |
| Subject: | Brief descriptions of Young chicken Salmonella serotypes. |
| Attachments: | Salmonella serovars descriptions project.doc |

Hi Delila,

Please find the attached partial work (Eleven from 20) done on the above project of serovar description. Sincerely, this is really very time consuming task. After searching many literature, books, and discussing with at least four microbiologists, I have learned that there is no such thing called 'serovar description' available any where. Perhaps, no body has done it! So there is no quick shot.

If we want to do it then one needs to read hundreds of articles in order to categorize their descriptions basically from the raw materials (articles). Again it varies so much place to place; authors to authors. One serovars may be highly prevalent in one geographical region, but the same serovar is not that frequent in the other region. So we shall have to evaluate into a valance of estimation only. But I believe it's worth doing it.

I suggest that this should be considered as an on-going project and continued for several months, or even years to make a comparatively completed list of descriptions. Because, information will keep changing and our descriptions also will need changing and updating time to time. Thanks.

Khurshed

**Chowdhury, Khurshed**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Tuesday, July 12, 2005 4:22 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Brief descriptions of servars: draft-2 |

Hi Delila,

Please find the attached second draft of brief descriptions of Salmonella serovars. I am upto # 16, and 4 more remained to be done. I am hoping that they will be completed by the end of this week.

As I have mentioned previously that there is no such thing called serovars description available in the literature or in the books, hence there is no short-cut, or any magic that I can really perform to complete these list. Actually, I shall have to make it out of available information from the published research articles. Again making our intended description from the literature is involving horrific time spending job to choose or decide which one will be pertinent for our information.

Extensive research works have been done on Salmonella. Therefore, there are no shortages of articles on Salmonella. If I click for one item, here comes hundreds or even thousand articles. But problem is I need to go one at time, article by article, read them, and think if they are of any use to our purpose. But where is the time for me to read so many articles within such a short time? There is not a single article available in which serovar description per se was given; but they talk about serovars for other purposes, and it is from that I am choosing my information to categorize them.

It will be better idea to continue this work for reasonable time period and slowly expand information, such as Alice's suggestion of antimicrobial resistance, or even some other information could be included in this description in future. But we need plenty of time to do a good job.

Going to the library may not be that productive since we may not get any book describing serovars. Yet if you want, I might go to library for some days to check what is available there. I can get plenty of literature in the internet search but time is very crucial factor. I have ordered some articles from the National Library today, though I am not sure if they will be of any good for our information.  Thanks.

Khurshed

6/2/2006

**Chowdhury, Khurshed**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Monday, July 18, 2005 3:49 PM |
| **To:** | Parham, Delila |
| **Cc:** | Thaler, Alice |
| **Subject:** | Brief descriptions of Young chicken Salmonella serotypes. |

Hi Delila,

Please find the attached brief descriptions of 20 serovars gfrom young chicken.  Thanks.


Khurshed

*Original Request for Serovars from Loren Lange* (handwritten)

## Lange, Loren

**From:** Thaler, Alice
**Sent:** Wednesday, July 06, 2005 6:47 AM
**To:** Lange, Loren
**Cc:** Parham, Delila
**Subject:** RE: Loren's Request for Salmonella Serotype Data

Delila is coordinating a single document.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Lange, Loren
**Sent:** Thursday, June 30, 2005 4:13 PM
**To:** Thaler, Alice
**Subject:** RE: Loren's Request for Salmonella Serotype Data

Thanks - should I ask HHSD to do the human part (and have me merge the two) or have Delila's staff work with HHSD to put this into a single document

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Thursday, June 30, 2005 1:51 PM
**To:** Lange, Loren
**Subject:** FW: Loren's Request for Salmonella Serotype Data

Note I only forwarded this to you. I leave it to you to share with David.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Parham, Delila
**Sent:** *Thursday, June 30, 2005 12:01 PM*
**To:** Thaler, Alice
**Cc:** Anandaraman, Neena
**Subject:** Loren's Request for Salmonella Serotype Data

Alice, I interpreted Loren's request as follows:

1. **Young Chicken Serotypes:** Provide *Salmonella* serotype data for young chickens for

317

3

# Chowdhury, Khurshed

**From:**     Chowdhury, Khurshed
**Sent:**      Monday, July 11, 2005 7:59 AM
**To:**        Thaler, Alice
**Cc:**        Parham, Delila
**Subject:** RE: Brief descriptions of Young chicken Salmonella serotypes.

Thanks. It is difficult to say any deadline but hope that I will be able to finish the remaining 9 serovars by the end of this week. It will be helpful if I get enough time to do more search on this. Thanks.


Khurshed




-----Original Message-----
**From:** Thaler, Alice
**Sent:** Friday, July 08, 2005 10:32 AM
**To:** Chowdhury, Khurshed; Parham, Delila
**Subject:** RE: Brief descriptions of Young chicken Salmonella serotypes.

This is a start.  I will share it with Loren to get feedback if this level of information will meet his expectations. How long before you finish the 20 descriptions?  Loren Lange asked for this information and it is very important to him.  Please also search for any review articles on *Salmonella* serotypes and also find any information on the antimicrobial resistance by serotype.

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Thursday, July 07, 2005 4:10 PM
**To:** Parham, Delila
**Cc:** Thaler, Alice
**Subject:** Brief descriptions of Young chicken Salmonella serotypes.

Hi Delila,

Please find the attached partial work (Eleven from 20) done on the above project of serovar description. Sincerely, this is really very time consuming task. After searching many literature, books, and discussing with at least four microbiologists, I have learned that there is no such thing called 'serovar description' available any where.  Perhaps, no body has done it! So there is no quick shot.

If we want to do it then one needs to read hundreds of articles in order to categorize their descriptions basically from the raw materials (articles).  Again it varies so much place to place; authors to authors. One serovars may be highly prevalent in one geographical region, but the same serovar is not that frequent in the other region. So we shall have to evaluate into a valance of estimation only.  But I believe it's worth doing it.

6/2/2006

**PIP SUMMARY ASSESSMENT REPORT**

DATE:                February 6, 2006
EMPLOYEE:            Dr. Khurshed Chowdhury
                     Veterinary Medical Officer, ZDRSD, OPHS
                     Washington, DC


On August 16, 2005, Dr. Khurshed Chowdhury was placed on a Performance Improvement Plan (PIP), copy attached, for 90 days to afford him another opportunity to demonstrate his capability to perform at the Fully Successful level in two Critical Elements and one Non-critical element: Mission Support (Critical), Research and Analysis (Critical), and Communication (Non-critical).  In a settlement agreement reached October 11, 2005, to his informal EEO complaint (Case number FSIS 2005-01076), the PIP was extended to 120 calendar days to allow Dr. Chowdhury additional time to complete one of the projects. Due to illness, he did not begin the PIP until August 29, 2005.  The PIP ended December 31, 2005.   Dr. Chowdhury was assigned three projects to work on during the 120-day opportunity period to assess performance in the two Critical elements and one Non-critical element. Weekly meetings were held from August 29 to December 19, 2005, to review his progress and to provide direction. Summary notes of all meetings were provided to Dr. Chowdhury. At the last meeting on December 19, one project remained to be completed and, therefore, no discussion was held about success or failure under the PIP.  This is the final assessment of how Dr. Chowdhury performed on the three projects at the completion of the 120 days. Assessment was based on timeliness as well as how the project reports met the standards and expectations (output) established for each of the projects.  Final papers were reviewed for acceptability by Drs. Alice Thaler or Delila Parham or others in ZDRSD or OPHS.

Project assessment results are as follows:

1. Prepare a scientific paper on toxoplasmosis as it relates to meat and poultry

Requirements: Dr. Chowdhury was assigned the task of writing a scientific paper on toxoplasmosis at the beginning of the 2004-2005 rating cycle as an independent research project. He was unable to show progress on the paper by the end of the 2004-2005 rating cycle. With the issuance of the PIP, the deadline for providing an acceptable paper was extended first to November 30, 2005, and then to December 31, 2005. For the PIP, he was expected to prepare a scientific paper on the subject as it relates to meat and poultry that was well researched with references.  The paper was expected to be free of major errors that required edits and revisions. Within two weeks of receiving the PIP notification letter, Dr. Chowdhury was expected to provide his focus and the format for the paper and establish milestones and delivery dates for completion of the work within the opportunity period.  Preparation of the paper in a format suitable for publication in a peer-reviewed journal would demonstrate his knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging diseases.  It would also demonstrate his ability to use available reference material and conduct a

comprehensive scientific study that would provide recommendations for specific Agency issues. In addition, it would show that he is capable of providing written documents that are clear, concise, and presented in an organized manner that are well researched and reflect sound scientific principles.

Accomplishment: Dr. Chowdhury acknowledged his concern about completing the work in the required timeframe at almost every weekly meeting. Yet, he afforded no opportunity for Drs. Thaler or Parham to assist him because he did not provide project plans with milestones and delivery dates, outlines, or drafts for review.  At the September 12 meeting, he provided a very sketchy work plan that did not include milestones and delivery dates. At the September 19 meeting, he indicated that he had started the literature review and had begun to write the paper, but later said he would not begin writing the paper until the end of October. At the November 21 meeting, Dr. Chowdhury admitted that he was not far along with the toxoplasmosis paper and would not be able to turn his attention to it until he completed the other two projects.  In the December 19 meeting, he indicated that he had begun "patching" the paper together, and would spend the following week reviewing and making corrections to the paper. When asked in the December 19 meeting if Dr. Parham could assist him by reviewing his outline or draft, he said assistance was not needed because he did not have an outline or draft ready to show.  He explained that it would be difficult to have someone review the paper because they would need at least one week to do so. At the December 19 meeting, although concerned about the time, Dr. Chowdhury expressed confidence in having the paper ready on the due date.

Assessment: This project was not completed successfully. Dr. Chowdhury submitted his review paper, "Seroprevalence of *Toxoplasma gondii* infection in various food animal species in the United States of America and its public health significance," on December 30, 2005. The submission was timely, but the work product was not completed to the required level of quality for work of this type.  Drs. Alice Thaler, Erich Hemphill, and Delila Parham, ZDRSD, OPHS, and Katrine Pritchard, Management Support Staff, OPHS, reviewed the final paper. Dr. Hemphill is the branch chief of the Animal and Egg Production Food Safety Branch, and serves on the National Pork Board *Toxoplasma/Trichina* Committee.  Ms. Pritchard is the editor/writer for OPHS.  All reviewers agreed that the paper is poorly written and has major errors that would require significant edits or revisions before it would be cleared by the Agency for submittal to a peer-reviewed journal. The work product did not meet the Fully Successful level for the three elements described below. The examples are not comprehensive, but are meant to illustrate a general pattern that indicates less than acceptable performance for each element.

*A. Mission Support (Critical):*

Although some level of error is anticipated in a first draft, the number of errors found in the paper indicating misinterpretation or misunderstanding of the literature is unacceptable. For example, narrow, geographical-based studies are used to represent the national picture. In the etiology and transmissions section of the paper, Dr. Chowdhury states that the "investigation also confirmed that all mammalian wild

animals (cats, raccoons, opossums, skunks, house mice, white footed mice, rats) serve as the main reservoirs of *T. gondii* infection in swine. However, what is actually stated in the abstract of the reference is, "All mammalian species examined were reservoirs of *T. gondii* infection." In the discussion section, the reference states, "The current investigation has identified all mammalian species captured in large numbers on swine farms in Illinois (cats, raccoons, opossums, skunks, house mice, white-footed mice, rats) as reservoirs of *T. gondii* infection." The findings are representative of Illinois only.

The paper contains material that has been copied verbatim from references, without proper acknowledgement of the source. In some cases, material is copied and given seemingly minor word changes that result in erroneous statements being made. In the etiology and transmission section, Dr. Chowdhury states, "Cats are the only <u>primary</u> host since all the developing stages occur in the cat and not in other animals." The reference states, "Cats are the <u>definitive</u> hosts for *Toxoplasma gondii*, since all the developmental stages occur in the cat and not in other species. Cats and other felines are the only definitive host – meaning the only host where the parasite completes its life cycle and produces oocysts (eggs). By using "primary host" and only discussing household cats, it could be inferred that there are several hosts where the parasite can complete its life cycle. While some word changes made by Dr. Chowdhury resulted in true statements, the statements may not reflect the intent of the reference. For example, Dr. Chowdhury states, "<u>Domestic animals</u> can become infected by eating oocysts from a contaminated environment (feed contaminated by cat's feces) or by eating raw or poorly cooked meats that are contaminated by the cat's feces or rodents. The reference states, "<u>Hogs</u> can become infected by eating oocysts from a contaminated environment (for example, in feed contaminated by cats) or by eating poorly cooked meats that are contaminated (for example, rodents dying in hog pens.)" While it is true that domestic animals can become infected by eating oocysts from a contaminated environment, as used in the paper, it is a broader claim than can be supported with the reference.

No real analysis, discussion, summary, or conclusion is provided to pull the "pieces" together to make the review relevant and useful to the Agency. While there are a few recommendations under the control section, the paper shows a lack of knowledge about the Agency's plans for addressing *T. gondii* in the slaughterhouse. The paper states, "It has been recommended that until examination of meat for *T. gondii* infection is implemented in the slaughterhouse; all meat should be cooked according to industry guidelines before human consumption in order to reduce the potential for transmission of *T. gondii* in humans." The Agency has not indicated that testing will occur ever at the slaughterhouse, no quick test is currently available, and industry is required to provide safe food handling labels, not cooking labels.

### B. Research and Analysis (Critical)

A review paper is meant to be a comparison and synthesis of results from various investigations. Many studies are cited throughout the paper, but no real information on what the results show is presented. Many of the references used in the paper are "fact

sheets, and are not from peer reviewed literature. Generally, background references such as textbooks or fact sheets are used to acquaint the author with the subject matter and are not cited because they contain information that is common knowledge in the subject area.  Timeframes for the studies are either omitted or referred to in vague terms such as "more recent" or "much earlier." Data are strung together with little attempt to analyze or interpret it. Percentages are used as evidence of various points, but since true numbers from the studies are not shown, there is no way of knowing what they mean. For example, the abstract states, "In the swine populations, *Toxoplasma gondii* antibodies were more prevalent in breeding swine (An average: 13.2%) than among finishing swine (An average: 4.3%), and prevalence of *T. gondii* was markedly lower among the swine raised in confinement (An average: 9.3%) than the pig herds in non-confinement facilities (An average: 14.1%)."  Several inconsistencies are noted in the paper. For example, Dr. Chowdhury states that confinement operations are expected to reduce exposure to toxoplasmosis; however, pigs are raised in confinement yet pose a high risk of infecting people. Conversely, he states animals raised outdoors risk greater exposure to toxoplasmosis, but does not explain why cattle, which are raised outdoors, pose a low risk of infecting people.

### *C. Communications (Non-critical)*

Numerous grammatical, spelling, and punctuation errors indicate that the document was not even "spell-checked" before submission. In the very first line of the document, the word "states" is spelled "sates." The paper lacks order and a consistent style of presentation throughout. For example, the paper switches at random between the words pigs, swine, and hogs.  Similarly, references to pork are varied: pig meat, meat (pork), and pork meat, as are references to the United States: US, USA, America, states of America, and United States of America. Phrasing is often awkward or unclear. For example, the paper states, "Pregnant women may not get *T. gondii* infection by the direct contact with cats, as the oocysts are not found on cat fur and are often buried in soil along with cat feces, and pregnant women probably get the diseases from the contaminated soil by cat feces."  Material has been plagiarized, which violates applicable Agency rules and regulations against this type of practice.

2. Prepare a scientific paper on the top five poultry Salmonella serotypes

Requirements: In response to a request in June 2005 from the Deputy Assistant Administrator, OPHS, Dr. Chowdhury was given the task of providing a paper with brief descriptions for several poultry Salmonella serotypes. Dr. Chowdhury completed the task in July 2005, but it was found unacceptable.  For the PIP, he was asked to continue work on the paper, but limit it to the top five poultry Salmonella serotypes. The scientific paper was expected to describe each serotype in detail, such as reservoirs, its public health significance, related antimicrobial resistance issues, and other information useful to the agency. The paper was expected to be well researched and referenced and free of major errors, requiring few edits and revisions. It was intended to address the request made by the Deputy Assistant Administrator to provide descriptive information on key poultry Salmonella serotypes.

Accomplishment:  At the September 19 meeting, Dr. Chowdhury shared the list of five serotypes he would address in his report, and indicated that he had begun the literature review. However, Dr. Chowdhury wrote in his October 21 progress report, "This week I made some headway in my serovars assignments. That is I have decided to stop running door to door to ask for help from experts/Microbiologists and making phone calls and sending emails (which has absorbed my enormous amount of time) which has turned out to be unproductive.  I get same old answer from everybody. Name of the game is—I shall have to make it up myself.  Best is to spend my time on literature search and pick something related to my purpose.  I will need to search thousands of articles to do a moderate job." In meetings held October 24, 2005, and November 7, 2005, Dr. Chowdhury acknowledged that he had hoped to find the material in a single source and had contacted several persons in and out of the agency including Moshe Dreyfuss, Branch Chief, Dr. Bonnie Rose, Kristina Barlow, Microbiology Division, OPHS, and Dr. Richard Gast, Agriculture Research Service, USDA, all of whom informed him that he would not find this information in a single source and provided possible sources that he might use to gather the information.  He expressed concern about the number of articles needed to write the paper and the paucity of information available for some of the serovars. At the November 7 meeting, he agreed to provide a draft of the paper at the next meeting.  The draft submitted on November 16, 2005, was poorly written, and Drs. Thaler and Parham provided extensive comments to the draft, which were discussed with him and included in the November 21 meeting notes.  No additional drafts were presented for review before the final paper was submitted.

Assessment: This project was not completed successfully. The paper was submitted on November 30, 2005, at the time required; however, it was not completed to the required level of quality for work of this type. Dr. Parham forwarded the paper to Loren Lange, Deputy Assistant Administrator, OPHS, to determine its adequacy in meeting his request. Mr. Lange commented that the data were carelessly or inaccurately presented and there were inaccuracies in the text. He did not think the material was presented in a format that addressed OPHS issues such as presence in FSIS regulated products and/or documentation of outbreaks attributed to FSIS regulated products. He did not find that this report reflected management expectations of a GS-13 analyst in OPHS. The work product did not meet the fully successful level for the three elements discussed below.  A few examples from the paper are provided as evidence of failure.

*A. Mission Support (Critical):*

Much of the information provided is too general for a paper of this nature and, often, does not address the specific topic being discussed.  Of the information provided, Mr. Lange found inaccuracies in the text as seen in the sentence, "This serovar is multiple drugs resistant."  Mr. Lange noted that resistance varies by serotype and/or strains.  Mr. Lange questioned the isolation rates provided in the paper.  Dr. Chowdhury obtained the percentages from a draft table prepared by Dr. Neena Anandaraman, Zoonoses Branch, ZDRSD, OPHS.  The table has not been published, which should have been

noted in Dr. Chowdhury's paper. For *S. Heidelberg*, the isolation rates are not the same as those provided in the draft table from lowest to highest for 1998 – 2004.

**B. Research and Analysis (Critical):**

The paper did not demonstrate ability to research and analyze issues thoroughly and accurately. In many cases, relevant information has been omitted. For example, *S. Heidelberg* is a known pathogen in swine and found commonly in market hogs, a product the Agency regulates. Yet, the paper does not include swine as a reservoir for *S. Heidelberg*. The sections on public health significance do not elaborate, in most cases, on the true public health significance of the serotype. For example, Dr. Chowdhury states that the public health significance for *S. Heidelberg* is moderate to high with about 5.39 - 8.0% isolated from human sources. No further analysis is provided. No attempt is made to correlate the information provided for isolation rates for young chickens and the public health significance. The text includes a lot of extraneous information, not relevant to the discussion. Several unnecessary paragraphs are included that provide no substantive information. For example, in the antimicrobial resistance section under *S. Typhimurium*, the paper states, "*S. Typhimurium* with excess mortality and the demonstration of a hazard to human health underscores the need for restrictions in the use of antimicrobial drugs in the production of food from animals. A particular risk was associated with quinolone resistance, indicating that the use of fluoroquinolones for food production animals should be discontinued." Discussion on the merits of using antimicrobial drugs in food animals is outside the scope of the paper. Mr. Lange would not anticipate a discussion on this subject given that drug usage in food animals is regulated by the Food and Drug Administration.

**C. Communications (Non-critical):**

The paper is poorly written. There are many incomplete sentences, and many are unclear. Carelessly written sentences resulted in ambiguous statements. For example, in the discussion on *S. Heidelberg*, it is written: Rate of isolation: 16.84 – 22.9% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998—2004) samples of broiler HACCP plants. Based on the manner in which the text was written, Mr. Lange assumed that the intent is to talk about the percent of young chicken isolates that are *S. Heidelberg,* but with the poor phrasing, it is unclear exactly what is intended. There are many grammatical errors as seen in these sentences: (1) Consuming shellfish taken from sewage-contaminated beds and raw fruits. (2) Very high percentages (22-26%) was isolated from the human source by Public Health Laboratory Systems (PHLIS) reported to CDC (Center for Disease Control) from 1998-2003. The paper switches between "multiple drugs (s should be omitted) resistant" and "multiple antimicrobial resistant." Both terms are incorrectly used in the paper.

3. Prepare a bimonthly compilation of worldwide emerging zoonoses

6

<u>Requirements</u>: Dr. Chowdhury was assigned the task of preparing a bimonthly compilation of worldwide emerging zoonoses, as seen in scientific journals, newspapers, Internet, and other available reference materials that may have potentially serious human health concerns that may be foodborne, especially related to meat, poultry, and eggs. Submissions were due on Thursday by close of business and were expected to be free of major errors, requiring few edits and revisions. The report was intended to provide Zoonoses Branch personnel with up-to-date information on zoonotic disease worldwide and serve as a valuable reference source for Agency inquiries on the subject.  This was a new project assigned under the PIP.

<u>Accomplishment:</u> Dr. Chowdhury submitted six reports during the opportunity period. The term "bimonthly" was confusing to Dr. Chowdhury who interpreted it as every two months, while Dr. Parham interpreted it as every two weeks. Given the confusion over the term bimonthly, it was agreed in the September 12, 2005, meeting that the first report would be due on September 15, 2005, and six reports would be prepared during the opportunity period. The first report was several pages long, and had been simply cut-and-pasted primarily from ProMed Internet reports. No attempt had been made to organize the material using titles or subtitles or limit the paper by choosing only relevant material to include in the report. At the September 19 weekly meeting, Dr. Parham discussed the first report with Dr. Chowdhury and the need to improve it and especially the need to use more than one source for the report. The second report, dated September 29, 2005, was in the same format and style as the first report.  Dr. Thaler forwarded the report to ZDRSD staff requesting feedback on how useful the staff found the report and suggestions on the format and additional resources to obtain information that could be included in the report with the goal of producing as comprehensive a report as possible to support surveillance efforts and policy based on science.  All comments were compiled by Dr. Thaler and provided to Drs. Chowdhury and Parham for discussion at the October 17 meeting.

While many found the "idea" of this type of report useful, they did not find the report useful as written.  One reviewer commented, "Very disappointing. Not acceptable. This is not a report. It appears to be mainly a "cut and paste" compilation of a few websites or abstracts of around four conditions. A report would require some sort of stated purpose, summary, or conclusion with these compilations as references, not the body of the report." Another reviewer commented, "Lot of information but not arranged," and provided a suggested style for arranging the material. The reviewer also suggested that Dr. Chowdhury "adopt a style or a format for compiling the report including adopting a [consistent] font." Dr. Chowdhury agreed to review the comments and work to provide a useful report.  Assisted by Dr. Thaler, he prepared a new format for the paper, and submitted it to Dr. Parham on October 18, 2005. The October 27 report, prepared in the new format, was submitted to the division director, branch chiefs, and Zoonoses Branch staff for review.  One reviewer commented that the avian influenza section was very good and informative, but questioned the accuracy of a statement that the EU did not feel it presented a threat to humans. The reviewer commented too that the quality of the work for the other diseases did not match that of avian influenza, the report should be checked carefully for spelling, typing, spacing, syntax and grammatical errors since these errors

were very distracting to the reader, and that hyperlinks should be checked to see if they worked. The final report was submitted November 28, 2005.

Assessment:  The work product met the Fully Successful level for the three elements - Mission Support (Critical), Research and Analysis (Critical), and Communication (Non-critical) on Communication (Non-Critical).  Each submission was timely.  Dr. Harry Walker, Branch Chief, ZDRSD, OPHS, was asked to review the final report.  Dr. Walker had a few comments on the report, but indicated it was a good report. While Dr. Chowdhury required a lot of guidance from the first to the final report, the final report was considered acceptable.

**CONCLUSION:** Dr. Chowdhury was placed under a PIP to afford him another opportunity to demonstrate his capability to perform at the Fully Successfully level. Of the three complex tasks assigned to him, only one was considered acceptable at the time of final submission.  That task was the simplest of the three and required extensive intervention from Drs. Thaler and Parham. Based on Dr. Chowdhury's performance on the three projects that he was assigned, he continues to be performing below the Fully Successful level in three critical elements - Mission Support (Critical), Research and Analysis (Critical), and Communications (Non-critical).  His rating for the performance period July 01, 2004 to June 30, 2005, extended to December 31, 2005, is Unacceptable.



| United States Department of Agriculture | Food Safety and Inspection Service | Labor & Employee Relations Division | 1400 Independence Ave., SW Room 3175 South Bldg. Washington, DC  20250 (202) 720-5657 |
|---|---|---|---|
| | | Employee *(or Labor)* Relations Branch | (202) 690-3938 fax (800) 217-1886 toll-free |

FOR OFFICIAL USE ONLY                                             August 16, 2005

TO:       Dr. Khurshed Chowdhury
              Veterinary Medical Officer, Zoonoses Branch, ZDRSD, OPHS
              Washington, DC

FROM:    Dr. Delila Parham   *Delila Parham*
              Chief, Zoonoses Branch, ZDRSD, OPHS
              Washington, DC

SUBJECT:   Notification of Unacceptable Performance/Opportunity to Improve

This notice is written confirmation that I am providing you with an opportunity to improve your performance to the Fully Successful level. At your midyear appraisal on December 20, 2004, you were advised that you were not working at the Fully Successful level and given a document detailing the concerns about your work and actions needed to correct the concerns listed. (See Exhibits 1-5 that includes the midyear performance appraisal document and supporting email messages.)  You have had two major projects since your midyear appraisal and from your work on these projects I have determined that your performance continues to be unacceptable in three elements of your position. The following Performance Improvement Plan (PIP) outlines activities that you must complete to attain a Fully Successful rating in the two critical and one non-critical element in which your performance has fallen to an unacceptable level.  If you have any concerns about the PIP or require additional guidance in following it, please let me know as soon as the questions arise.

The PIP becomes effective today and will continue for 90 calendar days from today.  It is important to perform well under the performance standards that were provided to you on July 18, 2005.  A copy of the elements and standards for your job is attached.  By the end of the opportunity period, you must have brought your performance up to at least the Fully Successful level in each of the critical elements that you are currently unacceptable in to avoid a reduction in grade or removal.  This PIP is to assist you in reaching that objective.

During the period of the PIP, you are to report directly to me for problems relating to your performance. Given the nature of my duties, I realize that there are times when I may not be available for several hours at a time during the day.  During these times, you should report any problems or address your questions to Dr. Alice Thaler, Director, Zoonotic Diseases and Residue Surveillance Division (ZDRSD).  Beginning Monday at 9:00 a.m. we will hold our first weekly meeting, and every Monday morning throughout the PIP you and I will meet at least once a week to discuss the quality of your work.  During these meetings, I will provide updates to your progress and constructive feedback.  Although I don't foresee any long-term absences on my part, if I am gone for a full week, Dr. Thaler will meet with you to review your performance.

In December 2004, following a discussion that you had not accomplished any work on a particular project, I requested that you begin keeping a journal so you could track your time and make adjustments, as necessary, to use it more efficiently.  Beginning this week, you will be required to complete a more expanded version of your journal.  Currently, you provide a very general list of tasks that you are working on.  I am now requesting that you expand this list to include the number of tasks that you have completed and more specific details about the work performed on each task.  For example, one of your tasks in your

00001797

00001797

May 26, 2005, journal was "working on the thinking paper." (See Exhibit 6.) You will need to explain specifically what work was being done and at what stage you are in the paper; that is, you might indicate that you have contacted personnel at the National Agriculture library to begin the literature search, how much time was involved, how many references were ordered, and when you expect to receive the reference material. You will continue to submit the journal to me by close of business on the Thursday of the second week of the pay period. The new, expanded journal should prove helpful in our discussions on your progress in reaching the Fully Successful level during the next 90 days.

The deficiencies in your performance have been in the critical elements of Mission Support and Research and Analysis and the non-critical element of Communications. These elements reflect the complexity and nature of work that is performed and expected in the Zoonoses Branch at the GS-13 level. During your years working in FSIS, you have received both on the job and formal training associated with these elements. You were required to participate in two of FSIS' cross cutting training classes, Technical Writing (May 2005) and Clear Writing Through Critical Thinking (June 2005), and a project management course (May 2005). You also attended a weeklong training class, "Poultry Foreign Animal Disease Awareness Training," sponsored by the Animal and Plant Health Inspection Service (March 2005) in Ames, Iowa, and a one-day symposium on "Protecting the Global Food Supply: Growing Concerns for Emerging Zoonotic Disease" (April 2005) in Minneapolis, MN. Despite the training you have received, you seem unable to apply this training and demonstrate the necessary skills in these two critical elements.

### Standards, Goals, and Activities for the Elements

#### I. Mission Support (Critical)

In the critical element of "Mission Support" your performance plan states that at the Fully Successful level of performance, you must demonstrate

A. Basic understanding of mission and organizational goals and priorities that support or directly protect the public health from foodborne hazards.

B. Complete assignments in accordance with applicable agency regulations, policies, procedures, and guidelines.

C. Provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements.

D. Adhere to safety and occupational health practices and procedures and maintain a safe and healthful work environment (where applicable).

To successfully meet the Mission Support element, you are required to meet the Agency's strategic goal to protect the public health by significantly reducing the prevalence of food borne hazards from meat, poultry, and egg products by meeting objectives 2 and 4 as follows:

*Objective 2: Create a coordinated national and international food safety risk management system for* meat, poultry, and egg products from farm to table.

1. Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.

2

00001798

00001798

2. Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.

3. Respond to food safety emergencies and critical events with useful plans and recommendations.

4. Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.

*Objective 4:* Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.

1. Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.

## II. Research and Analysis (Critical)

In the critical element of "Research and Analysis" your performance plan states that at the Fully Successful level you must have done the following:

A. Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate.

B. Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations).

C. Any recommendations or analysis provided must be based on available guidance and are generally accepted without major revision.

To successfully meet the Research and Analysis element, you must be involved in the following goals and activities:

1. Conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific policy issues and the development of policy and programs.

2. Identifying and compiling information, carrying out required analysis, establishing and maintaining working files, and developing and maintaining databases.

3. Participating in project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research /study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work.

4. Undertaking longer-term tracking and analysis of issues, identifying relevant scientific issues *that may have policy implications, analyzing the effect of policy proposals on projects and initiatives,* and formulating program and/or policy modifications for review by the management.

## III. Communication (Non-Critical)

3

00001799

00001799

In the non-critical element of "Communication" your performance plan states that at the Fully Successful level of performance, you must demonstrate the following:

A.  Oral and written communications were clear, correct, timely, and presented in an understandable manner.

B.  Supervisor and coworkers were kept informed of issues and problems when necessary.

C.  Information and guidance provided were timely and correct.

To successfully meet the Communication element, you must be involved in the following goals and activities:

1.  Maintain effective and collegial working relationships with other Branch, Division, Program, and other Agency employees, government officials, Congressional staffs, interest groups and other interested parties by:

   a.  Preparing and contributing to the development of discussion, position, and policy papers, briefing notes, presentations, and routine Agency correspondence.

   b.  Presenting written and/or oral findings and observations to project teams, colleagues, and managers in a manner that enhances confidence and credibility in the Branch, Division, Program, and Agency.

   c.  Preparing written reports, papers, and articles for Agency use and/or publication in peer-reviewed journals that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.

   d.  Attending branch, Division, Agency, and/or other interdepartmental or interagency meetings to discuss data/information requirements and results, assess trends, discuss policy issues, and analyze the effect of revised policies or programs in light of current science and public health implications.

   e.  Liaising with federal and state government personnel, academia, and stakeholders to obtain, exchange, and clarify data/information, describe policies and program activities, and remain abreast of trends and developments.

   f.  Responding to emergency and critical events by collaborating with appropriate staffs, internal and external to the Division, to develop a well-planned Program response that needs little modification and can be implemented with minor oversight from the Branch chief and/or Division director.

   g.  Conducting business in a manner that is professional, courteous, and exemplifies commitment to service.

**Unacceptable Task Performance**

Currently, your performance in these elements is at an unacceptable level as evidenced in the number of errors I have found in your work and the missed deadlines. As was discussed at the midyear appraisal, major projects were received late and only after I set a "final" due date. In addition, work products

4

00001800

00001800

received did not demonstrate the complexity and nature of work that should be performed by personnel in the Zoonoses Branch at the GS-13 grade level. You have had two major projects since the midyear evaluation, a "thinking paper" and a toxoplasmosis paper. While unacceptable work performance was not limited to task associated solely to these projects, they will be discussed as representative examples of your work following the midyear appraisal in December.

## I. Mission Support (Critical)

Your work did not meet the fully successful level under Mission Support element B and C, Objective 2, goals and activities #s 1, 2, and 4.

❖ Thinking Paper: The thinking paper, which you were asked to model after the Agency's bovine spongiform encephalopathy thinking paper, had to be returned to you to conduct more extensive scientific research and studies. You were asked to think broadly then began narrowing the paper down to a workable one. Your first draft was submitted on March 9, 2005; it was not well researched, lacked depth, and did not provide adequate support for the work suggested. The paper was returned to you with recommendations for conducting more thorough study and analysis, and you immediately requested an extension of one month without even attempting to meet the due date, delaying submittal of the paper until May 20. The second draft of the paper was longer and showed that you had done more work, but still could not be considered a comprehensive scientific review of the issues. You failed to fully develop the role of the Zoonoses Branch to the level of specific recommendations with the pros and cons of each and priority for meeting strategic goals. When the first draft was returned to you, I recommended that you consult others for input into the paper, providing you an opportunity to collaborate with other federal and state government personnel, academia, and others to clarify and exchange information on the branch's role, support information in the paper, and discuss potential research needs of the Agency related to zoonotic or emerging diseases. The second draft did not show that you had collaborated with others to assist you in your determinations. In addition, much of the material in the paper had been lifted directly from other sources, some without acknowledging the sources, which violates applicable Agency rules and regulations against this type of practice. (See Exhibits 7- 9.)

❖ Toxoplasmosis Paper: For the toxoplasmosis project, an independent research project in which you were expected to develop the project plan and establish milestones, you have again performed no work on the project beyond submittal of the project plan in February. This project was carried over form the 2003-2004 rating cycle. Although no work had been done on the project prior to the midyear appraisal in December, during the appraisal you indicated to Dr. Thaler and me that you wished to retain the project and would begin the necessary research. You were given ideas for developing a feasible plan in February, and some work could have been completed within one month. Only after a task request was sent via Outlook in July 2005 did you admit that no additional work had been done on the project, explaining that you thought that the thinking paper replaced the toxoplasmosis assignment. However, in August you submitted a new project plan indicating that you may have misunderstood. (See Exhibits 10, 11, and 14.)

## II. Research and Analysis (Critical)

Your work did not meet the fully successful level under Research and Analysis element A, B, and C, and goals/activities #s 1 – 4. The Research and Analysis element is written to fully support the Mission Support element. Therefore, any task failing to meet the Research and Analysis critical element is subject to failure in the Mission Support critical element.

5

00001801

00001801

❖ Thinking Paper: As discussed in the Mission Support element, the thinking paper had to be returned to you to conduct more extensive scientific research and studies. The drafts you submitted were not comprehensive, did not provide an adequate analysis of the issues, and did not suggest an ability to design an effective study approach or utilize analytical methods and objectives. Although you were expected to write this as a scientific paper, no references were included with the first draft to support the ideas and conclusions drawn in the paper. There was little attempt to analyze the effect of Agency policy proposals on current projects and initiatives. As written, the paper would not allow you to make meaningful recommendations for future projects and initiatives, and of the recommendations made, most are currently being done or under discussion. (See Exhibits 7-9.)

❖ Toxoplasmosis Paper: As of July 19, by your own admission, no work had been done beyond the project plan. Incomplete work products during this rating period are evidence of unacceptable execution of your analytical skills. It would also indicate an inability to plan, organize, and prioritize assigned work. (See Exhibits 11 and 14.)

### III. Communications (Non-Critical)

Your work did not meet the fully successful level under Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

❖ Thinking Paper: The assignment was not timely. The original assignment was discussed with you verbally at least one week prior to your formally receiving the task on February 25, 2005. You submitted the first draft on March 9, 2005. The paper was returned to you for corrections with a due date of April 22. You immediately requested an extension of one month without even attempting to meet the due date, submitting the paper on May 20. This branch is expected to produce well-written scientific papers; both drafts of the thinking paper were poorly written and could not be accepted for Agency use without much needed work. Some of the material lack references, especially the section on avian influenza. Much of the material has been lifted exactly as written from other documents. Lifting text from another manuscript without proper reference is not acceptable. In early July following training courses in May and June, you were given an opportunity to revise or modify the document but informed me that you were satisfied with the paper as written. Work on this paper presented an opportunity for you to liaison with federal and state government personnel, academia, and others to clarify and exchange information on the branch's role and support information in the paper, which was recommended when the first draft was returned to you, but there was no evidence in the second draft that you did this. (See Exhibits 6, 8, and 11—12.)

❖ Toxoplasmosis Paper: For the toxoplasmosis project, you failed to do work beyond drafting the project plan. When asked recently to give an update of the toxoplasmosis project, you indicated that you were not working on the project because you thought the thinking paper replaced the toxoplasmosis paper. This was not the case, and you made no attempt to clarify this. In August you sent an update of the toxoplasmosis project, admitting that I had not told you that the thinking paper replaced the toxoplasmosis paper, but I had never approved your project plan for the toxoplasmosis paper. You are correct that there is no written communication on this, but we have had verbal discussions in your office and at branch meetings. This is a failure to communicate, orally or in writing, to the supervisor to assist in clarifying or resolving a problem. In not continuing work on the project or providing a work product, you have not conducted business in a professional manner or shown a commitment to service. (See Exhibits 11 and 14.)

**Tasks to Improve Performance to the Fully Successful Level**

6

During this opportunity period, you must improve your performance to at least the Fully Successful level in order to continue in your position. The following is a list of specific tasks that have been assigned to you that must be completed during this opportunity period. You must meet all deadlines for the tasks described below. During this opportunity period there may be other related tasks such as review of notices and/or directives that are assigned to you that will also need to be completed timely and accurately.

1) **Toxoplasmosis Paper:** Prepare a scientific paper on toxoplasmosis as it relates to meat and poultry, written in a format prescribed by a peer-reviewed journal. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. Within two weeks of receiving this letter you are expected to provide me with your specific focus on the paper, provide the format for the paper, and establish milestones and delivery dates for completing all work on the paper within this 90-day opportunity period. The paper, if well written, properly researched and prepared for publication in a peer-reviewed journal, would indicate Fully Successful performance in the following:

❖ Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4.

- Preparation of a paper for publication in a peer –reviewed journal would demonstrate your knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging diseases. It would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues.

❖ Research and Analysis element A, B, and C, and goals/activities #s 1 – 4.

- Preparation of a paper for publication in a peer –reviewed journal would demonstrate your ability to research and analyze issues thoroughly and accurately. As discussed under Mission Support, it would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues.

❖ Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

- Preparation of a paper for publication in a peer—reviewed journal would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show too that you can prepare documents that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.

2) **Salmonella Serotype Paper:** Prepare a scientific paper of the top five poultry Salmonella serotypes, describing each serotype in detail, such as reservoirs, its public health significance, related antimicrobial resistance issues, etc. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. The paper, if well written and properly researched, would address a request made by the Assistant Deputy Administrator to provide descriptive information on key poultry Salmonella serotypes. It would indicate Fully Successful performance in:

❖ Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4.

7

00001803

00001803

- Preparation of the report would demonstrate your ability to provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements. It would show that you are capable of conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues

❖ Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4.

- Preparation of the paper would show that you are capable of researching and analyzing issues thoroughly and accurately, and in a timely manner, making use of available reference sources that would allow you to identify and compile information to carry out the required analysis.

❖ Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

- Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show that you can present written findings and observations to managers in a manner that enhances confidence and credibility in the Branch and Division.

3) **Zoonotic Disease Surveillance:** Prepare bi-monthly compilation of worldwide emerging zoonoses as indicated in scientific journals, newspapers, internet, and other available reference materials that may have potentially serious human health concerns and can possibly be foodborne (especially related to meat, poultry, and eggs). Submissions are due on Thursday by close of business and must be free of major errors and require few edits and revisions. The report, if conscientiously prepared and timely submitted, would provide the Zoonoses Branch with up-to-date information on zoonotic disease incidence worldwide and serve as a valuable reference source for Agency inquiries on the subject. It would indicate Fully Successful performance in:

❖ Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4.

- Preparation of the report would indicate your ability to provide a work product that is responsive to the supervisor's and the organization's stated priorities and requirements. In preparing the report, you would acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.

❖ Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4.

- Preparation of the report would demonstrate your ability to make use of available reference sources, research and analyze issues thoroughly and accurately, identify and compile information, establish and maintain working files, and identify relevant scientific issues that may have policy implications.

❖ Communications element A, B, and C, and goals/activities #s 1b, c, e, and g.

- Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, timely, and presented in an understandable manner. It would indicate an ability to present written findings to colleagues and managers in a manner that enhances confidence and credibility in the Branch and Division.

00001804

00001804

To assist you in obtaining the Fully Successful level, I would suggest that when you receive assignments from me for specific work, take notes. If the assignment is sent electronically through our Outlook message or task system and you do not understand the assignment, I encourage you to visit with me so we can discuss the assignment further. I suggest too that you better develop your writing, research, and analysis skills; the writing courses you took in May and June should be helpful. Finally, make good use of your time to ensure that all work can be completed in a timely manner; you may have tips from the project management class you took in May that will be useful in scheduling your time. To further assist you, I would like to spend some time during our first weekly meeting next Monday to review the element(s) and go over with you the tasks that you are responsible for completing.

You are reminded that you are responsible for meeting the Fully Successful level of performance on the critical elements listed above for one year from the beginning of the opportunity period. Failure to achieve acceptable performance on the critical elements during the opportunity period or to maintain them during the remainder of the one-year period may result in removal or reduction in grade without any further opportunity to demonstrate acceptable performance. You should refer to this plan throughout the PIP period.

If you feel that you have a personal or medical problem that may be impeding your ability to perform your duties at an acceptable level, I suggest that you seek assistance through the Employee Assistance Program (EAP). This is a confidential program, and you may reach a counselor by calling 1-888-290-4EAP to schedule an appointment.

Please sign a copy of this memorandum, which serves only to acknowledge your receipt of this notice.

Receipt Acknowledged: *Khurshed Chowdhury*

*Employee Refused to sign*                                          *08/29/2005*

_____                    _____
Signature                                                                       Date

*Dr. Aronoshar*

Enclosure

Cc:        Jose Calvo, Employee Relations Specialist
           Alice Thaler, Director, ZDRSD

9

00001805
00001805

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KHURSHED A. CHOWDHURY     )
     )
     Plaintiff,     )
     )
v.     )     **Civil Action No: 07-0997 (RCL)**
     )
     )
**ED SCHAFER,  Secretary,**     )
**United States Department of Agriculture** )
     )
     Defendant.     )     **February 25, 2008**
     )

## THE PLAINTIFF'S RESPONSES TO THE DEFENDANT'S FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS

### GENERAL OBJECTIONS

The plaintiff hereby objects to any and all production requests to the extent that they call for the waiver of any attorney-client or work product privilege, or are overly burdensome and/or involve undue financial expense or require the plaintiff to waive any rights to privacy. The plaintiff also believes there are documents in the defendant's production responses that may relate to his responses herein. However he has identified only documents in his possession prior to receiving the defendant's production responses. Subject to these objections and limitations, the plaintiff, Khurshed Chowdhury, hereby files his responses and objections to the defendant's first set of interrogatories and requests for production of documents as follow:

1

**Interrogatory 12.** As to paragraph 43 of your complaint, identify and fully describe each instance in which "Dr. Parham told Dr. Chowdhury that he was too old to continue his job and that she wanted him to retire;" said description should include when the statement was made, where it was made, any witnesses to the statement, the context of the conversation and what was actually said by the participants to the conversation.

5

RESPONSE

On December 13, 2004, the plaintiff sent Dr. Parham the Columbia poultry evaluation report she requested. Later that day, he went to her office and asked her not to punish him for not completing the paper. He reminded her that she had kept him busy with BSE. He then mentioned that she never asked the same from others in the branch. The plaintiff told her that in a few years, he would be retired. At this point, Dr. Parham said, "if you think you are so old then maybe you should retire soon."

**Interrogatory 13.** As to paragraph 44 of your complaint identify and fully describe each instance referred to in the statement that plaintiff's "treatment worsened and he was accused of having poor performance when that was not the case."

RESPONSE

The plaintiff filed his initial EEO complaint Case No. FSIS-2005-01076 on 8/11/05. After mediation, the plaintiff did not begin his PIP until October 15, 2005. It took another two weeks to approve the plans for the assignments during this PIP, the toxoplasmosis a peer-review paper, and salmonella serovar papers and the worldwide zoonoses report. Hence, the actual time available to complete these assignments was two months. See also memoranda exchanged during PIP-period attached as response to production request # 2.

When the plaintiff submitted the toxoplasmosis and salmonella serovar papers, Dr. Thaler and Dr. Parham found fault with petty typos or minor grammars or punctuation mistakes, as well as quotes form other published articles See also memoranda exchanged during PIP-period and March 10, 2006 rebuttal attached as response to production requests for # 2 and 8.

They also required the plaintiff to complete a daily journal, which was a compilation of how he spent each minute of his time during that period. They had the papers reviewed by other persons in the department who were not qualified. They also tried to influence other colleagues, such as Dr. Bernard Salamone and Dr. Harry Walker, against the plaintiff. Finally, Dr. Thaler unfairly criticized the plaintiff's report prepared for Dr. Holt as outlined in the response to interrogatory no. 11.

Finally, after his removal, the defendant precluded the plaintiff from receiving an excellence award for his work on BSE.

**Interrogatory 15.** Fully describe any statements by DOA employees or managers which you believe evidence discriminatory animus towards you based on age, race, color, national origin or reprisal, this should include but not be limited to the date, actor, statement made, and witnesses thereto.

RESPONSE

See response to interrogatory no. 12.

**Interrogatory 16.** As to each adverse action alleged, fully identify and describe the specific harm caused by the adverse action.

RESPONSE

The main adverse actions which caused Dr. Chowdhury harm were his unacceptable performance evaluation in August 2005, the placing him on a PIP at that time and removing him for failing the PIP effective September 1, 2006. He has suffered lost pay and benefits and emotional distress as set forth in the complaint.

7

# Red Exhibits Excerpted From Report of Investigation

## Khurshed Chowdhury
### v.
## United States Department of Agriculture, Food Safety & Inspection Service

## Case No. FSIS-2006-02266
## COPY - UNSANITIZED

# Red Exhibit Excerpted From Report of Investigation

# Khurshed Chowdhury
## v.
# United States Department of Agriculture, Food Safety & Inspection Service

# EXHIBIT 9

# WITNESS' AFFIDAVIT

I, (name)____Alice Thaler_____(County of): _____

am an _____X_____ employee of _____ applicant to_____ former employee of
the U. S. Department of Agriculture:

(Agency) _____Food Safety and Inspection Service_____

(County of Agency) _____

(Office) _____Office of Public Health Science_____

(Division) _____Office of the Assistant Administrator_____

(Branch) _____

Located in (city and state) _____Washington, D. C._____

In the capacity of (show both your organization title and the classification of your job, if
different): ____Senior Director for Program Services; Series 0701_____

Grade ____GS-15_____ between (date) _March 5, 2006 and (date) _____Present_____

My telephone number during working hours is: _____(202) 690-2687_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate
fully and promptly with the investigator who has been assigned to conduct a thorough
and impartial investigation into a complaint of discrimination against the Department of
Agriculture. I must provide a statement for the investigative report which is true and
complete to the best of my knowledge and which discloses all of my firsthand
knowledge having a bearing on the merits of the complaint. My statement is provided
under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal
Employment Opportunity Commission rules and regulations and Department of
Agriculture policy. This means that any employee(s) whom I accuse of discrimination or
other acts of impropriety may be shown relevant portions of my affidavit and be
provided an opportunity to respond for the record. In addition, the Complainant and the
appropriate Departmental officials involved in the EEO complaint process will receive
the entire investigative file. I have the right to review my statement prior to signing it and
may make initialized corrections if it is incomplete or inaccurate. I have the right to
receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the
investigative process, I solemnly swear___X_____ affirm_____    the    statement    which

Initials _____ 5/30/06
KA EXHIBIT ____9____
Page 1 of 5

follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

My date of birth is January 14, 1955.  My race is White.  My national origin is English/German/Polish.   Prior to entering my current position I was a Division Director and Dr. Khurshed Chowdhury's immediate supervisor.  I am not aware of his age.  With regard to his race and national origin, I cannot be precise but he has mentioned to me that he was going to visit his family in Bangladesh.  With regard to prior EEO activity, I filed EEO complaints in 1996 for non-selection and again in 1999 for reprisal.  I am aware of Dr. Chowdhury's prior EEO activity because I have been named as a management official.

Presently I have responsibility for supervising 64 employees that consist of an ethnically diverse group of people that speak approximately 60 languages.  As for age, Dr. Chowdhury is not the oldest employee and he is not the youngest.  I have never told any employee that he or she was too old and needed to retire.  Such a statement would be against my principles as a manager.  I do not believe that Dr. Chowdhury was treated any differently than the others who are in the same or a similar situation.

I have received training about my agency's harassment policy, and I have conveyed the information to my staff.  I stress that harassment of any kind will not be tolerated.   Except on one occasion, Dr. Chowdhury has not come to me and reported that he felt harassed by anyone.  The exception was one time when he barged into Dr. Parham's office, yelling at her and threatening her about mistreating his family and him. Dr. Parham files a workplace violence report about this incident.  As a result, I counseled Dr. Chowdhury about his behavior in this instance.

On May 31, 2006, I received an email from Dr. Kristin Holt at the Center for Disease Control (CDC). She was requesting that we provide her with answers to questions posed to CDC by Peru about Mad Cow Disease - Bovine Spongiform Encephalopathy (BSE). Dr. Holt does not have a staff, so she frequently calls on other Office of Public Health Science employees to provide her with information. I set the email aside with no intentions of acting on it because we don't answer questions from foreign countries. Correctly, the request should have been sent to the Office of International Affairs (OIA). I was out of the office on June 1 and 2, 2006. While I was away and Dr. Harry Walker was acting on my behalf, Dr. Holt re-sent the request for answers to the Peru BSE questions. Dr. Walker received the request and forwarded it Dr. Maqbool Qureshi who was acting Zoonoses Branch Chief to take action. Dr. Qureshi assigned the task verbally and by email to Dr. Chowdhury. Dr. Chowdhury submitted his document in response to this assignment on June 5, 2005. When I returned to the office, I read an email that Dr. Chowdhury had sent directly to the David Goldman, Assistant Administrator Office of Public Health Science. In it he notes that he submitted his report on June 5, 2006 and that Dr. Parham had already forwarded the report to Kristin Holt and Kristin had acknowledges its receipt. Dr. Chowdhury stated in this email that his report was diligently delivered, was within his area of expertise, and answered the questions appropriately within a short time period. Dr. Chowdhury's email included a copy of his report so I read it. As a result of my review, I found inaccuracies and misleading information in his report. I made revisions to the report and resubmitted it to Dr. Holt in CDC. I had a long conversation with Kristin Holt to inform her that the request should have been handled by the Office of International

Affairs and I urged her to forward what had been put together to that staff for final disposition. I acknowledged that in retrospect I should have contacted her immediately about my concern so that the Office of Public Health Science would not have prepared a response independently from the Office of International Affairs.

I normally let my subordinates know when I have found problems with their work. Generally I would first contact the immediate supervisor, but I determined that I needed to inform David Goldman at the same time because Dr. Chowdhury had emailed him directly about this report. I sent a copy of the email to David Goldman because he is my supervisor; to Neena Anandaraman because she was the acting branch chief; to Delila Parham because she is the permanent branch chief and Dr. Chowdhury's immediate supervisor; and to Harry Walker and Maqbool Qureshi because they were involved with giving Dr. Chowdhury the BSE assignment when they served in acting capacities. Sending copies of the email to others was not intended to embarrass, intimidate or harass Dr. Chowdhury. My sole concern was that inaccurate information not be sent out of the agency, especially through inappropriate channels to a foreign country. Previously, Dr. Chowdhury had received warning that his performance needed to improve. He had been placed on a performance improvement plan (PIP) in an effort to help him bring his performance up to an acceptable level, though to no avail. Dr. Chowdhury may have perceived our efforts to assist him with improving his performance as criticism and/or harassment.

Dr. Holt received Dr. Chowdhury's report, not knowing whether or not the information he provided was correct, complete or represented the agency position on the issue. She requested information from other agencies, as well as OPHS, and used

Initials _AMS_ 8/30/06
KA EXHIBIT _9_
Page 4 of 5

everyone's report to compile her report.    In her report, where she lists the information, she gives the name of the individual that furnished the data.    Dr. Chowdhury apparently believes that referencing his name by the information he provided is Dr. Holt's manner of complementing his work.  Actually, while listing the individual's name, she is merely indicating the source of her information.

I can say with certainty that Dr. Khurshed Chowdhury's age, race, national origin and prior EEO activity have had no bearing on the decisions management have made relevant to him.

I have no additional statement to add.

I have reviewed this statement, which consists of _____5_____ pages,    and    hereby solemnly ___X_____ swear _____ affirm that it is true and complete to the best of my knowledge and belief.  I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____        ___8/30/06___
(Signature of Deponent)                                              (Date)

Initials _AMA_ 8/30/06
KA EXHIBIT _9_
Page 5 of 5

# Red Exhibit Excerpted From Report of Investigation

## Khurshed Chowdhury
### v.
## United States Department of Agriculture, Food Safety & Inspection Service

# EXHIBIT 11

# WITNESS' AFFIDAVIT

I, (name)_____Delila Parham_____        (County of): _____

am an _____X_____ employee of _____ applicant to_____ former employee of

the U. S. Department of Agriculture:

(Agency) _____Food Safety and Inspection Service_____

(County of Agency) _____

(Office) _____Office of Public Health Science_____

(Division) ____Zoonotic Diseases and Residue Surveillance Division_____

(Branch) ____Zoonoses Branch_____

Located in (city and state) _____Washington, D. C._____

In the capacity of (show both your organization title and the classification of your job, if

different): _____Branch Chief – Supervisory Veterinary Medical Officer_____

Grade ___GS-14_____ between (date) _2001_ and (date) _____Present_____

My telephone number during working hours is: _____(202) 690-6573_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate
fully and promptly with the investigator who has been assigned to conduct a thorough
and impartial investigation into a complaint of discrimination against the Department of
Agriculture. I must provide a statement for the investigative report which is true and
complete to the best of my knowledge and which discloses all of my firsthand
knowledge having a bearing on the merits of the complaint. My statement is provided
under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal
Employment Opportunity Commission rules and regulations and Department of
Agriculture policy. This means that any employee(s) whom I accuse of discrimination or
other acts of impropriety may be shown relevant portions of my affidavit and be
provided an opportunity to respond for the record. In addition, the Complainant and the
appropriate Departmental officials involved in the EEO complaint process will receive
the entire investigative file. I have the right to review my statement prior to signing it and
may make initialized corrections if it is incomplete or inaccurate. I have the right to
receive a copy of the signed statement.

Initials DRP
KA EXHIBIT ___77___
Page 1 of 4

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear___X___ affirm_____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

My date of birth is April 14, 1953. My race is Black. My national origin is American. I am Dr. Khurshed Chowdhury's immediate supervisor. I am not aware of his age, and I have never made a comment to Dr. Chowdhury, jokingly or otherwise, that he is too old and should retire. Neither have I heard Dr. Alice Thaler make that statement to him. I know that he is Asian and originally from Bangladesh. Other than Dr. Chowdhury, I supervise two other Asians, Dr. Neena Anandaraman and Dr. Maqbool Qureshi. I know that Dr. Anandaraman was born in Asia but has been in the United States since early childhood and that Dr. Qureshi was born in Asia and has been in the United States for at least 25 years. I am aware of Dr. Chowdhury's participation in EEO activity because I have been named in at least two of them. His most recent EEO complaint was filed in early 2006 about his performance rating. I have never considered age, race, national origin, and/or participation in EEO activity as factors when making decisions with regard to Dr. Chowdhury or any other member of my staff. Everyone is treated the same regardless of age, race, ethnic background, or complaint activity.

I have received training about the agency's policy about harassment, and I have conveyed that information to my staff. I believe that Dr. Chowdhury's perception of harassment began when he was given a warning that he was not performing at an acceptable level. Later, he was placed on a performance improvement plan (PIP). His performance did not improve under the PIP, and he was given an Unacceptable rating

Initials DRP
KA EXHIBIT  77
Page 2 of 24

for the appraisal period. The matter was then forwarded to our Human Resources Division, Office of Management, to take whatever action deemed necessary.

The performance issue is what motivated Dr. Chowdhury's initial EEO complaint. The complaint was resolved through mediation, and it was during the mediation session that Dr. Chowdhury stated that he felt management was harassing him. He has never complained directly to me about harassment although he did confront me in my office in February to express his anger and distress about his Unacceptable rating. His manner was very intimidating, and I discussed the incident with Dr. Alice Thaler, my immediate supervisor, as well as file an official Agency report. Dr. Chowdhury apologized for the incident, and no further incidents have occurred.

I was out of the office on the Friday that Dr. Chowdhury was given the Bovine Spongiform Encephalopathy (BSE) assignment. I returned to work the following Monday, at which time I learned of Dr. Chowdhury's assignment, which was due that day. He completed the report then sent it to me electronically. As his supervisor I take responsibility for not reviewing the report. Most of the information was readily available on the FSIS' website and an acceptable report should have been expected from a staff officer at the GS-13 grade level. However, given Dr. Chowdhury's past performance problems, I should have reviewed the report before forwarding it to Dr. Kristin Holt, FSIS liaison with the Centers for Disease Control (CDC) in Atlanta, GA.

After receiving a copy of the report, Dr. Alice Thaler reviewed it and found that the information provided in it was incomplete. She made corrections to Dr. Chowdhury's report and sent the revision to Dr. Holt. I received a copy of Dr. Thaler's June 9, 2006, email to Dr. Chowdhury and others.



Initials D RP
KA EXHIBIT 11
Page 3 of 4

This is a summary of my involvement with this issue.  I have no further statement to add.

I have reviewed this statement, which consists of ____4____ pages,    and     hereby solemnly ___X____ swear _____ affirm that it is true and complete to the best of my knowledge and belief.  I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_Delila Parham_____          _8/30/2006_
(Signature of Deponent)                                      (Date)

Initials DRP
KA EXHIBIT  77
Page 4 of 4

# Red Exhibit Excerpted From Report of Investigation

# Khurshed Chowdhury
## v.
# United States Department of Agriculture, Food Safety & Inspection Service

# EXHIBIT 12

## WITNESS' AFFIDAVIT

I, (name)___Harry Lee Walker_____ (County of):  District of Columbia___

am an _____X____ employee of _____ applicant to_____ former employee of the U. S. Department of Agriculture:

(Agency) _____Food Safety and Inspection Service_____

(County of Agency) _____

(Office) _____Office of Public Health Science_____

(Division) ___Zoonotic Diseases and Residue Surveillance Branch·____

(Branch) _____Residue Branch_____

Located in (city and state) ____Washington, D. C._____

In the capacity of (show both your organization title and the classification of your job, if different): _____Branch Chief_____

Grade ___GS-14_____ between (date) __2004___ and (date)____Present_____

My telephone number during working hours is: _____(202) 720-4768_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. This means t hat a ny e mployee(s) whom I a ccuse o f d iscrimination o r o ther a cts o f impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the Complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Initials_____
KA EXHIBIT__12_
Page 1 of 4

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear __X__ affirm_____ the          statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

My date of birth is March 2, 1953. My race is White. My national origin is American.   About one year ago I filed an informal EEO Complaint, though I have never filed an EEO complaint at the formal level. I have known Khurshed Chowdhury for the past nine years, since arriving in Washington, DC. I don't know his age, but I am aware of his ethnic background and that he is Asian of Bangladesh origin. I have heard through the office grapevine that Dr. Chowdhury had participated in prior EEO activity, though I don't know the details of his complaints. He has never spoken to me personally about this.   To my knowledge, Dr. Chowdhury's age, race, national origin and prior EEO activity were not factors in any decisions I made relevant to him. I have treated him no differently than other employees in the same or a similar situation as he.

On May 31, 2006, Dr. Alice Thaler, the Senior Director for Program Services, was out of the office. I was acting on her behalf. I was also Acting as the Division  Director for ZDRSD. During this time I received an email from Dr. Kristin Holt at the Center for Disease Control, requesting that OPHS answer questions about Bovine Spongiform Encephalopathy (BSE).  I am not familiar with this line of work, so I gave the questions to Dr. Maqbool Qureshi in the Zoonotic Diseases Branch which is a part of the Residue Surveillance Division (ZDRSD) because, he was the Acting Branch Chief, their branch works extensively with BSE, and I knew he would know who to assign the questions to.

Initials _____

KA EXHIBIT __12__

Page 2 of 4

Dr. Qureshi was acting on behalf of Dr. Delila Parham, Chief of the Zoonotic Diseases Branch for ZDRSD who was out of the office. Dr. Qureshi informed me that he had assigned the questions to Dr. Chowdhury.

I briefly reviewed Dr. Chowdhury's report. As he was discussing things I was not totally sure of. This happens all the time as a supervisor, especially at the levels I was acting at, Director and Senior Director. My policy is to trust my Branch Chiefs until I have reason not to. I had to believe that Dr. Qureshi would not release a report that he was not sure of. I didn't know there was a problem with the BSE report until on June 9, 2006, when Alice Thaler directed an email to Dr. Chowdhury and sent a copy to me.

The Center for Disease Control is known to ask the same questions of various agencies. OPHS frequently receives such requests from CDC. For that reason I gave their request to Dr. Qureshi. Then when I spoke with Dr. Holt on the phone I recommended that the Risk Assessment Division within OPHS and the Office for International Affairs be contacted as well. I do not know if Dr. Holt contacted these other groups. Aside from giving Dr. Holt's request for answers to the BSE questions to Dr. Qureshi and for him to assign an appropriate staff member to research the answers, I had no involvement in the issue Dr. Chowdhury complains about.

I have no additional statement to add.

Initials
KA EXHIBIT 12
Page 3 of 4

I have reviewed this statement, which consists of ____3____ pages, and hereby solemnly ___X___ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____        _____

(Signature of Deponent)                                    (Date)

# Red Exhibit Excerpted From Report of Investigation

# Khurshed Chowdhury
## v.
# United States Department of Agriculture, Food Safety & Inspection Service

# EXHIBIT 13

## WITNESS' AFFIDAVIT

I, (name)___ Maqbool Qureshi _____ (County of): _____

am an _____X_____ employee of _____ applicant to_____ former employee of the U. S. Department of Agriculture:

(Agency) _____Food Safety and Inspection Service _____

(County of Agency) _____

(Office) _____Office of Public Health Science _____

(Division) ___ Zoonotis Diseases and Residue Surveillance Division _____

(Branch) _____

Located in (city and state) _____Washington, D. C._____

In the capacity of (show both your organization title and the classification of your job, if different): _____Veterinary Medical Officer _____

Grade ___GS-13_____ between (date) _2004_ and (date) _____Present_____

My telephone number during working hours is: _____(202) 690-6633_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the Complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear__X__ affirm_____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

My date of birth is November 13, 1949. My race is Asian. My national origin is Pakistani. I have held a position with the Department of Agriculture for the past 27 years. I was transferred to my current position two years ago, during which time Dr. Khurshed Chowdhury and I have been colleagues. I am aware of Dr. Chowdhury's age, race, and national origin because he has told me. I filed an EEO complaint in the year 1995, when I was working in the field. I learned of Dr. Chowdhury's EEO activity through hearsay among the staff. Other than Dr. Chowdhury and me, there is one other Asian staff member, Neena Anandaraman, who is from India. To the best of my knowledge age, race, national origin, and EEO activity have never been an issue in our organization.

I am aware of the Agency's policy about harassment, and I know how to report harassment. I was not aware that Dr. Chowdhury felt harassed by management or anyone. In my opinion, everyone is treated the same.

On Friday, June 5, 2006, Dr. Delila Parham, the Branch Manager was away on vacation. In her absence, the staff rotates, on a daily basis, as the Acting Branch Manager on Dr. Parham's behalf. On that Friday, I was the Acting Branch Manager. In that capacity, Dr. Harry Walker gave me a request to answer some Bovine Spongiform Encephalopathy (BSE) questions. He told me to handle it. I gave the questions to Dr. Chowdhury because of his expertise in BSE. He had worked on BSE before, and I felt he could get the job done.



Initials M.H.Q
KA EXHIBIT 13
Page 2 of 3

I was the Acting Branch Manager for that one day (June 5, 2006), and that was the extent of my involvement with this issue. I did receive a copy of the email dated June 9, 2006 that Dr. Thaler wrote to Dr. Chowdhury regarding his BSE report. I can only guess that a copy was sent to me because I issued the assignment. Normally, emails are sent to those involved in whatever issue is of concern. I don't know how this relates to discrimination, since I have not observed any discriminatory practices by the staff or by management.

I have no additional statement to add.

I have reviewed this statement, which consists of _____3_____ pages,     and     hereby solemnly ____X____ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.


_____M.H.Qureshi_____     08/30/2006
(Signature of Deponent)                                                                  (Date)


Initials M.H.Q
KA EXHIBIT 13
Page 3 of 3

# Red Exhibit Excerpted From Report of Investigation

# Khurshed Chowdhury
## v.
# United States Department of Agriculture, Food Safety & Inspection Service

# EXHIBIT 18

Message *6/2/06*   *Original Task Request Came from Peru*   Page 1 of 5

**Chowdhury, Khurshed**

*(Friday afternoon)*  ①

| From: | Qureshi, Maqbool |
| Sent: | Friday, June 02, 2006 10:51 AM |
| To: | Chowdhury, Khurshed |
| Subject: | FW: Reminder: BSE Questions from Peru |

Dr. Chowdhury:

Please read information below,and respond with your comments.Thanks

--Maq

----Original Message----
**From:** Walker, Harry
**Sent:** Friday, June 02, 2006 8:59 AM
**To:** Qureshi, Maqbool
**Cc:** Parham, Della
**Subject:** FW: Reminder: BSE Questions from Peru

Hi Maq,

I got a call from Kristin and then this email. I do not know if Alice or Della assigned this to someone in ZB and they are both out today.

In any case, can you please find out if someone in ZB has been assigned this BSE case?  If so, see if they can meet Kristin's deadline. If no one has been assigned to it, please see if someone can take it up and meet Kristin's deadline or as soon as they can.

Please let me know the outcome so I can report back to Kristin.

Thanks,

**Harry Lee Walker, DVM**
Acting Director, ZDRSD
USDA, FSIS, OPHS
Location: Rm 392 Aerospace Center
Mail Drop Rm 343 Aerospace Center
1400 Independence Ave., SW
Washington, DC 20250-3700
Phone (202) 720-4768, Fax (202) 720-8213
harry.walker@fsis.usda.gov

⊛ *Dr. Thaler knew on June 2, 2006*

----Original Message----
**From:** Holt, Kristin
**Sent:** Friday, June 02, 2006 8:30 AM
**To:** Walker, Harry; Hicks Quesenberry, Heather
**Cc:** Thaler, Alice
**Subject:** Reminder: BSE Questions from Peru

Just sending this as a reminder...hoping to get info by cob today. Monday mid-day would be fine. Really would appreciate any input RAD and ZDRSD might have. Already heard from EL folks (see below). Kristin

*KAC*

EXHIBIT 18

*Responses from Recims*

**5** Pg 1 of 1

## Chowdhury, Khurshed

**From:** Holt, Kristin
**Sent:** Monday, June 05, 2006 1:28 PM
**To:** Parham, Delila
**Cc:** Walker, Harry; Chowdhury, Khurshed
**Subject:** RE: BSE Questions from Peru

Thanks to you all!! Kristin

---

**From:** Parham, Delila
**Sent:** Mon 6/5/2006 1:23 PM
**To:** Holt, Kristin
**Cc:** Walker, Harry; Chowdhury, Khurshed
**Subject:** FW: BSE Questions from Peru

Kristin, I am forwarding Khurshed Chowdhury's responses to the questions on BSE. Feel free to contact Dr. Chowdhury or me if we can be of further assistance on this.

Delila

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Monday, June 05, 2006 1:12 PM
**To:** Walker, Harry
**Cc:** Parham, Delila; Qureshi, Maqbool
**Subject:** BSE Questions from Peru

Hi Harry,

Please find the attachment # 1 my comments on the issue of "BSE-questions from Peru" which has been forwarded to me in the afternoon of Friday (6-2-06) by the Acting Branch Chief of Zoonoses branch Dr. Qureshi. Within this very short period, I have tried my best to gather pertinent information to answer those questions from Peru. I have also discussed the question about OIE's TAH Code article 2.3.13.13 with Drs. Chuanafa Guo and Heather Hicks (RAD), but they could not give me anything new about it.

Thanks.

Khurshed Chowdhury, DVM, Ph.D.
VMO, ZDRSD, OPHS.

KAC

6/12/2006

EXHIBIT 18

# Red Exhibit Excerpted From Report of Investigation

# Khurshed Chowdhury
## v.
# United States Department of Agriculture, Food Safety & Inspection Service

# EXHIBIT 21

| | |
|---|---|
| Subj: | **FW: Re: BSE Questions from Peru** |
| Date: | 8/28/06 12:35:50 PM Eastern Daylight Time |
| From: | Delila.Parham@fsis.usda.gov (Parham, Delila) |
| To: | gamallard@aol.com |
| File: | BSEPeruquestions.doc (57856 bytes) DL Time (115200 bps): < 1 minute |

Ms. Mallard, please see the attachment for changes made by Alice Thaler.

Delila Parham
Zoonotic Diseases and Residue Surveillance Division
Office of Public Health Science
Food Safety and Inspection Service, USDA
Tel: 202-690-6566/6573
Email: delila.parham@fsis.usda.gov

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Friday, June 09, 2006 11:40 AM
**To:** Chowdhury, Khurshed; Goldman, David; Anandaraman, Neena
**Cc:** Parham, Delila; Walker, Harry; Qureshi, Maqbool
**Subject:** RE: Re: BSE Questions from Peru

The Peru questions should have been handled by OIA. I did not expect OPHS to respond to these questions from Peru. OIA is perfectly capable of and responsible for representing the agency position on BSE and our role at the most should be to review, at their request, whatever response OIA prepared.

I did not rename Dr. Chowdhury's file and have tracked changes and comments in the document. The document as submitted is not acceptable. There are technical inaccuracies and the wording in some parts is unclear or misleading. The response was not written to emphasize the agency position on BSE and may plant doubt about the agency position. My apologies David that this was sent to you before it had received adequate review. We will instruct employees who are acting as the branch chief to not clear documents on sensitive topics until they have been reviewed by at least the branch chief and division director. I will leave it to Dr. Anandaramna, acting Branch Chief to recall this response by Dr. Chowdhury from all parties who received it..

Alice M. Thaler, DVM, DACVPM
Senior Director for Program Services
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Thursday, June 08, 2006 9:26 AM
**To:** Goldman, David
**Cc:** Parham, Delila; Thaler, Alice; Walker, Harry; Qureshi, Maqbool
**Subject:** Re: BSE Questions from Peru

EXHIBIT 21

Dear Dr. Goldman,

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT
District of Columbia

```
_ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :      COPY
KHURSHED A. CHOWDHURY,              :
                                    :
          Plaintiff,                :      CASE NO.
                                    :
     v.                             :      1:07-CV-99 (RCL)
                                    :
ED SCHAFER and the                  :
UNITED STATES DEPARTMENT OF         :
AGRICULTURE,                        :
                                    :
          Defendant.                :
_ _ _ _ _ _ _ _ _ _ _ _ _ _        :
```

Washington, D.C.

Tuesday, April 22, 2008

Deposition of:

BERNARD SALAMONE

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the

United States Attorney's Office, 501 Third

Street, Northwest, Washington, D.C., before

Constance H. Rhodes of Capital Reporting Company,

a Notary Public in and for the District of

Columbia, beginning at 11:45 a.m., when were

present on behalf of the respective parties:

# Capital Reporting Company

Page 14

1    Q    Did that start around 2006 then?
2    A    Yeah. 2000 -- April -- it started in
3    Spring of 2006.
4    Q    Spring of 2006. Okay. Anything else
5    that you dealt with with regard to Salmonella
6    serotypes other than these reports for Mr. Lange?
7    A    No. That's it.
8    Q    Did you ever work on any issues regarding
9    toxoplasmosis?
10    A    No. Never. never.
11    Q    Were you ever asked to write a
12    peer-reviewed paper or a publication --
13    A    Yes.
14    Q    -- for a peer-reviewed journal?
15    A    Yes.
16    Q    Okay.
17    A    That was --
18    Q    Was that something that was required of
19    your job since the time that you began as a
20    veterinary medical officer?
21    A    It came about around 2000 -- might have
22    been 2004. We were -- we had a staff meeting and

Page 15

1    at that point in time it was brought to our
2    attention that as one of our elements, we were
3    going to have to write a peer-reviewed paper.
4    Q    Did you ever write one?
5    A    No. And I was -- and I was -- the
6    following year I was -- that was identified as
7    one of my deficiencies.
8    Q    But you've always maintained at least
9    minimum fully acceptable performance?
10    A    I have never been -- I have always been
11    outstanding.
12    Q    Outstanding.
13    A    Throughout my career in the military,
14    too. But you know I accepted it because I did
15    not meet the standards, and that was one of the
16    standards.
17    Q    But you still maintained an
18    outstanding --
19    A    No. I did not maintain -- no. I did
20    not, no.
21    Q    Okay. You became "fully successful" then
22    because of that?

Page 16

1    A    I don't know. What are the categories?
2    I don't -- What is it -- outstanding?
3    Q    You just have to tell me what you recall.
4    A    I can't remember. If the standards are
5    outstanding, superior, and fully qualified, then
6    I became superior.
7    Q    Okay. So you just went down one notch?
8    A    Yeah.
9    Q    All right. Thank you.
10    A    But I accepted it.
11    Q    I understand that.
12    A    I just want to make sure that you --
13    Q    Right.
14    A    That it was -- you know, because I did
15    not meet the standards.
16    Q    But you were never put on a performance
17    review because of that, were you?
18    A    No.
19    Q    Do you know anything about a NARMS
20    project? Does that name mean anything to you?
21    A    National Antimicrobial Resistant
22    Monitoring System. I worked on that project,

Page 17

1    also.
2    Q    Did Dr. Chowdhury work on that at all?
3    A    No. no.
4    Q    Tell me what that is.
5    A    The -- as part of the salmonellas, those
6    samples are then submitted to the Agriculture
7    Research Service. who do antimicrobial resistant
8    patterns on them. In other words, these
9    salmonellas are resistant to certain types of
10    antibiotics. and so. since these are our samples
11    coming from FSIS. they wanted representation.
12    Dr. Paula Craig runs that program, and we are
13    representative of FSIS because these samples are
14    coming from us. as well as -- she has
15    representatives from the Animal and Plant Health
16    Inspection Service since they get samples from
17    the farms.
18    Q    Do you recall whether Dr. Chowdhury. from
19    what you saw. did much work in Salmonella --
20    A    No.
21    Q    -- during the time -- you don't recall or
22    he did not?

# Settlement Agreement Exhibits

1) **Brown EEO Counselor Report**

2) **Settlement Agreement**

3) **Gould Letter**

4) **Bradshaw Memo**

# 1)  Brown EEO Counselor Report

# United States Department of Agriculture
## Food Safety and Inspection Service
### 14TH and Independence Ave., S. W., Washington, D.C. 20250

**EEO Counselor Report**
29 CFR Part 1614, Subpart A §1614.105

## CASE INFORMATION

| | |
|---|---|
| Case Number: FSIS-2006-01838    Individual ☒  or   Class Complaint ☐ | Counselor: **Valerie Sewell** |
| Anonymity: Yes ☐  No ☒    Counseling Process Election *(Select one):*   ADR ☐ | Traditional Counseling: ☒ |

## AGGRIEVED PARTY INFORMATION

Name: **Khurshed A. Chowdhury**   Job Title: **Veterinary Medical Officer**    Series: GS-0701    Grade: **13**

Program/Division/District/Duty Station: **FSIS-Office of Public Health & Science, Food Animal Science Division**

| | | | |
|---|---|---|---|
| Work Address: | **1400 Independence Ave, SW** | Phone (Work) | **202-690-6529** |
| Address Line 2: | **Room 343 Aerospace Center** | Phone (Home) | |
| City, State, Zip: | **Washington, DC  20250-3700** | Phone (Cell) | |
| | | Fax | **202-690-6565** |
| Home Address: | **401 Southview Avenue** | Email: | |
| Address Line 2: | | Work: | **202-690-6529** |
| City, State, Zip | **Silver Spring, MD  20905** | Home: | **301-388-0996** |

| | | |
|---|---|---|
| Representative's Name: | **No Representative** | Attorney *(Select one):*   Yes ☐   No ☐ |
| Address Line 1: | | Phone:  (   )   - |
| Address Line 2: | | FAX:  (   )   - |
| City, State, Zip: | , | Email: |

## CHRONOLOGY OF COUNSELING

| | |
|---|---|
| Date of Initial Contact | **February 9, 2006** |
| Date of Case Assignment [to counselor] | **February 9, 2006** |
| Date of Initial Interview | **February 15, 2006** |
| Date of Alleged Discriminatory Event | **February 8, 2006** |
| 45th Day after Discriminatory Event | **March 25, 2006** |
| Date of Final Interview | **February 27, 2006** |
| Date of NRF Issuance | **February 27, 2006** |
| Date Aggrieved Received NRF | **March 1, 2006** |
| Date Counselor Report Request | **February 27, 2006** |
| Date Counselor Report Submitted | **March 6,  2006** |

## EEO COUNSELOR REPORT

### CLAIM(s) FOR ALLEGED DISCRIMINATION

| | | |
|---|---|---|
| ☐ Appointment/Hire | ☒ Evaluation/Appraisal | ☐ Reinstatement |
| ☐ Assignment of Duties | ☐ Examination/Test | ☐ Retirement |
| ☐ Awards | ☐ Harassment Sexual | ☐ Terms/Conditions of Employment |
| ☐ Conversion to Full-time | ☐ Harassment | ☐ Time & Attendance |
| ☐ Demotion | ☐ Medical Examination | ☐ Training |
| ☐ Reprimand | ☐ Pay - Reg. Premium & Overtime | ☐ Other *(Explain)*: |
| ☐ Suspension | ☐ Promotion/Non-selection | |
| ☐ Removal | ☐ Reassignment | |
| ☐ Duty Hours | ☐ Accommodation | |

### BASIS(es) FOR ALLEGED DISCRIMINATION

| | | | |
|---|---|---|---|
| ☒ Race – **Asian Pacific** | ☐ National Origin - | ☒ Reprisal | ☐ Equal Pay |
| ☐ Color - | ☒ Age **(over 40)** | ☐ Political Belief | ☐ Genetic Information |
| ☒ Religion - **Muslim** | ☐ Disability – Physical | ☐ Marital Status | ☐ Sexual Orientation |
| ☒ Sex – **Male** | ☐ Disability –Mental | ☐ Familial Status | ☐ Other |

### PRECISE DESCRIPTION OF THE ISSUES COUNSELED

Claim:  The aggrieved has alleged that his first and second level supervisors have discriminated against him on February 8, 2006, when he learned he received a "Does not Meet" rating on his Performance Improvement Plan that he was placed on August 16, 2005.

The Aggrieved believes these actions have been taken against him because of his race (Asian Pacific Islander), religion (Muslim), gender (Male), age (over 40) and reprisal (prior EEO activity).

### REMEDY REQUESTED

As a result of the discrimination against him, Dr. Chowdhury has requested the following as remedy:

1) A removal of the present performance evaluation;

2) A performance evaluation for 2005 that rates him as fully successful; and

3) Compensatory damages for emotional distress, anxiety, humiliation, embarrassment and loss of enjoyment of life.

### EEO COUNSELOR CHECKLIST – Counselor advised the aggrieved individual in writing of the rights and responsibilities contained in the EEO Counselor checklist.

The aggrieved was e-mailed the EEO Counselor Checklist on February 15, 2006.  The assignment package included the rights and responsibilities, the election form, the designation of representative form, and the extension form.

### SUMMARY OF INFORMAL RESOLUTION ATTEMPT

#### If the Counselor attempted resolution (Personal Contacts):

Dr. Chowdhury is assigned to the Office of Public Health and Science in the Animal Sciences Division as a Veterinary Medical Officer.  He initiated a pre-complaint on February 9, 2006.  The issue that gave rise to Dr. Chowdhury's contact with the Civil Rights Division was during a meeting with his immediate and second level supervisors on

**EEO COUNSELOR REPORT**

February 8, 2006, he learned that he did not successfully pass a Performance Improvement Plan that he was placed on - on August 29, 2005.

**Background Information:**

Dr. Chowdhury was given an unsuccessful performance rating August 2005. He filed an informal complaint on that action and as a result of mediation (October 2005) was given an opportunity to improve the rating by writing three scientific papers to be submitted in three months later extended to 120 days or four months. The three papers were (1) a Toxoplasmosis paper, (2) a Poultry Salmonella Serotypes paper and (3) to compile a bimonthly report on zoonotic and emerging diseases.

Dr. Chowdhury presented the following facts:

Drs. Parham and Thaler required the aggrieved to write a research project for publication to the journal. This requirement was in addition to his regular assignments for FSIS, which is mission support. He stated that the requirement was not in his job description. According to Dr. Chowdhury, FSIS does not allow for any true research or scientific publication in journals and is not any criteria for his performance rating. Therefore, he believes it should not be included as part of the criteria for his performance rating. Further, he claims that Drs. Thaler and Parham did not use the same criteria of research and publishing projects for performance ratings to any others in the Division.

The aggrieved stated that by using his alleged poor performance on this research as an excuse, Drs. Parham and Thaler placed him unjustly on a PIP in August 2005. Before doing so, he said they did not give him any credit for the numerous priority FSIS urgent tasks (of more than 30 reports) for the mission support which he has accomplished during the same rating period, many of which have been used to make FSIS Policies/Regulations and Notices.

Dr. Chowdhury reported that Dr. Parham also required him to write a microbiology paper that he was not fully qualified to do. He stated that Office of Public Health Science (OPHS) has a fully staffed Microbiology Division with qualified microbiologists who could have prepared the paper.

Despite the heavy pressure and very rigid PIP deadlines, the aggrieved said he prepared and submitted all three reports on time. However, he believed Drs. Parham and Thaler had pre-determined that they were not going to accept his work as satisfactory. Instead they have found fault with them without any sound basis for scientific accuracy.

The aggrieved stated that he does not believe that his work was fairly judged. He also suggested that there are submissions within his report that he did not initially include and he has been rated on. He disagreed with the amount of spelling and grammar errors as stated by the reviewers.

Dr. Chowdhury said he requested time to make corrections and was not given an opportunity to do so.

The aggrieved asserted that Drs. Parham and Thaler's reasons for providing him with a poor performance rating were pretext for their discrimination and reprisal against him. He stated that not only did they treat him differently than others on his level in the division; they have made statements indicating that they wanted him to leave the division or retire.

Dr. Delilah Parham, Chief, Zoonoses Branch, GS-701-14

14th & Independence Avenue, SW

Room 343 – Aerospace Center

Washington, DC 20250-3700

202-690-6573

race (Black), religion (unknown), age (over 40), gender (female)

Dr. Alice Thaler, Director, ZDRSD, GS-701-15

(Same address as Dr. Parham)

202-690-2687

## EEO COUNSELOR REPORT

race (White), religion (unknown), age (over 40), gender (female)

Drs. Thaler and Parham were interviewed on February 21, 2006, during a conference call. They were presented with the allegations made by Dr. Khurshed Chowdhury and they both offered the following as a joint response:

Drs. Thaler and Parham met with the aggrieved on February 8, 2006, to discuss his failure to improve his performance rating during the 120-day performance improvement plan opportunity period and to give him his performance rating for unacceptable performance. They indicated that Dr. Chowdhury kept focusing on the editorial mistakes he made in his paper and arguing that they were not important. They emphasized the lack of scientific and technical analysis in the work products and the blatant plagiarism in the Toxoplasmosis paper. They pointed him back to the original PIP letter, which stated in detail what the expected quality of the work products needed to be to meet fully successful. The work he submitted at the end of the PIP did not meet the standard for fully successful. Dr. Chowdhury was assured that all his work throughout the rating period had been taken into consideration when his final rating was determined.

It was determined that the zoonotic disease report was the only acceptable final product, although he required extensive guidance to develop the report for this project, which was the simplest of the three PIP projects. The papers on toxoplasmiosis and poultry Salmonella serotypes did not meet the Fully Successful level for the Mission Support, Research and Analysis, and Communications elements.

### Documents Reviewed:

- Notice of Performance Improvement Plan

### Summary of Resolution Attempt:

### If Aggrieved opted for ADR, Counselor's statement that the ADR Process was fully explained to the Aggrieved Individual/Summary of information given to the Aggrieved Individual and the Agency by the Counselor.

The Aggrieved was offered mediation; however he declined. His final interview was conducted on February 27, 2006, followed by the issuance of his Notice of Right to File letter. He received the letter on March 1, 2006.

### COUNSELOR INFORMATION:

| Name: Valerie Y. Sewell | Signature & Date: | _Valerie Y. Sewell_ 3/27/06 |
|---|---|---|
| Phone No.: (301) 504-2159 | | |
| Fax No.: (301) 504-2141 | | |
| Email: Valerie.sewell@fsis.usda.gov | | |

### ATTACHMENTS:   Pages

- Notice of Right to File

## EEO COUNSELOR REPORT

- Receipt of NRF

# 2) Settlement Agreement

**ADEA**

**ADR**

## SETTLEMENT AGREEMENT

This agreement made by and between Khurshed Chowdhury, (hereafter referred to as the Aggrieved) and the Food Safety and Inspection Service (FSIS), U.S. Department of Agriculture (hereafter referred to as the Agency), constitutes a full, complete, and final settlement of all the employment concerns raised in the Aggrieved's informal EEO complaint *Case number FSIS-2005-01076, dated August 11, 2005.*

The execution of this settlement agreement does not prevent the Agency from pursuing any issues of alleged misconduct raised in the complaint nor from initiating any preventive, corrective or disciplinary action against Agency officials if warranted.

The parties wish to set forth the terms of the agreement in writing. This neither determines nor implies a finding of or admission that discrimination occurred.

This agreement is authorized under 29 CFR § 1614, regulations on processing EEO complaints in the Federal Government, and the EEOC's Management Directive (MD)-110.

**The Agency Agrees To:**

1. Continue to support and guide the Aggrieved throughout the remainder of the existing Performance Improvement Plan (PIP).

2. Accept submittal of two of the three assigned projects described in the PIP (*Salmonella Serotype Paper and Zoonotic Disease Surveillance Report*) by the end of November 2005.

3. Allow the Aggrieved an extension to submit the Toxoplasmosis Paper no later than December 31, 2005.

4. Allow the Aggrieved to submit a substantive progress report that includes updates on the three PIP projects, due no later than close of business Friday of each week, in lieu of a daily journal.

5. Detail the Aggrieved to another work unit within the Zoonotic Diseases and Residue Surveillance Division not to exceed 90 days, contingent upon his successful completion of the PIP.

6. Pay reasonable attorney fees not to exceed $1,000.

**The Aggrieved Agrees To:**

1. Withdraw his formal complaint and any other formal or informal complaint concerning

**ADEA**

                                                                          **ADR**

matters contained in the above referenced complaint and agrees not to raise any new complaints about the issues(s) in the above cited complaint.

2.  Submit in a timely manner each Friday a substantive progress report regarding the *Salmonella* Serotype Paper, Zoonotic Disease Surveillance Report and the Toxoplasmosis Paper that permits his supervisor to adequately assess his progress.

3.  Submit two of the three assigned projects described in the PIP (*Salmonella* Serotype Paper and Zoonotic Disease Surveillance Report) by the end of November 2005 acceptable to his supervisor and meeting the criteria detailed in the PIP.

4.  Submit the Toxoplasmosis Paper no later than Dec 31, 2005 acceptable to his supervisor and meeting the criteria detailed in the PIP.

5.  Release, waive and withdraw any and all concerns, complaints, grievances, appeals or civil actions against the Agency, its employees and officers in their individual or official capacities for any concerns arising out of these (or related) employment situations prior to the signing of the agreement. This agreement in no way prevents the Aggrieved from exercising his or her rights in accordance with 29 CFR 1614, in any other matter that arises after the signing of this agreement.

6.  *[Where age is included as a basis for the alleged discrimination]* This settlement applies to any and all complaints or causes of action under the ADEA, which the Aggrieved may have on file as of the date of the last signature on this agreement. The Aggrieved acknowledges that she/he has received something of value from the Agency in exchange for signing this agreement. The Aggrieved further acknowledges that she/he was advised to seek the advice of an attorney, if desired, and had adequate time to consider the terms of this agreement.

7.  *[Where age is included as a basis for the alleged discrimination]* The Aggrieved is aware of the right to representation by an attorney and is encouraged to have his/her representative review this agreement. The Aggrieved will have 21 days after receipt of this agreement to consider its terms. Should the Aggrieved sign the agreement before the 21 day time period has expired, Aggrieved attests that his/her decision to accept such a shortening of this period is knowing and voluntary, and was not induced by the Agency through fraud, misrepresentation, and/or threat to withdraw or alter the terms of this agreement. Aggrieved has 7 days from the date on which all parties have provided signatures to revoke this agreement.

**ADEA**

**ADR**

**Both Parties Agrees To:**

1.  Respect the privacy rights of all individuals involved in the matter. The fact that the case was voluntarily resolved in a manner acceptable to both sides may be communicated to others. Explicit terms of the agreement will not be discussed with, disclosed or released to anyone who does not need the information to implement the agreement, without express permission of the other party.

2.  Cooperate and communicate in good faith to implement and to abide by the terms of this agreement.

3.  Declare this complaint resolved through this settlement agreement. There are no other agreements between the parties, expressed or implied, oral or written.

4.  That after the agreement is fully implemented, the Agency will within 30 days, provide the Aggrieved with a written notice explaining the specific actions taken to implement the agreement. A copy of the notice will be provided to the Counseling Service Branch (CSB), Civil Rights Division (CRD), Maildrop 5261, 5601 Sunnyside Avenue, Room 1-2260, Beltsville, Maryland 20705-5000. If the Aggrieved has any questions about the implementation actions after receiving the notice, and the questions are not satisfactorily addressed by the Agency, the Aggrieved may raise these questions with the Director, Civil Rights Division at the above address or by calling (301) 504-7755.

5.  If the terms of this agreement are not carried out, through no fault of the Aggrieved, the Aggrieved may request enforcement of the terms of the agreement, **or** that the complaint be reinstated at the point it was closed by this agreement. This request must be filed within 30 days of the alleged failure to implement with the Director, CRD at the above address. This request should include a copy of this agreement, an explanation of which particular term(s) of the agreement have not been implemented, why the Aggrieved believes the term(s) have not been implemented, and any relevant documents. A copy of the request should also be provided to the individual who signed the agreement on behalf of the Agency.

6.  They are entering into this agreement voluntarily, without coercion or duress, and fully understand the terms of this agreement.

_____          10-11-05
Aggrieved                                Date

_____          10/11/2005
Management Official                      Date

# 3) Gould Letter

# Kestell & Associates

### Attorneys and Counselors at Law
### 1012 14th Street NW, Suite 630
### Washington, DC 20005-3423

James L. Kestell*
Tel. No. (703) 237-2912
Fax No. (703) 237-4321
email jlkestell@cox.net

Jonathan L. Gould***
Tel. No. (202) 347-3889
Fax No. (202) 347-4482
email jgould@igc.org

Michael P. Deeds**
Tel. No. (202) 347-4481
Fax No. (202) 347-4482
email mikedeeds@juno.com

Bianca Karim****
Tel. No. (202) 347-0090
Fax No. (202) 347-4482
email karim@kestellassociates.com

CR 2673
**received**
5/30/06

May 9, 2006

VIA FAX AND MAIL

Mr. Leslie Lightner
Equal Opportunity and Compliance Division
U.S. Department of Agriculture
Office of Civil Rights
1400 Independence Avenue, NW
Washington, DC 20005

RE: Khurshed A. Chowdhury EEO Complaint No. FSIS-2006-01838

Dear Mr. Lightner:

    This letter constitutes the complainant's objection to the decision of the Employment Complaints Division mailed on May 4, 2006 and received on May 8, 2006, to treat the above EEO complaint as one of non-compliance with a settlement agreement. There is nothing in the complaint that makes such an allegation. The complaint centers on the agency's issuance to Dr. Chowdhury of an unsuccessful performance evaluation on February 8, 2006.

    Although it is true that the agency and Dr. Chowdhury signed a settlement agreement regarding his previous EEO complaint, paragraph 5 on p. 3 of the agreement specifically provides that: "If the terms of the agreement are not carried out, through no fault of the Aggrieved, the Aggrieved may request enforcement of the terms of the agreement, *or that the complaint be reinstated at the point it was closed by this agreement.*" (Emphasis added).

*Admitted in DC, CT, WI, Not Admitted in VA
**Admitted in DC, VA
***Admitted in DC, CT, Of Counsel
****Admitted in Maryland

Virginia Office
209 Midvale Street
Falls Church, VA 22046
Tel. No. (703) 237-2912
Fax No. (703) 237-4321

Ms. Leslie Lightner
Equal Opportunity and Compliance Division
2

This provision is consistent with the agency's own guidelines for settlement agreements. The guidelines similarly provide:

> Chapter XIII - Compliance With Settlements And Final Agency Decisions.
>
> If the complainant believes that the terms of any settlement agreement (whether the settlement agreement was reached during the counseling stage or at any time in the formal complaint process) have not been implemented by the agency, the complainant may request compliance with the agreement, or reinstatement of the initial complaint at the stage at which it was settled. This request will be filed with the Office of Civil Rights either directly by the complainant or by the agency upon receipt of the request.

DM4300-001, EEO Complaint Processing Procedures, Chapter XIII.

As per these specific terms of the settlement agreement, Dr. Chowdhury had the unilateral right to re-initiate an EEO complaint at the time he received his evaluation. Moreover, what occurred during the period leading up to the unacceptable evaluation constituted new events that post-dated the signing of the agreement. This would also provide Dr. Chowdhury with a right to file a new EEO complaint. See for instance, Edwards v. Potter, EEOC No. 01A51395, 2006 WL 1209840 (2006); Nguyen v. Potter, EEOC No. 01A55616, 2006 WL 615742 (2006).

Finally, the terms of the settlement agreement obligated the agency only to take certain procedural steps during the period of Dr. Chowdhury's performance improvement plan (PIP) leading up to his unacceptable evaluation. These procedural obligations included accepting the submission of two of the three assigned projects during his PIP, allowing an extension to submit the Toxoplasmosis paper until December 31, 2005, providing Dr. Chowdhury with weekly progress reports and agreeing to detail Dr. Chowdhury to another work unit contingent upon his successful completion of the PIP.

There is nothing in the agreement that obligates the agency to allow Dr. Chowdhury to successfully complete the PIP. If that did not occur, it was the understanding of all parties that Dr. Chowdhury could file a new EEO complaint, which is what he did. Further, it is clear that the terms of Dr. Chowdhury's new EEO complaint attack the substantive decisions made during the PIP, as opposed to any failure to abide by the agency's procedural obligations during that time.

For these reasons, it was error for the Employment Complaints Division to treat Dr. Chowdhury's complaint as one for non-compliance. In fact, Dr. Chowdhury always

Ms. Leslie Lightner
Equal Opportunity and Compliance Division
3

retained the right to file a valid new EEO complaint, which is what he did. Please issue an
order remanding this case to the Employment Complaints Division for investigation.

Thank you.

Very truly yours,

*Jonathan L. Gould*

Jonathan L. Gould

Cc:    Dr. K. Chowdhury
       Denise Banks

# 4) Bradshaw Memo





| United States | Food Safety | Civil Rights Division |
|---|---|---|
| Department of | and Inspection | 5601 Sunnyside Avenue, MS 5261 |
| Agriculture | Service | Beltsville, MD 20705 |
| | | Phone: 301-504-7755 |
| | | FAX:   301-504-7746 |

October 4, 2006

**TO:**    Constance T. Bails, PhD
Deputy Director
Office of Civil Rights

**FROM:**    Karen L. Bradshaw *Karen L Bradshaw*
Deputy Director

**SUBJECT:**    Non-compliance with a Settlement Agreement
Khurshed Chowdhury (Agency Case No. FSIS-2005-01076)

This is in response to your memorandum dated July 6, 2006, regarding correspondence from the subject employee.

We direct your attention to the attached correspondence dated May 9, 2006, from Dr. Chowdhury's designated representative, Mr. Jonathan L. Gould. Mr. Gould claims the March 7, 2006 correspondence is not an allegation of non-compliance, but an allegation of discrimination on the results of the PIP. After careful review of the Complainant's correspondence, we are inclined to agree.

The terms of the settlement agreement in FSIS-2005-01076 addressed and expounded on aspects of the Performance Improvement Period (PIP). A close review of the correspondence from Dr. Chowdhury reflects dissatisfaction with the outcome of the PIP, not an allegation of non-compliance.

We believe that Agency Case No. FSIS-2006-01838 should be considered a new formal complaint of discrimination, not an allegation of non-compliance with the previous settlement agreement. Further, please be advised that Dr. Chowdhury has initiated informal EEO counseling on the ultimate outcome of the PIP (See FSIS-2006-02551).

If you have any questions please contact me or Mr. Kevin McGrath, Chief, Complaints Management Branch, on 301-504-7755.

Attachment

cc:    Leslie Lightner, EOCD, Reporter's Building, Washington, DC
Jonathan L. Gould, 1012 14th Street, NW, Suite 630, Washington, DC 20005
Dr. Kurshed A. Chowdhury, 401 Southview Avenue, Silver Spring, MD 20905

FSIS FORM 2630-5C (3/89)