**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| KHURSHED A. CHOWDHURY | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:07-cv-997 (RCL) |
| ED SCHAFER, Secretary, | ) | |
| U.S. DEPARTMENT | ) | August 13, 2008 |
| OF AGRICULTURE | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

_____

**THE PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This is a case of race, national origin, (Bangladesh), age discrimination and retaliation. The defendant terminated the plaintiff, Dr. Khurshed A. Chowdhury (hereafter Dr. Chowdhury), from federal service after a 17-year record of good performance as a veterinary medical officer.

The standards the defendant used for the termination are aptly described by an old joke. Two whites and a black (or, in this case, an old, Bangladeshi) die and go up for admission into heaven. St. Peter asks the first white person to spell "cat", which he does. He is admitted. He asks the second white person to spell "dog", which he does. He is also admitted.  St. Peter then asks the black person (or the old, Bangladeshi) to spell "chrysanthemum."

The defendant, the real world stand-in for St. Peter, has moved for summary judgment. It contends that, despite its own records showing Dr. Chowdhury never had a performance problem, the "undisputed evidence" proves that his performance was never good and, in fact, plummeted to unacceptable in 2004-2005.  Therefore, his termination was justified.

1

Dr. Chowdhury's evidence, which the Court must accept as true for purposes of the motion, tells a very different tale. In addition to his 17 years or good performance, Dr. Chowdhury held a PhD in veterinary pathology and was the branch expert in bovine spongiform encephalopathy (hereafter called BSE) or "mad cow disease".

Soon after Alice Thaler became head of the branch where Dr. Chowdhury worked, she and Dr. Chowdhury's first-line supervisor, Delila Parham, orchestrated his termination. Dr. Chowdhury's removal was not caused by his poor performance, as the defendant asks the Court to believe, but by the discriminatory and retaliatory animus in the way Parham and Thaler began evaluating that performance.

Parham made negative comments about his age. Along with Thaler, she applied performance standards for him different from the standards she and Thaler applied to other employees in his branch. They adopted evaluation criteria that were designed for him to fail and became more impossible for him to meet after he filed his EEO complaint. They manipulated the civil service rules by changing what two of the defendant's other managers said were non-critical elements of his job into critical ones. They expected perfection in his work. They failed him in his performance, and fired him, even though, under their own standards, he succeeded at over 90% of the projects assigned to him in 2004-5 and over 99.9% for all the years he worked for the defendant.

Looking at all the evidence in Dr. Chowdhury's favor and a fact finder at trial could easily find that his performance in 2004-5 had not worsened, but that Parham and Thaler, in fact, harbored animus against him because of age, race and national origin, which only increased after he filed an EEO complaint against them. This case is not close to being a candidate for summary judgment.

**FACTS**

Dr. Chowdhury has brought this discrimination and retaliation under The Age
Discrimination In Employment Act (ADEA), 29 U.S.C. §621, et. seq. at §633a(a) and §717 of
Title VII of the Civil Rights Act of 1964, as amended, (Title VII) 42 U.S.C. §2000e, et. seq. at
§2000e-16, incorporating the provisions of §§703 and 704 of Title VII, 42 U.S.C. §§2000e-2.
(Complaint ¶1.)  The facts that support the complaint are as follows.

    **A.    Dr. Chowdhury's Background**

Dr. Chowdhury is of the South Asian race. His country of national origin is Bangladesh.
He was over 65 years of age at the time of the defendant terminated his employment. (Ex. A,
Chowdhury Affidavit, ¶3).

The defendant, Ed Schafer, is Secretary of the U.S. Department of Agriculture (USDA).[1]
As such, he is responsible for administering the defendant's employment policies and for
preventing discrimination within its ranks. (Complaint ¶8, 9).

Dr. Chowdhury received his doctor of veterinary medicine in 1965 in Bangladesh. He
also received a PhD in veterinary pathology in the Czech Republic in 1969.   (Ex. A, Chowdhury
Affidavit, ¶4).

Dr. Chowdhury immigrated to the United States in December 1974. He worked at the
Cancer Research Center in Valhalla, NY until 1977.  (Ex. A., Chowdhury Affidavit, ¶6).  He
then was Chief Veterinary Pathologist at the Maryland Department of Agriculture for six years
where he received good evaluations and performance bonuses.  (Ex. A, Chowdhury Affidavit, ¶
7, 8).

---

[1] Mike Johanns, the original defendant, is no longer the Secretary of Agriculture. Ed Schafer, the present Secretary,
is automatically substituted as the defendant.

From 1981 to 1985 Dr. Chowdhury worked at the Food and Drug Administration as a Veterinary Medical Officer pathologist.  (Ex. A, Chowdhury Affidavit, ¶9).  He then returned to Bangladesh and worked as a pathologist until the end of 1990.  (Ex. A, Chowdhury Affidavit, ¶10).  He also taught pathology at Bangladesh Agricultural University.  (Ex. A, Chowdhury Affidavit, ¶5).

**B.  Dr. Chowdhury's Work History with the USDA**

In 1991, Dr. Chowdhury returned to the United States and began working with the defendant as a Veterinary Medical Officer pathologist in the division of Pathology in the Office of Public Health Sciences/Food Safety and Inspection Service (OPHS/FSIS).  (Ex. A, Chowdhury Affidavit, ¶11).  Later the defendant assigned him to the Food Animal Science Division (FASD), which was re-named later as Zoonoses Disease and Residue Surveillance Division (ZDRSD or zoonoses branch) of OPHS/FSIS. (Ex. A, Chowdhury Affidavit, ¶12; Ex. B, Organization Chart).

From 1991 to 2004, Dr. Chowdhury consistently received fully satisfactory to superior performance evaluations, including one from Dr. Alice Thaler in 1995 when she was his supervisor for several months.  (Ex. A, Chowdhury Affidavit; ¶13; Ex. W).  The central part of Dr. Chowdhury's job during that time was to prepare reports that served as a scientific basis for the agency's rules and regulations to prevent the spread of food borne diseases, especially of BSE).  By the early 2000's, BSE had become an extremely critical food safety issue for the agency.  (Ex. A; Chowdhury Affidavit ¶17; Ex. C, E, and U Kasnia Affidavits and attachment to Ex. U).

In late 2003, the defendant assigned Dr. Thaler to the position of Director of FASD and she became Dr. Chowdhury's second line supervisor. Dr. Chowdhury's first line supervisor was Dr. Delila Parham. (Ex. A, Chowdhury Affidavit, ¶14).

**C.  Dr. Chowdhury's Work While On The PIP**

In August 2005, for the first time since he began working for the defendant, Dr. Chowdhury received a notice of unacceptable performance.  Dr. Parham signed the notice and Dr. Thaler approved it.  At the same time he received the notice, Parham and Thaler placed Dr. Chowdhury on a performance improvement plan (PIP). (Def.'s Summary Judgment (SJ) Doc. 17-19).

During the PIP, they assigned Dr. Chowdhury three projects. The first was an article on toxoplasmosis that they required to be ready for publication in a peer review journal.  The second was a special project requiring him to describe poultry salmonella serotypes. The third was a report on emerging worldwide zoonoses diseases.  (Def.'s Summary Judgment (SJ) Doc. 17-19).

Despite the very rigid PIP-deadlines, Dr. Chowdhury prepared and submitted all the assignments on time.  (Ex. A, Chowdhury Affidavit, ¶¶32-37).  Parham and Thaler found that his article on worldwide emerging zoonoses was acceptable.  (Ex. D).  However, they found that the toxoplasmosis article and salmonella report were unacceptable.  (Ex. D).  The defendant ultimately terminated him on that basis. (Def.'s SJ Doc. 17-11, pp. 41-51).

In rating Dr. Chowdhury's performance unacceptable, and proposing him for removal, Parham and Thaler ignored his good work on the close to thirty other reports that he completed

during the same rating period. (Compare Ex. D with Ex. C).[2]  Most of those reports were directly related to the part of Dr. Chowdhury's job that supported FSIS' critical mission, which was his work on BSE.  (Ex. A; Chowdhury Affidavit; ¶17, 18; Ex. C, E, and U Kasnia Affidavits and attachment to Ex. U at p. 4).

In doing so, Parham and Thaler held Dr. Chowdhury to an excessive standard of perfection.  They removed Dr. Chowdhury even though he succeeded on almost 94% of his work during the performance year that ended on December 31, 2005.  (Ex. C).   In anyone else's world, except Parham and Thaler, a 94 rates an "A". In Parham's and Thaler's world, it rated an "F". (Compare Ex. C to Ex. D).

### D.    Discussion of the Toxoplasmosis Article

Dr. Chowdhury's work on the toxoplasmosis article was not part of the critical elements of his job as a veterinary medical officer. The article contributed little to the mission of FSIS, the area within the USDA where Dr. Chowdhury worked. Because FSIS is involved with ensuring food safety, its overall mission does not include conducting scientific research.  That job belongs exclusively to the Agricultural Research Service or ARS. Therefore, publication of articles based on independent scientific research is not part of what FSIS is supposed to do.  (Ex. A; Chowdhury Affidavit; 23; Ex. F, Rose Affidavit, Ex. G; Basu Deposition,  pp. 13-15; 21-24).  In fact, Loren Lange, a mathematician who served as a high manager in the OPHS division of FSIS, and who later criticized Dr. Chowdhury's work, bragged that he had never published such an article.  (Ex. G, Basu Depo., p. 35)

---

[2] In contrast to Thaler and Parham, Mike Kasnia, a former acting Director of OPHS, praised Dr. Chowdhury's extensive work on BSE during the same performance year when Thaler and Parham rated him unacceptable. (Ex. U attachment, p. 4).  There are obviously differing opinions in how to evaluate Dr. Chowdhury's performance during that period.

Further, research for publication of an article in a peer reviewed, scientific journal could not be considered a critical element because it was originally assigned as a special project and concerned communications. (Ex. H, p. 3). The agency performance plan does not list performance on special projects as part of the job's critical element. (Ex. H, p. 4). It also lists publications for scientific or peer review journals as part of communications, which is a non-critical element. (Ex. H).

Parham's and Thaler's insistence that peer review publications were part of mission and support and research and analysis, and thus critical to the job, was not supported by any other agency manager, including Dr. Parthapratim Basu, who was a special assistant, and Dr. Bhabani Dey, Dr. Thaler's successor. (Ex. G, Basu Deposition, pp. 26-40; Ex. N, Dey Deposition, pp. 29-31).

In fact, Dr. Parham herself testified that she did not think Dr. Chowdhury's toxoplasmosis article was critical to the agency's work. (Ex. Z, Parham Deposition, pp. 97-98). Therefore, even if the article was so deficient as to be completely unacceptable, the agency's own personnel rules prevented Parham and Thaler from using these deficiencies as grounds to rate him unsatisfactory overall and to propose his removal. Dr. Chowdhury should not have received an unacceptable performance review based upon the toxoplasmosis article.

Moreover, at the time, Parham and Thaler had not issued an unacceptable performance evaluation or removed anyone in the branch for failing to complete or publish an article for a journal. (Ex. Z, Parham Depo., pp. 96-99). One white employee, Bernard Salamone, admitted that he did not even turn in such an assignment. (Ex. I, Salamone Depo., pp. 15-16). Another employee, Maqbool Qureshi, who was much younger than Dr. Chowdhury, was never even given such an assignment. (Ex. K, Articles List; Ex. M, Qureshi performance plan and

evaluation; Ex. J, Qureshi, Depo., pp. 5-8); nor was he proposed for removal.  (Ex. J, Qureshi, Depo., pp. 5-8; Ex. M; Ex. Z, Parham Depo., pp. 96-99).

Two women, Jane Harman and Neena Anandaraman, who were involved in publishing articles, were given several months, if not years, to complete these assignments or were allowed to collaborate with several other scientists. (Ex. K: Ex, L., Thaler Deposition, p. 64; Ex. S, Anandaraman Depo., pp. 15-16).  In contrast, Parham and Thaler provided Dr. Chowdhury only a few weeks to write his article. They then recommended Dr. Chowdhury for removal, and he was removed, because they did not find the article acceptable.  (Def.'s SJ Doc. 17-11, pp. 41-51).

In addition, even though Dr. Chowdhury's proof of discrimination and retaliation does not hinge on his performance on the toxoplasmosis article, it should be noted that most of Dr. Thaler's criticism of the article were overblown, if not completely unfounded.  Any delays in its completion occurred because Dr. Parham never approved the specific contents of the toxoplasmosis article until October 2005 or several weeks after Dr. Chowdhury was into the PIP. (Chowdhury Affidavit, ¶27-29; Ex. O, Chowdhury e-mails).

Moreover, as with any other article prepared for a scientific journal, it was expected that other experts would review the toxoplasmosis article before it became final.  (Chowdhury Affidavit, ¶32; Ex. G, Basu Deposition, pp. 38-40).  During their meetings after the PIP, Dr. Thaler had promised Dr. Chowdhury that he needed only to complete a first draft of the article. (Chowdhury Affidavit, ¶32).

As support for their criticisms, Drs. Thaler and Parham also criticized some of the scientific statements in the articles even though Dr. Chowdhury was merely including information from other published scientific articles. (Chowdhury Affidavit, ¶33; Ex. P).  They

also unjustly accused him of errors based upon factual statements of others in these articles that he used for support.  (Chowdhury Affidavit, ¶33; Ex. P).

Further, they brought false allegations about the contents of the reports, thereby punishing him for mistakes that he did not commit. (Chowdhury Affidavit, ¶34; Ex. P). Even though the reports were only initial drafts, they did not have major grammatical, spelling errors or major scientific flaws as they claimed. (Chowdhury Affidavit, ¶35; Ex. P).

Finally, their contentions that parts of the report were plagiarized because they lacked quotations are subject to dispute.  Agency managers have testified that the agency had no plagiarism standards in place for its scientific articles. (Ex. G, Basu Deposition, pp. 11, 38-40).

Moreover, commentators have indicated that plagiarism is fundamentally a matter of intent. (Ex. Q, Richard A. Posner, *The Little Book of Plagiarism*, Pantheon Books, New York, 2007 at p. 17.)  Since Dr. Chowdhury freely gave the citations for almost every sentence in his article, he could not have any intent to plagiarize.  (Ex. P; Def. Doc. 17-11, pp. 144-155).

**E. Discussion of the Salmonella Serotypes Report**

As to the report on salmonella serotypes, this special project also should not have been classified as a critical element of Dr. Chowdhury's position.  A similar assignment later given to Dr. Qureshi was not so classified.  (Ex. H, pp. 4; Ex. M).  Moreover, compared to BSE, salmonella was not nearly as critical an issue to the branch's work, especially during 2004-5. (Ex. G, Basu Deposition, pp. 26-28; Ex. N, Dey Deposition, pp. 23-25).  Therefore, any deficiencies in the report should not have constituted grounds to rate Dr. Chowdhury's performance unsatisfactory or to support his removal.

Moreover, Drs. Thaler and Parham knew, or should have known, that analyzing descriptions of those bacteria was not a subject with which Dr. Chowdhury was familiar.  He was

trained as a veterinary pathologist and this was a subject better suited for a specialist in microbiology. (Ex. A, Chowdhury Affidavit, ¶ 24). OPHS has a full-fledged division of microbiology that has many qualified microbiologists who the agency could have assigned to write this report. (Chowdhury Affidavit, ¶25). In addition, Dr. Anandaraman, and not Dr. Chowdhury, had been one of the primary veterinary medical officers who were assigned to work on salmonella issues. (Def.'s Doc. 17-7, Ex. S, Anandaraman Deposition, p. 15-17; Ex. N, Dey Deposition, pp. 23-25).

Finally, Dr. Dey reviewed Dr. Chowdhury's other work on salmonella serotypes. To the extent he could understand the assignment, what he described he would do to comply tracked exactly what Dr. Chowdhury did. (Ex. N, Dey Deposition, pp. 27-29). This also supports the fact that the criticisms on the salmonella report were overblown.

### F.   Summary of Facts Supporting Defendant's Discrimination and Retaliation

In June 2006, after the proposed removal, Thaler continued to criticize Dr. Chowdhury's work for no reason, after Dr. Chowdhury had written a report on BSE for Dr. Kristin Holt. (Ex. R. Chowdhury, ROI Affidavits). Things did not improve for him after that. Relying exclusively on Thaler's and Parham's recommendations, the defendant removed Dr. Chowdhury from federal employment effective September 1, 2006. (Def.'s SJ Doc. 17-11, pp. 41-51).

In declaring Dr. Chowdhury's performance unacceptable and recommending his removal, Drs. Parham and Thaler treated him differently from the way they treated other, similarly situated Veterinary Medical Officers in ZDRSD. These employees were not originally from Bangladesh, were substantially younger than Dr. Chowdhury and had not previously filed discrimination complaints involving Thaler or Parham. (Chowdhury Affidavit, ¶41, ¶44-45; Ex. I, p. 7; Ex. J, pp. 5-8, Ex. S, Anandaraman Depo., pp. 7-8). Prior to the filing of Dr.

Chowdhury's discrimination complaints, it was not mandatory for any of them to publish a peer-review article in order to receive a satisfactory performance rating. (Ex. Z, Parham Depo. pp. 97. 98; Chowdhury Affidavit, ¶41).

Not only was Dr. Chowdhury treated differently from others on his level in the branch, as early as December 2004, Dr. Parham told Dr. Chowdhury that he was too old to continue in his job and that she wanted him to retire. (Chowdhury Affidavit, ¶ 42-43; Ex. T). Her criticism of his work on the toxoplasmosis article and salmonella report was her method for accomplishing that goal. Thaler had also discriminated against other employees who were older and/or who had filed EEO complaints. (Ex. U, Kasnia Affidavit).

Further, after Dr. Chowdhury filed his first EEO complaint, Thaler assured him that he would receive a fair review of his work during the PIP and that he could submit the toxoplasmosis article as a first draft rather then a final product. (Chowdhury Affidavit, ¶32). That did not happen.

Moreover, Dr. Chowdhury's past record shows that, prior to August 2005, he had always received satisfactory or superior ratings. (Chowdhury Affidavit, ¶13; Ex. W). He also had received several awards. (Ex. C).

In fact, in the middle of 2004, he received a letter of appreciation from FSIS Administrator Barbara Masters for his work on BSE prevention. (Ex. C). The sudden change in standards for evaluating Dr. Chowdhury's work on the toxoplasmosis article and the decision to remove him for alleged unacceptable performance were motivated by the defendant's discrimination and retaliation against him and were not caused by Dr. Chowdhury's alleged unacceptable performance.

**ARGUMENT**

    **A.**    **Summary Judgment Standards**

Summary judgment may not be granted unless the moving party has demonstrated that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *Czekalski v. Peters,* 475 F.3d 360, 363 (D.C. Cir. 2007); *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005); Fed R. Civ. P. 56(c). In examining the record, the reviewing court must view all inferences in a light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), and "assume the truth of the non-movant's evidence." See also, *George v. Leavitt*, 407 F.3d at 410.

The Supreme Court has specified the standards for reviewing employer's motions for summary judgment in employment discrimination cases. It has held that that the Court should review all of the evidence in the record. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 140 (2000). In doing so, however, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* at 143 (internal quotation marks omitted ). "Thus, although the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Id.* (emphasis supplied). The Court may not grant the motion unless there is "abundant and uncontroverted independent evidence that no discrimination occurred." *Id.* at 148.

In determining whether a reasonable jury could find discrimination under the facts as developed on summary judgment, the only question should be whether the employee's evidence, taken in its totality, is enough evidence to prove discrimination, or in this case, discrimination

and retaliation, was a motivating factor for the defendant's actions. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

The employee does not have to prove that discrimination or retaliation was the sole factor either under Title VII or the ADEA. *McDonnell Douglas v. Green*, 411 U.S. 792, 803-4(1973); (employee's prior illegal behavior grounds not to hire but summary judgment not appropriate because race discrimination was also an issue); *McDonald v. Santa Fe Transportation Corp.*, 423 U.S. 273, 276 (1976)(fact that white employee was fired for admittedly stealing was not determinative of race discrimination or grounds for summary judgment because two black employees also stole but were not terminated). *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)(age "must play a role in that process and ha[ve] a determinative influence on the outcome".)

Moreover, the employee need not present on summary judgment any further evidence that discrimination or retaliation was a motivating factor, leaving for trial whether to assume the burden of proving discrimination or retaliation was a "but for cause" or just a factor in the decision. *Hazen Paper Co.* at 610. The elements used to establish the so-called prima facie case are important for such a determination, but they are not exclusive or determinative. *Brady v. Office of Sergeant at Arms*, 520 F.3d at 494.

In a discrimination case, important elements of proof still include the employee's membership in a protected class, whether he suffered an adverse action, whether the employer treated him differently from employees outside his protected class to whom he could reasonably be compared and whether there were statements by decision-makers directed toward him that would prove discriminatory motive. *Czekalski v. Peters,* 475 F.3d at 367-69. In a retaliation case, important elements include knowledge of the protective activity, actions which are either

adverse or which could deter a reasonable employee from opposing discrimination and the

proximity in timing between the employer's knowledge and the retaliatory actions. *Burlington*

*Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-8 (2006); *Rochon v. Gonzales,* 438

F.3d 1211, 1217-1218 (D.C. Cir. 2006); *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000);

*Mitchell v Baldridge*, 759 F.2d 80, 986 (D.C.Cir.1985).

Similarly, on summary judgment, the Court may review the strengths or weaknesses of

the defendant's alleged legitimate, non-discriminatory reasons for its conduct.  While finding all

reasonable inferences of the evidence in favor of the employee, the Court must balance the

defendant's justifications for its conduct against the employee's evidence that these justifications

are false, that is pretexts for discrimination or retaliation, or that the defendant was more likely

than not motivated by discriminatory or retaliatory animus. The employee may prove illegal

animus "either directly by persuading the [fact finder] that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." *George v. Leavitt*, 407 F.3d at 414, quoting *Tex. Dep't of Cmty. Affairs v.*

*Burdine,* 450 U.S. 248, 256 (1981) and *United States Postal Serv. Bd. of Governors v. Aikens,*

460 U.S. 711 at 716 (1983).

As the Sixth Circuit has described it, the employee's burden to prove discrimination can

be met in a variety of ways:

> A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an
> employer to justify an adverse employment action 'by showing that the proffered
> reason (1) has no basis in fact, (2) did not actually motivate the defendant's
> challenged conduct, or (3) was insufficient to warrant the challenged conduct."
> *Tisdale v. Fed. Express Corp.,* 415 F.3d 516, 529 (6th Cir.2005) (internal
> quotation marks and citation omitted).

*Tuttle v. Metropolitan Government of Nashville,* 474 F.3d 307, 319 (6th Cir. 2007).

Similarly, the D.C. Circuit explained in its *en banc* opinion in *Aka* that this burden can be met not solely based on the falsity of the employer's explanation, but also on a host of available evidence:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289, 1294 (D.C. Cir. 1998)(*en banc*). *See also, George v. Leavitt*, 407 F.3d at 414. ("[A]n employer's reason need not be false in order to be pretextual.")

## B.  Dr. Chowdhury's Evidence Raises an Inference That Age Was A Motivating Factor In His Removal

Dr. Chowdhury has enough evidence to convince a reasonable jury that age was a factor in his removal.  First, there is no question that Dr. Chowdhury was the oldest person in the zoonoses branch subject to the supervision of Thaler and Parham.  (Chowdhury Affidavit, ¶41; Ex. I, p. 7; Ex. J, pp. 5-8, Ex. S, Anandaraman Depo., pp. 7-8).  Thaler and Parham were also both substantially younger than he was.  (Ex. V, Parham ROI Affidavit; Ex. Y, Thaler ROI Affidavit).  Moreover, Dr. Chowdhury was the only one they proposed for removal and who was removed. (Ex. I, Salamone Depo, pp 15-16; Ex. J, Qureshi Depo., pp. 5-8; Ex. M, Ex. Z, Parham Deposition, pp. 96-99).

Second, there is no question that Dr. Parham did not begin criticizing Dr. Chowdhury's performance until he approached his middle 60's in December 2004.  Until that time, Dr. Chowdhury never had trouble with his performance.  (Ex. A, Chowdhury Affidavit, ¶13, Ex. W).

The defendant, including in 1995 and 1996 when Dr. Thaler was his supervisor, had consistently rated him fully satisfactory to superior. (Chowdhury Affidavit, ¶13; Exs. C, W). The precipitous change in their perception of him raises an inference connecting his age to the termination decision. *George v. Leavitt*, 407 F.3d at 416 (alleged drop in performance can raise inference of discrimination).

Third, Dr. Chowdhury presented evidence that Dr. Parham especially had made remarks in response to his retirement plans that directly related to his age.  In the middle of December 2004, Dr. Chowdhury e-mailed Dr. Parham a short work-plan for his first draft of his article on toxoplasmosis.  Later that day, he went to her office and asked Dr. Parham not to punish him for not completing the article. He mentioned that she never asked the same from others in the branch. Dr. Chowdhury added that in a few years, he would be retired.  At this point, Dr. Parham said, "if you think you are so old then maybe you should retire soon."  (Chowdhury Affidavit, ¶42-43; Ex. T).

This statement is evidence of age-related animus.  *Tuttle v. Metropolitan Government of Nashville,* 474 F.3d at 320.  (following comment from former supervisor:  "how old are you? ... you will be retiring quicker than you think" found to be evidence of age discrimination).  Dr. Chowdhury said nothing about his age when he raised the issue of retirement. Dr. Parham just assumed on her own that Chowdhury was old and needed to retire for that reason.  Dr. Parham then played a direct role in placing Dr. Chowdhury on his performance improvement plan in August 2005, in rating his performance as unsatisfactory and recommending him for removal. Tia Gayle admitted that she would not have removed Dr. Chowdhury if this had not occurred. (Ex. X, Gayle Deposition, p. 8).

Thaler was also a prime mover in the decision. Thaler was the newly appointed senior director of the zoonoses branch, starting around October 2003. Prior to that time, Dr. Chowdhury never had any performance problems. (Ex. C; Ex. W). Parham had even praised his work at the end of September 2003. (Ex.W, p. 10). Relatively soon after Thaler became the boss, everything changed. She bolstered Parham's discriminatory attitudes and helped orchestrate his removal.[3]

Ten years before, Thaler had different views of Dr. Chowdhury's performance. She twice rated him fully successful and sent memos complimenting his performance. (Ex. W, pp. 2-8). Nothing had changed with regard to the quality of Dr. Chowdhury's work in that ten-year period. The only change was that Dr. Chowdhury was ten years older. This further raises an inference of age discrimination. *George v. Leavitt*, 407 F.3d at 416.

Moreover, there is comparative evidence of different treatment. Although Jane Harman and Neena Anandaraman, two other younger medical officers were assigned peer review articles, Harman was allowed to work for over one year during the last year of her employment. (Ex. L, Thaler Deposition, p. 64). Anandaraman's was a collaborative effort with several other scientists. (Ex. K, Def. SJ doc. 17-7; Ex. S, pp. 15-16). In contrast, the defendant required Dr. Chowdhury to work on his article completely alone. Dr. Qureshi, who though over 50, was not

---

[3] Parham freely admits that this occurred, although she claims now that Dr. Chowdhury's performance really was never good when her own evaluations state otherwise. (Ex. W, pp. 9-12). She says: "When Dr. Chowdhury and I started working together, I had a different supervisor. When Dr. Thaler became my supervisor, I told her his performance was not very good and she said he should go on a performance improvement plan (PIP)." Parham affidavit, Blue at p. 51, ¶15. (Def. Summary Judgment Memo., p. 5). Dr. James, Thaler's predecessor, makes a weak attempt to confirm Dr. Parham's sudden discovery when Thaler came on board. James also claims that Dr. Chowdhury always was a weak performer. (Def. Summary Judgment Memo., p. 5). Blue at p. 43 ¶ 8-98. James' recollections have the same problems as Thaler's. They are not confirmed by his written evaluations. (Ex.W, pp. 9-10).

so old as to be thinking of retirement (as Dr. Parham stated it), was never terminated for failing to write such a paper.  (Ex. J, Qureshi Deposition; pp. 5-8; Ex. M; Ex. Z, pp. 96-99).

In addition to writing the peer review article, Dr. Chowdhury had to keep up with his other work during 2004 to 2005.  This was extremely time-consuming. He had completed at least 23 separate papers on his specialty, BSE.  (Chowdhury Affidavit, ¶19; Ex. C).  During this time, BSE was one of the top priorities of his branch.  (Ex. G, Basu Depo., pp. 26-28). Dr. Chowdhury also worked on a special project, the so-called "thinking paper" Parham assigned to him for no apparent reason, as well as the salmonella serotypes special report assignment.  (Chowdhury Affidavit, ¶21). No one was assigned as much work as Dr. Chowdhury yet was required to prepare such a paper or the salmonella special report.[4]    (Chowdhury Affidavit, ¶22).

### C.     Dr. Chowdhury's Evidence Raises an Inference That His Race and National Origin Was A Motivating Factor In His Removal

For similar reasons as outlined above, Dr. Chowdhury has evidence that the fact he had the racial and national characteristics of someone from Bangladesh were also motivating factors in the decision to terminate him.  He was the only veterinary medical officer from Bangladesh in the zoonoses branch, supervised by Thaler and Parham, out of a total of five, and the only one who they recommended for termination. (Chowdhury Affidavit, ¶40-41; Parham Deposition, pp. 96-99; Ex. I, p. 7; Ex. J, pp. 5-8, Ex. S, Anandaraman, Depo., pp. 7-8).  Harman, Qureshi, Salamone and Anandaraman are the other four.  (Chowdhury Affidavit, ¶40).  Prior to the termination, he never had performance problems. (Chowdhury Affidavit, ¶40; Ex. C; Ex. W). Although no discriminatory statements were made related to his race or national origin, he was treated differently than these other non-Bangladeshis.

---

[4] Dr. Anandaraman was the salmonella specialist in the unit and usually prepared the statistical reports for Mr. Lange. (Ex. S, Anandaraman Depo., pp. 15-16). None of these reports had called for such an elaborate descriptions as the one Parham and Thaler insisted that Dr. Chowdhury prepare.

Two of these employees, Qureshi and Salamone, never wrote individual peer review articles during the performance years. (Ex. I, pp 15-16; Ex. K, List of Articles; Ex. M, Qureshi performance evaluation). Salamone testified that he was directed to write an article, but completely failed to accomplish this assignment. (Ex. I, pp 15-16). However, neither Parham, nor Thaler recommended Salamone for termination as they did Dr. Chowdhury. (Ex. I, pp. 15-16).

Moreover, as set forth above, in contrast to Dr. Chowdhury, Harman was allowed to work on her article almost exclusively the last year of her employment. (Ex. L, Thaler Deposition, p. 20). Anandaraman's articles were also completed in a different evaluation year than Dr. Chowdhury's. (Def. SJ Doc. 17-7; Ex. K, List of Articles; Ex. S, pp. 15-17). More importantly, she often worked in collaboration with several other scientists some of whom did extensive bench research. (Def. SJ Doc. 17-7; Ex. S, pp. 15-16). In contrast, the defendant required Dr. Chowdhury to work on his article completely alone and required him to keep current on all his other assignments. (Chowdhury Affidavit, ¶27; 41; Exs. C, O). Clearly, in the face of this evidence, the defendant subjected Chowdhury to disparate treatment as compared with all those other veterinary medical officers who were outside his protected racial and national origin classifications.

### D. Dr. Chowdhury's Evidence Raises Inferences That Retaliation Was A Factor In His Termination

Dr. Chowdhury's evidence also raises an inference that retaliation played a role in his unacceptable performance rating and his termination. There is no question that in August 2005 Dr. Chowdhury filed an EEO complaint against Thaler and Parham for placing him on a performance improvement plan. (Def. SJ Doc. 17-23, pp. 6, 11). Parham and Thaler do not and cannot deny they knew about the complaint. (Def. SJ Doc. 17-23, pp. 6, 11). In fact, in mid

October they participated in a mediation regarding that complaint. (Def. SJ Doc. 17-23, pp. 6, 11).

There is also proximity between the prosecution of that complaint in October 2005 and the subsequent adverse action in February 2006, the date Thaler and Parham issued Dr. Chowdhury an overall unacceptable rating for the rating year 2004 – 2005 and proposed his removal. (Ex. D). Although the defendant contests whether such a period (which it describes as four months but is really closer to 3.5 months) raises the appropriate inference, that cannot be the case.

First, several courts have held that 3.5 months or more between the prosecution of the EEO claim and the subsequent adverse action are sufficiently close to raise an inference of retaliation. *Cones v. Shalala*, 199 F.3d at 521 (nine month gap between initial complaint filing and adverse action held to be a close proximity to establish a prima facie retaliation case); *Heaton v. The Weitz Co., Inc.*, ___ F.3d ___, 2008 WL 2831852 at *4 (8th Cir. July 24, 2008)(six month gap between complaint filing and layoff does not negate an inference. *Buggs v. Powell*, 293 F.Supp.2d 135, 149-151 (D.D.C., 2003)(more than four months gap still sufficient to support on inference of retaliation); *Brodetski v. Duffey*, 199 F.R.D. 14, 20 (D.D.C., 2000)(up to one year gap may be sufficient). Some of these courts have recognized that the appropriate measuring point is not when the adverse action occurs but when the defendant first has the opportunity to take the adverse action. *Hayes v. Shalala,* 902 F.Supp. 259, 264 (D.D.C.1995) (causal connection existed based on the time plaintiff first became vulnerable to retaliation, even though that time occurred three years after plaintiff engaged in protected activity). Third, other courts have adopted held that proximity is measured not when the adverse action occurs but

when the defendant began taking steps that led to the adverse action. *Heaton v. The Weitz Co., Inc.*, at \*4, citing *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir.2006).

Under these standards, Dr. Chowdhury's EEO activity is sufficiently close in time to the defendant's actions to raise an inference of retaliation. In order to issue Dr. Chowdhury the unacceptable performance rating, Parham and Thaler began taking steps as early as January 2006 or after the final submission of the toxoplasmosis article. (Def. SJ Doc. 17-11, p. 174). They raised the standards for the article by requiring it to be ready for publication by the end of the PIP, rather than just a first draft. (Chowdhury Affidavit, ¶32). Drs. Basu and Dey confirmed Dr. Chowdhury's claims that it would have been impossible to prepare an article for final acceptance by a peer review journal within the time Thaler and Parham allotted to him during the PIP. (Ex. G, pp. 38-40. Ex. N, pp. 29-31). The time was too short to prepare something that a journal would accept. *Id*. In addition, it did not account for the extensive editing process that occurs before an article is ready for submission. *Id*. By changing the standard in this manner, Thaler and Parham would have known that it was impossible for Dr. Chowdhury to meet it.

Because that is the case, Thaler's and Parham's retaliation began less than 2.5 months after the conclusion of the mediation in Dr. Chowdhury's EEO complaint. This is within the short time period that even the defendant recognizes may be sufficient to raise an inference of retaliation.

Further, Dr. Chowdhury has other evidence that Dr. Thaler especially had animus against him because of his EEO activity. Dr. Thaler had engaged in retaliatory actions against other employees. (See Ex. U, Kasnia Statement).

Moreover, Dr. Thaler became even more hostile to Dr. Chowdhury after she proposed his removal. In a further attempt to discredit Dr. Chowdhury while his proposed removal was

pending, in June 2006, Dr. Thaler wrote a completely unfounded memo claiming Dr. Chowdhury had submitted a written response to an inquiry from Dr. Kristin Holt at the Center for Disease Control that contained inaccuracies and was unclear and misleading. (Ex. R).  Dr. Qureshi was acting for Parham as branch chief at the time of Dr. Holt's inquiry.  (Ex. R; Ex. J, pp. 20-23). Because the inquiry concerned BSE, he assigned the response to Dr. Chowdhury.  (Ex. R; Ex. J, pp. 20-23).

Despite Dr. Thaler's unfounded criticism, Dr. Holt thanked Dr. Chowdhury for the response and told him she was going to use parts of it if she received any further questions regarding BSE from Peru, the country who first requested the information. (Ex. R).  This dispels any validity to Dr. Thaler's criticisms. Along with the timing of the criticism, it is further support for drawing an inference of retaliation.

     **E.**     **Reasonable Inferences Drawn In Dr. Chowdhury's Favor Show That The Defendant's Justifications for His Termination Were Pretexts In the Sense That They Were Insufficient and/or Did Not Actually Motivate The Defendant's Conduct**

Dr. Chowdhury has also marshaled strong evidence that the reasons for his termination—that Thaler and Parham thought his job performance was unsatisfactory—were insufficient to support the termination and did not actually motivate the decision.  As the Court must draw inferences based on these facts in Dr. Chowdhury's favor, he has enough evidence to prove discrimination and retaliation in his termination. *George v. Leavitt*, 407 F.3d at 410.

     1.     <u>Defendant's civil service rules prohibited the termination for failing non critical assignments such as peer review publications and special projects</u>

First and foremost is that Thaler and Parham manipulated the personnel rules and performance criteria to justify Dr. Chowdhury's termination. Thus, even if Thaler, Parham, and some of the others who reviewed the toxoplasmosis article and the salmonella serotypes report

thought that they were unsatisfactory that could not be grounds to justify Dr. Chowdhury's termination.

The defendant's rules specifically classified peer review publications, such as the toxoplasmosis article, as non-critical aspects of Dr. Chowdhury's job.  (Ex. H, pp. 3, 4).  It also classified special projects, such as the salmonella report, as non-critical.[5]  (Ex. H, pp. 3, 4). Thus, the defendant could not remove him, or even recommend him for removal, based upon his failure in a non-critical aspect of his job.

Parham and Thaler illegally changed the performance standards and performance plan during Dr. Chowdhury's PIP.  The plan lists research for scientific journals and special projects as part of "communications" which is not listed as a critical job element. (Ex. H, pp. 3, 4). However, in the proposed removal, Parham and Thaler changed the classification of this project from communications to mission support and research and analysis.

This was improper interpretation of the defendant's civil service rules.  "Agencies may not use a PIP either to reduce or increase the standards of performance established at the beginning of the appraisal period."  *Betters v. Federal Emergency Management Agency*, 57 M.S.P.R. 405, 410 (1993).  Therefore, even if Dr. Chowdhury's toxoplasmosis article and

---

[5]Dr. Chowdhury's expertise was in BSE. (Chowdhury Affidavit, ¶17-24; Ex. C).  He had never before worked on issues involving salmonella serotypes.  (Chowdhury Affidavit, ¶17-24).  Parham assigned him the report only because of a request from Mr. Lange for some special data on this arcane subject. Moreover, Dr. Anandaraman was the salmonella expert within the branch and regularly provided Mr. Lange with statistical assessments on the prevalence of salmonella. (Def.'s Doc. 17-7, Ex. S, pp. 15-16). Yet Parham and Thaler chose to assign the special project to Dr. Chowdhury even though they knew, or should have known, that it was not something Dr. Chowdhury was regularly called upon to provide. At the same time, they allowed Dr. Anandaraman to avoid the assignment allegedly because she was tied up with other work.  (Ex. Z, Parham, Depo., p. 135).  Dr. Chowdhury was not afforded the same luxury even though he was similarly tied up working with BSE issues.  (Ex. C).  In any case, Dr. Anandaraman contradicts this story and does not even remember anyone asking about the salmonella serotypes report. ("Q  So you don't remember in particular any discussion with Dr. Parham or Dr. Thaler in which you turned down this request [on the serotypes] because you were too busy?  A  No.  I don't remember that at all."  Ex. S, pp. 24-25).

salmonella project were unacceptable, because his work on those assignments should not have been classified as part of the job's critical elements, they cannot be a basis for his removal.

The importance of this is self-evident. Even if Parham, Thaler and the others who reviewed Dr. Chowdhury's work, such as Lange, Pritchard and Hemphill, legitimately disliked his work, it did not mean that Dr. Chowdhury could be fired for it. In fact, there is no evidence that Lange, Pritchard or Hemphill made any recommendations with regard to Chowdhury's employment; nor were they authorized to do so. (Def. SJ Document 17-11). Only Parham's and Thaler's decision to classify this work as critical to the agency's mission, when it so clearly was not, assured Dr. Chowdhury's removal. (Ex. D and H, Ex. G, Basu Deposition; pp. 26-31; Ex. N, Dey Deposition, pp. 25-26; 29-31).

Parham and Thaler's failure to follow the personnel rules that applied in performance removal cases calls into question whether their motives for recommending Dr. Chowdhury's removal were really because they and others did not like his work on toxoplasmosis and salmonella. *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982)(failure to follow employer rules can be evidence of pretext or illegitimate motivation masking discrimination).

> 2. Expecting Dr. Chowdhury to complete a peer review article ready for publication during the PIP period was an impossible task designed for him to fail

The testimony of two other senior managers, Dr. Parthapratim Basu and Dr. Bhabani Dey, further confirms the fact that the defendant violated other civil service rules in the treatment of Dr. Chowdhury during the PIP and made it impossible for him successfully complete it. (Ex. G, Basu Deposition; pp. 11, 13-15, 16; 28-40; Ex. N, Dey Deposition, pp. 3-5; 13-22; 29-31). Dr. Basu and Dr. Dey both had longtime experience with the defendant as supervisors of veterinary medical officers. (Ex. G, Basu Deposition pp. 5-6; Ex. N, Dey Deposition, pp. 5-8).

In fact, Dr. Dey replaced Alice Thaler as chief of the zoonoses branch after her departure.  (Ex. N, Dey Deposition, pp. 5-8).

Dr. Basu and Dr. Dey also testified that it often takes months, if not years, to prepare an article for a peer review journal.  (Ex. G, Basu Deposition, 38-40; Ex. N, Dey Deposition, pp 13-22).   They also testified that it takes several drafts and reviews by third parties who often make changes to the article.  (Ex. G, Basu Deposition, pp. 38-40; Ex. N, Dey Deposition, pp. 13-22).  To expect someone to prepare an article ready for publication without such a review and in a matter of a few weeks was not reasonable.  (Ex. G, Basu Deposition; pp. 38-40; Ex. N, Dey Deposition, pp. 13-22).

These descriptions of how to prepare a peer review publication support the fact that no one could be expected to complete a finished product for publication in the time allotted to Dr. Chowdhury and without it undergoing several drafts after reviews by his peers. (Ex. G, Basu Deposition, pp. 38-40; Ex. N, Dey Deposition, pp. 13-22.)  They also make clear that initial criticisms of the article, and later revisions based on those criticisms, are an expected part of the process.

In contrast to Dr. Basu and Dr. Dey, Parham's and Thaler's expectations of Dr. Chowdhury during the PIP were quite different. Within less than two and one half months, they expected Dr. Chowdhury, on his own, to research and write an article, as well as have it ready in final form to be submitted for peer review publication.  This was in addition to the two other assignments he had to complete during that period.

Under Dr. Basu's and Dey's description, this was impossible. Moreover, Parham and Thaler would have known this because they themselves had participated in this process before, although they had several collaborators. (Ex. K, List of Peer Review Articles).

Assigning Dr. Chowdhury tasks during a PIP that were impossible to perform also violates civil service rules. Before firing an employee for performance, the rules require that the federal agency provide him sufficient time to complete the assignments within the PIP period. 5 C.F.R. § 432.104. [6] *Vines v. Department of Defense,* 67 M.S.P.R. 667, 681 (1995) (agency must give employee sufficient time to meet performance goals and establish improvement during the PIP). Parham's and Thaler's violations of these rules further supports an inference that they were setting Dr. Chowdhury up for failure and that their motives for terminating him were not legitimately related to his performance but to other discriminatory factors. *Johnson v. Lehman,* 679 F.2d at 922; *Tuttle v. Metropolitan Government of Nashville,* 474 F.3d at 319.

### 3. Peer review publications were not critical to the work of the zoonoses branch

There is further support for the fact that, even if the defendant believed Dr. Chowdhury wrote a poor article on toxoplasmosis, it did not justify his termination. Dr. Basu and Dr. Dey also testified that OPHS and FSIS, the divisions over the zoonoses branch, are prohibited from performing bench research. (Ex. G, Basu Deposition, pp. 13-15; 21-24; Ex. N, Dey Deposition, p 30). (See also affidavit of Bonnie Rose, Ex. F). That research is performed by a separate branch of the USDA, the Agricultural Research Service or ARS. (Ex. G, Basu Deposition; pp. 13-15; 21-24; Ex. N, Dey Deposition, p. 30).

Moreover, as with most jobs in FSIS, the veterinary medical officer's usual assignments involved preparing reports that either served as a scientific basis for the agency's rules and regulations or dealt with emergencies relating to prevent the spread of food borne diseases. (Ex. A, Chowdhury Affidavit, ¶17; Rose Affidavit, Ex. F). Dr. Basu and Dr. Dey further verified that

---

[6] 5 C.F.R. §432.104 provides in relevant part: "For each critical element in which the employee's performance is unacceptable, the agency shall afford the employee a reasonable opportunity to demonstrate acceptable performance, commensurate with the duties and responsibilities of the employee's position."

BSE was one of the most important issues in the zoonoses branch in 2004 and 2005 was BSE.

(Ex. G, Basu Deposition, pp. 26-28; Ex. N, Dey Deposition, pp 13-14).  Compared to this

disease, toxoplasmosis and salmonella were not high priorities.  (Ex. G, Basu Deposition, pp. 26-

28; Ex. N, Dey Deposition, pp. 13-14).

> Parham's testimony agrees with Dr. Basu's and Dr. Dey's. She testified:
>
> Q   Okay.  Now, you mentioned that Dr. Chowdhury's topic was not agency critical; isn't that right?  A  Yes, sir.  Q  Did Dr. Chowdhury perform other work that was agency critical during his performance evaluation period?  A  Yes, sir.  Q  Okay.  What types of work are you referring to that were agency critical?  A  Okay.  Agency critical in this case, I  was referring it to mean that it was not rush,  okay, agency critical, you've got to get it to someone right now.  BSE, some of that work was agency critical.  We were required to get it right away.  Q   Right, okay.  And the fact that it was a rush job meant that, at least at that particular point in time, it was more important that Dr. Chowdhury work on that particular assignment; isn't that right?  A That's correct.  Q  More important to the Agency, that is?  A Yes, sir.

(Ex. Z, Parham Depo., pp. 97-98; see also, p. 35 of Parham Depo).

Because of all these factors, publication of peer review articles, which usually involves

original research, has never been an important, much less a critical, element of the veterinary

medical officer position in OPHS or the zoonoses branch.   (Ex. G, Basu Deposition, 26-31; 38-

40; Ex. N, Dey Deposition, pp. 13-22; 29-31).  To dramatize its lack of importance, one of

OPHS' chief managers, Loren Lange, bragged that he had never published such an article. (Ex.

G, Basu Depo., p. 35).

More importantly, until Dr. Chowdhury no one was ever fired for not publishing a peer

review article.  Again, Dr. Parham verifies this fact.  At pp. 95-97 of her deposition (Ex. Z),

Parham testified as follows:

> Q   Okay, at least in that sentence.  Can you name me today which person that you supervised was asked to write a peer review report specifically designated for publication in a journal?  A  Asked to write specifically for a journal?  Q Right. A   Okay.  Independent projects are targeted and we hope that they will make it to

peer review journals.  Dr. Anandaraman was working on a paper.  Dr. Harman was also working on a paper.  Q  Did any of those papers get into peer review journals in the end?  A  No, sir, they didn't.  Q  Okay.  Did Dr. Harman get removed for unacceptable performance?  A  No, sir.  Q  Has Dr. Anandaraman been reviewed – been removed for unacceptable  performance? A No, sir.  Q Has she even been rated unacceptable at all by you?  A  No, sir.  Q  Okay.  By anyone that you know of?  A  I'm not aware that she's ever been rated unacceptable. Q Okay.  In fact, have you rated any other person, since you're head of the branch, unacceptable other than Dr. Chowdhury? A  No, sir.

In view of the fact that publication of a peer review article was not necessary to keep an employee's job, a legitimate question becomes: Why were they assigned in the first place?   At best, they were academic exercises; at worst, they were "make work".   To call their successful completion critical to the agency's mission borders on absurdity.

Thus, Dr. Chowdhury's evidence shows that preparing peer review articles was not a critical element of the veterinary medical officer's position and never had been.  Drs. Basu and Dey have confirmed this and so has Parham. (Ex. G, Basu, Deposition, pp. 26-40; Ex. N, Dey Deposition, pp. 29-31; Ex. Z, pp. 95-98).  His evidence also shows that the salmonella report was a special project and not a critical job element of his job. (Ex. H, pp. 3, 4; Ex. M, p. 7).

This evidence calls into question the *bona fides* of Drs. Thaler's and Parham's classifying the toxoplasmosis article and salmonella report as part of the job's critical elements, the failure of which justified termination.  The performance evaluation form did not do so; nor did the defendant's established practice.  (Ex. H, pp. 3, 4; Ex. G, Basu Depo., pp. 26-28).  Moreover, the diseases themselves were not critical to the defendant's mission at the time they were written. (Ex. G, Basu Depo., pp. 26-28; Ex. Z, Parham Deposition, pp. 97-98).

The testimony of Drs. Basu and Dey, and even Parham herself, creates a genuine dispute about the propriety of Parham's and Thaler's decision to classify Dr. Chowdhury's work on this article and report as critical to the agency's mission. (Ex. G, Basu, Deposition, pp. 26-40; Ex. N, Dey Deposition, pp. 29-31; Ex. Z, pp. 95-98).  There is no genuine dispute that, had they not

done so, they could not have proposed Dr. Chowdhury's removal or rated his overall performance as unsatisfactory.  (Ex. X, Gayle Deposition, pp. 8, 19-20).

The fact is, if Dr. Dey and Dr. Basu had been Dr. Chowdhury's supervisors, there is no way they would have recommended him for termination even if they believed he performed poorly on the toxoplasmosis article and salmonella report.  Their interpretation was that the defendant's rules and practices prohibited it.

In addition, based on Dr. Basu's and Dr. Dey's testimony, as well as the plain wording of the performance plan classifying peer review publications as non-critical, there is a genuine dispute whether Parham and Thaler properly followed the defendant's civil service rules.  (Ex. G, Basu Deposition, pp. 30-40; Ex. H; Ex. N, Dey Deposition, pp. 13-22; 29-31).  Moreover, there is a genuine dispute about whether their assignments of the toxoplasmosis article and salmonella report set Dr. Chowdhury up for failure.

Thus, there are genuine disputes about whether these decisions, which resulted in Dr. Chowdhury's termination, were motivated by his race, national origin, age or reprisal for his EEO activity that ended as late as October 2005.  On summary judgment, any inferences from such disputes must be drawn in Dr. Chowdhury's favor.  *George v. Leavitt*, 407 F.3d at 410. The existence of such a genuine dispute precludes summary judgment.

### 4. Thaler is not a totally credible individual

Finally, there also evidence the record that Alice Thaler, one of the promoters of Dr. Chowdhury's termination, is not a totally credible person. This can be evidence that she lacked genuineness in the decisions she made that led to the firing.  *Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3d Cir. 1991).

For instance, Thaler signed a sworn statement indicating that Dr. Chowdhury's performance was unsatisfactory when she supervised him in the mid 1990's. (Ex Y).  However, her performance reviews rated Dr. Chowdhury as fully successful. (Ex. W, pp. 2-7).  Her attached memo, actually praised him.  (Ex. W, pp. 4, 6, 7 and 8).

Moreover, Dr. Basu, who is in upper management and has no reason to lie, heard Dr. Thaler make comments indicating that she could manipulate the civil service rules as a way of terminating an employee instead of trying to improve their performance.

> But she [Thaler] was in my table and  McKaskey was here, and I was here (indicating). And McKaskey bought up a point about, you know, how do we get rid of people that are not  productive. And she said, anybody who wants help in firing somebody, come to me. I'll tell you the ways to do it.  And I was shocked.  I could  not believe it.  And I've mentioned this story to my boss.  I said, you know, I was amazed because I try to help people who are not producing, to help them along, and I was shocked to hear that she said that.  And she has said that after that, too -- come to me in another meeting, I heard her say almost the same thing in another leadership team meeting.

(Ex. G, Basu Deposition, at pp. 32-33).

Thaler's assertions in front of Dr. Basu, that firing employees was appropriate if they were not productive, rather than assisting them as the civil service rules require, is further evidence that she manipulated the process by which she recommended Dr. Chowdhury's termination.

Rather than following the rules or providing him with an appropriate standards and opportunities to improve, Thaler's method of operation was to decide to fire first and then decide the methods later. This can be evidence supporting the fact that Thaler was not in fact motivated by legitimate criteria in evaluating Dr. Chowdhury's performance but by discriminatory ones. This evidence, combined with the totality of other evidence supporting his claims--disparate treatment of similarly situated persons, proximity in timing between his EEO claims and adverse actions, statements that support a conclusion that there was animus towards him, at least as to his

age, and the implausibility of the defendant's criteria for evaluating his performance and

violations of the defendant's civil service rules—is more than sufficient for a reasonable jury to

find in Dr. Chowdhury's favor.

### F.    The Are Material Disputes With Regard To the Facts and Inferences Underlying the Defendant's Arguments That Preclude Summary Judgment

The defendant has issued a broadside attack on all the facts and arguments supporting Dr.

Chowdhury's claims.  Although some of these attacks present a plausible version of what *could*

have occurred in this case, they do not come close to meeting the defendant's burden on

summary judgment that its claims are completely "uncontroverted" and that there is "no

"independent evidence that no discrimination occurred."  *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 548 U.S. at 148. In fact, Dr. Chowdhury has evidence that undermines every one

of these arguments.

### 1. Gayle, the final decision-maker, accepted at face value Parham's and Thaler's criteria for evaluating Dr. Chowdhury's performance thereby ratifying their discrimination

Once there are inferences in Dr. Chowdhury's favor that support a finding of

discrimination against Thaler and Parham, the defendant cannot escape liability because Tia

Gayle made the final decision to terminate Dr. Chowdhury. Under the facts of this case, Gayle's

uncritical acceptance of Thaler's and Parham's recommendation ratified their discrimination.

"[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not

insulated from the subordinate's influence." *Griffin v. Wash. Convention Ctr.,* 142 F.3d 1308,

1312 (D.C.Cir.1998).  See also, *George v. Leavitt*, 407 F.3d at 416.  If a supervisor sets up an

employee for failure by assigning him work in an unreasonable manner and then judges that

work by unreasonable and discriminatory criteria, an employer becomes liable for discrimination

even if the final decision-maker does not personally have any discriminatory animus. *Shager* v. *Upjohn Co.*, 913 F.2d 398, 405 (7th Cir 1990).

("[A]n employer cannot escape responsibility for discrimination when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [a protected class]." (citations omitted). *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1323 (8th Cir.1994). In such a situation, "summary judgment is generally improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Alexander v. Wis. Dep't of Health and Family Servs.,* 263 F.3d 673, 684 (7th Cir.2001) (quoting *Eiland v. Trinity Hosp.,* 150 F.3d 747, 752 n. 1 (7th Cir.1998). That is exactly what happened here.

Gayle admitted in her deposition testimony that she could not have issued the termination notice if Parham and Thaler had not proposed Dr. Chowdhury's removal. (Ex. X, Gayle Deposition, pp. 8-11; 19-20). She also admitted that they recommended Dr. Chowdhury for removal because he failed the assignments during the performance improvement plan. (Ex. X, Gayle Deposition, pp. 8-11; 19-20). She admitted that Parham and Thaler had the sole and exclusive authority to decide the assignments during the PIP and the criteria for evaluating Dr. Chowdhury's performance on those assignments. (Ex. X, Gayle Deposition, pp. 30-34). She further admitted that she (Gayle) could not interfere with their judgment. (Ex. X, Gayle Deposition, pp. 30-34).

Thus, the facts show that Gayle accepted at face value the criteria that Thaler and Parham used to judge Dr. Chowdhury's performance. She accepted their judgment that, despite the plain wording of the performance evaluation plan, peer review publications were a critical part of Dr. Chowdhury's job. Moreover, she never questioned the reasonability of the short time

frame for the toxoplasmosis article during the performance improvement period.  As such,

Gayle was nothing more than a conduit, if not a rubber stamp, for Parham's and Thaler's

discrimination. The defendant, therefore, remains liable for Thaler and Parham's discrimination

even though the final decision was filtered down through Gayle.  *Burlington Industries, Inc. v.*

*Ellerth*, 542 U.S. 742, 762 (1998) (employer who ratifies sex harassment of subordinate

becomes liable for the subordinate's conduct); *Shager* v. *Upjohn Co.*, 913 F.2d at 405.

2.  <u>Dr. Chowdhury's settlement agreement does not preclude him from</u>
<u>challenging his unacceptable performance rating and criteria</u>

The defendant also cannot profit from the fact that Dr. Chowdhury signed a settlement

agreement settling any claims he made after receiving the first notice of his unacceptable

performance. The defendant wrongfully implies that this settlement, and the failure to move to

enforce the agreement for non-compliance, precludes him from challenging any of the actions

leading to the removal.  (See Def.'s SJ Doc. 17-23).

It has long been the law that a settlement agreement cannot waive a cause of action that

post-dates the agreement.  See, the ADEA's Older Workers Benefit Protection Act at 29 U.S.C.

§626(f) (1) (C) and *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 51 (1974) ("[W]e think it

clear that there can be no prospective waiver of an employee's rights under Title VII.")  In fact, it

is clear from the terms of the agreement that it is retrospective only. (See Def.'s SJ Doc. 17-23, p.

10, ¶5).  Dr. Chowdhury specifically retained the right to file a new claim based on events that

occurred after he signed the agreement.

In this case, almost all Parham and Thaler's actions that led to Chowdhury's termination

post-date that agreement. As Thaler herself admitted, Chowdhury officially did not receive an

unacceptable performance for the rating year 2004 to 2005 until February 2006, at the end of his

PIP.  (Ex. L, Thaler Deposition, p. 87).  Dr. Chowdhury's performance improvement plan merely

extended the performance-rating period until that date. Whatever he settled before could have no bearing on the overall unacceptable performance rating because Thaler and Parham had not issued this final assessment until after Dr. Chowdhury received the results of the PIP. This occurred several weeks after the date of the settlement. (Ex. D)

Moreover, Thaler and Parham engaged in discriminatory and retaliatory actions during the performance improvement plan that caused the unacceptable performance, proposed removal and the removal itself. These actions included the decision to use Dr. Chowdhury's performance in non-critical assignments, such as the toxoplasmosis article and salmonella report, as grounds to judge him unacceptable and propose his removal. (Def.'s SJ Doc, 17-11).

They also included Dr. Thaler's decision to require Dr. Chowdhury's article to meet the standard reserved for final publication of the peer review study. During the PIP, Dr. Thaler assured Dr. Chowdhury that she would judge the quality of his article as if it were a first draft. (Ex. A, Chowdhury Affidavit, ¶32). In no way did she indicate that she expected the article to be ready for final submission. Drs. Basu and Dey confirmed Dr. Chowdhury's claims that it would have been impossible to prepare an article for final acceptance by a peer review journal in the time allotted to Chowdhury during the PIP. (Ex. G, pp. 38-40; Ex. N, pp. 13-22). This period was both too short to produce an acceptable draft and did not account for the extensive editing process that occurs before an article is ready for submission.

However, it is clear that, after Dr. Chowdhury submitted the article, Dr. Thaler evaluated it on a much different standard she told Dr. Chowdhury would apply during the PIP. In fact, she testified that she expected the article to be ready for final submission to a peer review publication even though she may not have required that a journal actually accept it for publication. (Ex. L, Thaler Deposition, p. 66). She cannot explain how she expected this to happen when it was well

known that such an article must go through several drafts and peer reviews before it can be submitted for publication.  (Ex. G, Basu Deposition, pp. 38-40).  That is in part why it is called "a peer review" publication.

Under these circumstances, it is clear that the defendant engaged in discriminatory and retaliatory acts after signing the settlement agreement.  Because these actions directly led to Dr. Chowdhury's overall final unacceptable performance rating and termination, neither the settlement agreement, nor the failure to move to enforce it, bars any of Dr. Chowdhury's claims in this case.

3.  <u>Thaler and Parham did not give Dr. Chowdhury sufficient time to complete the toxoplasmosis article</u>

The defendant also argues that Dr. Chowdhury cannot complain about the short time period for completing the toxoplasmosis article. It claims that he had over one year to complete it and it was his fault that he did not start it until November 2005.  This argument plays fast and loose with the facts.

Although Parham and Dr. Chowdhury initially discussed writing the article in 2004, her instructions were vague and they agreed he would not start until she approved an outline. (Ex. O).  As late as March 2005, Dr. Parham had not approved the outline and Dr. Chowdhury was unable to start on the article.  (Ex. O).

In addition, instead of approving the outline for the article, Dr. Parham assigned him another "thinking paper" in March.  (Ex. O).  This paper required him, as a non-manager, and for the first time in his career, to draft all future goals and priorities for the zoonoses branch.  In the meantime, Dr. Chowdhury continued to work on what turned out to be close to 23 reports in response to questions regarding BSE issue.  (Ex. C).

Because of the new "thinking paper" assignment and lack of final approval of his outline for the toxoplasmosis article, Chowdhury assumed that the article was no longer a priority. (Chowdhury Affidavit, ¶29; Ex. O). After Dr. Thaler and Parham issued him the PIP in August 2005, in part for failing to complete the article, Dr. Chowdhury needed to take a few weeks off for medical reasons. (Chowdhury Affidavit, ¶30). When he returned in September, he needed to time to resolve his EEO complaint and then to finish the salmonella report and the zoonoses paper assigned to him during the PIP. (Chowdhury Affidavit, ¶31).

Under these circumstances, Dr. Chowdhury's failure to start on the toxoplasmosis article until November 2005 can hardly be held to be his fault. At worst for Dr. Chowdhury, there is a genuine dispute about whether he was late in starting the article.

In any case, under the civil service rules, Parham and Thaler still needed to give him a reasonable amount of time to complete the article for submission in final form if that was the standard they expected him to meet during the PIP. *Vines v. Department of Defense,* 67 M.S.P.R. 667, 681 (1995) (agency must give employee sufficient time to meet performance goals and establish improvement during the PIP). They failed to do this. The inferences to be drawn from these disputed facts, and how they fit into the rest of the evidence of discrimination and retaliation, can only be decided by the fact finder at trial.

4.  The criticisms of Dr. Chowdhury's work by Pritchard, Lange and Hemphill do not indemnify the defendant from liability

The defendant further argues that the criticisms of others, such as Pritchard, Lange and Hemphill, regarding Dr. Chowdhury's work were valid. Moreover, since they had no reason to discriminate against him, this proves that his termination was justified.

It is true that Dr. Chowdhury continues to believe that these criticisms were wrong in many instances, or at least exaggerated. (Ex. P). For instance, Pritchard's findings (adopted by

Thaler) of "plagiarism" for allegedly not putting enough quotations in the article were unfounded. (Ex. P). Moreover, some of her comments questioned Dr. Chowdhury's science. As someone trained in English, not science, her comments were often wrong. (Ex. P).

Dr. Chowdhury's article was meticulously footnoted as to its sources. (Ex. P.) According to a noted legal commentator: "Concealment is at the heart of plagiarism". (Ex. Q, Richard A. Posner, *The Little Book of Plagiarism*, Pantheon Books, New York, 2007 at p. 17.) Since Dr. Chowdhury cited every source for the assertions in his article, how could he have intended to conceal them?

Moreover, Dr. Basu has testified that the OPHS had never adopted any consistent plagiarism standards for writing peer review publications. (Ex. G, pp. pp. 11, 36-37). Dr. Chowdhury should not be held to violating standards that did not even exist.

Further, the complaints that the article was deficient because it lacked independent thought and because he just cited the findings of others is ridiculous on its face. Dr. Chowdhury's article was supposed to be a review of the literature written *by others* on toxoplasmosis. It was not supposed to contain his own research.

Dr. Chowdhury also cited instances where the criticism of the article punished him for mistakes that he did not commit. (Ex. P). Moreover, the article was supposed to be an initial draft, subject to "peer review". In that light, the grammatical and spelling errors were to be expected and were easily correctable.

The criticism of the serotypes report is also subject to debate. Prior to writing the report Mr. Lange never discussed with Dr. Chowdhury what he expected. (Chowdhury Affidavit, ¶ 25). Further, Mr. Lange seems confused about Dr. Chowdhury's area of expertise, finding his work deficient for a "GS-13 analyst". (See Def.'s SJ doc. 17-11, p. 159). That was not Dr.

Chowdhury's job. He was a veterinary medical officer, not an analyst, with no expertise in salmonella serotypes. (Chowdhury Affidavit, ¶24-25).

Finally, whether Dr. Chowdhury's work on the report was that bad is subject to challenge. Dr. Dey reviewed Dr. Chowdhury's work on salmonella serotypes. To the extent he could understand the assignment, what he described he would do to comply tracked exactly what Dr. Chowdhury did. (Ex. N, Dey Deposition, pp. 27-29).

Thus, the success of Dr. Chowdhury's work during the PIP seems to be in the eyes of the beholder, which is Dr. Chowdhury's main point. It was not whether Hemphill or Pritchard, Lange, or even Thaler and Parham, legitimately thought the toxoplasmosis article and salmonella report were good or bad that proves his case. It is the fact that his success on these assignments became both critical elements of his job and virtually the sole criteria for which he was fired. It is also the fact that the defendant's civil service rules did not allow firings for failing non-critical elements of the job and the fact that others, such as Salamone and Qureshi, were not similarly punished for failing to submit peer review articles. (Ex. I, pp. 15-16; Ex. J, pp. 5-8; Ex. M). Further, at least insofar as the toxoplasmosis article is concerned, the success of the article was judged against standards, that is final draft, ready for publication in a matter of weeks, rather than first draft ready for criticisms and changes, that Thaler and Parham knew were impossible for Dr. Chowdhury to meet.

        5.  Parham's comments about Dr. Chowdhury's age cannot be discounted

The defendant further quarrels with whether Parham's comment about Dr. Chowdhury's age constitutes evidence of age discrimination. It claims that, under Dr. Chowdhury version of what happened, Dr. Parham was just responding to his comments about his retirement plans. It also claims that the comments allegedly occurred in December 2004, or well before the

termination in 2006 and that several others were involved in the termination that could not have been influenced by Dr. Parham's remarks.

Dr. Chowdhury responds by pointing out that, although he did raise the issue of retirement, he said nothing about the fact that his *age* was the reason for this decision or that his age was preventing him from performing his job properly. (Ex. T). It was Parham's thought process that connected the two, which is evidence that she thought this was the case. (Ex. T). For this reason, the courts have found probative similar age-related comments. *Tuttle v. Metropolitan Government of Nashville,* 474 F.3d at 320.

Moreover, it is stretch, at best, to conclude that Parham's thought processes about Dr. Chowdhury's age changed later in 2005 and 2006, as Dr. Chowdhury got older and as Parham became more and more involved in the personnel decisions that led to the termination. Even Gayle, the final decision-maker, admitted that if Chowdhury's performance had been found acceptable he would not have been removed. (Ex. X, pp. 19-20).

There can be no doubt that Parham played a substantial role in Dr. Chowdhury's termination decision by concluding that his performance was unacceptable and signing the rating in February 2006. This directly led to his proposed removal and eventual termination. (Ex. D; Ex. X, pp. 19-20).

The inferences the defendant seeks to draw from Dr. Parham's comments may be plausible. However, the inferences connecting Dr. Parham's comments to his termination that Dr. Chowdhury suggests could be drawn by a fact finder are just as plausible, if not more so. On summary judgment, these inferences must be drawn in Dr. Chowdhury's favor. The defendant's arguments regarding Parham's comments do not support granting its motion.

6. The defendant's theories regarding Dr. Chowdhury's retaliation claims do no support summary judgment

The Court should also reject the defendant's contentions that Dr. Chowdhury's retaliation claims must fail either because they were not accompanied by adverse actions or because there was no sudden change in Dr. Chowdhury's performance ratings after he filed his EEO complaint.

First, Dr. Chowdhury does not claim that Thaler's critical memo regarding his work for Dr. Holt was an adverse action. (Ex. R). Instead, he is using Thaler's conduct in this regard as evidence that she had a retaliatory motive when she rejected his work and recommended him for termination. Moreover, to establish a retaliation claim he does not need to show that he suffered an adverse action. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. at 67-8.

Second, after he filed the EEO complaint, Dr. Chowdhury has shown how Thaler changed the standard under which she agreed to evaluate the toxoplasmosis article and that this decision raised an inference of retaliation. (Chowdhury Affidavit, ¶32). In view of this evidence, he does not need to prove a sudden drop in his performance after filing the EEO complaint to establish retaliation. He has evidence that proves a change in the performance criteria after he filed his complaint. Further, this change inured to his detriment and played a strong role in the decision to terminate him. Inferences drawn from such evidence do not support summary judgment on the retaliation claims.

## CONCLUSION

As the foregoing discussion makes clear, there are genuine disputes over almost all the important facts and inferences that apply in this case. However, to obtain summary judgment, the defendant must prove that there are no genuine disputes and that there is overwhelming and uncontroverted evidence that it did not discriminate or retaliate against Dr. Chowdhury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 148.

The defendant's motion has not met this standard.  Dr. Chowdhury's evidence, if accepted as true, as the Court must for the purposes of the motion, shows that discrimination and retaliation have occurred. For all the foregoing reasons, the Judge must deny the motion.

Respectfully Submitted,

The Plaintiff,
Khurshed A. Chowdhury

By     /s/ James L. Kestell
James L. Kestell
D.C. Bar # 955310
Kestell and Associates
1012 14th Street, NW, Suite 630
Washington, DC 20005
Tel. (703) 237-2912
Fax (202) 347-4482
Email: jlkestell@cox.net

/s/ Jonathan L. Gould
Jonathan L. Gould
DC Bar #491052
Law Office of Jonathan L. Gould,
1730 M Street, NW
Suite 412
Washington, DC 20036
Tel. 202-347-3889
Fax 703-652-7589
Email: jgould@igc.org

Attorneys for the Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

KHURSHED A. CHOWDHURY          )
                               )
        Plaintiff,             )
                               )
        v.                     )          Civil Action No.
                               )          1:07-cv-997 (RCL)
ED SCHAFER, Secretary,         )
U.S. DEPARTMENT                )          August 12, 2008
OF AGRICULTURE                 )
                               )
        Defendant              )
_____

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AND INFERENCES IN
DISPUTE**

        Pursuant to Rule 56.1 of the Local Rules of Civil Procedure, the plaintiff

submits his counter statement of facts and inferences that are in dispute, or if not in

dispute, are grounds upon which the Court should deny the motion:

    1.    The plaintiff, Dr. Khurshed A. Chowdhury, (Dr. Chowdhury) worked

          for the defendant as a veterinary medical officer. The defendant

          assigned him to the Food Animal Science Division (FASD), which was

          re-named later as Zoonoses Disease and Residue Surveillance Division

          (ZDRSD or zoonoses branch) of OPHS/FSIS. (Ex. A, Chowdhury

          Affidavit, ¶12).

    2.    From 1991 to 2004, Dr. Chowdhury consistently received fully

          satisfactory to superior performance evaluations, including one from Dr.

          Alice Thaler in 1995 when she was his supervisor for several months.

1

(Ex. A, Chowdhury Affidavit; ¶13; Ex. W).

3.     In 2004, the defendant assigned Dr. Thaler to the position of Director of
FASD and she became Dr. Chowdhury's second line supervisor. Dr.
Chowdhury's first line supervisor was Dr. Delila Parham.  (Ex. A,
Chowdhury Affidavit, ¶14).

4.     In August 2005, for the first time since he began working for the
defendant, Dr. Chowdhury received a notice of unacceptable
performance.  Dr. Parham signed the notice and Dr. Thaler approved it.
At the same time he received the notice, Parham and Thaler placed Dr.
Chowdhury on a performance improvement plan (PIP). (Def.'s
Summary Judgment (SJ) Doc. 17-19).

5.     During the PIP, they required Dr. Chowdhury to submit three
assignments: one on toxoplasmosis, one requiring him to describe
poultry salmonella serotypes and one on world wide emerging
zoonoses.  (Def.'s Summary Judgment (SJ) Doc. 17-19).

6.     Despite rigid PIP-deadlines, Dr. Chowdhury prepared and submitted all
the articles on time.  Parham and Thaler found that his article on
worldwide emerging zoonoses was acceptable.  However, Parham and
Thaler found Dr. Chowdhury's work on the toxoplasmosis and
salmonella articles was unacceptable.  (Ex. D).

7.     The major deficiency was Dr. Chowdhury's alleged failure to complete
a research project on toxoplasmosis for publication in a scientific
journal. (Ex. D.)

2

8.    Further, in rating his performance unacceptable, Parham and Thaler did not give him any credit for the more than thirty reports that he completed during the same rating period. (Compare Ex. D with Ex. C).

9.    The central part of Dr. Chowdhury's job was to prepare reports that served as a scientific basis for the agency's rules and regulations to prevent the spread of food borne diseases, especially of BSE (bovine spongiform encephalopathy or "mad cow disease"), an extremely critical food safety issue for the agency.  (Ex. A; Chowdhury Affidavit ¶17; Ex. C, E and U, Kasnia Affidavits and attachment to Ex. U).

10.   Most of the reports that Dr. Chowdhury prepared were directly related to the part of Dr. Chowdhury's job that supported FSIS' critical mission, which was his work on BSE.  (Ex. A; Chowdhury Affidavit; ¶17, 18; Ex. C and E, Kasnia Affidavit).

11.   Moreover, FSIS' mission does not involve, and it is prohibited from, conducting scientific research.  Publication of articles based on independent scientific research is not described as part of FSIS' Agency Mission and Objectives.  (Ex. A; Chowdhury Affidavit; 23; Ex. F, Rose Affidavit, Ex. G; Basu Deposition  pp. 13-15; 21-24).

12.   Moreover, Loren Lange, a high manager in OPHS, bragged that he had never published such an article.  (Ex. G, Basu Depo., p. 35)

13.   Further, research for publication of an article in a peer reviewed, scientific journal could not be considered a critical element of Dr. Chowdhury's job because it was originally assigned as a special project

3

and concerned communications. (Ex. H, p. 3).

14. The agency performance plan does not list performance on special projects as part of the job's critical element. (Ex. H, p. 4). It also lists publications for scientific or peer review journals as part of communications, which is also a non-critical element. (Ex. H).

15. Further, Dr. Parham herself testified that she did not think Dr. Chowdhury's toxoplasmosis article was critical to the agency's work. (Ex. Z, Parham Deposition, pp. 97-98). Dr. Chowdhury should not have received an unacceptable performance review for allegedly failing to complete the toxoplasmosis article.

16. In addition, at the time, Parham and Thaler had not issued an unacceptable performance evaluation, proposed removal or been removed because of failing to complete a research or publishing product. (Ex. Z, Parham Depo., pp. 96-99).

17. One white employee, Bernard Salamone, admitted that he did not even turn in such an assignment. (Ex. I, Salamone Depo., pp. 15-16).

18. Another employee, Maqbool Qureshi, who was much younger than Dr. Chowdhury was never given such an assignment. (Ex. K, List of Articles; Ex. M, Qureshi performance plan and evaluation; Ex. J, Qureshi, Depo., pp. 5-8). He was not proposed for removal. (Ex. J, Qureshi, Depo., pp. 5-8; Ex. M; Ex. Z, Parham Depo., pp. 96-99).

19. Two women, Jane Harman and Neena Anandaraman, who were involved in publishing articles were given several months, if not years,

4

to complete the assignment or were allowed to collaborate with several other scientists. (Ex. K: Ex, L., Thaler Deposition, p. 64; Ex. S, Anandaraman Depo., pp. 15-16)  In the end, Parham and Thaler recommended Dr. Chowdhury, for removal and he was removed, because he failed to turn in an acceptable publishable article in final form.  (Def.'s SJ Doc. 17-11, pp. 41-51).

20.    Drs. Thaler and Parham knew, or should have known, Dr. Chowdhury was not familiar with the issue related to the report they required on salmonella serotypes.  He was trained as a veterinary pathologist and this was subject required a specialist in microbiology.  (Ex. A, Chowdhury Affidavit, ¶ 24).

21.    OPHS has a full-fledged division of microbiology that has many qualified microbiologists who the agency could have assigned to write this report.  (Chowdhury Affidavit, ¶25).

22.    Dr. Anandaraman had been one of the primary veterinary medical officers who were assigned to work on salmonella issues. (Def.'s Doc. 17-7, Ex. S, Anandaraman Deposition, p. 15-17; Ex. N, Dey Deposition, pp. 23-25).

23.    Further, this special project should not have been classified as a critical element of Dr. Chowdhury's performance. A similar assignment later given to Dr. Qureshi was classified as a special project and therefore not critical.  (Ex. H, pp. 4; Ex. M).

24.    Finally, other than statistical evidence gathering performed by Dr.

5

Anandaraman and Dr. Qureshi, salmonella was not a critical issue to the branch's work. (Ex. G, Basu deposition, pp. 26-28; Ex. N, Dey Deposition, pp. 23-25).  Therefore, any deficiencies in the report should not have constituted grounds to rate his performance unsatisfactory or to support his removal.

25.    For similar reasons, no reasonable person could have found that Dr. Chowdhury's work on the toxoplasmosis article was a critical element of his job. The agency's performance plan specifically classifies publication in a peer review journal as a non-critical element of the job. (Ex. H, pp. 3-4).  Therefore, even if the article was so deficient as to be completely unacceptable, the agency's own personnel rules prevented Parham and Thaler from using these deficiencies as grounds to rate him unsatisfactory overall and to propose his removal.

26.    Parham's and Thaler's insistence that peer review publications were part of mission and support and research and analysis, and thus critical, was not supported by any other agency manager, including Dr. Basu who was a special assistant and Dr. Dey, Dr. Thaler's successor.  Ex. G, Basu Deposition; pp. 11, 13-15, 16; 28-40; Ex. N, Dey Deposition, pp. 3-5; 13-22; 29-31).

27.    Further, even though Dr. Chowdhury's proof of discrimination and retaliation does not hinge on his performance on the toxoplasmosis article, most of Dr. Thaler's criticisms of the article were overblown, if not completely unfounded.  Any delays in it completion occurred

6

because Dr. Parham never approved the specific contents of the toxoplasmosis article until October 2005 or several weeks after Dr. Chowdhury was into the PIP. (Chowdhury Affidavit, ¶27-29; Ex. O, Chowdhury e-mails).

28. Moreover, as with any other article prepared for a scientific journal, it was expected that other experts would review the toxoplasmosis article before it became final. (Chowdhury Affidavit, ¶32; Ex. G, Basu Deposition, pp. 38-40).

29. During their meetings after the PIP, Dr. Thaler had promised Dr. Chowdhury that he needed only to complete a first draft of the article. (Chowdhury Affidavit, ¶32).

30. As support for their criticisms, Drs. Thaler and Parham also criticized some of the scientific statements in the articles even though Dr. Chowdhury was merely including information from other published scientific articles. (Chowdhury Affidavit, ¶33; Ex. P).

31. They also unjustly accused him of errors based upon factual statements of others in these articles that he used for support. (Chowdhury Affidavit, ¶33; Ex. P).

32. Further, they brought false allegations about the contents of the reports, thereby punishing him for mistakes that he did not commit. (Chowdhury Affidavit, ¶34; Ex. P).

33. Even though the reports were only initial drafts, they did not have major grammatical, spelling errors or major scientific flaws as they claimed.

7

(Chowdhury Affidavit, ¶35; Ex. P).

34. Finally, their contentions that parts of the report were plagiarized because they lacked quotations are subject to dispute. Agency managers have testified that the agency had no plagiarism standards in place for its scientific articles. (Ex. G, Basu Deposition, pp. 11, 38-40)

35. Moreover, commentators have indicated that plagiarism is fundamentally a matter of intent. (Ex. Q, Richard A. Posner, *The Little Book of Plagiarism*, Pantheon Books, New York, 2007 at p. 17.)

36. Since Dr. Chowdhury freely gave the citations for almost every sentence in his article, he could not have any intent to plagiarize. (Ex. P; Def. Doc. 17-11, pp. 144-155).

37. Because they found his work on the two articles unacceptable, at the end of the PIP, Parham and Thaler proposed Dr. Chowdhury for removal. (Def.'s SJ Doc. 17-11, pp. 41-51).

38. After the proposed removal, Thaler continued to criticize Dr. Chowdhury's work for no reason, after Dr. Chowdhury had written a report on BSE for Dr. Kristin Holt. (Ex. R , Chowdhury ROI Affidavits).

39. Relying exclusively on Thaler's and Parham's recommendations, the defendant removed Dr. Chowdhury from federal employment effective September 1, 2006. (Def.'s SJ Doc. 17-11, pp. 41-51). In declaring Dr. Chowdhury's performance unacceptable and recommending his removal, Drs. Parham and Thaler treated him differently from the way

8

they treated other, similarly situated Veterinary Medical Officers in ZDRSD, including Jane Harman, Neena Anandaraman, Maqbool Qureshi and Bernard Salamone.

40.    These employees were not originally from Bangladesh and were substantially younger than Dr. Chowdhury was.  (Chowdhury Affidavit, ¶41; Ex. I, p. 7; Ex. J, pp. 5-8, Ex. S, Anandaraman Depo., pp. 7-8).

41.    In addition, they had not previously filed discrimination complaints involving Thaler or Parham.   (Chowdhury Affidavit, ¶44-45).  Prior to the filing of Dr. Chowdhury's discrimination complaints, it was not mandatory for any of them to publish a peer-review article in order to receive a satisfactory performance rating.  (Chowdhury Affidavit, ¶41).

42.    Not only was Dr. Chowdhury treated differently from others on his level in the branch, as early as December 2004, Dr. Parham told Dr. Chowdhury that he was too old to continue in his job and that she wanted him to retire.  (Chowdhury Affidavit, ¶ 42-43; Ex. T).  Her criticism of his work on the toxoplasmosis article and salmonella report was her means of accomplishing their goal of removing him from his position.

43.    Further, after Dr. Chowdhury filed his first EEO complaint, Thaler assured him that he would receive a fair review of his work during the PIP and that he could submit the toxoplasmosis article as a first draft rather then a final product.   (Chowdhury Affidavit, ¶32).  That did not happen.

9

44. Moreover, Dr. Chowdhury's past record shows that, prior to July 2005, he had always received satisfactory or superior ratings. (Chowdhury Affidavit, ¶13; Ex. W). He also had received several awards. (Ex. C). In fact, in the middle of 2004 he received a letter of appreciation from FSIS Administrator Barbara Masters for his work on BSE prevention. (Ex. C). Thaler has also discriminated against other employees who were older and/or who had filed EEO complaints. (Ex. U, Kasnia Affidavit).

45. Tia Gayle admitted in her deposition testimony that she could not have issued the termination notice if Parham and Thaler had not proposed Dr. Chowdhury's removal. (Ex. X, Gayle Deposition, pp. 8-11; 19-20).

46. She also admitted that they recommended Dr. Chowdhury for removal because he failed the assignments during the performance improvement plan. (Ex. X, Gayle Deposition, pp. 8-11; 19-20).

47. She admitted that Parham and Thaler had the sole and exclusive authority to decide the assignments during the PIP and the criteria for evaluating Dr. Chowdhury's performance on those assignments. (Ex. X, Gayle Deposition, pp. 30-34).

48. She further admitted that she (Gayle) could not interfere with their judgment. (Ex. X, Gayle Deposition, pp. 30-34).

49. Gayle accepted at face value the criteria that Thaler and Parham used to judge Dr. Chowdhury's performance. She accepted their judgment that, despite the plain wording of the performance evaluation plan, peer

10

review publications were a critical part of Dr. Chowdhury's job. (Ex. X, Gayle Deposition, pp. 30-34). Moreover, she never questioned the reasonability of the short time frame for the toxoplasmosis article during the performance improvement period. (Ex. X, Gayle Deposition, pp. 30-34).

50.    As such, Gayle was nothing more than a conduit, if not a rubber stamp, for Parham's and Thaler's discrimination. (Ex. X, Gayle Deposition, pp. 30-34). Dr. Chowdhury specifically retained the right to file a new claim based on events that occurred after he signed the agreement.

51.    Almost all Parham and Thaler's actions that led to Chowdhury's termination post-date any settlement agreement Dr. Chowdhury signed related to this case. (Def. SJ Doc 17-23).

52.    As Thaler herself admitted, Chowdhury officially did not receive an unacceptable performance for the rating year 2004 to 2005 until February 2006, at the end of his PIP. (Ex. L, Thaler Deposition, p. 87). Dr. Chowdhury's performance improvement plan merely extended the performance-rating period until that date.

53.    Whatever he settled before could have no bearing on the overall unacceptable performance because Thaler and Parham had not issued this final assessment until after Dr. Chowdhury received the results of the PIP. This occurred several weeks after the date of the settlement. (Ex. D)

54.    Moreover, Thaler and Parham engaged in discriminatory and retaliatory

11

actions during the performance improvement plan that caused the

unacceptable performance, proposed removal and the removal itself.

These actions included the decision to use Dr. Chowdhury's

performance in non-critical assignments, such as the toxoplasmosis

article and salmonella report, as grounds to judge him unacceptable and

propose his removal. (Def.'s SJ Doc, 17-11).

55.     They also included Dr. Thaler's decision to require Dr. Chowdhury's

article to meet the standard reserved for final publication of the peer

review study.  During the PIP, Dr. Thaler assured Dr. Chowdhury that

she would judge the quality of his article as if it were a first draft. (Ex.

A, Chowdhury Affidavit, ¶32).  In no way did she indicate that she

expected the article to be ready for final submission.

56.     The sudden change in standards for evaluating Dr. Chowdhury's work

on the toxoplasmosis article and the decision to remove him for alleged

unacceptable performance were motivated by the defendant's

discrimination against him because of his race, national origin, age and

because he had filed an EEO complaint and were not caused by Dr.

Chowdhury's alleged unacceptable performance.  (Exs. A-Z).

As part of this statement, the plaintiff also responds to the defendant's statement

of facts that allegedly are not in dispute as follows:

1.     Plaintiff is an South Asian male over the age of forty whose country of

national origin is Bangladesh. Complaint at ¶ 7.  Admitted.

12

2.      At the times pertinent to his complaint, plaintiff was employed by the United
States Department of Agriculture. Complaint at ¶ 14. He was a Veterinary Medical
Officer assigned to what became the Zoonoses Disease and Residue Surveillance
Division in the Office of Public Health/Food Safety and Inspection Service. *Id.* at ¶
15.  Admitted.

3.      The position description (PD) for a Veterinary Medical Officer in the
Zoonoses Branch (VMO) reflected the following duties:

> Analyzes and evaluates reported cases of meat and poultry borne
> illnesses and hazards. Analyzes reports and data for Director's office,
> for consumers, and for trends that would help identify emerging
> hazards.
>
> Provides concise, factual, timely written oral reports of all situations
> required and/or requested.
>
> Performs special epidemiological projects concerned with food
> hygiene, public health, and preventative medicine.
>
> Expands personal knowledge for food production, food animal
> production, and agricultural and industrial practices that might
> impact on public health and medicine.
>
> Represents the Agency in a professional manner at meetings,
> conferences, seminars, and training sessions as either a participant to
> obtain information, or as a speaker to impart information.
>
> Researches literature and keeps abreast of advances in the field of
> epidemiology and assesses potential impacts on program activities.

Position Description, Blue 67. The "Supervisory Controls" and "Guidelines" sections of
the position description reflect that a VMO was required to independently plan,
coordinate and conduct studies as assigned. "[T]he incumbent must be flexible,
enterprising, and expedient in utilizing the full range of professional abilities. There are
high requirements for good judgement and ability to conceptualize. To accomplish this,
one must utilize personal contacts, regulations, policies, manuals, professional texts,
technical publications, professional journals, and guidance from the Branch Chief to

13

ensure timely completion of selected projects. " *Id.* at p. 69. The position description also reflects that the duties involve highly complex investigation and analysis.

> The nature of investigations is complex and may involve in-depth probing into practices and procedures of food animal production, processing, transportation, distribution, consumer purchasing, and preparation. This all has to be conducted within a framework of compliance with the needs and concerns of the individuals concerned or involved and within the needs of regulatory programs. Much of this may be highly sensitive and good judgement with prudence must prevail.

*Id.* at p. 69, "Complexity";

> The primary purpose of this position is to investigate and study potential meat and poultry borne enteric disease; determine and document their cause and extent;
> and, develop sound scientific, factually supported recommendations to correct and prevent such conditions.
>
> The incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health.
>
> The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens. The need for an interdisciplinary approach to problem definition and resolution requires the ability to coordinate efforts with both officials within and outside the Agency, as well as with the meat, poultry, and egg products industries and related organizations. Problems solved are extremely difficult in nature and the results have a significant impact on program direction. *Id.* at p. 69-70 "Scope and Effect."

Admitted

4.     Beginning in about March 2001, plaintiffs first line supervisor was Dr. Delila Parham. Parham affidavit, Blue at p. 50 ¶12. Admitted.

## BACKGROUND

5.     In 2004, Dr. Thaler became Dr. Parham's first line supervisor and plaintiffs second line supervisor. Complaint at ¶17. Admitted.

6.     When Dr. Thaler became Dr. Parham's supervisor, Dr. Parham told Dr. Thaler plaintiffs performance was not very good and she said he should go on a performance improvement plan (PIP). Parham affidavit, Blue at p. 51, ¶15.

14

Admitted that is what Thaler claims. Denied as to truth.

7.      Dr. Parham verbally told plaintiff about his inadequate performance, and, during his midyear appraisal in December 2004, she also gave him a detailed written account of his work performance. Parham affidavit, Blue at p. 51, ¶16. Admitted.

**Mid-year Appraisal December 2004**

8.      On December 8, 2004, Dr. Parham, in the presence of Dr. Robert Brewer, met informally with Dr. Chowdhury to discuss her concerns with his unacceptable work performance. DDR 548; IPRO 548. Since Dr. Chowdhury was going to be on leave for approximately the entire month of January, 2005, it was decided that he should be given a mid-year performance appraisal prior to his leave. *Id.* Admitted.

9.      On December 20, 2004, Drs Parham and Thaler met with Dr. Chowdhury to discuss his mid year performance appraisal. *Id.* At that time they gave him a memorandum outlining the reasons why his performance had been found to be unacceptable. IPRO 1807-1809 (Red Ex 15 at p. 10-12). The memorandum addressed three areas in which plaintiffs performance was found by them to be unsuccessful: Mission Support, Research and Analysis, and Personal Contacts. It reflected that "Major projects were received late and only after setting a `final' due date. On one project, no work was being done, and there was no discussion with the supervisor to apprise her of the situation." *Id.* The document discussed problems with the Colombia and Thailand Review, and the Toxoplasmosis project which plaintiff had abandoned without telling Dr. Parham. It stated that "Dr. Chowdhury struggles with providing well-researched, well-written assignments. He does not ensure that all relevant and technical scientific issues are fully analyzed, and, therefore, much of his work is returned to him for more in-depth analysis. Moreover, the majority of his work requires major edits and revisions." *Id.* Also "Dr. Chowdhury does not accept supervision well. When attempting to discuss additional 'work needed on projects that he is assigned, he has become loud and disruptive with his supervisor... . Dr.

15

Chowdhury does not provide the supervisor with information that would inform the decision. ... In some situations he discussed assignments with personnel outside the branch and made a decision that he would not continue to work on the assignment based on his discussion with these individuals. Although he discontinued work on the assignment, he did not inform his supervisor." IPRO 1807-1809 (Red Ex 15 at p. 10-12). The document also discussed various actions to be taken to help improve performance including frequent meetings with Dr. Parham and preparation of a daily journal specifying the work plaintiff was doing and the time spent on said activities. *Id.*

Admitted that is what it says. Denied as to the truth or that it proves no discrimination or retaliation. (Exs. A-Z).

**August 2005 - Performance Improvement Plan (PIP)**

10.    The Department of Agriculture, Food Safety and Inspection Service (FSIS) Directives provide that a supervisor

> should inform an employee in writing if performance on a critical element falls below the fully successful level as soon as that fact becomes apparent. The supervisor should place the employee under a PIP. The PIP provides the employee a reasonable opportunity to improve performance to the fully successful level before the employee receives a rating of record of "Unacceptable."

FSIS Directive 4430.1, Blue at p. 353. The supervisor must identify the performance elements and standards not accomplished at the fully successful level and provide "reasonable means to assist . . . in improving performance. . . [such as] training, closer supervision, revision of assignments, or coaching. *Id.* The supervisor also was to "Describe specific incidents that illustrate the failure to meet the standards. *Id.* The employee is to be given a reasonable time to demonstrate performance at the fully successful level "usually no less that 30 days." *Id.* Admitted.

16

11.     The directive sets forth what must be in a PIP: identification of critical element being failed, what must be done to bring performance to the fully successful level, time frame provided for improvement, assistance offered, and consequences of failure to bring performance to fully successful level. *Id.* at p. 352.  Admitted.

12.     "Management may reduce in grade, remove, or reassign employees whose performance continues to be unacceptable." *Id.* at p. 351. Admitted.

13.     Plaintiff was not given a rating of record following the end of the appraisal period June 30, 2005. Rather, on August 9, 2005, plaintiff was advised that his performance continued to be at the unsatisfactory level and that he would be placed on a Performance Improvement Plan. Parham Dec at ¶ 5. Admitted.

14.     Plaintiff was issued a memorandum instituting the PIP dated August 16, 2005:

> This notice is written confirmation that I am providing you with an opportunity to improve your performance to the Fully Successful level. At your midyear appraisal on December 20, 2004, you were advised that you were not working at the Fully Successful level and given a document detailing the concerns about your work and actions needed to correct the concerns listed. (See Exhibits 1-5 that includes the midyear performance appraisal document and supporting email messages.) You have had two major projects since your midyear appraisal and from your work on these projects I have determined that your performance continues to be unacceptable in three elements of your position. The following Performance Improvement Plan (PIP) outlines activities that you must complete to attain a Fully Successful rating in the two critical and one non-critical element in which your performance has fallen to an unacceptable level. If you have any concerns about the PIP or require additional guidance in following it, please let me know as soon as the questions arise.
>     The PIP becomes effective today and will continue for 90 calendar days from today. It is important to perform well under the performance standards that were provided to you on July 18, 2005. A copy of the elements and standards for your job is attached. By the end of the opportunity period, you must have brought your performance up to at least the Fully Successful level in each of the critical elements that you are currently unacceptable in to avoid a reduction in grade or removal. This PIP is to assist you in reaching that objective.

PIP at p. 1.  Admitted that is what the document states. Denied as to truth (Exs. A-Z).

17

15.     The PIP provided for plaintiff to meet weekly with Dr. Parham, or in her absence with Dr. Thaler. PIP at p. 1. Admitted.

16.     The PIP required plaintiff to keep an expanded daily journal:

> In December 2004, following a discussion that you had not accomplished any work on 'a particular project, I requested that you begin keeping a journal so you could track your time and make adjustments, as necessary, to use it more efficiently. Beginning this week, you will be required to complete a more expanded version of your journal. Currently, you provide a very general list of tasks that you are working on. I am now requesting that you expand this list to include the number of tasks that you have completed and more specific details about the work performed on each task. For example, one of your tasks in your May 26, 2005, journal was working on the thinking paper." (See Exhibit b.) You will need to explain specifically what work was being done and at what stage you are in the paper; that is, you might indicate that you have contacted personnel at the National Agriculture library to begin the literature search, how much time was involved, how many references were ordered, and when you expect to receive the reference material. You will continue to submit the journal to me by close of business on the Thursday of the second week of the pay period. The new, expanded journal should prove helpful in our discussions on your progress in reaching the Fully Successful level during the next 90 days.

PIP at p. 1-2.  Admitted.

17.     The PIP stated that

> The deficiencies in your performance have been in the critical elements of Mission Support and Research and Analysis and the non-critical element of Communications. These elements reflect the complexity and nature of work that is performed and expected in the Zoonoses Branch at the GS- 13 level.

PIP at p. 2.

> Currently, your performance in these elements is at an unacceptable level as evidenced in the number of errors I hare found in your work and the missed deadlines. As was discussed at the midyear appraisal, major projects were received late and only after I set a "final" due date. In addition, work products received did not demonstrate the complexity and nature of work that should be performed by personnel in the Zoonooses Branch at the 05-13 grade level. You have had two major projects since the midyear evaluation, a "thinking paper" and a toxoplasmosis paper. While unacceptable work performance was not limited to task associated solely to these projects, they will be discussed as representative examples of your work following the midyear appraisal in December.

PIP at p. 4-5.  Admitted that is what the document states. Denied as to truth. (Exs. A-

18

Z).

18.     The PIP set forth two examples of what Dr. Parham considered unacceptable

performance, under the critical elements Mission Support and Research and Analysis

and the non-critical element of Communications, citing his work on a "Thinking

Paper" and on the "toxoplasmosis paper." PIP at p. 4-5. Admitted.

19.     The PIP issued to plaintiff dated August 16, 2005 had the following assessment

concerning the thinking paper:

> Thinking Paper: The thinking paper, which you were asked to model after the
> Agency's bovine spongiform encephalopathy thinking paper, had to be returned
> to you to conduct more extensive scientific research and studies. You were
> asked to think broadly then began narrowing the paper down to a workable
> one. Your first draft was submitted on March 9, 2005; it was not well
> researched, lacked depth, and did not provide adequate support for the work
> suggested. The paper was returned to you with recommendations for
> conducting more thorough study and analysis, and you immediately requested
> an extension of one month without even attempting to meet the due date,
> delaying submittal of the paper until May 20. The second draft of the paper was
> longer and showed that you had done more 'work, but still could not be
> considered a comprehensive scientific review of the issues. You failed to fully
> develop the role of the Zoonoses Branch to the level of specific
> recommendations with the pros and cons of each and priority for meeting
> strategic goals. When the first draft was returned to you, I recommended that
> you consult others for input into the paper, providing you an opportunity to
> collaborate with other federal and state government personnel, academia, and
> others to clarify and exchange information on the branch's role, support
> information in the paper, and discuss potential research needs of the Agency
> related to zoonotic or emerging diseases. The second draft did not show that
> you had collaborated with others to assist you in your determinations. In
> addition, much of the material in the paper had been lifted directly from other
> sources, some without acknowledging the sources, which violates applicable
> Agency rules and regulations against this type of practice... .
>
> * * *
>
> As discussed in the Mission Support element, the thinking paper had to
> be returned to you to conduct more extensive scientific research and
> studies. The drafts you submitted were not comprehensive, did not
> provide an adequate analysis of the issues, and did not suggest an ability
> to design an effective study approach or utilize analytical methods and
> objectives. Although you were expected to write this as a scientific paper,
> no references were included with the first draft to support the ideas and
> conclusions drawn in the paper. There was little attempt to analyze the
> effect of Agency policy proposals on current projects and initiatives. As
> written, the paper would not allow you to make meaningful
> recommendations for future projects and initiatives, and of the
> recommendations made, most are currently being done or under
> discussion... .
>
> * * *

19

The assignment was not timely. The original assignment was discussed with you verbally at least one week prior to your formally receiving the task on February 25, 2005. You submitted the first draft on March 9, 2005. The paper was returned to you for corrections with a due date of April 22. You immediately requested an extension of one month without even attempting to meet the due date, submitting the paper on May 20. This branch is expected to produce well-written scientific papers; both drafts of the thinking paper were poorly written and could not be accepted for Agency use without much needed work. Some of the material lack references, especially the section on avian influenza. Much of the material has been lifted exactly as written from other documents. Lifting text from another manuscript without proper reference is not acceptable. In early July following training courses in May and June, you were given an opportunity to revise or modify the document but informed me that you were satisfied with the paper as written. Work on this paper presented an opportunity for you to liaison with federal and state government personnel, academia, and others to clarify and exchange information on the branch's role and support information in the paper, which was recommended when the first draft was returned to you, but there was no evidence in the second draft that you did this... .

PIP at p. 5-9. Admitted that is what the document states. Denied as to truth. (Exs. A-Z).

20.     The PIP issued to plaintiff dated August 16, 2005 had the following

assessment concerning the toxoplasmosis paper:

For the toxoplasmosis project, an independent research project in which you were expected to develop the project plan and establish milestones, you have again performed no work on the project beyond submittal of the project plan in February. This project was carried over from the 2003-2004 rating cycle. Although no work had been done on the project prior to the midyear appraisal in December, during the appraisal you indicated to Dr. Thaler and me that you wished to retain the project and would begin the necessary research. You were given ideas for developing a feasible plan in February, and some work could have been completed within one month. Only after a task request was sent via Outlook in July 2005 did you admit that no additional work had been done on the project, explaining that you thought that the thinking paper replaced the toxoplasmosis assignment. However, in August you submitted a new project plan indicating that you may have misunderstood... .

* * *

As of July 19, by your own admission, no work had been done beyond the project plan. Incomplete work products during this rating period are evidence of unacceptable execution of your analytical skills. It would also indicate an inability to plan, organize, and prioritize assigned work.

* * *

For the toxoplasmosis project, you failed to do work beyond drafting the project plan. When asked recently to give an update of the toxoplasmosis project, you indicated that you were not working on the project because you thought the thinking paper replaced the toxoplasmosis paper. This was not the

20

case, and you made no attempt to clarify this. In August you sent an update of the toxoplasmosis project, admitting that I had not told you that the thinking paper replaced the toxoplasmosis paper, but I had never approved your project plan for the toxoplasmosis paper. You are correct that there is no written communication on this, but we have had verbal discussions in your office and at branch meetings. This is a failure to communicate, orally or in writing, to the supervisor to assist in clarifying or resolving a problem. In not continuing work on the project or providing a work product, you have not conducted business in a professional manner or shown a commitment to service.

PIP at p. 5-6. Admitted that is what the document states. Denied as to truth (Exs. A-Z).

**Tasks Required to Be Completed During PIP**

21.     The PIP gave plaintiff three tasks to complete successfully in a 90-day period in order show improvement to the fully successful level - preparation of 1) a Toxoplasmosis Paper, 2) a Salmonella Serotype Paper, and 3) Bi-monthly Zoonotic Disease Surveillance reports. The PIP also explained how successful completion of the tasks would demonstrate fully successful work under the applicable performance standards:

**Tasks to Improve Performance to the Fully Successful Level**

During this opportunity period, you must improve your performance to at least the Fully Successful level in order to continue in your position. The following is a list of specific tasks that have been assigned to you **that must be completed during this opportunity period. You must meet all deadlines for the tasks described below.** During this opportunity period there may be other related tasks such as review of notices and/or directives that are assigned to you that will also need to be completed timely and accurately. [Emphasis added.]

**Toxoplasmosis Paper:** Prepare a scientific paper on toxoplasmosis as it relates to meat and poultry, written in a format prescribed by a peer-reviewed journal. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. Within two weeks of receiving this letter you are expected to provide me with your specific focus on the paper, provide the format for the paper, and establish milestones and delivery dates for completing all work on the paper within this 90-day opportunity period. The paper, if well written, properly researched and prepared for publication in a peer-reviewed journal, would indicate Fully Successful performance in the following:

21

Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4[:] Preparation of a paper for publication in a peer -reviewed journal would demonstrate your knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging diseases. It would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues.

Research and Analysis element A, B, and C, and goals/activities #s 1 - 4[:] Preparation of a paper for publication in a peer -reviewed journal would demonstrate your ability to research and analyze issues thoroughly and accurately. As discussed under Mission Support, it would also demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues.

Communications element A, B, and C, and goals/activities #s lb, c, e, and g. [:] Preparation of a paper for publication in a peer-reviewed journal would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show too that you can prepare documents that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.

**Salmonella Serotype Paper:** Prepare a scientific paper of the top five poultry Salmonella serotypes, describing each serotype in detail, such as reservoirs, its public health significance, related antimicrobial resistance issues, etc. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions. The paper, if well written and properly researched, would address a request made by the Assistant Deputy Administrator to provide descriptive information on key poultry Salmonella serotypes. It would indicate Fully Successful performance in:

Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4[:] preparation of the report would demonstrate your ability to provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements. It would show that you are capable of conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues.

Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4 [:] Preparation of the paper would show that you are capable of researching and analyzing issues thoroughly and accurately, and in a timely manner, making use of available reference sources that would allow you to identify and compile information to carry out the required analysis.

Communications element A, B, and C, and goals/activities #s lb, c, e, and g[:] Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, and presented in an understandable manner. It would show that you can present written findings and observations to

22

managers in a manner that enhances confidence and credibility in the Branch and Division.

**Zoonotic Disease Surveillance:** Prepare bi-monthly compilation of worldwide emerging zoonoses as indicated in scientific journals, newspapers, internet, and other available reference materials that may have potentially serious human health concerns and can possibly be foodborne (especially related to meat, poultry, and eggs). Submissions are due on Thursday by close of business and must be free of major errors and require few edits and revisions. The report, if conscientiously prepared and timely submitted, would provide the Zoonoses Branch with up-to-date information on zoonotic disease incidence worldwide and serve as a valuable reference source for Agency inquiries on the subject. It would indicate Fully Successful performance in:

Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4 [:] Preparation of the report would indicate your ability to provide a work product that is responsive to the supervisor's and the organization's stated priorities and requirements. In preparing the report, you would acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.

Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4 [:] Preparation of the report would demonstrate your ability to make use of available reference sources, research and analyze issues thoroughly and accurately, identify and compile information, establish and maintain working files, and identify relevant scientific issues that may have policy implications.

Communications element A, B, and C, and goals/activities #s lb, c, e, and g [:] Preparation of the paper would demonstrate your ability to provide written documents that are clear, correct, timely, and presented in an understandable manner. It would indicate an ability to present written findings to colleagues and managers in a manner that enhances confidence and credibility in the Branch and Division.

PIP at p. 6-8. Admitted that is what the document states. Denied as to truth (Exs. A-Z).

22.    On about August 11, 2005, plaintiff had made an informal EEO complaint concerning his unsuccessful performance rating he had been advised about on August 9, 2005. EEO counselor report at p. 2; 10/11/05 Settlement agreement. On October 11, 2005, plaintiff signed a settlement agreement with the agency which, among matters, allowed

a) submission of the Salmonella Serotype Paper and Zoonotic Disease

23

Surveillance Report by the end of November 2005,

      b) an extension to submit the Toxoplasmosis Paper no later than December 31, 2005,

      c) submission of a substantive progress report that includes updates on the three PIP projects on a weekly basis, in lieu of a daily journal, and

      d) a 90-day detail, contingent upon his successful completion of the PIP.

Settlement agreement at p. 1.

      Plaintiff agreed to "release, waive and withdraw all concerns, complaints. . .civil actions against the Agency . . . for any concerns arising out of these (or related) employment situations prior to the signing of the agreement." 10/11/05 Settlement Agreement at p. 2.

Admitted that is what the document states. Denied as whether this precludes any challenge to Dr. Chowdhury's subsequent unacceptable performance rating or removal (Exs. A-Z).


### SEPTEMBER 2005-DECEMBER 2005: PIP
### PERFORMANCE PERIOD Salmonella Serotype Assignment

      <u>Background</u>

23.    On June 29, 2005, Loren Lang, the Deputy Assistant Administrator, Office of Public

Health and Science, of USDA' s Food Safety and Inspection Service, in a voice mail, followed up with an E-mail to Dr, Thaler, assigned the Zoonoses Branch to take the lead on an assignment pertaining to salmonella serotypes:

      Re: my voice mail I just left.

24

OFO wants us to look at:

Top 20 Serotypes in young chickens 1998-2005. Number and % of total samples with Serotypes (All sets)

Top 20 human illnesses by year (maybe just last couple years).

Trends or changes

What is known about sources

ZDRSD should take lead and get help from HHSD on human data.

June 29, 2005 Lange e-mail.  Admitted.

*24.*    The next day, Dr. Parham sent an e-mail interpreting Mr. Lange's request. Blue 327-328. He responded indicating that the item numbered 3 reflected his original request. *Id.* Admitted.

25.    Dr. Parham assigned Drs. Anandaraman and Maqbool to put together information on the top 20 Salmonella serotypes for poultry and humans. July 6, 05 Parham e-mail. Dr. Chowdhury was assigned to work on descriptive data on the 20 salmonella serotypes for chickens. *Id.*  Admitted.

26.    Dr. Chowdhury was given a list of chicken serotypes. His specific assignment was as follows

you are providing a brief statement (paragraph) on each of the young chicken serotypes listed . . .You will indicate the reservoirs, commonality, public health significance, and other pertinent facts, etc. The paper must include references."

PDR 242, Parham assignment to Chowdhury start date June 30, 2005. Admitted.

27.    On July 7, 2005, plaintiff sent to Dr. Parham, with a cc to Dr. Thaler, a partial report on ser

(1) Typhimurium.
Resevoirs: Domestic and wild animals, including poultry, swine, and cattle, rodents and pet animals, and also man. Commonality: Man, Cattle, Swine, Turkey

25

Public health significance: Very high

Antigenic character: 1,4,[5], 12,1

*See* DDR 445-450, plaintiff's July 7, 2005 submission. Admitted.

28.     On July 12, 2005, plaintiff submitted a second draft of his paper. PDR 244.

Admitted.

29.     Mr. Lange reviewed plaintiffs submission and stated:

> The July 2005 report. Looks like copied from a standard
> reference. No relationship from references to presentation. No
> value added. What do the findings mean for FSIS.

DDR 442.  Admitted that is what the document states. Denied as to truth (Exs. A-Z).

## **PIP Performance**

30.     The PIP required plaintiff to redo the project, but limited to only five (5)

serotypes. *See* X21 above.

31.     On November 14, 2005, plaintiff gave a draft of the salmonella paper to Dr.

Parham. Blue 217. On November 21, 2005, Dr. Parham discussed with plaintiff

needed revisions to the document. Blue 218-219. The discussion incorporated

suggestions/criticisms from Dr. Thaler. Blue 329. Admitted.

32.     Plaintiff submitted his final paper to Drs. Parham and Thaler on November

30, 2005. Blue 333.  Admitted.

33.     A copy of the document was sent to Mr. Lange with a request for his

comments. Blue 344- 345. He made hand written notes on the face of the document

for about three pages. IPRO 481- 490. Then he wrote

I've read enough to see that data is carelessly or inaccurately

26

presented. The text as written is inaccurate . . . .
     The material doesn't present the information in a format that addresses OPHS issues. I would expect a GS-13 analyst to organize material to address a serotype in the following manner:

Heidelberg:
     1. Presence in FSIS regulated products.
     Yes chicken is high, but how could one not mention Heidelberg in market hogs?
     2. Then discuss some documentation of outbreaks attributed to FSIS regulated products.
     3. Finally summarize some "expert opinion" about links to specific products. What do experts think are the likely sources of human illness? While this may go beyond the letter of the original request, it is what we would expect of a GS-13 analyst in OPHS

IPRO 477-478. Admitted that is what the document states. Denied as to truth. (Exs. A-Z).

34.    Dr. Parham prepared a summary assessment which included her and Dr. Thaler's assessment of the paper as well as Mr. Lange's. PIP Summary Assessment. Admitted.

**Toxoplasmosis Assignment**

    **PIP Performance**

35.    As was discussed above, plaintiff previously had been assigned to do a paper concerning toxoplasmosis. See ¶ 20 above. Admitted.

36.    During the PIP period Plaintiff submitted some daily journal and then progress reports concerning his work . Blue 192-206. Plaintiff also had meetings with Dr. Parham and/or Dr. Thaler during which he was supposed to discuss his progress with the three PIP assignments. Blue at p. 207-224. Admitted.

37.    On December 1, 2005, plaintiff submitted a work plan for the toxoplasmosis paper to Dr. Parham. Blue 300. Admitted.

38.    Plaintiff submitted the Toxoplasmosis paper to Dr. Parham by e-mail dated

27

December 30, 2005. Blue 283. Admitted.

39.    Dr. Eric Hemphill, was asked to review the document. Blue 283. He stated:

> In general the document is a helpful regurgitation (review) of information on Toxoplasmosis. There are, however, numerous grammatical errors and needs additional/critical wordsmithing. I suggest that the author review and make appropriate corrections, entries and changes prior to further distribution.
> A paragraph or so on conclusion of the paper and future considerations for research (i.e., developing a vaccine) may be useful but not necessary.
> Other than that please note comments re the paper. FEH
> P.S. Author also leans heavily on Dubey et al., in same 1990 AVMA journal.

Blue 283. Dr. Hemphill also submitted written edits and comments on the face of the document. *See* Blue 284- 295. Admitted.


40.    Katie Pritchard, Writer/Editor (OPHS employee) also was asked to review

the document. Her overall assessment was as follows:

> To put it bluntly, this document should not proceed further in the review or clearance process without first undergoing substantial changes and rewriting. I would not clear this document if it was sent to me for that purpose, nor would I attempt to edit it because there are simply too many problems. This document is not ready for review. Overall, the main idea of the paper it lost on the reader. It is poorly organized and difficult to follow. The document seems as though it is pieced together. As a result, there is no flow of information and the document seems to jump from idea to idea, never fully explaining the main point.

Blue 279. Ms. Pritchard then discussed various categories of problems relating to the paper including "References to Studies" (e.g. lack of information concerning what the studies were or what the actual results were; use of ambiguous time frames and geographical references); "Inconsistencies" (in uses of various words); "Awkward phrasing" (which "makes sentences difficult to understand and often times, not make sense at all") "Other errors" (prevalence of spelling, punctuation, and grammatical errors). Blue 279-282.  Admitted that is what the document states. Denied as to truth (Exs. A-Z).

Dr. Thaler also reviewed the document. Dr. Thaler prepared a memorandum discussing

some of the deficiencies she perceived in plaintiffs work product

> I completed my initial review of Dr. Chowdhury's Toxoplasmosis paper. At a GS-13 level, I expect an initial work product to be ready to review for substance, without significant basic editing mistakes. As stated in the PIP letter. The paper must be well researched with

28

references and it must be free of major errors requiring few edits and
revisions. A GS-13 level staff officer would be expected to
independently determine when to use his professional contacts to assist
in review of a paper prior to submitting it to his supervisor. A GS-13
level staff officer also is expected to prioritize the work to meet quality
and timeliness goals. Dr. Chowdhury informed me that he decided to
devote only the 30-day extension of the PIP to writing the
Toxoplasmosis paper.

From the perspective of being ready for supervisory review,
the paper is disappointing.

Thaler Toxo comments, Blue 272-277. Dr. Thaler noted style inconsistencies,

grammatical errors, and misspelled words. She found the substance of the paper to be

poor, with, among other matters, no analysis, conclusions which contradicted the data.

She found that "scientific information in the references used demonstrates an inability

to extract and use the data properly;" "[t]he data was not organized or analyzed," and

there were no graphs or tables to aide comprehension. Dr. Thaler supplied examples of

her concerns. *Id.* Admitted that is what the document states. Denied as to truth or that

there is inference of no discrimination or retaliation. (Exs. A-Z).

  41.    Dr. Parham also assessed the paper as poorly written, requiring numerous edits

of grammar, punctuation and spelling. Parham Toxo comments, Blue 278. She noted

data "strung together with little attempt to analyze or interpret it or arrange it in a

coherent and rational manner that provides for order throughout the paper." Blue 278.

"Material is often improperly referenced or missing a reference and much of it has

been plagiarised. In some cases the literature seems to be misunderstood or

misinterpreted. " *Id.*

Admitted that is what the document states. Denied as to truth or that there is inference

of no discrimination or retaliation. (Exs. A-Z).

### UNACCEPTABLE RATING AFTER PIP

29

43      On February 8, 2006, plaintiff received his final evaluation for July 1, 2004

to June 30 2005; the rating was unsuccessful. Blue 74. By memorandum dated

February 8, 2006, Dr. Parham advised plaintiff that his performance rating remained

at the unsuccessful level, because he had failed to complete the PIP successfully.

Blue 80-82 and Summary Assessment. Admitted.

44.     Plaintiff was advised that he had submitted an acceptable final product for

the assignment to compile a bimonthly report on zoonotic and emerging diseases,

but that the papers on toxoplasmosis and salmonella serotypes did not meet the

acceptable level. Blue 80. Admitted.

45.     The Summary Assessment stated the following concerning plaintiffs
toxoplasmosis paper:

> Accomplishment: Dr. Chowdhury acknowledged his concern about
> completing the work in the required time frame at almost every weekly
> meeting. Yet, he afforded no opportunity for Drs. Thaler or Parham to assist
> him because he did not provide project plans with milestones and delivery
> dates, outlines, or drafts for review. At the September 12 meeting, he provided
> a very sketchy work plan that did not include milestones and delivery dates. At
> the September 19 meeting, he indicated that he had started the literature
> review and had begun to write the paper, but later said he would not begin
> writing the paper until the end of October. At the November 21 meeting, Dr.
> Chowdhury admitted that he was not far along with the toxoplasmosis paper
> and would not be able to turn his attention to it until he completed the other
> two projects. In the December 19 meeting, he indicated that he had begun
> "patching" the paper together, and would spend the following week reviewing
> and making corrections to the paper. When asked in the December 19 meeting
> if Dr. Parham could assist him by reviewing his outline or draft, he said
> assistance was not needed because he did not have an outline or draft ready to
> show. He explained that it would be difficult to have someone review the
> paper because they would need at least one week to do so. At the December 19
> meeting, although concerned about the time, Dr. Chowdhury expressed
> confidence in having the paper ready on the due date.

> Assessment: This project was not completed successfully. Dr. Chowdhury submitted
> his review paper, "Seroprevalence of _Toxoplasma gondii_ infection in various food
> animal species in the United States of America and its public health significance," on
> December 30, 2005. The submission was timely, but the work product was not
> completed to the required level of quality for work of this type. Drs. Alice Thaler,
> Erich Hemphill, and Delila Parham, ZDRSD, OPHS, and Katrine Pritchard,
> Management Support Staff, OPHS, reviewed the final paper. Dr. Hemphill is the
> branch chief of the Animal and Egg Production Food Safety Branch, and serves on
> the National Pork Board _Toxoplasma/Trichina_ Committee. Ms. Pritchard is the

editor/writer for OPHS. All reviewers agreed that the paper is poorly written and has major errors that would require significant edits or revisions before it would be cleared by the Agency for submittal to a peer-reviewed journal. The work product did not meet the Fully Successful level for the three elements described below. The examples are not comprehensive, but are meant to illustrate a general pattern that indicates less than acceptable performance for each element.

### A. Mission Support (Critical):

Although some level of error is anticipated in a first draft, the number of errors found in the paper indicating misinterpretation or misunderstanding of the literature is unacceptable. For example, narrow, geographical-based studies are used to represent the national picture. In the etiology and transmissions section of the paper, Dr. Chowdhury states that the "investigation also confirmed that all mammalian wild animals (cats, raccoons, opossums, skunks, house mice, white footed mice, rats) serve as the main reservoirs of *T. gondii* infection in swine. However, what is actually stated in the abstract of the reference is, "All mammalian species examined were reservoirs of *T. gondii* infection." In the discussion section, the reference states, "The current investigation has identified all mammalian species captured in large numbers on swine farms in Illinois (cats, raccoons, opossums, skunks, house mice, white-footed mice, rats) as reservoirs of T. *gondii* infection." The findings are representative of Illinois only.

The paper contains material that has been copied verbatim from references, without proper acknowledgment of the source. In some cases, material is copied and given seemingly minor word changes that result in erroneous statements being made. In the etiology and transmission section, Dr. Chowdhury states, "Cats are the only <u>primary</u> host since all the developing stages occur in the cat and not in other animals." The reference states, "Cats are the <u>definitive</u> hosts for *Toxoplasma gondii,* since all the developmental stages occur in the cat and not in other species. Cats and other felines are the only definitive host - meaning the only host where the parasite completes its life cycle and produces oocysts (eggs). By using "primary host" and only discussing household cats, it could be inferred that there are several hosts where the parasite can complete its life cycle. While some word changes made by Dr. Chowdhury resulted in true statements, the statements may not reflect the intent of the reference. For example, Dr. Chowdhury states, "<u>Domestic animals</u> can become infected by eating oocysts from a contaminated environment (feed contaminated by cat's feces) or by eating raw or poorly cooked meats that are contaminated by the cat's feces or rodents. The reference states, "<u>Hogs</u> can become infected by eating oocysts from a contaminated environment (for example, in feed contaminated by cats) or by eating poorly cooked meats that are contaminated (for example, rodents dying in hog pens)" While it is true that domestic animals can become infected by eating oocysts from a contaminated environment, as used in the paper, it is a broader claim than can be supported with the reference.

No real analysis, discussion, summary, or conclusion is provided to pull the "pieces"

together to make the review relevant and useful to the Agency. While there are a few recommendations under the control section, the paper shows a lack of knowledge about the Agency's plans for addressing *T. gondii* in the slaughterhouse. The paper states, "It has been recommended that until examination of meat for *T. gondii* infection is implemented in the slaughterhouse; all meat should be cooked according to industry guidelines before human consumption in order to reduce the potential for transmission of *T. gondii* in humans." The Agency has not indicated that testing will occur ever at the slaughterhouse, no quick test is currently available, and industry is required to provide safe food handling labels, not cooking labels.

## B. *Research and Analysis (Critical)*

 A review paper is meant to be a comparison and synthesis of results from various investigations. Many studies are cited throughout the paper, but no real information on what the results show is presented. Many of the references used in the paper are "fact sheets, and are not from peer reviewed literatu'e. Generally, background references such as textbooks or fact sheets are used to acquaint the author with the subject matter and are not cited because they contain information that is common knowledge in the subject area. Timeframes for the studies are either omitted or referred to in vague terms such as "more recent" or "much earlier." Data are strung together with little attempt to analyze or interpret it. Percentages are used as evidence of various points, but since true numbers from the studies are not shown, there is no way of knowing what they mean. For example, the abstract states, "In the swine populations, *Toxoplasma gondii* antibodies were more prevalent in breeding swine (An average: 13.2%) than among finishing swine (An average: 4.3%), and prevalence of *T. gondii* was markedly lower among the swine raised in confinement (An average: 9.3%) than the pig herds in non-confinement facilities (An average: 14.1%)." Several inconsistencies are noted in the paper. For example, Dr. Chowdhury states that confinement operations are expected to reduce exposure to toxoplasmosis; however, pigs are raised in confinement yet pose a high risk of infecting people. Conversely, he states animals raised outdoors risk greater exposure to toxoplasmosis, but does not explain why cattle, which are raised outdoors, pose a low risk of infecting people.

## C. *Communications (Non-critical)*

Numerous grammatical, spelling, and punctuation errors indicate that the document was not even "spell-checked" before submission. In the very first line of the document, the word "states" is spelled "sates." The paper lacks order and a consistent style of presentation throughout. For example, the paper switches at random between the words pigs, swine, and hogs. Similarly, references to pork are varied: pig meat, meat (pork), and pork meat, as are references to the United States: US, USA, America, states of America, and United States of America. Phrasing is often awkward or unclear. For example, the paper states, "Pregnant women may not get *T. gondii* infection by the direct contact with cats, as the oocysts are not found on cat fur and are often buried in soil along with cat feces, and pregnant women probably get the diseases from the contaminated soil by cat feces." Material has been plagiarized, which violates applicable Agency rules and regulations against this type of practice.

32

Summary Assessment at p. 1-4.  Admitted that is what the document states. Denied as to truth or that there is inference of no discrimination or retaliation.  (Exs. A-Z).

46.     The summary Assessment stated the following concerning the Salmonella Serotype Paper

Accomplishment: At the September 19 meeting, Dr. Chowdhury shared the list of five serotypes he would address in his report, and indicated that he had begun the literature review. However, Dr. Chowdhury wrote in his October 21 progress report, "This week I made some headway in my serovars assignments. That is I have decided to stop running door to door to ask for help from experts/Microbiologists and making phone calls and sending emails (which has absorbed my enormous amount of time) which has turned out to be unproductive. I get same old answer from everybody. Name of the game i s - I shall have to make it up myself. Best is to spend my time on literature search and pick something related to my purpose. I will need to search thousands of articles to do a moderate job." In meetings held October 24, 2005, and November 7, 2005, Dr. Chowdhury acknowledged that he had hoped to find the material in a single source and had contacted several persons in and out of the agency including Moshe Dreyfuss, Branch Chief, Dr. Bonnie Rose, Kristina Barlow, Microbiology Division, OPHS, and Dr. Richard Gast, Agriculture Research Service, USDA, all of whom informed him that he would not find this information in a single source and provided possible sources that he might use to gather the information. He expressed concern about the number of articles needed to write the paper and the paucity of information available for some of the serovars. At the November 7 meeting, he agreed to provide a draft of the paper at the next meeting. The draft submitted on November 16, 2005, was poorly written, and Drs. Thaler and Parham provided extensive comments to the draft, which were discussed with him and included in the November 21 meeting notes. No additional drafts were presented for review before the final paper was submitted.

Assessment: This project was not completed successfully. The paper was submitted on November 30, 2005, at the time required; however, it was not completed to the required level of quality for work of this type. Dr. Parham forwarded the paper to Loren Lange, Deputy Assistant Administrator, OPHS, to determine its adequacy in meeting his request. Mr. Lange commented that the data were carelessly or inaccurately presented and there were inaccuracies in the text. He did not think the material was presented in a format that addressed OPHS issues such as presence in FSIS regulated products and/or documentation of outbreaks attributed to FSIS regulated products. He did not find that this report reflected management expectations of a GS-13 analyst in OPHS. The work product did not meet the fully successful level for the three elements discussed below. A few examples from the paper are provided as evidence of failure.

A.  Mission Support (Critical):

Much of the information provided is too general for a paper of this nature and, often,

33

does not address the specific topic being discussed. Of the information provided, Mr. Lange found inaccuracies in the text as seen in the sentence, "This serovar is multiple drugs resistant." Mr. Lange noted that resistance varies by serotype and/or strains. Mr. Lange questioned the isolation rates provided in the paper. Dr. Chowdhury obtained the percentages from a draft table prepared by Dr. Neena Anandaraman, Zoonoses Branch, ZDRSD, OPHS. The table has not been published, which should have been noted in Dr. Chowdhury's paper. For S. Heidelberg, the isolation rates are not the same as those provided in the draft table from lowest to highest for 1998 - 2004.

B.   Research and Analysis (Critical):

The paper did not demonstrate ability to research and analyze issues thoroughly and accurately. In many cases, relevant information has been omitted. For example, S. Heidelberg is a known pathogen in swine and found commonly in market hogs, a product the Agency regulates. Yet, the paper does not include swine as a reservoir for S. Heidelberg. The sections on public health significance do not elaborate, in most cases, on the true public health significance of the serotype. For example, Dr. Chowdhury states that the public health significance for S. Heidelberg is moderate to high with about 5.39 - 8.0% isolated from human sources. No further analysis is provided. No attempt is made to correlate the information provided for isolation rates for young chickens and the public health significance. The text includes a lot of extraneous information, not relevant to the discussion. Several unnecessary paragraphs are included that provide no substantive information. For example, in the antimicrobial resistance section under S. Typhimurium, the paper states, "S. Typhimurium with excess mortality and the demonstration of a hazard to human health underscores the need for restrictions in the use of antimicrobial drugs in the production of food from animals. A particular risk was associated with quinolone resistance, indicating that the use of fluoroquinolones for food production animals should be discontinued." Discussion on the merits of using antimicrobial drugs in food animals is outside the scope of the paper. Mr. Lange would not anticipate a discussion on this subject given that drug usage in food animals is regulated by the Food and Drug Administration.

C. Communications (Non-critical):

The paper is poorly written. There are many incomplete sentences, and many are unclear. Carelessly written sentences resulted in ambiguous statements. For example, in the discussion on S. Heidelberg, it is written: Rate of isolation: 16.84 - 22.9% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants. Based on the manner in which the text was written, Mr. Lange assumed that the intent is to talk about the percent of young chicken isolates that are S. Heidelberg, but with the poor phrasing, it is unclear exactly what is intended. There are many grammatical errors as seen in these sentences: (1) Consuming shellfish taken from sewage-contaminated beds and raw fruits. (2) Very high percentages (22-26%) was isolated from the human source by Public Health Laboratory Systems (PHLIS) reported to CDC (Center for Disease Control) from 1998-2003. The paper switches between "multiple drugs (s should be omitted) resistant" and "multiple antimicrobial resistant." Both terms are incorrectly used in the paper.

Summary Assessment at p. 5-6.  Admitted that is what the document states. Denied as

34

to truth or that there is inference of no discrimination or retaliation.  (Exs. A-Z).

47. The assessment stated the following concerning the zoonoses assignment

Accomplishment: Dr. Chowdhury submitted six reports during the opportunity period. The term "bimonthly" was confusing to Dr. Chowdhury who interpreted it as every two months, while Dr. Parham interpreted it as every two weeks. Given the confusion over the term bimonthly, it was agreed in the September 12, 2005, meeting that the first report would be due on September 15, 2005, and six reports would be prepared during the opportunity period. The first report was several pages long, and had been simply cut-and-pasted primarily from ProMed Internet reports. No attempt had been made to organize the material using titles or subtitles or limit the paper by choosing only relevant material to include in the report. At the September 19 weekly meeting, Dr. Parham discussed the first report with Dr. Chowdhury and the need to improve it and especially the need to use more than one source for the report. The second report, dated September 29, 2005, was in the same format and style as the first report. Dr. Thaler forwarded the report to ZDRSD staff requesting feedback on how useful the staff found the report and suggestions on the format and additional resources to obtain information that could be included in the report with the goal of producing as comprehensive a report as possible to support surveillance efforts and policy based on science. All comments were compiled by Dr. Thaler and provided to Drs. Chowdhury and Parham for discussion at the October 17 meeting.

 While many found the "idea" of this type of report useful, they did not find the report useful as written. One reviewer commented, "Very disappointing. Not acceptable. This is not a report. It appears to be mainly a "cut and paste" compilation of a few websites or abstracts of around four conditions. A report would require some sort of stated purpose, summary, or conclusion with these compilations as references, not the body of the report." Another reviewer commented, "Lot of information but not arranged," and provided a suggested style for arranging the material. The reviewer also suggested that Dr. Chowdhury "adopt a style or a format for compiling the report including adopting a [consistent] font." Dr. Chowdhury agreed to review the comments and work to provide a useful report. Assisted by Dr. Thaler, he prepared a new format for the paper, and submitted it to Dr. Parham on October 18, 2005. The October 27 report, prepared in the new format, was submitted to the division director, branch chiefs, and Zoonoses Branch staff for review. One reviewer commented that the avian influenza section was very good and informative, but questioned the accuracy of a statement that the EU did not feel it presented a threat to humans. The reviewer commented too that the quality of the work for the other diseases did not match that of avian influenza, the report should be checked carefully for spelling, typing, spacing, syntax and grammatical errors since these errors were very distracting to the reader, and that hyperlinks should be checked to see if they worked. The final report was submitted November 28, 2005.

Assessment: The work product met the Fully Successful level for the three elements - Mission Support (Critical), Research and Analysis (Critical), and Communication (Non-critical) on Communication (Non-Critical). Each submission was timely. Dr. Harry Walker, Branch Chief, ZDRSD, OPHS, was asked to review the final report. Dr. Walker had a few comments on the report, but indicated it was a good report. While Dr. Chowdhury required a lot of guidance from the first to the final report, the final report was considered acceptable.

*Id.at* p. *7-8.* Admitted that is what the document states. Denied as to truth or that there is inference of no discrimination or retaliation (Exs. A-Z).

48.    Plaintiff made initial contact with an EEO counselor on February 9, 2006. Brown EEO counselor report. He challenged the rating received following completion of the PIP. *Id.* at p. 2. Admitted.

49.    Although the agency originally construed plaintiff's complaint as an allegation of noncompliance with the settlement agreement signed on October 11, 2005, plaintiff's counsel explained that the complaint was not about non-compliance, but was a new claim of discrimination

> [I]t is clear that the terms of Dr. Chowdhury's new EEO complaint attack the substantive decisions made during the PIP, as opposed to any failure to abide by the agency's procedural obligations during that time.
>     For these reasons it was error for the Employment Complaints Division to treat Dr. Chowdhury's complaint as one for non-compliance.

Gould letter at p. 2-3. Therefore the complaint was treated as a new claim of discrimination concerning solely the outcome of the PIP. Bradshaw memo. Admitted that is what the document states. Denied as to truth or that there is inference of no discrimination or retaliation or inability to challenge subsequent unacceptable performance rating and termination. (Exs. A-Z).

**TERMINATION OF EMPLOYMENT**

50.    On May 22, 2006, plaintiff received a notice of proposed removal based on unacceptable performance. Blue 93-99. Admitted.

51.    By letters dated May 31, 2006, plaintiff's counsel requested an oral conference and submitted a written objection to the proposed removal. Blue 114-124. Admitted.

52.    The oral conference was held on June 15, 2006, with Oral Conference Officer Larry G. Janney, plaintiff and his counsel present. Blue 125-135. Admitted.

36

The oral conference officer reviewed plaintiff's objections to the proposed termination. In a decision dated August 13, 2006, he found "substantial evidence exists in support of the performance standards under which CHOWDHURY worked were valid, CHOWDHURY's performance in at least one critical element was deficient as charged, and CHOWDHURY was provided with a reasonable opportunity to demonstrate acceptable performance prior to proposing his removal ...Therefore, it appears that Agency officials met its (sic) burden of proof and the removal action should go forward." Blue 135. Admitted that is what the document states. Denied as to truth or that there is inference of no discrimination or retaliation. (Exs. A-Z).

Tia Gayle, Supervisory Employee Relations Specialist, was the final agency reviewing official concerning the proposed termination. By letter dated September 1, 2006, Ms. Gayle sustained the proposal to terminate plaintiff's employment. Blue 100-110. Admitted that is what the document states. Denied as to truth or that there is inference of no discrimination or retaliation (Exs. A-Z).

### JUNE 9, 2006 E-MAIL RE PERU QUESTIONS

53.     On June 8, Dr. Thaler saw a report which had been prepared by plaintiff during her absence. Thaler Aff at p. 3. Red Tab 9. She reviewed the report, found what she believed to be inaccuracies and misleading information in the report, revised it and resubmitted it to Dr. Holt. Thaler Aff at p. 3. Red Tab 9.

Admitted that is what the document states. Denied as to truth or that there is inference of no discrimination or retaliation.  (Exs. A-Z).

54.     Dr. Thaler sent an e-mail to David Goldman and to the members of her staff

37

who had been involved in the handling of the report. In the e-mail she expressed her

problems with the report and manner in which it had been handled. Thaler aff at p. 4.

Admitted that is what the document states. Denied as to truth or that there is inference

of no discrimination or retaliation.  (Exs. A-Z).

57.     The e-mail, in sum 1) stated that OIA rather than OPHS should have responded

to the questions from Peru; 2) stated that the document as submitted was not

acceptable; 3) apologized to her boss for a document being sent to him which had not

received adequate review, and 4) stated "We will instruct employees who are acting as

the branch chief to not clear documents on sensitive issues until they have been

reviewed by at least the branch chief and division director." June 9, 2006 Thaler e-mail

Red Tab 21.  Admitted that is what the document states. Denied as to truth or that there

is inference of no discrimination or retaliation.  (Exs. A-Z).

Respectfully Submitted,

The Plaintiff,
Khurshed A. Chowdhury

By    /s/ James L. Kestell_____
      James L. Kestell
      D.C. Bar # 955310
      Kestell and Associates
      1012 14th Street, NW, Suite 630
      Washington, DC 20005
      Tel. (703) 237-2912
      Fax (202) 347-4482
      Email: jlkestell@cox.net

      /s/ Jonathan L. Gould_____
      Jonathan L. Gould
      DC Bar #491052
      Law Office of Jonathan L. Gould,
      1730 M Street, NW
      Suite 412
      Washington, DC 20036
      Tel. 202-347-3889
      Fax 703-652-7589
      Email: jgould@igc.org

      Attorneys for the Plaintiff

39

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KHURSHED A. CHOWDHURY ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 1:07-cv-997 (RCL) |
| ED SHAFER, Secretary, ) | |
| U.S. DEPARTMENT ) | August 9, 2008 |
| OF AGRICULTURE ) | |
| ) | |
| ) | |
| Defendant ) | |

## SWORN STATEMENT OF DR. KHURSHED A. CHOWDHURY

I, Khurshed A. Chowdhury, of Silver Spring, MD, under the penalties of perjury, do hereby state and affirm as follows:

1. I am over eighteen years of age and I understand the meaning of an oath.

2. I am of the South Asian race. My country of national origin is Bangladesh.

3. I was born in 1941 and was 65 years of age at the time of the defendant terminated my employment.

4. I received my doctor of veterinary medicine in 1965 in Bangladesh. I also received a PhD in veterinary pathology in the Czechoslovakia in 1969.

5. After getting my PhD, I taught pathology at Bangladesh Agricultural University for 12 years.

6. I immigrated to the United States in December 1974 and started working at the Cancer Research Center in Valhalla, NY.

2

7. In 1977, I began working at the Maryland Department of Agriculture, as Chief Veterinary Pathologist. I worked there for six years.

8. I received good evaluations each year and performance bonuses.

9. In 1981, I began work at the Food and Drug Administration as a Veterinary Medical Officer pathologist.

10. I worked there until 1985 when he returned to Bangladesh. I worked in Bangladesh as a pathologist until the end of 1990.

11. In 1991, I returned to the United States and began working with the defendant as a Veterinary Medical Officer pathologist in the division of Pathology in the Office of Public Health Sciences/Food Safety and Inspection Service (OPHS/FSIS).

12. Later I was assigned to the Food Animal Science Division (FASD), which was re-named later as Zoonoses Disease and Residue Surveillance Division (ZDRSD or zoonoses branch) of OPHS/FSIS.

13. From 1991 to 2004, I consistently received fully satisfactory to superior performance evaluations, including one from Dr. Alice Thaler in 1995 when she was my supervisor for several months. Ex. C contains a true and valid summary of my ratings.

14. In the end of 2003, the defendant assigned Dr. Thaler to the position of Director of FASD and she became my second line supervisor. My first line supervisor was Dr. Delila Parham.

15. In August 2005, for the first time, I received a notice of unacceptable performance. Dr. Parham signed the notice and Dr. Thaler approved it. At

3

the same time, I received the notice, Parham and Thaler placed me on a performance improvement plan (PIP).

16. Attached, as Exhibit W is a summary of my performance evaluations that I took from the actual evaluations. Also attached are two evaluations that Dr. Thaler wrote when she was my supervisor in the mid 1990's.

17. The central part of my job was to prepare reports on critical mission objectives that served as a scientific basis for the agency's rules and regulations and to respond to emergency requests to prevent the spread of food borne diseases, especially of BSE (bovine spongiform encephalopathy or "mad cow disease").

18. For several years, especially from 2003 to 2005, BSE was an extremely critical mission objective and food safety issue for the agency.

19. Attached, as Exhibit C is a list of the work that I performed during the 2004-2005 period. Most of the reports that I prepared were directly related to my work on BSE.

20. I was the designated expert on the BSE issues in the zoonoses branch. Exhibit C contains the 23 separate reports I wrote on BSE issues during 2004-2005.

21. During this time, BSE was the top most priority foodborne issues of my branch. Despite my work on these issues, Dr. Parham required me to work on a special project, the so-called "thinking paper" for no apparent reason, as well as the Salmonella serovars special report assignment.

22. I know from reviewing the work of my co employees in the zoonoses branch that no one was assigned as much work as I was in 2004-2005.

4

23.    From my experience working at FSIS, I know that FSIS' mission does not involve, and it is prohibited from, conducting scientific research.

24.    Drs. Thaler and Parham knew, or should have known, that I was not familiar with the issue related to the report they required on Salmonella serotypes. I was trained as a veterinary pathologist and this subject required a specialist in microbiology.

25.    OPHS has a full-fledged division of microbiology that has many qualified microbiologists who the agency could have assigned to write this report.

26.    In addition, I know that Dr. Anandaraman had been one of the primary veterinary medical officers who was the designated expert on Salmonella issues and was always assigned to work on Salmonella tasks.

27.    Any delays in the completion of my toxoplasmosis article occurred because there was no written project assigned to me on toxoplasmosis by her, nor Dr. Parham approved any specific contents of the toxoplasmosis article until October 2005 or several weeks after I was into my PIP.

28.    I had provided her with outlines of my ideas for the article several times in early 2005, but she never approved them as far as I understood. Attached, as Exhibit O, are the emails showing the sequence of those events regarding the article.

29.    Because of the new "thinking paper" assignment and lack of final approval of my outline for the toxoplasmosis article, in the spring of 2005, I assumed that the article was no longer a priority. (See Ex. O).

30.    After Dr. Thaler and Parham issued the PIP in August 2005, in part for failing to complete the non-existing toxoplasmosis article, I was so pained and shocked that I needed to take a few weeks off for medical reasons.

31.    When I returned in September, I needed time to resolve my EEO complaint and then to finish the Salmonella report and the zoonoses paper assigned to me during the PIP.

32.    I also understood, even after my PIP began, that, as with any other peer-reviewed article prepared for a scientific journal, it was expected that at least three toxoplasma-experts from outside the division would review the toxoplasmosis article before it became final. During my meetings with Dr. Thaler during the PIP she had assured me that I needed only to complete a first draft of the article, as it is absolutely impossible or absurd to make any final publishable draft without the process of peer-reviews.

33.    In criticizing the initial first draft of my article, Drs. Thaler and Parham who were never any expert in toxoplasmosis, also criticized some of the scientific statements in the articles even though I was merely providing information from other published scientific articles. They also unjustly accused me of errors based upon factual statements of others in these articles that I used for support.

34.    Further, they brought false allegations about the contents of the reports, thereby punishing me for mistakes that I did not commit.

35.    Even though the reports were only initial drafts, they did not have major grammatical, spelling errors or major scientific flaws as they claimed.

36.    I also did not plagiarize or have any intent to plagiarize. I gave the citations as per
       the style of the Journal of Food Protection for almost every sentence in my article.

37.    Attached, as Ex. P is a summary I have made of my responses to their criticisms.

38.    After proposed my removal, Thaler continued to criticize my work for no reason
       after I had written a report on BSE Peru case for Dr. Kristin Holt.

39.    Attached as Exhibit Ex. R, are my sworn statements as to what occurred with
       regard to that report and Dr. Thaler's actions.

40.    I know from conversations and working with the other veterinary medical officers
       in the branch during the time period 2004 -2005  that none of them were
       Bangladeshi or as close to retirement as I was. None had filed EEO complaints
       against Thaler or Parham.

41.    Prior to the filing of my discrimination complaints, none of them were required to
       publish a peer-review article on their own or if asked to were not removed for
       failing to do so. Dr. Harman was allowed to discontinue most of her work in order
       to complete the peer review article. However, Dr. Harman's paper was never
       published. Dr. Harman was a white female substantially younger than I was.

42.    Exhibit T is a copy of my interrogatory response in which I describe the statement
       that Dr. Parham made to me in December 2004 regarding my age.

43.    As I described Dr. Parham told me at that time: "If you think you are so old then
       maybe you should retire soon."

44.   Finally, I have reviewed the defendant's responses to production request no. 8 from the plaintiff's first requests for production in which I requested all EEO complaint filed against Dr. Thaler or Parham from January 2001 to the present.

45.   There responses contained documents related to only two such complaints. One was from Edward Michael Kasnia. There were no records of any EEO complaints filed by any veterinary medical officers in the zoonoses branch during that time.

Signed, under the penalties of perjury, on August 9, 2008.

THE DECLARANT

Khurshed A. Chowdhury

8

# EXHIBIT B

# FOOD SAFETY AND INSPECTION SERVICE
## OFFICE OF PUBLIC HEALTH SCIENCE

(37 - 09)



The Office of Public Health Science (OPHS) provides expert scientific analysis, advice, data, and recommendations on all public health matters in FSIS. For example, OPHS describes, defines, and analyzes the entire spectrum of foodborne diseases in the human population, links them back to the food animal population, and determines the health effects of exposure to hazards associated to consumption of meat, poultry, and egg products; operates four ISO accredited field service laboratories which coordinate and conduct laboratory analytical services; responds to food security and foodborne illness emergencies through the operation of a nationwide network of food laboratories; performs risk assessments of biological and chemical hazards in meat, poultry, and egg products to evaluate intervention strategies to reduce foodborne risks; maintains liaison with other Federal, state, and local public health officials; leads and coordinates all investigations whenever meat, poultry, or egg products are associated with foodborne illness outbreaks; designs, develops, and oversees passive and active surveillance systems to collect data and information regarding foodborne illness and pathogens and analyzes such information to assess the use and efficacy of prevention measures on human population; provides microbiological, chemical, and toxicological expertise, leadership, quality assurance, and quality control for the Agency; identifies food safety concerns associated with animal production, transportation, marketing, and pre-slaughter preparation of livestock, poultry, and production of eggs. SUPERSEDES CHART APPROVED 11/09/04

ORG 4 (08/29/05)

EXHIBIT C

# EXHIBIT C

**List of accomplishments during the rating period (July, 2004-June, 2005)**

1. Review Comments on: BSE (Bovine Spongiform Encephalopathy) Non-Ambulatory disabled cattle. (2-10-05)

2. Review comments on: 9CFR Part 417 [Docket No. 05-005N] HACCP Reassessment for Establishments that intend to Slaughter Live Ruminants Imported from Canada. (2-11-05).

3. BSE SRM questions: Adrenal glands and peripheral nerves as Specified Risk Materials (SRM). (11-04-04).

4. AMI Technical Paper: Risk Evaluation of Tonsils and Associated Tissues in Cattle. ( 9-29-04).

5. Review comments on: the pictures of the bovine tonsil prepared by the Eastern Laboratory, Athens, Georgia. (9-14-04).

6. BSE-review comments on: "Beef and beef products not comprised of meat from any cattle over 30 months of age"-high risk and unknown risk countries. (11-03-04).

7. BSE SRM---Comments on the OIE text on distal ileum. (7-16-04).

8. BSE- Review comments on BSE-SRM documents for cattle over 30 months and older. (7-6-04).

9. BSE SRM questions: Lingual Tonsils and Salivary Gland issue. (9-15-04).

10. BSE SRM—Policy for Tonsil Clarification needed. (8-27-04).

11. BSE—Anatomical distributions of tonsil tissues in Ox tongue. (9-01-04).

12. Review Comments of FSIS Notice on: Additional Bovine Spongiform Encephalopathy (BSE) Surveillance Sampling Questions and Answers. (7-15-04).

13. Thinking Paper on Future Works for the Zoonoses Branch. (5-20-05).

14. BSE—Issue Paper on: Differentiating methods of distal ileum from the other Intestinal parts in Cattle. (7-15-04).

2

15. BSE- European Union: Review Comments on: BSE in Healthy Cattle Slaughtered in UK and USA. (07-06-04).

16. Scientific questions on: Is the diaphragm having smooth muscle or striated (Skeletal muscle)?  (7-28-04).

17. BSE-SRM: Comments on the OIE text on distal ileum: Proposed changes to the code.

18. BSE-Questions about the correct terminology of distal ileum. (4-25-05).

19. BSE-Tonsil as SRM with histological and gross pictures of tonsil locations in cattle tongue. (8-30-04).

20. BSE—Comments on distal ileum removal [Docket No. 04-044N], 9CFR Parts 310-327 (Upon which FSIS BSE rule has been amended recently). (11-24-04).

21. Review of FSIS Food Security Plan proposed rule [Docket 03-008P]. (10-04-04).

22. Review Comments on: FSIS Draft Notice on Bovine Tonsil Policy of SRM. Guidance to inspection program personnel for verifying that establishments that slaughter cattle do proper disposition and BSE sample collections. (FSIS BSE Notice was prepared upon this report).  (9-02-04).

23. Toxoplasmosis Work plan:

(A) Investigate the status of developing any rapid test for T. gondii to be used as to identify infected animals for human consumption during (1) ante mortem inspections, and (2) meats at the slaughter plants.  (2-25-05).

(B) Investigating the prevalence of toxoplasma gondii infections in the US meat and poultry raw products (in the slaughter plants) and assessing economic impact and public health burden of foodborne toxo infections. (2-25-05).

24. Review of Draft Notice: Importation of Canadian cattle, Sheep and Goats into the United States. (2-23-05).

25. Review comments on: Tyson Fresh Meat documents and Related questions by Dr. Dan Engelejohn on 0157 for EIAO—Cheek and Head Meat issue. (12-17-04).

0238

26. Preliminary Review of documents submitted by Thailand for determining of equivalency for U.S. Import Eligibility of Poultry Products. (12-06-04 and 12-17-04).

27. Preliminary Review of documents submitted by Columbia for determining of equivalency for U.S. Import Eligibility of Poultry Products. (12-13-04).

28. Protecting the global food supply: Growing concerns for emerging Zoonotic Diseases (Meeting report). (4-14-05).

29. Foreign Animal Disease Awareness Training on Poultry ( AMES Meeting report). (3-28-05).

30. Brief descriptions of 20 Salmonella serovars from young chicken. (7-18-05).

31. Review comments for draft FSIS Notice: Export certification of Imported Natural Casings. (7-14-2006).

32 . Highly critical and urgent task on: BSE questions from Peru. (6-5-06).

0239

**List of Awards and Certificates Received while in the FSIS:**

1. **Time-off Award** for stellar representation of in development of the USDA-FSIS BSE Response Plan—10-22-1999.

2. USDA **Certificate of Appreciation** award for assisting in creating awareness of the Agency's Mission and career Opportunities Among Students in the District of Columbia Public School System, June 1996

3. USDA-FSIS **Time-Off-Award** for excellent work performed in the Zoonoses Branch in various projects during FY 2003.

4. USDA-FSIS **Spot Award (Monetary award)** for excellent work performed in the Zoonoses Branch in various projects during FY 2003.

5. USDA, '**Certificate of Appreciation Award**' from the FSIS Administrator Barbara Masters for your exceptional contribution to success of the **BSE effort** over the holiday period and beyond, your professionalism, personal sacrifice and unwavering dedication to the mission and values of the food Safety and Inspection Service serve as a new standard for outstanding public service.  March 2004

6. USDA-FSIS **Spot Award (Monetary award)** for work on issues related to **Bovine Spongiform Encephalopathy (BSE)**—August 2, 2004

Khursfed Chowdhury
2/20/08

*Dr. Parham praises my work*

## Chowdhury, Khurshed

From:     Chowdhury, Khurshed
Sent:     Wednesday, August 10, 2005 4:43 PM
To:       Qureshi, Maqbool
Subject:  FW: Bovine Ileum

Here is another jam for you.

-----Original Message-----
From: Parham, Delila
Sent: Wednesday, August 10, 2005 3:39 PM
To: Chowdhury, Khurshed
Cc: Harman, Jane; Thaler, Alice
Subject: RE: Bovine Ileum

Good job Khurshed.  Thanks.

-----Original Message-----
From: Potter, Morris [mailto:Morris.Potter@cfsan.fda.g
Sent: Wednesday, August 10, 2005 2:48 PM
To: 'Harman, Jane'
Cc: Chowdhury, Khurshed; Parham, Delila
Subject: RE: Bovine Ileum

Jane-

Gosh, you guys are good...

Thanks bunches.  Have a glorious vacation.

Morrie

-----Original Message-----
From: Harman, Jane [mailto:Jane.Harman@fsis.usda.gov]
Sent: Wednesday, August 10, 2005 2:38 PM
To: 'Potter, Morris'
Cc: Chowdhury, Khurshed; Parham, Delila
Subject: Bovine ileum

Morrie,
Here some information on length of ileum written by Dr. Chowdhury, of our staff.  Hope it is helpful.
Jane

*Jane L. Harman, DVM, MS, PhD*
*Office of Public Health Science*
*Food Safety and Inspection Service*
*U.S. Department of Agriculture*
*1400 Independence Ave, S.W. -Aerospace 343*
*Washington, DC 20250*
*202-690-6404*

-----Original Message-----
From: Chowdhury, Khurshed
Sent: Wednesday, August 10, 2005 2:05 PM

3/1/2006

0081

*( Requesting Memos from bosses )*
*Report date: 9-1-04*

**Chowdhury, Khurshed**

| | |
|---|---|
| **From:** | Parham, Delila |
| **Sent:** | Friday, August 27, 2004 3:57 PM |
| **To:** | Chowdhury, Khurshed |
| **Subject:** | RE: tonsil srm - policy clarification needed |

*(11)*

Thanks, but please follow through with Alice's request to consult OIA.

Delila

-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Friday, August 27, 2004 3:54 PM
**To:** Parham, Delila
**Subject:** RE: tonsil srm - policy clarification needed

I did ask Sylvia and Jane about this question. They both said OIE does not talk anything about tonsil. They simply follow EU decision. I have searched for any comment by OIE in the internet but failed to get anything about tonsil. Thanks.

Khurshed

-----Original Message-----
**From:** Parham, Delila
**Sent:** Friday, August 27, 2004 3:33 PM
**To:** Chowdhury, Khurshed
**Subject:** FW: tonsil srm - policy clarification needed

Khurshed,

Did you contact someone in OIA to answer Alice's question below?

Thanks.

Delila

-----Original Message-----
**From:** Thaler, Alice
**Sent:** Thursday, August 26, 2004 7:50 AM
**To:** Stuck, Karen
**Cc:** Chowdhury, Khurshed; Parham, Delila
**Subject:** FW: tonsil srm - policy clarification needed

Does OIA have information on the procedures used in other countries to remove tonsils?

Alice M. Thaler, DVM, DACVPM
Director ZDRSD
Office of Public Health Science
202-690-2687
Fax 202-720-8213
alice.thaler@fsis.usda.gov

1

0140

2



-----Original Message-----
**From:** Engeljohn, Daniel
**Sent:** Thursday, August 26, 2004 7:45 AM
**To:** Thaler, Alice; Parham, Delila
**Subject:** FW: tonsil srm - policy clarification needed

FYI: It would be especially helpful to have the procedure used in other countries.

Daniel L. Engeljohn, Ph.D.
Deputy Assistant Administrator
OPPED, FSIS, USDA
(202) 205-0495; Fax (202) 401-1760; daniel.engeljohn@fsis.usda.gov

-----Original Message-----
**From:** McCaskey, Patrick
**Sent:** Thursday, August 26, 2004 6:12 AM
**To:** Petersen, Kenneth; Derfler, Philip; Engeljohn, Daniel
**Cc:** Lange, Loren; Hulebak, Karen; Sparling, Phyllis
**Subject:** FW: tonsil srm - policy clarification needed

Comments from our pathologists. Pat

Patrick C. McCaskey, DVM, MS
**Diplomate, American College of Veterinary Pathologists**
Senior Executive for Laboratory Services
USDA, FSIS, Office of Public Health Science
P.O. Box 6085, Athens, GA 30604
Phone: 706-546-3420    Fax: 706-546-3428
Cell:  706-215-3167
Patrick.McCaskey@fsis.usda.gov

-----Original Message-----
**From:** Hill, Joseph
**Sent:** Wednesday, August 25, 2004 3:22 PM
**To:** McCaskey, Patrick; Sparling, Phyllis
**Subject:** RE: tonsil srm - policy clarification needed

Just met with Scott and we went through a couple of anatomy books. He thinks that the British only found infectivity in the palatine tonsil which is located in the tonsilar sinus just back of an on either side of the terminal tongue. The pharyngeal tonsil seems to be in the soft palate. The tubular tonsil is near the opening of Eustachian tube and the lingual is probably located on the caudal tongue.

It would be very difficult to identify and remove all of these. Palatine and pharyngeal perhaps could be routinely identified and removed. jeh

-----Original Message-----
**From:** McCaskey, Patrick
**Sent:** Wednesday, August 25, 2004 3:13 PM
**To:** Sparling, Phyllis; Hill, Joseph
**Subject:** FW: tonsil srm - policy clarification needed

Comments? Pat

Patrick C. McCaskey, DVM, MS
**Diplomate, American College of Veterinary Pathologists**
Senior Executive for Laboratory Services
USDA, FSIS, Office of Public Health Science
P.O. Box 6085, Athens, GA 30604

2

0141

3

*Sample Memos to submit Reports to Supervisor*

Page 1 of 1

**Chowdhury, Khurshed**

1)

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Wednesday, September 01, 2004 9:29 AM |
| **To:** | Parham, Delila |
| **Subject:** | Tonsil SRM - policy clarification needed |

Hi Delila,

Please find the updated report on the above subject. Second attachment is the picture from UK. I called tech center but they also could not tell who Dr. Huette (who compiled anatomy of tinsils) is. I could not get Dr. Linda Madson on phone yet. Jane is working to get information from Germany, but as of now she did not receive anything new for us. Therefore I am sending these report considering the rush assignment. Thanks.

Khurshed

9/8/2005



Date: September 1, 2004

To: Delila Parham
   Chief, Zoonoses Branch
   ZDRSD

From: Khurshed Chowdhury
   VMO, Zoonoses Branch

Subject: Tonsil SRM - policy clarification needed

**Anatomical distribution of tonsil tissue in Ox tongue**

According Klaus-Dieter Budras, et.al's[1] compilation of the anatomy of tonsil there are five locations where tonsils are identified in the bovine head and differences of histology between calves and mature bovines ("The pharyngeal lymphatic ring consists of the palatine, pharyngeal, lingual, and tubal tonsils, and the tonsil of the soft palate."):

(1) Lingual tonsils: "On the root and on both sides of the median glosso-epiglottic fold are many small orifices of the crypts of the lingual tonsil and its glands." The lingual tonsils are only identifiable on histology as tonsilar tissue in calves (bob and fancy veal), but in mature bovines histology calls samples from the same locations salivary glands.

(2) Pharyngeal tonsils: "The cavity of the pharynx consists of 3 parts: oropharynx, laryngopharynx, and nasopharynx...Caudal to the vomer in ruminants, the membranous pharyngeal septum divides the dorsal part of the nasopharynx lengthwise, and extends to the caudodorsal wall, where it contains the pharyngeal tonsils. The sides of the pharyngeal tonsil are marked by long ridges and grooves in which the openings of mucous glands can be seen."

(3) Palatine tonsils: "The oropharynx extends to the base of the epiglottis, and its lateral wall contains the palatine tonsil ." "The palatine tonsil is concealed outside the mucosa of the lateral wall of the oropharynx. Only the orifice of the central tonsillar sinus , into which the crypts of the follicles open, is visible

(4) "Tubal tonsil, in the lateral wall of the pharyngeal orifice of the auditory tube, is flat and nonfollicular." ("The auditory tube connects the middle ear with the nasopharynx."

(5) "Tonsil of the soft palate, on the oral side, consists of some lymphatic tissue and a few follicles."

Bovine tongue is not classified as SRM and therefore can be sold for human consumption. Bovine palatine tonsil was found infective for BSE. Although the location

0143

5

of palatine tonsil is such that it is unlikely to be removed with tongue, there is a possibility that some lingual tonsil, which is close to the root of the tongue, might be present in that part of the tongue removed and intended for human food consumption. Even when all visible tonsil tissue was removed, research has found that very small amounts remained in the majority of tongues tested. However, the Government's advisory committee[2] on BSE, the Spongiform Encephalopathy Advisory Committee (SEAC), has agreed that although there are some uncertainties, the risk is likely to be very small.

Under EU wide hygiene regulations[3], tonsil from cattle of any age cannot enter the food chain. The Commission Regulation (EC) No. 1492; August 23, 2004 states that tonsils from any age of bovine should be considered as SRM. Controls on bovine offal, including tonsil, were first introduced in England and Wales in 1989.

**Infectivity study of tonsillar tissue**

Cattle were experimentally[2] infected with BSE, and pooled palatine tonsil tissue was taken from animals culled 10 months post inoculation (m.p.i.). Samples of this tissue were inoculated (intracerebrally) into five calves. The Committee was notified in September 2002 when one animal from this group developed BSE at 45 m.p.i. These assays are still ongoing and to date the other four animals in this group remain healthy with no clinical evidence of BSE at 58 m.p.i. Additional groups that received pooled palatine tonsil taken from animals at different time points after inoculation with BSE (6,18 & 26 m.p.i.) are also still healthy at 51 to 55 m.p.i. © SEAC 2003.

The Committee[2, 7, 8] acknowledged that a single finding supports the evidence for infectivity **of palatine tonsil**. They agreed that there was no direct evidence to suggest that lingual tonsil on ox tongue was infective. However, the positive finding in palatine tonsil meant that infectivity in the lingual tonsil, which has not been specifically tested for BSE infectivity, could not be ruled out.

Scientific Steering committee (SSC) [3,4,5,6] considers that the tonsil of a bovine animal of any age should be regarded as posing risk. The tongue of animals certified safe for human consumption does not pose a risk if contamination with CNS and tonsil material is avoided for animals of any age. This may imply that the harvested section of the tongue is shortened to avoid, by a cautious margin, removal with the tongue of that part of the root of the tongue containing lingual tonsil.

Considering the fact that only the pooled palatine tonsil tissue was tested so far, and no other tonsil was tested experimentally, it will be prudent to consider all five tonsillar tissues as the SRM. As of now I could not trace any training material to efficiently locate and remove tonsils in the slaughter plant. Technical center at OMAHA also do not have any training manual for tonsil removal. However, Eastern lab has taken a pilot project to obtain several bovine tongues and calf heads to identify the correct locations of tonsils and digitally photograph them which could be used by the Agency as a training manual for tonsil removal.

0144

6



I have also received one picture (attached) of lingual tonsil ("Identification of SRM on cattle tongue, prepared by UK) which describes the various position of the lingual tonsil on the uppermost surface of the position of the tongue.

**References:**

1) Klaus-Dieter Budras, et.al:  Bovine Anatomy, 1st edition,., 2003, Schulutersche, GmbH & Co. KG, Verlag and Druckereie, Hans-Bockler-Allee 7, 30173, Hannover, Germany.

2) Statement on BSE risk from bovine tonsil and consumption of ox tongue: ( SEAC 2003). http://www.seac.gov.uk/statements/Bovine_Tonsil.pdf

3) BSE infectivity found in bovine tonsil ,Thursday, 17 October 2002
http://cattlefeeder.ab.ca/herd/bse021017.shtml

4) BSE infectivity found in cow tonsil.
http://www.ehn-online.com/cgi-bin/news/news1/EpFVuylEZEFVsReGBl.html

5) UK finds mad cow disease infectivity in cow tonsil.
http://www.rense.com/general30/uks.htm

6) Statement on infectivity in Bovine tonsil
http://www.seac.gov.uk/statements/tonsil211002.pdf

7)EU Commission update of the opinion on TSE infectivity distribution in ruminant tissues; November 2002.
http://europa.eu.int/comm/food/fs/sc/ssc/out296_en.pdf

8) Commission Regulation (EC) No. 1492/2004; August 23, 2004
http://europa.eu.int/eur-
lex/pri/en/oj/dat/2004/l_274/l_27420040824en00030008.pdf

9) Veterinary histology: An outline of text atlas by Horst-Dieter
Dellmann; Lea & Febiger; 1971; Philadelphia.

0145

7



**MHS**
*Meat Hygiene Service*

# Identification of SRM on Cattle Tongue

### ALL TONSIL MATERIAL IS SRM
**Tonsils are located in the oral cavity in 4 anatomical sites**
**Palate, pharynx, buccal and lingual (tongue)**
This instruction describes the position of the LINGUAL TONSIL on the uppermost
surface of the portion of the tongue which should be treated as SRM

The portion of the tongue retained for human consumption must not contain any grossly visible SRM
material
To achieve this the Operator must ensure that the tongue is removed by incising at the level of the last
vallate papillae



1   LINGUAL TONSIL consists of
    lymphoid follicles organised around a crypt on
    the uppermost surface and along the sides of the
    back of the tongue.

2   The circles in the picture on the left indicate the posi-
    tion of the LINGUAL TONSIL on the uppermost sur-
    face of the tongue.
    **This area should be treated as SRM**

3   VALLATE PAPILLAE are raised circular
    structures found on the lateral aspects of the
    back of the tongue.

4   The last VALLATE PAPILLAE at the back of
    the tongue can be used as a landmark to assist
    in removing lingual tonsil to the extent
    practicable.



5   Any tongue material behind the
    **last VALLATE PAPILLAE should be**
    disposed of as SRM

*Reminder*
**The area behind the last**
**VALLATE PAPILLAE**
**as shown by this red line contains**
**LINGUAL TONSIL**
**and should be**
**disposed of as**
**SRM**

© 2003 Meat Hygiene Service    MHS PI (07/03)                    Vet Tec Support Unit July 2003

0146



**Chowdhury, Khurshed**

| | |
|---|---|
| From: | Parham, Delila |
| Sent: | Wednesday, September 29, 2004 7:45 AM |
| To: | Parham, Delila; Thaler, Alice |
| Cc: | Chowdhury, Khurshed |
| Subject: | RE: AMI Paper and Agency Position on Issue |

Alice,

Khurshed just talked with me, and he said Dr. Larsen asked for a copy of the paper. He will send a copy to the three of us when it is completed.

Delila

-----Original Message-----
From: Parham, Delila
Sent: Wednesday, September 29, 2004 7:42 AM
To: Thaler, Alice
Cc: Chowdhury, Khurshed
Subject: RE: AMI Paper and Agency Position on Issue

Alice, Khurshed has the lead on this, but will be out on Friday.  He is preparing comments on the AMI paper that should be ready today.  I have included him on the cc and will have him send you a copy of the paper when he sends it to me.  We can talk about it tomorrow morning.

Delila

Note: Khurshed, please send Alice a copy of the paper when you submit it to me.

-----Original Message-----
From: Thaler, Alice
Sent: Tuesday, September 28, 2004 8:36 AM
To: Parham, Delila
Subject: Fw:

Please have your comments ready for a possible Thurs mtg and plan to attend with me. Alice
M. Thaler, DVM, Diplomate ACVPM Director,Zoonotic Diseases and Residue Surveillance
Division USDA-FSIS
TEL:  202-690-2687
FAX:  202-720-8213
-------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


-----Original Message-----
From: Lange, Loren <Loren.Lange@fsis.usda.gov>
To: Lange, Loren <Loren.Lange@fsis.usda.gov>; Sutton, Mary <Mary.Sutton@fsis.usda.gov>;
Hafner, Scott <Scott.Hafner@fsis.usda.gov>; Hill, Joseph <Joseph.Hill@fsis.usda.gov>;
Kreindel, Silvia <Silvia.Kreindel@fsis.usda.gov>; Chowdhury, Khurshed
<Khurshed.Chowdhury@fsis.usda.gov>; Parham, Delila <Delila.Parham@fsis.usda.gov>; Thaler,
Alice <Alice.Thaler@fsis.usda.gov>
CC: Larsen, Lynn <Lynn.Larsen@fsis.usda.gov>; Goldman, David <David.Goldman@fsis.usda.gov>
Sent: Tue Sep 28 07:39:03 2004
Subject: RE:

Actually , we may want to have a conference call Thursday to develop an OPHS position on
Tonsils as an SRM.

-----Original Message-----
From: Lange, Loren
Sent: Tuesday, September 28, 2004 7:31 AM
To: Sutton, Mary; Hafner, Scott; Hill, Joseph; Kreindel, Silvia; Chowdhury, Khurshed;

1

0116

9

*✱ very high priority    Mission Support*

(4)

<u>Date:  September 29, 2004</u>

To: Delila Parham
    Chief, Zoonoses Branch
    ZDRSD

From: Khurshed Chowdhury
      VMO, Zoonoses Branch

Subject: AMI Technical paper: Risk Evaluation of Tonsils and Associated Tonsil
Tissue in Cattle.

<u>**My comments**</u>:

Considering the fact that USA is a "BSE minimal risk", or "BSE provisionally free"
country and also due to the fact that entire tonsillar tissues pose only 0.25 bovine oral ID
50 units, the tongue poses very limited BSE risk. Successful trimming of all visible
tonsillar tissues from the tongue, and reasonable aggressive trimming (short tongue) of
the harvested tongue should be safe for human consumption.

The British Food Standards Agency[4,5] has said there is little or no risk in eating ox
tongue despite the fact that some traces of tonsil might be left on the meat after
processing. Even when all visible tonsil tissue was removed, research has found that very
small amounts remained in the majority of tongues tested. It is likely that tongue[5] would
be peeled before consumption. This would remove the superficial layer, reducing the
amount of any adherent tonsil tissue and thus the exposure. Also, tongue meat is usually
served sliced making it unlikely that one person would consume all the lymphoid tissue
remaining on any one tongue.

Scientific Steering Committee (SSC)[1] considered: The tonsil of the bovine animal should
be considered as posing risk. The tongue of animals certified safe for human consumption
does not pose risk if contamination with CNS and tonsil material is avoided for animals
of any age. This may imply that the harvested section of the tongue is shortened (short
tongue) to avoid by a cautious margin, removal with the tongue of that part of the root of
the tongue containing lingual tonsil.

<u>**Anatomical problem**</u>:

Besides the presences of visible lingual tonsils on the root and on both sides of the
median glosso-epiglotic fold are many small orifices of the crypts of the lingual tonsil,
there are also numerous large tonsillar follicles under the tongue mucosa in the ox. The
small ruminants have only small amounts of diffuse lymphoid tissue within the tongue

0117

10

(4)

sub mucosa. Therefore, it is not practical to have complete removal of tonsillar tissues
from the bovine tongue.

**Alternate opinions:**

(A). Ellyn R. Mulcahy et al[3] have reported that the presence of the prion agent in skeletal
muscle is thought to be due to the infection of nerve fibers located within the muscle. The
pathological isoform of the prion protein, $PrP^{Sc}$, accumulates within skeletal muscle cells,
in addition to axons, in the **tongue of hamsters** following intralingual and intracerebral
inoculation of the HY strain of the transmissible mink encephalopathy agent.
Localization of $PrP^{Sc}$ to the neuromuscular junction suggests that this synapse is a site for
prion agent spread between motor axon terminals and muscle cells. Following
intracerebral inoculation, the majority of $PrP^{Sc}$ in the tongue was found in the lamina
propria, where it was associated with sensory nerve fibers in the core of the lingual
papillae. $PrP^{Sc}$ staining was also identified in the stratified squamous epithelium of the
lingual mucosa. These findings indicate that prion infection of skeletal muscle cells and
the epithelial layer in the tongue can be established following the spread of the prion
agent from nerve terminals and/or axons that innervate the tongue. This data suggest that
ingestion of meat products containing prion-infected tongue could result in human
exposure to the prion agent, while sloughing of prion-infected epithelial cells at the
mucosal surface of the tongue could be a mechanism for prion agent shedding and
subsequent prion transmission in animals.

(B) Jason C. Bartz et al[2] have stated that food-borne transmission of prions can lead to
infection of the gastrointestinal tract and neuroinvasion via the splanchnic and vagus
nerves. Transmission of transmissible mink encephalopathy (TME) is 100,000-fold more
efficient by inoculation of prions into **the tongues of hamsters** than by oral ingestion.
The incubation period following TME agent (hereinafter referred to as TME) inoculation
into the lingual muscles was the shortest among the five nonneuronal routes of
inoculation, including another intramuscular route. Deposition of the abnormal isoform of
the prion protein, $PrP^{Sc}$, was first detected in the tongue and submandibular lymph node
at 1 to 2 weeks following inoculation of the tongue with TME. $PrP^{Sc}$ deposits in the
tongue were associated with individual axons, and the initial appearance of TME in the
brain stem was found in the hypoglossal nucleus at 2 weeks postinfection. At later time
points, $PrP^{Sc}$ was localized to brain cell groups that directly project to the hypoglossal
nucleus, indicating the transneuronal spread of TME. TME $PrP^{Sc}$ entry into the brain stem
preceded $PrP^{Sc}$ detection in the rostral cervical spinal cord. These results demonstrate that
TME can replicate in both the tongue and regional lymph nodes but indicate that the
faster route of brain invasion is via retrograde axonal transport within the hypoglossal
nerve to the hypoglossal nucleus. Topical application of TME to a superficial wound on
the surface of the tongue resulted in a higher incidence of disease and a shorter incubation
period than with oral TME ingestion. Therefore, abrasions of the tongue in livestock and
humans may predispose a host to oral prion infection of the tongue-associated cranial
nerves. In a related study, $PrP^{Sc}$ was detected in tongues following the intracerebral
inoculation of six hamster-adapted prion strains, which demonstrates that prions can also
travel from the brain to the tongue in the anterograde direction along the tongue-

0119

11

(4)

associated cranial nerves. These findings suggest that food products containing ruminant or cervid tongue may be a potential source of prion infection for humans.

### Opinion of the Scientific Steering Committee (SSC)[1]

In the case the detection of $PrP^{sc}$ in tongue following direct tongue or intra cerebral infection as recently observed[2,3] in one specific animal model (Hamster), a quantitative risk analysis appears currently not to be possible in view of the total absence of data for other strains and species. Further research has been recommended.

### References:

(1) Opinion of the scientific panel on biological hazards of the European food safety authority on BSE risk from bovine tonsil and consumption of bovine tongue.

The EFSA Journal (2004) 41, 1-4, BSE risk from bovine tonsil and consumption of bovine tongue. Adopted on March 2004.

http://www.efsa.eu.int/science/biohaz/biohaz_opinions/243/opinion_biohaz_06_en1.pdf

(2) Rapid Prion Neuroinvasion following Tongue Infection.

Jason C. Bartz,[1] Anthony E. Kincaid,[2] and Richard A. Bessen[1,*] Department of Medical Microbiology and Immunology,[1] Department of Physical Therapy, Creighton University, Omaha, Nebraska 68178[2]

(3) Prion Infection of Skeletal Muscle Cells and Papillae in the Tongue.
Ellyn R. Mulcahy,[1,2] Jason C. Bartz,[1] Anthony E. Kincaid,[2] and Richard A. Bessen[3,*] Department of Medical Microbiology and Immunology[1] Department of Physical Therapy, Creighton University, Omaha, Nebraska 68178[2] Department of Veterinary Molecular Biology, Montana State University Bozeman, Montana 59717[3]

(4) Risk of BSE in Ox Tongue Very Small.
British Food Standards Agency decides not to advise against eating ox tongue. Web posted: June 26, 2003 , Category: Food Safety,Research
**http://www.meatnews.com/index.cfm?fuseaction=Article&artNum=5647**

(5) Statement on BSE risk from bovine tonsil and consumption of ox tongue: ( SEAC 2003). http://www.seac.gov.uk/statements/Bovine_Tonsil.pdf

0120

# EXHIBIT D

 United States
Department of
Agriculture

Food Safety
And Inspection
Service

Office of Public
Health and
Science

Washington, D.C.
20250

February 7, 2006

TO:      Dr. Khurshed Chowdhury
Veterinary Medical Officer, Zoonoses Branch, ZDRSD, OPHS
Washington, DC

FROM:    Dr. Delila Parham
Chief, Zoonoses Branch, ZDRSD, OPHS
Washington, DC

SUBJECT:    Unacceptable Performance Rating for July 1, 2004 – December 31, 2005

The purpose of this memo is to notify you that your performance rating for July 1, 2004 – December 31, 2005, is Unacceptable. A copy of your performance appraisal for this rating period indicating Unacceptable performance is attached. In December 2004 at the midyear appraisal, you were informed that your performance needed improvement. In July 2005, I determined that your performance was unacceptable in two critical elements and one non-critical element of your position: Mission Support (critical), Research and Analysis (critical), and Communications (non-critical). You were placed on a performance improvement plan (PIP) for 90 days beginning August 29, 2005. The opportunity period was extended to December 31, 2005, in a settlement agreement reached with the Agency on October 11, 2005, to your informal EEO complaint.

The PIP outlined activities that you had to complete satisfactorily to attain the Fully Successful rating in the three elements in which your performance had fallen to an unacceptable level. You were tasked with three major projects: (1) write a paper on toxoplasmosis, (2) write a paper on poultry *Salmonella* serotypes, and (3) compile a bimonthly report on zoonotic and emerging diseases.

It was determined that the zoonotic disease report was the only acceptable final product, although you required extensive guidance to develop the report for this project, which was the simplest of the three PIP projects. The papers on toxoplasmosis and poultry *Salmonella* serotypes did not meet the Fully Successful level for the Mission Support, Research and Analysis, and Communications elements as indicated below. Only a few examples from the papers are included in the discussion below. For a more thorough assessment of each work product you produced under the PIP, see the attached PIP Summary Assessment Report. The examples, while not comprehensive in this memorandum or in the PIP Summary Assessment Report, were seen as evidence of failure and used to determine your Unacceptable rating.

*Parham*
14

Defendant Discovery Response
556 of 1539

1. Mission Support:  Your performance on this critical element is at an unacceptable level due to the number of errors found in your work on the toxoplasmosis and poultry *Salmonella* serotypes papers, which misstated significant research conclusions and lack any substantive analysis.

- Toxoplasmosis Paper: The paper indicates a misunderstanding or inability to accurately interpret the literature.  For example, you portrayed narrow, geographically based studies limited to a single state or a few states as representative of the wider, national picture.  You also made word changes in some of the referenced materials that caused the statements to be inaccurate.  For example, in changing "definitive host" to primary host in the paper, the reader might assume that there is more than one host in which the *Toxoplasma gondii* parasite can complete its life cycle.  In the paper, you make statements that would seem to indicate action that the Agency is contemplating such as examination of meat for *T. gondii* in the slaughterhouse when in reality no such action is being considered by the Agency.

- *Salmonella* Serotypes Paper: Much of the information provided is very general and does not address the specific needs of the Office of Public Health Science (OPHS) as would have been seen if you had discussed issues like presence in FSIS regulated products and/or documentation of outbreaks attributed to FSIS regulated products. You present information in a careless manner, not checking for inaccuracies such as the isolation rate for *S. Heidelberg* from lowest to highest. In addition, you fail to mention that the HACCP data that you cite is not published, making the reader question the validity of the data that you used.

2. Research and Analysis: You have not met the Fully Successful level of performance under this element.  Your performance on the toxoplasmosis and poultry *Salmonella* serotypes papers demonstrates an inability to properly research and analyze the literature.

- Toxoplasmosis Paper:  You cite a number of studies and quote a lot of figures, but fail to explain or analyze the results appreciably.  You do not provide a perspective on when many of the studies were conducted, but refer to them in vague terms such as a "more recent" or "much earlier" study.  One of the more serious errors noted in the paper is the inconsistent presentation of information.  For example, you state that confinement rearing is expected to reduce exposure to toxoplasmosis.  Yet, you do not explain adequately why pigs raised in confinement rearing pose the highest risk of infecting people while cattle raised on pasture pose the least risk of infecting people.  Another inconsistency is seen in statements in the paper regarding handling of cats by pregnant women.

- *Salmonella* Serotypes Paper:  The paper has several references, but the information that you provide is general and of little relevance to the OPHS.  Of the information provided, no real analysis is done. Material that would be relevant to the OPHS such as swine being reservoirs for *S. Heidelberg* is omitted. In most cases, you simply indicate the public health risk as a range from low to high with no additional analysis as seen for *S. Heidelberg*.  In some cases, the information

Defendant Discovery Response
557 of 1539

provided is outside the scope of the paper as seen in the discussion on the usage of antimicrobial drugs in food producing animals.

3. Communications: You have not met the Fully Successful level of performance under this element. Both the toxoplasmosis and the poultry Salmonella serotypes papers were poorly written. Many errors could have been eliminated by simply proof-reading the documents.

- <u>Toxoplasmosis Paper:</u> There are numerous grammatical, spelling, and punctuation errors in the paper. The order and style of presentation is not consistent throughout the paper. You switch at random between words or terms like pigs, swine, and hogs, and US, USA, United States, America, and United States of America. Phrasing is awkward or unclear leaving the reader unsure of what is intended. The paper fails to adequately or properly cite sources, failings that could expose the Agency to liability because of plagiarism.

- <u>*Salmonella* Serotypes Paper:</u> There are many incomplete sentences, and many are unclear or ambiguous. Like the toxoplasmosis paper, there are numerous grammatical, spelling, and punctuation errors. There is failure to adequately or properly cite sources. The paper switches at random between terms like "multiple drugs resistant" (s should be omitted) and "multiple antimicrobial resistant," both terms incorrectly used in the paper.

During the PIP, you were given every opportunity to improve to the Fully Successful level, but you failed to do so. You were provided assistance throughout the PIP. If you wish to discuss further your Unacceptable rating, feel free to contact Dr. Alice Thaler, Director, Zoonotic Diseases and Residue Surveillance Division, OPHS, or me. Please sign and date a copy of this memorandum, which serves only to acknowledge the date on which you received it.

Receipt Acknowledged

_____        _____
Signature                                                      Date

Enclosures:
Performance Appraisal
PIP Summary Assessment Report

Defendant Discovery Response
558 of 1539

# EXHIBIT E

Affidavit by Mike Kasnia

Interrogatories of Michael Kasnia, Witness

1.  Do you swear or affirm that the testimony you are about to give is true and accurate to the best of your knowledge?
A.  Yes

2.  Please state and spell your name.
A.  Edward Michael Kasnia  Jr.

The issue is whether the Food Safety and Inspection Service (FSIS) discriminated against the Complainant based on race (Asian), religion (Muslim), sex (male), national origin (unspecified), age YOB:  1941), and reprisal (prior EEO activity) when on September 1, 2006, he was terminated from his position as Veterinary Medical Office, GS-701-13.

3.  Are you currently employed in the federal government?
A.  I am FSIS Retired as of November, 2006 and not currently employed by the Federal Government.

4.  What is your business telephone?
A.  713-838-4400, ext 288

5.  What is your gender?
A.  male

6.  What is your race?
A.  White

7.  What is your year of birth?
A.  9-19-46

8.  Please specify your national origin?
A.  Hungarian

Complaint No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Testimony of Michael Kasnia, Witness
Page 3 of

9.   When did you start working for the FSIS?
A.  July 2002


10. How do you know the Complainant?
A.  I had worked at FSIS/OPHS for about 3 years.  During that time, there were a number of projects, meetings and events that brought Dr. Chowdhury and myself together.


11. Did you ever supervise the Complainant?
A.  no.


12. Did you ever assign tasks to the Complainant?
A.  Yes, While working on the BSE project, I was Acting Director of the Risk Assessment Division and head of the BSE Team for about 3 months.  During that time there were several projects related to BSE where I and other team members asked for Dr. Chowdhury's help as a member of the BSE team in identifying significant BSE research elements.


13. Were you ever asked to prepare a peer review paper for publication in a journal?
A.  No.


14. Do FSIS employees conduct research?   Do they report on research conducted by other agencies?
A.  FSIS is not allowed to conduct research, since these activities are done by ARS for FSIS. We used research conducted by other agencies for constructing Office of Public Health (OPHS) Risk Assessments.


15.  Were you involved in the removal of Dr. Chowdhury?
A.  No.


16.  Is there anything else you would like to add?
A.  While working on the BSE project I found Dr. Chowdhury's assistance and interpretation of BSE related issues quite valuable.  Information collected by Dr. Chowdhury went into briefing papers and into the support of the Harvard BSE model project.  The Harvard BSE model helped to predict the outcomes of the use of various regulatory mitigations and was used for making risk management decisions by the highest levels of management within

Complaint No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Testimony of Michael Kasnia, Witness
Page 3 of

FSIS, and ultimately it helped define national policy. Members of the BSE team were recognized for this group effort by top FSIS management.

In light of his hard work and valuable contributions, Dr. Chowdhury's firing made no sense and was very demoralizing to others at OPHS. Many of us knew that Dr. Chowdhury was told to prepare a paper for publication (a very unusual assignment that seemed to be designed to give management a cause to bring an action against him and no one else).

I have reviewed this statement, which consists of __3__ pages, and hereby solemnly swear __x__ affirm ____ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          __2-3-07__
Michael Kasnia                                Date


Received by: _____

on this ____ day of _____, 20_____


_____
Paula M. Mazzoccante, Investigator

# EXHIBIT F

# WITNESS AFFIDAVIT

I, Bonnie Rose, am a former employee of the Food Safety & Inspection Service, located at the United States Department of Agriculture, Washington, D.C.  I was employed as a Microbiologist, GS-14, from 1979 until I retired on January 3, 2007.

My home telephone number is:  (301) 490-6123

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and U.S. Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the USDA.  I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint.  My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and USDA policy.  This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record.  In addition, the complainant and the appropriate Agency officials involved in the EEO complaint process will receive the entire investigative file.  I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate.  I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear _____ affirm __X___ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

Initials: _BER_

32

Affidavit of Bonnie Rose
Complaint of Khurshed Chowdhury #FSIS-2006-02551
Page 2 of 3

On January 30, 2007, EEO Investigator Paula Mazzoccante conducted a telephonic interview with Bonnie Rose regarding the EEO complaint filed by Khurshed Chowdhury against the Food Safety & Inspection Service, Case Number FS-2006-02251.

1. Please state and spell your name
A. Bonnie Rose

The issue accepted by the agency is whether Khurshed Chowdhury was subjected to discrimination based on his race (Asian), religion (Muslim), sex (male), national origin, age (YOB: 1941) and reprisal for prior EEO activity, when on September 1, 2006, he was terminated from his position as Veterinary Medical Officer, GS-701-13.

2. Are you currently employed with the Food Safety & Inspection Service?
A. No, I retired January 3, 2007.

3. When did you start working for the FSIS?
A. In 1979

4. What is your gender?
A. female

5. What is your race?
A. Caucasian

6. What is your National Origin?
A. American

7. What is your year of birth?
A. 1946

8. What was your position title and grade prior to your retirement?
A. I was a Microbiologist, GS-14.

9. How do you know the Complainant?
A. I don't know him well. He was in an office on the same floor. We worked in different divisions within the Office of Public Health Science; I worked in the Microbiology Division and Dr. Chowdhury worked in the Zoonotic Diseases and Residue Surveillance Division. He would come into my office occasionally and ask me questions. He would usually ask me questions pertaining to *Salmonella*. On one occasion he told me he was told to write a paper for publication in a peer-reviewed scientific journal, and he wanted to know if he could borrow one of my journals to look at the format for writing the paper. He seemed very distressed about this assignment. I never worked with him on any projects or committees so I don't know much about his job performance.

10. Did you ever assign him any work or did he do any work for you?
A. No, I became a non-supervisory Microbiologist when I was transferred to Headquarters (from the FSIS Beltsville Laboratory) in 1996.



Initials: BER

11. Were you ever asked to prepare a peer review paper for publication in a journal?

A. Yes, I was. It was under my "Communications" performance element, which is a non-critical element. The communications performance element also included writing reports for upper management, writing issue papers, and reports for the FSIS website. Writing reports fits under multiple performance elements. For example, if I was writing a paper to support FSIS upper management's decision on a particular subject, that assignment would also fall under the "Mission Support" performance element.

12. Were you ever asked to prepare a peer review paper?

A. Yes, a number of Microbiology Division employees, including myself, were asked to write peer-reviewed papers, as part of our non-critical communications performance element. In the Microbiology Division, we were encouraged to write papers for publication in peer-reviewed scientific journals, but publications were not a high priority because we were busy working on more important/higher priority assignments related to providing the scientific support for FSIS regulations/policy.

13. Do FSIS employees conduct research?

A. "Research" is a word that we used carefully in FSIS. The Agricultural Research Service (ARS) is the agency that is the "research arm" of USDA, and one of the roles of the ARS is to conduct research for FSIS. Congress has mandated that FSIS does not conduct "research", in the traditional since of the word. FSIS headquarters scientists conduct literature reviews to stay up-to-date on FSIS-related scientific issues, perform data analysis, and work with ARS and other groups/organizations that conduct research to support FSIS needs.

14. Were you involved in the Complainant's removal action?

A. No, I was not. I didn't know he had been removed until he called and asked me to be a witness for him.

15. Is there anything else you would like to add?

A. Writing peer-reviewed journal articles was not a high priority in OPHS/FSIS, but my supervisors in the Microbiology Division encouraged us to write papers for publication in peer-reviewed scientific journals. Dr. Chowdhury seemed very frustrated as to how to "tackle" his assignment of writing a paper for publication in a peer-reviewed journal.

I have reviewed this statement, which consists of 3 pages, and hereby solemnly ____ swear _X_ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_Bonnie E. Rose, Bonnie E. Rose_     2/5/07
Bonnie Rose, Affiant                  Date

_Paula M Mazzoccante_                 2/7/2007
Paula Mazzoccante, Investigator       Date

Initials: BER

# EXHIBIT G

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT
District of Columbia

– – – – – – – – – – – – – – –   :

KHURSHED A. CHOWDHURY,          :

        Plaintiff,          :   CASE NO.

        v.                 :   1:07-CV-99 (RCL)

ED SCHAFER and the              :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :

        Defendant.         :

– – – – – – – – – – – – – – –   :

Washington, D.C.

Tuesday, April 22, 2008

Deposition of:

PARTHAPRATIM BASU

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the

United States Attorney's Office, 501 Third

Street, Northwest, Washington, D.C., before

Constance H. Rhodes of Capital Reporting Company,

a Notary Public in and for the District of

Columbia, beginning at 10:45 a.m., when were

present on behalf of the respective parties:

## Capital Reporting Company

Page 2

1  On behalf of Plaintiff:
2    JONATHAN GOULD, ESQUIRE
     Kestell & Associates
3    1012 14th Street, Northwest
     Suite 630
4    Washington, D.C. 20005
     (202) 347-0990
5
   On behalf of Defendants:
6
     RHONDA FIELDS, ESQUIRE
7    United States Attorney's Office
     501 Third Street, Northwest
8    4th Floor
     Washington, D.C. 20530
9    (202) 347-0990
10   ROBERT HARDIN, ESQUIRE
     Office of General Counsel
11   United States Department of Agriculture
     1400 Independence Avenue, Southwest
12   Washington, D.C. 20250
     (202) 720-3962
13
14 ALSO PRESENT:
15   Khurshed Chowdhury
16
17       * * * * *
18
19
20
21
22

Page 3

1        CONTENTS
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiff        4, 53
4    Counsel for Defendants         41
5
6  BASU DEPOSITION EXHIBITS: *
7    1 Organizational Chart         4
8    2 Chowdhury Appraisal 10/1/03 to 6/30/04    16
9    3 Chowdhury Appraisal 7/1/04 to 6/30/05     18
10
11
12
13
14
15
16
17
18
19
20
21
22   (* Exhibits attached to transcript)

Page 4

1            P R O C E E D I N G S
2      (Plaintiff's Exhibit Number 1 was marked
3      for identification.)
4      WHEREUPON,
5            PARTHAPRATIM BASU
6  called as a witness, and having been first duly
7  sworn, was examined and testified as follows:
8        EXAMINATION BY COUNSEL FOR PLAINTIFF
9  BY MR. GOULD:
10   Q   Dr. Basu, can you tell me where you're
11 presently employed.
12   A   I'm employed at the USDA, Food Safety
13 Inspection Service, Office of Public Health
14 Science.
15   Q   I've shown you an org chart that's in
16 front of you we've marked as Number 1.
17   A   It's a little dated, but I'm under the
18 Assistant Administrator, the Office of the
19 Assistant Administrator on the very top.
20   Q   Right.  Okay.  Were you there in 2005?
21   A   Yes.  I was.
22   Q   What was your job title?

Page 5

1    A   I'm a special assistant, Office of the
2  Assistant Administrator.
3    Q   I'm John Gould and we've met just now,
4  and I represent Dr. Chowdhury in a case of
5  discrimination that he's brought against the
6  USDA.  And I'm going to be asking you some
7  questions today, and hopefully, we can get you
8  out for your meeting.
9    A   That's okay.  I just thought I'd change
10 the priorities a little bit.
11   Q   Can you give me just more about your
12 background in working at the USDA?  Have you had
13 other positions there besides the special
14 assistant?
15   A   Yes, I have.  I've been with the Food
16 Safety Inspection Service about 25-plus years
17 now, and I've been -- I've come through the field
18 ranks.  I've been a veterinarian in the field and
19 come up through the different stages of what has
20 become the Office of Public Health Science.
21 Before that it was the Science Program.  After
22 that, it was Science and Technology.  Then it

## Capital Reporting Company

| Page 6 |
|---|
| 1  became OPHS. I've been through every phase of |
| 2  that since middle '80s. |
| 3      Q   Have you been a supervisor? |
| 4      A   Yes, I have. |
| 5      Q   During what period of time. |
| 6      A   I've been a supervisor in the field and |
| 7  in Washington. Before I -- in this position and |
| 8  in Office of Public Health, I was Director of |
| 9  Chemistry and toxicology, which is not in this |
| 10  chart because it was before this reorganization. |
| 11  And I was Director of Technology Transfer. I was |
| 12  branch chief in the residue program. I was a |
| 13  supervisor in the field, also. |
| 14      Q   Who do you report to at present? |
| 15      A   I report to Loren Lange, who's assistant |
| 16  to Dr. Goldman, who is the assistant |
| 17  administrator. |
| 18      Q   Can we have your national origin, |
| 19  please? |
| 20      A   I'm from India. |
| 21      Q   And your religion? |
| 22      A   I'm Hindu. |

| Page 7 |
|---|
| 1      Q   And your age? |
| 2      A   I'm 63. |
| 3      Q   Is there an Association of Asian American |
| 4  Employees at the USDA? |
| 5      A   Yes. There are quite a few. Only one is |
| 6  recognized by USDA as a recognized organization. |
| 7  It's called APANA. Asian Pacific American |
| 8  Network in Agriculture. I might have a card |
| 9  here. I'm the president of it for the last two |
| 10  years plus and -- |
| 11      Q   What are your duties as president? |
| 12      A   Managing the organization. And the other |
| 13  thing is, as an organization, we have been noted |
| 14  the best in USDA. Last week we win an award from |
| 15  the Secretary as the best employee organization |
| 16  in all of USDA. |
| 17      Q   Why did APANA get that award? |
| 18      A   For our work in diversity and outreach. |
| 19  I thought I had a card, but I don't. |
| 20      Q   That's okay. |
| 21      A   Oh yes, I do. This is APANA card. and |
| 22  I'm also vice-president for another organization, |

| Page 8 |
|---|
| 1  which is all federal, government-wide, which is |
| 2  called FAP, Federal Asian Pacific. |
| 3      Q   Has APANA played any role with regard to |
| 4  what occurred in Dr. Chowdhury's case? |
| 5      A   I want to be careful in answering that. |
| 6  Let's go back a little bit. APANA was asked |
| 7  to -- and we have an MOU with FSIS |
| 8  administration. The MOU covers us being involved |
| 9  with them in recruiting more people in USDA and |
| 10  FSIS. I'm a trained recruiter. also. And we |
| 11  deal with employee difficulties and try to |
| 12  resolve it before it becomes a blown-up issue. I |
| 13  have a regular meeting with the assistant |
| 14  administrator for the Office of Management which |
| 15  is over the civil rights office. I meet him at |
| 16  least once -- now it's twice a month that he |
| 17  requested. and we try to negotiate issues that |
| 18  are ongoing and try to resolve it at the earliest |
| 19  possible stage. |
| 20      Q   Who is that person that we're talking |
| 21  about? |
| 22      A   Billy Milton. William Milton. Jr. is who |

| Page 9 |
|---|
| 1  I meet, who my contact is. |
| 2      Q   Have you discussed Dr. Chowdhury's case |
| 3  with Mr. Milton? |
| 4      A   I'm pretty sure I have. |
| 5      Q   What have you discussed about the case |
| 6  with him? |
| 7      A   What would I -- again. I'm under oath so |
| 8  I better not misspeak. What I try to do is, in |
| 9  any case, is try to get each case and talk a few |
| 10  minutes and try to see if we can come to common |
| 11  ground to give relief if anything is going on. |
| 12  And in this case, I think the main thing that was |
| 13  brought to my attention was plagiarism, and to |
| 14  me, the discussion I had with that is plagiarism |
| 15  is a very, very. clean, easy-cut thing to |
| 16  resolve. He said you either do it or don't do |
| 17  it, and I said, you know, we've never had a |
| 18  standard of writing in FSIS for people to be |
| 19  affected by something called plagiarism because |
| 20  we don't have a standard which is critical for |
| 21  writing like ARS has. I work a lot with |
| 22  Agriculture Research Service, where they have a |

## Capital Reporting Company

Page 10

1  standard of writing as a critical element, and
2  you have to publish in order to get your grades
3  and in order to get your pay increase and
4  everything else. FSIS never had that. Because I
5  was on the staff before when I was Director of
6  Technology Transfer. We did quite a lot writing.
7  We encouraged everybody to write, but it's not a
8  critical element. We couldn't enforce that to
9  that extent. We encouraged people to write and
10  they did, and I did, too.
11      Q   What --
12      A   So that's what was the discussion with
13  Billy Milton, to go back -- to see whether this
14  is something that could be handled like that. I
15  thought this was not an issue that should go
16  forward any more if it's plagiarism is all the
17  issue. And I didn't get involved with any side
18  issue that might be involved. I don't know that.
19  But the other thing I got involved with later on
20  was the ADR process. I know that was discussed,
21  and I discussed that with the secretary's office
22  too because I have an in door with the

Page 11

1  secretary's office, the secretary's office
2  meaning the Assistant Secretary for Civil Rights,
3  Margo McKay's office. We have regular meetings
4  as a recognized employer organization. We meet
5  regularly and I brought it up, too. There's a
6  directive, and I don't have the number in front
7  of me, about how ADR should be conducted. ADR is
8  alternate dispute resolution. She's writing it.
9  I'm spitting out acronyms that I'm not sure
10  everybody knows. I know you know.
11          The rules are set up by USDA or ADR, and
12  I told them that since the rules are set up, the
13  resolving official and the responding official
14  cannot be one and the same. That's clearly
15  stated in the requirement. And that's what
16  happened in his ADR, and I brought it up to the
17  attention. I said, you know, FSIS, as an
18  organization, is not following the USDA
19  requirement. If USDA doesn't want to enforce it,
20  cancel the requirement; otherwise, make sure the
21  agencies enforce it. And they agreed. I talked
22  to Dale Gentry who is in charge of ADR for USDA,

Page 12

1  and he said, you know, if that has happened, that
2  is not correct. That's the discussion I had with
3  Billy Milton, also, that we need to make sure
4  FSIS follows ADR requirements. That's spelled
5  out by the department.
6      Q   I want to focus on something you -- thank
7  you for the answer, by the way -- that you said
8  about ARS and publishing. You said that it was
9  your understanding that ARS, the critical element
10  of positions at ARS involved publishing?
11      A   Yes. I worked with the ARS quite a lot.
12  As a matter of fact, the deputy administrator,
13  the man second in command, is a colleague of
14  mine. We worked together for a long time in
15  different programs in the ARS because when I was
16  Director of Technology Transfer we used to have
17  the ARS conferences handled by us. ARS and FSIS
18  has conferences every year so I worked very
19  closely with ARS. ARS requirements are very
20  tricky. They are -- employees are mandated that
21  they have to publish so many papers -- I don't
22  know what the rule is -- in order to get their

Page 13

1  performance level brought to the satisfactory
2  level. They have different requirements for that
3  and outstanding and everything else. Also, the
4  conflict becomes they want to get patents for the
5  work they do, and if you publish it one time, you
6  can't get a patent. So the chicken and the egg
7  portion came in. So I got involved with that,
8  dealing with that situation, so I know that the
9  employees are told they have to publish;
10  otherwise, they won't get the grade. And here
11  they want a patent because they make money with
12  the patent, so it's --
13      Q   Well, what is it about OPHS positions as
14  opposed to ARS where publishing is not a critical
15  element?
16      A   Well, see, ARS is a scientific
17  organization which does strictly research. They
18  are mandated by Congress to do research for USDA.
19  They get funded for all the research they do for
20  not only the public -- they do research for USDA,
21  other agencies like FSIS. So ARS's requirement
22  is because they do cutting-edge research, like

## Capital Reporting Company

Page 14

1  they are the ones that made the rice that
2  everybody in the world eats now, the
3  high-producing grain rice. They do top-quality
4  research which has to be published in journals so
5  the whole world knows about what is going on. So
6  they're required to do publications; OPHS does
7  not have that requirement.
8      Q   What does OPHS do?
9      A   OPHS's requirement is to follow what FSIS
10  mandates are, which is food safety, which is
11  regulation.
12      Q   Are you familiar with -- let's go back to
13  the org chart. Are you familiar with the ZDRSD
14  division or --
15      A   Somewhat.
16      Q   -- were you familiar with it in 2005?
17      A   Somewhat.
18      Q   What's the basis of your familiarity?
19      A   Well, the Zoonotic Diseases and Residue
20  Surveillance Division, the residue part is the
21  one that I headed before. It was under my
22  previous position. But the zoonotic disease

Page 15

1  branch and the animal and egg production
2  branch -- the zoonotic disease branch would look
3  at zoonotic diseases -- diseases that occur
4  through animal contact, which is related to
5  food safety.
6      Q   What were they supposed to be doing with
7  regard to food safety?
8      A   Well, the scientific portion of FSIS,
9  OPHS, is supposed to either give answers to
10  questions raised by something happening in other
11  portions of FSIS -- other regulation, or any
12  disease outbreaks we have which might affect
13  human health, or basically look at what the
14  potentials are there which we should be out in
15  front with, or something that's happening outside
16  this country to make sure we are aware and we
17  have control over it, like BSE. BSE hasn't
18  happened in this country, but we need to be
19  prepared for it. So we have a position there
20  where hopefully, the zoonotic disease people know
21  what BSE is and are up front with what's
22  happening with BSE and can tackle it if ever the

Page 16

1  disease should come to this country's borders.
2      Q   The veterinary medical officer position,
3  did you ever have people that worked under you
4  with that title?
5      A   Yes. I'm a veterinary medical officer to
6  begin with, and I've had many veterinary medical
7  officers under me, yes.
8      Q   I forgot to ask you about any degrees or
9  education background.
10      A   I have a degree in veterinary medicine,
11  doctorate in veterinary medicine. I have a
12  masters in toxicology. I have a certification in
13  epidemiology.
14      Q   I'm going to show a couple of evaluations
15  here for performance appraisals.
16          MR. GOULD:  We're going to mark this as
17  Basu 2, I guess.
18          (Plaintiff's Exhibit Number 2 was marked
19          for identification.)
20  BY MR. GOULD:
21      Q   Before you looked at 2, you wanted to add
22  something to your testimony?

Page 17

1      A   No. That's okay.
2      Q   All right. I'm sorry. So let's just
3  look at 2, and I'm more interested in -- if you
4  can tell the difference in form rather than
5  content here under the performance elements.
6      A   What do you want me to say?
7      Q   Well, I want you to review it briefly.
8  Are those the standards or performance elements
9  of the job that you understood during this time
10  period?
11      A   I wouldn't know because at this time
12  period I was not director of a program, so I
13  wouldn't know. I wouldn't see these things. I
14  didn't handle them.
15      Q   All right. Look them over. Were they
16  performance standards that applied when you
17  supervised the job?
18      A   No. They were not.
19      Q   How are they different?
20      A   Well, "briefing papers, reports,
21  correspondence" is a very critical element here.
22  and the "evaluation and analytic studies" is

## Capital Reporting Company

Page 18

1  critical, and the "interpersonal relations" is
2  critical. Well, there's three here. One, two,
3  and number four are critical; and personally, I
4  don't like that myself. I never used -- I don't
5  think I've ever used three critical elements out
6  of four. I think it's too weighted. To me,
7  problem identification and solutions -- you're
8  asking for my own evaluation? Is that what --
9      Q   Well, no, I was going to ask you when you
10 supervised the job, did you have these kinds of
11 elements that you recall as part of the
12 performance standard?
13     A   Not in this language, no.
14     Q   All right.
15     A   Interpersonal relations, yes. The top
16 three, no. These are too nebulous to me.
17     Q   All right.
18         (Plaintiff's Exhibit Number 3 was marked
19         for identification.)
20 BY MR. GOULD:
21     Q   I want to show you something marked as
22 Basu 3 and ask you to compare it -- well, just

Page 19

1  look at 3 for a second. Again, I'm looking at
2  the form rather than the content of the overall
3  conclusions here, but in terms of the performance
4  elements, can you tell me, do you know anything
5  about how the performance elements changed from
6  2003 to 2004 on this particular job?
7      A   How did they change?
8      Q   Yeah.
9      A   I mean looking at it here?
10     Q   Yeah.
11     A   I know mission support was made mandatory
12 for all employees. And I know there's equal
13 employment opportunity, which was mandatory,
14 critical for supervisors. Personal contact EEO,
15 which is number nine, was mandatory for
16 nonsupervisors, I know that. I don't -- I've
17 never heard the customer service business because
18 I didn't think we were in the customer service
19 part. I don't know the research analysis part
20 because research is not a critical element for
21 us. Analysis could be, but research is not. So
22 I'm not sure I understand this. I've never seen

Page 20

1  this before.
2      Q   You don't know how it became part of the
3  performance standards?
4      A   I know -- I'll say this. I would have
5  never signed this as a standard for myself. I
6  would never have accepted it as an employee.
7      Q   How is it different from the performance
8  standards that you had for your veterinary
9  medical officers when you supervised?
10     A   Well, that was before this time where the
11 mission critical -- mission support and all that
12 became mandatory. But they would have something
13 that would cover their job for food safety, cover
14 something about communication needs. Not
15 critical. They would have -- definitely have an
16 EEO element, person contact, which is critical
17 because we want to make sure the customer service
18 was handled that way, not customer service as a
19 separate element. They would have an element
20 which covered basically what the job was. In
21 residue program, if they were making the plan,
22 annual plan for the year, that group would have

Page 21

1  the annual plan as their critical element. If
2  they were doing the data analysis, they would
3  have data analysis as a critical element.
4  Depends on what their work role is. It's very
5  specific, not trying to be a catch-all.
6      Q   I understand. Let's look at page three
7  of -- we're still on Basu 3.
8      A   Am I on the right page? Page three is
9  communication?
10     Q   We're looking at communications, yes.
11 We're looking under bullet point three. Do you
12 see where it talks about reports, publication,
13 and peer-reviewed journals?
14     A   Right. Yes, I do.
15     Q   In the veterinary medical officer
16 position when you supervised it, did you have any
17 such requirements?
18     A   I can't recall.
19     Q   Is there any change in the role that you
20 knew of in the zoonosis branch between 2003 to
21 2004 as opposed to 2004 to 2005 that would have
22 necessitated this change in performance elements?

**Capital Reporting Company**

Page 22

1      A   Again, I deal mostly in higher level
2   positions and Agency level positions rather than
3   just OPHS and the staff positions, and there was
4   no direction change from the top in FSIS to have
5   this change that I am aware of.
6      Q   Let's go to page two. Still on 3 now.
7      A   This is mission support?
8      Q   Yeah. If you look at objective two and
9   bullet two. Do you see that?  Conduct
10  comprehensive scientific research.
11     A   Well --
12     Q   Is that something that was performed by
13  veterinary medical officers in the zoonosis
14  branch?
15     A   Well, I'm hoping not because Congress
16  would not like that. I'll tell you again -- I'm
17  not side-tracking you away from what you ask
18  me -- when I was Director of Technology Transfer,
19  we also had -- were called Technology Transfer
20  Research Assessment, which was the whole
21  division's name, and part of the work was the
22  administrator gave me a pot of money, a few

Page 23

1   million dollars, to start a project where it
2   would involve research for FSIS, and Congress
3   slapped his hand pretty hard and took the money
4   back and gave it to ARS saying that FSIS will not
5   do any research. It's absolutely mandatory for
6   ARS to do research, not for FSIS. So I was
7   directly involved in that process with the
8   administrator, and the administrator was then
9   Russell Cross. So no, research is something we
10  don't do. We are mandated not to do and we've
11  been, again, told again and again that we are not
12  doing research. And ARS, who is very politically
13  connected, makes sure that FSIS doesn't do
14  research. They have this sole mandate from
15  Congress and from the USDA Secretary to be the
16  shop in the USDA to do research. We have no --
17  we don't have the resource to do scientific
18  research, all the money, all the funding. We are
19  a public health service regulatory agency.
20     Q   When a veterinary medical officer was
21  assigned to do a report while you were a
22  supervisor, did they do any research to prepare

Page 24

1   those?
2      A   Of course. I mean research meaning on
3   the Internet or through the library, not physical
4   research. They can't do -- no, this research is
5   research --
6      Q   How is that different from the research
7   described in objective two just as far as you
8   understand?
9      A   Comprehensive scientific research and
10  studies to prove -- I don't know. I don't know.
11  I don't know what it means. See, it has to be --
12  by research -- my meaning of research for my
13  staff would be you research what's already in
14  publication. You research what somebody else has
15  done, and that's the research we're talking
16  about. It's not scientific, individual research
17  which is cutting-edge research. I don't know
18  what comprehensive scientific research means in
19  studies. See, the wording -- I think the word
20  "studies" complicates the picture to me.
21     Q   Now, do you have any familiarity with
22  Dr. Chowdhury's actual work while he was there?

Page 25

1      A   Not totally.
2      Q   Okay. Were you aware of any priorities
3   in ZDRSD with regard to particular diseases or
4   pathogens that were around in the years, let's
5   say 2003 to 2005?
6      A   The big thing I think for us at that time
7   period would be BSE.
8      Q   Why was that?
9      A   Because BSE kills people. It's very
10  dangerous and it can happen through careless
11  handling of tissue which should not get into the
12  food product. There was a big push from all of
13  the U.S. Government to make sure that this
14  country is not affected like England was affected
15  because -- you have to understand. and people
16  don't realize how much money the U.S. Government
17  makes from export of food products. Second to
18  arms and ammunition. the U.S. makes more money in
19  exporting products from this country. If we have
20  a BSE attack that was found somewhere. our
21  borders would be closed. We couldn't export
22  anything. It would be financially devastating

# Capital Reporting Company

Page 26

1  for U.S. Government. I work a lot with the trade
2  office on trade issues, so I know very well -- I
3  worked for the undersecretary for a while -- how
4  important that is to have a disease like BSE
5  affect the population. And even one or two cases
6  would be devastating for the shipment of stuff
7  from this country anywhere outside.
8      Q  In the 2003 to 2005 period, can you
9  compare the significance in OPHS with regard to
10  BSE as opposed to toxoplasmosis?
11     A  Oh, my god. No, it doesn't even pass the
12  lap test.
13     Q  Why is that?
14     A  Toxoplasmosis is a very, very minor
15  ailment which causes flu-like symptoms, and if
16  you have it, you won't realize you had it until
17  it's over most of the time. It's pretty serious
18  for pregnant ladies who handle cat feces because
19  the cat is a natural harbor for the parasite.
20  It's an intercellular the parasite. So it is a
21  very serious disease for pregnant ladies. In our
22  veterinarian practice we always told ladies who

Page 27

1  were of that age to be careful in handling
2  excrement from cats because of that problem, but
3  nothing to do with the food. Now, you can
4  possibly have food contamination with the
5  parasite and affect the human, but that is not
6  very common in this country because we don't have
7  a tendency to eat raw meat. In France they do,
8  so France has a problem with toxoplasmosis
9  because they have raw meat being eaten as a
10  delicacy.
11     Q  And the exposure of pregnant woman is not
12  with food as you've described?
13     A  No, no. The dangers of toxoplasmosis --
14  any of your scientific journals will agree,
15  you'll find the dangers to the population is for
16  pregnant ladies if you have cats or handle cat
17  excrements. That's the danger of getting
18  seriously ill. Food illnesses is a minor
19  inconvenience at the most.
20     Q  Do you know anything about personnel
21  rules, practices, that applied at USDA while
22  Dr. Chowdhury was there in the years 2003 to 2006?

Page 28

1  let's say?
2      A  I'm not a personnel specialist so I may
3  know the rules you're asking about as a manager,
4  but I couldn't sit here and tell you I'm an
5  expert.
6      Q  Okay. Well, let me talk about the rules
7  that you followed as far as you understood them
8  while you were a supervisor. Did your
9  performance elements break down to critical and
10  noncritical functions?
11     A  Yes. That's mandated I'm pretty sure for
12  everybody.
13     Q  And you had to give yearly appraisals,
14  right?
15     A  Right.
16     Q  And --
17     A  Well, you give one six-month update and a
18  quarterly update to tell people how they're doing
19  so that it's not a shock at the end of the pay
20  period, I mean end of the grading cycle saying,
21  my God -- there's no "got you" here. You try to
22  help people improve through the process.

Page 29

1      Q  And if you look at 2 and 3 of your
2  exhibits we've marked Basu 2 and 3, do the rating
3  standards there in the tables -- outstanding,
4  superior, marginal, fully successful -- do they
5  correspond to the ratings that were present when
6  you were supervisor?
7      A  The "exceeds, meets, and does not meet"?
8  Is that you're saying?
9      Q  Yeah. Unacceptable, marginal, fully
10  successful, superior.
11     A  They're the same. They haven't
12  changed.
13     Q  Was it your understanding that you could
14  give an "unacceptable performance" overall
15  performance evaluation, if someone failed a
16  noncritical element?
17     A  No. No, no, no. I did not know that.
18  In a critical element, failing a critical, yes,
19  but noncritical, no.
20     Q  Did you understand or as far as you
21  understood the practice, could an element be
22  critical and noncritical at the same time?

## Capital Reporting Company

Page 30

1    A   No. Never heard that.
2    Q   It wasn't a practice that you were
3  familiar with?
4    A   No.
5    Q   Do you know Dr. Alice Thaler?
6    A   Yes, I do.
7    Q   How do you know her?
8    A   She was in another program. She was
9  mostly -- I know her from other people. She was
10  a branch chief when I was director. She never
11  worked for me, and I've never worked for her.
12  Now, she is 15, I'm 15 also, but before that, she
13  was an applicant for a job I interviewed. She
14  did not get selected, and she filed a complaint
15  on that. But I know her, yes, I know her.
16    Q   Were you one of the officials she named
17  as discriminating against her?
18    A   No. I was part of the interview panel,
19  and we were interviewed for her complaint.
20    Q   Did you ever attend meetings with her?
21    A   Oh, yes. Quite a few times.
22    Q   Did she ever indicate at any of these

Page 31

1  meetings that she had any expertise in personnel
2  and human resource issues?
3    A   Yes, she did. I was shocked.
4    Q   What do you remember her saying about
5  that?
6    A   I was shocked. We were in a meeting --
7  OPHS, excuse me. Office of Public Health and
8  Science. If I go into acronyms, I apologize.
9  OPHS has leadership team meetings on a regular
10  basis, and a few of them are outside. We go
11  outside because of less chance to get disturbed
12  for a few days, maybe a couple of days. And we
13  had one of those in Annapolis, Maryland. I don't
14  remember the date. She was -- we sat in a hotel,
15  a big, big room, and we had round tables, and she
16  happened to be sitting at my table along with Dr.
17  McKaskey -- Pat McKaskey who is in Athens.
18  Georgia -- and a couple of other people I don't
19  remember right now. But she was in my table and
20  McKaskey was here, and I was here (indicating).
21  And McKaskey bought up a point about, you know,
22  how do we get rid of people that are not

Page 32

1  productive. And she said, anybody who wants help
2  in firing somebody, come to me. I'll tell you
3  the ways to do it. And I was shocked. I could
4  not believe it. And I've mentioned this story to
5  my boss. I said, you know, I was amazed because
6  I try to help people who are not producing, to
7  help them along, and I was shocked to hear that
8  she said that. And she has said that after that,
9  too -- come to me in another meeting, I heard her
10  say almost the same thing in another leadership
11  team meeting.
12    Q   What's a leadership team meeting?
13    A   Leadership team is people at the 15 or
14  higher level in OPHS. We have a leadership team
15  meeting which is happening right now, which is
16  okay. 11:00 every Tuesday.
17    Q   It's only 5:30 in the morning according
18  to the U.S. Attorney's Office.
19    A   That's right.
20    Q   I think you've got plenty of time.
21    A   I have plenty of time.
22    Q   We're almost finished.

Page 33

1    A   No, no, no. That's okay. It doesn't
2  matter. They know where I am.
3    Q   Who usually attends these leadership team
4  meetings? What levels of people?
5    A   The heads of OPHS, meaning all the senior
6  executive service people and all the heads of the
7  different divisions, and the few of us who are
8  senior but not in charge of divisions. There's
9  three of us who are not in charge of divisions
10  who are at the senior level, 15 and above.
11    Q   And everyone else is senior executive
12  service, SES?
13    A   Yes.
14    Q   Did Mr. Lange ever make a statement about
15  publishing in his division?
16    A   No. He's not in the division. He was
17  in --
18    Q   I guess I mean under -- I don't know --
19  let me call it OPHS --
20    A   He's my boss.
21    Q   Is he in that department? What should I
22  call that?

## Capital Reporting Company

Page 34

1    A   Program.

2    Q   Okay. Program. I'm sorry. In that

3 program did he ever make a statement?

4    A   Yes. We had a -- once every quarter or

5 something we have leadership team meetings. I

6 mean, excuse me, we have all-hands meetings,

7 meaning we try to get everybody together from

8 OPHS to listen to the same message. In one of

9 those meetings -- and I can't tell you exactly

10 what date it is, we can go back and look -- loren

11 Lange made a statement about -- research came up

12 and writing came up, and he said he's never

13 published anything in his life. So that was kind

14 of -- somebody followed up and asked him another

15 question, and he said the same thing: This is

16 not ARS. We don't do research publications I've

17 never done anything. I'm paraphrasing exactly

18 what he said, but that's essentially what he

19 said.

20    Q   Fair enough. Mr. Milton -- just

21 finishing up with any conversations that you had

22 with him -- did he say anything more about

Page 35

1 Dr. Chowdhury's situation to you?

2    A   I can't recall, no.

3    Q   So you mentioned some of the things that

4 you discussed. Was there anything else?

5    A   No. The only thing I remember now, we

6 talked about the fact that Dr. McKaskey, who is

7 in this loop here as the -- he's the head of the

8 lab section. It's not really -- this is not a

9 very good presentation, but he's the head of the

10 lab section, which is on the right-hand side,

11 which is the Eastern Lab, Midwestern Lab, Western

12 Lab, Lab QC, and the Food Emergency -- these last

13 five works under Dr. Patrick McKaskey.

14    Q   What role did Mr. Milton -- how does Dr.

15 McKaskey --

16    A   Well, in our discussion I mentioned, you

17 know, I heard what -- the word plagiarism being

18 used. I said, you know, it was funny because

19 somebody sent me a website in USDA where

20 Dr. McKaskey made a publication, and he had a

21 slide saying: "Don't reinvent, plagiarize." I

22 said, how can you -- you have the assistant

Page 36

1 administrator -- I think that's what his title

2 is -- assistant administrator asking people to

3 plagiarize then trying to get action against an

4 employee for following that order. Because here

5 you have an SES telling employees in a USDA

6 website -- it's still published on the website --

7 to plagiarize, and then say, but he did it, so

8 that's wrong. I said then, we don't have a

9 consistent message. So I don't know where he

10 took that.

11    Q   Have you ever been involved -- have you

12 published or tried to publish in a peer-reviewed

13 journal yourself?

14    A   I have published, but I'm not sure if

15 it -- yeah, it must be peer-reviewed because I

16 published -- I did some work in the field on

17 cleaning up a heptico (phonetic) crisis in about

18 a nine-state area and that was a big deal for

19 USDA. And the administrator asked me to write it

20 up and I did, and it was published in a journal.

21 I guess it was peer-reviewed.

22    Q   About how long did you work on that?

Page 37

1    A   I don't remember. It was a long time

2 ago. It was middle '80s when I did that.

3    Q   Okay.

4    A   I got a special award from the

5 secretary's office for that.

6    Q   Do you know anything about the process by

7 which people go about trying --

8    A   Yes.

9    Q   All right. Tell me what you know and how

10 do you know it.

11    A   Well, I mean I've had my staff do

12 peer-reviewed publications and I -- yes, I have

13 been to peer-reviewed after that, especially when

14 I was Director of Technology Transfer, we did a

15 lot of peer-reviewed publications. Well, you go

16 to a journal and they mark it up and they send

17 back their -- every journal has its way of doing

18 things; and of course, this is depending on the

19 journal, how big they are in circulation and how

20 scientific they are. They have different

21 standards they use. So they tell you exactly

22 ahead of time what you need to spell out and how

**Capital Reporting Company**

Page 38

1  you need to word it, and then you follow the
2  directions and you send them a copy. They mark
3  it up, send it back; you correct it, send it back
4  to them. It's a long process. It takes a good
5  six months at least, maybe a year.
6      Q   Have you ever asked any of your employees
7  to prepare something for a peer-reviewed
8  journal -- just let me finish the question --
9  although you never really intended it to be
10  submitted?
11      A   Oh, no, no, no. I don't play games like
12  that. We have published in peer-reviewed
13  journals and employees have come and asked me
14  that. We have done good work. I was head of
15  biotechnology for USDA and for FSIS for a while,
16  and we had three people trained in biotechnology
17  from Texas A & M, and we -- when we did work,
18  which was cutting-edge work, the first time in
19  the U.S. Government we were doing this, I was
20  speaking to other governments like Canada and
21  Australia about these things we were doing. They
22  wanted to see what we were doing. We published

Page 39

1  some of the papers in peer-reviewed journals, and
2  they wanted to write it up and I encouraged
3  them.
4      Q   Did anyone ever accomplish this in a
5  one-month period of time?
6      A   Oh, by God no. It's not going to
7  happen.
8      Q   Why not?
9      A   It's too complicated, too time consuming
10  especially if you have a fairly good journal.
11  I'm not talking about our personal magazine.
12  Even that takes more than a month. We had a
13  scientific magazine we put out from our shop
14  there, and it took more than a month to get
15  papers written in that quality. Even I couldn't
16  review my staff's work and get it published in my
17  magazine in a month.
18      Q   Let me look at my notes. Was there a
19  class action that was filed on behalf of Asian
20  Americans against the USDA?
21      A   Yes.
22      Q   Were you involved in any way?

Page 40

1      A   Indirectly.
2      Q   What do you mean "indirectly"?
3      A   I was in the class action as one of the
4  class agents at the beginning. I had a lot of
5  issues that were pending. The Agency resolved
6  them within a very short time period, so I
7  withdrew from the class action.
8      Q   Okay. Did that involve recruiting and
9  hiring issues?
10      A   In the class action?
11      Q   Yes. With regard to Asian Americans?
12      A   I think it was promotion. Absolutely for
13  sure it was promotion, and -- I'm not exactly
14  sure right now. I know it was promotion for
15  sure.
16      Q   Were those your particular issues?
17      A   Mine was promotion, yes, exactly was
18  promotion. My wife was involved with that, and
19  she was one of the beneficiaries of the class
20  action and hers was promotion also.
21      Q   Okay.
22      A   My wife is also a veterinarian with the

Page 41

1  USDA.
2          MR. GOULD: Thank you, Dr. Basu.
3          THE WITNESS: Thank you.
4          MS. FIELDS: I just have a couple
5  questions.
6          THE WITNESS: Oh, I'm sorry. I'm sorry.
7          MR. GOULD: She gets a few.
8          EXAMINATION BY COUNSEL FOR DEFENDANT
9  BY MS. FIELDS:
10      Q   Just so I understand. You indicated that
11  you were the chief of the residue branch?
12      A   Well, I was branch of the residue branch
13  a long time ago. Then I was director of the
14  whole program after that.
15      Q   When were you chief of the residue
16  branch?
17      A   Well, it was not called the residue
18  branch. The residue division -- when we were
19  called a science program, I can't tell you the
20  dates off hand, we had a division called Residue
21  Evaluation Planning Division.
22      Q   And when were you the chief of that?

Page 42

1    A    And I was the chief of that I'm guessing
2    '89 through '91. I was branch chief of the
3    evaluation branch. After that I became Director
4    of the Technology Transfer Division.
5    Q    Okay. During what period of time were
6    you the chief of the technology branch?
7    A    I was director of that.
8    Q    Or director.
9    A    I'm guessing it's after that. It's '91
10   through -- I don't have it on the tip of my
11   tongue.
12   Q    Approximately how many years?
13   A    I think two years. And after that I was
14   Director of Chemistry and Toxicology Division,
15   which oversaw the whole residue program and other
16   portions of lab work, and I was there for three
17   years. And then I became the Special
18   Assistant.
19   Q    Okay. So you were the chief of --
20   A    The Director of Chemistry and Toxicology
21   Division.
22   Q    -- Chemistry and Toxicology Division.

Page 43

1    A    Which oversaw the residue branch and
2    other things, too. It oversaw the residue branch
3    and some of the groups that have been split
4    apart.
5    Q    Okay. So when you were the chief of the
6    chemistry and toxicology branch --
7    A    I was director of that.
8    Q    Director -- I'm sorry. It was not set up
9    the way it's set up under this chart?
10   A    No. The residue branch was divided
11   into -- right. The residue branch was there
12   under the Chemistry and Toxicology Division, but
13   there was other branches with that. The
14   combination was different.
15   Q    Did you ever work in the zoonosis
16   branch?
17   A    No. This is new. That was formed in
18   2005, I guess. I don't know when it was
19   formed.
20   Q    Okay.
21   A    No. I was never in that group.
22   Q    Now, you were talking about ARS. What is

Page 44

1    ARS, again?
2    A    Agriculture Research Service.
3    Q    And you indicate that they do, that they
4    are charged by Congress to do research?
5    A    Yes.
6    Q    Now, when you say "research," as a
7    layperson --
8    A    Right.
9    Q    -- you understand that there is like
10   bench research that involves cutting up tissues
11   and test tubes and chemicals and all that kind of
12   stuff?
13   A    Right.
14   Q    Is that the kind of research you're
15   talking about? Bench research?
16   A    Yes. That and other stuff, too.
17   Agriculture Research Service --
18   Q    Hold on. Just answer my questions just
19   so I understand.
20   A    Do you want yes or no, or do you want a
21   specific --
22   Q    No. I'm just trying to clarify some

Page 45

1    things in my mind. So bench research --
2    A    They do that, too.
3    Q    ARS does bench research?
4    A    And other things.
5    Q    What other kind of research do they do.
6    A    They do bench research. Again, if you --
7    if I explain -- Agriculture Research Service is
8    spread throughout the country. They have centers
9    under four different regions -- Eastern, Western,
10   et cetera, et cetera. All these regions work
11   with universities, too. Okay. So some of the
12   work they do in-house; some of the work they farm
13   out to the universities.
14   Q    But they do the type of --
15   A    They do bench research. They do research
16   in the field.
17   Q    Research in the field meaning what?
18   A    Like growing the rice that we eat today.
19   90 percent of the world's rice is rice that ARS
20   built by technology. When they started out they
21   created the embryonic implantation which now is
22   used in impregnating women now. ARS started some

## Capital Reporting Company

Page 46

1  of that work.
2      Q   So ARS does what lay people think of
3  as --
4      A   Scientific research.
5      Q   -- scientific research in terms of having
6  a lab coat on or going out and dealing with
7  chemicals or animals, that kind of research?
8      A   Right.
9      Q   Now, let's go to the veterinary medical
10  officers which would be under the Zoonotic
11  Diseases Surveillance Division?
12      A   Right.
13      Q   They don't do bench research, correct?
14      A   No.  We don't have the mandate for
15  that.
16      Q   They don't wear the little white coats?
17  They don't cut up tissues or use chemicals or go
18  out in the field and grow rice?
19      A   No, but we do wear lab coats --
20      Q   Just answer -- okay.  Forget the lab
21  coats.
22      A   They don't grow rice.

Page 47

1      Q   They don't do that kind of bench or what
2  we call scientific, hands-on, get yourself dirty
3  research that we're talking about in ARS; is that
4  correct?
5      A   Right.
6      Q   Now, there are -- you are doctors.
7  Veterinary medical officers are doctors; is that
8  correct?
9      A   Right.
10      Q   And as with all doctors, whether it's
11  vets or people doctors, there are scientific
12  journals that are written by you guys; is that
13  correct?
14      A   Absolutely.
15      Q   And these veterinary medical officers who
16  work under the zoonotic diseases branch, are they
17  expected to be able to take a topic and go to the
18  scientific journals and other documentary-type
19  resources and research and conduct research,
20  researching those journals, researching on the
21  website to gather information concerning certain
22  scientific issues?

Page 48

1      A   Sure.
2      Q   Okay.  So there are two different types
3  research; is that correct?  There's hard science
4  research, where you're actually doing what you
5  talk about ARS doing; is that correct?
6      A   What ARS does is original research.
7      Q   Original research.
8      A   Yeah.  That's the word for it.
9      Q   So ARS does original research, but the
10  people in the zoonotic branch, the veterinary
11  medical officers, are expected to be able to take
12  a topic and research it based on the journals and
13  other literature that is out there?
14      A   Just like lawyers do.  Case research.
15      Q   Precisely.  And that's very common, isn't
16  it?
17      A   Correct.
18      Q   And would you find it exceptional that
19  that would be among the performance elements of
20  somebody in the zoonosis branch, that they are
21  expected to do the -- not the original research
22  of ARS, but the research in the journals and the

Page 49

1  literature as part of their job?
2      A   To answer that, I expect a staff of mine,
3  if I was director, to be able to go and find the
4  answer for me and give me the answer of where --
5  let's say toxoplasmosis for example -- where do
6  we stand, where does the world stand -- give me
7  an answer for that.  Yes, I would expect the
8  person to go to the Internet, go to the
9  publications to find out what the positions are
10  for different countries.  I've done that in the
11  past.  And then we get it together in a document,
12  and we take it to our administrator and say:
13  This is where Canada is; this is where we need to
14  be to get our trade in balance, et cetera, et
15  cetera.  We do that.
16      Q   So that's common?
17      A   Sure.
18      Q   In the field?
19      A   In Washington.  It's not in the field.
20      Q   I'm sorry.  When I meant in the field, I
21  didn't mean out in the field, I meant --
22      A   We have veterinarians in the field that

## Capital Reporting Company

14 (Pages 50 to 53)

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  do different things.
2      Q   I'm not talking about the field field.
3  I'm talking about in the field of being a
4  veterinary medical officer.  In the area.
5      A   In Washington D.C. staff, yes.  Not in
6  the field.  There's a different requirement for
7  veterinarians in the field.
8      Q   Okay.  Thank you for correcting me on my
9  terminology.
10     A   I'm under oath.  I'm trying to be
11  specific in answering questions.
12     Q   I appreciate that.  Now, you indicated
13  that you were familiar to a certain degree with
14  Dr. Chowdhury's work?
15     A   I know he worked in the ZDRSD.
16     Q   Have you ever personally reviewed any of
17  his work?
18     A   Not really.
19     Q   Have you ever reviewed any of his work as
20  a supervisor?
21     A   Oh, no.  Never have been a supervisor for
22  him.

**Page 51**

1      Q   Have you ever had an occasion to evaluate
2  any of his work as a supervisor?
3      A   As a supervisor, no.
4      Q   Have you ever had an opportunity to
5  evaluate any of his work?
6      A   He brought something to me to look at one
7  time, and I didn't have time to read the whole
8  thing.  I read one page maybe and gave it back to
9  him.  I was too busy with my deadlines.
10     Q   You read one page and gave it back to
11  him?
12     A   I think so.  For a paper on toxoplasmosis
13  because I didn't think -- I didn't feel I could
14  advise him on toxoplasmosis because I was not
15  expert.  We have a lot of experts in Washington
16  who can answer questions better than I can.  I
17  have expertise that I can draw on.  Toxoplasmosis
18  is not one of them.  I know basically what it is,
19  but it's not an interest of mine because it's not
20  a safety food concern for me.
21     Q   Did you make any observations on the one
22  page that you looked at when you looked at it?

**Page 52**

1      A   I can't remember.  I might have -- I
2  might have told him to give me the next version
3  or something like that.  It was too preliminary
4  when he was doing it I think.
5      Q   When you say "it was too preliminary,"
6  what do you mean by "it was too preliminary" when
7  he gave it to you?
8      A   Well, I don't remember the format that
9  was given to me, but I remember not reading it
10  because -- I can't recall exactly what I told
11  him.  I remember not reading it completely.  He
12  gave it to me to read it, and it stayed in a pile
13  and I didn't get to it.
14     Q   So are you saying you did not really make
15  an assessment of the paper?
16     A   No, I did not.
17     Q   You couldn't today tell us whether or not
18  you thought it was good, bad, or indifferent; is
19  that correct?
20     A   No, I could not.
21         MS. FIELDS:  Thank you.
22         MR. GOULD:  That just brought up another

**Page 53**

1  question I didn't realize.
2         THE WITNESS:  Please.
3         FURTHER EXAMINATION BY COUNSEL FOR
4      PLAINTIFF
5  BY MR. GOULD:
6      Q   Did you discuss any other projects or
7  assignments that Dr. Chowdhury had been given by
8  Dr. Parham or Dr. Thaler around the period that
9  he brought you the toxo paper, particularly with
10  regard to any Salmonella serovars?
11     A   I know that he was working on that, but I
12  don't think I reviewed any work that he's done on
13  that or on BSE or any other disease conditions
14  under that program -- under that office's work
15  because I don't -- because of my position, I
16  don't go into other director's areas unless my
17  boss asks me to do that.  Then I do.
18         MR. GOULD:  I've got nothing further.
19  Thank you.
20         MS. FIELDS:  Thank you.
21         (Signature waived.)
22         (Whereupon, at 11:40 a.m., the deposition
   of PARTHAPRATIM BASU was concluded.)

Capital Reporting Company

Page 54

1                   CERTIFICATE OF NOTARY PUBLIC

2          I, CONSTANCE HUNT RHODES, the officer before

3      whom the foregoing deposition was taken, do

4      hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly

6      sworn by me; that the testimony of said witness

7      was taken by me in stenotypy and thereafter

8      reduced to typewriting under my direction; that

9      said deposition is a true record of the testimony

10     given by said witness; that I am neither counsel

11     for, related to, nor employed by any of the

12     parties to the action in which this deposition

13     was taken; and, further, that I am not a relative

14     or employee of any counsel or attorney employed

15     by the parties hereto, nor financially or

16     otherwise interested in the outcome of this

17     action.

18

19                              *Constance Hunt Rhodes*

20                         CONSTANCE HUNT RHODES
                           Notary Public in and for the
21                            District of Columbia
       My commission expires:
22     January 1, 2013

# EXHIBIT H

# EXHIBIT H

| USDA-FSIS PERFORMANCE APPRAISAL | INSTRUCTIONS: Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD From 07/01/04 To 06/30/05 |
|---|---|---|

| 2. NAME (Last, First, Middle Initial) CHOWDHURY, KHURSHED A | | 3. SOCIAL SECURITY NO. |
|---|---|---|

| 4. OFFICIAL POSITION TITLE VETNRY MEDCL OFFCR | 5. PAY PLAN / OCCUP. SERIES / GRADE / STEP GM-0701-13/00 | 6. ORGANIZATION 37 09 45 0010 00 |
|---|---|---|

| 7. DUTY STATION WASHINGTON, DC | 8. STANDARD JOB # 0 | 9. FUNDING UNIT NO. | 10. AGENCY USE |
|---|---|---|---|

## 11. COMPLETE AT THE BEGINNING OF APPRAISAL PERIOD PERFORMANCE ELEMENTS

Check appropriate performance elements for this rating cycle.
See descriptions on reverse. Sign blocks 12, 13 & 14.

Check box if element is critical ⟶

## 16. COMPLETE AT THE END OF APPRAISAL PERIOD APPRAISAL UNITS

(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.)

| | PERFORMANCE ELEMENTS | critical | EXCEEDS Fully Successful | MEETS Fully Successful | DOES NOT MEET Fully Successful |
|---|---|---|---|---|---|
| ✓ | 1) Mission Support (Mandatory critical for all employees) | X | | | 2 |
| ✓ | 2) Communications | | | | 1 |
| | 3) Supervision (Mandatory for supervisors) | | | | |
| | 4) Program Management | | | | |
| ✓ | 5) Special Projects  No special projects to rate | | | | Not rated. |
| ✓ | 6) Research and Analysis | X | | | 2 |
| | 7) Customer Service | | | | |
| | 8) Equal Opportunity & Civil Rights (Mandatory critical for supv.) | | | | |
| ✓ | 9) Personal Contacts - EO/CR (Mandatory critical for all nonsupv.) | X | | 2 | |
| | 10) Resource Management | | | | |
| | 11) Individual Contributions to the Team | | | | |
| | 12) | | | | |
| | 13) | | | | |
| | 14) | | | | |
| | At the end of the appraisal period, enter TOTAL APPRAISAL UNITS for each column ⟶ | EXCEEDS | MEETS 2 | DOES NOT MEET 5 | |

| 12. EMPLOYEE SIGNATURE Khurshed A. Chowdhury | DATE 7/21/04 |
|---|---|
| 13. SUPERVISOR'S SIGNATURE Nila R. Parhan | DATE 7/21/04 |
| 14. REVIEWER'S SIGNATURE | DATE 7/30/04 |

### 15. PROGRESS REVIEW (Initial & date to certify progress review discussions took place)

| EMPLOYEE | SUPERVISOR | EMPLOYEE | SUPERVISOR |
|---|---|---|---|
| KAC 12/20/06 | DR 12/20/2004 | | |

### 17. RATING / DECISION TABLE (check the correct rating)

| | | |
|---|---|---|
| OUTSTANDING | ☐ | All appraisal units are at "EXCEEDS" |
| SUPERIOR | ☐ | More appraisal units are at "EXCEEDS" than at "MEETS FULLY SUCCESSFUL" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL | ☐ | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL | ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE | ✓ | One or more critical elements are appraised at "DOES NOT MEET" |

### 18. EMPLOYEE (Check appropriate box)

| | YES | NO |
|---|---|---|
| I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction | ☐ YES | ☐ NO |
| My official position description adequately describes my duties and responsibilities | ☐ YES | ☐ NO |
| My supervisor has discussed my training needs with me | ☐ YES | ☐ NO |
| My supervisor has discussed this appraisal with me | ☐ YES | ☐ NO |

| 19. EMPLOYEE'S SIGNATURE Refused to sign 2/08/06  DR | IF EMPLOYEE DID NOT SIGN, STATE REASON. |
|---|---|

| 20. SUPERVISOR'S SIGNATURE Nila R. Parhan | DATE 2/08/06 | 21. REVIEWER'S SIGNATURE | DATE 02/08/06   7/30/04 |
|---|---|---|---|

| PERFORMANCE STANDARD | INSTRUCTIONS: Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD From: 7/01/04 | To: 6/30/05 |
|---|---|---|---|

2. NAME (Last, First, Middle)

Chowdhury, Khurshed

Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors *must* define goals and activities in the results oriented format, for each performance element established. The element and standard *must* be listed below, along with the goals and activities for the rating cycle.

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| Mission Support (Mandatory critical element for all employees) | ☒ CRITICAL (if critical, must be reflected in employee's position description.) ☐ NON-CRITICAL |

5. STANDARD (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Has demonstrated basic understanding of mission and organizational goals and priorities that support or directly protected the public's health from foodborne hazards. Assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines. Work product was responsive to the supervisor's and the organization's stated priorities and requirements. Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable). NOTE: **Must show link towards Agency strategic mission and goals.**

6. GOALS/ACTIVITIES FOR THE CYCLE (mandatory entry):

### Links to FSIS Strategic Plans

Strategic Goals:  Protect the public health by significantly reducing the prevalence of foodborne hazards from meat, poultry, and egg products.

Objective 2:  Create a coordinated national and international food safety risk management system for meat, poultry, and egg products from farm to table.

- Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.
- Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs.
- Respond to food safety emergencies and critical events with useful plans and recommendations.
- Develop collaborative mechanisms to increase the relevance and usefulness of research information to FSIS goals and objectives.

Objective 4:  Create and maintain an FSIS infrastructure to support risk assessment, risk management, and risk communication objectives.

- Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.

7. DOCUMENTATION OF ACCOMPLISHMENTS  (Document accomplishments for elements rated Exceeds or Does Not Meet.  No documentation is needed for elements rated Meets Fully Successful.  Documentation can be recorded on a separate sheet and attached.)

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From: 7/01/04    To: 6/30/05 |
|---|---|---|

**2. NAME** *(Last, First, Middle)*
Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| Communications | ☐ CRITICAL (If critical, must be reflected in employee's position description.)<br>☒ NON-CRITICAL |

**5. STANDARD** (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Oral and written communications were clear, correct, timely, and presented in an understandable manner. Supervisor and coworkers were kept informed of issues and problems when necessary. Information and guidance provided was timely and correct.

**6. GOALS/ACTIVITIES FOR THE CYCLE** *(mandatory entry):*

Maintains effective and collegial working relationships with other Branch, Division, Program, and other Agency employees, government officials, Congressional staffs, interest groups and other interested parties by:

- Preparing and contributing to the development of discussion, position, and policy papers, briefing notes, presentations, and routine Agency correspondence,
- Presenting written and/or oral findings and observations to project teams, colleagues, and managers in a manner that enhances confidence and credibility in the Branch, Division, Program, and Agency.
- Preparing written reports, papers, and articles for Agency use and/or publication in peer-reviewed journals that are well written, researched, and organized, and reflect sound scientific principles and concepts to consistently withstand scientific critique.
- Attending branch, Division, Agency, and/or other interdepartmental or interagency meetings to discuss data/information requirements and results, assess trends, discuss policy issues, and analyze the effect of revised policies or programs in light of current science and public health implications.
- Liaising with federal and state government personnel, academia, and stakeholders to obtain, exchange, and clarify data/information, describe policies and program activities, and remain abreast of trends and developments.
- Responding to emergency and critical events by collaborating with appropriate staffs, internal and external to the Division, to develop a well-planned Program response that needs little modification and can be implemented with minor oversight from the Branch chief and/or Division director.
- Conducting business in a manner that is professional, courteous, and exemplifies commitment to service.

**7. DOCUMENTATION OF ACCOMPLISHMENTS** *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From: 07/01/04     To: 06/30/05 |
|---|---|---|

2. NAME (Last, First, Middle)

Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| **Special Projects** | ☐ CRITICAL. (If critical, must be reflected in employee's position description.)<br>☒ NON-CRITICAL |

5. STANDARD (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Special projects were completed on time in a competent, accurate, and thorough manner. Completed projects complied with regulations and procedures. Special projects were completed independently, or reflected research and collaboration with others as required

6. GOALS/ACTIVITIES FOR THE CYCLE (mandatory entry):

Designs and implements major projects that address Agency special needs or issues by:
- Quickly assimilating the science as it impacts or addresses the arena of special projects.
- Developing specific areas of expertise and advancing knowledge of domestic and, to some extent, international scientific issues, conditions and trends as related to meat, poultry, and egg products.
- Conceptualizing, designing, and managing and/or leading projects of varying degrees of complexity.
- Having strong organizational skills, exceptional time management abilities, and the capacity to deliver on goals under constrained timeframes.
- Functioning effectively within a fast-paced environment with high expectations for maintaining a significant level of quality in the delivery of the work.
- Working effectively with scientific and technical representatives, internal and external to the Division and Agency, and supporting their efforts to achieve successful projects.
- Working effectively with management to devise, analyze, modify, and evaluate the overall effort.

7. DOCUMENTATION OF ACCOMPLISHMENTS (Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)

77

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From: 7/01/04 | To: 6/30/05 |
|---|---|---|---|

2. NAME *(Last, First, Middle)*

Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| **Research and Analysis** | [X] CRITICAL (if critical, must be reflected in employee's position description.)<br>[ ] NON-CRITICAL |

5. STANDARD (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate. Made use of available reference sources (e.g., USDA manuals, or applicable law or regulations). Recommendations or analysis provided were based on available guidance and were generally accepted without major revision.

6. GOALS/ACTIVITIES FOR THE CYCLE *(mandatory entry)*:

Conducts needed research and analysis by:

- Conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific policy issues and the development of policy and programs.
- Identifying and compiling information, carrying out required analysis, establishing and maintaining working files, and developing and maintaining data bases.
- Participating in project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research /study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work.
- Undertaking longer-term tracking and analysis of issues, identifying relevant scientific issues that may have policy implications, analyzing the effect of policy proposals on projects and initiatives, and formulating program and/or policy modifications for review by the management.

7. DOCUMENTATION OF ACCOMPLISHMENTS. *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

| PERFORMANCE STANDARD | INSTRUCTIONS:<br>Refer to FSIS Directive 4430.4 | 1. APPRAISAL PERIOD<br>From: 7/01/04      To: 6/30/05 |
|---|---|---|

2. NAME (Last, First, Middle)

Chowdhury, Khurshed

*Performance elements, standards and goals/activities shall be set within 30 days after the beginning of the appraisal period or after the assignment to a new position. Supervisors must define goals and activities in the results oriented format, for each performance element established. The element and standard must be listed below, along with the goals and activities for the rating cycle.*

| 3. ELEMENT | 4. CHECK ONE |
|---|---|
| **Personal Contacts - EO/CR** *(Mandatory critical element for nonsupv. employees)* | ☒ CRITICAL (If critical, must be reflected in employee's position description.)<br>☐ NON-CRITICAL |

5. STANDARD (Describe the level expected for Fully Successful performance. Description of Exceeds or Does Not Meet fully successful levels is optional.)

Projected a positive and professional image of USDA. Performed all duties in a manner which consistently demonstrated fairness, cooperation, and respect toward coworkers, customers, and all others in the performance of official business. Complied with EO/CR guidelines and policies.

6. GOALS/ACTIVITIES FOR THE CYCLE *(mandatory entry)*:

Carry out duties in a manner that is non-discriminatory and impartial towards others by:

- Conducting business in a manner that is professional, courteous, and exemplifies commitment to service.
- Demonstrating fairness, cooperation, and respect toward coworkers, subordinates, supervisors, and all internal and external customers.
- Working cooperatively with other Agency personnel and organizations to further Agency goals by listening to and respecting the views of others, promoting expression of diverse opinions and collaborating on solutions to Agency problems. Promoting a cooperative spirit and team approach to program delivery.
- Adhering to an applying knowledge of Agency civil rights policies, goals, and objectives that contribute to a productive and nondiscriminatory work environment through written and oral communication and interpersonal relations.

7. DOCUMENTATION OF ACCOMPLISHMENTS *(Document accomplishments for elements rated Exceeds or Does Not Meet. No documentation is needed for elements rated Meets Fully Successful. Documentation can be recorded on a separate sheet and attached.)*

# EXHIBIT I

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT
District of Columbia

– – – – – – – – – – – – – – – :

KHURSHED A. CHOWDHURY,          :

        Plaintiff,          :   CASE NO.

      v.                  :   1:07-CV-99 (RCL)

ED SCHAFER and the              :
UNITED STATES DEPARTMENT OF     :
AGRICULTURE,                    :

        Defendant.          :

– – – – – – – – – – – – – – – :

                     Washington, D.C.

            Tuesday, April 22, 2008

Deposition of:

        BERNARD SALAMONE

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the

United States Attorney's Office, 501 Third

Street, Northwest, Washington, D.C., before

Constance H. Rhodes of Capital Reporting Company,

a Notary Public in and for the District of

Columbia, beginning at 11:45 a.m., when were

present on behalf of the respective parties:

# Capital Reporting Company

2 (Pages 2 to 5)

Page 2

1    On behalf of Plaintiff:
2        JONATHAN GOULD, ESQUIRE
         Kestell & Associates
3        1012 14th Street, Northwest
         Suite 630
4        Washington, D.C. 20005
         (202) 347-0990
5
     On behalf of Defendants:
6
         RHONDA FIELDS, ESQUIRE
7        United States Attorney's Office
         501 Third Street, Northwest
8        4th Floor
         Washington, D.C. 20530
9        (202) 347-0990
10   ROBERT HARDIN, ESQUIRE
         Office of General Counsel
11       United States Department of Agriculture
         1400 Independence Avenue, Southwest
12       Washington, D.C. 20250
         (202) 720-3962
13
14   ALSO PRESENT:
15       Khurshed Chowdhury
16
17           * * * * *
18
19
20
21
22

Page 3

1            C O N T E N T S
2    EXAMINATION BY:              PAGE
3        Counsel for Plaintiff         4
4
5
6    SALAMONE DEPOSITION EXHIBITS: *
7    1  Organizational Chart          4
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   (* Exhibits attached to transcript)

Page 4

1            P R O C E E D I N G S
2        (Plaintiff's Exhibit Number 1 was marked
3        for identification.)
4    WHEREUPON,
5            BERNARD SALAMONE
6    called as a witness, and having been first duly
7    sworn, was examined and testified as follows:
8            EXAMINATION BY COUNSEL FOR PLAINTIFF
9    BY MR. GOULD:
10       Q   It's still morning, Dr. Salamone, so I
11   wish you good morning. I'm John Gould. I
12   represent Khurshed Chowdhury in a case that he's
13   brought of discrimination against the USDA. I'll
14   be asking you a few questions this morning.
15   Hopefully, I won't keep you that long. If you
16   could just keep your answers audible because
17   they're being transcribed, and we need to get
18   them on the record.
19       A   That will be fine.
20       Q   Let me ask you first where you presently
21   work.
22       A   I'm with the FSIS. Food Safety Inspection

Page 5

1    Service. Our division is a new division now.
2    We're in the -- called the Applied Epidemiology
3    Division. Previously. it was the zoonotic branch
4    which has now been absorbed into this Applied
5    Epidemiology Division.
6        Q   Okay. I've shown you an organization
7    chart.
8        A   Yes.
9        Q   Is that a chart that applied at some
10   point in 2005 to your position?
11       A   Exactly.
12       Q   And you're in the -- you were in the
13   zoonosis branch?
14       A   Zoonosis branch. Exactly.
15       Q   And Dr. Chowdhury worked with you in that
16   branch?
17       A   Yes. he did.
18       Q   How long had you worked with Dr.
19   Chowdhury?
20       A   Since January of 2001.
21       Q   And the supervisors in that branch were
22   at some point Dr. Parham?

Page 6

1    A    She has been a supervisor since I think
2    May of 2001, April or May of 2001.
3    Q    And Dr. Thaler was her supervisor for a
4    while, Dr. Parham's supervisor?
5    A    She became the supervisor when the animal
6    and egg production branch came over to us.
7    Dr. Thaler, when she brought her division over,
8    it became a branch, and then she became the
9    division chief.  Then from there she then became
10   the senior director.
11   Q    And Dr. Dey?
12   A    Dr. Bonnie Dey.  Dr. Dey was the
13   division -- acting division chief.
14   Q    And your background is -- your education
15   background?
16   A    I went to Auburn University for my DVM.
17   I went to Tulane University for my masters in
18   public health.  Prior to this position here. I
19   spent 30 years in the United States Army
20   veterinary corps, and I retired in the rank of
21   colonel.
22   Q    Okay.  And so you've been a USDA employee

Page 7

1    for how long?
2    A    Since January of 2001.
3    Q    And how old are you?
4    A    I'll be 62 this week.
5    Q    Congratulations.
6    A    Thank you.
7    Q    If that's the right word.
8    A    Yes.
9    Q    And your national origin background is
10   what?
11   A    In what sense?
12   Q    Where were you born?
13   A    I was born here in the states.
14   Q    And you don't have any connection --
15   you're not East Asian in any way, any blood or
16   East Asian blood, nothing like that, or South
17   Asian?
18   A    My family is from Italy.
19   Q    Did you have any particular disease that
20   you specialized in while you worked with
21   Dr. Chowdhury?
22   A    We worked together on BSE.

Page 8

1    Q    And from what period of time?
2    A    From 2001 until -- until his termination
3    in 2006.
4    Q    And can you describe to me -- when you
5    said that you worked together, what kinds of
6    things did you do together on BSE?
7    A    What they did, when I first took over the
8    position in January of 2001, Bill James formed up
9    a group of people to work on BSE issues.
10   Dr. James was our supervisor -- was our division
11   chief at that time.  And he would have weekly
12   meetings, and then we would discuss issues
13   pertaining to the disease itself, dealing with
14   things of policies, policies that was coming out
15   of FSIS, as well as dealing with the animal,
16   plant, health inspection service.
17   Q    Was this known as the BSE working
18   group?
19   A    Like a working group, yes.  There was a
20   number of us together on that.
21   Q    Was Dr. Chowdhury a coordinator at some
22   point on that?

Page 9

1    A    He was a member of it and later on he
2    took the minutes.
3    Q    I see.  Okay.  Was he ever removed from
4    that group that you know of?
5    A    No.  What happened, the group finally --
6    the group didn't terminate, but when Dr. James
7    left, the group was no longer functional.  I mean
8    in the sense that we didn't meet on a weekly
9    basis or on a monthly basis.
10   Q    Did you meet at all when Dr. Parham took
11   over?
12   A    I can't remember that.  I can't remember
13   that.  What we -- what happened after that was
14   that as we got assignments -- you know,
15   occasionally we would get assignments from the --
16   a question would be asked dealing with, something
17   dealing with BSE, and we would have to do
18   literature reviews and things like that to answer
19   the question, or we would get a question from
20   Policy in reference to something.  As they were
21   trying to develop a policy for the Agency, we
22   would get scientific questions to answer.

# Capital Reporting Company

## Page 10

1    Q    Is that a fair description of what the
2  greater percentage of your job was?
3    A    In what sense?
4    Q    Did you spend most of your time
5  responding to these requests?
6    A    Oh, yeah, of BSE. Well, we had other
7  things, too. That was just one issue. That was
8  just one thing I dealt with.
9    Q    What other types of requests did you
10  have.
11    A    I dealt with anything with zoonotic
12  diseases, any disease that would come up. If a
13  question was asked dealing with something in
14  occupational health, like in the slaughter
15  establishments, if they were exposed to bird
16  diseases, citicosis, or something like that,
17  anything which is zoonotic -- diseases which are
18  transmissible from animals to man -- we could
19  have been asked a question dealing with that.
20    Q    All right. Let me focus on when you're
21  asked a question. What was the purpose of the
22  question?

## Page 11

1    A    They would just -- it could be we need a
2  paper on this disease. And then you would just
3  write or then we would just write a paper dealing
4  with all aspects of that disease, what we call
5  maybe a one-pager or a two-page paper, something
6  of that nature.
7    Q    Who were typically the requesters for
8  these papers?
9    A    Usually people in Policy. Policy usually
10  asked questions like that. Most of the inquiries
11  came from Policy because they would -- at that
12  time they were developing the regulation for BSE,
13  so they had numerous questions on that.
14    Q    All right.
15    A    But we also worked on Salmonella.
16  Salmonella is a -- any foodborne diseases --
17  these are things that I worked on, Salmonella,
18  Salmonella serotypes. And then that information
19  is usually on the web.
20    Q    What were you asked particularly to do
21  with regard to Salmonella serotypes? Do you
22  recall?

## Page 12

1    A    I'm doing that now. I do that every
2  quarter. What happens is that we have a
3  requirement that in testing of food
4  establishments, slaughter establishments, they
5  have to meet certain standards. The Agency
6  requires certain standards to be met. And so
7  samples are taken, and these samples are tested,
8  and depending on the number of samples --
9  depending on the product is the number of samples
10  that are tested. And if establishments do not
11  meet certain standards, then those plants would
12  be reinspected. And so as a result, any positive
13  salmonellas that we would get, then those samples
14  are then sent to the national veterinary labs in
15  Ames, Iowa, where they then do another test to
16  determine the serotype, exactly what Salmonella
17  it is. There are certain salmonellas that are
18  transmissible to humans. And so what we try to
19  do, we try to show -- we try to ensure that we
20  don't have an association between certain
21  serotypes that we see in animals which may be
22  transmissible to man. And so I do all the

## Page 13

1  evaluations on those different types of
2  Salmonella serotypes.
3    Q    So it's something that's done for Mr.
4  Lange?
5    A    Yeah. Loren Lange. yeah. we do for him.
6  We do that for him. But again. it's a report
7  that's put on the web. And we do a quarterly
8  report. and we do a -- excuse me. We do
9  quarterly reports. but we do semiannual reports
10  that are placed on the web as well as annual
11  reports.
12    Q    Were you doing those while Dr. Chowdhury
13  was a veterinary medical officer?
14    A    We had just started that. They were
15  being done -- someone else was doing it at that
16  point in time. Neena Anandaraman was doing it at
17  that time. and then Delila felt that Neena's
18  plate was getting kind of crowded with other
19  things. and so she decided that all of us should
20  be aware of how to do this. and so Neena trained
21  us how to do it. And since that time I'm the
22  person that continued with it.

## Capital Reporting Company

Page 14

1    Q   Did that start around 2006 then?
2    A   Yeah.  2000 -- April -- it started in
3  Spring of 2006.
4    Q   Spring of 2006.  Okay.  Anything else
5  that you dealt with with regard to Salmonella
6  serotypes other than these reports for Mr. Lange?
7    A   No.  That's it.
8    Q   Did you ever work on any issues regarding
9  toxoplasmosis?
10   A   No.  Never, never.
11   Q   Were you ever asked to write a
12  peer-reviewed paper or a publication --
13   A   Yes.
14   Q   -- for a peer-reviewed journal?
15   A   Yes.
16   Q   Okay.
17   A   That was --
18   Q   Was that something that was required of
19  your job since the time that you began as a
20  veterinary medical officer?
21   A   It came about around 2000 -- might have
22  been 2004.  We were -- we had a staff meeting and

Page 15

1  at that point in time it was brought to our
2  attention that as one of our elements, we were
3  going to have to write a peer-reviewed paper.
4    Q   Did you ever write one?
5    A   No.  And I was -- and I was -- the
6  following year I was -- that was identified as
7  one of my deficiencies.
8    Q   But you've always maintained at least
9  minimum fully acceptable performance?
10   A   I have never been -- I have always been
11  outstanding.
12   Q   Outstanding.
13   A   Throughout my career in the military,
14  too.  But you know I accepted it because I did
15  not meet the standards, and that was one of the
16  standards.
17   Q   But you still maintained an
18  outstanding --
19   A   No.  I did not maintain -- no.  I did
20  not, no.
21   Q   Okay.  You became "fully successful" then
22  because of that?

Page 16

1    A   I don't know.  What are the categories?
2  I don't -- What is it -- outstanding?
3    Q   You just have to tell me what you recall.
4    A   I can't remember.  If the standards are
5  outstanding, superior, and fully qualified, then
6  I became superior.
7    Q   Okay.  So you just went down one notch?
8    A   Yeah.
9    Q   All right.  Thank you.
10   A   But I accepted it.
11   Q   I understand that.
12   A   I just want to make sure that you --
13   Q   Right.
14   A   That it was -- you know, because I did
15  not meet the standards.
16   Q   But you were never put on a performance
17  review because of that, were you?
18   A   No.
19   Q   Do you know anything about a NARMS
20  project?  Does that name mean anything to you?
21   A   National Antimicrobial Resistant
22  Monitoring System.  I worked on that project,

Page 17

1  also.
2    Q   Did Dr. Chowdhury work on that at all?
3    A   No. no.
4    Q   Tell me what that is.
5    A   The -- as part of the salmonellas, those
6  samples are then submitted to the Agriculture
7  Research Service, who do antimicrobial resistant
8  patterns on them.  In other words, these
9  salmonellas are resistant to certain types of
10  antibiotics, and so. since these are our samples
11  coming from FSIS, they wanted representation.
12  Dr. Paula Craig runs that program, and we are
13  representative of FSIS because these samples are
14  coming from us, as well as -- she has
15  representatives from the Animal and Plant Health
16  Inspection Service since they get samples from
17  the farms.
18   Q   Do you recall whether Dr. Chowdhury. from
19  what you saw. did much work in Salmonella --
20   A   No.
21   Q   -- during the time -- you don't recall or
22  he did not?

## Capital Reporting Company

Page 18

1    A    He did not. He did not, other than the
2    train -- other than the -- other than back in
3    2006 when we were learning the procedure. But
4    other than the fact that we were learning the
5    procedure, that was the only time that
6    Dr. Chowdhury worked on Salmonella.
7    Q    Okay. From what you saw, what he mainly
8    worked on were BSE issues; isn't that right?
9    A    That was one of his main ones, was BSE.
10   Q    Any other particular disease that comes
11   to mind that he spent as much --
12   A    Tuberculosis. He spent some time on
13   tuberculosis. We had one project on TB, and that
14   was it.
15   Q    Okay.
16   A    That was a request, a TB request.
17   Q    All right.
18   A    And toxoplasmosis. I know he worked on
19   toxoplasmosis.
20   Q    Right, right. Do you have any idea how
21   many projects that you worked on or requests for
22   papers that you worked on in evaluation year

Page 19

1    2004-2005? Was there a particular amount?
2    A    We got requests all the time on BSE
3    because what happened, they were -- again, the
4    policy people were -- most of this stuff -- most
5    of -- we were working on BSE in 2001, 2002, but
6    we really started getting busy in December of
7    2003. That's when we had our first case of BSE
8    in the country out of Washington State. And
9    that's when -- at that point in January of 2004,
10   the USDA was coming out with -- FSIS was coming
11   out with a policy of how to address this issue of
12   this, and so we were getting numerous inquiries
13   at that point in time, and these inquiries
14   continued.
15   Q    How long did that last?
16   A    Oh gee. It lasted for years.
17   Q    It's still going on?
18   A    We don't get as many now, but back then
19   we were getting quite a few because we had to --
20   we had to work on things dealing with -- we had
21   these -- I forget how they call these things --
22   they have the -- the regulation was a -- I want

Page 20

1    to say a provisional regulation. And then during
2    that time, we -- those rules goes out. We get
3    comments back on those rules, and then based upon
4    those comments, we respond to that, and then
5    eventually we'd come out with a final rule at the
6    end. And so there was a number of rules that
7    were being generated. And so we were asking
8    numerous questions dealing with specified risk
9    materials. And in particular, there was two
10   projects that we dealt with that Dr. Chowdhury
11   was responsible for. Again, a lot of time these
12   things, these things occurred if you happened to
13   be at work that day. If you happened to be the
14   person there that day, then you got that topic to
15   do. I'm pretty sure those two topics came up
16   during the summertime. One dealt with distal
17   ileum or the intestinal track and the other one
18   dealt with the tonsils.
19   Q    Summer of 2004 or 2005?
20   A    2005 I believe.
21   Q    2005.
22   A    I think it was 2005.

Page 21

1    Q    All right. Thank you very much, Dr.
2    Salamone. I don't know if Ms. fields has any
3    questions.
4       MS. FIELDS: No, thank you.
5       THE WITNESS: That's it?
6       MR. GOULD: That's it.
7       (Whereupon at 12:01 p.m., the deposition
8    of BERNARD SALAMONE was concluded.)
9
10       * * * * *
11
12
13
14
15
16
17
18
19
20
21
22

Page 22

1          CERTIFICATE OF NOTARY PUBLIC
2          I, CONSTANCE HUNT RHODES, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly
6   sworn by me; that the testimony of said witness
7   was taken by me in stenotypy and thereafter
8   reduced to typewriting under my direction; that
9   said deposition is a true record of the testimony
10  given by said witness; that I am neither counsel
11  for, related to, nor employed by any of the
12  parties to the action in which this deposition
13  was taken; and, further, that I am not a relative
14  or employee of any counsel or attorney employed
15  by the parties hereto, nor financially or
16  otherwise interested in the outcome of this
17  action.
18
19  _____
              CONSTANCE HUNT RHODES
20         Notary Public in and for the
              District of Columbia
21
     My commission expires:
22   January 1, 2013

## Capital Reporting Company

Page 22

1              CERTIFICATE OF NOTARY PUBLIC

2          I, CONSTANCE HUNT RHODES, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in stenotypy and thereafter

8    reduced to typewriting under my direction; that

9    said deposition is a true record of the testimony

10   given by said witness; that I am neither counsel

11   for, related to, nor employed by any of the

12   parties to the action in which this deposition

13   was taken; and, further, that I am not a relative

14   or employee of any counsel or attorney employed

15   by the parties hereto, nor financially or

16   otherwise interested in the outcome of this

17   action.

18

19        *Constance Hunt Rhodes*
          CONSTANCE HUNT RHODES
20        Notary Public in and for the
          District of Columbia
21
     My commission expires:
22   January 1, 2013

# EXHIBIT J

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT
District of Columbia

– – – – – – – – – – – – – :
KHURSHED A. CHOWDHURY,              :
                                    :
            Plaintiff,              :    CASE NO.
                                    :
      v.                            :    1:07-CV-99 (RCL)
                                    :
ED SCHAFER and the                  :
UNITED STATES DEPARTMENT OF         :
AGRICULTURE,                        :
                                    :
            Defendants.             :
– – – – – – – – – – – – – :

                              Washington, D.C.

                         Tuesday, April 22, 2008

Deposition of:

            MAQBOOL QURESHI, DVM

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the

United States Attorney's Office, 501 Third

Street, Northwest, Washington, D.C., before

Constance H. Rhodes of Capital Reporting Company,

a Notary Public in and for the District of

Columbia, beginning at 9:20 a.m., when were

present on behalf of the respective parties:

**Capital Reporting Company**

---

Page 2

1
2    On behalf of Plaintiff:
        JONATHAN GOULD, ESQUIRE
3        Kestell & Associates
        1012 14th Street, Northwest
        Suite 630
4        Washington, D.C. 20005
        (202) 347-0990
5
        On behalf of Defendants:
6
        RHONDA FIELDS, ESQUIRE
7        United States Attorney's Office
        501 Third Street, Northwest
8        4th Floor
        Washington, D.C. 20530
9        (202) 347-0990
10       ROBERT HARDIN, ESQUIRE
        Office of General Counsel
11       United States Department of Agriculture
        1400 Independence Avenue, Southwest
12       Washington, D.C. 20250
        (202) 720-3962
13
14
        ALSO PRESENT:
15
        Khurshed Chowdhury
16
17              * * * * *
18
19
20
21
22

---

Page 3

1              C O N T E N T S
2    EXAMINATION BY:              PAGE
3       Counsel for Plaintiff          4
4
5
6    QURESHI DEPOSITION EXHIBITS: *
7    1 Organizational Chart            4
8    2 Mid-Year Performance Appraisal  18
9    3 E-mail 6/2/06                   22
10
11
12
13
14
15
16
17
18
19
20
21
22   (* Exhibits attached to transcript)

---

Page 4

1              P R O C E E D I N G S
2       (Plaintiff's Exhibit Number 1 was marked
3    for identification.)
4       WHEREUPON,
5              MAQBOOL QURESHI, DVM
6    called as a witness, and having been first duly
7    sworn, was examined and testified as follows:
8       EXAMINATION BY COUNSEL FOR PLAINTIFF
9    BY MR. GOULD:
10      Q   Dr. Qureshi, I'm John Gould.  I represent
11   Dr. Khurshed Chowdhury in a case that he's
12   brought against his former employer, the U.S.
13   Department of Agriculture.  I'll be asking you
14   some brief questions today, and please keep your
15   voice up and try to answer them audibly so that
16   we can get them transcribed.
17      Can you tell me where you presently
18   work?
19      A   I'm with the Albany District Office.
20      Q   And that's part of the USDA, correct?
21      A   That's part of the USDA.  Correct.
22      Q   And you were just recently assigned

---

Page 5

1    there?
2       A   Just two weeks back.
3       Q   Okay.  Was it a transfer?  Is that fair
4    it call it?
5       A   No.  I took a downgrade.
6       Q   You took a downgrade?
7       A   Yes.
8       Q   What is your job there?
9       A   I'm a supervisory veterinary medical
10   officer, SVMO.
11      Q   And you're a doctor of veterinary
12   medicine; is that right?
13      A   I'm DVM, yes, sir.
14      Q   How long have you worked for the USDA?
15      A   28 years.
16      Q   28?
17      A   Yes, sir.
18      Q   Prior to moving to the Albany District
19   Office, did you work in the Washington office, on
20   Independence Avenue, of the USDA?
21      A   No.  I worked at Aerospace Center, not
22   14th Street and Independence Avenue.

---

**Capital Reporting Company**

Page 6

1    Q    Where is that?
2    A    Right in D.C.
3    Q    What street is that on?
4    A    D 901, 901 D.
5    Q    We've marked a chart here as Dr. Kureshi
6    1. Can you point to me -- this is an
7    organization chart of the Office of Public Health
8    Science. Can you point to me what branch or
9    division you were in at the time that you worked
10   in Washington, D.C.? And again, this is around
11   2005 we're talking about.
12   A    I was with the ZDRSD.
13   Q    That's over there on the left side?
14   A    All the way left.
15   Q    You were in the zoonosis branch; is that
16   right?
17   A    Yes. Right.
18   Q    How long were you in that particular
19   branch?
20   A    Four year.
21   Q    Did you work with Dr. Chowdhury there?
22   A    Yes. I believe two year, yes.

Page 7

1    Q    You worked with him for two years?
2    A    Yes.
3    Q    Who was your supervisor?
4    A    Dr. Delila Parham.
5    Q    Who was her supervisor?
6    A    Dr. Alice Thaler.
7    Q    Could you just tell me the title of your
8    job while you worked in the zoonosis branch?
9    A    VMO, veterinary medical officer.
10   Q    Did Dr. Salamone work there as well?
11   A    Yeah. He was one of my colleagues.
12   Q    Dr. Harmon worked there, too, for a
13   while?
14   A    Jean Harmon, yes. She worked with us,
15   with me, I would say over one year. Then she
16   took another job.
17   Q    Right.
18   A    Yes.
19   Q    She was also a veterinary medical
20   officer?
21   A    She was veterinary medical officer, but
22   she has a PhD.

Page 8

1    Q    Any other veterinary medical officers
2    there in the zoonosis branch?
3    A    Neena Anandaraman.
4    Q    Anandaraman?
5    A    Yes.
6    Q    Now, can you tell me your national
7    origin, please.
8    A    Pakistan.
9    Q    You're Pakistani?
10   A    Yes.
11   Q    And your religion?
12   A    Muslim.
13   Q    And can you tell me approximately how old
14   you are?
15   A    I'm 59 years old.
16   Q    Why did you take a downgrade?
17   A    Two reasons. I had my -- my wife has
18   arthritis, and my whole family's in New York, her
19   family and my family, and she would rather have
20   knee replacement surgery there, not here. She
21   has arthritis, and of course, she's been
22   struggling with that arthritis for a couple of --

Page 9

1    three, four years. And now they recommended us
2    to have that knee replacement. And since our
3    family is in New York, and my kids, my children,
4    they are in New York, and it's a huge operation,
5    she wanted to have it done there.
6    Q    Okay. While you were in the zoonosis
7    branch working with Dr. Chowdhury, did you have a
8    specific disease or pathogens that you were
9    expert in or that you worked on?
10   A    I have like -- let me think. It's four
11   years back. I was hired as a field expert
12   because I work in field before I came 25 year, 24
13   year. And my job -- originally, they said you
14   are going to be answering all the field question
15   because the headquarters -- a lot of people, they
16   have DVM degree, but they never work in the
17   field -- like Dr. Salamone, Dr. Chowdhury -- they
18   were like research scholar. They did not work --
19   they did not work for Office of Field Operation,
20   and I did that. And after a couple of months,
21   then I was told, Maq, that whatever we will give
22   you, that assignment/project, you will do. I

# Capital Reporting Company

4 (Pages 10 to 13)

Page 10

1    said, No problem.
2        I did work on Salmonella. I did work on
3    ADRSD -- animal disposition slaughter reports was
4    like a big project of mine. And then director,
5    branch chief, even our associate and deputy
6    administration, they would send us FSIS notices
7    and directive, and our job was to review that and
8    give them comments. That was really big job.
9    Most of the time I was doing that.
10       Q    What would you have to do to review them
11   and give comments?
12       A    Let's say when you write directive, they
13   want all expert -- like I have field experience,
14   you have a PhD, you have microbiology -- they
15   would rather give that assignment project to all
16   four of us, three of us. And everybody would put
17   comments and send it back through the chain of
18   command, branch chief to administrative director,
19   Dr. Thaler, and goes to the South Building.
20       Q    What would you do to give the comments?
21   What kinds of things would you do?
22       A    If there was any new thing that was not

Page 11

1    required that we should add in this directive, we
2    would give our recommendations.
3        Q    And how would you go about making your
4    recommendations?
5        A    How -- I'm not clear, Mr. Gould. Say
6    again. What did you say?
7        Q    How would you go about making your
8    recommendations? Where would they come from?
9        A    Field knowledge. Let's say -- let's say
10   they have some -- they are writing directive,
11   FSIS notice, expert in the field, slaughter and
12   processing. And of course, everything is already
13   in FSIS's notices and manual and regulation. And
14   they not change, they would amend that or maybe
15   they increase that inspection. Let's say after
16   BSE, they changed the regulation, how we used to
17   do slaughter in the field. Then it was like,
18   since we had that BSE, then we have to make sure
19   that the veterinarian is really like 100-percent
20   involved. In the field, veterinarian is involved
21   only when there is disposition needed there. If
22   the inspector is retaining the carcass, we would

Page 12

1    go and make our disposition. After the BSE, then
2    we have to do ante-mortem ourself, to be that
3    veterinarian. Before that, inspector was doing
4    that. This kind of stuff. When they change the
5    regulation or add something new to that
6    regulation and FSIS notice, then they would send
7    us the draft of FSIS notice, draft of FSIS
8    directive, and they would ask us to put your
9    comment -- what do you think, Maq? What do you
10   think, Dr. Chowdhury? What do you think -- that
11   sort of thing thank you. Were you ever asked to
12   do a research review for a peer-reviewed
13   journal.
14       A    No.
15       Q    Now, you mentioned the disease BSE. It's
16   commonly known as mad cow disease; is that
17   correct?
18       A    Yes, sir.
19       Q    Was there a particular working group in
20   OPHS for work on BSE especially while you worked
21   for Dr. Parham and Dr. Thaler?
22       A    Yes. Actually, when I came it was all

Page 13

1    over -- that Dr. Ben Salamone, Jean Harmon, and
2    Dr. Chowdhury, they were the main people to work
3    on BSE.
4        Q    Okay.
5        A    I was not involved in that BSE myself.
6        Q    I see. So you weren't aware of whether
7    there was such a working group for that
8    particular problem with BSE?
9        A    Can you repeat your question?
10       Q    You were not aware whether there was a
11   formal working group that had been set up to
12   concentrate USDA resources or OPHS resources on
13   combating BSE?
14       A    Yeah. When I came they briefed me who
15   was working and who did work on BSE.
16       Q    Okay. And those are the three names that
17   you mentioned?
18       A    Yes, sir.
19       Q    But you didn't attend any group meetings
20   that the people that you mentioned or other
21   people had on this particular problem?
22       A    Yeah. They brought me to just get a

## Capital Reporting Company

Page 14

1    little briefing because I was from the field. I
2    attended like three meetings on BSE.
3        Q    Was Dr. Chowdhury at the meetings?
4        A    Dr. Chowdhury was not there. He was
5    vacationing at that time. He was not there
6    positively. Dr. Jean Harmon was there. And
7    actually, Ben was not there either.
8        Q    Was there any expert on Salmonella in
9    the -- that worked mostly on Salmonella in the
10   zoonosis branch while you there?
11       A    Did I what?
12       Q    Was there any particular person who
13   worked more on Salmonella in the zoonosis
14   branch?
15       A    Yes.
16       Q    And who was that?
17       A    Before I joined, Neena was working on
18   that Salmonella. And then Dr. Parham asked us,
19   all of us, to learn to make that report.
20   Actually, it's a quarterly report on Salmonella,
21   then six month and yearly report. We work --
22   actually, that was job of another division, but

Page 15

1    then they give it to ZDRSD to work on
2    Salmonella.
3        Q    What other division was it originally
4    part of?
5        A    Microbiology.
6        Q    Do you know when it came over into ZDRSD?
7        A    Good question. I don't know the date,
8    but I would say before Dr. Chowdhury left. I
9    remember because we were still in process of
10   learning how to make that quarterly report and
11   six-month report and yearly report.
12       Q    And who particularly was that report sent
13   to? Do you recall?
14       A    Yes. It was gone to Doctor -- Mr. Loren
15   Lange. He's a deputy --
16       Q    We know who he -- he's the deputy in
17   OPHS.
18       A    Right.
19       Q    Did you ever do any work on
20   toxoplasmosis?
21       A    No.
22       Q    Are you familiar with that particular

Page 16

1    parasitic disease?
2        A    Yes. Of course, being a veterinarian,
3    yes, I did. And then, again, we used to have
4    meetings every Wednesday. And there Dr. Parham
5    would tell us: Dr. Chowdhury's working or he did
6    work on toxoplasmosis; Maq is working on swine
7    fever. Everybody was -- had assignment. And she
8    did mention -- again, that thing happened before
9    I arrived. Dr. Chowdhury was working on that
10   disease and he submitted the report. But I was
11   told, because that was Dr. Parham's job to make
12   sure she, that all the group know who was who --
13   what he's working on, all kind of stuff.
14       Q    Back to this quarterly report and yearly
15   report for Mr. Lange that you mentioned on
16   Salmonella --
17       A    Yes, sir.
18       Q    -- can you just describe to me briefly
19   the contents of the report?
20       A    We have a -- like a HACCP program in the
21   field, and when we have a positive in the whole
22   nation, they send that report through that lab

Page 17

1    and it end up to the Microbiology Division. We
2    gather, we mean that Microbiology Division used
3    to get that all positive serotypes because it's
4    like -- Salmonella bacteria, as you know, it's
5    like 3700 serotypes plus. And that report would
6    come to Microbiology Division. And now, in this
7    case, they gave it to ZDRSD, and then you were to
8    compile that -- the whole nation, where was that
9    Salmonella positive. That's like, as I said,
10   like 3700-plus serotype. Many. And then they
11   compile and make that quarterly report that last
12   year we had 11 positive, this year we did better
13   job, and it's only 7 positive. I'm just giving
14   hypothetical example.
15       Q    Okay.
16       A    Yes, sir. And that was -- again, they
17   told us that you guys have to do that, too.
18       Q    Okay. And about when -- was it around
19   2006 that you were assigned to work on that
20   report?
21       A    Yes, sir.
22       Q    Did you ever have to do anything with

## Capital Reporting Company

Page 18

1 descriptions of Salmonella serovars as part of

2 that report?

3    A  No.

4    Q  And as you said, there were over 3700 of

5 those?

6    A  Yes, sir.

7    Q  Do you ever remember a time while you

8 worked with Dr. Chowdhury that he was pulled off

9 from working on BSE issues?

10    A  He was working on BSE and then all of a

11 sudden Jean Harmon, she was the main person for

12 BSE from ZDRSD, then she had to leave, and

13 Dr. Parham give that job or project or assignment

14 to Ben Salamone. But before that, they all three

15 were working.

16    Q  Okay. I want to show you this.

17       MR. GOULD: So why don't we have this

18 marked.

19       (Plaintiff's Exhibit Number 2 was marked

20       for identification.)

21 BY MR. GOULD:

22    Q  Now, this is a midyear performance

Page 19

1 appraisal for you from July to December 2006, and

2 I'm really not interested in the results of the

3 appraisal so much, but just the description

4 that's in there of your work on the Salmonella

5 serotype. First of all, if we go to page five,

6 there are some bullet points there. Can you tell

7 me what those are?

8    A  Mission support or communication?

9    Q  Well, just a summary. Does that

10 basically describe the work that you did during

11 the particular period?

12    A  Yes, sir.

13    Q  Okay. If you look at the last page, see

14 that? It says there's a list of special

15 projects.

16    A  Yes, sir.

17    Q  Well, actually, let me go back a second.

18 Okay. This is split up into two different

19 quarters so that would be a three-month period?

20    A  Yes, sir.

21    Q  Okay. So we're talking about in the

22 second quarter you listed -- is this your

Page 20

1 listing?

2    A  Yes. It's my listing.

3    Q  Okay. Under Special Projects you listed

4 the Salmonella serotypes.

5    A  Right.

6    Q  Is that what you were talking about, the

7 report that you were doing for Mr. Lange?

8    A  Yes.

9    Q  Why did you list it under Special

10 Projects? Do you know?

11    A  I could have -- when you read that job

12 description, I could have put that in Special

13 Project and Research and Analysis both, but I put

14 it in Special Project because --

15    Q  In any case, that was also something that

16 you were assigned, right?

17    A  Yes, sir.

18    Q  Okay. And based on that you received an

19 "acceptable," correct?

20    A  Yes, sir.

21    Q  There is a mention here, if we go to -- I

22 think back on page five, Personal Contacts, for

Page 21

1 the first quarter.

2       MS. FIELDS: On page four?

3       MR. GOULD: Yes. I'm sorry. Page --

4 well --

5       THE WITNESS: Number four.

6 BY MR. GOULD:

7    Q  It's number four, but it's the fifth page

8 of the document, so same thing. It says you were

9 selected to give input on an EEO complaint. Was

10 that Dr. Chowdhury's EEO complaint?

11    A  I don't think so.

12    Q  Whose was it, if you recall?

13    A  Oh, my God, I'm getting old. It

14 definitely was not Dr. Chowdhur. It was

15 somebody else.

16    Q  Somebody else?

17    A  But I would recall maybe later on.

18 Otherwise, I would not have put there. It means

19 I have some record for that. I don't recall

20 right now.

21    Q  All right. But you know that it wasn't

22 Dr. Chowdhury?

Page 26

1  toxoplasmosis, can you tell me, do you think it's
2  an established meatborne problem?
3      A   It's not like a really big problem, but
4  yes, of course, this pathogen is a problem, too,
5  but not like a serious problem like Salmonella,
6  like BSE.  No.
7      Q   Have you ever heard of anything called
8  the NARMS project, N-A-R-M-S?
9      A   Yes.  I did hear and Dr. Neena was
10 working on that if I recall correctly.
11     Q   And what was that, if you know?
12     A   To be honest with you, I believe -- I'm
13 not sure. I believe they asked Dr. Chowdhury to
14 work on that.  To be honest, I don't know because
15 Dr. Neena was positively working.
16         MR. GOULD:  I don't think I have anything
17 further.  Thank you for coming.
18         THE WITNESS:  Thank you so much.
19         MS. FIELDS:  Thank you very much.
20         MR. GOULD:  Ms. Fields may have --
21         MS. FIELDS:  No questions.
22         MR. GOULD:  No questions from her.  Thank

Page 27

1  you.
2         (Signature waived.)
3         (Whereupon, at 9:55 a.m., the deposition
4         of MAQBOOL QURESHI was concluded.)
5
6                 * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 28

1          CERTIFICATE OF NOTARY PUBLIC
2      I, CONSTANCE HUNT RHODES, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in stenotypy and thereafter
8  reduced to typewriting under my direction; that
9  said deposition is a true record of the testimony
10 given by said witness; that I am neither counsel
11 for, related to, nor employed by any of the
12 parties to the action in which this deposition
13 was taken; and, further, that I am not a relative
14 or employee of any counsel or attorney employed
15 by the parties hereto, nor financially or
16 otherwise interested in the outcome of this
17 action.
18
19
           _____
           CONSTANCE HUNT RHODES
20         Notary Public in and for the
           District of Columbia
21
   My commission expires:
22 January 1, 2013

Capital Reporting Company

Page 28

1          CERTIFICATE OF NOTARY PUBLIC

2          I, CONSTANCE HUNT RHODES, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in stenotypy and thereafter

8    reduced to typewriting under my direction; that

9    said deposition is a true record of the testimony

10   given by said witness; that I am neither counsel

11   for, related to, nor employed by any of the

12   parties to the action in which this deposition

13   was taken; and, further, that I am not a relative

14   or employee of any counsel or attorney employed

15   by the parties hereto, nor financially or

16   otherwise interested in the outcome of this

17   action.

18

19                    *Constance Hunt Rhodes*
                   CONSTANCE HUNT RHODES
20                 Notary Public in and for the
                     District of Columbia
21
     My commission expires:
22   January 1, 2013

# EXHIBIT K

## Abstracts and/or Papers Prepared for Peer-Reviewed Journals    07/01/04 to present

√ = copy attached

Defendant Discovery Response
1028 of 1539

**Defendant Discovery Response 1029 of 1539**

| | | | | |
|---|---|---|---|---|
| | | | in clinical practice; Submitted to Journal of Food Protection (JFP), but rejected because it was not seen as new information | |
| 25 | Neena Anandaraman | *Salmonella* Incidence in Broilers: FSIS Update | Abstract for oral presentation at North Atlantic Poultry Health and Management Conference | May 12, 2004 |
| 26 | Neena Anandaraman | A Swine In-Plant Pilot Study in Preparation for Food Safety and Inspection Service Participation in the Collaboration in Animal Health, Food Safety and Epidemiology (CAHFSE) <br><br> Statement of Work | Statement of Work for procurement | July 22, 2004 |
| 27 | **N. Anandaraman**, P. J. Fedorka-Cray, B. Rose, J. Robens | Antimicrobial Salmonellae at Slaughter | Abstract for oral presentation at Society for Risk Analysis conference | December 6, 2004 |
| 28 | P. J. Fedorka-Cray, **N. Anandaraman**, D. A. Dargatz, M. Headrick | Perspective on Multi-Drug Resistant *Salmonella enterica* serotype Typhimurium DT104 from the Animal Arm of NARMS | Abstract for poster presentation at Annual Conference on Antimicrobial Resistance | June 27, 2005 |
| 29 ✓ | P. J. Fedorka-Cray, J. F. Robens, N. E. Wineland, **N. Anandaraman** | Food Safety on the Farm | Abstract for oral presentation at AVMA Annual Convention | July 16, 2005 |
| 30 ✓ | J. S. Bailey, P. J. Fedorka-Cray, D. A. Dargatz, N. **Anandaraman**, B. Rose, N. | *Salmonella* Serotypes from 1997-2003 NARMS Swine | Abstract for oral presentation at Safe Pork Symposium | September 6, 2005 |

**Defendant Discovery Response 1030 of 1539**

|  |  | E. Wineland, M. Headrick | Diagnostic, On-farm and Slaughter Samples |  |  |
|---|---|---|---|---|---|
| 31 | ✓ | P. J. Cray, R. R. Kraeling, N. E. Wineland, D. A. Dargatz, E. J. Bush, J.S. Bailey, S. R. Ladely, **N. Anandaraman** | Collaboration in Animal Health and Food Safety Epidemiolgoy | Abstract for oral presentation at Safe Pork Symposium | September 6, 2005 |
| 32 |  | Neena Anandaraman | Research papers on poultry "Chilling" and "Reprocessing" | Used as part of internal agency white paper | October 5, 2005 |
| 33 | ✓ | P. J. Fedorka-Cray, N. E. Wineland, N. Anandaraman, D. A. Dargatz, B. Rose, J. F. Robens | The National Antimicrobial Resistance Monitoring System | Abstract for oral presentation at the Managing Antimicrobial Resistance Conference | October 23, 2006 |
| 34 | ✓ | P. J. Fedorka-Cray, N. E. Wineland, **N. Anandaraman**, R. Kraeling, D. A. Dargatz, B. Rose, J. S. Bailey, J. F. Robens | Collaboration in Animal Health and Food Safety Epidemiology | Abstract for oral presentation at the Managing Antimicrobial Resistance Conference | October 23, 2006 |
| 35 |  | **Neena Anandaraman,** Patricia Bennett | Revisiting Young Turkey Carcass *Salmonella* Performance Standards | Internal agency white paper | February 16, 2006 |
| 36 |  | Neena Anandaraman | "Serotypes Profile of *Salmonella* Isolates from Meat and Poultry Products January 1998 through December 2004" | Posting on FSIS web site | February 17, 2006 |
| 37 |  | P. J. Fedorka-Cray, A. Douris, C. R. Jackson, **N. Anandaraman**, B. Rose | Characterization of *Salmonella enterica* serovar Agona Slaughter Isolates from the Animal Arm of the National Antimicrobial Resistance Monitoring System-Enteric Bacteria (NARMS): 1997 through 2003 | Abstract for poster presentation at International Conference on Emerging Infectious Diseases | March 19, 2006 |
| 38 |  | Neena Anandaraman | "Serotypes Profile of *Salmonella* Isolates from Meat and Poultry Products | Posting on FSIS web. site | April 14, 2006 |

| | | January 1998 through December 2005" | | |
|---|---|---|---|---|
| 39 | Neena Anandaraman | Food Safety and Inspection Service Sources of Veterinary Public Health Information and Data | Abstract for oral presentation at AVMA Convention | July 19, 2006 |
| 40 | J. S. Bailey, P. J. Fedorka-Cray, J. H. Haro, **N. Anandaraman**, B. Rose, B. Salamone | Antimicrobial resistance of *Salmonella* species from chicken, turkey, cattle, and swine slaughter isolates | Abstract for oral presentation at the National Foundation for Infectious Diseases Conference | June 26, 2006 |
| 41 ✓ | P. Fedorka-Cray, **N. Anandaraman**, J. Plumblee | Perspective on Antimicrobial Susceptibility of *Escherichia coli* Isolates Recovered from Poultry Carcass Rinsates as Part of the Animal Arm of NARMS | Abstract for oral presentation at the National Foundation for Infectious Diseases Conference | April 12, 2007 |
| 42 ✓ | P. J. Fedorka-Cray, J. Plumblee, **N. Anandaraman**, M. Englen, R. Meinersmann | Antimicrobial Resistance in *Campylobacter jejuni* and *Campylobacter coli* Isolated from Chicken Carcass Rinsates: Update from the Animal Arm of NARMS | Abstract for oral presentation at the International Association for Food Protection 94[th] Annual Meeting | April 12, 2007 |
| 43 | **N. Anandaraman**, P. Fedorka-Cray, B. Rose | Antimicrobial Resistance in *Salmonella* Species Isolated from Cattle Carcasses and Raw Ground Beef: NARMS 1997 through 2005 | Manuscript for publication; Target journal: Applied and Environmental Microbiology | In Progress: draft through 2003 completed, currently being updated with 2005 data |

# EXHIBIT L

1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4     - - - - - - - - - - - - - - -X

       KHURSHED A. CHOWDHURY          :

 5                                     :

            Plaintiff,                 :

 6     vs.                            :   C.A. No.:

                                       :   1:07cv997 (RCL)

 7     ED SCHAFER, SECRETARY,         :

       U.S. DEPARTMENT OF AGRICULTURE :

 8                                     :

            Defendant.                 :

 9     - - - - - - - - - - - - - - -X

10                      Washington, D.C.

11             Wednesday, April 16, 2008

12

13     Videotape deposition of:

14                   ALICE THALER

15     called for oral examination by counsel for

16     Plaintiff, pursuant to notice, at the offices of

17     Capital Reporting Company, 1821 Jefferson Place,

18     N.W., Washington, D.C., before Jodi Scheffel, a

19     Notary Public in and for the District of Columbia,

20     beginning at 9:33 a.m., when were present on behalf

21     of the parties:

22
```

1    what you're saying; is it?

2        A    I said he chose the topic for the paper.

3    She clearly assigned to everybody on -- in the

4    branch to develop a topic and write a paper on it.

5        Q    Do you remember, looking back now at any

6    of the other people there, what topics they were

7    assigned?

8        A    Not off the top of my head.

9        Q    Was this paper on BSE that you mentioned

10   that Dr. Harman did, was that -- was that something

11   that -- you seem to recall that.  Was that her

12   special assignment?

13       A    Well, that was her choice when she -- to

14   have the kind of research paper they were asked to

15   write, but hers spanned more than a year because

16   hers was a very long involved project.  So that was

17   not assigned at the same time per se, but everybody

18   in the branch was expected to have a project like

19   this to be working on.

20       Q    And that was the one -- the project that

21   she got?

22       A    She had been well established as the BSE

1    expert and she had been working on it for a long

2    time.

3        Q    So that's a yes?

4        A    When you say, that's the one she got, I'm

5    not sure what you mean by that.  It was not

6    assigned to her.  That was the topic she was

7    working on.

8        Q    Well, I thought you told me that each

9    person was assigned to write one of these papers,

10   not for peer --

11       A    Right.

12       Q    -- publication but for recommendation for

13   peer publication?

14       A    No, I didn't say that.

15       Q    Well, that's what I thought you were

16   saying so maybe I misunderstood.  That's what

17   Mr. Chowdhury was assigned to do; isn't that right?

18       A    No, it was not.  That's not what I said.

19       Q    All right.  Well, you said --

20       A    You keep restating it in a different way

21   and it's not accurate.  I will try it again.

22       Q    Well, I thought you said --

1       A    Shall I try again?

2       Q    No.  You need to respond to my questions.

3       A    All right.

4       Q    I thought you said that Dr. Chowdhury was

5   assigned this paper for the purpose of peer review

6   quality so that you could recommend the paper to a

7   peer review journal --

8       A    No.

9       Q    -- that is one of the purposes --

10      A    No, that is not what I said.

11      Q    Okay.  So it did not have to be of the

12  quality to recommend to a peer review journal?

13      A    Well, you're using different words and I

14  wouldn't say it that way.  It had to be of the

15  quality that if it were submitted to a journal,

16  that it would likely be accepted for publication

17  without major revision.  But that's different from

18  the way you stated it.

19      Q    All right.  Well, we'll take the way that

20  you just stated it.  Was Dr. Harman's paper that

21  kind of paper as well?

22      A    Yes.

```
 1          Q    Do you remember preparing this?

 2          A    Yes.

 3          Q    Is that your signature on here?

 4          A    As the reviewer, yes.

 5          Q    Okay.  Tell me why this was prepared.

 6          A    Every employee is expected to be under

 7     standards so that when we finish out our rating

 8     period we start standards for the next rating

 9     period.

10          Q    But you hadn't finished the rating period

11     yet, your appraisal for Dr. Chowdhury, by the time

12     that you filled this out, isn't that right, for the

13     previous appraisal year?

14          A    We extended his previous appraisal year

15     to include the performance improvement period.

16          Q    Well -- but your appraisal was due for --

17     appraisal period 7/1/04 to 6/30/05 was due no later

18     than July 31st, isn't that right, of '05?

19          A    They typically give us until November to

20     finish paperwork but it's -- you rate for the

21     performance through the end of the rating period.

22          Q    Well, in any case you didn't tell
```

1    period.

2         Q    Well, you reviewed Dr. Chowdhury's

3    assignments.

4         A    They were not significant assignments.

5         Q    But they were numerous though?

6         A    They were the -- you could group those.

7    Tonsils was one topic.  The fact that you answer a

8    question on tonsils 20 times doesn't make it 20

9    projects.

10        Q    Now, I think you said that the BSE expert

11   was Dr. Harman; is that right?

12        A    Jane Harman.

13        Q    Jane Harman, okay.  How many important

14   assignments did she have on BSE during 2004, 2005

15   evaluation period; do you know?

16        A    There was virtually -- there was very

17   little assignment during that time in the Agency.

18   Risk Assessment was being worked on.  Most of the

19   BSE work was being done in the Risk Assessment

20   Division.

21        Q    So she probably had none during that

22   period?

1       A    Less.  She was still supporting the Risk

2    Assessment.

3       Q    In fact, she was working on that

4    important paper for preparation for possible peer

5    review publication; wasn't she?

6       A    I'd have to review dates.  I don't recall

7    when she left.

8       Q    Well, you said that she worked on that

9    for about a year, I think.

10      A    Right, but I don't recall which year.

11      Q    All right.  But it could have been that

12   year?

13      A    I can't say.

14      Q    So you really don't know what she was

15   doing that year then is what you're telling me.

16   Well, you know she wasn't working on mad cow.  You

17   know, at some point, she had produced this

18   excellent publication but you don't know what else

19   she was really doing during that year.  That's

20   what you're telling me?

21      A    I would first have to have information to

22   remind myself what you were talking about.  I'm not

# EXHIBIT M

RPP #1

OPHS

| USDA-FSIS PERFORMANCE APPRAISAL | INSTRUCTIONS: Refer to FSIS Directive 4430.1 Rev. 5 | 1. APPRAISAL PERIOD From: 07/01/06 To: 06/30/07 |
|---|---|---|

2. NAME (Last, First, Middle Initial)  QURESHI, MAQBOOL H

3. SOCIAL SECURITY NO.  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

4. OFFICIAL POSITION TITLE  VETNRY MEDCL OFFCR

5. PAY PLAN / OCCUP. SERIES / GRADE / STEP  GS-0701-13/06

6. ORGANIZATION  37 09 45 0010 00

7. DUTY STATION  WASHINGTON, DC

8. STANDARD JOB #  0

9. FUNDING UNIT NO.

10. AGENCY USE

| 11. COMPLETE AT THE BEGINNING OF APPRAISAL PERIOD PERFORMANCE ELEMENTS | | 16. COMPLETE AT THE END OF APPRAISAL PERIOD APPRAISAL UNITS (Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.) | | |
|---|---|---|---|---|
| Check appropriate performance elements for this rating cycle. See descriptions on reverse. Sign blocks 12, 13 & 14.  Check box if element is critical | | EXCEEDS Fully Successful | MEETS Fully Successful | DOES NOT MEET Fully Successful |
| ✓ | 1) Mission Support (Mandatory critical element for all employees) X | | 2 | |
| ✓ | 2) Communications X | | | |
| | 3) Supervision (Mandatory critical element for supervisors) | | | |
| | 4) Program Management | | | |
| ✓ | 5) Special Projects | 1 | | |
| ✓ | 6) Research and Analysis X | | 2 | |
| | 7) Customer Service | | | |
| | 8) Equal Opportunity & Civil Rights (Mandatory critical element for supervisors) | | | |
| ✓ | 9) Personal Contacts - EO/CR (Mandatory element for nonsupervisory employees) X | 2 | | |
| | 10) Resource Management | | | |
| | 11) Individual Contributions to the Team | | | |
| | 12) | | | |
| | 13) | | | |
| | 14) | | | |
| At the end of the appraisal period, enter TOTAL APPRAISAL UNITS for each column ▶ | EXCEEDS 3 | MEETS 6 | DOES NOT MEET | |

| 12. EMPLOYEE SIGNATURE  M.H QurShi | DATE 07/13/2006 |
|---|---|
| 13. SUPERVISOR'S SIGNATURE  Delilu R. Parham | DATE 07/13/2006 |
| 14. REVIEWER'S SIGNATURE | DATE 8/7/06 |

17. RATING / DECISION TABLE (check the correct rating)

| OUTSTANDING ☐ | All appraisal units are at "EXCEEDS" |
|---|---|
| SUPERIOR ☐ | More appraisal units are at "EXCEEDS" than al "MEETS FULLY SUCCESSFUL" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL ✓ | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE ☐ | One or more critical elements are appraised at "DOES NOT MEET" |

15. PROGRESS REVIEW (Initial & date to certify progress review discussions took place)

| EMPLOYEE 01/17/2007 M.H.Q | SUPERVISOR 1/13/07 Delila Parham | EMPLOYEE | SUPERVISOR |
|---|---|---|---|

18. EMPLOYEE (Check appropriate box)

| | | YES | NO |
|---|---|---|---|
| I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction | | ✓ YES | ☐ NO |
| My official position description adequately describes my duties and responsibilities | | ✓ YES | ☐ NO |
| My supervisor has discussed my training needs with me | | ✓ YES | ☐ NO |
| My supervisor has discussed this appraisal with me | | ✓ YES | ☐ NO |

| 19. EMPLOYEE'S SIGNATURE | DATE 7/30/07 | IF EMPLOYEE DID NOT SIGN, STATE REASON. See attached | 21. REVIEWERS SIGNATURE | DATE 7/30/07 |
|---|---|---|---|---|
| 20. SUPERVISOR'S SIGNATURE  Delila R. Parham | DATE 7/30/07 | | | |

FSIS FORM 4430-10 (04/12/2006)    REPLACES FSIS FORM 4430-10 (07/20/2004), WHICH IS OBSOLETE.

Dr. Maqbool Qureshi
Performance Appraisal: 7/01/06 – 6/30/07
Rating: Fully Successful


1. Mission Support (Critical):  Fully Successful

Standard: Has demonstrated a basic understanding of mission and organizational goals and priorities that support or directly protected the public health from foodborne hazards.  Assignments were completed in accordance with applicable agency regulations, policies, procedures, and guidelines.  Work product was responsive to the supervisor's and the organization's stated priorities and requirements.  Adhered to safety and occupational health practices and procedures and maintained a safe and healthful work environment (where applicable).

Exceeds Standard: The assigned specific mission support goals and objectives were significantly exceeded in terms of quality, timeliness, cost effectiveness, customer satisfaction, or other measurable result.  Virtually all applicable quantitative or qualitative criteria were exceeded.

Justification:  None required.

2. Communications (Critical): Fully Successful

Standard: Oral and written communications were clear, correct, timely, and presented in an understandable manner.  Supervisor and co-workers were kept informed of issues and problems when necessary.  Information and guidance provided was timely and correct.

Exceeds Standard:  Employee (1) was skilled in communicating effectively with diverse audiences, including people with technical and non-technical backgrounds and (2) has demonstrated a full range of communication skills, including such advanced techniques as preventing and resolving conflicts, influencing parties to take appropriate action, interpreting non-verbal communication, and successfully negotiating agreements and partnerships.

Justification:  None required.

3. Special Projects (Non-Critical): Exceeds Fully Successful

Standard: Special projects were completed on time in a competent, accurate, and thorough manner.  Completed projects were compiled in accordance with regulations and procedures. Special projects were completed independently or reflected research and collaboration with others as required.

Exceeds Standard:  Employee anticipated and exceeded the needs of the project's internal or external customers in terms of project quality, timeliness, cost-effectiveness, or overall success. Employee regularly adjusted project priorities and schedules as appropriate, especially as resources changed or as the project was integrated with related programs and activities.  Because of the employee's outstanding efforts, the project had greater than expected positive impact on the organization or its customers.

Justification:  During this rating period, Dr. Qureshi has been involved in short term projects such as quick review of Agency materials including directives, notices, and video materials – most of which he has reviewed and provided very timely responses.  A special project of note was his work with the Microbiology Division (MD).  Because of his experience in large meat slaughter plants, Dr. Qureshi was asked to work on a special OPHS team put together by Dr. Uday Dessai, Director, MD, to provide a response to OFO regarding the safety of cattle carcasses that had been exposed to heavy plant condensation.  The team's quick work in reviewing the situation and providing a response to OFO prompted the Deputy Assistant Administrator, OFO, to send notes of appreciation to all team members.

4. Research and Analysis (Critical): Fully Successful

Dr. Qureshi: Performance Appraisal for 7/01/06 – 6/30/07

Standard: Researched and analyzed issues thoroughly, accurately, and in a timely manner, probing for detail, as appropriate. Employee makes use of available reference sources (e.g. USDA manual or applicable law or regulations). Recommendations or analysis provided were based on available guidance were generally accepted without major revision.

Exceeds Standard: Employee (1) Demonstrated such thorough, logical, and professional research and analysis that employee's methods, processes, and work products serve as an example to others, (2) Displayed persistence in tracking down hard-to-obtain information, (3) Adapted conventional research and analysis techniques to new and changing situations, using appropriate technology, policies, or science in developing recommendations, conclusions, determinations, and final reports, and (4) Made effective recommendations for solving problems beyond immediate scope of responsibility.

Justification: None required.

5. Personal Contacts – EO/CR (Mandatory critical for all non-supervisory personnel.): Exceeds

Standard: Projected a positive and professional image of USDA. Performed all duties in a manner which consistently demonstrated fairness, cooperation, and respect toward coworkers, customer, and all others in the performance of official business. Complied with EO/CR guidelines and policies.

Exceeds Standard: Employee (1) Demonstrated such a professional image and considerate demeanor towards others that the employee's manner of establishing, conducting, and maintaining personal contacts serves as an example to others, (2) Adapted existing communication style and techniques to new and changing situations and to diverse individuals and groups, and (3) Seized opportunities to coach and developed less skilled coworkers in effective personal contacts, EO/CR.

Justification: Dr. Qureshi usually presents himself in a professional manner. He is definitely a "people person" and is well liked by his colleagues. Being among the few in OPHS who has field experience, he is sought out by others for his knowledge and expertise on field-related issues, which he willingly shares. He was name-requested by the Microbiology Division (MD) Director to assist the MD by providing the field perspective on an issue. As a result of his outstanding work with the team, he was commended by the Deputy Assistant Administrator, OFO. Dr. Qureshi has complied with all applicable EO/CR guidelines and policies, and participated in and sometimes assisted in preparation for special emphasis programs at the Department, Agency, and/or local level including programs during Asian Pacific Islander month and the Combined Federal Campaign. He is active in several employee organizations sanctioned by the Agency.

2

RFP #1

Attachment: First Quarter Accomplishment Report Submitted by Dr. Qureshi

**Mission Support:**
- Supplied in-depth comments and suggestions on directive 6000.1.
- I completed a Federal Employee Dependent Care Survey. (07/03/2006)
- An active member of the Risk-based Inspection System (RBIS) focus group.
- Participated in CWD Decontamination Working Group meeting. (07/18/2006)
- Provided comments on Trichnella, Regulation 318.10. (06/08/2006)
- The Residue Branch asked me a question in regards to age, size and hormones in veal/calves slaughter at the plants. (07/10/2006)
- Mandatory annual security awareness training. (07/19/2006)
- I successfully completed a briefing techniques course to enhance my presentation skills.(08/17/2006)
- I worked closely with interns and helped educate them on the OFO role in FSIS.
- Worked extensively with the Combined Federal Campaign Team as the Organization of Professional Employees of the US Department of Agriculture (OPEDA) representative and received an award acknowledging commitment to program efforts.
- Provided detailed comments to the Residue Branch regarding FAST testing, in the context of disabled cattle and humane slaughter.(Sept.4/2006)
- Provided updated eADRS definitions to HHSD.(08/15/2006)
- Since coming from OFO, I have often been consulted about field related meat and poultry inspection questions on a regular basis.
- Participated in the FSIS Program Area Competency Model and completed survey.

**Communication:**
- I am part of the USDA Toastmasters Club communication and leadership program.
- I successfully completed a briefing techniques course to enhance my presentation skills.

**Special Projects:**
- I have completed work on Evaluation of ADRSD Categories for Zoonotic Implications.
- Supplied in-depth comments on draft FSIS NOTICE Export Certification OF Imported Natural Casing. (07/14/2006)
- I have continued worked on Foreign Animal Diseases. (FADs)
- I have worked on an assessment of the Risk-based Inspection System (RBIS). I have also provided a detailed critique and recommendation for improving the program.
- Participated in the Docket Committee to develop a proposed rule to add yak and other species to the list of exotic animals that receive voluntary inspection under the Regulatory Provisions of 9 CFR Part 352.
- Mark of inspection docket committee OPPED. (In Progress)

**Personal Contacts –ER/CR**
- I was selected to give my input on an EEO complaint filed by a USDA employee and was asked to mail a report. (08/28/2006)

RFP #1

Attachment: Second Quarter Accomplishment Report Submitted by Dr. Qureshi

**Mission Support:**
- Attended OPHS Seminar: "Prevalence of Selected Food-Borne Pathogens and Indicator Organisms in Domestic Beef" (December 12, 2006)
- Attended OPHS Seminar "Process Control in Slaughter Establishments" (November 16, 2006)
- CWD Decontamination Working Group Meeting
- Reviewed and provided detailed Comments on Draft FSIS Notice: 'Interim Program for Voluntary Inspection and Certification of Natural Casings"
- Acting Branch Chief.
- Reviewed and provided detailed comments on the Video Identification, Removal and Disposal of SRMs (November 24, 2006)
- Completed Mandatory annual security awareness training.
- Attended OPHS Seminar: "Mass Euthanasia and Disposal Option for Catastrophic Poultry Disease"
- Attended OPHS Seminar: "Campylobacter Infection and AIDS-The Correlation Between Two Illnesses"
- Completed Mandatory Training Required by the No FEAR ACT ( November 17, 2006)
- Dr. Jay's Inquiry: Regarding swine slaughter, specifically body weight and liver size/weight.

**Communication:**
- As Acting Branch Chief, I was often called upon to communicate with internal and external agency employees to accomplish various relevant matters and tasks.
- On-Line Competency Survey-OPM (Oct.5th.2006)
- Validation Survey (Oct.9th,2006)
- FSIS-Competency Study: Phase # 2 Focus Group (Oct.5th2206)
- Web Search

RFP #1

**Special Projects:**

- ADRS-Pathology Evaluation Completed
- Foreign Animal Diseases FADs Completed
- Salmonella Serotypes (In-Progress)
- Yak ( Docket Committee) and other species to the list of exotic animals that receive voluntary inspection ( OPPED) (In Progress)
- Mark of inspection docket committee (OPPED) (In Progress)

**Research & Analysis:**

- Dr. Jay's Inquiry: Regarding swine slaughter, specifically body weight and liver size/weight.
- Dr. Cindy Deyrup's inquiry: Regarding residue in the field.
- Dr. Salamone's inquiry: Regarding post-mortem inspection, collection of brain sample for BSE & EIAO's role in the field.

**Personal Contacts –ER/CR**

- USDA Toastmaster Club- Communication and leadership program.
- Attended Seminar: Organization of Professional Employees of the US Department of Agriculture (November 13, 2006)
- Actively Participated in the CFC campaign for OPEDA and OSAAA (Assisted in the luncheon to benefit the CFC campaign)
- Actively participated in agency activities which provide a friendly constructive and diverse working environment.
- Attending seminars and lectures pertaining to EEO issues, such as sexual harassment, equal opportunity employee rights, civil right goals and discrimination complaint process.
- Enhancing the knowledge through reading journal articles and books pertaining to sexual harassment, equal opportunity employee rights, civil rights goals and discrimination complaint process.
- Efforts are made to maintain a friendly work environment free from race, sex, cultural or disability bias.
- Provided prompt support and timely response to EEO issues.

# EXHIBIT N

1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4      - - - - - - - - - - - - - -X

        KHURSHED A. CHOWDHURY            :

 5                                       :

             Plaintiff,                  :

 6      vs.                              :   C.A. No.:

                                         :   1:07cv997 (RCL)

 7      ED SCHAFER, SECRETARY,           :

        U.S. DEPARTMENT OF AGRICULTURE   :

 8                                       :

             Defendant.                  :

 9      - - - - - - - - - - - - - -X

10                          Washington, D.C.

11                      Friday, May 2, 2008

12

13      Deposition of:

14                      BHABANI DEY

15      called for oral examination by counsel for

16      Plaintiff, pursuant to notice, at the U.S

17      Attorney's Office, 501 Third Street, N.W.,

18      Fourth Floor, Washington, D.C., before

19      Jodi Scheffel, a Notary Public in and for the

20      District of Columbia, beginning at 9:33 a.m.,

21      when were present on behalf of the parties:

22
```

## Capital Reporting Company

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - -X
KHURSHED A. CHOWDHURY         :
                             :
    Plaintiff,               :
vs.                          :  C.A. No.:
                             :  1:07cv997 (RCL)
ED SCHAFER, SECRETARY,        :
U.S. DEPARTMENT OF AGRICULTURE :
                             :
    Defendant.               :
- - - - - - - - - - - - - - -X
```

Washington, D.C.

Friday, May 2, 2008

Deposition of:

BHABANI DEY

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the U.S

Attorney's Office, 501 Third Street, N.W.,

Fourth Floor, Washington, D.C., before

Jodi Scheffel, a Notary Public in and for the

District of Columbia, beginning at 9:33 a.m.,

when were present on behalf of the parties:

# Capital Reporting Company

Page 2

```
 1              A P P E A R A N C E S
 2   On behalf of the Plaintiff:
 3      JONATHAN GOULD, ESQUIRE
        Kestell & Associates
 4      1012 14th Street, N.W.
        Suite 630
 5      Washington, D.C. 20005
        (202) 347-0990
 6
 7   On behalf of the Defendant:
 8      RHONDA FIELDS
        ASSISTANT UNITED STATES ATTORNEY
 9      Judiciary Center Building
        555 4th Street, N.W.
10      Civil Division
        Washington, D.C. 20530
11      (202) 514-6970
12
     Also Present:  Robert Hardin, Esquire
13                   Khurshed Chowdhury
14                   * * * * *
15
16
17
18
19
20
21
22
```

Page 3

```
 1              C O N T E N T S
 2   EXAMINATION BY:                    PAGE
 3   Counsel for Plaintiff               4
 4
 5              E X H I B I T S
 6   DEY DEPOSITION EXHIBITS:
 7   1 FSIS Organizational Chart         6
       2 07/08/05 E-mail
 8       & Attachements                 27
 9
10
11
12
13   (*Exhibits attached to transcript.)
14
15
16
17
18
19
20
21
22
```

Page 4

```
 1              P R O C E E D I N G S
 2   Whereupon,
 3              BHABANI DEY,
 4   called as a witness, and having been first duly
 5   sworn, was examined and testified as follows:
 6       EXAMINATION BY COUNSEL FOR PLAINTIFF
 7   BY MR. GOULD:
 8       Q   Good morning, Mr. Dey.  I'm Jonathan
 9   Gould.  I represent Khurshed Chowdhury in a case
10   that he's brought against the U.S. Department of
11   Agriculture.  I'm going to be asking you some
12   questions this morning.  We are transcribing your
13   testimony.  So if you would please respond audibly
14   because we need to get that down for the court
15   reporter and transcribed.  It shouldn't take too
16   long so you shouldn't need a break or anything.  If
17   you do for any reason, please let me know.  If you
18   don't understand a question that I ask, also please
19   let me know that and I'll try to rephrase it --
20       A   Before you go --
21       Q   Yes.
22       A   -- may I ask you a question?
```

Page 5

```
 1       Q   Yes, you surely may.
 2       A   How am I involved in this litigation case
 3   or dispute?
 4       Q   Well, we are going to find out today.
 5       A   Oh, okay, thank you.
 6       Q   In fact, my first question to you is, you
 7   were subpoenaed here today, right?
 8       A   Yes.
 9       Q   You are now retired from the USDA?
10       A   Yes.
11       Q   What was your last position that you
12   held?
13       A   I was a Division Director of the Zoonoses
14   and Residue Surveillance Branch as well I was the
15   Special Assistant of the Associate Administrator
16   mostly looking after Avian Influenza projects of
17   work, the chicken disease that's going on all over
18   the world, I guess.
19       MR. GOULD:  I'm going to show you an
20   organization chart.  It's one I picked out.  It's
21   dated 2005.  It sort of orients us to the time
22   period.  We'll have that marked as Dey 1.
```

# Capital Reporting Company

Page 6

```
 1          (Dey Exhibit No. 1 was
 2          marked for identification.)
 3   BY MR. GOULD:
 4      Q   Now, is your job, the one that you last
 5   held, listed on that organization chart, Dey 1?
 6   Let me withdraw that.  That's not the best
 7   question.  Is the section that you headed listed on
 8   the organization chart in Dey 1?
 9      A   Yes.
10      Q   Where would that be?
11      A   This one is Zoonotic Diseases and
12   Residue Surveillance Division.  It's to the extreme
13   left.
14      Q   Right.  And you were the Director of
15   that?
16      A   As well as I was assigned to the Office
17   of Public Health and Science as Associate
18   Administrator and as a Special Assistant.  That was
19   my real position.  This one they gave me to take
20   care of temporarily.
21      Q   I see.  Who did you report to in both
22   positions?
```

Page 7

```
 1      A   One I reported to Dr. Goldman as a
 2   Special Assistant.  Every week I was reporting to
 3   him what was happening with the Avian Influenza,
 4   and then later on I had reported to Dr. Alice
 5   Thaler for this division.
 6      Q   Okay.  What years are we talking about
 7   when you were first reporting --
 8      A   2006 through 2008.
 9      Q   This is a case involving Dr. Chowdhury's
10   race, nationality and age.  I do need to get, for
11   the record, the same kinds of information from you.
12      A   Okay.
13      Q   So could I have your national origin,
14   please?
15      A   I'm from India.
16      Q   And your ethnic background in India,
17   religious background?
18      A   I'm a Hindu.
19      Q   Could we have your age, please?
20      A   Yes, I'm 72.
21      Q   How long were you employed by the USDA?
22      A   I retired after 30 years.
```

Page 8

```
 1      Q   Could we have your educational
 2   background?
 3      A   Sure.  I have a DVM, Doctor of Veterinary
 4   Medicine, from India; then I went to school in
 5   England; I had a diploma in applied microbiology
 6   from City College in London; then I had a
 7   management short course with the Metropolitan
 8   College in London; then I came to the United
 9   States.  I got a master's in medical microbiology
10   from the school of Medicine, University of Missouri
11   Columbia; from the same University I had a master's
12   in public health, from the Veterinary school.  And
13   from the same university I had a Ph.D. in 1976 in
14   microbiology -- actually, it was food science;
15   major was microbiology and minor was nutrition.
16      Q   What position were you in in 2004, 2005
17   with the USDA; do you recall?
18      A   I was with the branch -- it's not listed
19   here -- yes, it is listed here.  I was in the
20   Animal and Egg Production Branch but it was for a
21   very short period.  I was with the Associate
22   Administrator as a Special Assistant.  That's in
```

Page 9

```
 1   2005 when the Avian Influenza problem came in.
 2      Q   Reporting to Dr. Goldman?
 3      A   Yes.
 4      Q   Have you ever been called to testify in a
 5   court case before?
 6      A   No.
 7      Q   Have you ever testified in a deposition
 8   like this before?
 9      A   No.  No.
10      Q   Now, did you come in contact at any point
11   in time with Dr. Chowdhury while you worked at the
12   USDA?
13      A   Yes.  Sure.  I know -- you see, the FSIS
14   had a lab in Beltsville.  It was a long time ago.
15   The lab moved to Athens, Georgia.  During that time
16   it was called Science.  Under Science, which is
17   Public Health here, this whole thing, was in
18   Beltsville.  He was in pathology and I was in
19   epidemiology.  Since then I knew him, but he was in
20   a different building and I was in a different but
21   in the same division.  Then, of course, when I
22   moved downtown, I heard he was downtown.  Socially,
```

| Page 10 |
|---|

1  once or twice, we'd meet in the hallway and say
2  hello. That's it.
3      Q   What about when you were in the Animal
4  and Egg Production, the Special Assistant position,
5  dealing with those issues that you just indicated;
6  did you have any contact with Dr. Chowdhury while
7  he was in the Zoonoses Branch?
8      A   Not for any reason other than he once
9  came and asked me about some microbiology
10  questions, you know, particularly I might say
11  serology because he knew I was a microbiologist.
12  So I helped him to look up some books and some
13  questions he had and I answered.
14      Q   Do you remember what project he was
15  assigned at --
16      A   I think it was Salmonella, if I'm not
17  mistaken.
18      Q   Did it involve certain serotypes.
19  poultry serotypes of Salmonella?
20      A   That's right.
21      Q   Why did he need your help?
22      A   Because he was not a microbiologist.

| Page 11 |
|---|

1  Again. serotype. particularly is called Lancefield.
2  Dr. Lancefield came out with what's called
3  serotype. Serotype is a thing to differentiate
4  between species any organisms of the same species.
5  Serotype. for the ordinary microbiologist. is too
6  difficult. Mostly it is done by molecular
7  microbiologists because there are two types of
8  antigens that comes out of an organism. Should I
9  go on and explain it to you?
10      Q   Sure. Go ahead.
11      A   One is called the O antigen. It's called
12  somatic. the cell antigen. The other is called H
13  antigen or haulk. It comes from the German word.
14  haulk. h-a-u-l-k. It's called flagella antigen.
15  Antigens are the proteins that give a typical
16  characteristic of an organism. By identifying all
17  of these antigens, either on the cell wall or in
18  flagella. one can differentiate between organisms.
19  They can be used for pathogenicity; they can be
20  used for serotyping: isolation and everything.
21      Q   Now. were you familiar with -- was OPHS
22  dealing with Salmonella serotypes at this

| Page 12 |
|---|

1  particular point in time between or anytime between
2  2004 to --
3      A   I'm not familiar with whether they were
4  because I'm not a microbiologist. I don't think
5  they were doing this serotyping. If I remember
6  correctly, they were sending the Salmonella
7  isolates to Ames. Iowa.
8      Q   You say this is a subject that would
9  mostly be dealt with by the microbiology division
10  listed on Dey 1?
11      A   I presume so. I mean, this is mostly --
12  you see, serology work is mostly lab work to
13  produce an antigen -- an antibody. In order to
14  produce an antibody, you have to inject a small lab
15  animal. you know, to produce an antibody to detect
16  an organism. It is mostly lab work that's
17  involved.
18      Q   Did you ever see the final product that
19  Dr. Chowdhury produced?
20      A   No.
21      Q   Did you know anything about any
22  statistics that Mr. Lange was keeping on Salmonella

| Page 13 |
|---|

1  Serotypes around this time frame?
2      A   Well. when I was a Division Director.
3  even before or during that time. he used to
4  call for some data. One of the branches. they
5  would give him some kind of data. He was
6  interested. I was not familiar with it.
7      Q   This assignment that Dr. Chowdhury --
8  that you remember reviewing with him -- while you
9  were the Director of Zoonotic Diseases. did you
10  ever give such an assignment to any of the people
11  who worked under you?
12      A   No. You mean. particularly the serology
13  type?
14      Q   Yes.
15      A   No. You see. the responsibility as a
16  Division Director is not to get involved in the
17  branch. It's the management of the branch and
18  overseeing the projects that are going on. It's
19  the responsibility of the branch chief to look into
20  FSIS requirements and then accordingly bring the
21  projects to help FSIS operations. So the Director
22  is there to conquer and to guide. not to bring any

5 (Pages 14 to 17)

Page 14

1  new project unless an Associate Administrator wants
2  something special, then, of course, the Director
3  gets involved. I do not remember giving any such
4  project to anybody.
5      Q   So you don't remember any of the people
6  above you, like Dr. Goldman or Mr. Lange, wanting
7  anything special while you were the Director?
8      A   No. I said Dr. -- you see, some of this
9  data, the Salmonella data, these isolates were sent
10 to ARS, that's a service in Athens, Georgia. The
11 data used to come to the Zoonotic Disease Branch
12 and they would clarify everything. They would keep
13 the data. Every once in a while, Loren Lange would
14 ask for that data and Loren Lange would get it.
15     Q   Were you -- have you ever done any peer
16 review publications yourself?
17     A   A number of them, yes.
18     Q   How many do you think?
19     A   Thirty, 40, maybe.
20     Q   Did you do any while you were at USDA?
21     A   Yes, I did.
22     Q   Did you do any from original research?

Page 15

1      A   Yes. But, you see, this is something --
2  whatever I learned, research doing from a lab and
3  research doing from a book are two different
4  things.
5      Q   Right. I was going to get into that.
6      A   It is because of my own interest --
7  before I came to the USDA, I published with the
8  university and some of my microbiology work is
9  being marketed now. I always had interested of
10 doing something. I always had the interest of
11 doing something. Low and behold, I got a chance of
12 working in a lab when I started.
13         I just came out of the university where I
14 was doing antibody research work in animals. So I
15 continued that. Some of this old data I published.
16 Then I came to Beltsville. There also, because of
17 my background and everything, I published a big
18 monograph, which took me five years to write
19 because it was book research, you know, you have to
20 read literature, you have to read books. It's
21 paper research. Paper research takes more time
22 because you start from the beginning. Well, you

Page 16

1  are doing the research yourself. You know what you
2  are doing. You have the background.
3      Q   Would you classify -- this big monograph
4  that you described, would that be a literature
5  review-type, peer review, publication?
6      A   Of course, it is.
7      Q   So this big monograph, you said, took you
8  five years to do?
9      A   Yes, because I was working in
10 epidemiology. Even then it was a difficult
11 project.
12     Q   How many drafts did it go through?
13     A   Six, seven, eight drafts.
14     Q   Who reviewed the drafts; not the people,
15 but generally what kinds of people reviewed them?
16     A   One guy Dawson from Australia; Meizner
17 from Germany; Dr. Paul Ranine from Utah, who's the
18 godfather of atypical mycobacteria. So my paper
19 was sent to different people all over the world.
20     Q   I see. That's one of the larger ones
21 that you've done?
22     A   Yes.

Page 17

1      Q   How about a smaller one; do you remember
2  any of those, a short one?
3      A   A paper review?
4      Q   Yes; literature review, peer review
5  publication.
6      A   No. The short ones, I haven't done it.
7  Mostly it's research that I had done.
8      Q   Literature review research or --
9      A   Let me take that back. If you call data
10 review, which the data we already had, for
11 instance, fast data, cast data, which the USDA had.
12 I took it out and on my own I analyzed. Again, in
13 fact, I was involved in the lab so I had a
14 background, but I knew what data to get. Even then
15 it took me. I would say, a year and a half to two
16 before I could publish this peer review journal.
17 You see, when you are talking about a publication,
18 you must clarify what you mean by "publication".
19     Q   I mean, an attempt to get an article in a
20 form that could be approved for a peer review
21 publication. That's what I'm talking about.
22 That's the goal of --

## Capital Reporting Company

Page 18

1    A    You see, publication in USDA sense, they
2    put it up on the internet. I have done it. If you
3    go and give a lecture somewhere, your lecture is up
4    on the internet; here is Dr. Dey from the USDA.
5    That is not a publication.
6        Q    Correct. I'm not talking about that.
7        A    A publication is a peer review journal
8    seen by four, five --
9        Q    Correct.
10       A    -- eminent scientists. That is what I'm
11   saying.
12       Q    The shortest one, it took about one to
13   two years?
14       A    Yes.
15       Q    What positions were you in at USDA when
16   you did these peer review publications?
17       A    Veterinary Medical Officer.
18       Q    Can you give me an idea what decade this
19   was in?
20       A    I published until 1994 -- no, 2004 --
21   yes, 2003, 2004, yes.
22       Q    Do you remember who your Supervisor was

Page 19

1    then?
2        A    Actually, in my case it's very funny in
3    the sense -- Alice Thaler was my Supervisor, but
4    she didn't know much about what I was trying to do
5    or what I was writing about. For instance, I was
6    writing about a small screen test by which you can
7    screen many, many animals to find out if those
8    animals have antibodies in their tissue. So this
9    work I have done in the lab, you know. When I came
10   out of the lab downtown, then I put the procedure,
11   as well as the data, separately and published.
12   So, yes, Alice Thaler was my supervisor but I don't
13   think she -- other than a few English, you know,
14   presentations, I don't think she had anything to
15   say about the technical.
16       Q    She gave you about a year to do it; a
17   year to two years?
18       A    I took it upon myself. She didn't give
19   me any time. In my interest, I was doing that.
20   Always, since my college days, I had published
21   papers, a number of presented papers, published
22   papers. It was not that she wanted that

Page 20

1    particularly as a part of my job.
2        Q    Would you say that was a special project
3    when you did these peer review publications?
4        A    You might call it a special project.
5    Again, I took it upon myself because I was
6    interested to publish those data. What happened,
7    we used to have a lot of foreign scientists in our
8    lab, people from Japan, from Spain, from Nigeria.
9    One time one guy came from Spain -- two people.
10   They took our method and they went back and
11   published two papers. Since that time I decided,
12   before you do it, I'll do it. So I started to
13   publish papers.
14       Q    How did you find time to do that as
15   opposed to doing the other work required of you as
16   a Veterinary Medical Officer?
17       A    It was of my own interest. You know, I
18   used to do that. I was not forced to publish
19   papers. I was not forced to publish papers.
20       Q    Okay. Again, how many drafts did these
21   go through?
22       A    Oh, I would work on it -- five, six, I

Page 21

1    would do it myself, five, six drafts, and it would
2    take me, you know, five, six months to do that
3    because I was working making graphs. I went to
4    Alice Thaler with at least three drafts before we
5    could make it presentable in a journal.
6        Q    Did you have any kind of specific
7    deadline to get the paper in?
8        A    No, because it was all my paper. They
9    never gave me any deadline.
10       Q    Did it go to any kind of grammarian or
11   someone to check the English?
12       A    Well, I'm glad you asked me that. No,
13   not those papers. One time I was getting ready to
14   present a paper in Thailand. It was an oral talk.
15   My paper was sent to a young lady -- what was her
16   name; I can't remember -- Pritchard and she did all
17   of the grammatical things. She was questioning
18   some of the things that I said. Does she know that
19   this is just an oral presentation; this is not for
20   a journal. I don't think she had any idea how a
21   journal -- scientific journal papers are written.
22   It's not a flowery language. Some of the language

# Capital Reporting Company

Page 22

1     is very rough.

2          Q    What part of the process -- do you recall

3     when in the process did Ms. Pritchard become

4     involved in this particular -- this was not a peer

5     review publication. This was some presentation you

6     were making?

7          A    Right. I think it was 2003.

8          Q    No. During what part of the time before

9     you made the presentation?

10         A    Oh, when I sent my abstract, it was

11    accepted and then I had to have permission. In

12    order to get permission from the USDA, I had to

13    give what I was presenting. I think it was at that

14    stage that my paper was sent to her with the

15    pictures. It was a PowerPoint presentation.

16         Q    She made some corrections then,

17    Ms. Pritchard?

18         A    Yes.

19         Q    Yes, she did. Did you ever receive any

20    kind of unacceptable rating or downgrade as a

21    result of her corrections?

22         A    You mean, a downgrade in my position?

Page 23

1          Q    Yes.

2          A    No.

3          Q    Or even in a performance appraisal.

4          A    No. I was kind of shocked. She was an

5     English major maybe, but she didn't know what she

6     was telling. Technically, she didn't know. She

7     was looking for English but that was not the style

8     of the journal or the presentation. Actually, I

9     didn't mean it was a full-fledged paper. It was a

10    speaking draft.

11         Q    I forgot to ask you this. If you'll

12    look back at the chart, when you were there, what

13    was the main admission of the people working under

14    you in the Zoonoses Branch? What were the usual

15    things that they were involved with while you were

16    the director of ZDRSD?

17         A    Well, first of all, they were engaged in

18    a big project where they were following different

19    diseases and how to pinpoint different diseases.

20    Then they were doing the Salmonella Serotyping.

21    It's called putting the data together, you know,

22    USDA was receiving reports from ARS. Samples were

Page 24

1     going to ARS. They were doing that. They were

2     storing Salmonella data. Every three months or

3     four months, they were reporting the data on the

4     internet.

5          Q    Which Veterinary Medical Officers were

6     involved? Was Dr. Anandaraman involved?

7          A    Who?

8          Q    Neena Anandaraman.

9          A    Anandaraman, yes. Neena was doing that,

10    yes.

11         Q    Dr. Quereshi was also involved a little

12    bit; do you recall?

13         A    Yes. I think he was asked to do that

14    kind of job. Again, Dr. Quereshi was not a

15    microbiologist. Dr. Quereshi didn't have that kind

16    of background, lab background. To him, species and

17    in general is the same. I think he was trying to

18    learn it later on. I think he did some work on it.

19         Q    Now, you mentioned they were involved in

20    certain diseases but you didn't name the diseases

21    that the people in the Zoonoses Branch, while you

22    were the Director there, were involved in. Can you

Page 25

1     help me out with that?

2          A    Lately they were always talking about

3     Salmonella, you know, and then E coli 0157.

4     Earlier to that, if I remember correctly, they were

5     handling BSE. Other than that, I don't think it

6     was anything significant.

7          Q    Were they involved at all in

8     toxoplasmosis?

9          A    No. I don't think -- Toxoplasma -- when

10    I was in Beltsville, then people were thinking

11    about doing some kind of Toxoplasma work. Again,

12    Toxoplasma became famous because of the famous

13    tennis player. Martina Navratilova got infected

14    with Toxoplasma. That's how it became -- I don't

15    think it was a full-fledged project. I don't

16    remember.

17         Q    Well, do you remember the division

18    considering it to be a serious foodborne hazard at

19    any time you were there?

20         A    Not during my time.

21         Q    Do you know a Dr. McCaskey?

22         A    Yes.

## Capital Reporting Company

Page 26

1    Q    Who is Dr. McCaskey?

2    A    He's the associate that perhaps was in

3    Athens, Georgia. I know him from when I used to

4    work in epidemiology in 1981 through '87. He was

5    in the field as well as he was in one of the labs.

6    I used to send him samples. That's how I know him.

7    And then, of course, I met him off and on in

8    meetings and other places.

9    Q    Was there any discussion either with

10   Dr. McCaskey or anyone else that you knew about

11   FSIS's standards or rules regarding plagiarism?

12   Do you recall any discussions about that?

13   A    There were some offhand remarks made in

14   one of those, you know, senior management members.

15   I don't fully recall what.

16   Q    Do you recall any standards being set

17   forth with regard to plagiarism by FSIS while you

18   were there?

19   A    I cannot definitely say that I remember.

20   I may have heard, but I cannot exactly remember

21   what was said.

22   Q    These literature review papers, do you

Page 27

1    ever recall having one presented? Have you ever

2    had one of these peer review publications presented

3    just after one draft? Did that ever happen to you?

4    A    Peer review publication just after one

5    draft?

6    Q    Yes.

7    A    No, I don't think so.

8    Q    When you do a citation in an article for

9    a peer review publication, are there certain

10   standards for that?

11   A    Sure.

12   Q    Who sets those?

13   A    The journal. Different journals have

14   different ways of, you know, saying things or

15   listing the citations.

16        MR. GOULD: We'll mark that as Dey No. 2.

17        (Dey Exhibit No. 2 was

18         marked for identification.)

19        (Tenders document to witness.)

20        Just look it over briefly.

21   BY MR. GOULD:

22   Q    Is this the subject matter that

Page 28

1    Dr. Chowdhury came to discuss with you as contained

2    in this particular set of documents?

3    A    I think he did something with serology

4    but I don't specifically remember. It looks like

5    it is. I don't know what Alice is trying to say, I

6    would appreciate a little information. What kind

7    of information -- oh, human serotypes, okay, sorry.

8    Q    What is she trying to say; do you know?

9    A    Whether or not Dr. Chowdhury has

10   responded to his initial questions, that is, human

11   serotypes involved in illness and chicken serotypes

12   in illness. I think she was trying to relate that

13   serotypes coming from chickens can cause human

14   illness. That is what my feeling is.

15   Q    What about a serotype description; do you

16   know what that is -- I'm sorry, serovar

17   description. Does that term make any sense to you?

18   A    A serovar description is -- I cannot tell

19   you what -- maybe serovar serotypes that are

20   pathogenic and some Serovars are not pathogenic.

21   What is meant by serovar descriptions. These are

22   antigens, cell antigens, all flagella antigens, and

Page 29

1    they are all specific according to their own. you

2    know. material. Some may be identified. We can

3    pinpoint some of them that, yes. if you have this.

4    this. this, like O29. 42, eight so and so. it's a

5    pathogen.

6    Q    Let's look at page three of this

7    document, page two of two but it's page three of

8    the document.

9    A    Yes.

10   Q    If you'll look at paragraph three there.

11   Summary Statements --

12   A    Yes. Provide a brief summary statement

13   about each of the top 20 serotypes for young

14   chickens that include information such as

15   reservoirs, commonality, etc. For example. the

16   statement may indicate that the serotype is common

17   in chicken. but it is also common in -- yes.

18   Q    What would you do to comply with this

19   requirement?

20   A    Just list those serotypes that are found

21   in chickens and what is the reservoir. you know.

22   what other animals they have seen or has it ever

Page 30

1    been recorded in humans causing, you know, illness.
2    It's a brief summary -- he's not asking anything
3    else -- 20 serotypes?
4        Q    Let me check over my notes, Dr. Dey.
5        A    Sure.
6        Q    In terms of performance appraisals or
7    evaluations, did you ever do those for people when
8    you supervised them?
9        A    Sure.
10       Q    You did, okay.  Peer review publications
11   for Veterinary Medical Officers in ZDRSD, would you
12   classify those as critical or noncritical or did
13   you when you did these appraisals?
14       A    Again, I have to ask you, where did this
15   element come from, publication of research
16   material.  As far as I remember, FSIS is regulatory
17   agency.  The research part of USDA is ARS.  I
18   specifically remember in 1980 that Dr. Ingle, who
19   used to be the head of the OPHS, said do not call
20   yourself a research hand.  Research is the
21   responsibility of ARS.  We were called the methods
22   development lab.

Page 31

1        Q    Is that methods development?
2        A    Yes.
3        Q    So this is a term that's foreign to you.
4    It's not something that ever came up while you were
5    there, whether peer review publication should be
6    critical or noncritical?
7        A    The question doesn't arise.  Even if it
8    does, it should be noncritical.
9        MR. GOULD:  I have nothing further,
10   Doctor.
11       THE WITNESS:  Let me understand.  These
12   peer review publications for an ordinary regulatory
13   agency, I don't think I have seen that.
14       MR. GOULD:  Thank you.  Your witness.
15       MS. FIELDS:  I don't have any questions.
16       MR. GOULD:  Thank you, Dr. Dey.
17       (Whereupon, at 10:05 a.m., the
18       deposition of Bhabani Dey
19       was concluded.)
20
21
22

Page 32

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Jodi Scheffel, RPR, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the witness whose testimony appears in
5    the foregoing deposition was duly sworn by me; that
6    the testimony of said witness was taken by me in
7    stenotype and thereafter reduced to typewriting
8    under my direction; that said deposition is a true
9    record of the testimony given by said witness, that
10   I am neither counsel for, related to, nor employed
11   by any of the parties to the action in which this
12   deposition was taken; and further, that I am not a
13   relative or employee of any attorney or counsel
14   employed by the parties hereto, nor financially, or
15   otherwise interested in the outcome of the action.
16
17            Jodi Scheffel
18            Notary Public in and for
19            the District of Columbia
20
21   My commission expires:
22   August 31, 2011

Page 33

1        ACKNOWLEDGEMENT OF DEPONENT
2
3        I, BHABANI DEY, do hereby acknowledge I
4    have read and examined the foregoing pages
5    of testimony, and the same is a true, correct
6    and complete transcription of the testimony given
7    by me, and any changes or corrections, if any,
8    appear in the attached errata sheet signed by me.
9
10
11
12
13
14   _____    _____
15   Bhabani Dey            Date
16
17
18
19
20
21
22

Page 34

1    Rhonda Fields
2    Assistant United States Attorney
3    Judiciary Center Building
4    555 4th Street, N.W.
5    Civil Division
6    Washington, D.C. 20530
7    IN RE: Chowdhury vs. Schafer
8    Dear Ms. Fields,
9        Enclosed, please find your copy of the
10   deposition of BHABANI DEY, along with the original
11   signature page.
12       As agreed, you will be responsible for
13   contacting the witness. Within 30 days of receipt,
14   please forward errata sheet and original signed
15   signature page to counsel for Plaintiff, Mr. Gould.
16
17       If you have any questions, please do not
18   hesitate to call. Thank you.
19   Yours,
20
21   Jodi Scheffel
     Reporter/Notary Public
22   cc: Jonathan Gould, Esquire

Page 35

1    Capital Reporting Company
2    1821 Jefferson Place, N.W.
3    Third Floor
4    Washington, D.C. 20036
5    (202) 857-3376
6        E R R A T A   S H E E T
7    Case: Chowdhury vs. Schafer
8    Witness: Bhabani Dey
9    Date: Friday, May 2, 2008
10   Page No.     Line No.      Reason/Change
11
12
13
14
15
16
17
18
19
20
21   _____   _____
22   Signature          Date

1          CERTIFICATE OF NOTARY PUBLIC

2          I, Jodi Scheffel, RPR, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me in

7    stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness, that

10   I am neither counsel for, related to, nor employed

11   by any of the parties to the action in which this

12   deposition was taken; and further, that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties hereto, nor financially, or

15   otherwise interested in the outcome of the action.

16

17                    Jodi Scheffel

18                    Notary Public in and for

19                    the District of Columbia

20

21   My commission expires:

22   August 31, 2011

# EXHIBIT O

<u>**Toxo-project: Sequence of Events**</u>:          2/14/08

**[During entire period of (July, 2004 to June, 2005) disputed rating year I was
barraged with many (about 30 projects) very important high priority mission
supporting tasks/projects on BSE with very urgent deadline. I was doing all of them
diligently and promptly. <u>Toxo-project was in addition to my above mission
supports.</u> Besides, toxo-project was in verbal discussion only and actual written
project was assigned to me after the PIP]**

↓

**Sometimes in early summer of 2004**—Dr. Parham asked me verbally, as to, what
special project I would like to work to **make a peer-review publication** to the Journal.
**For 17 years of my employment with FSIS, this is the first time any supervisor
suddenly asked me to make literature review publication—a non-critical element.** I
said you please tell me, because I don't know what you are talking about since we never
did such project in the past. She declined and asked me to find out. I then said may be I
can work on Toxoplasmosis. She said you find out from the experts about it.

↓

I talked with some experts and they all discouraged me to do peer-review paper which
will **never be published** by any journals. I have informed her verbally and in writing and
she still insisted to find out. **Then I was investigating this case further**.

↓

**December 7, 2004**—she had a meeting in her room in which she **severely scolded** me in
front of Dr. Brewer and asked me to give her Toxo-paper for peer-review journal. **I said
no project as of yet been formulated, nor you have assigned me any approved
written project to work**. How could I do any progress when actually <u>I have no written
project approved as of now</u>? She was very mad at me and asked me to give her a quick
work plan for toxo before I go for vacation (**Her memo dated: 12-26-04**). And I gave
her short work-plan (First draft) at the end of **December 30, 2004** and went for my one
month vacation to Bangladesh. At this time she has verbally warned about
"Unsatisfactory" rating. **She also demanded Daily Journal from me.** But she never
mentioned anything about series of high priority reports I was making on BSE issue.

↓

I have returned from my vacation by the first week of February, 2005. **On February 7,
2005**— I gave her my **Second Draft** of toxo-project (after discussing with most famous
toxo-scientists) and ask her approval. She responded with memo (her memo dated
**February 7, 2005**) by saying: " *Thank you. I will look it over, and we can discuss it.*"

↓

<u>**On February 10, 2005**</u>  She came up with some suggestion and changes which I have
done and gave her my **Third draft of** toxo-project on **February 25, 2005** (my memo
dated: February 25, 2005). I requested her **approval in this Third draft of toxo project.**

↓

She then responded (same day) by email that she will soon look into it and will come
back to me. Her memo dated: **February 25, 2005** says: "*Thank you. I have a very full
schedule next week, but will try very hard to sit down with you and discuss it.*"

↓

0038

**But she never did reply any further about toxo-project whatsoever and <u>never approved it</u> as I have requested in the introduction of my "Third draft" of toxo-project dated: <u>February 25, 2005.</u>  She remained silent about toxo-project for a period of about 6 months.**

↓

**Instead, on February 28, 2005**—she came to my room and asked me a **whole new project** to start which she called "**Thinking paper**" for the branch. That is, I must find work-plans for everybody in the branch.

↓

I did give her a plan of thinking paper (**First draft**) on **March 9, 2005** after incorporating toxo-plan into it. Because, I thought she has given up toxo-project for good.

↓

She responded with a letter **dated March 16, 2005** that she will have a discussion meeting with other members of her branch to decide the matter (Her memo dated: **March 16, 2005**). She never did have any discussion meeting whatsoever. But she requested to make some elaboration of my suggested plan in the meantime.

↓

**At this time she barraged me with many urgent mission supporting tasks** (please see my accomplishment list) therefore, I requested her to allow me some time to do the necessary elaboration of "Thinking Paper", (**my memo: April 18, 2005**).

↓

She agreed with a memo: **dated April 22, 2005 in which she has laid down some more requests about the paper.**  I was working to elaborate the paper.

↓

I did the elaboration she asked for this plan and submitted to her on <u>May 20, 2005</u> for her comment. She never commented and remained completely silent about it for until July, 2005.

↓

At this time she was again assigning me several very high priority project for mission support and I was delivering those tasks keeping every deadlines.

↓

For several months she did not talk about Toxo and Thinking paper at all. Suddenly, in July, 2005, she demanded full reports for both Toxoplasma and Thinking paper.

↓

Khurshed A. Chowdhury, DVM, Ph.D.

2

| | |
|---|---|
| **Subject:** | For August 9-13 |
| **Start Date:** | Friday, August 13, 2004 |
| **Due Date:** | Friday, August 13, 2004 |
| **Status:** | Not Started |
| **Percent Complete:** | 0% |
| **Total Work:** | 0 hours |
| **Actual Work:** | 0 hours |
| **Owner:** | Chowdhury, Khurshed |

Dr. Chowdhury,

As discussed, please do the following:

1. Continue your research on the toxoplasmosis paper that you would like to write. We will discuss your progress when I return. From the time you mentioned it to me and we agreed that this is something that you can do, I believe you should have done quite a bit on the literature review.

2. Please review the questions that I gave you from Todd Furey, and began answering them if you have not begun already. As mentioned, we will not wait for a meeting to begin answering them. You have had this for some time, so you should have looked it over. Get as many answered as you can. We will discuss your progress on this when I return.

Thanks.

Dr.

Defendant Discovery Response
574 of 1536

1

| From: | Parham, Delila |
|---|---|
| Sent: | Wednesday, December 01, 2004 10:59 AM |
| To: | Chowdhury, Khurshed |
| Cc: | Brewer, Robert |
| Subject: | FW: For August 9-13 |

Attachments:     For August 9-13

Khurshed,

I am again asking that you prepare answers and/or comments for the questions asked for the Columbia and Thailand review. Your paper is being prepared for the Zoonoses Branch. Having a written document will ensure that we can compare answers to these types of questions that come in from the various countries and that we are consistent in our response.

Please do not contact Todd Furey or Nancy Goodwin again. In my last message from Todd (November), he assured me that he will let me know when he will hold the first meeting. If you have questions, please let me know.

Thanks.

Delila

-----Original Message-----
From: Parham, Delila
Sent: Thursday, August 05, 2004 5:11 PM
To: Chowdhury, Khurshed
Subject: FW: For August 9-13



For August 9-13

Khurshed,

I think this states that you will begin August 13. The start date is August 9.

Delila

Defendant Discovery Response     575-00153

1

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, December 17, 2004 8:46 AM |
| **To:** | Parham, Delila |
| **Cc:** | Brewer, Robert |
| **Subject:** | Toxoplasmosis Project |
| **Attachments:** | PREVALENCE OF TOXOPLASMOSIS INFECTION IN FOOD ANIMALS IN THE UNITED STATES.doc; ISSUE PAPER-1.doc; Toxo questions for media inquiry.doc; Toxo-memo to Bill.doc; Toxo in sheep study.doc |

Hi Delila,

Defendant Discovery Response 539

Please be informed that it was not actually true that I did not produce anything on toxoplasmosis at all. Actually, I did produce some products on the issues of toxoplasmosis (please see attachments). Besides these attachments, I have also written some small memos to the consumers on toxoplasma risks on sheep and rabbit meat and also commented on CDC toxoplasma diagnostic test project.

I am not blaming anybody but myself. In the midst of tremendous business with various issues—I have totally forgot about what I have done on toxoplasmosis. Also, during my changing room and changing furniture, while packing my office stuffs, I misplaced the floppy disks in which I wrote these toxoplasma works. Therefore, even though I barely remembered, I could not locate what I have done on this subject. As a result, when you have asked last week about toxo project, erroneously I told you that I did not have anything to produce to you. However, after a thorough search I have found them.

About the "Toxoplasmosis Project" I really never considered it as the project assigned to me having any deadline to finish. I have only considered it as the possibility of working in this field. It was I myself volunteered to work on this issue, because early 2003, I did not have much to do other then attending to some periodical working group meetings on BSE/TSE, National Trichinae Oversight Committee (TOC), Egg Products and ADRS. It was at that time I did express my desire to you to work on toxoplasmosis but did not know what could I do? Then I have told you that I will consult with some expert like Dr. Dubey and will try to fix an objective what I will do.

In our discussion Dr. Bubey asked me what actually I plan to do. When I said that may be literature review and writing a review paper to publish, Dr. Dubey was highly pessimistic about review paper and said nobody will publish your paper. And it will be wastage of your time and energy. He rather suggested me to find some funding to start a project in the field situation. I do admit that I should have informed you my conversation with Dr. Dubey.

Immediately after that I became busy and got to do whole lot of works like: CWD, Issue paper on T.B., Issue paper on Avian Influenza, Issue paper on AMR, Updating Swine condemnation table, Reindeer table review, reviewing various papers, and of course many requests on BSE etc. Almost every week we did have something to do, and I was passing pretty busy time. As a result, I almost forgot about Toxoplasmosis.

Now that you are still interested in this issue, and also things are a bit slow on BSE issue, I believe I can work on this project of toxoplasmosis. I can still continue working on this issue and if you want I can formulate some idea which will be appropriate for the public health protection on the area of FSIS. At

least I can prepare a presentable issue paper after sufficient literature survey. After coming from my vacation in January, I can start working on this issue again. Attending toxoplasma seminar arranged by HHSD yesterday, I got developed some interest on this issue of toxoplasmosis again.

Please let me know your opinion. Thanks.

Khurshed

**Defendant Discovery Response 584 of 1539**

| | |
|---|---|
| Subject: | Toxoplasmosis Outline |
| Status: | Not Started |
| Percent Complete: | 0% |
| Total Work: | 0 hours |
| Actual Work: | 0 hours |
| Owner: | Chowdhury, Khurshed |

*New begining after December 7th 2004 meeting.

We will consider that you are starting anew with your toxoplasmosis proposal. Please provide an outline of what you would like to do. This is just a rough sketch of what you have in mind, and how you plan to proceed with some estimates of dates and time for completion of parts of the work.

Thanks.

(Happy Holidays, and have a safe and enjoyable trip.)

Delila

1

5

0040

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Thursday, December 30, 2004 2:25 PM |
| **To:** | Parham, Delila |
| **Cc:** | Zahn, Sherie; Bresler, Faye |
| **Subject:** | Toxoplasmosis work outline |
| **Attachments:** | Toxo work plan.doc |

Hi Delila,

Please find the attached an outline of proposed work plan on toxoplasmosis.  Thanks.

Khurshed

Defendant Discovery Response
585 of 1539

Date: December 30, 2004

**Toxoplasmosis work plan**

I have discussed this issue with Dr. Sherie Zahn (USDA, Foodborne Disease Investigation Branch, Atlanta, GA.) and also with Dr. Dubey, BARC, Beltsville, MD. At this moment following are my thoughts:

(A) **We can investigate the status of developing any rapid test for T. gondii to be used as to identify infected animals for human consumption during (a) ante mortem inspections, and (b) meats at the slaughter plants.**

- Check with manufacturers of parasitic diagnostics to ascertain what is being done, and by whom. One such manufacturer could be **Safe-Path Lab.** at California, which does produce rapid test for parasitic diagnosis.

- Check whether this test will be feasible both by **economical and technical point** of views?

- Who is funding it, or whether the FSIS can in anyway support/provide partial funding of this project?

- Check what such work may be underway in Europe?

- Check with academic researchers in the field to ascertain what is being done, and by whom?

- What are the obstacles to such research?

- How is this prioritized relative to developing such tests for other pathogens?

- Contact Ms. Patricia Lee's (CDC) what was the status of her desire to developing a Diagnostic Test for Toxoplasmosis to be used in the Slaughter Plants (on raw meat only)?

According to Dr. Dubey, at present there is no known rapid test available for quick diagnosis of toxoplasmosis. ELISA test is the only test being used for toxo diagnoses which is not a quick test. Developing quick diagnostic test will be highly useful especially to diagnose toxoplasmosis in the raw meat products in the plants. This test can be used on—Chicken breast and Pork Chops to identify Antibody. This test, although, will not be helpful to identify live Toxoplasma, however it will be useful for:  1. To identify Antibody,  2. To identify DNA of Toxoplasma gondii.

**Defendant Discovery Response 586 of 1539**

(B) Investigating the prevalence of toxoplasma gondii infections in the US meat and poultry raw products (in the slaughter plants) and assessing economic impact and public health burden of foodborne toxo infections.

(C) Searching recent literature on toxo research going on around the world and writing a literature peer review paper on toxoplasmosis to the final product of a formal toxoplama issue paper for internal FSIS use.

I have outlined three possibilities (A, B, C) of work on this issue of toxoplasmosis. As Dr. Bresler has suggested—we (ZDRSD and HHSD) need to sit together to discuss which one should we pursue and how we plan to proceed as the project on toxoplasmosis. At this time I am not predicting any time line for the completion of the project. We must discuss and decide which one we shall chose to pursue and only then we can set up a reasonable deadline of completion. Thanks.

Khurshed A. Chowdhury, DVM. Ph.D.
VMO, Zoonoses Branch,
ZDRSD, OPHS.

Defendant Discovery Response
587 of 1539

Chowdhury, Khurshed

**From:** Parham, Delila
**Sent:** Monday, February 07, 2005 11:03 AM
**To:** Chowdhury, Khurshed
**Subject:** RE: Toxoplasmosis work plan

Thank you. I will look it over, and we can discuss it.

Delila

    -----Original Message-----
    **From:** Chowdhury, Khurshed
    **Sent:** Monday, February 07, 2005 11:01 AM
    **To:** Parham, Delila
    **Subject:** Toxoplasmosis work plan

    Hi Delila,

    Please find the attached my work plan for Toxoplasmosis. Since Dr. Sherie Zahn will not available to be a partner,
    I have decided to continue alone in this venture. Thanks.

    Khurshed.

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Monday, February 07, 2005 11:01 AM |
| **To:** | Parham, Delila |
| **Subject:** | Toxoplasmosis work plan |
| **Attachments:** | Toxo workplan-2.doc |

Hi Delila,

Please find the attached my work plan for Toxoplasmosis. Since Dr. Sherie Zahn will not available to be a partner, I have decided to continue alone in this venture. Thanks.

Khurshed.

Defendant Discovery Response
588 of 1539

To: Delila Parham
    Chief, Zoonoses Branch, ZDRSD.

Date: February 7, 2005

From: Khurshed Chowdhury
     VMO, Zoonoses Branch, ZDRSD.

Subject: **Toxoplasmosis work plan**

Considering the fact that Dr. Sherie Zahn (USDA, Foodborne Disease Investigation Branch, Atlanta, GA.) is no longer available to be a partner of this project, I have decided to proceed alone with this toxo work plan, of course, if you agree with this idea. Let me continue to work on the following two phages of work (A and B).

(A) **Investigate the status of developing any rapid test for T. gondii to be used as to identify infected animals for human consumption during (a) ante mortem inspections, and (b) meats at the slaughter plants.**

- Check with manufacturers of parasitic diagnostics to ascertain what is being done, and by whom. One such manufacturer could be **Safe-Path Lab.** at California, which does produce rapid test for parasitic diagnosis.

- Check whether this test will be feasible both by **economical and technical point** of views?

- Who is funding it, or whether the FSIS can in anyway support/provide partial funding of this project?

- Check what such work may be underway in Europe?

- Check with academic researchers in the field to ascertain what is being done, and by whom?

- What are the obstacles to such research?

- How is this prioritized relative to developing such tests for other pathogens?

- Contact Ms. Patricia Lee's (CDC) what was the status of her desire to developing a Diagnostic Test for Toxoplasmosis to be used in the Slaughter Plants (on raw meat only)?

(B) **Investigating the prevalence of toxoplasma gondii infections in the US meat and poultry raw products (in the slaughter plants) and assessing economic impact and public health burden of foodborne toxo infections.**

**Defendant Discovery Response
589 of 1539**

**Time period to complete the investigations:**

Part A:

I would like to finish my investigation by the end of April, 2005 and a concise report of my findings will be produced by the end of June, 2005.

Part B:

This part will need enough literature searches to make the proper assessment of toxoplasma situation in the US. Assessing economic impact and public health burden of food borne toxo infections should take ample time. So, I would like to finish my search by the end of December, 2005. And the final report will be ready by the end of March, 2006.

Khurshed A. Chowdhury, DVM. Ph.D.
VMO, Zoonoses Branch,
ZDRSD, OPHS.

**Defendant Discovery Response
590 of 1539**

**Parham, Delila**

| | |
|---|---|
| **From:** | Parham, Delila |
| **Sent:** | Thursday, February 10, 2005 5:02 PM |
| **To:** | Chowdhury, Khurshed |
| **Cc:** | Thaler, Alice |
| **Subject:** | FW: Toxoplasmosis work plan |
| **Attachments:** | Toxo workplan-2.doc |

Khurshed,

This is a follow-up to our conversation this afternoon. As discussed, please review the proposal and consider the following:

Defendant Discovery Response
591 of 1539

A. Rapid Tests: Please conduct some exploratory work to determine how much information is available on rapid tests and the feasibility of use in slaughter plants. If the work is in its infancy, there is little that we (Zoonoses Branch) will be able to do or recommend and need not spend a great deal of time pursuing this. In looking at the majority of the questions put forward in your work plan, you should be able to find answers and prepare a summary report in less than a month. Of course, your summary report may be the basis for recommending that the Agency include development of rapid tests for toxoplasmosis on its research agenda.

B. Prevalence at Slaughter: Again, I recommend that you conduct an initial literature review to assist you in developing an approach to your paper. You need to know what recent work has been done on this issue; this will to guide you in developing your thesis statement (approach) for your paper. Ask yourself, what would your paper provide of interest to the scientific community and the public and be of benefit to FSIS? If approved to proceed, you should be able to complete a literature review and draft your article much sooner than March 2006, even with our fluctuating workload and priorities.

C. Other Thoughts: (1) I don't think a risk profile has been conducted for *T. gondii* in US meat products. While risk assessments are not in our purview, it seems reasonable that we would be able to work with someone in the Risk Assessment Division to look at this issue. (2) I know you consulted Dr. J.P. Dubey on this issue, but for economic info, you may want to talk with Jean Buzby or Tanya Roberts in the Economic Research Service; for grant information, Mary Torrence in the Cooperative State, Research, Education and Extension Service; and for other cooperative agreement info, our own John Ragan.

Please plan to talk with me again in the next two weeks to advise me of your progress. If you need time at the library, please let me know. Or, you may want to contact the NAL to get assistance with your literature review on the subject. Having a few abstracts and/or articles should be useful in directing you on this issue.

If you have questions, please see me.

Thanks.

Delila


-----Original Message-----
**From:** Chowdhury, Khurshed
**Sent:** Monday, February 07, 2005 11:01 AM
**To:** Parham, Delila
**Subject:** Toxoplasmosis work plan

Hi Delila,

Please find the attached my work plan for Toxoplasmosis. Since Dr. Sherie Zahn will not available to be a partner, I have decided to continue alone in this venture. Thanks.

Khurshed.

Defendant Discovery Response
592 of 1539

## Parham, Delila

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, February 11, 2005 12:58 PM |
| **To:** | Parham, Delila |
| **Subject:** | RE: Toxoplasmosis work plan |

Thanks. Please let me think and I will talk to you next week.

Khurshed

-----Original Message-----
**From:** Parham, Delila
**Sent:** Thursday, February 10, 2005 5:02 PM
**To:** Chowdhury, Khurshed
**Cc:** Thaler, Alice
**Subject:** FW: Toxoplasmosis work plan

Khurshed,

This is a follow-up to our conversation this afternoon. As discussed, please review the proposal and consider the following:

   A.  Rapid Tests: Please conduct some exploratory work to determine how much information is available on rapid tests and the feasibility of use in slaughter plants. If the work is in its infancy, there is little that we (Zoonoses Branch) will be able to do or recommend and need not spend a great deal of time pursuing this. In looking at the majority of the questions put forward in your work plan, you should be able to find answers and prepare a summary report in less than a month. Of course, your summary report may be the basis for recommending that the Agency include development of rapid tests for toxoplasmosis on its research agenda.

   B.  Prevalence at Slaughter: Again, I recommend that you conduct an initial literature review to assist you in developing an approach to your paper. You need to know what recent work has been done on this issue; this will to guide you in developing your thesis statement (approach) for your paper. Ask yourself, what would your paper provide of interest to the scientific community and the public and be of benefit to FSIS? If approved to proceed, you should be able to complete a literature review and draft your article much sooner than March 2006, even with our fluctuating workload and priorities.

   C.  Other Thoughts: (1) I don't think a risk profile has been conducted for *T. gondii* in US meat products. While risk assessments are not in our purview, it seems reasonable that we would be able to work with someone in the Risk Assessment Division to look at this issue. (2) I know you consulted Dr. J.P. Dubey on this issue, but for economic info, you may want to talk with Jean Buzby or Tanya Roberts in the Economic Research Service; for grant information, Mary Torrence in the Cooperative State, Research, Education and Extension Service; and for other cooperative agreement info, our own John Ragan.

Please plan to talk with me again in the next two weeks to advise me of your progress. If you need time at the library, please let me know. Or, you may want to contact the NAL to get assistance with your literature review on the subject. Having a few abstracts and/or articles should be useful in directing you on this issue.

If you have questions, please see me.

Thanks.

Delila

Defendant Discovery Response
593 of 1539

**Parham, Delila**

| | |
|---|---|
| **From:** | Chowdhury, Khurshed |
| **Sent:** | Friday, February 25, 2005 2:55 PM |
| **To:** | Parham, Delila |
| **Subject:** | Updated Toxo working plan |
| **Attachments:** | Toxo work plan 3.doc |

Hi Delila,

Please find the attached updated working plan for toxoplasmosis.  Thanks.

Khurshed

Defendant Discovery Response
594 of 1539

To: Delila Parham                          Date: February 25, 2005
    Chief, Zoonoses Branch, ZDRSD.

From: Khurshed Chowdhury
      VMO, Zoonoses Branch, ZDRSD.

Subject: **Toxoplasmosis work plan**

Considering your suggestions (Feb. 10, 2005) and having discussions on several
occasions with Drs. Dubey, Gamble, I have made some changes of my work plan and
following are my work plans on toxoplasmosis which I would like to continue after you
approve it. Regarding the investigational works on the issue of rapid test for toxo, both
Drs. Gamble and Dubey was not sure if anybody was/is working for it and they suggested
me to do an investigational search, especially if anything was done in Europe. Therefore,
I have decided to continue on this rapid test investigation. Here are my suggested plans
on toxoplasmosis.

(A) **Investigate the status of developing any rapid test for T. gondii to be used as to
identify infected animals for human consumption during (a) ante mortem
inspections, and (b) meats at the slaughter plants.**

- Check with manufacturers of parasitic diagnostics to ascertain what is being done,
  and by whom. One such manufacturer could be **Safe-Path Lab.** at California,
  which does produce rapid test for parasitic diagnosis.

- Check whether this test will be feasible both by **economical and technical
  point** of views?

- Who is funding it, or whether the FSIS can in anyway support/provide partial
  funding of this project?

- Check what such work may be underway in Europe?

- Check with academic researchers in the field to ascertain what is being done, and
  by whom?

- What are the obstacles to such research?

- How is this prioritized relative to developing such tests for other pathogens?

- Contact Ms. Patricia Lee's (CDC) what was the status of her desire to developing
  a Diagnostic Test for Toxoplasmosis to be used in the Slaughter Plants (on raw
  meat only)?

Defendant Discovery Response
595 of 1539

EXHIBIT P

**RESPONSE TO PRODUCTION REQUEST # 8 and #9**

*( Rebuttal to PIP-review )* <u>*Production-8*</u>

Date: March 10, 2006

I have highlighted and chronologically numbered sub-heading items the accusations cited by my supervisors, Drs. Parham and Thaler, against the three reports I submitted during my PIP. I have rebutted their charges point by point. I urge you to read my responses.

**Toxoplasma Review Paper**

**1) "There are numerous grammatical, spelling, and punctuation errors in the paper".**

**Response:** All my articles were just initial "first draft" prepared hurriedly to meet the very rigid deadlines. Actually there were very negligible grammatical errors and punctuation problems in my articles. I consider that in an initial first draft of 12 pages long article just 4 or five spelling errors (typos) are neither unusual nor very dangerous! These minor errors could be taken care very easily by any one single review by any knowledgeable person. These papers the first drafts were not ready to send for publication. These documents were submitted only for internal reviews by various scientists. In order to be published, any scientific paper should go through series of reviewers. Only after that the paper is ready to send for publication

**2) "Narrow geographical based studies and giving wider national picture".**

**Response:** This Toxoplasma paper was purely a review article prepared from other people's research findings and whatever statements I have quoted in this article were on the basis of the available scientific studies done by other people and none of these statements are mine. At the beginning of the abstract of this paper I have already stated that seroprevalence research studies were inadequate in the U.S. Very few states did seroprevalence study and overall, amount of studies done were quite inadequate for making absolute statistical measurement for the entire USA. Statements that I have made about the meat from retail stores were transmitted from the published paper (article: Ref. 10) which was prepared by retail store meat sampling study by the most famous Toxoplasma experts like Drs. J.P. Dubey and H.R.Gamble. These statements, for which I was blamed, are theirs and not mine (Please see Exhibit-2). These were the concluding statements made by the most famous toxoplasma authors of the country.

**3) "Agency is contemplating examination of meat in the slaughterhouse".**

**Response:** This is the statement made by Drs. J.P. Dubey and H.R. Gamble in their published article (Ref: #16) and this statement is not mine (Please see Exhibit-1). This statement only says that until there is a system of checking meat in the slaughterhouse, meat should be eaten after proper cooking. This statement never says that FSIS has in fact a plan to implement.

1

0260

**4) "Yet you do not explain adequately why pigs raised in confinement rearing pose the highest risk of infecting people while cattle raised on pasture pose the least risk of infecting people".**

**Response:** This is a serious misstatement by my supervisor, and is a deliberate falsification of my report, **because my paper does not contain such a statement.** I have never written, *"pigs raised in confinement rearing pose the highest risk of infecting people while cattle raised on pasture pose the least risk of infecting people"* in my report. Anybody can check my report for accuracy of my claim. I have clearly stated that seroprevalence studies in cattle were very limited and suggested that further studies are required to determine whether beef plays any important role in the epidemiology of *toxoplasmosis* in humans.

**5) "Inconsistency regarding handling cats by pregnant women".**

**Response:** This is again misunderstanding of a scientific statement which only cautioning pregnant women to keep her away from cat contaminated soil, and its litter boxes. Statement that says, "Pregnant women may not get (i.e. possibly not) Toxoplasma infection by the direct contact with cats" is a new observation by a published paper (Ref. # 24), the author of which thought so, on the basis of unavailability of oocysts in the cat's fur (Please see Exhibit-3). Further, the author is not saying that this is guaranteed, since he has used the phrase: "may not". This statement is only a hypothesis. The statement in my write up also continued by saying, "…..and pregnant women probably get the disease from the contaminated soil by cat feces." So, there should not be a contradiction here.

The statement about pregnant women in the control section is not just a caution against touching cat's fur by pregnant women. It cautions them not to ever go near cat's litter or soil contaminated by cats. Almost all toxoplasma authors/researchers unanimously stated this precautionary advice for the consumers. Therefore, I do not consider it an inconsistency or a contradiction. In any case, this statement was not made by me; rather it was the statement made by the author of a published paper (ref. # 24).

**6) "Improperly cite sources……failings that could expose the Agency to liability because of plagiarism".**

**Response:** According to the dictionary (The American Heritage) the meaning of plagiarism is: **"To steal and use (the ideas or writings of another) as one's own."** This article I have prepared is purely a review paper (100%), and anything and everything I have stated/produced in this article were from other people's research articles, and none is mine. Under no circumstances did I represent that this was my own work. I have stated *them with proper reference numbers and I have used the style of the "journal of food protection"* which (style) was never improper for this particular journal. Everybody in the whole world does follow the very style of the particular journal. Therefore, I do not believe that I have engaged in any plagiarism.

2

**7) "Switching terms like pigs, swine and hogs, and US, USA, United States of America".**

**Response:** Again this is a review paper and I am talking about the works/findings of other peoples and I am bound to use their terminologies they have used in their articles. Please ask them why they have published paper with these different terminologies? I have seen scientists using different terminologies (like swine, hogs, gilts, or US, USA, or United States of America) in the same published paper. This was only a first draft and by reviewing I could make it uniform wherever possible. Because in any scientific paper like this it is not always possible to make the terminologies uniform. Example; when author needs to talk about swine population; he must separate swine from hogs, sows, gilts, finisher pigs, pigs etc. for the sake of different stages of his study. And he just can not call everything swine or everything hogs. This will not be a perfect study by any scientist if he calls everything swine or hogs. Therefore, the question of uniformity does not always fit the purpose of a scientific paper.

**8) "Primary host vs. definitive host for Toxoplasma gondii? The reader might assume that there is more than one host".**

**Response:** I did mistakenly put the word "host" instead of the word "carrier" which was my actual intention to describe how this organism spreads to other species. My intention was to identify the primary carrier cat family; in which both asexual and sexual stages develop endogenously and oocysts are shed in the feces. This term was used by a published article (ref. # 25; please see exhibit-6) which was the source of this statement. However, this term "Primary host" or "Final host" are also used by some authors as the synonyms to "Definitive host". Of course, there are other hosts of Toxoplasma which are called "intermediate host" or "secondary host". I could always change it after the first review by my supervisors.

**9) "Using vague terms such as a "more recent" or "much earlier" study".**

**Response:** What I meant was that there were much earlier study means study done in 50s or 60s, i.e. older studies. Each statement is referenced by numbers and one can easily find the year of that particular study conducted. This was my personal choice of putting those different studies (studies done in consecutive years) in sequential groups. I thought that using the "consecutive years" like: 1981, 1982, or 1952, 1998 etc. would look very cumbersome and confusing for the readers. Besides, it could always be changed by editing.

<u>Salmonella Serovars paper</u>

**1) "Little relevance to the OPHS and does not address specific needs of OPHS".**

**Response:** This assignment had no model, no clear cut objective or style given to me to follow. In fact, nobody in our division previously had written such a paper. I do not think anyone even knew what it was! My supervisor did not provide me any guidance other

3

than saying "make a brief description of 20 serovars" within 3 days. There was no specific need spelled by anybody regarding this task. There was no request or model given to me to address any specific needs of OPHS. In addition, this assignment was out of my expertise since I am not a qualified microbiologist. What ever I have written in this report came from published articles. This was terribly time and labor consuming. I have repeatedly cautioned my supervisors by numerous memos and verbally that I do not understand what they expected of me in exactly this assignment. No microbiologist ever made any paper to describe serovars. Serovars description simply does not exist. No books have ever described serovars (*please see the background story of Salmonella assignment)*

**2) "Swine being the reservoir of S. Heidelberg is omitted".**

**Response:** Swine is a domestic animal. I have mentioned domestic animals (i.e., Swine, Cattle, Sheep and Goats) as the reservoir. Therefore, I did not omit swine from the reservoir list, since swine is also a domestic animal. Besides, this report was reviewed by Dr. Parham before it was submitted. It was Dr. Parham in her memo dated 11/22/05 who criticized me when I put reservoirs: Domestic animals, cattle, swine, poultry etc.). In the 2nd of 3rd paragraph of that memo she stated: *"In addition, the reservoir list is not well constructed. For example: as written, domestic animals include cattle, but your listing states, "domestic animals, cattle, etc".* Dr. Parham has clearly criticized my style. After that I changed the statement of reservoir according to Dr. Parham's suggestion and put only 'domestic animals' skipping the word swine or cattle separately (please see Exhibit-7). Now Dr. Parham is criticizing her own suggested change from her memo dated: 11/22/05.

**3) "Public health risk as range from low to high with no additional analysis as seen in S. Heidelberg".**

**Response:** This is an incorrect statement by my supervisor. Actually for *S. Heidelberg* I have stated 'Moderate to High' and not "Low to High". I have worked in the field of medical science for the last 35 years and I have been often used these terminologies (Low, Moderate. High and Severe or very high) to determine the degree of infections, degree of damages, degree of affecting public health etc. Most scientists use them as an expression of the quality. These terminologies do not necessarily carry statistical accuracies; these only carry the hypothetical values. In my report of Salmonella serovars description, I have given a very clear "Glossaries of Public health significance" with the explanations of each terminology. These glossaries should be readily understandable.

**4) "Uses of antimicrobial drugs in food producing animals were outside the scope of paper".**

**Response:** This is yet another incorrect statement and misunderstanding by my supervisor. Again this is not my own statement or my own finding. I have simply quoted

4

it from the published scientific paper. This is of course without any doubt a genuine factor of antimicrobial resistance (Please see Exhibit-8). When mentioned about antimicrobial resistance of any chemical agent, one must give the hypothesis or source from where this chemical agent developed antimicrobial resistance. Scientists generally describe why certain disease causing agents are antimicrobial resistant. For example; when some human patients are not responding to certain antibiotic to kill a bacterial agent—doctors or scientists positively presume that patient may have consumed foods containing that antibiotic (may be in the meats), so the target bacteria developed immunity to that antibiotic. I do not consider that this urgently relevant statement could be termed as "outside the scope" of this write up.

**5) "Isolation rating of S. Heidelberg from lowest to highest and HACCP data not published".**

**Response:** This is another misstatement by my supervisor. I have never said *S. Heidelberg* isolation from "low to high". Actually, I have said: 'Moderate to high'. HACCP data was provided by my supervisor from which I have selected these five serovars. This report of S.serovars was not meant for publication and was requested only for general information. So, I did not consider that it was a requirement that I state whether or not HACCP data was published. This paper was reviewed by Dr. Parham before the final submission. But she did not tell me anything about this in her comments before. Moreover, it was only a first draft and if necessary it could always be stated that HACCP data was unpublished.

**6) "Multiple drugs resistant vs. Multiple drug resistant".**

**Response:** English grammar rules by Microsoft (Spelling and Grammar: English (U.S.) in my PC has suggested me that I use 's' with the word 'drug', as the phrase says: Multiple drugs. Multiple means more than one and using 's' was correct according to Microsoft's "Spelling and Grammar" rules.

By Khurshed A. Chowdhury, DVM. Ph.D.

5

0264

*Production – 8*

*Ref # 16 of Toxo-report*

J. Parasitol., 88(6), 2002, pp. 1234-1238
© American Society of Parasitologists 2002

# HIGH PREVALENCE OF VIABLE *TOXOPLASMA GONDII* INFECTION IN MARKET WEIGHT PIGS FROM A FARM IN MASSACHUSETTS

J. P. Dubey, H. R. Gamble,* D. Hill, C. Sreekumar, S. Romand,† and P. Thulliez†
Parasite Biology, Epidemiology and Systematics Laboratory, Building 1001, Animal and Natural Resources Institute, Agricultural Research Service, United States Department of Agriculture, Beltsville Agricultural Research Center-East, Beltsville, Maryland 20705. e-mail: jdubey@anri.barc.usda.gov

*Comment by these famous Toxoplasma authors*

Feldman dye test, the modified agglutination test, and the Western blot. Results indicate that until examination of meat for T. gondii infection is implemented in slaughterhouses, all meat should be cooked according to industry guidelines before human consumption.

PMID: 12539744 [PubMed - indexed for MEDLINE]

*Exhibit – 1*

*Ref.# 10*

J. Parasitol. 91(7), 2005, pp. 000–000
© American Society of Parasitologists 2005

# PREVALENCE OF VIABLE *TOXOPLASMA GONDII* IN BEEF, CHICKEN, AND PORK FROM RETAIL MEAT STORES IN THE UNITED STATES; RISK ASSESMENT TO CONSUMERS

J. P. Dubey, D. E. Hill, J. L. Jones[*], A. W. Hightower[*], E. Kirkland[*], J. M. Roberts[*], P. L. Marcet[*], T. Lehmann[*], M. C. B. Vianna, K. Miska, C. Sreekumar, O. C. H. Kwok, S. K. Shen, and H. R. Gamble

United States Department of Agriculture, Agricultural Research Service, Animal and Natural Resources Institute, Animal Parasitic Diseases Laboratory, Building 1001, Beltsville, Maryland 20705-2350. e-mail: jdubey@anri.barc.usda.gov

*Comments by these famous authors of Toxoplasmosis*

we conducted a statistically valid study of the prevalence of *T. gondii* in pork, beef, and chicken in retail grocery stores in the United States. This survey provides an accurate picture of the risk of exposure to *T. gondii* in retail meat.

The ingestion of infected uncooked pork was believed to be a major meat source of *T. gondii* infection for humans in the United States (Mead et al., 1999). This is paradoxical because most consumers, since childhood, are aware of the danger of eating uncooked pork in the United States due to a fear of acquiring *Trichinella spiralis* infection. Further, the prevalence of *T. gondii* in the human population is stable (around 20%) and has not decreased as a result of a decrease of *T. gondii* infection in pigs (Dubey, Weigel et al., 1995; Jones, Kruszon-Moran et al., 2001; Jones et al., 2003). Therefore, further studies are needed concerning the dietary habits and other sources of meat consumed in the United States.

TABLE VIII. Risk to consumers of purchasing *Toxoplasma gondii* contaminated meat from U.S. retail stores.

| Meat | Annual meat consumption (kg) | Minimum likely prevalence (no. positive/no.) (95% CL) | Probability of purchasing *T. gondii* contaminated meat over time[*]. | |
|---|---|---|---|---|
| | | | 1 yr | 10 yr |
| Pork | 23.5 | .0038 (8/2094) (.00165, .0075) | .0626 | .4765 |
| Beef | 29.5 | 0 (0/2094) (.0000, .0176) | 0 | 0 |
| Chicken | 37.2 | 0 (0/2094) (.0000, .0176) | 0 | 0 |

[*]Binomial probability computations assume a mean sample weight of 1.36 kg.

## DISCUSSION

Overall, a low prevalence of *T. gondii* was found in meat sold from retail stores in the United States. *T. gondii* was identified in 7 pork pools from a total of 2,094 pork samples. These data are based on bioassay of pools made of 6 100-g samples

*Exhibit – 2*

*BMJ* 2000;321:127-128 ( 15 July )

*Ref.# 24*

**Editorials**

# Sources of *Toxoplasma gondii* infection in pregnancy

*Until rates of congenital toxoplasmosis fall, control measures are essential*

Papers p *142*

*Comment by the above author*

The association of cats and human toxoplasmosis is difficult to assess by epidemiological surveys because soil, not the cats, is the main culprit. Oocysts are not found on cat fur and are often buried in soil along with cat faeces.[11] Therefore, direct contact with cats is irrelevant with respect to *T gondii* transmission, and soil contact is universal and difficult to avoid.

*Exhibit — 3*

*Ref.# 11*

*Toxoplasma gondii* Levels in Swine Operations:
Differences Due to Technology Choice
and Impact on Costs of Production

Chun-Hsuan Wang,* Vina Diderrich,**
James Kliebenstein,* Sharon Patton,**
Jeff Zimmerman,* Arne Hallam,* Eric Bush,***
Charles Faulkner,** Raymond McCord**

Iowa State University
Department of Economics
Staff Paper No. 337
September 2000

*Comment by the above authors*

Toxoplasmosis in swine is a food safety issue, as opposed to an animal health issue. For balance, it should be noted that the role of meat as a risk factor for human toxoplasmosis is unclear and, indeed, a number of studies have found no association between meat consumption and toxoplasmosis (Ahmed, 1992; Etheredge and Frenkel, 1995; Rawal, 1959; Warren and Dingle, 1966; Wende and Dienst, 1961).

*Exhibit — 4*

*Ref.# 14*

Reports from the Scientific Program,

Section on Toxoplasmosis,

126th Annual AVMA Meeting, Orlando, Fla, July 15-19, 1989

*245*

# Transmission of toxoplasmosis and the role of immunity in limiting transmission and illness

J. K. Frenkel, MD, PhD

*Comment by the above author*

Vaccination of cats could reduce transmission of *Toxoplasma*, because all *Toxoplasma* infections, whether in intermediate hosts or cats, ultimately depend on oocyst shedding from cats (Fig 5). This vaccine is an altruistic one because reduction of oocyst contamination around human populations, in farms, and in zoos, accrues benefits mainly to human beings. The vaccine is a living one, and although it has been frozen, it has not been lyophilized.

*Exhibit — 5*

( Ref. # 25 )

**Toxoplasmosis fact sheet**

*This was the origin of my erroneous comment*

**Description**

Toxoplasmosis is caused by a one-celled protozoan parasite known as *Toxoplasm gondii.* Cats, the primary carriers of the organism, become infected by eating rodents and birds infected with the organism. Once ingested, the

Exhibit – 6

*Dr. Parham's review caused errors in my Salmonella report↓*

**Issue: "Swine was omitted from the list of reservoir for S. Heidelberg".**

In my original draft, I did include swine, cattle, and pet animals in the reservoir list because several literature dictated me that **swine, cattle and pet animals** are reservoirs for this above serovar. But Dr. Parham has asked me to change it in her review (her memo dated: 11-22-05) of this Salmonella paper before my final submission, as I have mentioned in my rebuttal.

*Before the review by Dr. Parham*

    **(2) S. Heidelberg.** [20, 18, 24, 26, 29, 30]

16.84-22.9% isolated from young chicken.

    **Reservoirs:** Domestic and wild animals, poultry, including wild birds, swine, and cattle, rodents and pet animals, and also man.

*After the review by Dr. Parham*

    **(2) *S*. Heidelberg.**

    **Antigenic formula:** 1,4, [4], 12, r, 1, 2

    **Rate of isolation:** 16.84-22.9% was isolated from young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

    **Reservoirs:** Domestic and wild animals, poultry, including wild birds, rodents and pet animals, and also man[1, 2].

*Exhibit - 7*

*Comments by This article* *Ref. # → (20)*

# Antibiotic Resistance in *Salmonella* Enterica Serotypes Heidelberg, Kentucky, and Thompson Isolated From Human and Broiler Chicken Sources

*Hollinger K, Silvers L, Marano N, Fedorka-Cray P, Angulo F, Tollefson L, Stamey K*

**Background**: Chickens are a common source of Salmonella. Antibiotics are used in chicken production raising concerns that chicken food products may be a source of resistant salmonella for humans.

**Methods**: In 1998, National Antimicrobial Resistance Monitoring System (NARMS) isolates were susceptibility tested to 17 antibiotics by SensititreTM microbroth dilution and classified by NCCLS breakpoints, where defined. Comparison of serotypes among all animal species indicated that Salmonella Heidelberg(H), Kentucky(K) and Thompson(T) were most often isolated from chicken, accounting for 55.0% of chicken and 8.0% of human isolates. Human serotypes were separated into two groups: HKT( n=107), and another group composed of the remaining serotypes, non-HKT ( n=1330).

**Results**: Comparison between the two human groups indicated similar prevalence of resistance for all antibiotics tested except for: chloramphenicol, gentamicin, kanamycin, and streptomycin. The largest difference between human groups was observed for gentamicin where 15.9% of the HKT group and 1.8% of the non-HKT group were resistant; the HKT group was more similar to the chicken isolates, (15.5%). Comparison of human HKT and Chicken groups indicated similarity in prevalence of resistance for all antibiotics except kanamycin where Chicken prevalence (3.2%) was more similar to the human non-HKT (5.2%).

**Discussion**: The higher prevalence of gentamicin resistance between human groups was a discrepancy not seen with other antibiotics. In the chicken industry there is widespread injection of broiler eggs with gentamicin prior to hatch.

**Conclusion**: The greater proportion of gentamicin resistance in persons ill with salmonella and submitting isolates to NARMS occurred in serotypes that were predominantly isolated from chickens. Use of gentamicin in the poultry industry needs to be examined in light of these findings.



Suggested citation

Hollinger K, Silvers L, Marano N, Fedorka-Cray P, Angulo F, Tollefson L, Stamey K. Antibiotic resistance in Salmonella Enterica Serotypes Heidelberg, Kentucky, and Thompson isolated from human and broiler chicken sources. 39th Interscience Conference on Antimicrobial Agents and Chemotherapy, San Francisco, CA. September 1999.

*Exhibit – 8*

**Dr. Richard gast's statements on October 18 and 19, 2005 in his emails to me regarding serovars description issue:**

Dear Dr. Chowdhury:

"It would be difficult to find all of the information you are seeking in a single source. Below are some references that I believe will be helpful to you. Good luck and let me know if there is something else I can do."

--Richard

Dr. Chowdhury,

"I definitely appreciate your problem with this assignment. The amount of information that you are being asked to compile is essentially equivalent to the entire contents of a comprehensive review article on Salmonella in poultry. I know from my own experience in working on those types of tasks that this is an immense and complex job. Again, don't hesitate to let me know if I can be helpful with any specific questions that come up as you proceed."

*Richard K. Gast, PhD*
*Microbiologist and Research Leader*
*Egg Safety and Quality Research Unit*
*USDA Agricultural Research Service*
*Russell Research Center, Room 311*
*950 College Station Road*
*Athens, GA 30605 USA*

Exhibit-9

*Dr. Thaler was correcting Microbiology classification in my Salmonella report which was taken from Ref # 16 a published bacterial classification by famous microbiologist.*

### Brief descriptions of five Salmonella serotypes

Five most frequently isolated Salmonella serovars from young chicken have been selected *(From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004)* for writing brief descriptions. The Salmonella serovars (in order from their most frequently isolated to less frequently isolated from the broilers) are: *S. Kentucky, S. Heidelberg, S. Typimurium var. Copenhagen, S. Typhimurium,* and *S. Enteritidis.*

### General information [16]

*Ref # 16 of Salmonella*

Family: Enterobacteriaceae; Genus: *Salmonella*, named after United States Department of Agriculture vet Daniel E Salmon.

> **Comment [AMT1]:**
> se the full word

Species: *Salmonella enterica,* and *Salmonella bongori. S. enterica* has six subspecies. Isolates from humans and warm-blooded animals belong to *Salmonella enterica* subspecies *enterica*

Serotypes: More than 2,400 *Salmonella* serotypes have been described and reported. All *Salmonella enterica* subspecies *enterica* serotypes are considered potentially pathogenic. Some serotypes are host specific, but the majority can affect different hosts.

> **Deleted:**
>
> **Deleted:** All *Salmonella* serotypes are considered potentially pathogenic. Some serotypes are host specific, but the majority can affect different hosts. ¶
>
> **Deleted:** sporing

### Characteristics of *Salmonella* serotypes in general

- Gram-negative non-spore-forming rods (2-4X0.5μm), do not have capsules.
- Usually motile with long flagella.
- Non-motile variants may occur e.g *S. Pullorum , S. Gallinarum.*
- Optimal growth between 35-37°C and pH 7-7.5.
- Can survive several months away from the host.
- Can survive refrigeration, freezing (much reduced growth at temperatures <15°C and above 6°C) and dry conditions.
- Sensitive to most disinfectants.
- Killed at high temperatures. In general 60°C for 2-6 minutes or 70°C for 1 minute will kill the bacteria.

### (1) S. Kentucky

**Antigenic formula**: I, 8, 20 : i: z, 6

**Rate of isolation**: Very high percentages (32.14-44.39%) were isolated from the young chicken (From the table of Poultry Salmonella serotypes isolated through HACCP verification testing, all sets 1998-2004) samples of broiler HACCP plants.

**Reservoirs**: Domestic and wild animals, poultry, including wild birds, rodents and pet animals, and also man[1, 2]

> **Comment [AMT2]:**
> hy have these specific examples been used? Seems redundant.

*For Salmonella report*

1

*Exhibit - 10*

# EXHIBIT Q



# The Little Book of Plagiarism

RICHARD A. POSNER



*Pantheon Books, New York*

copyright, which normally prohibits the unautho-rized publication of copyrighted work, and why should the exception shelter plagiarists? The pla-giarist does not play fair. Were there such an exception, one could write a book consisting entirely of unacknowledged passages from other writers, provided one took only a small amount from each work; in fact it would be a case of both plagiarism and copyright infringement.

The law does not excuse copyright infringe-ment, no matter how fulsome the infringer's acknowledgment of his copying; but the acknowl-edgment will exonerate him of any charge of pla-giarism. Or at least should—because judges will sometimes call copyright infringers "plagiarists" though there is no concealment. This loose usage erases what is distinctive about plagiarism, though it illustrates how the rise of copyright has made copying a suspicious activity.

Concealment is at the heart of plagiarism. But it must be carefully defined. It is not a mere fail-ure to acknowledge copying. Often copying is

17

# EXHIBIT R

### COMPLAINANT'S AFFIDAVIT

I, (name) ___Khurshed Chowdhury_____ (County of): _____

am an __X__ employee of _____ applicant to _____ former employee of the U. S. Department of Agriculture:

(Agency) _____Food Safety & Inspection Service_____

(County of Agency) _____

(Office) _____Office of Public Health Service (OPHS)_____
_____

(Division) _____Zoonoses Diseases and Residue Surveillance Division_____
_____

(Branch) Zoonoses Disease_____
_____

Located in (city and state) Washington, D.C._____

In the capacity of (show both your organization title and the classification of your job, if different): _Veterinary Medical Officer_____

Grade _____GS-701-13_ between (date) _____1991_____and (date)_Present_
_____

My telephone number during working hours is:_(202) 690-6529____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I have an obligation to cooperate fully with the investigator, who has been assigned to conduct a thorough and impartial investigation of my complaint of discrimination. Therefore, I must provide a statement for the investigative record which is true and complete to the best of my knowledge and belief and which fully addresses the issues accepted for investigation. My statement must be specific with regard to names, dates, places, circumstances and related events, and disclose my firsthand knowledge of any directly related information, which is relevant to the issue(s). My statement, along with my Informal Complaint, Counselor's Summary Report, my Formal Complaint, and the description of the issue(s) for investigation will serve as the basis for the investigation. While I may voluntarily submit any additional documents or information to the investigator for consideration, it will be the investigator's responsibility to determine what

evidence will actually become part of the investigative report. If there are any documents or facts, which substantiate my allegations, I must provide them to the investigator, or make them known to the investigator. I may suggest witnesses to be interviewed by the investigator. However, the investigator will decide which witnesses to interview based on relevant information he or she feels will be furnished.

My statement is made under oath (or affirmation), without a pledge of confidentiality; in accordance will the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Department of Agriculture. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of this statement and be given an opportunity to respond. Agency officials responsible for processing complaints of discrimination will have access to the entire investigative report. If discrimination is found, any employee accused of discrimination will have an opportunity to review a sanitized version of the report. If discrimination is found and disciplinary action is proposed, the employee accused of discrimination will have an opportunity to review the report in its entirety without deletions. Participants in the discrimination complaint process are specifically protected by law and the EEO regulations from any acts of reprisal, discrimination, coercion, harassment, restraint, or inference for their participation in the investigation and other phases of complaint processing.

I have the right to be represented by a person of my choice during presentation of my complaint and preparation of my statement (so long as my choice does not result in a conflict of interest). I have ____X____ / have not _____ chosen a personal representative at this stage of my complaint. In the event I have not chosen a representative but obtain a representative at a later date, I will advise the investigator and the Director of the Civil Rights Division in writing.

I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.

Having reviewed the preceding information with the investigator, I solemnly swear affirm that the statement that follows is true and complete to the best of my knowledge and belief, and fully addresses the issues and allegations raised by me in my EEO complaint.

My immediate supervisor is Dr. Delila Parham. At the time of this complaint my second-level supervisor was Dr. Alice Thaler (who was later promoted as senior Director). My date of birth is November 5, 1941. My race is Asian-American, and my national origin is Bangladesh. There are two other Asians among my colleagues,

Initials _KAC_
KA EXHIBIT _7_
Page 2 of _7_

Maqbool Qureshi, who is from Pakistan and a female whose parents are from India though she probably was born in America. Management was aware of my age, race and national origin because jokingly the subjects have come up in conversations. It's known among those I work with that I am the oldest member of my staff because on several occasions I have mentioned that I have been with the Agency for a long time. The other staff members are considerably younger. I believe that my age is a factor in my supervisors' discriminatory actions because on two separate occasions, Dr. Parham and Dr. Thaler have suggested that I was too old and should retire. The comment was made because I did not remember something.

I filed a prior EEO complaint in February 9, 2006. Dr. Parham and Dr. Thaler were named as the responsible management officials. The issue in that complaint was that my supervisors discriminated against me by rating my performance unsatisfactory allegedly because I did not complete an article suitable for publication in a peer review journal. My supervisors ignored the fact that I had worked very hard and had many important accomplishments supporting the critical FSIS mission. They also ignored the fact that my performance plan indicated that publication in a journal is a non-critical element of my job. My supervisors also did not use publication as the critical criteria to judge the performance of my other colleagues. Since filing that complaint, I have felt harassed by Dr. Thaler. Dr. Thaler continuously finds fault with my work. Until last year, I received high performance ratings. I believe that Dr. Parham gave me the unsatisfactory ratings as of her carrying out Dr. Thaler's orders. I am a DVM, Ph.D. and have worked at FSIS for almost nineteen years, and I have always received performance ratings satisfactory or exceeded a satisfactory level to superior. I have



Initials _KA C._
KA EXHIBIT _7_
Page 3 of _7_

concluded that Dr. Thaler believes that I am too old, plus she doesn't like Asians, and her criticism of my work is to set the stage for my removal from FSIS.

I have received training about my Agency's harassment policy, and I know how to report harassment. I complained to the head of OPHS, FSIS, Dr. David Goldman, the Assistant Administrator, about Dr. Thaler's criticism of my work. I wrote him a letter but didn't receive a response.

The organization where I work is comprised of a scientific team. Our job is to give scientific information to our policy maker, our administrator or to anybody who needs to know about scientific information about certain diseases. We provide this information with references and evidence. The information is treated as raw material and is by no means treated as a final solution. The receiver/customer makes the final decision. The report I was asked to do came from Peru. Peru imports beef from America, which is the reason they sent three questions regarding Bovine Spongiform Encephalopathy (BSE) to Dr. Kristin Holt. Dr Holt is the liaison for FSIS to the Center for Disease Control (CDC)) at Atlanta, Georgia. The request initially came to Dr. Alice Thaler first on May 31, 2006 and again on June 2, 2006. At that time, Dr. Thaler never said that these questions should not go to OPHS; rather they should go to Office of International Affairs (OIA). Instead, she advised her junior to find out the answers. On Friday, June 2, 2006, Dr. Qureshi (Acting Branch Chief) and Dr. Harry Walker (Acting Director) assigned me the task of answering the questions from Peru and providing them with the information as soon as possible. I was given until 1 P.M. on Monday (June 5, 2006) to complete a task that would normally take a longer time. Dr. Harry



Initials *KAC*
KA EXHIBIT 7
Page 4 of 7

Walker was acting on behalf of Ms. Thaler during this time.   It should also be noted that this same request was sent to four other individuals in Atlanta, Georgia and in Riverdale, Maryland, all of who sent answers to the specific questions.   Dr. Holt received scientific information from me and also received from all those scientists mentioned above.  Dr. Holt used the information from all of us to prepare her report to be sent to Peru.

Dr. Holt thanked me for the report I had completed, and she used my report entirely. She told me that my report was superior.  Dr. Holt used my name as a reference eight times in her short draft report.  It puzzles me to think that if my report was so bad, why Dr. Holt (the customer) would compliment the report and use the information so widely rather than to criticize it.

In Dr. Thaler's June 9, 2006 email to me, she stated "The Peru questions should not have been handled by OIA.  I did not expect OPHS to respond to these questions from Peru."  Then she says, "The document as submitted is not acceptable.  There are technical inaccuracies and the wording in some parts is unclear or misleading."

If my report was misleading then why did my immediate supervisor and everyone else accept my report and why did Dr. Holt (the customer) use it in its entirety?  Dr. Thaler said that the questions should have been handled by OIA, yet it was she who gave the request to her junior to get the information.

Certainly there were no technical inaccuracies or anything scientifically wrong in my report as Dr. Thaler has claimed. My report, which was prepared only for Dr. Kristin Holt, had nothing to do with slaughterhouse plants that FSIS regulates; nor was this information provided to discredit the agency position, as Dr. Thaler has claimed in her

letter of June 9, 2006.  Dr. Thaler even attempted to correct the English of the original questions that came to Dr. Holt from Peru and attempted to blame me for these mistakes.  She also corrected language in the references that I took directly from 9 CFR Parts 310 and 313-a—FSIS Final Notice.

Dr. Thaler's criticisms were unjust, caused great injury to my professional self-esteem and were part of an attempt to support my firing for discriminatory and retaliatory reasons.  I believe that Dr. Thaler's allegations regarding my report were baseless, frivolous in quality, and were part of her design to discriminate against me because of my age and because I am an Asian-Pacific American employee. Her criticisms of my work were also a reprisal against me because I have previously filed EEO complaint against her.

As a remedy to resolve this complaint, I would like a letter of apology for insulting my professionalism from Dr. Alice Thaler and reasonable payment for attorney fees. Also, removal of the present performance evaluation; performance evaluation for 2005 that rates me as fully successful, compensatory damages for emotional distress, anxiety, humiliation, embarrassment and loss of enjoyment of life.  I would like for the harassment and retaliation to cease, and I want Dr. Thaler to withdraw her memo concerning my work, dated June 9, 2006, to Dr. David Goldman and others.

I have no further statements to add.

I have reviewed this statement, which consists of _____5_____ pages, and hereby solemnly X_____ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

Initials _KAC_
KA EXHIBIT _7_
Page 6 of _7_

_Khurshed A. Chowdhury_                    8/29/06
(Signature of Deponent)                   (Date)

Date: August 31, 2006

To: Ms. GLORIA MALLARD
Contract EEO Investigator
Kensington Associates, LLC

Subject:  Rebuttal to the "STATEMENTS BY MANAGEMENT OFFICIALS
EEO Complaint No. FSIS-2006-02266 for Khurshed Chowdhury" dated:August 30,
2006

This is my rebuttal to the management claims that my report sent to Dr. Kristin
Holt had scientific errors and was not up to the standard. I first want to point out that
management did not specify as to what was/were so called "errors" in my informal
report. They only said that there were errors in my report.

I have been sending scientific information regarding BSE to my supervisors for
the last 4 to 5 years. I have used the same standards and methods and I was never told
that my reports had problems.  Rather, I have received many awards and letters
praising my performance from my previous supervisors.

I also want to emphasize that I needed to prepare this report within 3 or 4
hours time. My purpose was to provide only the available scientific information
requested. The report was never intended as a final document for public distribution.
Science was the subject here and I described to Dr. Holt the most recent scientific
information with pertinent references. While we were discussing the issue of Peru's BSE
questions on the telephone, Dr. Holt never told me that she was confused with my
report or that she discovered some errors. Instead she thanked me very much and
asked if she could use the table (BSE measures comparison table between OIE and
USA which I have given her with my report) as additional support to answer any further
questions from Peru about BSE.

As I have stated, my report had authenticated raw data and internationally
accepted scientific information regarding BSE.  It also contained scientific data
regarding organs that were  suspected to be at risk for BSE. My report stated the names
of organs and tissues which are internationally accepted SRM (Specified Risk Materials)
for BSE infectivity. Those organs which were controversial (not internationally accepted)
SRM, I included with a prefix: "perhaps" and with the pertinent references.

I included these suspect organs because Peru's questions mentioned some
organs (liver, kidneys, lungs, heart and stomachs) for SRM which were not considered
suspect by the world BSE experts. In addition to the well designated SRMs (Brain,
Spinal cord, Eyes, Dorsal root ganglia, Trigeminal nerve, Distal ileum, Tonsil, Lymphoid
tissues), I also mentioned two additional SRMs (tongue muscles and peripheral nerves)
considered as potential SRMs by many BSE experts. I also provided references to
substantiate this claim.  By including these suspect organs,  I intended to assist Dr. Holt
in her final report to Peru.

KAC

EXHIBIT   10
Page  2  of  7  pages

I have no way of knowing what scientific errors Dr. Thaler discovered in my report because neither my immediate supervisor, Dr. Parham, nor Dr. Thaler, ever pointed out any errors to me. In fact, on June 5, 2006, I submitted this report to Dr. Parham for her review. Dr. Parham sent it to Dr. Holt that same day without any changes.

Had there been any serious scientific inaccuracies or misleading items in the report the following would have occurred:

1. My immediate supervisor would not have forwarded the report to Dr. Holt; instead she would have sent it back to me for necessary corrections and then sent it to Dr. Holt.

2. Dr. Holt would have expressed her dissatisfaction or confusion to me about my report during her conversation with me on telephone.

3. Dr. Holt would not have used my alleged incorrect information or would not have used my name as the reference so many times knowing that information in my report was confusing or erroneous. Because, nobody uses incorrect information in his report, or cites references about somebody who has provided wrong information.

4. Dr. Holt would not thank me in her emails and on the phone and ask my opinion about whether she should include my table with her report.

I should further emphasize that my report was never sent to Dr. Thaler for her review and correction. Dr. Thaler received the report when I sent a courtesy copy to Dr. David Goldman, the Assistant Administrator, five days later on June 9, 2006. Only then did Dr. Thaler try to discredit my work.

I also point out again that, contrary to Dr. Thaler's claims, my report had nothing to do with slaughterhouse plants that FSIS regulates; nor was this information provided to discredit the agency position. Dr. Thaler even attempted to correct the English of the original questions that came to Dr. Holt from Peru and attempted to blame me for these mistakes. She also corrected language in the references that I took directly from 9 CFR Parts 310 and 313-a—FSIS Final Notice.

Further, it was untrue that I ever barged into Dr. Parham's office or yelled at or threatened her as Dr. Thaler claims. When I met with Dr. Parham all I told her was that I was hurt when she issued me an unsatisfactory rating and that my family was in distress with the pain and uncertainty of whether I would be fired. I spoke to her very quietly. Had I shouted at her, somebody near her office would have heard me. However, that was not the case.

Moreover, as I already have explained in my EEO complaint which was filed on February 9, 2006, since filing my original complaint in 2005 and continuing thereafter, I

*KØC*

2

EXHIBIT ___10
Page 3 of 7 pages

08/31/2006 15:02 FAX              004/004

have felt harassed by Dr. Thaler. She continually finds fault with my work even though until last year, I received high performance ratings. She has ignored the fact that I had worked very hard and had many important accomplishments supporting the critical FSIS mission. She issued me an unsatisfactory rating for alleged poor performance on the publication in peer-review journal for discriminatory and retaliatory reasons. It was not because of my poor performance in critical FSIS mission support as she claimed. Publication in peer review journals is not even listed as a critical element of my job. My supervisors also did not use publication as the critical criteria to judge the performance of my other colleagues. My supervisors did not give me any credit for my better accomplishments in the area of critical mission support for the FSIS.

Finally I state again that Dr. Thaler's allegations regarding my report to Dr. Holt were baseless and frivolous and were part of the design to discriminate against me because of my age and because I am an Asian-Pacific American who had previously filed EEO complaints against her. Dr. Thaler's criticism of my work is to set the stage for my proposed removal from FSIS.

I have no other statement to make.


_Khurshed A. Chowdhury_          _8/31/06_
(Signature of Deponent)               (Date)

3

EXHIBIT _10_
Page _4_ of _7_ pages

| | |
|---|---|
| Subj: | **Dr. Alice Thaler's reputation in the FSIS** |
| Date: | 9/2/06 6:53:15 AM Eastern Daylight Time |
| From: | chowdhuryk@gmail.com (K Chowdhury) |
| Reply-to: | chowdhuryk@gmail.com |
| To: | Gamallard@aol.com |
| File: | **AliceThalerCharacter.doc** (28160 bytes) DL Time (115200 bps): < 1 minute |

Dear Ms. Mallard,

I humbly apologize for bothering you with this email. I thought I forgot to fax you this document (attachment) which could expose real character of Dr. Alice Thaler. I urge you to read the attachment above before you complete report.

I was surprised and stunned by the eccentric protection given to Dr. Thaler by Dr. David Goldman. I was wrong, I thought Dr. Goldman will tell the truth; instead he protected Dr. Thaler almost blindly. It is the well known fashion in the FSIS to support manager, no matter how cruel a manager is. Neither Dr. Goldman nor anybody can show you any scientific error in my report. Only thing they can point out could be some silly punctuation or English grammars. Fact is, Grammars were not the issue in this report. Other people who also answered BSE questions did not even make any report (like mine) to give their scientific input; they simply commented in their simple emails to Dr. Holt. I was the only person sent comments in the form of report only to maintain our division's style.

Handing this terrible notice of removal on Thursday by Dr. Thaler was obviously another **cruel retaliation** by her, because of your investigation has annoyed her seriously. She is very powerful and can manipulate agency's punishment at her will. Many of my peers told me this.

I could give you a series of names who could better evaluate Dr. Thaler to you. But I know you probably do not have that much time to contact people. But I am hoping that you will give your fair judgment to this critical investigation which is most important for my fate. Thank you for your patience.

Sincerely,

Khurshed Chowdhury, DVM, Ph.D.
401 Southview Ave, Silver Spring, MD 20905
Phone: 301-388-0996

--------------------------- Headers ---------------------------
Return-Path: <chowdhuryk@gmail.com>
Received: from  rly-yb02.mx.aol.com (rly-yb02.mail.aol.com [172.18.205.134]) by air-yb03.mail.aol.com (v112.5) with ESMTP id MAILINYB33-17f44f9629028c; Sat, 02 Sep 2006 06:53:15 -0400
Received: from  wx-out-0506.google.com (wx-out-0506.google.com [66.249.82.233]) by rly-yb02.mx.aol.com (v112.5) with ESMTP id MAILRELAYINYB23-17f44f9629028c; Sat, 02 Sep 2006 06:53:04 -0400
Received: by wx-out-0506.google.com with SMTP id s13so1292979wxc
      for <Gamallard@aol.com>; Sat, 02 Sep 2006 03:53:04 -0700 (PDT)
DomainKey-Signature: a=rsa-sha1; q=dns; c=nofws;
      s=beta; d=gmail.com;
      h=received:reply-to:from:to:subject:date:message-id:mime-version:content-type:x-priority:x-msmail-priority:x-mailer:importance:x-mimeole;

Tuesday, September 05, 2006 America Online: Gamallard

EXHIBIT    10

b=Zo76PcrmNT+riZPJOCanq/bh+ZbxwC3BG6xG7pqAXDYnvLxADET+LfTCcdlPj5ViOadUP3nucEkYsQEazSnmZ
Received: by 10.70.14.9 with SMTP id 9mr5345794wxn;
    Sat, 02 Sep 2006 03:53:03 -0700 (PDT)
Received: from abba ( [72.66.77.73])
    by mx.gmail.com with ESMTP id 29sm193926wrl.2006.09.02.03.53.02;
    Sat, 02 Sep 2006 03:53:03 -0700 (PDT)
Reply-To: <chowdhuryk@gmail.com>
From: "K Chowdhury" <chowdhuryk@gmail.com>
To: <Gamallard@aol.com>
Subject: Dr. Alice Thaler's reputation in the FSIS
Date: Sat, 2 Sep 2006 06:53:22 -0400
Message-ID: <000001c6ce7e$02f5c460$1102445c@abba>
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="----=_NextPart_000_0001_01C6CE5C.7BE42460"
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook, Build 10.0.6626
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2962
X-AOL-IP: 66.249.82.233
X-AOL-SCOLL-SCORE: 0:2:404492255:10468982
X-AOL-SCOLL-URL_COUNT: 0

EXHIBIT 10
Page 6 of 7

# EXHIBIT R

### COMPLAINANT'S AFFIDAVIT

I, (name) ___Khurshed Chowdhury_____ (County of): _____

am an __X__ employee of _____ applicant to _____ former employee of the U. S. Department of Agriculture:

(Agency) _____Food Safety & Inspection Service_____

(County of Agency) _____

(Office) _____Office of Public Health Service (OPHS)_____
_____

(Division) _____Zoonoses Diseases and Residue Surveillance  Division_____
_____

(Branch) Zoonoses Disease_____
_____

Located in (city and state) Washington, D.C._____

In the capacity of (show both your organization title and the classification of your job, if different):  Veterinary Medical Officer_____

Grade _____GS-701-13__ between (date) _____1991_____and (date)_ Present _____

My telephone number during working hours is:_ (202) 690-6529_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I have an obligation to cooperate fully with the investigator, who has been assigned to conduct a thorough and impartial investigation of my complaint of discrimination. Therefore, I must provide a statement for the investigative record which is true and complete to the best of my knowledge and belief and which fully addresses the issues accepted for investigation. My statement must be specific with regard to names, dates, places, circumstances and related events, and disclose my firsthand knowledge of any directly related information, which is relevant to the issue(s). My statement, along with my Informal Complaint, Counselor's Summary Report, my Formal Complaint, and the description of the issue(s) for investigation will serve as the basis for the investigation. While I may voluntarily submit any additional documents or information to the investigator for consideration, it will be the investigator's responsibility to determine what

evidence will actually become part of the investigative report. If there are any documents or facts, which substantiate my allegations, I must provide them to the investigator, or make them known to the investigator. I may suggest witnesses to be interviewed by the investigator. However, the investigator will decide which witnesses to interview based on relevant information he or she feels will be furnished.

My statement is made under oath (or affirmation), without a pledge of confidentiality; in accordance will the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Department of Agriculture. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of this statement and be given an opportunity to respond. Agency officials responsible for processing complaints of discrimination will have access to the entire investigative report. If discrimination is found, any employee accused of discrimination will have an opportunity to review a sanitized version of the report. If discrimination is found and disciplinary action is proposed, the employee accused of discrimination will have an opportunity to review the report in its entirety without deletions. Participants in the discrimination complaint process are specifically protected by law and the EEO regulations from any acts of reprisal, discrimination, coercion, harassment, restraint, or inference for their participation in the investigation and other phases of complaint processing.

I have the right to be represented by a person of my choice during presentation of my complaint and preparation of my statement (so long as my choice does not result in a conflict of interest). I have ____X____ / have not _____ chosen a personal representative at this stage of my complaint. In the event I have not chosen a representative but obtain a representative at a later date, I will advise the investigator and the Director of the Civil Rights Division in writing.

I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.

Having reviewed the preceding information with the investigator, I solemnly swear affirm that the statement that follows is true and complete to the best of my knowledge and belief, and fully addresses the issues and allegations raised by me in my EEO complaint.

My immediate supervisor is Dr. Delila Parham. At the time of this complaint my second-level supervisor was Dr. Alice Thaler (who was later promoted as senior Director). My date of birth is November 5, 1941. My race is Asian-American, and my national origin is Bangladesh. There are two other Asians among my colleagues,

Maqbool Qureshi, who is from Pakistan and a female whose parents are from India though she probably was born in America. Management was aware of my age, race and national origin because jokingly the subjects have come up in conversations. It's known among those I work with that I am the oldest member of my staff because on several occasions I have mentioned that I have been with the Agency for a long time. The other staff members are considerably younger. I believe that my age is a factor in my supervisors' discriminatory actions because on two separate occasions, Dr. Parham and Dr. Thaler have suggested that I was too old and should retire. The comment was made because I did not remember something.

I filed a prior EEO complaint in February 9, 2006. Dr. Parham and Dr. Thaler were named as the responsible management officials. The issue in that complaint was that my supervisors discriminated against me by rating my performance unsatisfactory allegedly because I did not complete an article suitable for publication in a peer review journal. My supervisors ignored the fact that I had worked very hard and had many important accomplishments supporting the critical FSIS mission. They also ignored the fact that my performance plan indicated that publication in a journal is a non-critical element of my job. My supervisors also did not use publication as the critical criteria to judge the performance of my other colleagues. Since filing that complaint, I have felt harassed by Dr. Thaler. Dr. Thaler continuously finds fault with my work. Until last year, I received high performance ratings. I believe that Dr. Parham gave me the unsatisfactory ratings as of her carrying out Dr. Thaler's orders. I am a DVM, Ph.D. and have worked at FSIS for almost nineteen years, and I have always received performance ratings satisfactory or exceeded a satisfactory level to superior. I have



Initials _KAC_
KA EXHIBIT _7_
Page 3 of _7_

concluded that Dr. Thaler believes that I am too old, plus she doesn't like Asians, and her criticism of my work is to set the stage for my removal from FSIS.

I have received training about my Agency's harassment policy, and I know how to report harassment. I complained to the head of OPHS, FSIS, Dr. David Goldman, the Assistant Administrator, about Dr. Thaler's criticism of my work. I wrote him a letter but didn't receive a response.

The organization where I work is comprised of a scientific team. Our job is to give scientific information to our policy maker, our administrator or to anybody who needs to know about scientific information about certain diseases. We provide this information with references and evidence. The information is treated as raw material and is by no means treated as a final solution. The receiver/customer makes the final decision. The report I was asked to do came from Peru. Peru imports beef from America, which is the reason they sent three questions regarding Bovine Spongiform Encephalopathy (BSE) to Dr. Kristin Holt. Dr Holt is the liaison for FSIS to the Center for Disease Control (CDC)) at Atlanta, Georgia. The request initially came to Dr. Alice Thaler first on May 31, 2006 and again on June 2, 2006. At that time, Dr. Thaler never said that these questions should not go to OPHS; rather they should go to Office of International Affairs (OIA). Instead, she advised her junior to find out the answers. On Friday, June 2, 2006, Dr. Qureshi (Acting Branch Chief) and Dr. Harry Walker (Acting Director) assigned me the task of answering the questions from Peru and providing them with the information as soon as possible. I was given until 1 P.M. on Monday (June 5, 2006) to complete a task that would normally take a longer time. Dr. Harry

Walker was acting on behalf of Ms. Thaler during this time.   It should also be noted that this same request was sent to four other individuals in Atlanta, Georgia and in Riverdale, Maryland, all of who sent answers to the specific questions.   Dr. Holt received scientific information from me and also received from all those scientists mentioned above.  Dr. Holt used the information from all of us to prepare her report to be sent to Peru.

Dr. Holt thanked me for the report I had completed, and she used my report entirely. She told me that my report was superior.  Dr. Holt used my name as a reference eight times in her short draft report.  It puzzles me to think that if my report was so bad, why Dr. Holt (the customer) would compliment the report and use the information so widely rather than to criticize it.

In Dr. Thaler's June 9, 2006 email to me, she stated "The Peru questions should not have been handled by OIA.  I did not expect OPHS to respond to these questions from Peru."   Then she says, "The document as submitted is not acceptable.  There are technical inaccuracies and the wording in some parts is unclear or misleading."
If my report was misleading then why did my immediate supervisor and everyone else accept my report and why did Dr. Holt (the customer) use it in its entirety?  Dr. Thaler said that the questions should have been handled by OIA, yet it was she who gave the request to her junior to get the information.

Certainly there were no technical inaccuracies or anything scientifically wrong in my report as Dr. Thaler has claimed. My report, which was prepared only for Dr. Kristin Holt, had nothing to do with slaughterhouse plants that FSIS regulates; nor was this information provided to discredit the agency position, as Dr. Thaler has claimed in her

letter of June 9, 2006. Dr. Thaler even attempted to correct the English of the original questions that came to Dr. Holt from Peru and attempted to blame me for these mistakes. She also corrected language in the references that I took directly from 9 CFR Parts 310 and 313-a—FSIS Final Notice.

Dr. Thaler's criticisms were unjust, caused great injury to my professional self-esteem and were part of an attempt to support my firing for discriminatory and retaliatory reasons. I believe that Dr. Thaler's allegations regarding my report were baseless, frivolous in quality, and were part of her design to discriminate against me because of my age and because I am an Asian-Pacific American employee. Her criticisms of my work were also a reprisal against me because I have previously filed EEO complaint against her.

As a remedy to resolve this complaint, I would like a letter of apology for insulting my professionalism from Dr. Alice Thaler and reasonable payment for attorney fees. Also, removal of the present performance evaluation; performance evaluation for 2005 that rates me as fully successful, compensatory damages for emotional distress, anxiety, humiliation, embarrassment and loss of enjoyment of life. I would like for the harassment and retaliation to cease, and I want Dr. Thaler to withdraw her memo concerning my work, dated June 9, 2006, to Dr. David Goldman and others.

I have no further statements to add.

I have reviewed this statement, which consists of ____5____ pages, and hereby solemnly X_____ swear _____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

Initials _KAC_
KA EXHIBIT ____7
Page 6 of _7_

_Khursheed A. Chowdhury_     8/29/06
(Signature of Deponent)         (Date)

Date: August 31, 2006

To: Ms. GLORIA MALLARD
Contract EEO Investigator
Kensington Associates, LLC

Subject:  Rebuttal to the "STATEMENTS BY MANAGEMENT OFFICIALS
EEO Complaint No. FSIS-2006-02266 for Khurshed Chowdhury" dated August 30,
2006

     This is my rebuttal to the management claims that my report sent to Dr. Kristin
Holt had scientific errors and was not up to the standard. I first want to point out that
management did not specify as to what was/were so called "errors" in my informal
report. They only said that there were errors in my report.

     I have been sending scientific information regarding BSE to my supervisors for
the last 4 to 5 years. I have used the same standards and methods and I was never told
that my reports had problems.  Rather, I have received many awards and letters
praising my performance from my previous supervisors.

     I also want to emphasize that I needed to prepare this report within 3 or 4
hours time. My purpose was to provide only the available scientific information
requested. The report was never intended as a final document for public distribution.
Science was the subject here and I described to Dr. Holt the most recent scientific
information with pertinent references. While we were discussing the issue of Peru's BSE
questions on the telephone, Dr. Holt never told me that she was confused with my
report or that she discovered some errors. Instead she thanked me very much and
asked if she could use the table (BSE measures comparison table between OIE and
USA which I have given her with my report) as additional support to answer any further
questions from Peru about BSE.

     As I have stated, my report had authenticated raw data and internationally
accepted scientific information regarding BSE.  It also contained scientific data
regarding organs that were  suspected to be at risk for BSE. My report stated the names
of organs and tissues which are internationally accepted SRM (Specified Risk Materials)
for BSE infectivity. Those organs which were controversial (not internationally accepted)
SRM, I included with a prefix: "perhaps" and with the pertinent references.

     I included these suspect organs because Peru's questions mentioned some
organs (liver, kidneys, lungs, heart and stomachs) for SRM which were not considered
suspect by the world BSE experts. In addition to the well designated SRMs (Brain,
Spinal cord, Eyes, Dorsal root ganglia, Trigeminal nerve, Distal ileum, Tonsil, Lymphoid
tissues), I also mentioned two additional SRMs (tongue muscles and peripheral nerves)
considered as potential SRMs by many BSE experts. I also provided references to
substantiate this claim.  By including these suspect organs,  I intended to assist Dr. Holt
in her final report to Peru.

*KAC*

EXHIBIT  10
Page  2  of  7  pages

I have no way of knowing what scientific errors Dr. Thaler discovered in my report because neither my immediate supervisor, Dr. Parham, nor Dr. Thaler, ever pointed out any errors to me. In fact, on June 5, 2006, I submitted this report to Dr. Parham for her review. Dr. Parham sent it to Dr. Holt that same day without any changes.

Had there been any serious scientific inaccuracies or misleading items in the report the following would have occurred:

1. My immediate supervisor would not have forwarded the report to Dr. Holt; instead she would have sent it back to me for necessary corrections and then sent it to Dr. Holt.

2. Dr. Holt would have expressed her dissatisfaction or confusion to me about my report during her conversation with me on telephone.

3. Dr. Holt would not have used my alleged incorrect information or would not have used my name as the reference so many times knowing that information in my report was confusing or erroneous. Because, nobody uses incorrect information in his report, or cites references about somebody who has provided wrong information.

4. Dr. Holt would not thank me in her emails and on the phone and ask my opinion about whether she should include my table with her report.

I should further emphasize that my report was never sent to Dr. Thaler for her review and correction. Dr. Thaler received the report when I sent a courtesy copy to Dr. David Goldman, the Assistant Administrator, five days later on June 9, 2006. Only then did Dr. Thaler try to discredit my work.

I also point out again that, contrary to Dr. Thaler's claims, my report had nothing to do with slaughterhouse plants that FSIS regulates; nor was this information provided to discredit the agency position. Dr. Thaler even attempted to correct the English of the original questions that came to Dr. Holt from Peru and attempted to blame me for these mistakes. She also corrected language in the references that I took directly from 9 CFR Parts 310 and 313-a—FSIS Final Notice.

Further, it was untrue that I ever barged into Dr. Parham's office or yelled at or threatened her as Dr. Thaler claims. When I met with Dr. Parham all I told her was that I was hurt when she issued me an unsatisfactory rating and that my family was in distress with the pain and uncertainty of whether I would be fired. I spoke to her very quietly. Had I shouted at her, somebody near her office would have heard me. However, that was not the case.

Moreover, as I already have explained in my EEO complaint which was filed on February 9, 2006, since filing my original complaint in 2005 and continuing thereafter, I

2

EXHIBIT 10    Page 3 of 7 pages

have felt harassed by Dr. Thaler. She continually finds fault with my work even though until last year, I received high performance ratings. She has ignored the fact that I had worked very hard and had many important accomplishments supporting the critical FSIS mission. She issued me an unsatisfactory rating for alleged poor performance on the publication in peer-review journal for discriminatory and retaliatory reasons. It was not because of my poor performance in critical FSIS mission support as she claimed. Publication in peer review journals is not even listed as a critical element of my job. My supervisors also did not use publication as the critical criteria to judge the performance of my other colleagues. My supervisors did not give me any credit for my better accomplishments in the area of critical mission support for the FSIS.

Finally I state again that Dr. Thaler's allegations regarding my report to Dr. Holt were baseless and frivolous and were part of the design to discriminate against me because of my age and because I am an Asian-Pacific American who had previously filed EEO complaints against her. Dr. Thaler's criticism of my work is to set the stage for my proposed removal from FSIS.

I have no other statement to make.


_Khurshed A. Chowdhury_                    _8/31/06_
(Signature of Deponent)                     (Date)

3

EXHIBIT _10_
Page _4_ of _7_ pages

| Subj: | **Dr. Alice Thaler's reputation in the FSIS** |
|---|---|
| Date: | 9/2/06 6:53:15 AM Eastern Daylight Time |
| From: | chowdhuryk@gmail.com (K Chowdhury) |
| Reply-to: | chowdhuryk@gmail.com |
| To: | Gamallard@aol.com |
| File: | **AliceThalerCharacter.doc** (28160 bytes) DL Time (115200 bps): < 1 minute |

Dear Ms. Mallard,

I humbly apologize for bothering you with this email. I thought I forgot to fax you this document (attachment) which could expose real character of Dr. Alice Thaler. I urge you to read the attachment above before you complete report.

I was surprised and stunned by the eccentric protection given to Dr. Thaler by Dr. David Goldman. I was wrong, I thought Dr. Goldman will tell the truth; instead he protected Dr. Thaler almost blindly. It is the well known fashion in the FSIS to support manager, no matter how cruel a manager is. Neither Dr. Goldman nor anybody can show you any scientific error in my report. Only thing they can point out could be some silly punctuation or English grammars. Fact is, Grammars were not the issue in this report. Other people who also answered BSE questions did not even make any report (like mine) to give their scientific input; they simply commented in their simple emails to Dr. Holt. I was the only person sent comments in the form of report only to maintain our division's style.

Handing this terrible notice of removal on Thursday by Dr. Thaler was obviously another **cruel retaliation** by her, because of your investigation has annoyed her seriously. She is very powerful and can manipulate agency's punishment at her will. Many of my peers told me this.

I could give you a series of names who could better evaluate Dr. Thaler to you. But I know you probably do not have that much time to contact people. But I am hoping that you will give your fair judgment to this critical investigation which is most important for my fate. Thank you for your patience.

Sincerely,

Khurshed Chowdhury, DVM, Ph.D.
401 Southview Ave, Silver Spring, MD 20905
Phone: 301-388-0996

---------------------- Headers ----------------------
Return-Path: <chowdhuryk@gmail.com>
Received: from rly-yb02.mx.aol.com (rly-yb02.mail.aol.com [172.18.205.134]) by air-yb03.mail.aol.com (v112.5) with ESMTP id MAILINYB33-17f44f9629028c; Sat, 02 Sep 2006 06:53:15 -0400
Received: from wx-out-0506.google.com (wx-out-0506.google.com [66.249.82.233]) by rly-yb02.mx.aol.com (v112.5) with ESMTP id MAILRELAYINYB23-17f44f9629028c; Sat, 02 Sep 2006 06:53:04 -0400
Received: by wx-out-0506.google.com with SMTP id s13so1292979wxc
    for <Gamallard@aol.com>; Sat, 02 Sep 2006 03:53:04 -0700 (PDT)
DomainKey-Signature: a=rsa-sha1; q=dns; c=nofws;
    s=beta; d=gmail.com;
    h=received:reply-to:from:to:subject:date:message-id:mime-version:content-type:x-priority:x-msmail-priority:x-mailer:importance:x-mimeole;

EXHIBIT  10
Four  5  of  7

b=Zo76PcrmNT+riZPJOCanq/bh+ZbxwC3BG6xG7pqAXDYnvLxADET+LfTCcdlPj5ViOadUP3nucEkYsQEazSnmZ
Received: by 10.70.14.9 with SMTP id 9mr5345794wxn;
    Sat, 02 Sep 2006 03:53:03 -0700 (PDT)
Received: from abba ( [72.66.77.73])
    by mx.gmail.com with ESMTP id 29sm193926wrl.2006.09.02.03.53.02;
    Sat, 02 Sep 2006 03:53:03 -0700 (PDT)
Reply-To: <chowdhuryk@gmail.com>
From: "K Chowdhury" <chowdhuryk@gmail.com>
To: <Gamallard@aol.com>
Subject: Dr. Alice Thaler's reputation in the FSIS
Date: Sat, 2 Sep 2006 06:53:22 -0400
Message-ID: <000001c6ce7e$02f5c460$1102445c@abba>
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="----=_NextPart_000_0001_01C6CE5C.7BE42460"
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook, Build 10.0.6626
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2962
X-AOL-IP: 66.249.82.233
X-AOL-SCOLL-SCORE: 0:2:404492255:10468982
X-AOL-SCOLL-URL_COUNT: 0

EXHIBIT 10
Page 6 of 7

# EXHIBIT S

1

1          UNITED STATES DISTRICT COURT

            District of Columbia

2

3     – – – – – – – – – – – – – –
                                    :

    KHURSHED A. CHOWDHURY,          :

4                                   :

            Plaintiff,              :   CASE NO.

5                                   :

            v.                      :   1:07-CV-99 (RCL)

6                                   :

    ED SCHAFER and the              :

7   UNITED STATES DEPARTMENT OF     :

    AGRICULTURE,                    :

8                                   :

            Defendants.             :

9   – – – – – – – – – – – – – – :

10                          Washington, D.C.

11                    Tuesday, April 22, 2008

12  Deposition of:

13              NEENA ANANDARAMAN

14  called for oral examination by counsel for

15  Plaintiff, pursuant to notice, at the

16  United States Attorney's Office, 501 Third

17  Street, Northwest, Washington, D.C., before

18  Constance H. Rhodes of Capital Reporting Company,

19  a Notary Public in and for the District of

20  Columbia, beginning at 9:58 a.m., when were

21  present on behalf of the respective parties:

22

```
 1   reorganized?

 2        A    We just got a new director.

 3        Q    Who is that?

 4        A    His name is Robert Teclaw, T-E-C-L-A-W.

 5        Q    Now, this case is regarding

 6   discrimination based on national origin and a few

 7   other things, so I have to ask you these

 8   questions and I apologize.  Can you tell me your

 9   national origin, please.

10        A    I'm from India.

11        Q    Were you born there?

12        A    Yes, sir.

13        Q    What part of India?

14        A    What part of India?  I was born in

15   Waltair, W-A-L-T-A-I-R.  That's actually the old

16   British name, though.  I guess I should give you

17   the present name, which is longer, Visakaputnama,

18   V-I-S-A-K-A-P-U-T, N, as in Nancy, A, M, as in

19   Mary.

20        Q    Can we just have also your religious

21   background?

22        A    I'm a Hindu.
```

1          Q    Can you just locate geographically where

2     in India Waltair is?

3          A    It's in the southeastern coast.

4          Q    Okay.  Is that near Madras then?

5          A    I don't know how close it is.  Maybe

6     it's -- Madras is more central, south central.

7          Q    All right.  And could we have your age,

8     please, or date of birth?  Just your age is fine.

9          A    40.

10         Q    And you're also a veterinary medical

11    officer, that's your title?

12         A    Yes, sir.

13         Q    Did you have a particular specialty or

14    disease or pathogen that you concentrated on or

15    that you have concentrated on as a veterinary

16    medical officer in the zoonosis branch?

17         A    A number of them.  I mean just kind of

18    had to be aware of any zoonoses-type issues.

19         Q    There wasn't one during any period of

20    time that predominated over another?

21         A    Well, I work on Salmonella.  I work on

22    antimicrobial resistant pathogens.

1      A    Other work priorities.

2      Q    In the right-hand box it says, "In

3    Progress:  Draft through 2003." Is that basically

4    an accurate assessment of what it took to prepare

5    this?

6      A    I think another draft was completed and

7    was waiting for comments from ARS and then --

8    it's waiting.

9      Q    I see.  And P. Fedorka-Cray, can you just

10   tell me who that is?

11     A    That's our ARS researcher, our sister

12   agency.

13     Q    They're the research arm at USDA?

14     A    That's correct.

15     Q    You don't do any such research like they

16   do in OPHS; is that correct?

17     A    Well, we don't do bench research, if

18   that's what you're asking.

19     Q    He does?  Doctor --

20     A    She.

21     Q    She -- I'm sorry -- Fedorka-Cray?

22     A    She, yes, that's our research arm.

1        Q      So you collaborated with her?

2        A      That's correct.

3        Q      And also there's a B. Rose.  Is that

4    Bonnie Rose?

5        A      Yes.

6        Q      And she was in the Microbiology Division;

7    is that right?

8        A      That's correct.

9        Q      So it was a collaboration with those two

10   other scientists?

11       A      That's correct.

12       Q      So you've never done one totally on your

13   own.

14       A      Well, there's one that's not on this

15   list.

16       Q      When did you do that?

17       A      That was done -- it was published in

18   2005.

19       Q      Okay.  What was that on?

20       A      That one was on Salmonella.  Also, I did

21   another one that I sent for publication that did

22   not get published.

1     Q     On Salmonella?

2     A     No.  That was on air saculitis.

3     Q     Can you just briefly describe to me the

4     Salmonella paper without being too technical?

5     A     Yeah.

6     Q     What that encompassed.

7     A     That encompassed looking at agency data

8     that the agents had collected on Salmonella and

9     summarizing that data.

10     Q     Speaking of data on Salmonella, was there

11     any particular report that Mr. Lange requested

12     that was assigned to the zoonosis branch at some

13     point while you were there on Salmonella

14     serotypes?

15     A     He requested information all the time on

16     Salmonella.

17     Q     Was there any special statistical

18     report?

19     A     A number of them.

20     Q     Did you do work on those?

21     A     I have.

22     Q     Can you just tell me what kinds of things

1    projects around June and early July of 2005 when

2    this was assigned to Dr. Chowdhury?

3         A    I can say that I'm always extremely busy.

4    I can't remember that exact date or time, but

5    I've been extremely busy.

6         Q    So you don't remember in particular any

7    discussion with Dr. Parham or Dr. Thaler in which

8    you turned down this request because you were too

9    busy?

10        A    No.  I don't remember that at all.

11        Q    Subsequently, did you consult with

12   Dr. Chowdhury about another report that he was

13   supposed to do on poultry Salmonella serotypes

14   after this one that he initially prepared for Mr.

15   Lange?

16        A    On poultry in particular?

17        Q    Either young chickens or poultry, I'll

18   use the term interchangeably.

19        A    Maybe.  I can't remember for sure.

20        Q    Let me show you this.

21             (Plaintiff's Exhibit Number 4 was marked

22             for identification.)

```
 1    BY MR. GOULD:

 2        Q    Does this refresh your recollection of

 3    the discussion?

 4        A    Not really.  Maybe.  I don't remember for

 5    sure.  If it's there I'm sure it happened.

 6        Q    If you look at the second page, does

 7    that -- do you remember having that discussion

 8    with Dr. Chowdhury on that issue?

 9        A    I don't really remember.

10        Q    Okay.

11        A    I see it there.  I just don't remember

12    the details of it.

13        Q    All right.  But stay on that page for a

14    second.

15        A    Okay.

16        Q    Dr. Parham on the second page talks about

17    you having this list of the top Salmonella

18    serotypes.

19        A    Okay.

20        Q    Why would you have had that list?

21        A    Why would I have had it?

22        Q    Yeah.
```

# EXHIBIT T

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KHURSHED A. CHOWDHURY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 07-0997 (RCL) |
| | ) | |
| | ) | |
| ED SCHAFER, Secretary, | ) | |
| United States Department of Agriculture | ) | |
| | ) | |
| Defendant. | ) | February 25, 2008 |
| | ) | |

**THE PLAINTIFF'S RESPONSES TO THE DEFENDANT'S FIRST SET OF
INTERROGATORIES
AND DOCUMENT REQUESTS**

**GENERAL OBJECTIONS**

The plaintiff hereby objects to any and all production requests to the extent that they call

for the waiver of any attorney-client or work product privilege, or are overly burdensome and/or

involve undue financial expense or require the plaintiff to waive any rights to privacy. The

plaintiff also believes there are documents in the defendant's production responses that may

relate to his responses herein. However he has identified only documents in his possession prior

to receiving the defendant's production responses. Subject to these objections and limitations, the

plaintiff, Khurshed Chowdhury, hereby files his responses and objections to the defendant's first

set of interrogatories and requests for production of documents as follow:

1

0001

RESPONSE

On December 13, 2004, the plaintiff sent Dr. Parham the Columbia poultry evaluation report she requested. Later that day, he went to her office and asked her not to punish him for not completing the paper. He reminded her that she had kept him busy with BSE. He then mentioned that she never asked the same from others in the branch. The plaintiff told her that in a few years, he would be retired. At this point, Dr. Parham said, "if you think you are so old then maybe you should retire soon."

**Interrogatory 13.** As to paragraph 44 of your complaint identify and fully describe each instance referred to in the statement that plaintiff's "treatment worsened and he was accused of having poor performance when that was not the case."

RESPONSE

The plaintiff filed his initial EEO complaint Case No. FSIS-2005-01076 on 8/11/05. After mediation, the plaintiff did not begin his PIP until October 15, 2005. It took another two weeks to approve the plans for the assignments during this PIP, the toxoplasmosis a peer-review paper, and salmonella serovar papers and the worldwide zoonoses report. Hence, the actual time available to complete these assignments was two months. See also memoranda exchanged during PIP-period attached as response to production request # 2.

When the plaintiff submitted the toxoplasmosis and salmonella serovar papers, Dr. Thaler and Dr. Parham found fault with petty typos or minor grammars or punctuation mistakes, as well as quotes form other published articles See also memoranda exchanged during PIP-period and March 10, 2006 rebuttal attached as response to production requests for # 2 and 8.

They also required the plaintiff to complete a daily journal, which was a compilation of how he spent each minute of his time during that period. They had the papers reviewed by other persons in the department who were not qualified. They also tried to influence other colleagues, such as Dr. Bernard Salamone and Dr. Harry Walker, against the plaintiff. Finally, Dr. Thaler unfairly criticized the plaintiff's report prepared for Dr. Holt as outlined in the response to interrogatory no. 11.

Finally, after his removal, the defendant precluded the plaintiff from receiving an excellence award for his work on BSE.

**Interrogatory 14.** As to paragraph 46 of your complaint give the factual basis for your claim that "Thaler and other of the defendant's management officials, have also discriminated against other employees who were South Asian. Older and /or who had filed EEO complaints."

RESPONSE

See EEO claims of Edward Michael Kasnia in defendant's responses to the plaintiff's first

6

# EXHIBIT U

AFFIDAVIT OF EDWARD MICHAEL KASNIA

1.  My name is Mike Kasnia and I reside 7539 Norwood Avenue, Sykesville, MD 21784. Ph: (410) 549-7626.  I am a 60 year old (dob 9/19/46) Caucasian male.

2.  I worked at the Department of Agriculture for 4 and 1/2 years, starting in July 2002 and ending October 2006.  I was a Grade 14, step 10  the entire time I worked there. I held the position of Senior Risk Assessor in the Risk Assessment Division, Office of Public Health Science.

3.  I reported to Janell Kause from September 2005 until my retirement in 2006.  Before that I reported to Dr. Uday Dassai.  My second level supervisor was Alice Thaler the entire time that I reported to Janell Kause.   I was Acting Director of the Risk Assessment Division from October 2005 through January 2006, and during that time I reported directly to Alice Thaler.

4.  I received good evaluations and several performance awards through January 2006.  I received some of the highest awards while serving as Acting Director of the Risk Assessment Division.  However, I competed with Janell Kause for the permanent position as head of Risk Assessment and Ms. Kause was selected.   From that point on, I had to report directly to her and I was quickly threatened with being put on a performance improvement plan and was threatened with termination.  Throughout the competition for the Director of Risk Assessment Division, Ms. Thaler supported Ms. Kause for the position.

5.  During the first six months of 2006, I was given several unusual projects to work on and when I gave back my results, on each occasion I was severely criticized for the work that I performed, without being given specifics about what I could have done better.  I kept copies of my analysis following each and will provide those separately.

6. On one of the projects, I was given a short deadline and was attempting to meet the deadline when my computer was taken from me by Ms. Thaler, who said that their was a concern over the security of my computer because I did not have some of the latest security programs.   However, several computers in my area did not have the latest updates.

7.   Most of my work on the project was on the computer and that delayed my completion as I had to redo much of the work.

8.  Later I learned from colleagues that Janell Kause was urging them to take care in communicating with me because I was under investigation by the IG office.   Janell Kause and Alice Thaler were the ones who reported me to the IG's office.

9.   I had much data on the computer that I had developed when I was working as a consultant with various companies prior to working for the government.   However, the

data was important to my risk assessment job and I frequently would refer to it, as did others in my department.   There was no conflict of interest in using this data.

10.  I filed a complaint of discrimination in May 2006 alleging age discrimination in being threatened with being placed on a performance improvement plan.

11.  I eventually settled my EEO complaint with my agreeing to retire and the agency agreeing not to give any bad references to any future employers that I might apply to.

12.  I later applied for several positions over at the Food and Drug Administration and was interviewed for one GS-15 position five separate times.   I was later told by the selecting official that he had followed up on one of my references, Dr. Uday Dessai, and he reported that I was on some kind of black list, but that if he were permitted to talk about my performance, he would say only good things.   The selecting official was somewhat frustrated because this was a big red flag warning them that I was on some kind of black list.    I did not get this position.

13.  I called Dessai and he reported that he had been instructed by Alice Thaler that he could not give any good reference for me, which he interpreted to mean I was basically being black listed.

14.   Three months after I resigned, the IG's office called to say they were dropping the investigation relating to my computer information.   However, I was denied the use of my computer during the entire time of the investigation.

15. Finally, I have reviewed a statement I provided Dr. Chowdhury during the course of the investigation of this EEO complaint regarding his termination. That statement is attached to this declaration. The information in that statement accurately reflects my experience with Dr. Chowdhury when I worked with him.


Signed, under the penalties of perjury  this  9th  day of August, 2008.



THE DECLARANT


_Edward Michael Kasnia_

Elements of BSE Support from
Dr. Khurshed Chowdhury
October 6th, 2006

From September 2003 into December 2003, I was acting Director of the OPHS Risk
Assessment Division when the first U. S. BSE Case surfaced and also a member of the
BSE team extending into 2005. This team was tasked with keeping current on the
evolution of BSE issues by modeling various scenarios to support rule-making efforts and
providing briefings to decision-makers.

There were a number of members of a BSE team from RAD, ZDRSD and periodically
from other parts of FSIS.  Dr. Kurshed Chowdhury was, at times, an active part of this
team, and at other times, other members of the team from ZDRSD such as Jane Harman
would present his work to the group for consideration.  The BSE Team used portions of
his BSE related papers on many occasions.  Excerpts from his work became part of
briefings and briefing papers for the highest levels of FSIS.

Some of Dr. Chowdhury's papers that were used and/or reviewed in support of the team's
BSE efforts included the following:

- Adrenal glands and peripheral nerves as Specified Risk Materials.
- Lingual Tonsils and Salivary Gland issue.
- Anatomical distributions of tonsil tissues in Ox tongue.
- Review Comments on: BSE SRM document; OIE position on intestine.
- List of the Diseases causing CNS disorders in Cattle (Ruminants), and
  methods of diagnosis.
- Review Comments on: IEA's Documents for BSE—(a) Techniques for
  removal of SRM in meat; (b) Rapid test for PrPsc Screening Methods.
- BSE-Questions about ileum: (a) What is the scientific basis of removal distal
  ileum as SRM? (b) What is the total length of distal ileum in Cattle.
- Questions about the correct terminology of distal ileum.
- Anatomy of the differentiating distal ileum from the other parts of the
  intestine of the Cattle.
- BSE assignment: On differentiation of distal ileum and Japan's methods of
  removal part of distal ileum.
- Review Comments on: BSE Option paper for prohibiting certain materials of
  Cattle for human food.
- Which are the countries remove entire intestine as SRM?
- Review comments on "Beef and beef products not comprised of meat from
  any cattle over 30 months of age."

In my opinion, Dr. Chowdury was a valuable contributor to the OPHS and FSIS BSE
efforts.

*E. Michael Kasnia*

E. Michael Kasnia
**FSIS/OPHS - Retired**

# EXHIBIT V

## WITNESS AFFIDAVIT

I, Delila Robinson Parham, am an employee of the Food Safety & Inspection Service, located at the United States Department of Agriculture, Washington, D.C. in the capacity of Branch Chief, Supervisory Veterinarian Medical Officer, Grade 14 from February 1983 to the present date.

My telephone number during working hours is:  202 690-6573

I HAVE BEEN ADVISED OF THE FOLLOWING:
I am required by Federal regulations and U.S. Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the USDA. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and USDA policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Agency officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear _____ affirm _____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

Initials: DRP

On January 21, 2007, EEO Investigator Paula Mazzoccante conducted a telephonic interview with Delila Parham regarding the EEO complaint filed by Khurshed Chowdhury against the Food Safety & Inspection Service, Case Number FS-2006-02251.

1. Please state and spell your name
A.  D-e-l-i-l-a  R-o-b-i-n-s-o-n  P-a-r-h-a-m

The issue accepted by the agency is whether Khurshed Chowdhury was subjected to discrimination based on his race (Asian), religion (Muslim), sex (male), national origin, age (YOB: 1941) and reprisal for prior EEO activity, when on September 1, 2006, he was terminated from his position as Veterinary Medical Officer, GS-701-13.

2. Please state your current position title, grade and series
A.  Supervisory Veterinarian Medical Officer, Branch Chief, GS-701-14

3. What is your business telephone number?
A.  202-690-6573

4. Please identify the management official to whom you report
A.  Dr. Bhabani Dey

5. What is your gender?
A.  Female

6. What is your race?
A.  African American

7. What is your National Origin?
A.  American

8. What is your religion?
A.  Protestant

9. What is your year of birth?
A.  1953

10. How long have you worked for FSIS?
A.  Since February 1983

11. How do you know the Complainant?
A.  I was his direct supervisor.

12. How long did you supervise the Complainant?
A.  Since March 2001

13. Why was the Complainant removed?

Initials: DRP

# EXHIBIT W

**My rating history in the FSIS for the past years:**

| Year | Supervisors | Rating received |
|------|-------------|-----------------|
| **90**-91 | **Dr. Pat. McCaskey** | Fully Satisfactory |
| 91-92 | | **Superior with awards** |
| 92-93 | | Fully Satisfactory |
| 93-94 | | **Superior with awards** |
| **94-95** | **Dr. Bill James** | **Superior with awards** |
| 95-95 | | Fully Satisfactory |
| 95-96 | | Fully Satisfactory |
| 95-96 | | ,,        ,, |
| 96-97 | | ,,        ,, |
| 97-98 | | ,,        ,, |
| 98-99 | | **Superior  with awards** |
| **99-00** | | **Superior  with awards** |
| 00-01 | **Dr. Parham** | Fully Satisfactory |
| 01-02 | | ,,        ,, |
| 02-03 | | Fully Satisfactory  **with awards** |
| 03-04 | | Fully satisfactory  **with  awards** |
| **04-05** | | ***PIP-suddenly Unsatisfactory?** |

\*\*\* Please Note: Even in this rating period I received Spot-Award but at the end I was given "Unsatisfactory" rating.

**Khurshed A. Chowdhury, DVM., Ph.D.**
**Veterinary Medical Officer, ZDRSD.**
**FSIS, OPHS**
**Phone: 202-690-6529**

(95-95)

| PERFORMANCE APPRAISAL | INSTRUCTIONS: *Refer to FSIS Directive 4430.1* | 1 APPRAISAL PERIOD |
|---|---|---|

|  |  | FROM 4/24/95 | TO 9/30/95 |
|---|---|---|---|

2 NAME *(Last, First, Middle Initial)*
Chowdhury, Khurshed

3. OFFICIAL POSITION TITLE
Staff Officer

| 4. SOCIAL SECURITY NO. 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 | 5. PAY PLAN / OCCUP. SERIES / GRADE / STEP GM-701-13 | 8 ORGANIZATION FSIS, S&T, SISPD |
|---|---|---|

| 9 DUTY STATION *(City, State)* Washington, DC | 10. STANDARD JOB # | 11. PMRS FUNDING UNIT NO. 3720 | 12. AGENCY USE |
|---|---|---|---|

| 14 PERFORMANCE ELEMENTS *(Enter brief description of performance elements)* | 15. Critical Element (✓) | APPRAISAL UNITS *(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column)* | | |
|---|---|---|---|---|
| | | 16. EXCEEDS Fully Successful | 17. MEETS Fully Successful | 18. DOES NOT MEET Fully Successful |
| 1) Interacts with Organizations | X | | 2 | |
| 2) Interprets Agency/Division Policy | | | 1 | |
| 3) Accomplishes Major Goals | X | | 2 | |
| 4) Accomplishes Major Goals | | | 1 | |
| 5) | | | | |
| 6) | | | | |
| 7) | | | | |
| 8) | | | | |
| 9) | | | | |
| 10) | | | | |

| TOTAL APPRAISAL UNITS *(Enter total for each column)* ➡ | EXCEEDS 0 | MEETS 6 | DOES NOT MEET |
|---|---|---|---|

19. RATING *(Check the correct rating)*

**DECISION TABLE**

| OUTSTANDING | ☐ | All appraisal units are at "EXCEEDS" |
|---|---|---|
| SUPERIOR | ☐ | More appraisal units are at "EXCEEDS" than at "MEETS FULLY SUCCESSFUL" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL | ☒ | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL | ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE | ☐ | One or more critical elements are appraised at "DOES NOT MEET" |

20. EMPLOYEE *(check appropriate box)*

| | YES | NO |
|---|---|---|
| I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction | ☑ YES | ☐ NO |
| My official position description adequately describes my duties and responsibilities. | ☑ YES | ☐ NO |
| My supervisor has discussed my training needs with me | ☑ YES | ☐ NO |
| My supervisor has discussed this appraisal with me | ☑ YES | ☐ NO |

21. EMPLOYEE'S SIGNATURE *(Instructions for resolutions of disputes are on the reverse of employee copy.)*
*Khurshed A. Chowdhury*
DATE 10/30/95
If employee did not sign, state reason.

22 SUPERVISOR'S SIGNATURE
*Dr. Mohal*
DATE 10/30/95

23 REVIEWER'S SIGNATURE
DATE 11/30/95

24. PMRS FUNDING UNIT MANAGER'S SIGNATURE *(Optional)*
DATE

FSIS FORM 4430-7 (10/87)

**EMPLOYEE'S COPY**          USDA - FSIS

Dr. Khurshed Chowdhury
PERFORMANCE APPRAISAL
April 24, 1995 to September 30, 1995

1) Interact with Federal, Industry, Consumer Groups, State Governments, or other External/Internal Organizations - MEETS

Dr. Chowdhury produced good quality documents on many slaughter issues with some editing needed primarily for style. His assignments were generally completed within the assigned deadline. His interpersonal skills were good, dealing with several difficult situations involving support staff. Dr. Chowdhury achieved a good balance of keeping his supervisor informed of important issues and anticipating problems. Developing a network with a variety of contacts and establishing yourself as a technical expert on a range of slaughter issues are needed to exceed in this element.

2) Interprets and Implements Agency and Division Policy - MEETS

Dr. Chowdhury interpreted policy related to new slaughter procedures. His work on Branch projects including NuTech demonstrated an acceptable understanding of policy positions and preferences. The documents he developed for sawdust liver and bile disposition criteria demonstrated his ability to interpret policy. Demonstrating the ability to formulate new policy on complex slaughter issues is needed to exceed in this element.

3) Accomplish Major Division Goals - MEETS

Dr. Chowdhury completed good quality work performing data collection on the NuTech project. He helped review the midpoint report. Demonstrating the ability to successfully manage a new slaughter procedure project independently is needed to exceed in this element.

4) Accomplish Major Division Goals - MEETS

Dr. Chowdhury managed to complete several special project assignments. He completed reviews for several slaughter QC programs. He carried a limited workload and completed most assignments within established deadlines. His work on special projects required minimal supervision. Demonstrating the ability to successfully manage multiple special projects along with your major projects is needed to exceed. Being recognized for your expertise so that your participation is requested by people outside the Division is additional evidence supporting a rating of exceeds.

95 — 96

| PERFORMANCE APPRAISAL | | **INSTRUCTIONS:** Refer to FSIS Directive 4430.1 | 1. APPRAISAL PERIOD<br>FROM 10/01/95 TO 09/30/96 |

| 2. NAME (Last, First, Middle Initial) CHOWDHURY, KHURSHED A | | 3. OFFICIAL POSITION TITLE VETNRY MEDCL OFFCR |
| 4. SOCIAL SECURITY NO. 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 | 5. PAY PLAN / OCCUP. SERIES / GRADE / STEP GM-0701-13/00 | 6. ORGANIZATION 20 10 0015 10 |
| 9. DUTY STATION (City, State) WASHINGTON, DC | 10. STANDARD JOB # 0 | 11. PMRS FUNDING UNIT NO. | 12. AGENCY USE |

| 14<br>PERFORMANCE ELEMENTS<br>(Enter brief description of performance elements) | 15.<br>Critical<br>Element<br>( ✓ ) | APPRAISAL UNITS<br>(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.) | | |
| --- | --- | --- | --- | --- |
| | | 16.<br>EXCEEDS<br>Fully Successful | 17.<br>MEETS<br>Fully Successful | 18.<br>DOES NOT MEET<br>Fully Successful |
| 1) Interacts with Organizations | X | | 2 | |
| 2) Interprets Agency/Division Policy | | | 1 | |
| 3) Accomplishes Major Goals | X | | 2 | |
| 4) Accomplishes Special DIvision Goals | | | 1 | |
| 5) | | | | |
| 6) | | | | |
| 7) | | | | |
| 8) | | | | |
| 9) | | | | |
| 10) | | | | |
| **TOTAL APPRAISAL UNITS** (Enter total for each column) ➡ | EXCEEDS<br>0 | MEETS<br>6 | DOES NOT MEET |

19. RATING (Check the correct rating)                    **DECISION TABLE**

| OUTSTANDING | ☐ | All appraisal units are at "EXCEEDS" |
| SUPERIOR | ☐ | More appraisal units are at "EXCEEDS" than at "MEETS FULLY SUCCESSFUL" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL | ☒ | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL | ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE | ☐ | One or more critical elements are appraised at "DOES NOT MEET" |

20. EMPLOYEE (check appropriate box)

| *I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction* | ☒ YES | ☐ NO |
| *My official position description adequately describes my duties and responsibilities.* | ☒ YES | ☐ NO |
| *My supervisor has discussed my training needs with me* | ☒ YES | ☐ NO |
| *My supervisor has discussed this appraisal with me* | ☒ YES | ☐ NO |

| 21. EMPLOYEE'S SIGNATURE (Instructions for resolutions of disputes are on the reverse of employee copy) | DATE 11/13/96 | If employee did not sign, state reason. |
| 22. SUPERVISOR'S SIGNATURE | DATE 11/13/96 | 23. REVIEWER'S SIGNATURE | DATE 1/13/96 |
| 24. PMRS FUNDING UNIT MANAGER'S SIGNATURE (Optional) | | | DATE |

FSIS FORM 4430-7P (10/87)                    EMPLOYEE'S COPY    USDA - FSIS

0019

**Dr. Khurshed Chowdhury**
**PERFORMANCE APPRAISAL**
October 1, 1995, to September 30, 1996

Performance review:

1. Employees' opinion on performance since the last appraisal period. What do you think you are doing well? What are areas where you fell you might need to improve?

*Did alot of improvement. QC program reviews + protocol reviews are routine. Want to improve computer skills and letter writing.*

2. Recognition by the supervisor of several accomplishments since the last appraisal.

You completed technically sound documents on airsacculitis, over 11 slaughter QC reviews and various miscellaneous issues. You reviewed egg products ISG inspection information. You developed a training package for NuTech implementation. You completed a review of hands as a source of contamination. Your continued personal commitment to improving your technical writing style and your willingness to follow instruction is appreciated. Your efforts to complete assignments on or before the due date have been effective. You continued to complete assignments that had no specific deadline very promptly. You demonstrated your ability to handle multiple assignments and prioritize work.

3. One or two areas identified by the supervisor for improvement in addition to those the employee identifies.

Continue to work on your writing style striving to submit drafts that I only have to review for technical accuracy and adherence to policy. Continue to provide a reasonable turnaround time for completing assignments. Continue to expand your network of professional contacts so people are aware of your current job responsibilities and slaughter expertise.

4. Summarize overall performance. Discuss the appraisal.

You consistently perform at a fully successful level demonstrating the utmost professionalism and good technical competence. You are expected to continue to develop your knowledge, skills, and abilities to perform work as a Staff Officer in SISPD. I am pleased with your progress. I have provided written comments for each element regardless of the element rating. These comments reiterate your positive accomplishments and suggest ways to improve your performance.

*[signature]* Date 11/13/96

*[signature]* Date 11/13/96

# MEMO

**To:**       Khurshed Chowdhury

**From:**     Alice M. Thaler

**Subject:**  Letter to OIG

**Date:**     November 22, 1995

Please prepare a letter for my signature to send information to Melinda Stevens, Office of the Inspector General, at the address indicated on the reference slip. Include in the body of the letter a list of the materials we are sending. I need this today as soon as possible.

*Thanks for the quick turnaround and willingness to revise several drafts.*

*Alice 11/22/95*

*Good job .*

*a few final edits*
*OK to final as edited*
*AMT*
*10/23/95*
*I am also clearing it*
*for cc's*
*AMT*

Pat Basu, Director
Technology Transfer & Coordination Staff
Science and Technology


Bill James, Director
Slaughter Inspection Standards
and Procedures Division, S&T


Subject: Review of Protocol Submitted by Smithfield Foods for
Reconditioned Water Use Program.


The Slaughter Inspection Standards and Procedures Division
(SISPD) has carefully reviewed the experimental protocol
submitted by Smithfield Foods for an in-plant evaluation of
Reconditioned Process Water Use at Carolina Food Processors,
Inc., Establishment 18079, Tar Heel, North Carolina.  The
proposed reconditioned process water uses include: plant     *— remove*
utilities, inedible processing, livestock pens, slaughter area   *extra*
(pre-evisceration) and edible byproducts processing.           *space*


SISPD has the following comments related to the submitted
protocol:


1. The proposed selected use of reconditioned process water
should not interfere or hinder the normal USDA visual inspection
of slaughter operations as long as following criteria are met:

    *Lineup*
    (a) Reconditioned process water use should be limited to
    the selected areas mentioned in the protocol.

    (b) The system should not compromise product quality and
    food safety and routinely checked for all United States
    Department of Agriculture, Food and Drug Administration, and
    Environmental Protection Agency recommendations and criteria.


SISPD has no other comments.

*00 - 01*

| U.S. DEPARTMENT OF AGRICULTURE<br>**PERFORMANCE APPRAISAL** *(Combined Form)* | **INSTRUCTIONS:** Refer to FSIS Directive 4430.1 | 1. APPRAISAL PERIOD<br>From: 10/01/2000    To: 09/30/2001 |
|---|---|---|

**2. NAME** *(Last, First, Middle Initial)*
Chowdhury, Khurshed

**3. SOCIAL SECURITY NO.**
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

| 4. OFFICIAL POSITION TITLE<br>Veterinary Medical Officer | 5. PAY PLAN / OCCUP. SERIES / GRADE /<br>STEP GM-0701-13 | 6. ORGANIZATION<br>FSIS, OPHS, FASD |
|---|---|---|

| 7. DUTY STATION<br>Washington, DC | 8. STANDARD JOB # | 9. FUNDING UNIT NO. | 10. USERS' GUIDE *(or other reference)* | 11. AGENCY USE |
|---|---|---|---|---|

| 12. COMPLETE AT THE BEGINNING OF APPRAISAL PERIOD | | 17. COMPLETE AT THE END OF APPRAISAL PERIOD | | |
|---|---|---|---|---|
| **PERFORMANCE ELEMENTS**<br>*(list performance elements (up to 35 characters each ) and<br>Sign in Blocks 13, 14, and 15<br>Check box if element is critical* | | **APPRAISAL UNITS**<br>*(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.)* | | |
| | | EXCEEDS<br>Fully Successful | MEETS<br>Fully Successful | DOES NOT MEET<br>Fully Successful |
| 1)<br>Briefing papers, reports, correspondence, presentation | X | | 2 | |
| 2)<br>Evaluation and analytic studies | X | | 2 | |
| 3)<br>Problem identification and solution | | | 1 | |
| 4)<br>Interpersonal relations and communication | X | | 2 | |
| 5) | | | | |
| 6) | | | | |
| 7) | | | | |
| 8) | | | | |
| **TOTAL APPRAISAL UNITS** *(At the end of the appraisal period,<br>enter total for each column* ➤ | EXCEEDS | MEETS<br>7 | DOES NOT MEET | |

**13. EMPLOYEE'S SIGNATURE** *Khurshed Chowdg*  DATE 5/29/01

**14. SUPERVISOR'S SIGNATURE** *Debra R Parham*  DATE 5/29/01

**15. REVIEWER'S SIGNATURE**  DATE 6/22/01

**16. PROGRESS REVIEW** *(Initial and date to certify progress review discussions took place)*

| EMPLOYEE | SUPERVISOR | EMPLOYEE | SUPERVISOR |
|---|---|---|---|
| | | | |

**18. Rating** *(check the correct rating)*    **DECISION TABLE**

| | | |
|---|---|---|
| OUTSTANDING | ☐ | All appraisal units are at **"EXCEEDS"** |
| SUPERIOR | ☐ | More appraisal units are at **"EXCEEDS"** than at **"MEETS FULLY SUCCESSFUL"** but none are rated **"DOES NOT MEET"** |
| FULLY SUCCESSFUL | ☒ | Any combination of appraisal units which falls between **"SUPERIOR"** and **"MARGINAL"** |
| MARGINAL | ☐ | More appraisal units are at **"DOES NOT MEET"** than at **"EXCEEDS"** |
| UNACCEPTABLE | ☐ | One or more critical elements are appraised at **"DOES NOT MEET"** |

**19. ACCOMPLISHMENTS** *(Document accomplishments for elements rated Exceeds or Does Not Meet fully successful. Attach separate sheet if additional space is needed.)*

**20. EMPLOYEE** *(Check appropriate box)*

*I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction* - - - - - - - - - - - - - - ☒ YES  ☐ NO

*My official position description adequately describes my duties and responsibilities* - - - - - - - - - - - - ☒ YES  ☐ NO

*My supervisor has discussed my training needs with me* - - - - - - - - - - - - - - - - - - - - - - - - ☒ YES  ☐ NO

*My supervisor has discussed this appraisal with me* - - - - - - - - - - - - - - - - - - - - - - - - - - ☒ YES  ☐ NO

**21. EMPLOYEE'S SIGNATURE** *(If you wish to grieve your rating, contact your Servicing Personnel Office for specific instructions or applicable procedures.)*
*Khurshed A. Chowdy*  DATE 11-13-01

IF EMPLOYEE DID NOT SIGN, STATE REASON.

**22. SUPERVISOR'S SIGNATURE** *Debra R Parham*  DATE 11-13-01

**23. REVIEWER'S SIGNATURE**  DATE 07/1/08

FSIS FORM 4430-5 (10/91)    REPLACES FSIS FORM 4430-5 (8/88), WHICH MAY BE USED UNTIL EXHAUSTED.    EMPLOYEE'S COPY *(at the end of appraisal period)*
Designed on FORMFLOW software.

0028

*02 - 03*

| U.S. DEPARTMENT OF AGRICULTURE PERFORMANCE APPRAISAL *(Combined Form)* | INSTRUCTIONS: Refer to FSIS Directive 4430.1 | 1. APPRAISAL PERIOD From: 10/01/2002   To: 09/30/2003 |
|---|---|---|

| 2. NAME *(Last, First, Middle Initial)* Chowdhury, Khurshed | 3. SOCIAL SECURITY NO. 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 |
|---|---|

| 4. OFFICIAL POSITION TITLE Veterinary Medical Officer | 5. PAY PLAN / OCCUP. SERIES / GRADE / STEP GS-0701-13 | 6. ORGANIZATION FSIS, OPHS, FASD |
|---|---|---|

| 7. DUTY STATION Washington, DC | 8. STANDARD JOB # | 9. FUNDING UNIT NO. | 10. USERS' GUIDE *(or other reference)* | 11. AGENCY USE |
|---|---|---|---|---|

### 12. COMPLETE AT THE BEGINNING OF APPRAISAL PERIOD

**PERFORMANCE ELEMENTS**
*(list performance elements (up to 35 characters each ) and Sign in Blocks 13, 14, and 15 Check box if element is critical)*

### 17. COMPLETE AT THE END OF APPRAISAL PERIOD

**APPRAISAL UNITS**
*(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.)*

| | EXCEEDS Fully Successful | MEETS Fully Successful | DOES NOT MEET Fully Successful |
|---|---|---|---|
| 1) Briefing papers, reports, correspondence, etc. | X | 2 | |
| 2) Evaluation and analytic studies | X | 2 | |
| 3) Problem identification and solution | | 1 | |
| 4) Interpersonal relations and communication | X | 2 | |
| 5) | | | |
| 6) | | | |
| 7) | | | |
| 8) | | | |
| **TOTAL APPRAISAL UNITS** *(At the end of the appraisal period, enter total for each column)* | EXCEEDS | MEETS 7 | DOES NOT MEET |

| 13. EMPLOYEE'S SIGNATURE *Khurshed A. Chowd* | DATE 12/02/02 |
|---|---|
| 14. SUPERVISOR'S SIGNATURE *Debra R. Parham* | DATE 12/02/02 |
| 15. REVIEWER'S SIGNATURE | DATE 02-11-18 |

**16. PROGRESS REVIEW** *(Initial and date to certify progress review discussions took place)*

| EMPLOYEE KAC 5/19/01 | SUPERVISOR DRP 5/19/03 | EMPLOYEE | SUPERVISOR |
|---|---|---|---|

**18. Rating** *(check the correct rating)*

**DECISION TABLE**

| | | |
|---|---|---|
| OUTSTANDING | ☐ | All appraisal units are at "EXCEEDS" |
| SUPERIOR | ☐ | More appraisal units are at "EXCEEDS" than at "MEETS FULLY SUCCESSFUL" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL | X | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL | ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE | ☐ | One or more critical elements are appraised at "DOES NOT MEET" |

**19. ACCOMPLISHMENTS** *(Document accomplishments for elements rated Exceeds or Does Not Meet fully successful. Attach separate sheet if additional space is needed.)*

**20. EMPLOYEE** (Check appropriate box)

| | YES | NO |
|---|---|---|
| I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction | ☑ YES | ☐ NO |
| My official position description adequately describes my duties and responsibilities | ☑ YES | ☐ NO |
| My supervisor has discussed my training needs with me | ☑ YES | ☐ NO |
| My supervisor has discussed this appraisal with me | ☑ YES | ☐ NO |

| 21. EMPLOYEE'S SIGNATURE *(If you wish to grieve your rating, contact your Servicing Personnel Office for specific instructions on applicable procedures.)* *F.Khurshed A. Chowd* | DATE 10/28/03 | IF EMPLOYEE DID NOT SIGN, STATE REASON. |
|---|---|---|
| 22. SUPERVISOR'S SIGNATURE *Debra R. Parham 10/28/03* | DATE 10/28/03 | 23. REVIEWER'S SIGNATURE | DATE 10/28/03 |

FSIS FORM 4430-5 (10/91)    REPLACES FSIS FORM 4430-5 (8/88), WHICH MAY BE USED UNTIL EXHAUSTED.    Designed on FORMFLOW software.    EMPLOYEE'S COPY (at the end of appraisal period)

0029



**Dr. Khurshed Chowdhury**
Accomplishments (10/01/02 -- 9/30/03)

Performance Appraisal Rating: Fully Successful

Elements:

1.  Briefing papers, reports, correspondence, and presentations.

2.  Evaluation and analytic studies.

3.  Problem identification and solution.

4.  Interpersonal relations and communications.


*Note:* Dr. Chowdhury has provided comments on several Agency documents, and was lead author on several issue papers prepared by the Branch. Dr. Chowdhury's attention to a paper about the distal ileum, written after Canada's first native case of Bovine Spongiform Encephalopathy (BSE), was of great value in assessing "next steps" the U.S. may take to address the issue. Dr. Chowdhury works well with others; he seeks the opinion of others and ensures that the ideas and suggestions of others are reflected in his work.

0030

03—04

| U.S. DEPARTMENT OF AGRICULTURE PERFORMANCE APPRAISAL *(Combined Form)* | INSTRUCTIONS: Refer to FSIS Directive 4430.1 | | 1. APPRAISAL PERIOD From: 10/01/2003 | To: 09/30/2004 |
|---|---|---|---|---|
| 2. NAME *(Last, First, Middle Initial)* Chowdhury, Khurshed A | | | 3. SOCIAL SECURITY NO. 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 | |
| 4. OFFICIAL POSITION TITLE Veterinary Medical Officer | 5. PAY PLAN / OCCUP. SERIES / GRADE / STEP GS-0701-13/00 | 6. ORGANIZATION 37 09 45 0010 00 FSIS/OPHS/ZDRSD | | |
| 7. DUTY STATION Washington, DC | 8. STANDARD JOB # 0 | 9. FUNDING UNIT NO. | 10. USERS' GUIDE *(or other reference)* | 11. AGENCY USE |

| 12. COMPLETE AT THE BEGINNING OF APPRAISAL PERIOD | | | 17. COMPLETE AT THE END OF APPRAISAL PERIOD | | |
|---|---|---|---|---|---|
| **PERFORMANCE ELEMENTS** *(list performance elements (up to 35 characters each ) and Sign in Blocks 13, 14, and 15 Check box if element is critical* | | | **APPRAISAL UNITS** *(Rate actual performance by entering 2 for critical elements and 1 for non-critical elements in appropriate column.)* | | |
| | | | EXCEEDS Fully Successful | MEETS Fully Successful | DOES NOT MEET Fully Successful |
| 1) Briefing papers, reports, correspondence | X | | | 2 | |
| 2) Evaluation and analytic studies | X | | | 2 | |
| 3) Problem identification and solution | | | | 1 | |
| 4) Interpersonal relations and communication | X | | | 2 | |
| 5) | | | | | |
| 6) | | | | | |
| 7) | | | | | |
| 8) | | | | | |
| **TOTAL APPRAISAL UNITS** *(At the end of the appraisal period, enter total for each column.)* | | | EXCEEDS | MEETS 7 | DOES NOT MEET |

13. EMPLOYEE'S SIGNATURE   *Khurshed B. Chow*   DATE 10/28/03

14. SUPERVISOR'S SIGNATURE   *Dula R. Parham*   DATE 10/28/03

15. REVIEWER'S SIGNATURE   *signature*   DATE 10/30/03

16. PROGRESS REVIEW *(Initial and date to certify progress review discussions took place)*

| EMPLOYEE | SUPERVISOR | EMPLOYEE | SUPERVISOR |
|---|---|---|---|
| | | | |

| 18. Rating *(check the correct rating)* DECISION TABLE | | |
|---|---|---|
| OUTSTANDING | ☐ | All appraisal units are at "EXCEEDS" |
| SUPERIOR | ☐ | More appraisal units are at "EXCEEDS" than at "MEETS FULLY SUCCESSFUL" but none are rated "DOES NOT MEET" |
| FULLY SUCCESSFUL | ☒ | Any combination of appraisal units which falls between "SUPERIOR" and "MARGINAL" |
| MARGINAL | ☐ | More appraisal units are at "DOES NOT MEET" than at "EXCEEDS" |
| UNACCEPTABLE | ☐ | One or more critical elements are appraised at "DOES NOT MEET" |

19. ACCOMPLISHMENTS *(Document accomplishments for elements rated Exceeds or Does Not Meet fully successful. Attach separate sheet if additional space is needed.)*

20. EMPLOYEE (Check appropriate box)
*I have an understanding of USDA and Agency regulations on employee responsibilities and conduct; I have discussed them with my supervisor and questions have been answered to my satisfaction* ☒ YES  ☐ NO
*My official position description adequately describes my duties and responsibilities* ☒ YES  ☐ NO
*My supervisor has discussed my training needs with me* ☒ YES  ☐ NO
*My supervisor has discussed this appraisal with me* ☒ YES  ☐ NO

21. EMPLOYEE'S SIGNATURE *(If you wish to grieve your rating, contact your Servicing Personnel Office for specific instructions or applicable procedures.)*   *Khurshed B. Chow*   DATE 7/30/04   IF EMPLOYEE DID NOT SIGN, STATE REASON.

22. SUPERVISOR'S SIGNATURE   *Dula R. Parham*   DATE 7/30/04

23. REVIEWER'S SIGNATURE   *signature*   DATE 7/30/04

FSIS FORM 4430-5 (10/91)   REPLACES FSIS FORM 4430-5 (8/89), WHICH MAY BE USED UNTIL EXHAUSTED. Designed on FORMFLOW software.   EMPLOYEE'S COPY (at the end of appraisal period)

0031

# EXHIBIT X

1              IN THE SUPREME COURT FOR THE DISTRICT OF COLUMBIA

2      ---------------------------------------+

       KHURSHED CHOWDHURY,                     :

3                      Plaintiff,              :

                                               :

4                                              :

                                               :CASE NUMBER:

5      vs.                                     :1:07-CV-997 (RCL)

                                               :

6                                              :

                                               :

7      ED SCHAFER, et al,                      :

                       Defendants.             :

8      ---------------------------------------+

9                                  Washington, D.C.

10                              Friday, April 18, 2008

11

12     Deposition of:

13                      TIA GAYLE

14     called for oral examination by counsel for Plaintiff,

15     pursuant to notice at U.S. Attorney's Office, 501 Third

16     Street, Fourth Floor, Washington, D.C. 20530, before

17     Janie Arriaga of Capital Reporting Company, a Notary

18     Public in and for the District of Columbia beginning at

19     9:30 a.m., and were present on behalf of the respective

20     parties:

21

22

```
1          A     Yes, I did.

2          Q     Who did you report to in 2006?

3          A     Christie Cowen.

4          Q     Has she left?

5          A     Yes, she has.

6          Q     Okay.  When did she leave?

7          A     I believe it was April of last year.

8          Q     So who do you report to now?

9          A     Dawn Rufner.

10               MR. GOULD:  We're going to have this marked as

11   Gayle 1.

12               (Gayle Exhibit Number 1 was marked for

13               identification.)

14   BY MR. GOULD:

15         Q     Now, this is a copy of your decision on the

16   proposed removal regarding Dr. Chowdhury; is it not?

17         A     It appears to be, yes.

18         Q     Okay.  And that's your signature there; right?

19         A     It is.

20         Q     Okay.  As I understand it, there were three

21   assignments -- well, I'm sorry, there were two

22   assignments that were given to Dr. Chowdhury that formed
```

```
 1    the basis for this removal; isn't that right?  Do you

 2    agree with that?

 3         A    Yes, I do.

 4         Q    Okay.  One was an assignment with regard to

 5    the toxoplasmosis paper; correct?

 6         A    Yes.

 7         Q    And the second one was regarding a paper

 8    involving Salmonella Serovars as indicated on page six;

 9    correct?

10         A    Yes.

11         Q    I forgot to ask you this, but you don't have

12    any scientific degrees, do you?

13         A    I do not.

14         Q    Okay.  Did you review Dr. Chowdhury's paper on

15    toxoplasmosis before you made the decision?

16         A    Yes.

17         Q    You did?

18         A    Uh-huh.

19         Q    Did you review Dr. Parham's and Dr. Thaler's

20    comments about that?

21         A    Yes, I did.

22         Q    Did you agree with their comments?
```

1       A    I don't necessarily agree or disagree with the

2  comments.  I check for what the outcome is supposed to

3  be, what the assignment -- and what they expected from

4  the assignment, what they received, and their critiqued

5  of what they received.  So I agreed with -- I concurred

6  with their critique of it.

7       Q    Okay.  That's fair.  It's fair to say if they

8  hadn't made that critique and recommended the proposed

9  removal, you would not have taken your decision; isn't

10 that right?

11      A    I don't understand your question.

12      Q    Well, if they had indicated that they -- that

13 the toxoplasmosis review paper was acceptable, that the

14 work that Dr. Chowdhury had done on that paper, and the

15 work that he had done on the Salmonella Serovars paper

16 was acceptable, you would not have made the decision to

17 remove him; isn't that right?

18      A    That's correct.

19      Q    In fact, probably under the Civil Service

20 Rules, it wouldn't have even gone this far or reached

21 your desk to review; isn't that right?

22      A    Right.

1      Q    Did you understand the science that

2   Dr. Chowdhury was employing in the toxoplasmosis paper?

3      A    No.  That is not my area of expertise.

4      Q    Do you consider that Dr. Parham's and Thaler

5   area?

6      A    That's their responsibility.

7      Q    Yes, okay.  And the same thing with regard to

8   the Salmonella Serovars paper; is that correct?

9      A    That is correct.

10      Q    I don't have the full evidence file here, but

11   do you remember any other things that come to mind that

12   you reviewed before you made this decision?

13      A    I reviewed the entire case file, which is the

14   information we received initially about the employee's

15   performance, any information that transpired between the

16   specialist assigned to the case, the PIP letter

17   informing Dr. Chowdhury of the PIP.  At the end of the

18   PIP -- or if anything happened, you know, between the

19   beginning of the PIP and the end of the PIP, if

20   something came to our office, I reviewed that, whatever

21   was on the record, and also the proposal, the written

22   response.

```
 1        A    Partially.  The person doesn't have to have

 2   actually received the rating.  They could be in the

 3   middle of a rating cycle, and the supervisor deemed

 4   their performance unsuccessful.  It doesn't always have

 5   to be once they received the rating.  Once they've

 6   received the rating, we are required to put them on a

 7   PIP, but there are other points during the performance

 8   year that a PIP can be installed.

 9        Q    I guess that's possible.  In this case,

10   though, it was after an overall unacceptable performance

11   rating that the removal was proposed; is that right?

12        A    I don't recall.  Do you have it in the

13   evidence file if --

14        Q    Well, doesn't it say that in this document?  I

15   thought it did.

16        A    Let me review it.  He failed the PIP, but he

17   wasn't -- it doesn't tell me -- you're saying that

18   before he was put on the PIP, was he failing his

19   performance?

20        Q    Well, I'm asking you isn't it a fact that he

21   failed the performance after the PIP?

22        A    Yes, as a result of the PIP, yes.
```

```
 1        Q    Now, when that happens, if you look at page

 2   five, they quote -- Mr. Barrett is who signed this.

 3   There is a quotation of an FSIS directive.  Isn't it

 4   fair to say there are three alternatives after someone

 5   receives an overall unacceptable performance?

 6        A    Yes.

 7        Q    Re-assignment, demotion, or removal?

 8        A    Yes.

 9        Q    Anywhere in your records is your

10   recollection -- is there anything that recalls why

11   removal was chosen as the proposal for Dr. Chowdhury

12   rather than re-assignment or a demotion?

13        A    It's my understanding that re-assignment or

14   demotion would require the specific office to have a

15   position available, and it did not have a position

16   available.  Demotion would be the next lower grade down,

17   and there was not an available position.

18        Q    And how did you gain that understanding?

19        A    I believe that my branch chief had some

20   discussions with HR.  They did do a search, and they did

21   not have a position available.  So as a process of

22   elimination, that was the only available option.
```

1          A    No.  Our process is that the specialist works

2    with the supervisor to make sure the standards and

3    assignments are explained to the employee so that he

4    understands -- he or she understands the assignments

5    during the PIP period.

6          Q    If you'd look at page three of Gayle 3.

7          A    Okay.

8          Q    Under communications, non-critical elements

9    there.

10         A    Okay.

11         Q    If you'd look at box number six, bullet point

12   three.

13         A    Okay.

14         Q    You will admit to me that it says there that

15   preparing written reports, papers, and articles for

16   agency use and/or publication and peer review journals

17   is listed under that bullet point as being part of the

18   non-critical communications part of Dr. Chowdhury's

19   position; isn't that right?

20         A    Yes.

21         Q    But you have no understanding about whether or

22   not the toxoplasmosis paper, as we sit here today, was a

31

1    paper that was supposed to be a publication for a peer

2    review journal?

3        A    Can you repeat that?

4        Q    You have no understanding about whether the

5    toxoplasmosis paper that Dr. Chowdhury was assigned,

6    whether or not that was assigned as a publication for a

7    peer review journal?

8        A    Not specifically, but it was assigned -- it

9    was an assignment that was under his PIP, his

10   performance improvement plan --

11       Q    Right.

12       A    -- that encompassed -- although communication,

13   as you stated, is a non-critical element, that

14   assignment encompassed elements that were critical,

15   research and analysis.  So while it's stated under --

16   that particular bullet states that it's under

17   communications for the purposes of the PIP period, those

18   assignments were -- he was given assignments that were

19   under his critical element.

20       Q    And that was because that's how Dr. Parham and

21   Dr. Thaler classified him; isn't that right?

22       A    No.  When the -- the whole point of a PIP is

1    to give the employee an opportunity to raise the

2    performance level to a satisfactory level.  So the

3    assignments are geared toward the employee's ability to

4    meet those functions that are critical, missions

5    support -- for instance, missions support and research

6    and analysis.

7         So while on here, for the purposes of his

8    overall performance plan, which is dated during that

9    time -- initially this is what he was under, but for the

10    purposes of the PIP, he needed to be given assignments

11    that encompassed those critical elements.

12         Q    So if Dr. Parham and Dr. Thaler were wrong

13    about those assignments and those assignments were

14    non-critical elements, then he shouldn't have been

15    removed; isn't that correct?

16         A    No, that is not correct.  It's not that they

17    put him -- it's not that the supervisors changed those

18    elements incorrectly.  It's that during the PIP period,

19    he has to be given an opportunity to demonstrate those

20    skills.  The skills that are associated with his grade

21    level are those things that are critical, which is

22    research and analysis.

1          So the outcome of that assignment is the

2    paper, which would be that bullet, but the skills that

3    he needed to be able to demonstrate to create that

4    product are all under critical elements and not

5    non-critical.  In other words, the skills that he needed

6    to analyze these things, research, and then at the end

7    create this and turn in this paper, the actual paper

8    itself may fall under this, but for the PIP period,

9    these are his critical standards.

10        Q    That's because Dr. Thaler and Dr.

11   Parham determined that; isn't that right?

12        A    They gave him -- yes, they determined which

13   assignments would best meet those standards, those

14   critical standards.  In other words, they gave him

15   assignments that would demonstrate his skills and

16   abilities in that area.

17        Q    So even though those assignments may have been

18   to work on an article for publication and peer review

19   journal, you're claiming that's part of missions support

20   and research, because they also involve those items as

21   well?

22        A    The supervisor -- just as the supervisor sets

1    those elements that are critical and non-critical in

2    this performance plan, during the PIP period, they also

3    have the responsibility of assigning those assignments

4    that are critical in order to give him an opportunity to

5    improve.  For this assignment, those were his critical

6    elements.

7        Q    Would you say that the assignments have to

8    support the missions of the agency in actuality in order

9    to be critical?

10       A    Yes.

11       Q    But the supervisors, in this case Dr. Thaler

12   and Dr. Parham, get to determine that?

13       A    They get to determine that at any level, in

14   every instance, whether it is during the PIP or at the

15   beginning of the rating cycle.  That is their

16   responsibility.

17       Q    Are you telling me that it's always the case

18   that a supervisor decides -- hands an employee an

19   assignment to write a paper for publication in a peer

20   review journal, and it's always the case that it

21   involves a missions support and research and analysis?

22       A    No, that's not what I'm saying.  What I'm

# EXHIBIT Y

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 1 of 8

## ALICE THALER, WITNESS AFFIDAVIT

I  _Alice M. Thaler_____

am an __X___ employee of ___ applicant to ___ former employee of the U.S. Department of Agriculture:

(Agency)  ___Food Safety and Inspection Service_____

(Office)  ___Office of Public Health
Science_____

(Division)  ___Office of the Assistant
Administrator_____
___

(Branch)  _____

Located in (city and state)  _____Washington, D.C._____

In the capacity of (show both your organization title and the classification of your job, if different):

_____Senior Director for Program Services_____

Grade __GS-15__ in current position since 03/05/06____ worked for FSIS between (date) _May 1984___ and (date) ___to the present_____

My telephone number during working hours is: _____202-690-2687_____

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. This means that any e mployee(s) whom I a ccuse o f d iscrimination o r o ther a cts o f i mpropriety may b e s hown r elevant p ortions o f my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

54


Initials

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear __XX__ affirm _____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

Q.  Do you solemnly swear or affirm that the testimony you are about to give is true and correct to the best of your knowledge?
A.  I do

Q.  Please state and spell your name
A.  A-l-i-c-e M.  T-h-a-l-e-r

The issue accepted by the agency is whether Khurshed Chowdhury was subjected to discrimination based on his race (Asian), religion (Muslim), sex (male), national origin, age (YOB: 1941) and reprisal for prior EEO activity, when on September 1, 2006, he was terminated from his position as Veterinary Medical Officer, GS-701-13.

Q.  Please state your current position title, grade and series
A.  Senior Director for Program Services, GS-701-15

Q.  What is your business telephone number?
A.  202-690-2687

Q.  Please identify the management official to whom you report
A.  David Goldman, Assistant Administrator

Q.  What is your gender?
A.  Female

Q.  What is your race?
A.  Caucasian

Q.  What is your National Origin?
A.  American

Q.  What is your religion?
A.  Catholic

Q.  What is your year of birth?
A.  1955

Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 3 of 8

Q. How long have you worked for FSIS?
A. Since May 1984

Q. How do you know the Complainant?
A. He was a staff officer in policy when I was the Branch Chief in policy and he reported to me for a short time. In a reorganization he was reassigned to the Office of Public Health Science and I stayed in policy. Then in another reorganization, the staff that I was supervising in policy was reassigned to the Office of Public Health Science, and in 2003 I was asked to combine two divisions and serve as the Director and he was in one of the divisions. I was his second line supervisor and his immediate supervisor was Delila Parham.

Q. Why was the Complainant removed?
A. We had very carefully documented his failure to perform. His performance declined over a series of years and he reached the point where he refused to do the complex work assigned to him. It was at that point his supervisor was prepared to document and see if it would turn him around but he failed to improve his performance.

Q. Please describe the Complainant's performance?
A. It became apparent that when his supervisor would give him simple review work to do he wouldn't turn in a quality product, so he was assigned less complicated work because he was unable to do the complex work. So it got to the point where he wouldn't do anything meaningful and he would argue about assignments that were well within his scope as a veterinarian.

Q. When did his performance decline?
A. People noticed over time that he wasn't one of the star performers. He wasn't someone to whom you could assign complex work and be confident that he would get it done. He never got his performance to that quality. As we get to where we have more work to do and fewer people, I think it is necessary to get people to pull their weight. I think the performance improvement plan is a way to let someone know formally that their performance is falling below the "meets" standard. He would become argumentative and yell at his supervisor. At one point, he threatened his supervisor and she did file a workplace violence complaint against him. The workplace violence complaint was investigated at my level and at that point he had apologized to her and he explained he was under stress because we were trying to work on his performance. I was concerned that he was ignoring the fact that he was under a performance improvement plan and we even went to Alternate Dispute Resolution just trying to get him to accept that his performance was deficient. He continued to ignore the fact that he was on a performance improvement plan and pleaded to be left alone and taken off the performance improvement plan.

Initials

Case No. USDA-FSIS-2006-02551
Khurshed Chowdhury, Complainant
Dr. Alice Thaler, Affidavit
Page 4 of 8

Q.  Are you aware of whether the Complainant received regular counseling sessions regarding his performance?

A.  Yes, he was set up to have weekly discussions with his supervisor and when she was not available to meet with him, she would let me know and I would arrange to have those discussions.  We asked him to keep a log of his work so we could advise him of how to better utilize his time.  He did not keep a log with enough detail to allow us to advise him and said that he found it demeaning to be asked to keep a log.  He consistently would show up for the meetings and say he had no questions or problems and assured us that he would turn in acceptable work products by the deadlines.  He didn't want to admit there was an issue or problem with his performance.  Usually you sit and talk with an employee about their deficient performance and they quickly make a turnaround to improve.  I haven't decided if he wasn't capable of improving his performance or he just decided he wasn't going to do it.

Q.  Dr. Chowdhury had 17 years with the agency; do you know how he performed for all those years?

A.  When he was in policy with me, I was on the verge of putting him on a performance improvement plan then, and that's when the reorganization happened.  I thought in the interim he would have developed better skills.  When I became Senior Director for Program Services, I discussed his performance with his supervisor and she did raise concern, but she wasn't to the point of putting him on a performance improvement plan yet.  In fact, when she gave him one assignment and then later given him another assignment, he assumed he no longer had to work on the original assignment without discussing this with his supervisor.  When she asked him how he was doing on the original assignment he told her everything was fine and never told her he stopped working on it.  She got to the point that between him yelling at her, and saying he didn't finish an assignment because he assumed she wanted him to work on something else, that was it and she felt he stepped beyond the point of accepting assignments and seeking help when he needed it.

Q.  Were there specific assignments that the Complainant failed to complete or were completed untimely?

A.  There were three main assignments we gave him for the performance improvement plan period.  He would spend a whole week working on the weekly emerging zoonoses update and then come up with one or two bullets.  The assignment was searching the internet and look at emerging issues that people were starting to talk about on emerging zoonotic diseases.  He would prepare a minimal synopsis with a couple of bullets and others on the staff were looking at other issues.  He clearly did not want to accept Dr. Parham's authority or mine.  We had a writer editor look at his work and she was the one who identified the plagiarism.  Others who looked at his work, such as Loren Lange the Deputy Assistant Administrator identified that Dr. Chowdhury made no effort to identify the information he gathered on Salmonella serotypes with any relevance to the agency.

When information is gathered you should identify how the information is important to our agency.


Initials

# EXHIBIT Z

1    THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF COLUMBIA

3

4  - - - - - - - - - - - - - - -X

  KHURSHED A. CHOWDHURY    :

5             :

    Plaintiff,     :

6  vs.         : C.A. No.:

             : 1:07cv997 (RCL)

7  ED SCHAFER, SECRETARY,   :

  U.S. DEPARTMENT OF AGRICULTURE :

8             :

    Defendant.    :

9  - - - - - - - - - - - - - - -X

10         Washington, D.C.

11       Tuesday, April 15, 2008

12

13 Videotape deposition of:

14      DELILA PARHAM

15 called for oral examination by counsel for

16 Plaintiff, pursuant to notice, at the offices of

17 Capital Reporting Company, 1821 Jefferson Place,

18 N.W., Washington, D.C., before Jodi Scheffel, a

19 Notary Public in and for the District of Columbia,

20 beginning at 9:35 a.m., when were present on behalf

21 of the parties:

22

1      Q     All right.

2      A     -- sometimes, yes.

3      Q     Was he assigned projects by the meetings

4    or what were the meetings designed to accomplish,

5    if you recall?

6      A     At the time that the BSE was a major

7    issue in FSIS and OPMS, the purpose of the meetings

8    was to keep up with -- with what was going on with

9    BSE, to give us assignments if necessary based on,

10    you know, what our positions were and what our

11    expertise was.  So, yes, we could get assignments

12    out of the work group.

13      Q     Do you remember Dr. Chowdhury getting

14    assignments on BSE from that group?

15      A     I think he may have gotten some, yes.

16          MR. GOULD:  All right.  I think we're up

17    to 10 -- 9, I'm sorry.

18          (Parham Exhibit No. 9 was

19           marked for identification.)

20          (Tenders document to witness.)

21    BY MR. GOULD:

22      Q     I'm showing you a document entitled

1    on mad cow disease, on his performance evaluation

2    that ended or his appraisal that ended in December

3    of 2005; isn't that right?

4         A    That's correct.

5         Q    Now, if we look at 24 --

6         A    Yes, sir.

7         Q    -- okay, the investigator asks you a

8    question about peer review reports for publication

9    in journals.

10        A    That's correct.

11        Q    And you say in response each person has

12   to conduct independent research work; isn't that

13   right?

14        A    Yes, sir.

15        Q    But you're not saying -- your response

16   didn't indicate that other employees were tasked

17   with writing peer review reports for publication in

18   journals.  You didn't respond directly to that; did

19   you?

20        A    I don't believe so.

21        Q    Okay, at least in that sentence.  Can you

22   name me today which person that you supervised was

1       asked to write a peer review report specifically

2       designated for publication in a journal?

3            A     Asked to write specifically for a

4       journal?

5            Q     Right.

6            A     Okay.  Independent projects are targeted

7       and we hope that they will make it to peer review

8       journals.  Dr. Anandaraman was working on a paper.

9       Dr. Harman was also working on a paper.

10           Q     Did any of those papers get into peer

11      review journals in the end?

12           A     No, sir, they didn't.

13           Q     Okay.  Did Dr. Harman get removed for

14      unacceptable performance?

15           A     No, sir.

16           Q     Has Dr. Anandaraman been reviewed -- been

17      removed for unacceptable performance?

18           A     No, sir.

19           Q     Has she even been rated unacceptable at

20      all by you?

21           A     No, sir.

22           Q     Okay.  By anyone that you know of?

1         A     I'm not aware that she's ever been rated

2    unacceptable.

3         Q     Okay.  In fact, have you rated any other

4    person, since you're head of the branch,

5    unacceptable other than Dr. Chowdhury?

6         A     No, sir.

7         Q     Okay.  Now, you mentioned that

8    Dr. Chowdhury's topic was not agency critical;

9    isn't that right?

10        A     Yes, sir.

11        Q     Did Dr. Chowdhury perform other work that

12    was agency critical during his performance

13    evaluation period?

14        A     Yes, sir.

15        Q     Okay.  What types of work are you

16    referring to that were agency critical?

17        A     Okay.  Agency critical in this case, I

18    was referring it to mean that it was not rush,

19    okay, agency critical, you've got to get it to

20    someone right now.  BSE, some of that work was

21    agency critical.  We were required to get it right

22    away.

1          Q     Right, okay.  And the fact that it was a

2     rush job meant that, at least at that particular

3     point in time, it was more important that

4     Dr. Chowdhury work on that particular assignment;

5     isn't that right?

6          A     That's correct.

7          Q     More important to the Agency, that is?

8          A     Yes, sir.

9          Q     Now, can you tell me who you

10    supervised -- I don't think I asked you this -- you

11    supervise at present?

12         A     At present?

13         Q     Yes.

14         A     Let's see.  Remember I also said the

15    branch had changed --

16         Q     Right.

17         A     -- okay, and we had been merged into a

18    new division.  So the persons now would be Kis

19    Robertson, Kristal Southern, Neena Anandaraman and

20    Ben Salamone.  Dr. Qureshi left his position on

21    Monday, April 14th.

22         Q     So at some point you also supervised

1    Dr. Qureshi, correct?

2         A    That's correct.

3         Q    Okay.  When did Ms. Harman leave

4    approximately; year?

5         A    I think it would be 2006 --

6              DR. CHOWDHURY:  2005.

7              THEN WITNESS:  2005, thank you.

8    BY MR. GOULD:

9         Q    Do you know why she left?

10        A    She took a new position at NIH.

11        Q    And why is Dr. Qureshi not there anymore?

12        A    He took a position with the Field, Office

13   of Field Operations in FSIS.

14        Q    And where is that located; in New York

15   somewhere?

16        A    Yes, sir.  I believe Albany, New York is

17   the district.

18        Q    Do you know what office he works out of

19   in Albany?

20        A    I can get that information for you, sir.

21        Q    Okay.  You don't have it as we speak?

22        A    No, sir.

1      Q    Okay.  And you cc'd that to her because

2    she was the one who had done the most work on

3    Salmonella; isn't that right?

4      A    That's correct.

5      Q    In fact, she was also doing work on

6    serotypes; isn't that right?

7      A    She calculated serotypes, yes, sir.

8      Q    Right.  And so you asked for input as

9    well; isn't that right?

10     A    Yes.  I certainly sent it to her, yes,

11   sir.

12     Q    All right.  Did you have -- do you

13   remember any discussions with Dr. Anandaraman about

14   this particular request from Mr. Lange?

15     A    I think I did.

16     Q    Okay.  What do you recall her saying to

17   you on that point?

18     A    And the reason -- well, it's speculation.

19   But at the time Dr. Anandaraman was tied up with

20   some other work that she was doing and we didn't --

21   I could not give the assignment to her.

22     Q    So initially you thought of giving her