UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KHURSTED A. CHOWDHURY   )
               )
Plaintiff,        )
               )
v.           )  Civil Action No: 07-0997 (RCL)
               )
MIKE JOHANNS, Secretary,   )
United States Department of Agriculture )
               )
Defendant.       )

**REPLY TO PLAINTIFF'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

Defendant respectfully submits this reply to plaintiff's opposition to motion for summary

judgment.

**Plaintiff Has Not Presented Evidence upon Which a Jury Could Find That the Defendant's
Legitimate Non-discriminatory/retaliatory Reasons Were Pretexts**

 **Plaintiff presented no evidence that his work on other reports was ignored in
evaluating his performance.**

Plaintiff claims that there is evidence of discrimination/retaliation because in giving

plaintiff his final evaluation at the end of the PIP, Drs. Parham and Thaler allegedly ignored

plaintiff's good work on approximately 30 reports done during the rating period, most of which

were about BSE. Opposition at p. 6, Opposition Ex. C. This, argument evades the fact the PIP

was instituted based on a determination that plaintiff's performance, including the 30 some

reports had been found to be unacceptable.

Dr. Parham related that

[Plaintiff] did not meet deadlines and when he did provide work it nearly always
had to be rewritten. I would have to send it back to him several times before his

1

work was satisfactory and then eventually I had to do it myself.

SJM at p. 2, citing Parham affidavit, Blue at p. 51, ¶14.   Plaintiff never rebutted this.

The evidence shows that  in December 2004, Dr. Parham met with plaintiff and later gave him a written mid-year appraisal of unacceptable performance.  DDR-IPRO Ex at 1807-1809. Plaintiff's performance was found to continue to be unsatisfactory and plaintiff was placed on the PIP in August 2005.   In addition to submitting work late and dropping assignments without telling his supervisor, the mid-year evaluation and the PIP reflected that the **quality** of plaintiff's work was not acceptable.

The mid-year evaluation summarized the reasons plaintiff's performance was found to be unacceptable up to that point.  It included problems with major projects being submitted late, problems with the Columbia and Thailand Reviews being done, as well as plaintiff's abandoning the toxoplasmosis paper without telling Dr.  Parham.   Statement of Material Facts (SMF) 9.  It also stated that "Dr. Chowdhury struggles with providing well-researched, well-written assignments. He does not ensure that all relevant and technical scientific issues are fully analyzed, and, therefore, much of his work is returned to him for more in-depth analysis. Moreover, the majority of his work requires major edits and revisions."  *Id.*  It also discussed his failure to accept supervision well and his failure to inform his supervisor when he was discontinuing work assignments given to him.  *Id.*    Although Plaintiff's Statement of Material Facts and Inferences in Dispute (Disputed Facts) number 9, purports to deny the truth of the matters raised in the mid-term evaluation,  citing to his exhibits A-Z, defendant can find nothing in those exhibits which rebuts the issues raised in the mid-term evaluation.  Disputed Facts at p. 15-16.  Indeed, plaintiff's affidavit does not even address, much less deny, the performance issues

2

discussed in the mid-year evaluation.  *See* Opposition Ex. A.   For example, plaintiff did not

deny that much of his work had to be returned for more in-depth analysis or that the majority of

his work required major edits and revisions.  *Id.*

In addition to the issues raised in the mid-year evaluation, the PIP discussed plaintiff's

performance since December 2004.   It reflected that "work  products received did not

demonstrate the complexity and nature of work that should be performed by personnel in the

Zoonoses Branch at the GS-13 level." PIP at p. 4-5.   It used as examples the Thinking Paper and

the Toxoplasmosis Paper.   It indicated for example that the first draft of the thinking paper was

not well researched, lacked depth and  had to be returned for further research and analysis.  *Id*. at

p.  5-6.   The second draft lacked sufficient analysis and lifted material from other sources

without acknowledging the sources.  *Id*.  As to the toxoplasmosis paper, plaintiff had again

abandoned the project without advising Dr.  Parham, claiming this time  that he "assumed"  the

thinking paper had replaced it.  *Id.*   Although purporting to dispute the findings reflected in the

PIP, the exhibits referred to in plaintiff's Disputed Facts again failed to rebut the findings of the

PIP.   Disputed Facts 19 & 20 at pp.  19-21.   Plaintiff's affidavit did not discuss the merits of the

thinking paper or of any other aspect of his work on the other projects, and admitted that he

"assumed" the toxoplasmosis article was no longer a priority.   Opposition Ex.  A,  Chowdhury

Dec. at ¶29.

Plaintiff points to the affidavit of Michael Kasnia as purported evidence concerning

plaintiff's performance.  Opposition at p.6 fn 2 and at Ex. U p.4.   But, Mr. Kasnia was not

plaintiff's supervisor and was not in the Zoonoses Branch.  He does not purport to know the

quality of the work product initially given to Dr. Parham by plaintiff, whether or not it had to be

returned to plaintiff several times for further reviews and analysis, whether or not major edits and revisions were required, or whether Dr. Parham had to prepare the documents finally submitted.

It is well settled in this Circuit that when a plaintiff files an opposition addressing only certain arguments raised by the defendant, "a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., General Bd. Of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002) (*citing FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997); *see also* Local Rule LCvR 7(b). Plaintiff has failed to submit any evidence rebutting that much of his work had to be returned for more in-depth analysis; that the majority of his work required major edits and revisions; and that Dr. Parham eventually had to do some of his work herself. Additionally, Dr. Parham estimated that during the evaluation period, plaintiff spent only approximately 35% of his time on BSE issues. Parham Depo at p. 14-15. Thus, plaintiff has conceded these issues. He has failed to present evidence that his work on other reports was ignored, that he was held to an excessive standard of perfection or that qualitatively 94% of his work rated an "A."

**Toxoplasmosis Paper**

Plaintiff contends that the toxoplasmosis paper was not a part of the critical elements of his job as a veterinary medical officer because FSIS is prohibited from doing "scientific research," because conducting scientific research is exclusively done by the Agricultural Research Service (ARS). Opposition at p. 6-7 citing to Opposition Ex. G, Basu Deposition.

As was explained by Dr. Basu, the type of scientific research done by ARS was "original research" such as bench research in a laboratory or field research such as developing and growing

4

different types of rice built by technology.  *Id*. Basu Deposition at p. 43-48.   Veterinary medical

officers in the Zoonotic branch were expected to be able to take a topic and research it based on

scientific  journals and other literature available,  "Just like lawyers do. Case research."  *Id*. at p.

47- 48.  As Dr. Basu further elaborated in answer to the following questions

> Q   And would you find it exceptional that that would be among the performance
> elements of somebody in the zoonosis branch, that they are expected to do the –
> not the original research of ARS, but the research in the journals and the literature
> as part of their job?
> A To answer that, I expect a staff of mine, if I was director, to be able to go and
> find the answer for me and give me the answer of where   – lets say toxoplasmosis
> for example – where do we stand, where does the world stand  – give me an
> answer for that.   Yes, I would expect the person to go to the Internet, go to the
> publications to find out what the positions are for different countries.   I've done
> that in the past.  And then we get it together in a document . . . .
> Q   So that's common?
> A Sure .

*Id*. at p.  48-49.

Plaintiff was not asked to do the type of original scientific research done by ARS, nor did

he do any original research for the toxoplasmosis paper.   The PIP does not have any requirement

that plaintiff do original scientific research.   SMF 21.    Indeed, the work plan plaintiff

submitted on Toxoplasmosis pursuant to the PIP also reflects that he did not believe that he was

being requested to do original scientific research:

> Workplan:   Available literature on sero-prevalence in the US will be collected
> and will be reviewed to make a comprehensive review article having recent survey
> of toxoplasma infections of Food animal species in the US, and its public health
> danger.   FSIS current status on toxoplasplasma will be highlighted.   Suggestions
> to protect consumer's health will be summarized.

Blue 300.   Thus, he has failed to show that he was required to do original research.

Plaintiff also argues that  preparation of the toxoplasmosis paper could not be used to find

his performance unacceptable because it fell under non-critical elements of plaintiff's

performance plan, i.e. communications and special projects. Opposition at p. 7.[1] The same

argument was raised in plaintiff's responses to the proposal to terminate him. Blue at 101. The

Oral Conference Officer rejected this argument noting

> Upon reviewing the position description of the Veterinary Medical Officer,
> GS-0701-13, I found that an incumbent is expected to analyze and evaluate,
> provide concise, factual, timely written and oral reports of all situations required
> and/or requested. Also, the incumbent performs special epidemiological projects
> concerned with food hygiene, public health, and preventative medicine. Further,
> the incumbent researches literature and keeps abreast of advances in the field of
> epidemiology and assess potential impacts on program activities.

> Under "Knowledge Required" for the position, the incumbent has a mastery of a
> diverse range of medical sciences (such as microbiology, bacteriology, pathology,
> parasitology, immunology, and virology) and a demonstrated mastery in the field
> of epidemiology and public health, particularly as related to the origin and
> transmission of food borne pathogens. The incumbent, among other things, is

---

[1]

The communications standard provides:
Oral and written communications were clear, correct, timely, and presented in an
understandable manner. Supervisor and coworkers were kept informed of issues and
problems when necessary. Information and guidance provided was timely and correct.

Opposition at Ex.H p. 76. The goals and activities listed under the communications standard included:

> Maintains effective and collegial working relationships with other Branch, Division,
> Program, and other Agency employees, government officials, Congressional staffs,
> interest groups and other interested parties by:
> • Preparing and contributing to the development of discussion, position, and policy
>   papers, briefing notes, presentations, and routine agency correspondence.
> • Presenting written an/or oral findings and observations to project teams,
>   colleagues, and managers in a manner the enhances confidence and credibility in
>   the Branch, Division, Program, and Agency.
> • Preparing written reports, papers, and articles for Agency use and/or publication
>   in peer-reviewed journals that are well written, researched, and organized, and
>   reflect sound scientific principles and concepts to consistently withstand
>   scientific critique. . . . .

*Id.*

required to possess the skill to communicate effectively in both oral presentation and writing which includes presenting seminars and publishing articles in professional journals.

Under "Scope and Effect," the incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health. The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens. The need for an interdisciplinary approach to problem definition and resolution requires the ability to coordinate efforts with both officials within and outside the Agency, as well as with the meat, poultry, and egg products industries and related organizations. Problems solved are extremely difficult in nature and the results have a significant impact on program direction.

Blue at 133-134.  The hearing examiner found as follows:

Mr. Gould submits that the performance plan lists publications for scientific journals as part of communications which is a non-critical element. The performance plan reflects under Mission Support Goals/Activities for the Cycle-Objective 2: "Conduct comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs." Under Objective 4: "Conduct epidemiological activities that provide guidance to the Agency's programs to ensure that the Agency's public health and food safety goals are met.: The performance plan also requires under critical element Research and Analysis Goals/Activities for the Cycle - Conducts needed research and analysis by: "Participating in project teams; establishing the nature and scope of studies; recommending data/information requirements and policy research/study approaches, analytical methods and objectives; organizing studies; and planning, organizing and prioritizing assigned work." I find the projects assigned to CHOWDHURY are more closely aligned with Mission Support and Research and Analysis. Further, it was noted that PARHAM had indicated the projects should be prepared as if they were going to be published for scientific journals, and NOT that he was to prepare for his report for publication in a scientific journal.

In reviewing the plethora of material submitted, what CHOWDHURY was asked to do falls most closely under critical elements Mission Support, and Research and Analysis. As a side note, it was CHOWDHURY who suggested that he prepare a paper on toxoplasmosis in response to PARHAM's request that he provide topics for the team to consider as project work

7

Blue at 134-135.  As Ms. Gayle, the deciding official, explained:

> [d]uring the PIP period, he has to be given a chance to demonstrate [critical element] skills.  The skills that are associated with his grade level are those things that are critical, which is research and analysis.
>     So the outcome of that assignment is the paper, which would be that bullet, but the skills that he needed to be able to demonstrate to create that product are all under critical elements and  not non-critical.   In other words, the skills that he needed to analyze these things, research, and then in the end create this and turn in the paper, the actual paper itself may fall under this, but for the PIP period, these are his critical elements. . . . In other words, they gave him assignments that would demonstrate his skills and abilities in that area.

Opposition  Ex.X, Gayle depo at p.  32-33.    And indeed, that is precisely what the PIP indicated.

For example, for the critical element of mission support the PIP stated that "preparation of a

paper for publication in a peer-reviewed journal would demonstrate your knowledge and

expertise in zoonotic diseases and pathogens and the impact on food safety to address emerging

and re-emerging diseases.  It would also demonstrate you ability to use available reference

material and conduct a comprehensive scientific study that would provide recommendations and

support analysis and management for specific Agency issues.   SMF 21 at p. 22.  For the critical

element of research and analysis the PIP stated: "Preparation of a paper . . .would demonstrate

you ability to research and analyze issues throughly and accurately . . . ." *Id.*

Defendant submits that the only manner in which a zoonoses branch VMO's skills in  the

critical elements could be demonstrated was through oral or written communication  – e.g..  oral

or written reports given to his supervisors and others.  According to  plaintiff's logic,  since all

written and oral communication was described under the non-critical communications

requirement, see fn 1 above, all of plaintiff's  written and oral communications  could have

shown a total lack of the ability to do scientific research and analysis, and the agency would not

have been able to find that he failed to meet the critical standards at issue.  Clearly, as with a

legal brief,  one assignment can implicate many different critical elements or skills and abilities –

for example, writing a legal brief demonstrates the  ability to do legal research and analysis,

ability to analyze and apply facts to law, ability to write, and if oral argument is required ability

to communicate orally, etc.  The same applies to written reports and memoranda prepared by a

VMO such as plaintiff.    Thus, plaintiff has not established that only non-critical elements were

involved in writing the toxoplasmosis paper.

      Plaintiff also asserted that Dr. Parham testified that she did not think the toxoplasmosis

paper was critical to the agency's mission.  Opposition at p.  7.   What she testified to was that the

topic was not "agency critical."   She explained that not being agency critical simply  meant "that

it was not rush, agency critical, you've got to get it to someone right now."  Parham Depo at 96-

97.  See  Parham Dec.  at ¶7.    But, the mission of Dr. Parham's branch is not just to be reactive

to a "rush assignment," but also to be proactive and have a knowledge base about emerging

zoonotic issues as they  pertain to public health.   That is why Dr.  Parham tasked her staff to

develop a knowledge base and expertise in one or more issues.  Their research and the papers

generated from that research create a bank of knowledge to which they can refer as  issues on

those topics arise without having to start research from scratch each time. Parham Dec.  at ¶7, 16.

 The topic which plaintiff chose for this purpose was toxoplasmosis.  *Id.*  at ¶4.  The research and

analysis for such longer-term  projects clearly fall within the critical elements of mission support

and research and analysis. *See e.g.*  Opposition Ex. H at p. 7, Research and Analysis Standard,

goals and/activities  ("Undertaking longer-term tracking and analysis of issues, identifying

relevant scientific issues that may have policy implications . . . .")

Plaintiff also alleges evidence of discrimination/retaliation because Dr. Salamone and Dr. Qureshi were neither given unsatisfactory performance evaluations nor removed and they did not complete or publish an article for a journal.    However, plaintiff did not discuss or rebut, and thus conceded,  defendant's summary judgment argument that he was not treated differently from these alleged similarly situated individuals.  See SJM at p. 29-30.

Dr. Salomone testified that his performance rating went down one level because he had not written a peer-reviewed paper.  *Id.*  Plaintiff's rating went down one level from fully satisfactory to unsatisfactory ( based in part on his failure to successfully complete the toxoplasmosis paper).   Thus, he was not treated differently  from Dr. Salamone.

Dr. Qureshi, who had been working in the field as an inspector, only had joined the staff in 2004.  *Id.*  He was not asked to do such a paper because of his newness to the branch and the change in the type of work he was doing.  He needed time to transition into the new duties. *Id*. Plaintiff, on the other hand had been in the branch since 2001 when it was established and had been in the division since the mind-1990's.  *Id*.   Thus plaintiff was not similarly situated to Dr. Qureshi.

**Salmonella Serotype Paper**

Plaintiff argues that the salmonella serotype paper was a "special project" and "should not had been classified as a critical element of Dr. Chowdhury's position." .   That argument properly was rejected by the oral hearing examiner and the deciding official for the same reasons as their rejection of plaintiff's argument that the toxoplasmosis paper could not be considered under a critical element, discussed above.  Simply, as is stated in the PIP, researching and writing the salmonella paper would demonstrate his skills and abilities in the critical performance elements:

Mission Support element C, Objective 2, goals and activities #s 1, 2, and 4[:] preparation of the report would demonstrate your ability to provide work products that are responsive to the supervisor's and the organization's stated priorities and requirements. It would show that you are capable of conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues.

Research and Analysis element A, B, and C, and goals/activities #s 1, 2, and 4 [:] Preparation of the paper would show that you are capable of researching and analyzing issues thoroughly and accurately, and in a timely manner, making use of available reference sources that would allow you to identify and compile information to carry out the required analysis.

SMF 21.  Moreover, as is reflected in the PIP, "The paper, if well written and properly researched, would address a request made by the Assistant Deputy Administrator to provide descriptive information on key poultry Salmonella serotypes." *Id.*    The standard for the critical element of  Mission Support for fully successful performance was:

Has demonstrated basic understanding of mission and organizational goals and priorities that support or directly protected the public's health from foodborne hazards.  Assignments were completed in accordance with applicable agency regulations, policies, procedures and guidelines.  Work product was responsive to the supervisor's and the organization's stated priorities and requirements.

Opposition Ex. H at p. 4.    Under goals and activities, the Mission Support  element specifically notes as one of the activities under the standard

- •    Acquire knowledge and expertise of zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging disease issues.
- •    Conduct comprehensive scientific research and studies to provide recommendations and  support the analysis and management of specific Agency issues and the development of  policies and programs.

*Id.* The standard for critical element Research and Analysis is

Researched and analyzed issues throughly, accurately, and in a timely manner, probing for detail, as appropriate.  Made use of available reference sources . . . . Recommendations or analysis provided were based on available guidance and

were generally accepted without major revision.

*Id. at p. 7.* One of the activities and goals listed was "conducting comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific policy issues and the development of policy and programs." *Id.*

Thus, the preparation of the Salmonella paper, as well as the toxoplasmosis paper, clearly fell within the critical elements of Mission Support and Research and Analysis.

Similarly, the rating of Dr. Qureshi cited by plaintiff, provides no support for plaintiff's argument. Opposition Ex. M. The document contains a justification for giving Dr. Qureshi a rating of exceeds fully successful under Special Projects, because a justification is required " for elements rated Exceeds or Does not Meet. No documentation is needed for elements rated Meets Fully Successful." Opposition Ex. H at p. 4 box 7. The attachment to the rating prepared by Dr. Qureshi listed a salmonella assignment and some other assignments as a special project. Opposition Ex. M at p. 7; Qureshi Depo at p. 20. When asked why he had listed the Salmonella assignment under special projects, Dr. Qureshi responded

> I could have – when you read that job description, I could have put that in Special Projects and Research and Analysis both . . . .

*Id* at p. 20. Thus, Dr. Qureshi acknowledged that one assignment could fall under more than one performance element.

Plaintiff also argues that the salmonella assignment should have been given to someone in the microbiology division. Opposition at p. 10. However, plaintiff does not address and thus conceded defendant's argument that the assignment to someone in the Zoonoses branch rather than to someone in the Microbiology Division is not evidence of discrimination or

retaliation.  The reason for this is that Mr. Lange told Dr.  Thaler that the Zoonoses Branch was

to take the lead on the project.  Disputed Facts 23 ( Mat Fact 23 was admitted by plaintiff).   See

also Parham Dec. at ¶ 6. (She told plaintiff that the focus of the paper was to be from a public

health perspective not microbiology focus).

Plaintiff next argues that the salmonella assignment should have been given to Dr.

Anadaraman because she had worked on Salmonella issues.   Opposition at p. 10.  Whether or

not another VMO could have done the paper is irrelevant.  Pursuant  to the position description

**all** of the VMO's, including Dr. Chowdhury, should have had the knowledge and skills to

research, analyze and do the assignment.   In commenting on the position description for the

position, the hearing examiner noted

> Under "Knowledge Required" for the position, the incumbent has a mastery of a
> diverse range of medical sciences (such as microbiology, bacteriology, pathology,
> parasitology, immunology, and virology) and a demonstrated mastery in the field
> of epidemiology and public health, particularly as related to the origin and
> transmission of food borne pathogens. The incumbent, among other things, is
> required to possess the skill to communicate effectively in both oral presentation
> and writing which includes presenting seminars and publishing articles in
> professional journals.

Blue 134, Oral Conference  Report at p.10; see also Disputed Facts at ¶ 3 (SMF 3 admitted by

plaintiff).

Plaintiff had been with the Zoonoses Branch since it's inception in 2001 and had been in

the branch since the 1990's.  Parham Dec at ¶7; Opposition Ex.  W.  Dr. Anandararaman also

started working in the Zoonoses Branch in 2001.  Anandararaman Depo at p. 6.    As the

Hearing Examiner found:

> It is true that CHOWDHURY's performance has always been fully successful or
> better in previous rating years. However, that does not guarantee fully successful

> or better performance each new rating year. Based on the requirements of the
> position, coupled with CHOWDHURY's years of successful performance,
> assignment of the toxoplasmosis and salmonella projects is within the duties of
> the position for which CHOWDHURY is qualified to perform.

Blue at p. 134,Oral Hear Examiner report at p. 10. Therefore, the initial assignment to do the

report on 20 salmonella serotypes requested by Mr. Lange, and the requirement under the PIP

to do a paper on just 5 salmonella serotypes, were well within the duties which plaintiff should

have been qualified to perform, and is no evidence of discrimination or retaliation.

Plaintiff also argues that Dr. Thaler "is not a totally credible person" because she signed a

sworn statement allegedly saying plaintiff's performance was unsatisfactory when she supervised

him in the mid-1990's. Opposition at p. 29-30 citing to Ex. Y. However, exhibit Y merely

contains the statement that Dr. Thaler "was on the verge of putting him on a performance

improvement plan then, and that's when the reorganization happened." *Id.* at p. 5. That

statement is not contradicted by the fact that plaintiff got a meets fully successful rating. In

order to give plaintiff an unsatisfactory rating, Dr. Thaler would have had to place him on a PIP.

See SMF 10-11. She stated that she was on the verge of putting him on a PIP, not that she had

placed him on a PIP.

Additionally, Dr. Thaler's alleged comment to the inquiry "how do we get rid of people

that are not productive?" ( Opposition at p. 30) is not evidence of discriminatory or retaliatory

intent towards plaintiff or anyone else. Being an unproductive employee is not a protected

status. Moreover, while one part of the FSIS directives provides for reasonable assistance in

improving performance, it is clear that the directive also provides for reduction in grade, removal

or reassignment of employees whose performance continues to be unacceptable after being

14

placed on a PIP.   SMF 10-11.  Knowing how to remove someone who continues to be

unproductive using the appropriate procedures is a supervisor's job and not evidence of

discriminatory or retaliatory intent.

**Plaintiff did not produce sufficient evidence for a reasonable jury to find that the asserted non-discriminatory reason is not the actual reason and that the defendant intentionally discriminated against him**

Defendant presented its legitimate non-discriminatory reasons for finding that plaintiff

failed to successfully complete the PIP and for his ultimate removal from his position.   That is,

in sum, that his supervisors and others in the organization assessed the papers he was required  to

produce and believed them to be significantly deficient.   Therefore plaintiff failed to successfully

complete the toxoplasmosis and salmonella assignments  as required to obtain a fully successful

performance evaluation.

**Plaintiff Did Not Produce Sufficient Evidence for a Reasonable Jury to Find Age Discrimination**

Plaintiff previously had argued that he was treated differently from the other VMO's in

his branch, because "none of them had to publish any peer review article to receive a satisfactory

performance rating."  Blue Ex at 117-118.   Plaintiff did not dispute, and thus conceded

defendant's argument that there is no evidence of desperate treatment on that basis because 1) all

of the VMOs were asked to do such papers, which requirement was later qualified as a

requirement to write a paper of peer review quality; 2) Drs. Anandarman and Harmon did prepare

such papers, 3) Dr. Salomone received a lower rating for not doing the assignment, and 4) Dr.

Qureshi was not required to do such a paper due to his newness to the branch.   SJM at p. 20.

Plaintiff's opposition now argues that there is evidence of different treatment because Dr.

15

Harman was allowed to work on her article for over one year, and Dr. Anandaraman's article was a collective effort with others. Opposition at p. 17. The point missed by plaintiff's argument is that unlike Drs. Anandaraman and Harmon, from 2003 to August 2005 (or from December 2004 to August 2005), plaintiff had failed to produce even an outline or a draft of a toxoplasmosis paper.

He also argues that "No one could be expected to complete a finished product for publication in the time allotted to Dr. Chowdhury and without it undergoing several drafts after review by his peers." "Within less than two months and one half months, they expected Dr. Chowdhury, on his own, to research and write an article, as well as have it ready in final form to be submitted for peer review publication." Opposition at p. 25. However, the PIP only provided a standard for the preparation of the toxoplasmosis paper. SMF at ¶21 ("Prepare a scientific paper on toxoplasmosis as it relates to meat and poultry, written in a format prescribed by a peer-reviewed journal. The paper must be well researched with references and it must be free of major errors requiring few edits and revisions.") Even Dr. Chowdhury admits that under the PIP he was not required to submit a finished product for publication. *See* Opposition at p. 11 citing Chowdhury affidavit ¶32 (he was told that he could submit the toxoplasmosis article as a first draft rather than a final product). Further, the document was evaluated by Dr. Thaler as a first draft and found to be insufficient

> I completed my initial review of Dr. Chowdhury's Toxoplasmosis paper. At a GS-13 level, I expect an initial work product to be ready to review for substance, without significant basic editing mistakes. As stated in the PIP letter the paper must be well researched with references and it must be free of major errors requiring few edits and revisions. A GS-13 level staff officer would be expected to independently determine when to use his professional contacts to assist in review of a paper prior to submitting it to his supervisor. A GS-13 level staff

16

officer also is expected to prioritize the work to meet quality and timeliness goals.
Dr. Chowdhury informed me that he decided to devote only the 30-day extension
of the PIP to writing the Toxoplasmosis paper.

From the perspective of being ready for supervisory review, the paper is
disappointing.

Mat Fact 41.

Plaintiff also realleges that Dr. Parham's response when he said he would be retiring soon
was evidence of age discrimination.   Opposition at p.  16.   However, plaintiff did not rebut, and
thus concedes that the statement was one isolated remark made eight months before Dr.  Parham
placed plaintiff on a PIP and about 14 months before his unsuccessful performance evaluation in
February 2006, and thus not sufficient to prove discrimination.   SJM at p. 31. *Threadgill v.
Spellings*, 377 F. Supp 2d 158, 164 (D.D.C.2005).

### Plaintiff Did Not Produce Sufficient Evidence for a Reasonable Jury to Find Race and National Origin Discrimination

Plaintiff claims that he was discriminated against because he had "the racial and national
origin characteristics of some one from Bangladesh." Opposition at p. 18.   Plaintiff uses as
comparators for his race and national origin discrimination claim Drs. Harman, Qureshi,
Salomone and Anadaraman.  Opposition at p. 18.    Plaintiff admits that his race is Asian-
American and that the race of Drs. Qureshi and Anandaraman  also is Asian -American.
Opposition Ex Q, Chowdhury R  at p.2-3.    Dr.  Qureshi's place of national origin is Pakistan.
Opposition Ex.  J, Qureshi Depo at p.  8.  Dr.  Anandaraman's place of national origin is India..
Opposition Ex S, Anandaraman depo at  p. 7.   Thus, plaintiff is the same race as two of his
alleged comparators.  Further, plaintiff has submitted no evidence indicating why there would be
discrimination by Drs. Parham and Thaler against someone from Bangladesh versus someone

from Pakistan or India.   Plaintiff also did not rebut, and thus concedes that there were no statements allegedly made by any employees or managers demonstrating discriminatory intent on the basis of nation origin, race, or retaliation. SJM at p. 32;   Plaintiff's response to Interrogatory 12 & 15.

Further, as is discussed above, plaintiff  has not shown that he was treated desperately from similarly situated VMOs in the assignment to do the toxoplasmosis paper.

### Plaintiff Did Not Produce Sufficient Evidence for a Reasonable Jury to Find Retaliation

Plaintiff has not produced sufficient evidence for a reasonable jury to find retaliation played a role in his unacceptable performance rating and his termination.     Plaintiff contends that the time period between his EEO activity and his unacceptable performance evaluation (which plaintiff counts as 3.5 months)  is sufficient to raise an inference of discrimination.   But in light of defendant's legitimate non-retaliatory reasons for its actions, even if the court should find the time period sufficiently short,  that inference alone is insufficient to overcome summary judgment.

Plaintiff cites to *Heaton v. The Weitz Co., Inc* which states that "Although the temporal proximity between the protected activity and the alleged retaliatory act must generally be 'very close, . . . the employee may attempt to shorten the gap between [the] protected activity and the adverse action by showing that shortly after [the employee] engaged in the protected activity, the employer took escalating adverse and retaliatory action against [the employee]." *Heaton v. The Weitz Co., Inc*.,  534 F.3d 882, 888 (8th Cir. 2008).  *See also  Buggs v. Powell*,  293 F.Supp.2d 135, 149 (D.D.C.2003) ("evidence of a 'pattern of antagonism' following the protected conduct

can also give rise to the inference").

However, plaintiff has not offered evidence of such a pattern in this case.   Plaintiff does not dispute, and thus concedes that well before he initiated EEO activity  he had been notified that his performance was unacceptable.   Eight months later he was told that his performance continued to be unacceptable and he was going to be placed on a PIP.   SJM at p. 37 (In December 2004, he was told at mid-year that his performance was unacceptable;  he was told on August 9, 2005  that his end year performance was unacceptable and he was being put on a PIP. Initial contact with the EEO was on August 11, 2005.)  The PIP advised plaintiff that he would be subject to removal should he not successfully  complete the PIP requirements concerning the three papers.

Plaintiff did not rebut and thus concedes that he led his supervisors to believe that he had started working on this PIP projects in September, 2005.  Therefore, that he did not start work on the toxoplasmosis and salmonella papers until October 15, 2005 is not evidence of retaliation. SJM at p. 33-34.

Plaintiff failed to rebut and thus conceded that his work on the two papers was found to be deficient by  not only Drs.  Parham and Thaler but also by Mr. Lang, Dr. Hemphill, and Ms. Pritchard, who  had not been the subject of plaintiff's prior EEO complaint and had no reason to retaliate against plaintiff. Plaintiff also failed to rebut, and thus conceded that it was entirely reasonable for his supervisors to believe these individuals to be qualified to review his papers.

Plaintiff withdrew Dr. Thaler's  June 9, 2006 e-mail concerning the Peru questions from consideration as an independent claim of discrimination/retaliation, but contends it is evidence of retaliatory hostility for the rating  which occurred in February 2006.  Opposition at p. 21-22.   He

19

failed to rebut the legitimate non-retaliatory reason for the e-mail – i.e. that the e-mail was used as a manner for Dr. Thaler to tell everyone involved with the Peru report her concerns about the report and how it was handled.  Additionally, the e-mail is approximately 10 months after plaintiff's initial EEO contact  and four months after the February rating.  It together with the acts discussed above, together, fail to show  escalating adverse and retaliatory action close in time to  plaintiff's  protected activity or a pattern of antagonism.

Plaintiff also contends that he has other evidence of retaliatory animus concerning Dr. Thaler, alleging that she retaliated against Mr. Kasnia.    Opposition at p.  21 and attachment U. Plaintiff does not offer evidence, nor even allege,  that there was a finding that Dr. Thaler retaliated against Mr. Kasner.   All he offers is a hearsay statement  of what Mr. Dessai told Mr. Kassnia  Dr. Thaler allegedly said.  Ex U at ¶13.  This is rank hearsay.   *See Hanan v. Corso ,* 1999 WL 320858, *12 at fn 7 (D.D.C.1999) (*citing Waldridge v. American Hoechst Corp*., 24 F.3d 918, 920 & n. 2 (7th Cir.1994) (in ruling on summary judgment motions federal courts can consider only evidence that would be admissible)).  Additionally, since Mr. Kasnia's affidavit reflects that the issue concerning his computer arose before he initiated EEO activity, it is not evidence of  retaliatory intent.  Ex.  U. at ¶ 6-10.

**Termination**

Plaintiff does not contend  that the decision makers concerning his termination, the hearing examiner and Ms. Gayle, independently bore any discriminatory or retaliatory animus toward him.   He has failed to present sufficient evidence to rebut defendant's legitimate reasons for their actions and for the actions of Drs. Parham and Thaler.

## CONCLUSION

In this case plaintiff asks the Court to second guess the defendant's evaluation of his work product.   But the Courts are without authority to "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C.Cir.1996).   Plaintiff has failed to present evidence upon which a reasonable jury could find discriminatory or retaliatory motive for the defendant's actions. Therefore, defendant's motion for summary judgment should be granted.

Respectfully submitted,

_____/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/ Rudolph Contreras_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/ Rhonda C. Fields_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KHURSHED A. CHOWDHURY          )
                              )
          Plaintiff,          )
                              )
v.                            )          Civil Action No: 07-0997 (RCL)
                              )
                              )
MIKE JOHANNS, Secretary,      )
United States Department of Agriculture   )
                              )
          Defendant.          )
                              )

DECLARATION OF DELILA PARHAM

I, DELILA PARHAM hereby state as follows:

1. As is reflected in my December 20, 2004, memorandum to Dr. Chowdhury, concerning his unacceptable mid-year performance rating, by the end of 2004 it was apparent that Dr. Chowdhury's performance had deteriorated from not very good to an unacceptable level. In addition to being untimely on his assignments, being argumentative with his supervisor, and the need for substantial revisions to his work, he had not done any work on two assignments that I had given to him, without even telling me. He finally did turn in written work on the Columbia and Thailand reviews. But, he did so only after I told him that regardless of what someone else might have told him, written papers were required for use by our branch so that we would have a record of what our position had been for future reference in order to attempt to maintain consistent positions should an issue arise again.

2. Following our mid-year discussion, Dr. Chowdhury assured me that he would begin working on the toxoplasmosis assignment when he returned from vacation at the end of January

1

2005.

3.  After Dr. Chowdhury returned from vacation, he gave me written work plans in February 2005 for the toxoplasmosis paper. The written work plans set forth two areas that might be pursued: (a) investigation of the status of developing a rapid test for *Toxoplasma gondii* at the slaughter plant, and (b) a literature review relating to prevalence of *T. gondii* infections in meat and poultry products. I discussed these proposals with Dr. Chowdhury. I told him to find out how much information was available on rapid tests and that he should be able to do a paper on that within a month. I also told him to conduct an initial literature review to assist him in developing an approach or thesis for his paper. After he submitted another written work plan, I had further discussion with him. I told Dr. Chowdhury that he would not likely be able to do a study. This was because a study would have required a collaborator who could provide him with study results. I told him that it would be more feasible for him to do a literature review and pursue the second topic (b) or some aspect of it such as investigating the prevalence of *T. gondii* infections in the U.S. meat and poultry raw products in the slaughter plants, and assessing risk of eating U.S. meat products (namely pork and poultry meat), and economic impact and public health burden of foodborne toxo infections. From these conversations, it was my clear impression that Dr. Chowdhury would be engaged in researching the literature on *Toxoplasma* to start preparing his paper.

4.  In July 2005 before he went on vacation, I asked Dr. Chowdhury to give me an update on what he had been doing with toxoplasmosis. I was dismayed by his response that he had not done any work on the toxoplasmosis paper, but that he assumed it had been replaced by the Thinking Paper, which I also had assigned to him. This excuse was totally unacceptable. I had

2

stressed to him in December 2004 that he must do the toxoplasmosis paper. He had had this

project since 2003, and he had even selected the topic himself. In December, I had informed him

that part of the reason his performance was unacceptable was that he was not communicating

with me and keeping me apprised of what he was doing. Yet, he claimed he stopped working on

toxoplasmosis on an assumption without even seeking clarification from me. Additionally, he

claimed that he had incorporated toxoplasmosis into the Thinking Paper. But, the Thinking

Paper did not reflect that any extensive literature reviews had been done. Only two references

concerning toxoplasmosis were cited. So, even after our discussion in December and the mid-

year appraisal memorandum that had been given to him, Dr. Chowdhury again had done no work

during the rating period on toxoplasmosis other than the work plans.

     5. I did not give Dr. Chowdhury a rating of record following June 30, 2005, which was

the end of the performance appraisal period for 2004-2005. I had been consulting with my

supervisor and the agency's human resources office about placing Dr. Chowdhury on a

Performance Improvement Plan (PIP). I was advised that I could tell Dr. Chowdhury that he

would not be receiving a rating of record, but that since I had evaluated his performance as

unsatisfactory he was going to be placed on a PIP. I verbally informed him of this on August 9,

2005. I issued to him the memorandum dated August 16, 2005, which officially placed him on

the PIP.

     6. One of the assignments, which Dr. Chowdhury was given under the PIP, was to

prepare a paper pertaining to five *Salmonella* serotypes (serovars). Prior to the PIP, Deputy

Administrator Lange had assigned my branch to give him information about the top 20

*Salmonella* serotypes in young chickens. I assigned Dr. Chowdhury to prepare a brief statement

3

(paragraph) on each of the young chicken serotypes on a list given to him. He was to indicate the

reservoirs, commonality, public health significance, and other pertinent facts relating to each

serovar. I told him that the paper must include references. Dr. Chowdhury responded to me that

he could not find anything called "description" of serotypes separately. He seemed to think he

should be able to find one textbook or other reference that would have the requested information

already collected for him. I told him that he would have to conduct research of the literature and

try to get the information requested. Dr. Chowdhury persisted in complaining that there was no

"description" of the serovars in any single reference and that the task was impossible based on

discussions he had with microbiologists. I should not have had to, but did explain to Dr.

Chowdhury that we did not want a paper from a technical microbiology point of view, but from a

public health perspective and in keeping with the agency's mission. [If Mr. Lange had wanted a

microbiology-focused paper, he would have asked the Microbiology Division to do the report.] I

told Dr. Chowdhury that he might have gotten the response from microbiologists, which he

reported, because he had not explained to them what I actually had requested. It appeared that he

wanted to be able to just cut and past the information from a textbook. I agreed with Dr.

Chowdhury that there probably was no single reference that had compiled the information

requested and that he would actually have to research the literature regarding the 20 *Salmonella*

serotypes. I told him that as a start he should "google" the serotypes using the search engines

available and then do a literature review on them from outside sources as well as using agency

materials. The work product that he submitted was not acceptable. I told him that the information

supplied concerning each serotype was not sufficient and that the submission was not

substantive. His July 2005 submissions on the serotypes and his initial submission of the

4

zoonoses report under the PIP are examples of the type of work he submitted, which I described as not good and requiring revisions.

7. I asked each of the Veterinary Medical Officers (VMOs) in my branch to be responsible for different subject matter areas and to become in effect the branch "expert" on the topic. I also asked each VMO to prepare a paper for peer review. This was later qualified as a requirement to write a paper of peer review quality. Drs. Anandaraman and Harmon prepared peer review articles for publication. Dr. Qureshi did not prepare a peer review paper. He only joined the staff in 2004. He had been working in the field as an inspector. He was not asked to do a peer review paper when he started with the branch because of his newness to the branch and the change in the type of work he was doing. He needed time to transition into this position with different duties. Dr. Chowdhury had been with the Zoonoses Branch since 2001 when it was established and with the Division since the mid 1990s. He had agreed to do a paper on toxoplasmosis beginning in 2003.

8. I have no reason to believe that Deputy Administrator Lange, Dr. Hemphill, Dr. Walker, or Ms. Pritchard were not qualified to give me an assessment of the work done by Dr. Chowdhury. They were asked to give us their independent assessment of Dr. Chowdhury's work, so that there would be an independent perspective.

9. Deputy Administrator Lange was my superior and had requested the *Salmonella* serotype report. He represented the agency on issues pertaining to *Salmonella* as well as other matters. One of the responsibilities of my branch was to report to him and to prepare papers for and answer questions posed to us by Deputy Administrator Lange on public health issues. As my superior, he evaluated whether or not the work of my branch and its employees met the

expectations of the agency.

10.   Ms. Pritchard was the editor/writer for OPHS. She was responsible for reviewing papers for publication generated within OPHS; that was part of her job. The agency had assigned her that responsibility to review papers and she had reviewed papers for publication of other individuals before she was asked to review Dr. Chowdhury's paper.

11.   Dr. Hemphill was a branch chief just like me. He was the Chief of the Animal and Egg Production Food Safety Branch. He served on the National Pork Board Toxoplasma/ Trichina Committee and thus was knowledgeable about toxoplasmosis.

12.   Dr. Harry Walker was the Chief of the Residue Branch.

13.   I did not recommend that Dr. Chowdhury receive any award. The agency gave a group award for work previously done on BSE. Since Dr. Chowdhury was a part of the group that had worked on BSE, he was included in the award. I was not asked to assess his individual performance regarding the group award.

14.   Three people from my branch, Dr. Harmon, Dr. Salamone, and Dr. Chowdhury were assigned to work on BSE. When assignments came in on the topic, they were made lead on a rotating basis. That meant that the lead was responsible for coordinating a response from among the group and preparing the report. If anyone among that group were considered to truly be an expert on BSE, it would be Dr. Harmon, who prepared a peer review article on BSE.

15.   Dr. Chowdhury did do work on BSE during the 2004-2005 rating period. Dr. Chowdhury and the other VMOs had done a lot of work previously pertaining to BSE because it had been a hot topic when instances of mad cow disease began being reported. Some of the work involved quick turn around responses. Some of the work merely required Dr. Chowdhury to

6

review documents and comment on them with little to no research being required. Some of the work required refinement or further clarification of issues relating to research done previously. The reports were generally no more than a few pages long. The work Dr. Chowdhury was doing on BSE during the period at issue should not have taken all of his time. I estimate that it should have taken no more than 35% of the time of a competent GS-13 VMO. During the remainder of his time, Dr. Chowdhury was required to do other assignments given to him by me. This included working on toxoplasmosis and doing the Columbia and Thailand reviews and doing the Thinking Paper.

16. The mission of my Division is not just to be reactive, but also to be proactive and have a knowledge base about emerging zoonotic issues as they pertain to public health. That is why I tasked my staff to develop a knowledge base and expertise in one or more issues. Their research and the papers generated from that research create a bank of knowledge to which we can refer as issues on those topics arise without having to start research from scratch each time.

17. When I use the term "research" as it pertains to the Zoonoses Branch, I do not mean bench research or field research. VMOs in the Zoonoses Branch research agency studies and papers and scientific literature, including textbooks, journal articles, meeting abstracts, papers, and proceedings, and third party studies, etc. This is sometimes called literature reviews. It is similar to research done by lawyers in researching legal issues by finding pertinent cases, statutes, law review articles, etc. and then analyzing the information found. Dr. Chowdhury was never required by me to do bench research. He was required to research scientific literature and do analysis based on that research as is required by his position description and performance standards.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _11 th_ day of July, 2008

Delila Parham