UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KHURSHED A. CHOWDHURY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 07-0997 (RCL) |
| v. ) | |
| ) | |
| ED SCHAFER, Secretary ) | |
| United States Department of Agriculture ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

Defendant Ed Schafer[1] ("Schafer"), Secretary of Agriculture, has moved [17] for summary judgment in his favor in this employment discrimination suit. The Court has considered the parties' filings, the entire record herein, and the applicable law. For the reasons explained below, defendant's motion shall be GRANTED.

## BACKGROUND[2]

Plaintiff Khurshed A. Chowdhury ("Chowdhury") worked for the Department of Agriculture ("DOA") as a Veterinary Medical Officer ("VMO") assigned to what became the Zoonoses Disease and Residue Surveillance Division in the Office of Public Health/Food Safety and Inspection Service. (Compl. ¶ 14.) The position description indicated:

The primary purpose of this position is to investigate and study potential meat and

---

[1] Plaintiff originally named then-Acting Secretary of Agriculture Mike Johanns, in his official capacity. The Senate confirmed Ed Schafer as Secretary of Agriculture on January 28, 2008, at which time he replaced Mike Johanns as the official defendant in this action, pursuant to Fed.R.Civ.P. 25(d).

[2] Unless specifically indicated, the parties do not dispute the facts set out herein.

poultry bourne enteric disease; determine and document their cause and extent; and, develop sound scientific, factually supported recommendations to correct and prevent such conditions. The incumbent's investigation, analysis, conclusions, and recommendations may have an immediate impact on food hygiene programs, which affect the public's health.

The planning, evaluation, and recommendations contribute to the success of the Agency's efforts in surveillance, information gathering, and detection of food borne pathogens . . . . Problems solved are extremely difficult in nature and the results have a significant impact on program direction.

(Def. Statement of Mat. Facts ¶ 3.) Further, "[T]he incumbent must be flexible, enterprising, and expedient in utilizing the full range of professional abilities. There are high requirements for good judgment and ability to conceptualize." (*Id.*)

From 1991 to 2004, Chowdhury consistently received fully satisfactory to superior performance evaluations. (Chowdhury Aff. ¶ 13.) Beginning in about March 2001, however, some supervisors had concerns with Chowdhury's performance. Specifically, Dr. Delila Parham, Chowdhury's front line supervisor, noted that "[h]e did not meet deadlines and when he provided work it nearly always had to be rewritten. I would have to send it back to him several times before his work was satisfactory and then eventually I had to do it myself." (Parham Aff. p. 51 ¶ 15.)

In a mid-year appraisal in December 2004, Chowdhury was verbally told that his performance was inadequate. (*Id.* ¶ 16.) Following this, Chowdhury was given a memorandum outlining the reasons why his performance had been found to be unacceptable. (Def. Statement of Mat. Facts ¶ 9.) In August 2005, Dr. Chowdhury received a notice of unacceptable performance and was advised that he would be placed on a Performance Improvement Plan ("PIP"). (*Id.* ¶ 13.) The PIP set forth two examples of Chowdhury's continued unacceptable

performance, under the critical elements of Mission Support and Research and Analysis and the non-critical element of Communications, citing his work on a "Thinking Paper" and on the "toxoplasmosis paper." (*Id.* ¶¶ 18-20.)  Prior to the PIP, Chowdhury contends that these elements were non-critical and therefore he should not have been given an unacceptable rating pursuant to DOA evaluation policy. (*See* Pl. Opp'n at 23.)

        A.        **Performance on the Thinking Paper**

In February 2005, Dr. Parham assigned Chowdhury to prepare a "Thinking Paper" setting forth suggestions for future work the Zoonoses Branch should undertake.  On March 16, 2005, plaintiff sent Dr. Parham a two page document listing what he described as the four most common food borne pathogens and suggesting that the branch investigate their risk profiles. (Def. Mo. for Summ. J. TP 3/16/05 Attach.)  Chowdhury's supervisors told him that the document was inadequate because it contained approximately seven sentences discussing one of the pathogens and no discussion of the others and lacked any references. (*See id.*)  Four months later, Chowdhury sent a final eleven page draft of the paper which discussed the four pathogens, one of which was Toxoplasmosis. (Def. Mo. for Summ. J. TP 7/19/05 Attach.)   In the final draft, only two references were cited in the four paragraphs devoted to toxoplasmosis. (*Id.*)  The PIP explained that the "Thinking paper" was not well researched, lacked depth and did not provide adequate support for the work suggested; the drafts submitted were not comprehensive, did not provide an adequate analysis of the issues, and did not suggest an ability to design an effective study approach or utilize analytical methods and objectives. (Def. Mo. for Summ. J. PIP Attach.)

        B.        **Performance on the Toxoplasmosis Article**

After Chowdhury allegedly did not complete the toxoplasmosis article after originally being requested to do so, Dr. Parham, Chowdhury's supervisor, requested that Chowdhury create an outline of the work Chowdhury planned to do in order to complete the toxoplasmosis article. Chowdhury estimated he could finish a literature search of Prevalence at Slaughter by the end of December 2005 and produce a final report by the end of March 2006. (Pl. Disc. Resp. 43.) In response, Dr. Parham gave him a revised work plan because she felt that the work could be completed in a much shorter time span. (*Id.* 43.) The revised work plan suggested (A) an investigation of the status of developing a rapid test for T. Gondii at slaughter plants and (B) a literature review to assess the toxoplasma situation in the United States. (*Id.* 46-48.)

After Dr. Parham asked for an update on the toxoplasmosis project, Chowdhury told Dr. Parham that he thought her request for a thinking paper had replaced the toxoplasmosis project. (*Id.* 50.) As a result of this apparent misunderstanding, the two references in four paragraphs to toxoplasmosis in the Thinking Paper reflected the only literature research concerning toxoplasmosis Chowdhury had done in the five month time period. (Def. Mo. for Summ. J. TP 7/19/05 Attach. at 4) Following this incident, the PIP issued to Chowdhury on August, 16, 2005 explained why Dr. Parham believed the toxoplasmosis article was unacceptable in the three elements of Chowdhury's performance requirements. (Def. Statement of Material Facts ¶ 20.)

   **C.**  **Requirements under the PIP**

The PIP gave Chowdhury three tasks to complete successfully in a 90-day period in order to show improvement to the fully successful level - preparation of (1) a Toxoplasmosis paper, (2) a Salmonella Serotype Paper, and (3) Bi-monthly Zoonotic Disease Surveillance reports. (*Id.* ¶ 21.) The PIP also explained how successful completion of these tasks would demonstrate fully

successful work under the applicable performance standards. (Def. Mo. for Summ. J.)  The period of the 90-day PIP began officially on August, 29, 2005 and was scheduled to end on about November 29, 2005.  (*Id.*)

### D.      EEO Settlement

On August 11, 2005, plaintiff had made an informal EEO complaint concerning his unsuccessful performance rating.  (Def. Mo. for Summ. J. At 9.)  A settlement agreement was reached that October that permitted, among other things, the submission of the Salmonella Serotype paper by the end of November 2005 and an extension on the toxoplasmosis article until December 2005.  (Def. Mo for Summ. J. Settlement Agreement Attach.)  In return, Chowdhury agreed to "release, waive and withdraw all concerns, complaints . . . civil against the agency . . . for any concerns arising out of these (or related) employment prior to the signing of the agreement."  (*Id.*)

### E.      Unsatisfactory Rating after PIP

On February 8, 2006, Chowdhury received his final evaluation for July 1, 2004 to June, 30 2005; the rating was unsuccessful. (Def. Statement of Material Facts ¶ 43.)   By memorandum dated February 8, 2006, Dr. Parham advised plaintiff that his performance rating remained at the unsuccessful level because he had failed to complete the PIP successfully.  (*Id.*)  It was determined that Chowdhury had submitted an acceptable final product for the assignment to compile a bimonthly report on zoonotic and emerging diseases, but that the Toxoplasmosis and Samonella Serotypes papers did not meet the fully successful level for the three applicable performance standards.  (*Id.* ¶¶ 44-47.)  As a result, Chowdhury received notice of proposed removal because of unacceptable performance on May 22, 2006.  (*Id.*  ¶ 50.)  Following this, the

Department of Agriculture terminated Chowdhury's employment because it found that at least one critical element of Chowdhury's performance was deficient, and he failed to improve his performance after being given reasonable opportunity to do so.

      **F.**      **E-mail on June 9, 2006**

On June 8, 2006, Dr. Thaler saw a report which had been prepared by Chowdhury during her absence, and which has been sent outside of the branch. (Def. Statement of Material Facts ¶ 55.) After reviewing the report, Dr. Thaler found what she believed to be inaccuracies and misleading information in the report, revised it and resubmitted it to Dr. Holt. (*Id.*) Because of the problems in the way in which the report had been handled, Dr. Thaler sent an e-mail to those who were involved that (1) stated that OIA rather than OPHS should have responded to the question from Peru, (2) stated that the document as submitted was not acceptable, (3) apologized to her boss for a document being sent to him which had not received adequate review, and (4) stated the branch will instruct employees who are acting as the branch chief to not clear documents on sensitive issues until they have been reviewed by at least the branch chief and division director. (*Id.* ¶ 57.)

**DISCUSSION**

      **I.**      **Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial. Fed.R.Civ.P. 56(c). A court must look to the substantive law on which a claim or defense rests to determine whether an issue involves "material" facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is

"genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where "the nonmoving party [] fails[] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. *Id.* at 323. Further, the court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor. *Anderson*, 477 U.S. at 255. This standard is "'very close' to the 'reasonable jury' directed verdict standard," and despite their distinct procedural postures, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

For employment discrimination cases the Supreme Court has established a burden-shifting approach that applies when the plaintiff lacks direct evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This approach, the *McDonnell Douglas* framework, applies to both Title VII and ADEA claims. *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) (citing *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)). To proceed under the *McDonnell Douglas* standard, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case of [race or age] discrimination." *McDonnell Douglas,* 411 U.S. at 802.

On a defendant's motion for summary judgment, however, the Court need not evaluate whether the plaintiff has carried this burden. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). In a Title VII disparate-treatment suit, when an employer asserts a legitimate non-discriminatory reason for the decision, "the district court need not – *and should*

*not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* Instead, the question for the court to answer is: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* Thus, the Court must first determine whether defendant has articulated a legitimate non-discriminatory reason for Chowdhury's non-selection. *See id.*; *McDonnell Douglas*, 411 U.S. at 802. If so, the Court must then examine the evidence to determine whether a reasonable jury could deem this asserted reason mere pretext, designed to conceal intentional race and/or age[3] discrimination and/or retaliation.

## II.     Defendant's Proffered Non-Discriminatory Reason

DOA's explanation for terminating Chowdhury's employment was that his termination was due to his unacceptable performance level and his failure to complete the subsequent performance improvement plan in order to raise his performance to an acceptable level. DOA has presented evidence that Chowdhury's work on the Thinking Paper and toxoplasmosis article was unacceptable. As a result, DOA placed Chowdhury on a performance improvement plan. After Chowdhury was given an opportunity to raise his performance to an acceptable rating, DOA found Chowdhury's work to be unacceptable with respect to at least one critical element. For this reason, DOA made a decision to terminate Chowdhury's employment. DOA has thus

---

[3]Although *Brady* does not expressly indicate that ADEA follows the same framework, this Court as well as other courts in this district have nonetheless applied *Brady*'s rule to age discrimination cases. *See Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 96 n.9 (D.D.C. 2008) (Lamberth, C.J.); *Simpson v. Leavitt*, 557 F. Supp. 2d 118, 126-27 (D.D.C. 2008) (Friedman, J.); *Short v. Chertoff*, 555 F. Supp. 2d 166, 172 (D.D.C. 2008) (Urbina, J.).

presented evidence of a legitimate, non-discriminatory reason for Chowdhury's termination: his performance was unacceptable and after being given a chance to improve, he continued to produce unacceptable work product.

### III.     Plaintiff's Evidence of Discrimination/Retaliation

Because DOA has articulated a legitimate, non-discriminatory reason for Chowdhury's termination, "'the sole remaining issue is discrimination *vel non*.'" *Waterhouse v. District of Columbia*, 298 F.3d 989, 993 (D.C. Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142-43 (2000)).  In order to prove pretext in an employment action, Chowdhury may present *inter alia*: (1) "evidence suggesting the employer treated other employees of a different [age or race] . . . more favorably in the same factual circumstances"; (2) evidence of "changes and inconsistencies in the stated reasons for the adverse action"; (3) evidence that the employer "fail[ed] to follow established procedures or criteria"; or (4) evidence "that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F.3d at 495 n.3.  The Court now turns to the evidence of discrimination or retaliation offered by Chowdhury.

#### A.     Discrimination

Chowdhury argues that a reasonable jury could reject DOA's explanation for his termination on any of several bases.  First, Chowdhury contends that similarly situated employees who were non-Bangladeshis were treated more favorably in similar factual circumstances.  (Pl.'s Opp'n at 18-19.)  Second, Chowdhury contends that DOA failed to follow established procedures or criteria when DOA gave Chowdhury an unacceptable rating based on non-critical elements.  (*Id.* at 22-24.)  Third, Chowdhury contends that the PIP created

impossible goals and was thus designed such that he would fail. (*Id.* at 24-26.) Fourth, Chowdhury contends that even though he may have failed to complete the requirements under the PIP, it would not justify his termination because peer review articles are non-critical elements of his job. (*Id.* at 26-29.) Fifth, and finally, Chowdhury contends that Dr. Thaler is not a credible person and therefore may be lying about her reasons for terminating him. (*Id.* at 29-30.)

First, Chowdhury contends that similarly situated employees who were non-Bangladeshis were treated more favorably in similar factual circumstances. (Pl.'s Opp'n at 18-19.) Specifically, Chowdhury contends that "[t]wo of the employees, Qureshi and Salamone, never wrote individual peer review articles during the performance years." (*Id.* at 19.) Additionally, Salamone stated that he was assigned to write an article, but failed to accomplish the assignment. (*Id.*) Therefore, Chowdhury asserts that DOA treated Salamone, who is non-Bangladeshi, differently by not terminating him for failing to complete a peer review article.

In response, defendant has noted that Qureshi only joined the staff in 2004 after previously working as a field inspector so "[h]e was not asked to do a peer reviewed paper because of his newness to the branch and the change in the type of work he was doing." (Def. Mo. for Summ. J. at 29.) The other similarly situated employees had been treated similarly, though, because Dr. Parham had asked the other VMOs to prepare peer review papers. (*Id.*) Specifically, Neena Anandarama was asked to do a research paper for peer review and she completed the assignment which was later published in February 2004. (*Id.*) In addition, with respect to Salamone, he noted that he was told to write a peer review paper and that "his performance rating went down one level because he had not written a peer-review paper." (*Id.*)

Contrary to Chowdhury's assertions, no reasonable jury could find that DOA's non-

discriminatory reasons were pretext on the grounds that Chowdhury was allegedly treated differently than similarly situated employees. Apart from Chowdhury's accusation that one or two other employees were not required to prepare a peer review paper, Chowdhury offers no evidence of favorable treatment in similar factual circumstances. In fact, DOA offered perfectly reasonable explanations for the alleged disparate treatment, and has also noted that Salamone's rating dropped one level on account of not completing a peer review paper. (Def. Mo. for Summ. J. at 29.) The evidence suggests that these employees were, in fact, treated similarly. Thus, this allegation is insufficient to show that DOA's non-discriminatory reasons were pretext.

Second, Chowdhury contends that DOA failed to follow established procedures or criteria when DOA gave Chowdhury an unacceptable rating based on non-critical elements. (Pl.'s Opp'n at 22-24.) Specifically, Chowdhury claims that "[t]he defendant's rules specifically classified peer review publications, such as the toxoplasmosis article, as non-critical aspects of Dr. Chowdhury's job." (*Id.*) Chowdhury also noted that special projects such as the salmonella reports were non-critical job elements. (*Id.*) Under the PIP, however, Drs. Parham and Thaler changed the classification of the projects from the non-critical element of "communications" to the critical element of "mission support and research analysis." Citing *Betters v. Federal Emergency Management Agency*, 57 M.S.P.R. 405, 410 (1993), Chowdhury contends that this was unlawful because it increased the standards of performance established at the beginning of the appraisal period. (Pl.'s Opp'n at 23.)

In response, DOA argues first that the toxoplasmosis and Thinking Paper were critical elements even before the PIP was created, and second that the DOA acted properly in including the papers as critical elements in the PIP. Due to Chowdhury's position, DOA contends that the

toxoplasmosis article and Thinking Paper were critical to Chowdhury's role at the DOA.  To support this contention, DOA posits that although papers and reports fall under the non-critical element of "Communications", a single task can implicate several performance elements, thus making it proper to consider the papers under the critical elements of Mission Support and Research and Analysis.  Indeed, after Chowdhury argued this point at a termination hearing, the Oral Conference Officer rejected the assertion finding that, due to Chowdhury's position[4], the toxoplasmosis article and Thinking Paper implicated critical elements of the position.[5]

      Putting aside whether the papers were critical elements to begin with, the PIP clearly noted that these papers were to be treated as critical elements.  The PIP stated that "preparation of a paper for publication in a peer-reviewed journal would demonstrate your knowledge and

---

[4] According to the Oral Conference Officer: "Upon reviewing the position description of the Veterinary Medical Officer, GS-0701-13, I found that an incumbent is expected to analyze and evaluate, provide concise, factual, timely written and oral reports of all situations required and/or requested.  Also, the incumbent performs special epidemiological projects concerned with food hygiene, public health, and preventative medicine.  Further, the incumbent researches literature and keeps abreast of advances in the filed of epidemiology and assess potential impacts on program activities."

"Under the 'Knowing Requirement' for the position, the incumbent has a mastery of a diverse range of medical sciences (such as microbiology, bacteriology, pathology, parasitology, immunology, and virology) and a demonstrated mastery in the field of epidemiology and public health, particularly as related to the origin and transmission of food borne pathogens.  The incumbent, among other things, is required to possess the skill to communicate effectively in both oral presentation and writing which includes presenting seminars and publishing articles in professional journals." (Def. Mo. for Summ. J. at 8-9.)

[5] "I find the projects assigned to CHOWDHURY are more closely aligned with Mission Support and Research and Analysis.  Further, it was noted that PARHAM had indicated the projects should be prepared as if they were going to be published for scientific journals, and NOT that he was to prepare for his report for publication in a scientific journal"

"In reviewing the plethora of material submitted, what CHOWDHURY was asked to do falls most closely under critical elements Mission Support, and Research and Analysis." (*Id.* at 9.)

expertise in zoonotic diseases and pathogens and the impact on food safety to address emerging and re-emerging diseases. It would demonstrate your ability to use available reference material and conduct a comprehensive scientific study that would provide recommendations and support analysis and management for specific Agency issues." (Def. Statement of Mat. Facts ¶ 21.) Accordingly, Chowdhury was given full notice that these papers were considered critical elements by the DOA and was given two and half months to improve his performance.

Further, the administrative decision cited by Chowdhury does not establish that DOA acted unlawfully because the administrative decision dealt with a situation in which the PIP was changed so substantially that the employee did not have an actual opportunity to improve his/her performance. *See Betters*, 57 M.S.P.R. at 410. In this instance, the reclassification did not change Chowdhury's standards of performance and the PIP did not deprive Chowdhury of an opportunity to improve. To the contrary, as detailed below, Chowdhury was given 90 days to complete a manageable task. Accordingly, a reasonable jury could not find the treatment of the Thinking Paper and toxoplasmosis article as critical elements of Chowdhury's position in the PIP as proof of discriminatory intent.

Third, Chowdhury contends that the PIP created impossible goals and was thus designed such that he would fail. (Pl.'s Opp'n at 24-26.) Chowdhury contends "[t]o expect someone to prepare an article ready for publication . . . in a matter of a few weeks was not reasonable." (*Id.* at 25.) Chowdhury described the requirements of the PIP as: "Within less than two and a half months, they expected Dr. Chowdhury, on his own, to research and write an article, as well as have it ready in final form to be submitted for peer review publication. This was in addition to the two other assignments he had during that period." (*Id.*)

13

In response, DOA noted that the toxoplasmosis article did not need not be in final publication form, rather "[t]he paper must be well researched with references and it must be free of major errors requiring few edits and revisions." (Def. Statement of Mat. Facts ¶ 21.)  Even under this less strict requirement, Dr. Thaler, believing that the task was manageable, found Chowdhury's work to be insufficient.[6]  Given that Chowdhury was allowed two and a half months to complete the Thinking Paper and toxoplasmosis article, no reasonable jury could find that the PIP was created such that Chowdhury was designed to fail.

Fourth, Chowdhury contends that even though he may have failed to complete the requirements under the PIP, it would not justify his termination because peer review articles are non-critical elements of his job.  (Pl.'s Opp'n at 26-29.)  Chowdhury contends, for a variety of reasons that, "publication of peer review articles, which usually involves original research, has never been an important, much less critical, element of the veterinary medical officer position in OPHS or the zoonoses branch." (*Id.* at 27.) "More importantly, until Dr. Chowdhury, no one was ever fired for not publishing a peer review article." (*Id.*)  Accordingly, because his termination was based on these papers, Chowdhury contends that "[t]his evidence calls into question the *bona fides* of Drs. Thaler's and Parham's classifying the toxoplasmosis article and salmonella

---

[6] Dr. Thaler noted: "I completed my initial review of Dr. Chowdhury's Toxoplasmosis paper.  At a GS-13 level, I expect an initial work product to be ready to review for substance, without making significant basic editing mistakes.  As stated in the PIP letter the paper must be well researched with references and it must be free of major errors requiring few edits and revisions.  A GS-13 level staff officer would be expected to independently determine when to use his professional contacts to assist in review of a paper prior to submitting it to his supervisor.  A GS-13 level staff officer also is expected to prioritize the work to meet quality and timeliness goals.  Dr. Chowdhury informed me that he decided to devote only the 30-day extension of the PIP to writing the Toxoplasmosis paper.  From the perspective of being ready for supervisory review, the paper is disappointing." (Def. Statement of Mat. Facts ¶ 41.)

report as party of the job's critical elements, the failure of which justified termination." (*Id.* at 28.)

DOA contends, however, that both the toxoplasmosis article and the Thinking Paper involved critical elements of the job.[7] As discussed above, both papers related to the critical elements of Research and Analysis and Mission Support. Although the papers are also considered under the non-critical element of Communications, these duties were vital to Chowdhury's position and were properly considered critical to his performance. Indeed, the Mission Support element of goals and activities requires the employee to: "Conduct a comprehensive scientific research and studies to provide recommendations and support the analysis and management of specific Agency issues and the development of policies and programs." (Def. Reply at 11.) More importantly, given the evidence presented by DOA, DOA's decision to treat these papers as relating to the critical elements of the job can hardly be

---

[7] In Dr. Basu's deposition, Dr. Basu was asked about the duties of employees in the zoonosis branch:

> Q   And would you find it exceptional that would be among the performance elements of somebody in the zoonosis branch, that they are expected to do the - not the original research of ARS, but the research in the journals and the literature as part of their job?
> A   To answer that, I expect staff of mine, if I was director, to be able to go and find the answer for me and give me the answer of where - lets say toxoplasmosis for example - where do we stand, where does the world stand - give me an answer for that. Yes, I would expect the person to go to the Internet, go to the publications to find out what the positions are for different countries. I've done that in the past. And when we get it together in a document . . . .
> Q   So that's common?
> A   Sure.

(Basu Dep. at 48-49.)

seen as pretext for discrimination. Accordingly, a reasonable jury could not find that DOA's decision to consider these papers in the critical elements of Research and Analysis and Mission Support as pretext for a discriminatory motive.

Fifth, Chowdhury contends that Dr. Thaler is not a credible person and therefore may be lying about her reasons for terminating him. (Pl.'s Opp'n at 29-30.) Specifically, "Dr. Basu, who is in upper management and has no reason to lie, heard Dr. Thaler make comments indicating that she could manipulate the civil service rules as a way of terminating an employee instead of improve their performance." (*Id.* at 30.) Chowdhury alleges that this is "evidence that she manipulated the process by which she recommended Dr. Chowdhury's termination." (*Id.*)

This statement, however, is hardly evidence of discrimination or retaliation against Chowdhury on account of age or race. Nor does this statement undermine the credibility of Dr. Thaler's statements such that it makes it more likely that Dr. Thaler is disguising a discriminatory motive. Accordingly, no reasonable jury would construe these statements as evidence of discriminatory intent based on age or race.

**B.  Retaliation**

With regards to retaliation, Chowdhury argues that a reasonable jury could reject DOA's explanation for his termination because there is a sufficient temporal link between the filing of his EEO complaint and his poor performance rating. (Pl.'s Opp'n at 21-22.) In addition, Chowdhury offers the e-mail sent on June 9, 2006 which criticizes the work product of Chowdhury as further evidence of retaliation. To establish this claim, Chowdhury cites *Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 888 (8th Cir. 2008), to support the proposition that although the temporal relationship and the adverse action must generally be close, this gap may be

shortened if the plaintiff shows that the employer took escalating adverse and retaliatory action against the employee.

Given DOA's non-discriminatory explanations for the actions complained of, no reasonable jury could find that DOA retaliated against Chowdhury in response to filing an EEO complaint. First, Chowdhury was verbally informed of his poor performance rating a few days before Chowdhury submitted the EEO complaint. (Def. Mo. for Summ. J. at 9.) As a result, the poor performance rating cannot have been in response to Chowdhury's EEO complaint. Second, DOA has offered a perfectly legitimate explanation for the e-mail sent on June 9, 2006: the purpose of the e-mail was to inform those involved what the proper protocol for future communications of that type was. Although the e-mail may have criticized Chowdhury's work, the evidence suggests that the critique was valid. Further, even though the e-mail might have critiqued Chowdhury's work, Chowdhury has not offered any evidence that suggests that the real motive for sending the e-mail was based on retaliation. Thus, Chowdhury has failed to establish that DOA retaliated against him for filing an EEO complain on August 11, 2005.

Consequently, the Court concludes Chowdhury has not "produced sufficient evidence for a reasonable jury to find that [DOA's] asserted non-discriminatory reason [for his termination] was not the actual reason[,] and that [DOA] intentionally discriminated against" him based on his age, race, and/or prior EEO activity. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

## **CONCLUSION**

For the reasons expressed above, the Court finds Chowdhury has failed to present – and the record herein simply does not disclose – any evidence to refute DOA's proffered non-

discriminatory reasons for his termination.  Accordingly, defendant's motion for summary judgment on Chowdhury's race and age discrimination and retaliation claims shall be GRANTED.

A separate order shall issue this day.

SO ORDERED.


Signed by Royce C. Lamberth, Chief Judge, November 26, 2008.